**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| KURDISTAN VICTIMS FUND, A NON-PROFIT 501(c)(3) FOUNDATION, <br>        United States of America <br><br> SHAKHWAN ABDULRAHMAN <br> United States <br><br> SHAKHWAN ABDULRAHMAN <br> United States <br> AS REPRESENTATIVE OF JIHAN TAHA ABDULRAHMAN, DECEASED <br><br> MAKI REVEND <br>        Berlin, Germany; <br><br>                AND <br><br> JOHN DOES 1-5000. <br><br>                        Plaintiffs <br><br> _____v. <br><br> KURDISTAN REGIONAL GOVERNMENT ("KRG"), <br><br>  MASROUR BARZANI, <br>        1532 16th St NW <br>        Washington, DC 20036; <br><br><br> MASOUD BARZANI ("MASOUD"), <br>        1532 16th St NW <br>        Washington, DC 20036; <br>        MASROUR <br>  WAYSI BARZANI, <br>        1532 16th St NW | *Case No.1:24-cv-00278* <br><br><br> CIVIL ACTION <br><br> SECOND AMENDED COMPLAINT FOR VIOLATIONS <br> OF FEDERAL AND INTERNATIONAL LAW <br><br><br> JURY TRIAL DEMANDED |

Washington, DC 20036~~;~~

~~WAYSI BARZANI,~~

~~1532 16th St NW~~

~~Washington, DC 20036;~~

MULLA "BABO" MUSTAFA BARZANI~~,~~

Erbil, Kurdistan, Iraq~~;~~

MUKSI BARZANI

Erbil, Kurdistan, Iraq

JEYRA MOHAMAD KHALED

Erbil, Kurdistan, Iraq

KATJA VRECAR BARZANI

Erbil, Kurdistan, Iraq

AREEN MASROUR BARZANI,

Erbil, Kurdistan, Iraq~~;~~

~~SARWAR PEDAWI,~~

JONATHON~~Erbil, Kurdistan, Iraq;~~

~~LAAWEEN (LAWIN) PEDAWI,~~

~~Dubai;~~

~~KARIM SINJARI,~~

~~Erbil, Kurdistan, Iraq;~~

~~JOHNATHON~~ R. MOORE

New York City and East Hampton, NY

JOE R. REEDER

Washington, DC

VALERIE CUPP

Washington, DC

JULIE MAI SANFORD

Stafford, Virginia

LAURA GEHO HARRIS
    Washington, DC


~~BAYAN SAMI ABDUL RAHMAN,~~
    ~~Erbil, Kurdistan, Iraq;~~

TREEFA AZIZ~~,~~
    1532 16th St NW
    ~~1532 16th St NW~~
    Washington, DC 20036~~;~~

ENTIFADH KAMAL QANBAR
    6062 Burnside Landing Drive
    Burke, Virginia 22015~~;~~

~~ARFAN SALEH OMAR SHERWANI,~~
    ~~Virginia;~~

OMAR S. BARZANI~~,~~
    9716 Windburn Drive
    Plano, TX 75025-5418~~;~~

~~DINDAR ZEBARI,~~
    ~~Erbil, Kurdistan, Iraq;~~

~~AZIZ AHMAD,~~
    ~~Erbil, Kurdistan, Iraq;~~

~~ASHTI HAWRAMI,~~
    ~~London, England, United Kingdom;~~

~~BAZ KARIM AL-BARZANJI~~
    ~~Erbil, Kurdistan, Iraq;~~

~~MAHMOOD KARIM AL-BARZANJI~~
    ~~Erbil, Kurdistan, Iraq;~~
~~GHAFOOR KHOSHNAW~~
    ~~Erbil, Kurdistan Iraq;~~

AMEER SAADALLAH RASHEED
        Erbil, Kurdistan, Iraq;

DASKO SHERWANI
        Washington, DC

HAYMAN QUASSI
        Washington DC

HAMZA SALIM
        Washington DC

KAMAL KIRKUKI,
        Erbil, Kurdistan, Iraq;

JAFAR AMINKI,
        Erbil, Kurdistan, Iraq;

ZAHEEM ALI,
        Erbil, Kurdistan, Iraq;

AZAD BARWARI,
        Erbil, Kurdistan, Iraq;

HOSHYAR ZEBARI,
        Erbil, Kurdistan, Iraq;

SAYRAN SABER MUSTAFA BARZANI,
        Erbil, Kurdistan, Iraq;

LINA BARZANI,
        United States of America;

DILSHAD BARZANI,
        Erbil, Kurdistan, Iraq;

SIRWAN BARZANI,
        Erbil, Kurdistan, Iraq;

NIHAD BARZANI,
        Erbil, Kurdistan, Iraq;

SIDAD BARZANI,
        Erbil, Kurdistan, Iraq;

SIHAD BARZANI
        Erbil, Kurdistan, Iraq;

HIKMAT BAMARNI,
        3875 B Plaza Drive
        Fairfax, VA 22030;

SHIMAL JAWHAR SALIN,
        Kurdistan, Iraq;

NIZAR HANNA NASRI,
        Kurdistan, Iraq;

DILSHAD YOUSEF,
        Erbil, Kurdistan, Iraq;

ISMAT ARGOSHI,
        Erbil, Kurdistan, Iraq;

BARZAN HERSHA or HERISH RASH,
        Kurdistan, Iraq;

AZAD GERMARI,
        Duhok, Kurdistan, Iraq;

"SHALAWO,"
        Address unknown

RABEA BARZANI,
        Erbil, Kurdistan, Iraq;

GHALIB RABEA BARZANI,
        Erbil, Kurdistan, Iraq;

RUBAR S. SANDI,
        9300 Belle Terre Way
        Potomac, MD 20854;

ARFAN SALIH OMER SHERWANI

1532 16th St NW
Washington, DC 20036

HAMZA SALIM
1532 16th St NW
Washington, DC 20036

HIKMET BAMERNI
1532 16th St NW
Washington, DC 20036

HAYMAN HIMAL JAWHAR SALIN,
Kurdistan, Iraq;

DILAL ABBAS,
Kurdistan, Iraq;

AHMAD KURDU NORI,
Nuremberg, Germany

MAHMOOD AGAHA,
Kurdistan, Iraq;

HAMELA GARDI,
Kurdistan, Iraq;

DILSHAD HASSAN NAJAR,
Kurdistan, Iraq

SAAD ALDOSKI
Kurdistan, Iraq

BLEND ALDOSKI
Kurdistan, Iraq

JOSEPH TEICHMEULLER,
Germany;

U.S. PUBLIC OFFICIAL #1,
Erbil, Kurdistan, Iraq;

U.S. PUBLIC OFFICIAL #2,
Erbil, Kurdistan, Iraq;

QUASS
       1532 16th St NW
       Washington, DC 20036

DASKO SHIRWANI
       1532 16th St NW
       Washington, DC 20036

*Defendants.*

## ~~AMENDED COMPLAINT~~

## PRELIMINARY STATEMENT

This is a massive and complex civil action, with expanding claims presenting daily, addressing the totality of circumstances, for compensatory and punitive damages from tortious acts to injure Plaintiffs in deliberate violation and disregard of core principles of state, federal, international law, and treaties that are "Supreme Law of the Land." U.S. Const, art. VI, cl. 2. Expanding evidence comes to Plaintiffs daily. Plaintiffs assert several claims and allege the following tortious acts based genuine issues of material fact, upon the investigation by plaintiff's counsel and investigators, including witness and victim declarations, comprehensive evidentiary review of U.S. Government and United Nations diplomatic communications, unclassified and declassified military and intelligence agency reporting documents, reports, files, and judicial and administrative records, and self-authenticating statements of public office and filings by Defendants and their agents, as well as federal, state, and local regulatory filings and reports, bank and corporate records, and other documents. The Barzani Criminal Enterprise's ("BCE") pattern of abuses and lack of trustworthiness has been documented and catalogued by a litany of governmental, judicial, and investigative actors, including the U.S. government, judicial mechanisms, and numerous civil society organizations. Substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. ⎯This Amended Complaint is filed pursuant to leave of Court subsequent to an agreed dismissal under Federal Rule of Civil Procedure ~~Rule 15 (a)(1)(B);~~8 to simplify the Complaint; and is accompanied by a redline comparison with the Amended Complaint filed May 13, 2024.

2.    Plaints make a clear distinction between the Kurdish people and their disreputable leaders; they are not one and the same.  This civil action is against perpetrators of depraved abuses, as individuals, as natural persons, and does not challenge the Defendants' conduct related to *lawful* functions of their government positions, to hold them accountable and seek relief for victims for injuries caused by and traceable to actions undertaken perfidiously and without or in excess of authority against the Plaintiffs.  The conduct of each Defendant named herein demonstrates a continued pattern of disregard for law and constitutes a global criminal conspiracy of tortious conduct in unlawful and prohibited activities which affect interstate and foreign commerce, for personal gain and private motivation, and could have reasonably foreseen the domestic and international harm to Plaintiffs and that their truly wretched, dehumanizing acts which comprise these innumerable, grave, widespread, and systematic wrongful acts and infringements of rights were harms' proximate cause.

3.    This action is not against a foreign sovereign, imposes no obligation on a foreign government, and criticizes no foreign government policy.  Defendants' tortious acts were not those of the state itself, not part of reasonable, normal, and expected function and existence of a government, not any act of war, nor undertaken within the scope of Defendants' official capacities or in furtherance of the official policies of the Republic of Iraq.  Defendants did not act on behalf of the sovereign.  Defendants have hidden and attempted to hide under the false, deceptive, and legally unmerited cloak of anonymity and/or officialdom.  ~~original complaint~~ None of their tortious actions are legitimate, official, permissible, or lawful acts of a foreign sovereign or any subordinate subdivision or instrumentality thereof.  All defendants are knowing, willing, and active participants, of, and planned, prepared, initiated or executed a tortious act of a criminal enterprise, undertaken by such persons in concert with five or more other persons, to enrich the enterprise, and from which such persons obtained substantial resources to harm Plaintiffs.  The Supreme Court

has unambiguously held liability is limited to natural persons. *Mohamad v. Palestinian Authority,* 566 U.S. 449, 453-456, 132 S.Ct. 1702, 182 L.Ed.2d 720 (2012).

4.     No defendant can point to any statute, decree, order, resolution or comparable evidence or any official policy or officially sanctioned policy of the Republic of Iraq (the foreign sovereign), Kurdistan Regional Government (KRG), any U.S. statute, or any international treaty, convention, or bilateral agreement providing sovereign authorization for any of the tortious actions enumerated herein. "To qualify as official, an act must be imbued with some level of formality, such as the authorization by the foreign sovereign through an official statute, decree, order or resolution." *Kashef v. BNP Paribas S.A.,* 925 F.3d 53, 60 (2d Cir. 2019).

5.     This action is for damages caused by acts committed pursuant to Defendants' wrongs. "The gist of the action is not the conspiracy, but the wrong done by acts in furtherance of the conspiracy." *Halberstam* v. *Welch,* 705 F. 2d 472, 487 (CADC 1983).  All tortious acts were and are in furtherance of the criminal enterprise, conspiracy, and scheme of Defendants, meant to engage in the conduct described herein, and for the purpose of facilitating the commission of the claimed tortious acts which harmed and damaged Plaintiffs internationally and domestically.

6.     The complaint alleges violations of core principles of American law and some of the most serious crimes known to humankind including murder, torture, genocide, and arbitrary detention. *Cf. Sosa v. Alvarez-Machain,* 542 U.S. 692, 732 (2004).  In the present complaint, federal courts in the United States offer the only meaningful forum available to the Plaintiffs to seek enforceable relief for the alleged tortious acts.

7.     Defendants' conduct encompasses torts of the century, and is substantial, unreasonable, intentional, knowing, unlawful, reckless, and willful.  All Defendants' actions were, at the very least, a substantial factor causing significant harm to Plaintiffs.  Defendants are capable of unfathomable evil, and it is impossible to overstate Defendants' culpability and the enormity and

breadth of their tortious scheme and resultant human suffering, injury, and loss.  Plaintiffs have alleged sufficient facts upon which a reasonable jury could find the Defendants liable as claimed. The complaint captures the gravamen of the offenses and alleges copious facts and outrageous fact patterns of a sophisticated murderous global conspiratorial criminal enterprise and tortious offenses against Plaintiffs, containing a common plan and purpose to commit multiple criminal acts, and "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'" and "factual content that allows the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged,"  See *Christopher Eric Fite LLC v. Internal Revenue Service*, Civil Action No. 2016-0728 (D.D.C. 2016), citing *Ashcroft v.* ~~the Standing Order, United States~~*Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556, 570) (citation omitted).

8.      Though not a party to the instant case, the United States of America is a severely harmed victim of Defendants' criminal enterprise.

9.      Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their agents and representatives, in furtherance of the conspiracy and to affect the illegal object thereof, in the District ~~Judge Randolph D. Moss, paragraph 7.~~    of Columbia and elsewhere, did knowingly and intentionally conspire and agree with others, and committed and caused to be committed, among others, the following overt acts to violate certain laws, treaties, and conventions in furtherance of the BCE.  Defendants have participated by deceitful and dishonest means in, facilitated, furthered, controlled, organized, and profited from the violent BCE, and enjoy the proceeds, fruits, and instrumentalities of its crimes including properties in the United States and elsewhere derived from or obtained, directly or indirectly, through the commission of the offenses, and whose members and associates conspired and engaged in acts, in furtherance of the BCE, and the manner and methods used by the Defendants and other members and associates of the

enterprise to further the goals of the enterprise and to achieve its purposes included, but were not limited to, involving murder and attempted murder, extrajudicial execution, enforced disappearances, torture, intimidation, narcotics trafficking, counterfeiting, money laundering, fraud, obstruction of justice, tax fraud, immigration fraud, fraud against the United States Government, illicit sale and delivery of defense articles between sanctioned foreign countries without having received a license or approval from the Department of State, engaged in commercial trade with nations sanctioned by the United States and prohibited by the Directorate of Defense Trade Controls ("DDTC"), conduct with designated terrorist organizations against the interests of the United States, and committed other crimes against the United States and its citizens and its national security interests, and the citizens of Kurdistan, and thereby benefitting by receiving billions of illicit dollars.  Each and every tortious act committed by Defendants engaged in the BCE, under the auspices of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, has provided the means to intentionally cause damage to Plaintiffs.

2.     10.     Plaintiffs do not sue any official in their official capacity. This civil action is instituted to recover damages from the Defendants, jointly and severally, including Barzani family members and family members by marriage, many of whom are kept secret from public view, and others known and unknown and not named as Defendants, who as individuals acted with no lawful basis for the claimed government power and acting in some feigned, artificial, connived, or imitated official capacity of the Defendant Iraqi Kurdistan Regional Government but knowingly lacking objective legal reasonableness or untethered to any statute or law or authorization of legal rules clearly established at times of such unlawful acts, unlawfully conspired, confederated, constituted, and agreed together and with each other to commit heinous offenses against the Plaintiffs and against the United States, in ways made more definite below to violate certain laws, treaties, and conventions, through a coldly efficient with impunity in a widely acknowledged corrupt,

oppressive, violent, kleptocratic regime riddled with rampant systemic corruption.  All of Defendants' actions were outside the scope of legally authorized official duties.

11.    Transnational criminal organizations "are drivers of crime, corruption, violence, and misery." *See Executive Order 13773.*  The BCE (known as a Joint Criminal Enterprise (JCE) in the International Criminal Court), an association-in-fact, is a transnational criminal organization, ~~corruption scheme, and conspiracy of crimes, continuing~~multiyear corruption scheme of tortious acts, mass atrocities, and other abuses against civilians, acts of terrorism, transnational crimes, and immigration fraud, and operating a vast empire of shell corporations, among others, to this day, led by Defendant Masrour Barzani and enabled ~~and aided~~ by their Washington representatives, and which in injuring Plaintiffs and others ~~criminally degrades,~~tortiously desecrates, ~~derides,~~ and violates the "norm of international character accepted by the civilized world."  *See Kiobel v. Royal Dutch Petroleum Co.,* 569 U.S. 108, 133 S. Ct. 1659, 185 L. Ed. 2d 671 (2013).~~*See Kiobel v. Royal Dutch Petroleum Co.,* 569 U.S. 108, 133 S. Ct. 1659, 185 L. Ed. 2d 671 (2013).~~

12.    Corruption reigns supreme in Kurdistan.  The Kurdistan Regional Government ("KRG") is completely and corruptly controlled by Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and Barzani family members lacks all transparency and accountability, and acts as a vertically integrated criminal organization to maximize corrupt profits and use the judiciary to ensure impunity.  KRG and BCE are *unus et idem*, meaning "one and the same".  They are two creatures, but from a practical consideration and for purposes of accountability and culpability there is no operational distinction between them. The connectivity and overlapping network of connections is complex, multi-faceted, simultaneously and unilaterally controlled by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and Barzani family members. Defendants have taken over and repurposed state functions and public resources to earn illicit money – ranging from vast embezzlement in state-controlled enterprises, diversion of state oil resources and other

state assets, to an intricate web of atrocity crimes, murderous cruelty, counterfeiting, money laundering, and fraud – to harm Plaintiffs.

13.     Defendants are not ordinary, and do not stand accused of routine misdeeds.  Their utterly lawless conduct and murderous cruelty, involving moral turpitude so inherently depraved and vile it disrespects and antagonizes societal norms, committed with deliberate and premeditated malice, intent and knowledge, and encompassing the underlying predicate crimes by the BCE -  especially the core crimes of genocide, murder, torture, crimes against humanity and widespread human rights violations, and patterns of "atrocity crimes", have foreseeably and concretely damaged the Plaintiffs.

14.     At all times relevant, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani had the ultimate power, *inter alia*, each having a position of authority to give orders and did regularly issue orders and strategic directions to engage in crimes; to ensure compliance with the orders issued; to discipline any subordinate; and to withdraw them at any time.  Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani engaged in this tortious conduct and were aware of their positions of authority and influence over the physical perpetrators of the crimes. They intended or were aware that the tortious acts would be committed in the ordinary course of events as a result of the implementation of their orders or as a result of their acts or omissions, and each had the intent and knowledge specific to the relevant acts, as set forth hereinafter.

15.     Plaintiffs' causes of action arise under and violate domestic and international law as defined in statute, agreements, declarations, conventions, resolutions, and treaties, and are international and interstate in nature, and impact interstate commerce.  (See Appendix D)

# TABLE OF CONTENTS[1]

Page

PRELIMINARY STATEMENT…………………………………………………………4

NATURE OF THE ACTION…..………………………………………………………4

INTRODUCTION……………………………………………………………………24

THE PARTIES…………………………………………..…………………………31

    A.      Plaintiffs……………………………………………………………31

    B.      Defendants……………………………………………………………32

    C.      Plaintiffs Make No Claim Against Kurdistan Regional Government and
           Kurdistan Democratic Party ……………………………………………36

JURISDICTION AND VENUE………………………………………………………...38

    A.      This Court Has Subject-Matter Jurisdiction…………………..……….....39

    B.      This Court Has Federal Question and Personal Jurisdiction………..…………41

    C.      This Court Has Nexus Jurisdiction……………………………..…………46

    D.      This Court Is Bound by the Law of Nations……………………..…………52

    E.      Defendants Have No Claim to Sovereign Immunity………………………55

    F.      TVPA Provides Liability Even If Defendants' Conduct Was Authorized……...63

    G.      The Act of State Doctrine Does Not Bar Plaintiff's Claims…..………………65

    H.      Defendant Masrour Barzani Explicitly and Implicitly Waived and
           Relinquished Sovereign Immunity…………………………………………...67

    I.      Defendants Violated Existing International Agreements and Treaties…………67

    J.      Plaintiffs Claims Do Not Implicate the Political Question Doctrine……..…...70

    K.      Plaintiffs Are Crime Victims of Defendants' Offenses……………….……72

---

[1] As an assistance and explanation to the Court, Defendants' names are listed where they explicitly directed or participated in tortious criminal conduct. Each act was a contributing part, object, and purpose of the entirety of the BCE tortious criminal conspiracy scheme.

L.    Plaintiffs Satisfy All Requirements of Standing…………………………………...76

M.    John Doe Plaintiffs – Victims Without a Voice – Warrant Pseudonymity ..……83

N.    Forum Non Conveniens………..……………………………………………..……87

**FACTUAL ALLEGATIONS**………………………………………………………………89

**I.    INTRODUCTORY ALLEGATIONS**……………………………………………………89

**II.    BARZANI  CRIMINAL ENTERPRISE ("BCE")**....………………………………………92

A.    BCE Is A  Criminal Enterprise……………………………………………………..94

●  Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, Muksi Barzani, Mulla 'Babo' Mustafa Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani, Areen Masrour Barzani, and Barzani family members, Jonathon S. Moore, Joe R. Reeder, Valerie Cupp, Juli Mai Sanford, Laura Geho Harris, Rubar Sandi, Treefa Aziz, Arfan Saleh Omar Sherwani, Omar S. Barzini, Entifadh Kamal Qanbar, Hamza Salim, Hikmet Bamerni, Hayman Quass, Dasko Shirwani

B.    Defendants' Organization and Operation of the BCE……………………….…..97

●  Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, Muksi Barzani, Mulla 'Babo' Mustafa Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani, Areen Masrour Barzani, and Barzani family members, Jonathon S. Moore, Joe R. Reeder, Valerie Cupp, Juli Mai Sanford, Laura Geho Harris, Rubar Sandi, Treefa Aziz, Arfan Saleh Omar Sherwani, Omar S. Barzini, Entifadh Kamal Qanbar, Hamza Salim, Hikmet Bamerni, Hayman Quass, Dasko Shirwani

C.    BCE Is A Corrupt Regime of Concealment, Disinformation, False Representations, and Defamation……………………………………………….....101

●  Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, Treefa Aziz

D.    BCE Is A Criminal Regime of Self-Enrichment, Fear, Intimidation, and Death………………………………………………………….………....105

●  Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani

E.    Defendants' Enterprise Is A Conspiracy, With Overt Acts to Effect the Object of the Conspiracy………....………………………………………….105

●  Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, Muksi Barzani, Mulla 'Babo' Mustafa Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani, Areen Masrour Barzani, and Barzani family members,

Jonathon S. Moore, Joe R. Reeder, Valerie Cupp, Juli Mai Sanford, Laura Geho Harris, Rubar Sandi, Treefa Aziz, Arfan Saleh Omar Sherwani, Omar S. Barzini, Entifadh Kamal Qanbar, Hamza Salim, Hikmet Bamerni, Hayman Quass, Dasko Shirwani

**III.    DEFENDANTS TORTIOUS ACTS WERE KNOWING AND INTENDED**........109

    A.    Defendants Masoud Barzani,  Masrour  Barzani, and Waysi Barzani Are the Master Criminals of the Criminal Enterprise……………..……………110

        ● Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani ?

    B.    Defendants Acts Constituted Pattern and Practice……………………….....…111

        ● Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani?

    C.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani Exercised Command Responsibility At All Times………………………;;……113

        ● Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani

    D.    Defendants Knowingly and Willfully Violate Law, Treaties, Convention……………………………………………………………...……………..117

        ● Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, Muksi Barzani, Mulla 'Babo" Mustafa Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani, Areen Masrour Barzani, and Barzani family members, Jonathon S. Moore, Joe R. Reeder, Valerie Cupp, Juli Mai Sanford, Laura Geho Harris, Rubar Sandi, Treefa Aziz

    E.    Defendants' Harm to Plaintiffs Was a Foreseeable and Natural Consequence Of Intentions……………………………………………………………...……………118

        ● Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, Muksi Barzani, Mulla 'Babo" Mustafa Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani, Areen Masrour Barzani, and Barzani family members, Jonathon S. Moore, Joe R. Reeder, Valerie Cupp, Juli Mai Sanford, Laura Geho Harris, Rubar Sandi, Treefa Aziz, Arfan Saleh Omar Sherwani, Omar S. Barzini, Entifadh Kamal Qanbar, Hamza Salim, Hikmet Bamerni, Hayman Quass, Dasko Shirwani

**IV.    DEFENDANTS ACTED IN CONCERT WITH AL-QAEDA AND ISLAMIC STATE AS PART OF AL-QAEDA'S AND ISLAMIC STATE'S TRANSNATIONAL TERRORIST CAMPAIGNS TO HARM PLAINTIFFS, AMERICANS AND EXPEL THE UNITED STATES FROM THE MIDDLE EAST**…………………………………………………………………………..118

A.    Defendants Traded With The Enemy and Conspired With And Provided Material Support To Foreign Terrorist Organizations…………………………118

- Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani

B.    Defendants Knowingly Provided Substantial Assistance to Terror…………….122

- Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani

C.    Defendants Knowingly Made Payments to Terrorists…………………………125

- Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani

D.    Defendants' Acts Were Knowing, Intentional, and Facilitated by Washington, DC Counsel, Lobbyists, and Representatives……..………………………….126

- Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, Muksi Barzani, Mulla 'Babo' Mustafa Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani, Areen Masrour Barzani, and Barzani family members, Jonathon S. Moore, Joe R. Reeder, Valerie Cupp, Juli Mai Sanford, Laura Geho Harris, Rubar Sandi, Treefa Aziz, Arfan Saleh Omar Sherwani, Omar S. Barzini, Entifadh Kamal Qanbar, Hamza Salim, Hikmet Bamerni, Hayman Quass, Dasko Shirwani

E.    Defendants' Acts Targeted United States and Plaintiffs…..…………………..127

- Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani

F.    Defendants Shared Classified U.S. National Defense Intelligence with the Enemy……………………………………………………………...………128

- Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani

G.    Defendants' Acts Were Knowing and Intentional……………….……………..130

- Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani

V.    DEFENDANTS' GENOCIDE AGAINST OWN NATIONALS………...…………132

A.    Plaintiffs' Allegations Establish a Genocide of Yazidi in Kurdistan……...……133

- Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani

B.    Defendants' Complicit Acts of Genocide…………..…………………………134

● Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani

C.    Defendants' Acts Constitute Atrocity Crimes……………………………………137

● Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani

D.    Defendants Are Common Enemies of All Mankind and All Nations…………138

Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani

E.    Defendants Acted with Intent to Destroy Religious Minority Group…………141

● Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani

F.    Defendant Masrour Barzani Committed Ethnic Cleansing…..…………..…….143

● Defendant Masrour Barzani

G.    Defendants' Acts of International Terrorism in Extreme Violation of U.S.
       and International Law………………………………………………………….143

● Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani

H.    Defendants Directly Responsible For Over 12,000 Deaths……………..……..145

● Defendants Masoud Barzani and Masrour Barzani

I.    Defendants' Violation of Duty to Prevent and Not Be Complicit in Genocide..150

● Defendants Masoud Barzani and Masrour Barzani

J.    Defendants' Crimes Against Humanity Were Foreseeable
       and Desired Consequences…………………………………………..……….151

● Defendants Masoud Barzani and Masrour Barzani

K.    Defendants Orchestrated Genocide and Collaborated with Foreign Terrorist
       Organizations………………………………………………………………….152

● Defendants Masoud Barzani and Masrour Barzani

VI.    DEFENDANTS' MURDER U.S. GOVERNMENT EMPLOYEES…..…………153

A.    Execution of A U.S. Intelligence Agent……………………………….………153

- Defendants Masrour Barzani, Waysi Barzani

   B.      Execution of U.S. Defense Intelligence Agent…………………….…….…..156

- Defendant Masoud Barzani

**VII.   DEFENDANTS' SANCTIONED MURDER, ASSASSINATION, ENFORCED DISAPPEARANCES, TORTURE, AND OTHER ACTS OF LETHAL CRIMES AGAINST HUMANITY AND PLAINTIFFS**………..……………….…….…...156

   A.      Defendants Murder To Silence Freedom Advocate Schoolteacher Jihan Taha Abdulrahman………………………………………….…….…..157

- Defendants Masrour Barzani, Waysi Barzani

   B.      Defendants Sanctioned and Ordered Torture and Murders……….…………159

- Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani

   C.      Defendants' "Assassins" and Unspeakable Brutality…………………………160

- Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani

   D.      Defendants' Kidnapping and Deliberated Enforced Disappearances…………162

- Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani

   E.      Defendants' Atrocity Crimes and Arbitrary Deprivation of Life………………166

- Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani

   F.      Defendants' Extreme Violation of Human Rights, International Law, and Treaties…………………………………………………………………..170

- Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani

**VIII.  DEFENDANTS' ACTS OF MURDER, ATTEMPTED MURDER, AND TORTURE OF JOURNALISTS AND DISSIDENTS**………………………………………173

   A.      Censorship Scheme to Inflict Severe Physical and Mental Pain and Suffering to Silence Journalists and Political Speech of Dissidents………………………173

- Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani

   B.      BCE Silences Journalists and Dissidents on U.S.-based Electronic Platforms…176

- Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani

C.    BCE Uses Law Enforcement to Silence Journalists and Dissidents................179

- Defendants Masrour Barzani and Waysi Barzani

D.    Defendants Attempted Murder to Silence Plaintiff Maki Revend.................180

- Defendant Masrour Barzani

E.    Defendants Knowingly and Willfully Defame Plaintiff Maki Revend............188

- Defendant Reeder

F.    Defendants Use Kidnapping and Assassination to Silence Journalists.............195

- Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani

(1)    Sardasht Osman Hassan Hamad (Zardasht Osman)...............................196

(2)    Wedat Hussein (Wadat Hussein Ali)........................................................196

(3)    Qaraman Shukri.........................................................................…............197

(4)    Kawa Garmyane (Garmyani)....................................................................197

(5)    Soran Mohammed Aziz.............................................................................198

(6)    Guhdar Zebari............................................................................................198

(7)    Sherwan Sherwani.....................................................................…............199

(8)    Arkan Sharifi..............................................................................................199

VIII.   DEFENDANT MASROUR BARZANI – A UNITED STATES PERSON –
        COMMANDS CIVIL RIGHTS ABUSE OF AMERICAN VICTIMS...............201

A.    Defendant Masrour Barzani's Violence And Lack Of Respect
      For Human Rights to Harm Plaintiffs.......................................................201

- Defendant Masrour Barzani

B,    Defendants Violate Shakhwan Abdulrahman's Constitutional Rights............203

- Defendants Masrour Barzani, Waysi Barzani, Arfan Salih Omer Sherwani,
  Hamza Salim, Hikmet Bamerni, Hayman Quassi, and Dasko Shirwani

B.    Defendants Falsely Imprisonment And Torture American Citizen
      Sidqi Bradosti…………………………………………………………………..211

          ● Defendants Masrour Barzani and Waysi Barzani

C.    Defendants Torture Driver of American Citizen……………..……………….233

          ● Defendants Masrour Barzani and Waysi Barzani

IX.    DEFENDANTS' HUMAN RIGHTS ABUSES, TRANSNATIONAL
       REPRESSION, AND CRIMES AGAINST HUMANITY…………………………234

A.    Defendants' Deliberated Extrajudicial Death Threats, Transnational
      Repression, and Forced Exile of Ayub Barzani……………………………...235

          ● Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani

B.    Defendants' Deliberated Extrajudicial Exile And Attempted Assassination
      of Kamal…………………………………………………………………………242

          ● Defendants Masoud Barzani, Masrour Barzani

C.    Defendants' Deliberated Extrajudicial Exile And Threats To
      Twana Noder Karim……………………………………………………………243

          ● Defendants Masoud Barzani, Masrour Barzani

D.    Defendants' Deliberated Extrajudicial Exile And Threats To Fatah Zaxoiy...…243

          ● Defendants Masoud Barzani, Masrour Barzani

E.    Defendants' Deliberated Extrajudicial Imprisonment And Torture Of
      Rozhgar Rizgar Mohammed Mohyaddin……………………………………...244

          ● Defendants Masoud Barzani, Masrour Barzani

F.    Defendants' Deliberated Extrajudicial Exile And Death Threats To And
      Unlawful Expropriation Of Property Rights of Qasim Omer
      Abdulakdir Bndean…………………………………………………….……….245

          ● Defendants Masrour Barzani, Waysi Barzani

X.    DEFENDANTS HARM PLAINTIFFS AND FINANCE CRIMINALITY BY
      LAUNDERING MONEY INSTRUMENTS AND CONSPIRACY TO
      COMMIT MONEY LAUNDERING..........................................................248

A.    Defendants' Criminal Money Laundering Threatens United States
      National Security And Democracy Itself…………………………….………248

      ● Defendants Masrour Barzani, Waysi Barzani, Muksi Barzani, Mulla 'Babo'
         Mustafa Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani, Areen
         Masrour Barzani, Jonathon S. Moore, Joe R. Reeder, Valerie Cupp, Juli Mai
         Sanford, Laura Geho Harris, Rubar Sandi

B.    Defendants Conspire to Make Dirty Money Appear Clean……….…..……..250

      ● Defendants Masrour Barzani, Waysi Barzani, Muksi Barzani, Mulla
         'Babo" Mustafa Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani,
         Areen Masrour Barzani, Jonathon S. Moore, Joe R. Reeder, Valerie Cupp,
         Juli Mai Sanford, Laura Geho Harris, Rubar Sandi

C.    Defendants are Knowing and Complicit………………………….…….………262

      ● Defendants Masrour Barzani, Waysi Barzani, Muksi Barzani, Mulla
         'Babo" Mustafa Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani,
         Areen Masrour Barzani, Jonathon S. Moore, Joe R. Reeder, Valerie Cupp,
         Juli Mai Sanford, Laura Geho Harris, Rubar Sandi

D.    Defendants' Manner and Means to Defraud………………….…….……….…..264

      ● Defendants Masrour Barzani, Waysi Barzani, Muksi Barzani, Mulla
         'Babo" Mustafa Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani,
         Areen Masrour Barzani, Jonathon S. Moore, Joe R. Reeder, Valerie Cupp,
         Juli Mai Sanford, Laura Geho Harris, Rubar Sandi

E.    Defendant Attorneys Act Corruptly to Launder Money…………………….…..272

      ● Defendants Moore, Reeder, Cupp, Sanford, Harris, Sandi

F.    Defendant Attorneys Acted With Knowledge and Willful Blindness………….278

      ● Defendants Moore, Reeder, Cupp, Sanford, Harris, Sandi

XI.   **DEFENDANTS USE DISHONESTY, FRAUD, AND DECEIT TO HARM
      PLAINTIFFS AND DEFRAUD UNITED STATES OF AMERICA**……...………..282

A.    Defendants Create Multitudinous Sham Corporations…………….………...…284

      ● Defendants Masrour Barzani, Waysi Barzani, Muksi Barzani, Mulla 'Babo'
         Mustafa Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani, Areen
         Masrour Barzani, Jonathon S. Moore, Joe R. Reeder, Valerie Cupp, Juli Mai
         Sanford, Laura Geho Harris, Rubar Sandi

B.      Defendants Defraud Programs Receiving U.S. Federal Funds…………………284

    (1)     Defendants' False Information and Claims to the
           United States Government …………………………………………… 284

        ●   Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani

    (2)     Defendants' Theft of U.S. Federal Funds ……………………….….. 285

        ●   Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani

    (3)     Defendants' Theft of U.S. Foreign Military Assistance and
           Other U.S. Assistance…………………………………………………..286

        ●   Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani

    (4)     Defendants Defraud the U.S. Contracting Process to Harm Plaintiffs… 287

        (a)     Defendants Defraud Small Business Administration and
                 Defense Logistics Agency………………………………………287

               ▪  Defendants Masrour Barzani, Mustafa Barzani, Moore,
                  Cupp

        (b)     Defendants Defraud the Department of Defense………………292

               ▪  Defendants Masoud Barzani, Masrour Barzani, Waysi
                  Barzani

    (5)     Defendants Willfully Violate National Security
           Foreign Agent Registration ……………………………………....294

      ●   Defendants Masoud Barzani, Masrour Barzani, Moore, Aziz, Bamarni,
           Rahman

    (6)     Defendants' International Crimes of Theft …………………………297

        ●   Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani

C.      Defendants' Abusive Criminal Tax Schemes…………………………………..297

        ●   Defendants Masoud Barzani, Masrour Barzani, Mustafa Barzani, Waysi
           Barzani, Qanbar, Omar Barzani

D.      Defendant Entifadh Kamal Qanbar Files False Documents……………………299

24

● Defendants Masrour Barzani and Entifadh Kamal Qanbar

E.      Defendants Masrour Barzani and Omar S. Barzani Fraudulently
        Obstructed Federal Tax Function……………………………………………….303

        ● Defendants Masrour Barzani and Omar S Barzani

F.      Defendant Masrour Barzani Fraudulently Evaded Federal Tax Obligations...…305

        ● Defendants Masrour Barzani, Waysi Barzani, Muksi Barzani, Mulla 'Babo"
          Mustafa Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani, Areen
          Masrour Barzani, Jonathon S. Moore, Joe R. Reeder, Valerie Cupp, Juli Mai
          Sanford, Laura Geho Harris, and Rubar Sandi

G,      Defendant Masrour Barzani Defrauded U.S. Immigration……………………..309

        ● Defendants Masrour Barzani and Rubar Sandi


XII.   DEFENDANTS ORCHESTRATE  GLOBAL COMMERCIAL
       CORRUPTION……………………………………………………………………..314

       A.      Defendants' Widespread Transnational Commercial Corruption………………314

               ● Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani

       B.      Defendants' Counterfeiting of Pharmaceuticals and Cigarettes, Production

               and Distribution of Illicit Drugs……………………………………………………...317

               ● Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani

       C.  Counterfeiting of United States Brand Alcohol……………………….……………..320

               ● Defendants Masoud Barzani, Masrour Barzani

       D.      Defendants' Smuggling of Counterfeit United States Brand Products and
               U.S. Currency……………………………………………………………………….321

               ● Defendants Masoud Barzani, Masrour Barzani

       E.      Defendants' Smuggling of Counterfeit United States Brand Pharmaceuticals
               and Medications…………………………………………………………….………322

               ● Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani

       F.      Defendants Produce and Traffic In Crystal Meth And Cocaine……………...…324

●   Defendant Masrour Barzani

G.     Defendants' Production and Distribution of Counterfeit
U.S. Brand Cigarettes…………………………………………………………..325

●   Defendants Masrour Barzani, Waysi Barzani

**XIII.   HIDING FRUITS OF THE BARZANI CRIMINAL ENTERPRISE**………………327

A.     Defendants Diverted And Concealed Proceeds of Unlawful Activity……...…..327

●   Masoud Barzani, Masrour Barzani, Waysi Barzani, Muksi Barzani, Mulla
'Babo" Mustafa Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani,
Areen Masrour Barzani, and Barzani family members, Jonathon S. Moore,
Joe R. Reeder, Valerie Cupp, Juli Mai Sanford, Laura Geho Harris, Rubar
Sandi, Treefa Aziz, Arfan Saleh Omar Sherwani, Omar S. Barzini,
Entifadh Kamal Qanbar, Hamza Salim, Hikmet Bamerni, Hayman Quass,
Dasko Shirwani

B.     Defendants' Illicit Proceeds Used Finance Harm to Plaintiffs……………...….328

●   Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, Muksi
Barzani, Mulla 'Babo" Mustafa Barzani, Jeyra Mohamad Khaled, Katja
Vrecar Barzani, Areen Masrour Barzani, and Barzani family members,
Jonathon S. Moore, Joe R. Reeder, Valerie Cupp, Juli Mai Sanford, Laura
Geho Harris, Rubar Sandi, Treefa Aziz, Arfan Saleh Omar Sherwani,
Omar S. Barzini, Entifadh Kamal Qanbar, Hamza Salim, Hikmet Bamerni,
Hayman Quass, Dasko Shirwani

C.     The Totality of Defendants' Crimes are Domestically and Internationally
Well-Recognized……………………………………………………………..329

●   Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, Muksi
Barzani, Mulla 'Babo" Mustafa Barzani, Jeyra Mohamad Khaled, Katja
Vrecar Barzani, Areen Masrour Barzani, and Barzani family members,
Jonathon S. Moore, Joe R. Reeder, Valerie Cupp, Juli Mai Sanford, Laura
Geho Harris, Rubar Sandi, Treefa Aziz, Arfan Saleh Omar Sherwani,
Omar S. Barzini, Entifadh Kamal Qanbar, Hamza Salim, Hikmet Bamerni,
Hayman Quass, Dasko Shirwani

**CLAIMS FOR RELIEF**

General Allegations……………….……………………………………………………...330

FIRST CLAIM FOR RELIEF: ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d)
[All Defendants: Aiding-And-Abetting Liability, Attack Predicate]..........................................331

SECOND CLAIM FOR RELIEF:  Torture…………...……………………………………….337

THIRD CLAIM FOR RELIEF:  Crimes Against Humanity……………..…………………….343

FOURTH CLAIM FOR RELIEF:  Cruel, Inhuman, or Degrading Treatment or
Punishment…………………………………………………………………………………....345

FIFTH CLAIM FOR RELIEF:  Extrajudicial Killing…………………………………………348

SIXTH CLAIM FOR RELIEF: Violation of the Duty to Prevent Genocide…………….…….353

SEVENTH CLAIM FOR RELIEF:  Complicity In Genocide ………………………………...355

EIGHTH CLAIM FOR RELIEF:  Wrongful Death - Jihan Taha Abdulrahman……..……......357

NINTH CLAIM FOR RELIEF:  Wrongful Death - Yazidi Genocide Victims………………..358

TENTH CLAIM FOR RELIEF:  Negligent Infliction Of Emotional Distress…………………360

ELEVENTH CLAIM FOR RELIEF: Deprivation of Constitutional Right of American

Citizens………………………………………………………………………………………362

TWELFTH CLAIM FOR RELIEF:  Hate Crimes Against American Citizen………………...367

THIRTEENTH CLAIM FOR RELIEF:  Money Laundering………...……………..…………371

FOURTEENTH CLAIM FOR RELIEF: Conspiracy to Launder Money…………………..…373

FIFTEENTH CLAIM FOR RELIEF: Defamation *Per Se*………………………….………..376


PRAYER FOR RELIEF…………………………………………………….………...........380

JURY DEMAND………………………………………………………………………….381

APPENDICES

APPENDIX A  – DEFENDANTS' MINIMUM STATUTORY VIOLATIONS – PARTIAL

LISTING

APPENDIX B –  DEFENDANTS' SHAM CORPORATIONS – PARTIAL LISTING

APPENDIX C – DEFENDANTS' FOREIGN HOLDING COMPANIES – PARTIAL LISTING

APPENDIX D – INTERNATIONAL TREATIES AND CONVENTIONS VIOLATED – PARTIAL LISTING

## INTRODUCTION

With knowledge as to themselves and otherwise on information and belief, Plaintiffs claim and allege as follows:

### A GLOBAL CRIMINAL ENTERPRISE

16.    All of Plaintiff's injuries are "fairly traceable to the defendant's allegedly unlawful conduct." *Allen v. Wright*, 468 U.S. at 738, 104 S.Ct. 3315 (1984).

17.    The Defendants and others as culpable individuals constituting a criminal association whose members and associates unlawfully conspired and engaged in intentional, knowledgeable, and objectively and subjectively foreseeable related tortious acts in multiple countries and locales including Washington, D.C. and with impunity pursued criminal conduct at the collective level, acted in concert by developing joint enterprises and pursuing their criminal goals together, and their culpability resides at the collective level.

18.    BCE, a criminal organization constituting an enterprise, that is, a group of individuals associated in fact. The Defendants and other members had connections and relationships with one another and with the enterprise. The enterprise constitutes an ongoing organization whose members and associates functioned as a unit for a common purpose of achieving the objectives of the enterprise. The enterprise operated for a sufficient period of time for its members and associated persons to achieve its objectives.

### MANNER AND METHODS OF THE ENTERPRISE

19.    In order to provide substantial money to fund the BCE and pay fees, salaries, and expenses to co-conspirator managers and agents of the BCE engaged in genocide, torture, attempted murder, and murder of Plaintiffs and Plaintiffs' families, and multitudinous other egregious crimes,

including money laundering, Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, Muksi Barzani, Mulla 'Babo' Mustafa Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani, Areen Masrour Barzani, and Barzani family members, Jonathon S. Moore, Joe R. Reeder, Valerie Cupp, Juli Mai Sanford, Laura Geho Harris, Rubar Sandi, Treefa Aziz, Arfan Saleh Omar Sherwani, Omar S. Barzini, Entifadh Kamal Qanbar, Hamza Salim, Hikmet Bamerni, Hayman Quass, Dasko Shirwani, and others, and their co-conspirators and others, knowingly and willfully combined and conspired with and continue to conspire to harm Plaintiffs.

20.    These named Defendants, and others, a force unrestrained by rules or laws and to further their own personal political agenda, and believing themselves to be above the law, and through their unique combination of power and control, placed their own serial tortious and other illegitimate interests, financial enrichment, and political power above the safety of Plaintiffs and United States national security interests.

21.    The innumerable tortious activities of all Defendants, and their agents, associates, representatives, servants, employees, collaborators, co-conspirators, and others known and unknown, which at all times includes Barzani family members and family members by marriage, in BCE, conducted with impunity, and unfailingly as individuals hiding behind the cloak of the authority and contrived protections of their authoritarian government offices and appointments, were undertaken to provide the substantial money and resources needed to cause injury, that was foreseeable, substantial and direct, to the named Plaintiffs herein and the John Doe Plaintiffs.

22.    Defendant Masrour Barzani was and is Prime Minister of KRG, the presiding and actual head of provincial government and head of the executive power, acting in concert with many co-conspirators to achieve a common criminal goal, engaged in and directed predicate offenses of genocide, terrorism, criminal behavior, crimes against humanity, human and civil rights violations, material infraction of treaties, murder and torture, and innumerable tortious acts as part of the

worldwide BCE he directs.  The acts of Defendant Masrour Barzani directly and/or indirectly through agents, representatives, and subordinates cause great bodily and emotional and mental harm to Plaintiffs and other victims including a United States citizen legally in Kurdistan.  These conscious and deliberate acts occurred in Iraq and in the United States, including money laundering, counterfeiting, immigration fraud, defrauding the United States Government, false representations to agencies of the United States and its states, tax crimes, harm to American stockowners, and attacks by Defendant Masrour Barzani's agents against American citizens. Employing unlawful tactics of repression and censorship undermining freedom of expression, bearing striking resemblance to Soviet-era censorship, silencing dissent and instilling fear among critics lest the prevailing public narrative be challenged or scrutinized, the tortious acts of Defendant Masrour Barzani, along with co-conspirators, directly caused severe and unlawful bodily harm and emotional and mental harm, and financial harm, to the Plaintiffs and others.

23. 3.    Defendant Masrour Barzani is considered a strongman who rules by decree, has contemptuous disregard for the rule of law, violates civil rights, suppresses freedom of expression and speech, each a defense against tyranny, suppresses democratic participation, illegally detains and tortures his own citizens and others he deems to be a threat, orders extrajudicial murder, and terrorizes many of Iraq's Kurdish population in Kurdistan and worldwide.  As part of a long and obvious pattern focused first on domestic enemies and then globally, Defendant Marour Barzani and his representatives under his command propagate disinformation, traffic in deception. and engage in information warfare.

24.    All Defendants as individuals engaged in and do engage in unlawful means, each of whom had conduct, knowledge, and intent, and each of whom is aware of the criminal enterprise's contumacious conduct and has some participation in the operation of the enterprise itself, and with orchestrated intent to enrich themselves and further the object of the criminal enterprise, and are

directly responsible for various related heinous ~~criminal activities~~tortious acts, having the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents, knowingly violating basic human principles and international norms including, but not limited to, atrocity crimes; indiscriminate violence; arson; claims for murder; attempted murder; genocide; abduction; hostage taking and kidnapping; torture and other cruel, inhuman, or degrading treatment or punishment; collaboration with terrorist organizations; prolonged arbitrary detention; extrajudicial killing; enforced disappearance; cruel, inhuman, or degrading treatment; crimes against humanity; theft; drug trafficking; counterfeiting; defrauding the United States Government and others; financial crimes; identify theft and access device fraud, mail fraud, wire fraud; laundering of monetary instruments; engaging in transactions with the proceeds of specified unlawful activity; acts involving perjury, false statements and declarations; comprehensive computer data theft and destruction; obstruction of justice; bribery and facilitation payments; deprivation of income and employment; willful concealment of tax data; tax fraud and tax perjury; immigration fraud and immigration perjury; and in violation of the Torture Victim Protection Act of 1991, the Alien Tort Statute of 1789, the Anti-Terrorism Act (ATA), 18 U.S.C. § 2333, as amended by the Justice Against Sponsors of Terrorism Act (JASTA), Pub. L. No. 114-222, § 4(a), 130 Stat. 852, 854 (2016) (codified at 18 U.S.C. § 2333(d)), and other laws and statutes of the United States and the law of nations and international treaties, agreements, and conventions more fully set forth herein; and conspiracy to commit all above ~~criminal~~tortious acts; and did fraudulently and through material misrepresentations gain control for personal enrichment over money that was property of the ~~Defendant Iraqi Kurdistan Regional Government.~~KRG.  Defendants' acts were all carried out with *mens rea* and *actus reus*.

4.   25 Defendants are not ordinary, and do not stand accused of routine misdeeds.  Their crimes are serious violations of U.S. law,   undermine American economic and national security, and provide substantial means for Defendants to torture, murder, and otherwise injure Plaintiffs.

5.    Defendants, as well as others known and unknown, are "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the Barzani Continuing Criminal Enterprise ("BCCE").   The Barzani Continuing Criminal Enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of Defendants, including each of their employees, agents, contractors, servants, and Barzani family members and family members by marriage, and others named and unnamed.

6.    The Barzani Continuing Criminal Enterprise falls within the meaning of 18 U.S.C. § 1961(4) and consists of a group of "persons" associated together for the common purpose of: (i) accumulating wealth for the enterprise's leadership, through both legal and illegal means; (ii) concealing and refusing to report the criminal activity of its members; (iii) preventing its members' victims, including member victims, from reporting crimes to governmental authorities and/or cooperating with governmental authorities; (iv) preventing witnesses of its members' crimes from cooperating with governmental authorities; and (v) engaging in punitive harassment campaigns against perceived enemies, including victims and witnesses who cooperate with governmental authorities.  To achieve their common goals, and to harm Plaintiffs, Defendants hid and do hide the Enterprise's crimes from the public, from governmental authorities, and from Plaintiffs, and prevented or attempted to prevent others, often violently or lethally, including but not limited to Plaintiffs, from approaching governmental authorities regarding Defendants' horrendous crimes.

7.    For two centuries, the United States Supreme Court has affirmed that domestic law of the United States recognizes the law of nations.  See, *e.g.*, *Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 423, 84 S. Ct. 923, 11 L. Ed. 2d 804 (1964)*.  *Sosa v. Alvarez-Machain*, 542 U.S. 692, *at*

*730 (2004)*.  The United States Supreme Court and the Court of Appeals for the District of Columbia have both affirmed, "The Court is bound by the law of nations which is a part of the law of the land."  *THE NEREIDE, BENNETT, MASTER*, 13 U.S. 388, 3 L. Ed. 769 (1815).  Also, *Ali v. Rumsfeld*, 649 F.3d 762 (D.C. Cir. 2011).  Under international law, "every treaty in force is binding upon the parties to it and must be performed by them in good faith."  See *Vienna Convention on the Law of Treaties, Article 26;* and *Vienna Convention on the Law of Treaties between States and International Organizations or between International Organizations.*  A treaty enters into force for a State after, *inter alia*, it has provided its consent to be bound by the treaty.  Treaties, international agreements, and conventions, each entered into by the sovereign Republic of Iraq of which the Defendant Iraqi Kurdistan Regional Government is a subordinate system and institution, and intergovernmental organizations like the United Nations, are all examples of public international law knowingly, willfully, repeatedly, and contemptuously violated, disobeyed, and dishonored by Defendants to harm Plaintiffs.

8.    The complained of acts occurred at a time when Defendant Masoud Barzani was President of the Defendant Iraqi Kurdistan Regional Government, and after; when Defendant Masrour Barzani was General Director of the KRG Security Protection Agency and formerly Director of the Intelligence and Security Agency (the successor agency to Parastin) and later the first Chancellor of the Iraqi KRG's Security Council, and subsequently and at present time is the Prime Minister of Iraqi Kurdistan, the presiding and actual head of government and head of the responsible executive power, and a United States person for the entire period of the criminal enterprise; and when Defendant Waysi Barzani was, and before, and continues as the Director of the Iraqi KRG Intelligence and Security Agency, and Director General of Counter Terrorism (CTD), a part of the Iraqi Kurdistan Region Security Council (KRSC) and a unit of the Iraqi Kurdistan Regional Government — a provincial government deliberately operated by Defendants

as a government of men and not a government of laws, with powers both devolved from the federal national Iraq state and self-ascribed, and offices which Defendants have used and do use as an instrument of crime. "[C]riminal conduct is not part of the necessary functions performed by public officials." See *United States v. Isaacs*, 493 F.2d 1124, 1144 (7th Cir. 1974). That is especially so when the willful acts of substantive crimes, fraudulent behavior, policies of deception, perpetual lawlessness, placing Defendants' financial self-interest, profiteering, and corruption on a grand scale above the public welfare, and imperious perversion of the administration of justice—all rooted in Defendants' self-serving ethos—require criminal intent, as have Defendants' tortious acts to injure Plaintiffs.

9.      It is impossible to overstate Defendants' extreme culpability. As but one example, Defendants engaged in depraved acts of deliberate indifference in effectively offering up their ~~Iraqi~~ Kurdish countrymen as human sacrifices to a designated terrorist organization. Transacting quantitatively significant business with terrorists at the cost of innocent human lives, while repugnant to most, was and is business as usual for the Barzani regime in ~~Iraqi~~ Kurdistan, where Defendants by dissembling have continually avoided and evaded responsibility for their ~~crimes.~~unlawful acts. Plaintiffs have each been ~~directly and~~ concretely harmed by the Defendants' egregiously unlawful conduct, scheme, and criminal conspiracy, not by mistake or accident, and by Kurdistan courts ~~lacking and~~ absent the judicial guarantees ~~which are~~ recognized by ~~the District Court of the District of Columbia~~this court as "*indispensable by civilized peoples*." See *Cabrera v. Islamic Republic of Iran*, Civil Action No. 19-3835 (JDB) (D.C. Jan. 27, 2023).

10.      At all times, Defendants, a force unrestrained by rules or laws, to further their own personal political agenda, and believing themselves to be above the law, placed their own serial criminal and other illegitimate interests, financial enrichment, and political power above the national security interests of the United States, the safety of American lives and others in the Middle East,

including Plaintiffs, and the governmental interests of and political, economic, and security conditions conducive to a peaceful Kurdish civil society, democracy, and modern state advancing the interests, ideals, and aspirations of all Kurdish citizens.

1126. Plaintiffs claim herein that Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani. "By knowingly providing substantial assistance," (*See Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 210 (D.C. Cir. 2022), Defendants' conduct knowingly supported Islamic State's violent global terrorist campaign and acts against Americans in Iraq, Afghanistan, and Syria. Defendants' conduct knowingly translated directly into substantial numbers of terrorists, weapons, and bombs that the Islamic State and the Islamic Revolutionary Guard Corps (IRGC) (two groups formerly identified as complicit with Hamas, officially the Islamic Resistance Movement, in the massacre of Americans and others in Israel in October, 2023, including beheading of babies and the use of inhuman and barbaric sexual violence against women and children. The founding Hamas Covenant spells out clearly Hamas's genocidal intentions, and is branded by the United States as "a genocidal terrorist organization, worse than ISIS", and in which Iran "was complicit". Hamas' violent nature has been noted in several federal court decisions. See *In re Abu Marzook,* 924 F.Supp. 565 (S.D.N.Y. 1996) (recounting numerous incidents of Hamas terrorism against civilians in the Mideast), *U.S. v. One 1997 E35 Ford Van,* 50 F.Supp.2d 789 (N.D.Ill.1999) (describing Hamas' covert financial transactions in the U.S.), (D.D.C. 2000), *Eisenfeld v. Islamic Republic of Iran,* 172 F.Supp.2d 1 (D.D.C.2000), *Mousa v. Islamic Republic of Iran,* 238 F.Supp.2d 1 (2001), *Weinstein v. Islamic Republic of Iran,* 184 F.Supp.2d 13 (D.D.C.2002), and used to harm Plaintiffs and to kill and injure Americans in Iraq, Afghanistan, and Syria. Terrorist sponsors' material support can be a substantial factor in a given terrorist attack even without a direct link between the support and the particular attack at issue. See, e.g., *Sotloff v. Syrian Arab Republic*, 525 F. Supp. 3d 121, 139 (D.D.C. 2021). As the District Court of the

District of Columbia noted, the Islamic Revolutionary Guard Corps ("IRGC") is "the primary driver of Iran's terror activities." See *Cabrera v. Islamic Republic of Iran*, Civil Action No. 19-3835 (JDB) (D.C. July 19, 2022). IRGC, also called Sepah or Pasdaran, is a multi-service primary branch of the Iranian Armed Forces, performs government functions for Iran, and is an instrumentality of that government.

12. The Circuit Court for the District of Columbia held that "defendant[s] must be generally aware of [their] role as part of an overall illegal or tortious activity at the time [they] provide assistance." (See *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 210 (D.C. Cir. 2022). "There is no specific intent requirement." *Id.* at 221. A "defendant need not be generally aware of its role in the specific act that caused the plaintiff's injury; instead, it must be generally aware of its role in an overall illegal activity from which the act that caused the plaintiff's injury was *foreseeable*," whether Defendant gave assistance "indirectly or indirectly," *Id.* at 221, and over a significant duration." *Id* at 224. (See *Honickman,* 6 F.4th at 496 (emphasis in original) (citing *Halberstam,* 705 F.2d at 477, 488). Through abundant classified and highly informative U.S. and Allied intelligence provided by U.S. government agents and officials to the leadership of the Iraqi Kurdistan Regional Government and its predecessors in Peshmerga, including Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and others, and the guidance of their retained Washington D.C. counsel, lobbyists, and representatives acting within the scope of their employment or office, and widely circulated media reports, and public designations of these organizations as foreign terrorist organizations, Defendants were appreciably and unambiguously more than "generally aware" they were engaged in illegal activity, and were knowledgeable of public, classified, and unclassified U.S. Government and United Nations reports extensively documenting both the Iranian Government's role in terrorism against America and American interests and the primary mission of IRGC, ISIS, and Hamas to engage in terrorist acts. At all

times relevant, Defendants retained legal counsel, lobbyists, and compensated staff representatives in Washington D.C. to provide legal, national and economic security information, contemporaneous executive branch policy guidance, and legislative policy guidance.  Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and other subordinates, held and do hold frequent and documented informative briefings and consultations with U.S. Government officials, including senior officers of the U.S. Departments of State and Defense and other federal departments and agencies and the National Security Council staff, of the U.S. military and intelligence services, of the U.S. Embassy in Iraq, including the United States Ambassador, of the U.S. Consulate in Erbil, and even with the President of the United States and other officials of the Executive Office of the President, and with Members of Congress and their staffs.

13.     Defendant Masrour Barzani's awareness of Defendants' criminality and illegal activity immeasurably exceeds "generally aware."  He is American educated and appreciably informed and knows Defendants were engaged in illegal activity.  He holds a bachelor's degree with honors in International Studies and a master's degree in Peace and Conflict Resolution from a prestigious Washington D.C. university, is the recipient of countless documented U.S. Government policy, intelligence, and law briefings from high-level United States government officials, including classified briefings of and access to detailed national security intelligence and sensitive national defense information by the agencies that comprise the United States Intelligence Community and the United States Departments of State and Defense, and the laws, rules, and agreements governing its usage, and has knowledge, skill, experience, training, and education beyond the ordinary lay person about U.S. law and policy.  Defendant Masrour Barzani is a "United States Person", as defined in 18 U.S.C. § 2331(2) and 8 U.S.C. § 1101(a)(22), "a person who, though not a citizen of the United States, owes permanent allegiance to the United States"  and yet through his willful, knowing, and abundant criminal and tortious acts has shown no

allegiance to the United States. Defendants Masoud Barzani, Waysi Barzani, and other co-conspirators are also recipients of countless documented U.S. Government policy, intelligence, and law briefings and sensitive information. Numerous public declaration filings by Defendant Iraqi Kurdistan Regional Government with agencies of the U.S. Government also affirm Defendants received substantial continuing legal guidance and assistance from representatives and former senior U.S. Government officials of the United States.

14. The United States Congress specifically excluded so designated foreign terrorist organizations from the definition of "military force," 18 U.S.C. § 2331(4), (6), and none of the Defendants' criminal and conspiratorial acts were or are acts-of-war.

15. "Terrorism is the modern-day equivalent of the bubonic plague: it is an existential threat." *U.S. v. Mehanna, 735 F.3d 32, at 40 (1st Cir.* 2013). Plaintiffs separately claim elsewhere herein that Defendants be held directly liable for acts of international terrorism they did not merely aid, but themselves committed, and were "a substantial factor in the sequence of events that led to [Plaintiffs'] injuries and that those injuries" were "reasonably foreseeable or anticipated as a natural consequence of [defendants'] conduct." (See *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 226(D.C. Cir. 2022) (quoting *Owens v. Republic of Sudan* (Owens III), 864 F.3rd 751, 794, (D.C. Cir. 2017).

16. Defendants' conduct occurred against the backdrop of several decades of al-Qaeda, Islamic State, and IRGC history as a globalized terrorist campaign in which such designated foreign terrorist organizations needed Defendants' money to kill and injure Americans, and to affect such conduct by mass destruction, assassination, and kidnapping to achieve violent political ends and further the Barzani Continuing Criminal Enterprise. Defendants knew they were dealing with al-Qaeda, al-Qaeda in Iraq, the Islamic State, and IRGC because the people and entities that Defendants interacted with held themselves out as representatives of these terrorist organizations,

39

~~and concealed their actions in part because they knew the U.S. and other governments considered such actions to be illegal.~~

~~17~~27.        The Court of Appeals for the District of Columbia Circuit characterized and defined torturer: "[F]or purposes of civil liability, the torturer has become – like the pirate and slave trader before him – *hostis humani generis,* an enemy of all mankind" (See *Tel-Oren* v. *Libyan Arab Republic,* 726 F. 2d 774 (CADC 1984)).  Applying the definition given by the Court of Appeals, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents and representatives ~~including Barzani family members and family members by marriage, as torturers are~~, are torturers, and each "an enemy of all mankind."

~~18~~28.        The ~~United States~~ Supreme Court declared, "We think courts should require any claim based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms we have recognized." (See *Sosa v. Alvarez-Machain*, 542 U.S. 692, 124 S. Ct. 2739, 159 L. Ed. 2d 718 (2004)).  Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, their co-conspirator agents, representatives, servants, collaborators, and co-conspirators, ~~including Barzani family members and family members by marriage,~~ have, in their unbridled pursuit of power and their expansive illicit transnational ~~Continuing~~tortious criminal enterprise, and unfailingly hiding behind the cloak of the authority and misapplied protections of their authoritarian government offices, and lacking legal reasonableness, and exceeding the outer limits of lawful authority of any ~~official KRG office~~sovereign, consistently, knowingly, and willfully failed to comport with and did act in contravention and abuse of "a norm of international character accepted by the civilized world" and the law of nations.

~~19~~29.        Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani acted in concert with and exercised command responsibility over other subordinate members of the ~~Defendant Iraqi~~

Kurdistan Regional Government and the indistinguishably complementary Kurdistan Democratic Party ("KDP") political organizationBCE, which these Defendants simultaneously controlled and directed, to plan, carry out, and cover up the genocide, extrajudicial killing, extrajudicial exile, hostage taking and kidnapping, enforced disappearance, and torture of and other grievous crimesacts against the Plaintiffs.  Further, Defendants failed to prevent or punish the violations of international law, Iraq law, Kurdistan law, United States law, and international treaties, agreements, and conventions committed by their subservient subordinates, agents, and representatives, including the Barzani family members.  Defendants Masoud Barzani, Masrour Barzani, and members of the family by marriage.Waysi Barzani bear direct responsibility for their role in these many acts and bear responsibility for conspiring with and/or aiding or abetting their subordinates to commit these tortious acts.  Under international law, Iraq law, Kurdistan law, and United States law, all Defendants are liable to Plaintiffs for the injuries Plaintiffs suffered.

20.    "It is undisputed that genocide itself is a violation of international law."  See, e.g., *Tel-Oren v. Libyan Arab Republic,* 726 F.2d 774, 791 n. 20 (D.C.Cir. 1984) (Edwards, J., concurring); *accord Abelesz,* 692 F.3d at 675-76 (collecting authority).

21.    The Court of Appeals of the District of Columbia Circuit "adopted the definition of genocide set forth in the Convention on the Prevention of the Crime of Genocide."  See *Philipp v. Federal Republic of Germany, 894 F.3d 406, 411 (D.C. Cir. 2018).*  The Convention defines genocide as any of five "acts committed with intent to destroy, in whole or in part, a national, ethnical, racial or religious group."  These five acts include killing members of the group, causing them serious bodily or mental harm, imposing living conditions intended to destroy the group, preventing births, and forcibly transferring children out of the group.  Victims are targeted because of their real or perceived membership of a group, not randomly."  The convention further criminalizes "complicity, attempt, or incitement of its commission."  Member states [including the

Republic of Iraq] are prohibited from engaging in genocide and obligated to pursue the enforcement of this prohibition. All perpetrators are to be tried regardless of whether they are private individuals, public officials, or political leaders with sovereign immunity." These are the criminal acts of Defendants Masoud Barzani and Masrour Barzani, and their co-conspirator agents and representatives, including Barzani family members and family members by marriage, in aiding and abetting and enabling the killing, harming and destroying of Yazidi people, and creating conditions of life calculated to bring about their physical destruction as a group.

22. During the 2005 United Nations World Summit, heads of state and government accepted the responsibility of every state to protect its population from four crimes: genocide, war crimes, crimes against humanity, and ethnic cleansing. The first three crimes are legally defined in various international legal documents, such as the 1948 Convention on the Prevention and Punishment of the Crime of Genocide, the obligations under which bind Iraq and its instrumentalities are owed *erga omnes* and *erga omnes partes*, the 1949 Geneva Conventions and their 1977 Additional Protocols, and the 1998 Rome Statute of the International Criminal Court. ("Although the United States has not joined the International Criminal Court, U.S. law recognizes the definition of crimes against humanity as stated in the Rome Statute." See *Ofisi v. BNP PARIBAS, SA*, 278 F. Supp. 3d 84, n.16 (D.C. 2017). *Also Almog v. Arab Bank, PLC, 471 F.Supp.2d 257, 275 n.23 (E.D.N.Y. 2007).)* The Convention on the Prevention and Punishment of the Crime of Genocide (CPPCG), or the Genocide Convention, is an international treaty that criminalizes genocide and obligates state parties to pursue the enforcement of its prohibition. The Convention defines genocide as any of five "acts committed with intent to destroy, in whole or in part, a national, ethnical, racial or religious group." These five acts include killing members of the group, causing them serious bodily or mental harm, imposing living conditions intended to destroy the group, preventing births, and forcibly transferring children out of the group. Victims are targeted because of their real or

42

perceived membership of a group, not randomly. The convention further criminalizes "complicity, attempt, or incitement of its commission." Member states are prohibited from engaging in genocide and obligated to pursue the enforcement of this prohibition. All perpetrators are to be tried regardless of whether they are private individuals, public officials, or political leaders with sovereign immunity. Their status as international crimes is based on the universal belief that the acts associated with them affect the core dignity of human beings, both in times of peace and in times of war. Acts of genocide, as a matter of law and morality, are distinct from other violations of international law and are sanctioned and perpetuated by the Defendant Iraqi Kurdistan Regional Government—though there is often a close connection between all such acts—including the serious and ongoing violations of international law associated therewith, including grave breaches of numerous international treaties and agreements, and other crimes against humanity. Defendants' acts and omissions are genocidal in character, as they are committed with the requisite specific intent to destroy, in whole or in part, including the purposeful targeted elimination of Yazida culture and identify, Yazidis in Kurdistan as a part of the Iraqi Kurdistan Region's broader territorial, racial and ethnic group.

23.    The acts of Defentants' genocide of Yazidi in Sinjar are all attributable to Defendants Masoud Barzani and Masrour Barzani, who as long-established leaders of the Defendant Iraqi Kurdistan Regional Government knew or should have reasonably known, of the jus cogens character of the prohibition of genocide and the erga omnes and erga omnes partes character of the obligations owed by states, including Iraq and Defendant Kurdistan Regional Government, under the Genocide Convention.

24.    Defendants Masoud Barzani and Masrour Barzani, and their co-conspirator agents and representatives, including Barzani family members and family members by marriage, failed to prevent genocide, facilitated genocide, and committed genocide on non-combatant civilians of

minority ethnicity, including the shooting of children and those who posed no imminent threat, in manifest violation of the Genocide Convention, and who have also violated and are continuing to violate its other fundamental obligations under the Genocide Convention, including by failing to prevent or punish the direct and public incitement to genocide. Defendants acts and omissions meet the legal definition of genocide, as contained in the Genocide Convention, and are aimed at not just simply the killing of innocent people and the destruction of their livelihoods but a systematic effort to empty Kurdistan of its Yazidi people. Entire multi-generational families have been wiped out completely and thousands displaced. Further, Defendants knowingly and willfully, directly and indirectly, failed in their governmental duties for protection of civilians and upholding legal and humanitarian obligations.

25.    Defendants' acts included killing members of the Yazidi populace, causing serious bodily or mental harm to members of the Yazidi group, deliberately inflicting on the Yazidi group conditions of life calculated to bring about its physical destruction in whole or in part, imposing measures intended to prevent births within the Yazidi group, forcibly transferring children of the group to another group, and subjecting thousands of Yazidis to physical violence, abuse, humiliation, severe ill-treatment, serious beatings, and other outrages to personal dignity, and trapped tens of thousands of Yezidis on Iraq's Mt. Sinjar with no food or water. The Yazidi victims of the Barzani-orchestrated genocide were and are deliberately targeted—not randomly—because of their real or perceived membership in an ethnical, racial or religious group protected under the Convention.

26.    Because most Yazidis continue to live under the very same political sphere that orchestrated their massacre and enslavement — the Barzani Continuing Criminal Enterprise controlling the Defendant Iraqi Kurdistan Regional Government — most live in tents in refugee camps dotting the Kurdistan region controlled by the Defendant Iraqi Kurdistan Regional

Government and in constant fear that another genocide may soon take place, even though ISIS has largely, but not entirely, been vanquished. As internally displaced persons, thousands of Yazidis remain at grave and immediate risk of continuing and further acts of genocide as Yazidi people have sought refuge in refugee facilities across Kurdistan, creating overcrowded, undignified, unhygienic, unsafe, and impoverished conditions.

27.    Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, their agents, representatives, servants, collaborators, and co-conspirators, including Barzani family members and family members by marriage, and others known and unknown, have knowingly and willfully, directly and indirectly, planned, schemed, orchestrated, aided and abetted, conspired, financed, and committed multitudinous crimes, including acts and omissions, in each of four criminal categories, only partially delineated herein.

28.    *Atrocity crimes,* constituting crimes of hate and violent crimes of the state and state-like organizations orchestrated against citizens as a means to destroy and to gain or attain power, are the wanton barbarous acts of Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their servile agents and representatives, including Barzani family members and family members by marriage, in their transnational Barzani Continuing Criminal Enterprise. The White House-led interagency Atrocity Prevention Task Force broadly defines *atrocities* as "widespread, intentional violence against civilians, including genocide, war crimes, crimes against humanity and ethnic cleansing." Executive Order 13729, issued by the President of the United States, further defines atrocities "as large-scale and deliberate attacks on civilians, and includes acts falling within the definition 'genocide' as defined in international law and under U.S. domestic statute," and declares "*preventing mass atrocities and genocide is a core national security interest and a core moral responsibility of the United States.*" The United Nations defines *atrocity crimes* as: "… *the most serious crimes against humankind.* Their status as international crimes is based on the belief that

the acts associated with them affect the core dignity of human beings, in particular the persons that should be most protected by States, both in times of peace and in times of war.  However, the victims targeted by acts of genocide, crimes against humanity … differ."  The United Nations further states, "Apart from the moral and ethical responsibility to protect populations at risk of atrocity crimes, both individually and collectively, there are also well-established legal obligations to do so.  Such obligations can be found in the Convention on the Prevention and Punishment of the Crime of Genocide, an instrument of international law acceded to by the Republic of Iraq in 1959 and in force in Kurdistan since that time, in international human rights and humanitarian law, and in customary law of nations and international law.  International courts and tribunals have also cited these obligations and clarified their specific content."

29.    Torturers and those who commit genocide are now fairly viewed, like pirates, as "common enemies of all mankind and all nations have an equal interest in their apprehension and punishment."  See *Kiobel v. Royal Dutch Petroleum*, 569 U.S. at 129, 131, 133 S. Ct. 1659 (Breyer, J. concurring in judgment) (2013).

30.    Most significantly egregious of the multitude and breadth of heinous crimesacts committed and being committed by slavishly submissive individuals under the command of, or in collaboration with foreign terrorist organizations, and/or by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, their agents, representatives, servants, and Barzani family members and family members by marriage, and others known and unknown, in their continuing decades-long (and not sporadic), enterprise-wide pattern of unlawfultortious activity and corruption in their transnational criminal network are:and in furtherance the BCE tortious object are: (a) Murder of a United States agent; (b) U.S. Immigration Fraud and Perjury; (c) Extrajudicial murders and enforced disappearances; (d) Genocide and human rights abuses; (e) Torture of a U.S. citizen; (f) Illegal exile of Kurdish citizens; and (g) International narcotics trafficking.

       (a)      Murder of a United States agent

       (b)      U.S. Immigration Fraud and Perjury

       (c)      Extrajudicial murders and enforced disappearances

       (d)      Genocide and human rights abuses

       (e)      Torture of a U.S. citizen

       (f)      Illegal exile of Kurdish citizens

       (g)      International narcotics trafficking

(The United States Supreme Court defined "pattern", quoting Congress: "[C]riminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." (See *Sedima, SP RL v. Imrex Co.,* 473 U.S. 479, 105 S. Ct. 3275, 87 L. Ed. 2d 346 (1985))

31.    ~~In all instances~~          Defendants were and are, in all instances, a substantial factor in the sequence of *events* that caused the plaintiffs' injuries, there was and is reasonable connection between the acts or omissions of ~~the~~ Defendants and the damage which Plaintiffs have suffered, and Plaintiffs' injuries were and are reasonably foreseeable ~~or anticipated as a natural consequence of the defendants' conduct. (See *Estate of Parhamovich v. The Syrian Arab Republic*, No. 17-cv-61 (GMH) (D.C. Dec. 28, 2022); *Valore v. Islamic Republic of Iran,* 700 F. Supp. 2d 52, 66 (D.D.C. 2010)). [Defendants']"full knowledge of the greater background conspiracy is not necessary." (*See U.S. v. Okoronkwo*, 46 F.3d 426, 433 (5th Cir. 1995))~~as a natural consequence of defendants' conduct.

32.    The John Doe Plaintiffs; ~~and~~ the ~~Kurdish~~Kurdistan Victims Fund~~, a national non-profit 501(c)(3) charitable foundation, incorporated in the United States~~; Maki Revend, an individual; and Shakhwan Abdulrahman, individually and as representative of Jihan Taha Abdulrahman,

deceased, ~~hereby~~ institute this civil action for compensatory and punitive damages for torts for a ~~continuing~~ pattern of unlawful activity in violation of international and domestic law and claim relief against Defendants for compensable injuries sustained as a result.  The alleged wrongful behavior ~~can~~could reasonably be expected to recur.  Plaintiffs claim compensatory and punitive damages for crimes against humanity for their own mental pain and suffering and claims of torture and crimes against humanity on behalf of their decedent relatives.  Torture victims of the Barzani regime, or their relatives, never received the ~~redress~~relief, reparation and rehabilitation they are entitled to under international law, treaty, and convention.

33.     Plaintiffs bring claims of torture and crimes against humanity for their own mental pain and suffering in witnessing the Yazidi (Êzidîs) Massacre. Plaintiffs also bring claims of torture and crimes against humanity on behalf of their decedent relatives.

~~34.     This Complaint refers to Confidential Human Sources and U.S. Public Official #1 and U.S. Public Official #2 and/or their families in Iraqi Kurdistan and beyond, and foreseeable witnesses, who face grave, specific, and targeted implicit and expressed retributive policies, and statements and disparagement, and threats to their safety and lives, including incitement to violence, which are not imaginary nor wholly speculative, and of which Defendants have a long and well-documented demonstrated history, are likely to suffer largely irreversible retaliation, retribution, and other intimidation measures and further human rights abuses and violence, even murder, and grave threats to the integrity of this proceeding, at the hands of the Barzani Continuing Criminal Enterprise if their identities become public, and thus are listed anonymously herein, the identify of whom is known to Plaintiffs' counsel.  (Title 18, United States Code, Sections 2332(a)(1), 2 and 3551 et seq.)  Protecting their identities is also essential to advance the compelling interests of ensuring a fair trial free from outside influence and untainted by harassment, intimidation, and threats directed towards or murder of or enforced disappearance of witnesses and other trial~~

participants. Courts not only have the power, but the duty, to "protect their processes from prejudicial outside interferences" and to ensure a fair trial. See *Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966).

# PARTIES

### A.    Plaintiffs

35.  34.    **Plaintiff Kurdistan Victims Fund**:  The Kurdistan Victims Fund is a not-for-profit 501(c)(3) charitable foundationcivic association incorporated in the United States for the benefit of Kurdish victims.

3635.   **Plaintiff Shakhwan Abdulrahman**:  Shakhwan Abrulrahman acting individually, is an American citizen presently residing in the United States, and is a member of Plaintiff Kurdistan Victims Fund.

3736.   **Plaintiff Shakhwan Abdulrahman**:  Shakhwan Abdulrahman, residing in the United States, as Representative of Jihan Taha Abdurahman, Deceased.

38.  37.    **Plaintiff Maki Revend**:  Maki Revend acting individually, is a German citizen presently residing in Berlin, Germany.  He is of Iraqi Kurdish origin.

39.  38.    **Plaintiffs John Does 1-5000**: On their own behalf and on behalf of their deceased relatives.

### B.    Defendants
*(Collectively, the Barzani Continuing Criminal EnterpriseBCE Defendants)*

39.  **Defendant Masoud Barzani**40.   **Defendant Kurdistan Regional Government**:  The Defendant Kurdistan Regional Government, a subordinate subsidiary subdivision provincial governate and instrumentality of the Republic of Iraq, self-identified in written submission to the

United States Government as the same as the Kurdistan Democratic Party, a political party, at Erbil, Kurdistan, Iraq, and operating from an office located at 1532 16th St NW, Washington, DC 20036.

41.    **Defendant Masoud Barzani (AKA Mas'ud Barzani , Massoed Barzani, Massoud Barzani, Massud Barsani, Massud Barzani, Masud Barsani, Masud Barzani, Masúd Barzáni, Masʿūd Barzānī, Mesud Barzani, Mesud Barzanî, Mesut Barzani, Mesûd Barzanî, Mesûd Berzanî, Məsud Barzani, and Serok Barzani):** Masoud Barzani is an individual, a citizen of Iraq, born August 16, 1946 in the Republic of Mahabad, Iran, is the former President of the Defendant Iraqi Kurdistan Regional Government, current President of the ruling Kurdistan Democratic Party, is an individual residing at Erbil, Kurdistan, Iraq, and operating from an office located at 1532 16th St NW, Washington, DC 20036.  He was President of the KRG.

42.    40.    **Defendant Masrour Barzani (AKA Masrur Barzani, Masrūr Bārzānī, Mesrur Barzani, and Mesrûr Barzanî):** Masrour Barzani, is an individual, son of Defendant Masoud Barzani, a citizen of Iraq, born March 02, 1969, is the Prime Minister of Defendant Iraqi Kurdistan Regional Government and Chancellor of its Kurdistan Regional Security Council, a leader of the Kurdistan Democratic Party, is an individual with U.S. permanent residence status and therefore a "a "United States person", and a "foreign official" as that term is used in the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. §  78dd-3(f)(2)(A) residing at Erbil, Kurdistan, Iraq, and McLean, Virginia, and operating from an office located at 1532 16th St NW, Washington, DC 20036.D.C..  At all times herein,

43.    **Defendant Waysi Barzan**i: Waysi Barzani possessing Iraq citizenship identity card #00802544 issued July 27, 2016, is an individual, son of Defendant Masoud Barzani, a citizen of Iraq, is the Director of the Defendant Iraqi Kurdistan Regional Government

Intelligence and Security Agency, and Director General of Counter Terrorism (CTD), a part of the Kurdistan Region Security Council (KRSC), a unit of the Defendant Iraqi Kurdistan Regional Government, is an individual unless otherwise stated, was and is Prime Minister of KRG, the presiding and actual head of government and head of the executive power.  He previously was General Director of the KRG Security Protection Agency and formerly Director of the KRG Intelligence and Security Agency (the successor agency to Parastin).

41.   **Defendant Waysi Barzan**i, is an individual and a "foreign official" as that term is used in the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. § 78dd-3(f)(2)(A) residing at Erbil, Kurdistan, Iraq, and operating from an office located at 1532 16th St NW, Washington, DC 20036D.C.

4644.   **Defendant Mulla "Babo" Mustafa Barzani**:  Mulla "Babo" Mustafa Barzani, is an individual, the youngest son of Defendant Masoud Barzani, is an individual American citizen residing at Erbil, Kurdistan, Iraq.

45.   **Defendant Jeyra Mohamad Khaled**:  Jeyra Mohamad Khaled, an individual and Barzani mother and , and beneficial owner of sham or front corporations in the United States, and residing at Erbil, Kurdistan, Iraq.

43.   **Defendant Muski Barzani**, is an individual, and beneficial owner of sham or front corporations in the United States, residing in Erbil, Kurdistan, Iraq.

4644.   **Defendant Katja Vrecar Barzani:** Katja Vrecar Barzani,**Jeyra Mohamad Khaled**, is an individual, wife of Defendant Mustafa "Babo" Barzani, and Barzani mother and beneficial owner of sham or front corporations in the United States, and residing in Erbil, Kurdistan, Iraq.

45.    **Defendant Katja Vrecar Barzani**, is an individual, wife of Defendant Mustafa "Babo" Barzani, and beneficial owner of sham or front corporations in the United States, and residing in Erbil, Kurdistan, Iraq.

46.    ~~47.~~    **Defendant Areen Masrour Barzani**~~, Areen Barzani~~, is an individual, ~~is~~ a "United States person", ~~is~~ a son of Masrour Barzani, and resides in Erbil, Kurdistan, Iraq.

~~48.    **Defendant Sarwar Pedawi**:  Sarwar Pedawi, is an individual, a "United States Person" (a green card holder), as defined in 18 U.S.C. § 2331(2) and 8 U.S.C. § 1101(a)(22), "a person who, though not a citizen of the United States, owes permanent allegiance to the United States", is the Founder and Chairman of North Light Holding, based in Iraq and the U.A.E.  North Light's interests include ICT, various industrial sectors, healthcare, free economic zones and distribution networks. He is the Founder and Chairman of the Ster Group, based in the Kurdistan Region of Iraq.  He is economic advisor to the President of the Defendant Iraqi Kurdistan Regional Government, and oversees financial elements of the Barzani Continuing Criminal Enterprise, counterfeiting of cigarettes and pharmaceuticals, has dual Iraq and Netherlands citizenship, and is an individual residing at Erbil, Kurdistan, Iraq and in Dubai, United Arab Emirate.~~

~~49.    **Defendant Laaween (Lawin) Pedawi**:  Laaween (Lawin) Pedawi is an individual, with Dutch citizenship, brother of Defendant Sarwar Pedawi, residing in Dubai, United Arab Emirate..~~

~~50.    **Defendant Karim Sinjari (Sinjiri)**:  Karim Sinjari (Sinjiri) is a former Minister of Interior of the Defendant Iraqi Kurdistan Regional Government, former Chief of Staff to Defendant Iraqi KRG President Masoud Barzani, and presently Senior Advisor to the President of Defendant Iraqi Kurdistan Regional Government. He is an individual holding Swedish citizenship, residing at Erbil, Kurdistan, Iraq.~~

~~51.~~    47.    **Defendant Jonathon R. Moore**~~:  Defendant Jonathor R. Moore~~, is an individual, ~~and~~ an attorney licensed to practice in Washington, D.~~ ~~C. and New York, and is attorney of record for

Mansour Barzani, Masrour Barzani, Muksi Barzani, Mulla "Babo" Mustafa Barzani, ~~and~~ Waysi Barzani, and others, in Washington ~~DC,~~ D.C., an organizer and corporate officer and/or agent of numerous Barzani-owned sham or front shell corporations~~.~~, tailored to the specific needs of his BCE law clients.  He resides in East Hampton, N.Y.  As of January 3, 2025, his law firm maintains principal offices in Washington, D.C.  It has associated offices in London and New York City, and lists its principal office at 5335 Wisconsin Avenue, NW, Suite 440, Washington, D.C. 20015-2079. (Source: website *moorelawoffices.us*).

~~52~~48.  **Defendant Joe R Reeder**~~:  Defendant Joe R. Reeder,~~ is an individual, a former United States Under Secretary of the Army, and is a practicing attorney with the law firm of Greenberg Traurig, LLP in Washington, D. C., and is, or was, attorney of record for Defendant Masrour Barzani and others.

53.  **Defendant Valerie Cupp**~~:  Defendant Valerie Cupp,~~ is an individual and administrator of properties and manager and corporate officer of front corporations for the ~~Barzani Continuing Criminal Enterprise~~BCE.

~~54~~49.  **Defendant Julie Mai Sanford**~~:  Defendant Julie Mai Sanford,~~ is an individual and administrator of properties and manager and corporate of front corporations for the ~~Barzani Continuing Criminal Enterprise~~BCE in Washington, D. C.  She resides in Stafford, Virginia.

~~55~~50.  **Defendant Laura Geho Harris**~~:  Defendant Laura Geho Harris,~~ is an individual and administrator of properties and manager and corporate officer of front corporations for the ~~Barzani Continuing Criminal Enterprise~~BCE in Washington, D.C.

51.  ~~56.    **Defendant Bayan Sami Abdul Rahman**:  Bayan Sami Abdul Rahman is an individual, a United Kingdom citizen, and is senior advisor to Kurdistan Prime Minister Masrour Barzani for foreign affairs and climate change, is an individual residing in Erbil, Kurdistan, Iraq, and was previously from 2015 until August 1, 2023, located in Washington,D.C. as the High~~

~~Representative of the Defendant Iraqi Kurdistan Regional Government and a compensated representative of Masoud Barzani and Masrour Barzani and other Iraqi KRG officials, acting within the scope of her office or employment actively advocating Barzani interests including disinformation and deception at the highest levels of the U.S. government, before agencies and officials of the Government of the United States, influencing U.S. financial and military assistance to the Defendant Iraqi Kurdistan Regional Government. She reported to Masrour Barzani and helped push Barzani/Defendant Iraqi Kurdistan Regional Government talking points with American policymakers, actively advocating for the Defendant Iraqi Kurdistan Regional Government's interests in Washington, D.C. and with a network of influencers coordinated and pushed their positions and priorities at the highest levels of the United States government. She represented the interests of these foreign entities and principals, issued public written and oral communications and position statements on their behalf to the American public and to elected and appointed U.S. government officials, agencies, and departments, and was employed as spokesperson in the United States for the Barzani's, operating from an office located at~~ **Defendant Treefa Aziz**, is an individual, a United States citizen, a~~1532 16th St NW, Washington, DC 20036. She was previously a journalist, High Representative of the Defendant Iraqi Kurdistan Regional Government to the United Kingdom, and a member of the Kurdistan Democratic Party Leadership Council.~~

57.    **Defendant Treefa Aziz**: ~~Treefa Aziz, is an individual and a resident of the United States since 1977, a United States citizen, a knowledgeable~~ law-trained member of the Virginia Bar, and a long-time representative of and for the Barzani's. As of~~-~~ August 1, 2023 she is the designated and employed representative of the ~~Defendant Iraqi Kurdistan Regional Government~~KRG and Masoud Barzani and Masrour Barzani, and other ~~Defendant Iraqi~~ KRG officials~~, acting within the scope of her office or employment~~, actively advocating Barzani interests including disinformation

and deception at the highest levels of the U.S. government, before agencies and officials of the ~~Government of the~~ United States Government, influencing U.S. financial and military assistance to the ~~Defendant Iraqi Kurdistan Regional Government~~KRG.   She has represented and does represent the interests of these foreign principals, issues written and oral communications and position statements on their behalf to the American public and to elected and appointed U.S. government officials, agencies, and departments, and is a compensated spokesperson in the United States for the Barzani's, with offices located at 1532 16th St NW, Washington, D.C. ~~20036.~~  She recently served as a senior advisor to the ~~Defendant Iraq~~KRG Prime Minister, Masrour Barzani, in Erbil.   Previously, she worked in the United States Congress for a member of the House Appropriations Committee, ~~and~~ was previously the Kurdistan Democratic Party (KDP) Representative to the United States. ~~She holds,~~ has a ~~Juris Doctorate~~law degree from ~~the Washington College of Law at~~ American University, and is a licensed albeit suspended attorney in ~~Washington, D.C~~Virginia.

~~58~~52.   **Defendant ~~Afan Saleh Omar Sherwani~~:  ~~Afan~~Arfan Saleh Omar Sherwani**, is an individual, is a representative, agent, business agent, and financial agent for Defendant Masrour Barzani, a foreign principal, in the United States, though has not submitted a registration statement with the U. S. Attorney General pursuant to the statutory requirements of the Foreign Agents Registration Act, is an individual with U.S. permanent residence status and therefore a "United States Person", residing in Virginia, and currently working at or officed at 1532 16th St NW, Washington, D.C.

~~59~~53.   **Defendant Omar S. Barzani**~~:  Omar Barzani,~~ is an individual whose current address is 9716 Windburn Drive, Plano, TX 75025, is principal officer of the Barzani Charitable Foundation, 5111 Greenville Avenue, Dallas, TX 75206.

6054.    **Defendant Entifadh Kamal Qanbar** ~~(AKA Entifadh Qanbar, Entfaidh Qanbar,~~ ~~Entifaoh K Qanbar, Entifah Qanbar, Entifadh K Qua Bar, Entifadfh K Qanbar, Etifadh K~~ ~~Qanbar),~~ is an individual born in Iraq, is a United States citizen ~~since 1999~~, residing at 6062 Burnside Landing Drive, Burke, Virginia 22015, self-declared he is "presently leading an advocacy campaign that was approved by Kurdish Prime Minister [Defendant] Masrour Barzani." He has served as Senior National Security Advisor for the Iraqi Parliament, the Deputy Military Attache for the Embassy of Iraq in Washington, D.C., Spokesman to Member of the Iraqi Governing Council, Director of the Iraqi National Congress Foundation, and ~~and~~ a Special Envoy for the United Iraqi Alliance.  He is the founder and president and director of two purported non-profit organizations, Future Foundation, whose legal charitable status of the Internal Revenue Service appears questionable, and Kurdish Protection Action Committee (KPAC).  He self-describes as "rendering services for the Council of Ministers Kurdistan Regional Government," an entity controlled by Defendant Masrour Barzani.  In 2023, he led an advocacy campaign that was approved by Defendant ~~Iraqi Kurdistan Regional Government Prime Minister~~ Masrour Barzani.

~~61.    **Defendant Dindar Zebari**:  Dindar Zebari is an individual, and is the Defendant Iraqi~~ ~~Kurdistan Regional Government's Coordinator for International Advocacy with responsibility to~~ ~~communicate policy clarifications primarily to human rights forums and panels of multilateral~~ ~~treaty forums, residing in Erbil, Kurdistan, Iraq55.~~

~~62.    **Defendant Aziz Ahmad**:  Aziz Ahmad is an individual, and is Deputy Chief of Staff to~~ ~~Defendant Iraqi Kurdistan Regional Government Prime Minister Masrour Barzani, chief contact~~ ~~for lobbyists including those in the United States, formerly Assistant to the Chancellor of the~~ ~~Defendant Iraqi Kurdistan Regional Government Security Council, formerly holding positions in~~ ~~the Defendant Iraqi Kurdistan Regional Government Department of Foreign Relations, residing in~~ ~~Erbil, Kurdistan, Iraq.~~

63.    **Defendant Ashti Hawrami, PhD**:  Ashti Hawrami, Ph.D. is an individual, was Minister for Natural Resources and Assistant Prime Minister for Energy Affairs in the Defendant Iraqi Kurdistan Regional Government, was previously an oil executive and was an engineer in the Iraqi National Oil Company.  He resides in London, England, United Kingdom.

64.    **Defendant Baz Karim Al-Barzanji**:  Baz Karim Al Barzanji is an individual, owner of record and operator of KAR Group and KAR Refinery in Erbil, who with his brother Defendant Mahmoud Karim Al Barzanji for and in partnership with the Barzani Continuing Criminal Enterprise and Defendant Iraqi Kurdistan Regional Government conduct illegal oil trading, mostly in the north of Iraq, and facilitates money laundering of the BCCE, and resides in Erbil, Kurdistan Iraq, Dubai, and Turkey. Baz Karim Al Barzanji employs multiple U.S. persons including a former U. S. Government Official.

65.    **Defendant Mahmoud Karim Al-Barzanji:** Mahmoud Karim Al Barzanji is an individual and a partner with his brother Defendant Baz Karim Al Barazanji in the oil refinery who for and in partnership with the Barzani Continuing Criminal Enterprise and Defendant Iraqi Kurdistan Regional Government conducts illegal oil trading, mostly in the central part of Iraq, and facilitates money laundering of the BCCE..

66.    **Defendant Ghafoor Khoshnaw**:  Ghafoor Khoshnaw is an individual, citizen of Iraq possessing a Caribbean island nation  passport, owner of record  and operator of Khoshnaw Group in Erbil, residing in Erbil, Kurdistan, Iraq.  He is husband to coconspirator Defendant Hamela Gardi, President, Region Trade Bank for Investment and Finance (aka "RT Bank"), in Iraqi Kurdistan.  He oversees cigarette counterfeiting business, smuggles cigarettes, and participates in money laundering for the Barzani Continuing Criminal Enterprise in partnership with Defendant Masrour Barzani.

67. **Defendant Ameer Saadallah Rasheed**: Ameer Saadallah Rasheed is an individual, a United States citizen, owner of record and operator of Renos Company in Erbil, and fronts for Shinika, a front corporation of the Barzani Continuing Criminal Enterprise in its fraudulent contracts with the U.S Defense Logistics Agency of the U.S. Department of Defense. He resides in Kurdistan.

68. **Defendant Dasko Shirwani**. Defendant Dasko Shirwani is an individual, U.S. citizen, employed as Director of Outreach for the Washington, D.C. office of the Iraqi Kurdistan Regional Government, and resides in the Washington, D.C. area.

69. **Defendant Kamal Kirkuki**: Kamal Kirkuki is an individual, formerly Defendant Iraqi Kurdistan Regional Government speaker of parliament and former Kirkuk governor, residing in Erbil, Kurdistan, Iraq.

70. **Defendant Jafar Aminki**: Jafar Aminki is an individual, senior official in Kurdistan Democratic Party, is a member of KDP intelligence services, and resides in Erbil, Kurdistan, Iraq.

71. **Defendant Zaheem Ali**: Zaheem Ali is an individual, a senior official in the Kurdistan Democratic Party, and resides in Erbil, Kurdistan, Iraq.

72. **Defendant Azad Barwari**: Azad Barwari is an individual, and resides in Erbil, Kurdistan Iraq.

73. **Defendant Hoshyar Zebar**: Hoshyar Zebar is an individual, uncle of Masoud Barzani, was formerly the Deputy Prime Minister, Minister of Finance, and Minister of Foreign Affairs of the Republic of Iraqi where he was a member of the executive committee of the Iraqi National Congress, its Presidential Council, and Iraqi Governing Council. He was a member of KDP's Central Committee as well as its Political Bureau. He previously directed KDP foreign relations and represented the party in the United States and United Kingdom, and resides in Erbil, Kurdistan, Iraq.

74.    **Defendant Sayran Saber Mustafa Barzani**:  Sayran Saber Mustafa Barzani is an individual, a spouse of Masrour Barzani, a "United States person" by virtue of permanent resident status, and resides in Erbil, Kurdistan, Iraq.

75.    **Defendant Lina Sirwan Barzani**:  Lina Barzani may be a fictitious person of the Barzani Continuing Criminal Enterprise.  It is believed she is an individual born on June 22, 1994 in Arlington, VA, publicly represents herself as Chairman and CEO at Lina Holding and Vice President of J.P. Morgan (though J.P. Morgan does not list her in its global employee directory). She is the purported daughter of Sirwan Saber Mustafa Barzani (billionaire owner of Kurdistan telecommunications monopoly Korek Telecom Co., CS Ltd. and nephew of Masoud Barzani), and an American citizen alleged to be managing assets gained from the Barzani Continuing Criminal Enterprise in the United States and internationally, residing at address(es) unknown in Virginia and/or New York.

76.    **Defendant Dilshad Barzani**:  Dilshad Barzani, brother of and "right hand man" to Defendant Masoud Barzani, was Kurdistan Democratic Party representative to Germany and Europe, is an individual after fleeing Germany now residing in Erbil, Kurdistan, Iraq, and is a major beneficiary of the fruits of the Barzani Continuing Criminal Enterprise.

77.    **Defendant Sirwan Barzani**:  Sirwan Barzani is nephew of Masoud Barzani, billionaire owner of a Kurdistan telecommunications monopoly Korek Telecom *Co.,* CS, is an individual residing in Erbil, Kurdistan, Iraq.

78.    **Defendant Nihad Barzani**:  Nihad Barzani is an individual, brother of Masoud Barzani and uncle of Masrour Barzani, reporting to Masrour Barzani, who directs the illicit drug manufacture and distribution operations of the Barzani Continuing Criminal Enterprise, and resides in Erbil, Kurdistan, Iraq.

79. **Defendant Sidad Barzani**: Sidad Barzani is an individual, occupies a senior leadership position in Kurdistan Democratic Party headquarters, residing at Erbil, Kurdistan, Iraq.

80. **Defendant Sihad Barzani**: Sihad Barzani is an individual, holds the rank of General in the Defendant Iraqi Kurdistan Regional Government Peshmerga military forces, residing at Erbil, Kurdistan, Iraq.

81. **Defendant Hikmat Bamarni**: Hikmat Bamarni is an individual, a U.S. citizen, and is Director of the Kurdistan Democratic Party Seventh Branch (USA and Canada), officing at 3875 B Plaza Drive, Fairfax, VA 22030.

82. **Defendant Shimal Jawhar Salin**: Shimal Jawhar Salin is an individual who for the Barzani Continuing Criminal enterprises manages the counterfeiting of pharmaceuticals and cigarettes, and resides in Kurdistan, Iraq.

83. **Defendant Dilshad Yousef**: Dilshad Yousef is an individual and is the head of a Defendant Iraqi Kurdistan Regional Government Asayish security force based in Erbil, is a hitman for the Barzani Continuing Criminal Enterprise, residing in Erbil, Kurdistan, Iraq.

84. **Defendant Ismat Argoshi**: Ismat Argoshi is an individual and who is the head of Security Asayesh, the Kurdish security organization, is a hitman for the Barzani Continuing Criminal Enterprise, residing in Erbil, Kurdistan, Iraq.

85. **Defendant Barzan Hersha Rash**: Barzan Hersha Rash is an individual and a Kurdish Democratic Party (KDP) hitman, a hitman for the Barzani Continuing Criminal Enterprise, residing in Kurdistan, Iraq.

86. **Defendant Azad Germari**: Azad Germari is an individual who is the Director of the Office of Intelligence for the Iraqi Kurdistan Province of Duhok, is a hitman for the Barzani Continuing Criminal Enterprise, and resides in Duhok, Kurdistan, Iraq.

87. **Defendant "Shalawo"**: "Shalawo" is an individual, whose current address is unknown.

60

88. ~~Defendant Rabea Barzani: Rabea Barzani is an individual, an uncle of Masrour Barzani, residing in Erbil, Kurdistan, Iraq.~~

89. ~~Defendant Ghalib Rabea Barzani: Ghalib Rabea Barzani is an individual, residing in Erbil, Kurdistan, Iraq.~~

90. ~~Defendant Raber Barzani: Raber Barzani is an individual, residing in Erbil, Kurdistan, Iraq.~~

91. ~~Defendant Ghalib Raber Barzani: Ghalib Raber Barzani is an individual, residing in Erbil, Kurdistan, Iraq.~~

~~92.~~ **Defendant Rubar S. Sandi** ~~: Rubar S. Sandi,~~ is an American citizen, an individual of Kurdish origin residing at 9300 Belle Terre Way, Potomac, MD 20854. He is currently an executive of TDS Global Solutions Inc. registered in Washington, D.C. and Chairman of TSG Global Holdings Inc. registered in the British Virgin Islands.

~~93.~~ 56.    **Defendant** ~~Dilal Abbas: Dilal Abbas~~**Hamza Salim,** is an individual~~, residing in Kurdistan, Iraq~~ currently working at or officed at KRG Washington Office, 1532 16th St NW, Washington, D.C.

~~94.~~ 57.    **Defendant** ~~Ahmad Kurdu Nori: Ahmad Kurdu Nori~~ **Hikmet Bamerni,** is an individual~~, whose current address is unknown~~ currently working at or officed at KRG Washington Office, 1532 16th St NW, Washington, D.C.

~~95.~~ 58.    **Defendant** ~~Mahmood Agaha: Mahmood Agaha~~**Hayman Quass,** is an individual~~, whose current address is unknown~~ currently working at or officed at KRG Washington Office, 1532 16th St NW, Washington, D.C.

~~96.~~ 59.    **Defendant** ~~Hamela Gardi: Hamela Gardi~~**Dasko Shirwani,** is an individual~~, residing in~~ currently working at or officed at KRG Washington Office, 1532 16th St NW, Washington, D.C.

**C.     Plaintiffs Make No Claim Against Republic of Iraq,** **Kurdistan**, Iraq. She is President, Region Trade Bank for Investment and Finance (aka "RT Bank"), in Iraqi **Regional Government, or** **Kurdistan** and wife of BCCE coconspirator Defendant Ghafoor Khoshnaw. **Democratic Party**

60.     The complaint seeks no relief against the sovereign, or any instrumentality or subdivision or affiliate thereof.

61.     All Defendants, as individual co-conspirators in the BCE, are officers, employees, agents, representatives, advisors, and/or attorneys for KRG and/or its sister one-in-the-same entity Kurdistan Democratic Party ("KDP"), or affiliates.  None of these organizations is a party to this lawsuit.  Defendants' tortious acts, though committed by an official or employee or agent of the KRG or KDP, were not acting within the authorized lawful scope of his/her office or employment.  Activities in violation of peremptory norms of international law (also known as *jus cogens*) can never be conducted in an official capacity.  *See Giraldo v. Drummond Co., Inc*., 808 F. Supp. 2 d 247 (D.D.C. 2011) (no exception to foreign official immunity for *jus cogens* violations) (citing *Belhas v. Ya'alon*, 515 F.3d 1279, 1287 (D.C. Cir. 2008)).  "[A] *jus cogens* norm, also known as a "peremptory norm" of international law, "is a norm accepted and recognized by the international community of states as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character." *Siderman de Blake v. Republic of Argentina*, 965 F. 2d 699 - Court of Appeals, 9th Circuit 1992.

62.   97.   **Defendant Afan Saleh Omar Sherwani**:  Afan Saleh Omar Sherwani is an individual whose current address is in Northern Virginia.

    Defendants Masoud Barzani, Masrour Barzani98.    **Defendant Dilshad Hassan Najar**: Dilshad Hassan Najar is an individual, residing in Kurdistan, Iraq.

98.   **Defendant Saad Aldoski**:  Saad Aldoski is an individual who for the Barzani Continuing Criminal Enterprise manages and partners in the counterfeiting of U.S. cigarettes and alcohol products, and resides in Kurdistan, IraqWaysi Barzani, entrusted with power have, in time,

perverted the KRG into tyranny and ~~Dubai.   He also operates Duty Free in Erbil which accommodates~~ exercised direct and ~~sells counterfeit U.S. products.   He carries an Eastern European passport.~~

~~99.    **Defendant Blend Aldoski**:  Blend Aldoski is an individual who for the Barzani Continuing Criminal Enterprise manages and partners in the counterfeiting of U.S. cigarettes and alcohol products, and resides in Kurdistan, Iraq, and Dubai.   He operates Duty Free in Erbil which accommodates and sells counterfeit U.S. products.~~

possibly unlimited~~100.    **Defendant Joseph Teichmueller**:   Joseph Teichmueller is an individual residing in Germany.~~

~~101.    **Defendant U.S. Public Official #1**:  U.S. Public Official #1 is an individual, an American citizen, who as a senior United States government official and official of the Coalition Provisional Authority – Iraq, possessed substantial~~ influence over ~~foreign military sales and foreign military financing and assistance to Iraqi Kurdistan, and retired United States military official residing at Erbil, Kurdistan, Iraq.~~

~~102.    **Defendant U.S. Public Official #2**:  U.S. Public Official #2 is an individual, an American citizen, who as a senior United States government official and official of the Coalition Provisional Authority – Iraq,  possessed substantial influence over foreign military sales and foreign military financing and assistance to Iraqi Kurdistan, and retired United States military official whose current address is Erbil, Kurdistan, Iraq.~~

## ~~JURISDICTION AND VENUE~~

~~103.    Plaintiffs have suffered severe injury in fact.   These injuries were and are caused by the intentional and knowing conduct of the Defendants.   The requirements of Article III standing are familiar: First, the plaintiff must have suffered an injury in fact – an invasion of a legally protected~~

interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *United States v. Windsor, 570 U.S. 744, 133 S.Ct. 2675, 2685-86, 186 L.Ed.2d 808 (2013).* Plaintiffs satisfy all requirements of standing.

104.   With respect to Plaintiffthe Kurdish Victims Fund, this Court has previously stated:

"Even in the absence of injury to itself, an association may have standing solely as the representative of its members." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). "The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *Sierra Club v. Morton*, 405 U.S. 727, 731-734 (1972) as Plaintiffs do in the instant complaint. *Black's Law Dictionary* define association as "The act of a number of persons who unite or join together for some special purpose or business." In *Hunt v. Washington State Apple Advertising Commission*, the Supreme Court set forth the criteria for associational standing. 432 U.S. 333. Under the so-called Hunt test, a plaintiff at the motion to dismiss stage must plausibly allege or otherwise offer facts sufficient to permit the reasonable inference (1) that the plaintiff has at least one member who "would otherwise have standing to sue in [her] own right;" (2) that "the interests" the association "seeks to protect are germane to [its] purpose;" and (3) that "neither the claim asserted nor the relief requested requires the participation of [the] individual members in the lawsuit." *Id.* at 343. (See *Public Citizen, Inc. v. Trump*, Civil Action No. 2017-0253 (D.D.C. 2018). The Kurdish Victims Fund meets the requirements for standing.

105.    "The D.C. Circuit has translated the requirement into a single question: 'did the [defendant]'s actions materially increase the probability of injury?'" *Huddy v. FCC*, 236 F.3d 720, 722 (D.C.Cir. 2001).  All of Plaintiffs' injuries are "the consequence of the defendants' actions...." *Warth v. Seldin, 422 U.S. 490, 504-05, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)*.  Actual injury is "fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision." See *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011).  None of defendants' acts were "acts of war" as defined in 18 U.S.C. § 2331(4).

106.    This court has federal question jurisdiction pursuant to 28 U.S.C. § 1331; and subject matter and personal jurisdiction pursuant to the Torture Victim Protection Act of 1991; 28 U.S.C. 1350; 18 U.S.C. § 1961 *et seq.*; the Anti-Terrorism Act, 18 U.S.C.§ 2333 *et seq.*; the Alien Tort Statute of 1789, 28 U.S.C. 1350; and the Torture Act, 28 U.S.C. § 1350 note § 2(a)(1)-(2).

107.    In general, the Judiciary has a responsibility to decide cases properly before it, even those it "would gladly avoid." *Cohens v. Virginia,* 6 Wheat. 264, 404, 5 L.Ed. 257 (1821).  Supreme Court precedents have identified a narrow exception to that rule, known as the "political question" doctrine.  *See, e.g., Japan Whaling Assn. v. American Cetacean Soc.*, 478 U.S. 221, 230, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986).  The present matter involves no "political question" and presents no nonjusticiable political questions; and thus, this court has jurisdiction of the matters raised herein. See *Zivotofsky Ex Rel. Zivotofsky v. Clinton*, 566 U.S. 189, 132 S. Ct. 1421, 182 L. Ed. 2d 423 (2012).  There is no danger of inadvertent interference with foreign relations.  See *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, at 16 (D.C. 1998).  Defendants' beliefs, conduct, and assertions notwithstanding, they are not above the law.  Defendant Masrour Barzani is a "United States person", and "No man in this country is so high that he is above the law." See *United States v. Lee,* 106 U. S., at 220 (1882).

108.   Acknowledging "a defendant must have minimum contacts with the forum reflecting 'some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum,'" this Court has personal jurisdiction over the Defendants because their extensive forum contacts are all squarely related to Plaintiffs' claims.  (See *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 210 (D.C. Cir. 2022), (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)).

109.   This Court has personal jurisdiction over the Defendants because the Alien Tort Statute, also called the Alien Tort Claims Act (ACTA), 28 U.S.C. § 1350, provides "the district courts shall have jurisdiction over any civil action by an alien for a tort only, committed in violation of the law of nations or treaty of the United States."  Two conditions must exist for this Court to have subject matter jurisdiction under the ATCA.  First, Plaintiffs must be aliens.  Most of the Plaintiffs are citizens of Iraq; Plaintiff Maki Revend, motivated by relentless debilitating fear of and deadly threats and acts by Defendants, has renounced his Iraq citizenship and accepted German citizenship and residence; and are thus aliens.  Second, the tortious conduct Plaintiffs allege must have been committed in violation of the law of nations or a treaty to which the United States is a signatory.  In fact, nothing more than a violation of the law of nations is required to invoke jurisdiction under the ATCA.  *See Tel-Oren v. Libyan Arab Republic*, 726 F.2d at 774, 779 (D.C. Cir. 1984) (Edwards, J. concurring.)  In addition, the actions Plaintiffs allege are violations of the law of nations.  Courts have held that torture, summary execution, crimes against humanity and cruel, inhuman and degrading treatment are acts that violate international law; therefore, they meet the ATCA's criterion that Plaintiffs' claims violate the law of nations. *See FIS*, 993 F. Supp. at 4, 8; *Xuncax*, 886 F. Supp. 162.  The Torture Act establishes federal jurisdiction and liability for "[a]n individual who, under actual or apparent authority, or color of law, of any foreign nation ... subjects an individual to torture …" 28 U.S.C. § 1350 note § 2(a)(1)-(2).

110. In committing these tortious acts against Plaintiffs, Defendants knowingly, willingly, and substantially violated treaties, as defined by the Vienna Convention on the Law of Treaties:

(a) Article 2(a): "treaty" means an international agreement concluded between States in written form and governed by international law, whether embodied in a single instrument or in two or more related instruments and whatever its particular designation;

(b) Article 2 (b): "ratification", "acceptance", "approval" and "accession" mean in each case the international act so named whereby a State establishes on the international plane its consent to be bound by a treaty;

(c) Article 2(g): "party" means a State which has consented to be bound by the treaty and for which the treaty is in force;

(d) Article 18: A State is obliged to refrain from acts which would defeat the object and purpose of a treaty when: (a) it has signed the treaty or has exchanged instruments constituting the treaty subject to ratification, acceptance or approval, until it shall have made its intention clear not to become a party to the treaty; or (b) it has expressed its consent to be bound by the treaty, pending the entry into force of the treaty and provided that such entry into force is not unduly delayed.

(e) Article 27: A party may not invoke the provisions of its internal law as justification for its failure to perform a treaty.

(f) Article 29: …a treaty is binding upon each party in respect of its entire territory.

111. This Court has personal jurisdiction over the Defendants because Defendants had contacts constituting purposeful activity with the District of Columbia and/or the United States. *See International Shoe Company v. Washington*, 326 U.S. 310, 316 (1945), and could have anticipated being brought into court here. See *World-wide Volkswagon Corp. v. Woodson*, 444 U.S. 286, 297 (1980). At all times relevant, Defendants had "continuous and systematic" contacts between

themselves and the District, a staffed office with continuous operations in the District, retained lobbyists, representatives, and counsel in the District, and through the acts of its authorized agents, which give rise to general jurisdiction over Defendants as they traveled to the United States.  See *Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 416 (1984).

112.    This Court has personal jurisdiction over all the Defendants because the Alien Tort Statute enacted as part of the Judiciary Act in 1789 provides jurisdiction for the federal courts to hear lawsuits regarding torts "committed in violation of the law of nations." 28 U.S.C. § 1350. See *Doe v. Exxon Mobil Corp.*, 654 F.3d 11 at 29 (D.C. Cir. 2011).  "The Alien Tort Statute in its entirety states '[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.' 28 U.S.C. § 1350.  The Torture Act establishes federal jurisdiction and liability for '[a]n individual who, under actual or apparent authority, or color of law, of any foreign nation ... subjects an individual to torture ...' 28 U.S.C. § 1350 note § 2(a)(1)-(2)".  *Doe v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20, at 22 (D.C. 2005).

113.    This Court has personal jurisdiction over all the Defendants because the "aiding and abetting liability is well established under the Alien Tort Statute" enacted as part of the Judiciary Act in 1789, "that the principle of aiding and abetting liability is well established in customary international law, and that the *mens rea* and *actus reus* requirements are those set out by the Nuremberg Tribunals and the international courts created by the United Nations, which reflect the standard under federal common law." See *Doe v. Exxon Mobil Corp.*, 654 F.3d 11 at 15 (D.C. Cir. 2011).  Federal courts have relied on international criminal law norms in establishing the content of the law of nations.  See, *e.g., Khulumani,* 504 F.3d at 270 (Katzmann, J., concurring); *Kadic,* 70 F.3d at 241-43; *see also Sosa,* 542 U.S. at 762-63, 124 S.Ct. 2739 (Breyer, J., concurring).  The Court of Appeals for the District of Columbia has acknowledged it is "guided by our recognition

of established and fundamental principles of international law." See *FTC v. Compagnie de Saint-Gobain-Pont-a-Mousson*, 636 F.2d 1300, 1304 (D.C. Cir. 1980). On September 28, 2016, Congress enacted the Justice Against Terrorism Act ("JASTA"), which expands ATA civil liability to reach "any person who aids and abets, by knowingly providing substantial assistance [to], or who conspires with the person who committed such an act of international terrorism." 18 U.S.C. § 2333(d)(2).

114.    Authorities and sources set forth in instant Complaint confirm that aiding and abetting and material support or resources liability is clearly established in the law of nations and consequently such liability is available in this Court. 18 U.S.C. 2339A defines the term "material support or resources" to mean currency or other financial securities, financial services, lodging, training, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets, except medicine or religious materials.

115.    This Court has personal jurisdiction over all the Defendants because "As to the extent of liability, once the conspiracy has been formed, all its members are liable for injuries caused by acts pursuant to or in furtherance of the conspiracy. A conspirator need not participate actively in or benefit from the wrongful action in order to be found liable. He need not even have planned or known about the injurious action, as in the case of the getaway driver in *Davidson [Davidson v. Simmons,* 203 Neb. 804, 280 N.W.2d 645 (1979)], so long as the purpose of the tortious action was to advance the overall object of the conspiracy." In "civil conspiracy", "a conspirator can be liable even if he neither planned nor knew about the particular overt act that caused injury, so long as the purpose of the act was to advance the overall object of the conspiracy." See *Halberstam v. Welch*, 705 F.2d 472, at 481 (D.C. Cir. 1983).

116.    With respect to conspiracy, the Supreme Court further stated:  "Secrecy and concealment are essential features of successful conspiracy.  The more completely they are achieved, the more successful the crime.  Hence the law rightly gives room for allowing the conviction of those discovered upon showing sufficiently the essential nature of the plan and their connections with it, without requiring evidence of knowledge of all its details or of the participation of others."  See *Blumenthal v. United States*, 332 U.S. 539, at 557.

117.    This Court has personal jurisdiction over the Defendants in that the Torture Victim Protection Act ("TVPA"), Pub. L. No. 102-256, 106 Stat. 78 (1992) (codified as 28 U.S.C. § 1350 note), does provide subject matter jurisdiction because Plaintiffs did exhaust, or were obstructed in exhausting, local Kurdistan legal remedies, in that such remedies are neither credible nor available as there is no fair administration of justice, before seeking relief in a United States court. The TVPA states "a court shall decline to hear a claim ... if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred." 28 U.S.C. § 1350, note 2 (emphasis added).  "Adequate and available remedies" indisputably do not exist for the Plaintiffs in Iraqi Kurdistan, the "place in which the conduct giving rise to the claim occurred."  Plaintiffs cannot find relief in any Defendant Iraqi Kurdistan Regional Government tribunal, which are manifestly unjust and oppressive, due to the legacy highly documented (by agencies of the United States Government and the United Nations, and in many contemporaneous public accounts) of an incorrigibly corrupt judiciary, political obstruction, systemic intimidation, administrative sabotage, illicit and arbitrary interference, an absence of judicial independence, deploying instruments of oppression, an absence of accountability or transparency, infliction of harm or injury unjustifiable by any government interest, deliberate indifference to and deprivation of due process and rights of Iraq constitutional law, lacking all protection of the individual against arbitrary action of government and the exercise of power against the individual without any

70

reasonable justification in the service of a legitimate governmental objective, with no reasonable access to documents for purposes of discovery, with magistrates closely aligned with and politically beholden to the Defendants who politicize legal disputes, and where Defendants invent their own judicial standards and contort facts to their liking — all to a degree that would shock the contemporary conscience. The European Union Agency for Asylum reports Defendant Iraqi Kurdistan Regional Government "Judges are frequently appointed based on partisanship rather than merit or independence." "There is an overall mistrust in the criminal justice system in Kurdistan with respect to the lack of effective investigations and the atmosphere of impunity, particularly regarding attacks on media professionals." The Defendant Iraqi Kurdistan Regional Government judiciary does not resolve cases of abuse filed by civilians against the Defendant Iraqi Kurdistan Regional Government and its officials, leaders, associates, and subordinates, and any pursuit of remedies against the Defendants in Iraqi Kurdistan would be futile and presents a substantial and serious real threat of severe, even deadly, physical or mental harm reprisals against those raising the allegations. Examples of such, and as detailed elsewhere herein, is the two-year torture of American citizen Sidqi Bradosti in a Defendant KRG prison, as straightforwardly acknowledged by a judge of the court. The District Court of the District of Columbia has made it clear that "exhaustion is a prudential doctrine that should be applied flexibly and not when further pursuit of remedies is futile." See *Doe v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20, 29 (D.C. 2005); *Cutler v. Hayes*, 818 F.2d 879, 890-91 (D.C.Cir. 1987).

118.    Because the TVPA is not a jurisdictional statute, a failure to comply with its requirements will not preclude a U.S. court from hearing a claim under it. *See Al-Odah v. United States*, 321 F.3d 1134, 1146 (D.C. Cir. 2003) (Randolph concurring). (*See also Abiola v. Abubakar*, 267 F. Supp. 2d 907,910 (N.D. Ill 2003).) The statute provides a cause of action for damages to "anyone who suffered torture anywhere in the world at the hands of any individual acting under the law of

any foreign nation." *Id.* Further, any case brought under the TVPA will also arise under federal law and jurisdiction can then be based on 28 U.S.C.16 § 1331, which expressly grants general federal question jurisdiction. *Id.*

119. This Court "must assume the truth of facts plausibly alleged in plaintiffs' … complaint and draw all reasonable inferences in plaintiffs' favor." See *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 210 (D.C. Cir. 2022). *Owens v. BNP Paribas, S.A.* (*Owens IV*), 897 F.3d 266, 272 (D.C. Cir. 2018).

120. This Court has personal jurisdiction over the Defendants because they are individual, non-state defendants that have been and are doing business in Washington, D.C., and operate in concert as an operative criminal conspiracy with an element of pecuniary gain and economic and physical threat and injury, and have a registered address at 1532 16th St NW, Washington, DC, where at all times relevant a staff was and is employed, are not immune from suit, are not relieved of responsibility under law, can point to no statute, decree, order, resolution, or comparable evidence of sovereign authorization for any of the actions in question, and are subject to this Court's jurisdiction. See 515 F.3d 1279 (D.C. Cir. 2008), 115 F.3d 1020 (D.C. Cir. 1997), and *Paul Rusesabagina, et al. v The Republic of Rwanda, et al.* (Civil Case No. 22-469(RJL), U.S.D.C.D.C March 16, 2023).

121. The Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602 et seq., does not provide immunity for Defendants. The Supreme Court said, "We hold that the FSIA does not govern the determination of petitioner's immunity from suit." *Samantar v. Yousuf*, 560 U.S. 305, 130 S. Ct. 2278, 2282, 176 L. Ed. 2d 1047 (2010). A foreign state is "presumptively immune from the jurisdiction of United States courts." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993). However, Defendant Iraqi Kurdistan and its officers are not immune as a foreign state under FSIA because of its continuing criminal enterprise as set forth herein. This

Court has declared, "Under the Foreign Sovereign Immunity Act, 28 U.S.C. § 1604, a foreign state, including its instrumentalities," which Defendant Iraqi Kurdistan Regional Government is, "is immune from suit in state or federal court unless the case falls within an express statutory exception. See *Fritz v. Islamic Republic of Iran*, Civil Action No. 2015-0456 (D.D.C. 2018), citing *Kz`lburn v. Socialist People 's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1-126 (D.C. Cir. 2004). The instant complaint details numerous and extensive express enumerated statutory exceptions.

122.   Plaintiffs do not dispute that sitting heads of state (i.e. Presidents and Prime Ministers) of *nation states* are entitled to immunity in United States courts and, with some exception, categorically immune from suit in American courts. See *Lewis v. Mutond,* 918 F.3d 142, 145 (D.C. Cir. 2019).  Nor do Plaintiffs dispute that "It is undisputed that under the FSIA, the Kurdistan Region qualifies as a foreign state. Therefore, it is given the presumption of immunity unless an exception can be demonstrated with some facts…"  *MINISTRY OF OIL OF THE REPUBLIC OF IRAQ v. 1,032,212 BARRELS OF CRUDE OIL*, Civil Action No. G-14-249 (S.D. Tex. Jan. 7, 2015).  The facts herein constitute comprehensive criminal and commercial conduct subject to exceptions enumerated in the FSIA statute, where Defendants were not acting under the auspices or lawful authority of a state but only as private individuals.

123.   However, neither Defendant Masoud Barzani nor Defendant Masrour Barzani nor any Defendant is, or has ever been, a "sitting head of a nation state", their persistent and knowingly deceptive misrepresentations, declarations, and prior claims of sovereignty notwithstanding.  As the United States Supreme Court pointed out, "'[s]overeignty' is a term … much abused." See *Boumediene v. Bush*, 553 U.S. 723, 2252, 128 S. Ct. 2229, 171 L. Ed. 2d 41 (2008).  First, Defendant Masoud Barzani, at present, holds no provincial regional presidential or prime ministerial position, within the subdivision governate of the nation state of the Republic of Iraq or any nation state.  Second, provincial Iraqi Kurdistan is indisputably not a nation state.  Loosely

and inconclusively demarcated, and with boundary lines unclearly defined, fluid, and imprecise, "Kurdistan", land of the Kurds, is an ill-defined geographic area existing within the borders of four nation states: Iraq, Syria, Turkey and Iran. These four nation states are sovereign, whereas the Iraqi Kurdistan provincial governorate, located within and a subdivision of the Republic of Iraq— where Defendants Masoud Barzani and Masrour Barzani and Waysi Barzani, and many co-conspirators, hold limited regional government executive positions — is indisputably not a nation state.

124.    Iraqi Kurdistan enjoys an asymmetrical federalism; the boundaries separating Kurdistan from the rest of Iraq were not clearly defined and there is a substantial contested area between Kurdistan and the rest of Iraq. Second, it was never established who was included in the population of Kurdistan, because Saddam Hussein had moved many Arabs into the region and the Kurds wanted them removed; Article 140 of the Iraq constitution provided for a process to establish who belonged in the region, but the process was never implemented. Further, the financial autonomy of the Kurdistan region was always tenuous. The issue hinges on control over Kurdistan's abundant oil and gas reserves, and to a lesser extent on control over custom duties on imports into Kurdistan from neighboring countries, most importantly Turkey. All three issues remain unresolved to this day. Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, each of whom did at times relevant occupy the senior-most regional government positions of executive authority of the Defendant Iraqi Kurdistan Regional Government, a constitutionally recognized autonomous regional government within the Republic of Iraq, the federal parliamentary sovereign state. The federal Republic of Iraq did not appoint them to these positions of executive command authority and they do not report to the Republic of Iraq. In this constitutional arrangement, the federal state discharges minimal to no practical governmental function; nor does the federal state exercise control over the Defendant Iraqi Kurdistan Regional Government's operations, administration,

~~legislation, judiciary, policing, or military; nor is the Defendant Iraqi Kurdistan Regional Government in general compliance with federal Republic of Iraq government goals, mandates, laws, and rules. The Defendant Iraqi Kurdistan Regional Government is virtually free of and persistently challenges, including via armed combat, or countermands intermittent and irregular efforts of Iraq to exercise any federal government control.~~

~~125. The Foreign Sovereign Immunities Act (FSIA) establishes a default rule granting foreign sovereigns immunity from the jurisdiction of United States courts. See 28 U.S.C. § 1604; *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 13 (D.C.Cir.2015). That baseline grant of immunity, however, is subject to a number of exceptions. See 28 U.S.C. §§ 1605-07; see also id. § 1604. Moreover, the non-commercial tort "exception to the FSIA does not apply to any claim arising out of malicious prosecution, abuse of process ..., misrepresentation, [or] deceit," id. § 1605(a)(5)(B). See *MacArthur Area Citizens Ass'n v. Republic of Peru, 809 F.2d 918, 921 (D.C. Cir.) (citation omitted), modified 823 F.2d 606 (D.C. Cir. 1987). MacArthur Area Citizens Ass'n v. Republic of Peru,* 809 F.2d 918, 921 (D.C. Cir.) (citation omitted), modified, 823 F.2d 606 (D.C. Cir. 1987).~~

~~126. While the FSIA "establishes a general rule granting foreign sovereigns immunity from the jurisdiction of United States courts," there are "a number of exceptions" to that rule that apply here. See *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, Case 1:22-cv-00245-RJL Document 17-1 Filed 06/11/22 Page 14 of 33 9-13–14 (D.C. Cir. 2015). Should the court determine Iraqi Kurdistan is a sovereign state, Plaintiffs herein produce evidence that the exception applies. *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013). Once Plaintiffs make this showing, "the sovereign bears the ultimate burden of persuasion to show the exception does not apply." *Id.*~~

127.    Defendants might contend that the FSIA itself obligates a plaintiff to exhaust domestic remedies before attempting to bring suit against a foreign sovereign (which Plaintiffs do not herein do and Defendants are not a foreign sovereign) in United States courts.  The Court of Appeals for the District of Columbia Circuit, however, has held that the FSIA itself imposes no exhaustion requirement.  See *Simon v. Republic of Hungary, 812 F.3d 127, 148 (D.C. Cir. 2016);  Chabad, 528 F.3d at 948-49; accord Abelesz, 692 F.3d at 678.*

128.    In the FSIA, the Congress enacted a "comprehensive framework for resolving any claim of sovereign immunity." *Republic of Austria v. Altmann*, 541 U.S. 677, 699, 124 S.Ct. 2240, 159 L.Ed.2d 1 (2004).  The purpose of the FSIA was "to free the Government from . . . case-by-case diplomatic pressures." *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. at 488, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983).  The statute effectuates this purpose by "set[ting] forth 'the sole and exclusive standards to be used in resolving questions of sovereign immunity raised by foreign states before Federal and State courts in the United States.'" *MacArthur*, 809 F.2d at 919 (emphasis added) (*quoting* H.R. Rep. 94-1487, at 12.)  Iraqi Kurdistan is indisputably not a foreign state, but is a subordinate part thereof.  Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani have no absolute immunity, and their criminal conduct falls outside the outer perimeter of any lawfully empowered official responsibilities.  FSIA does not immunize criminal conduct.  "No officer of the law may set that law at defiance with impunity." *United States v. Lee*, 106 U.S. 196, 220 (1882).

129.    Nonetheless, should the Defendant Iraqi Kurdistan Regional Government or its Defendant officials incorrectly assert that such sovereign immunity is applicable, the FSIA terrorism exception strips immunity from a foreign state that "specifically instructs" a terrorist organization to carry out an attack and from a foreign state that "only provides general support, but was not involved with the" specific act.  See *Kilburn v. Socialist People's Libyan Arab Jamahiriya, 376*

76

F.3d 1123, 1128 (D.C. Cir. 2004)). Under the causation standard imposed by the FSIA, a plaintiff need not establish but-for causation and instead may articulate a claim by showing (1) the defendant's actions were "a 'substantial factor' in the sequence of events that led to the plaintiff's injury; and (2) the plaintiff's injury was "'reasonably foreseeable or anticipated as a natural consequence' of the defendant's conduct." See *Owens v. BNP Paribas, SA,* 897 F.3d 266, 794 (D.C. Cir. 2018). Further, This Court has held "Political assassinations ordered by foreign states outside their territory, however, are not valid acts of state." See *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, at 24 (D.C. 1998).

130. With respect to Defendant Masoud Barzani, no longer an official of the Defendant Iraqi Kurdistan Regional Government since 2017, the United States Supreme Court held that a former official is not covered by the FSIA. See *Samantar v. Yousuf*, 560 U.S. 305, 130 S. Ct. 2278, 176 L. Ed. 2d 1047 (2010). Former Presidents of Defendant Iraqi Kurdistan Regional Government enjoy no special conditions on their criminal and civil liability. The Supreme Court also held that the term "agency or instrumentality" in the FSIA does not refer to natural persons, such as individual government officials. *Id. at 2286-87.*

131. "The fact that a person who committed an act which constitutes a crime under international law acted as Head of State or responsible Government official does not relieve him or her of responsibility under international law." See *U.N. International Law Commission, Principles of International Law Recognized in the Charter of the Nürnberg Tribunal and in the Judgment of the Tribunal, in Report of the International Law Commission on its Second Session, 5 June to 29 July 1950, (Document A/1316), reprinted in II YEARBOOK OF INTERNATIONAL LAW COMMISSION 1950, 374, 375 U.N. Doc. A/CN. 4/SER.A/1950/Add. 1 (Jun. 6, 1957)* ("*PRINCIPLE III)* "The fact that a person who committed an act which constitutes a crime under international law acted as Head of State or responsible Government official does not relieve him

from responsibility under international law." See *U.S. Department of Defense Law of War Manual, 2015, p. 1150.*

132.    "The official position of any accused person, whether as Head of State or Government or as a responsible Government official, shall not relieve such person of criminal responsibility nor mitigate punishment." See *U.S. Department of Defense Law of War Manual, 2015, p. 1150.*

133.    Acting pursuant to orders does not relieve a person of responsibility. The International Law Commission has declared:

> "The fact that a person acted pursuant to orders of his or her Government or of a superior does not relieve that person from responsibility under international law, provided it was possible in fact for that person to make a moral choice." See *U.S. Department of Defense Law of War Manual, 2015.*

The standard for Defendants' liability for criminal acts exceeds that for civil liability of those acts.

134.    The Supreme Court has been equally clear on federal court jurisdiction regarding treaties. "It is a general principle of construction with respect to treaties that they shall be liberally construed, so as to carry out the apparent intention of the parties to secure equality and reciprocity between them." *Geofroy v. Riggs,* 133 U.S. 258, 10 S. Ct. 295, 33 L. Ed. 642 (1890). With relevance in the instant matter, with respect to another "Convention" the Supreme Court said it is "a multilateral treaty to which approximately 160 countries, including the United States. . . are signatories. As a ratified treaty, [it] has the status of federal law." "[T]reaties are recognized by our Constitution as the supreme law of the land." *Breard v. Greene,* 523 U.S. 371, 118 S. Ct. 1352, 140 L. Ed. 2d 529 (1998). U.S. Constitution, Article VI, clause 2 (all treaties shall be supreme law of the land). Defendants have abused and dishonored treaties as set forth herein with impunity and reckless abandon to, knowingly and willfully, criminally and tortiously harm Plaintiffs.

135. Further, although "[t]he text of § 1605A(a)(1) does not expressly address attempts to commit acts" such as extrajudicial killing, Courts in this District have concluded that injuries "resulting from 'deliberate' attempts to kill fall within the scope" of the terrorism exception. *See Cabrera v. Islamic Republic of Iran*, Civil Action No. 19-3835, 81 (JDB) (D.C. Jan. 27, 2023); *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 58 (D.C. 2019); accord *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 99 (D.D.C. 2017).

136. Defendants have purposefully directed tortious activity at residents of this forum. Plaintiffs' claims arise out of, and relate to, Defendants' long-running conspiracy to cause pain and sow terror in the United States injuring Plaintiffs. Plaintiffs are not the only link between Defendants and the forum; rather, Defendants' tortious conduct also forms the necessary connection. Defendants have repeatedly, purposefully, knowingly, and willingly defrauded businesses of the United States; Defendants have repeatedly, purposefully, knowingly, and willingly defrauded the United States Government; and Defendants have repeatedly and expressly intended to affect the United States and its economic, military, and national security interests and the conduct of U.S. foreign policy and U.S. citizens through their violent, incessant, and expansive criminal conspiracy conduct. This tortious and criminal conduct by Defendants has provided the means for Defendants to damage Plaintiffs.

137. Pursuant to 28 U.S.C. § 1391(b)(1), venue is proper in the United States District Court for the District of Columbia because the Defendant's principal place of business in the United States is in the District of Columbia, where Defendants for all times relevant have and do maintain an office and employed staff, and because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

138. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 18 U.S.C. § 2333(d), and 18 U.S.C. § 2338, as a civil action brought by citizens of the United States who have

been killed, maimed, injured or otherwise harmed by reason of acts of international terrorism at a depth of self-enriching evil beyond horrific; to also include foreign nationals pursuant to 28 U.S.C. 1350 harmed by the Barzani Continuing Criminal Enterprise operating worldwide, including in the United States; and their estates, survivors, and heirs.

139.    This court has subject matter jurisdiction because "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U. S. C. § 1350.  (See *Sosa v. Alvarez-Machain*, 542 U.S. 692, 124 S. Ct. 2739, 159 L. Ed. 2d 718 (2004)).

140.    This court has subject matter jurisdiction pursuant to 28 U.S. C. § 1331; 28 U.S.C. §§ 1391(b), and (d); 28 U.S.C. § 2331; 18 U.S.C. § 2333(d); and, 18 U.S.C. § 2334(a), as a civil action brought by citizens of the United States who have been killed or injured by reason of acts of international terrorism, and their estates, survivors, and heirs.

141.    Defendants are subject to personal jurisdiction pursuant to 18 U.S.C. § 2334(a), and Fed. R. Civ. P. 4(k).

142.    As explained in greater detail below, and upon information and belief, and at all times relevant hereto, Defendants' conduct had a substantial nexus to the United States and to Washington, D.C., including by virtue of repeated and systematic use of U.S. dollar transactions and banks in the United States to pay, conspire with, and aid and abet terrorists or to launder proceeds from such transactions.  Defendants thereby purposefully availed themselves of U.S. jurisdiction to commit the tortious acts described in the Complaint, which enabled ISIS (the terrorist extremist group Islamic State in Iraq and al-Sham ("ISIS" a.k.a. "ISIL" a.k.a. "IS" a.k.a. "Islamic State")) and IRGC (Islamic Revolutionary Guard Corps), a unit of the Government of Iran, to carry out terrorist attacks that killed or harmed U.S. citizens and foreign national Plaintiffs in Iraqi Kurdistan and elsewhere, and further a global covert influence campaign, thereby injuring

Plaintiffs. "Iran is a major state sponsor of global terrorism, and particularly of terrorism against the United States." "The IRGC is 'the primary driver of Iran's terror activities.'" "The IRGC protects Iran's regime and attempts to impose its clerical regime on other Muslim nations throughout the Middle East, providing military forces, directing much of Iran's economy, and implementing a global campaign of terrorist activity." *See Cabrera v. Islamic Republic of Iran*, Civil Action No. 19-3835 (JDB) (D.C. Jan. 27, 2023). The United States designated Iran as a state sponsor of terrorism in 1984, and that designation has remained in place ever since. (The U.S. government often designates one element of a terrorist group before the group itself, like the IRGC's Qods Force (designated as an SDGT organization in 2007) and its parent group, the IRGC (designated in 2017)). (See *Cabrera v. Islamic Republic of Iran*, Civil Action No. 19-3835 (JDB) at 17 (D.C. Jan. 27, 2023).)

143. The Islamic State of Iraq and Syria, or ISIS, is a Sunni Islamist militant group known for documented extreme violence and radical interpretation of Islamic law. It emerged from the remnants of the al-Qaeda terrorist group in Iraq and is also known as the Islamic State, ISIL or Daesh. "Al Qaeda provided significant operational support to the Taliban in planning and authorizing terrorist attacks" against Americans in Afghanistan. See *Cabrera, et al. v. Islamic Republic of Iran*, 2022 WL 2817730, at 9 (D.D.C. July 19, 2022).

144. To carry out their operative transnational criminal enterprise conspiracy, upon information and belief, and at all times relevant hereto, Defendants purposefully made and do make U.S. dollar payments to terrorist and sanctioned intermediaries and others and wired funds through U.S. banks for money laundering purposes.

145. Defendants knew that their strategy to generate hard-to-trace off-the-books cash sources through uncontrolled slush funds for their illicit transactions caused U.S. dollar, cash-based protection payments to terrorists. Defendants knew that terrorists craved access to U.S. dollars,

most of all the American cash that was the currency of choice for terrorists worldwide. Numerous United States government reports alerted Defendants, and their Washington D.C. agents, representatives, attorneys, and advisors, that bulk U.S. dollar cash payments and associated cash smuggling were a key strategy to route payments to terrorists.

146. Confidential Human Sources #1 and #2, who have direct clandestine access to senior ranking Barzani subordinates, from the previously impenetrable inner circle of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, confirm that numerous other payments in furtherance of their conspiracy with ISIS and IRGC and others were made in U.S. dollars. International U.S. dollar banking transfers are cleared through financial institutions that deal in U.S. dollars in the United States, known as intermediary banks.

147. By routinely and purposefully engaging in U.S. dollar-denominated transactions Defendants, upon information and belief, and at all times relevant hereto, purposefully availed themselves of the benefit of doing business in the United States.

148. Defendants are also subject to personal jurisdiction given their participation in a conspiracy with ISIS and IRGC, whose actions were at all relevant times directed at the United States, including the killing of Americans.

149. First, Defendants, upon information and belief, and at all times relevant hereto, and ISIS and IRGC were in an operative conspiracy to provide material support to foreign terrorist organizations ("FTOs") in violation of U.S. criminal law, namely, 18 U.S.C. § 2339B. ("A conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." (See *United States v. Jackson, 335 F.3d 170, 180 (2d Cir. 2003)* (internal quotation marks omitted)) As with the other elements of a conspiracy, "a defendant's knowledge of the conspiracy and his participation in it with criminal intent may be established through circumstantial evidence." See *United States v. Gordon, 987 F.2d 902, 906–07 (2d Cir. 1993).*

150.   Second, Defendants, upon information and belief, and at all times relevant hereto, participated in that conspiracy by making millions of dollars in transactions with ISIS and IRGC, which allowed ISIS and IRGC to carry out terrorist attacks and engage in other unlawful acts.

151.   Third, ISIS's and IRGC's terrorist attacks were expressly directed at the United States.  In one representative instance, in August 2014, ISIS broadcasted its beheading of U.S. journalist James Foley, and threatened the life of another American journalist, Steven Sotloff, if President Obama did not end military operations in Iraq.  Tellingly, the beheading videos of both Foley and Sotloff (in September 2014) were titled "Message to America" and "A Second Message to America," respectively.  ISIS stated that its killing of Sotloff was specifically in response to U.S. airstrikes targeting it in Iraq.

152.   Fourth, Defendants knew that they were dealing with the Islamic State and IRGC, because the people and entities that Defendants interacted with held themselves out as representatives of these terrorist organizations and because it was common knowledge in Iraqi Kurdistan, that their payments were being used to support terrorist activities and affiliates.   Al-Qaeda, serving as a global network and umbrella group that organized the anti-American terrorist campaigns of its branches (like al-Qaeda-in-Iraq) and affiliates or allies (like the Taliban) - which in effect merged with ISIS in Iraq, subsequently (the court found) "provided significant operational support to the Taliban in planning and authorizing terrorist attacks against Americans in Afghanistan."   See *Cabrera, et al. v. Islamic Republic of Iran*, 2022 WL 2817730, at *9 (D.D.C. July 19, 2022).

153.   Through al-Qaeda's global network, al-Qaeda terrorists enjoyed a force-multiplier effect by establishing links with other like-minded organizations around the globe, and the resultant terrorist interconnectivity, changed the nature of terrorism.   At all times, al-Qaeda emphasized unity with other Islamists – as long as they sought to attack America.  Under this approach, al-Qaeda's strategy was to use its money, polyterrorists, and good offices to try to build bridges and

otherwise unite Islamists who targeted Americans in order to expel the U.S. from the Middle East. Al-Qaeda's doctrinal emphasis on unity, and the cooperation with other terrorists demanded by it, served al-Qaeda's programmatic interests by positioning al-Qaeda as the leader of an anti-American vanguard, facilitating cooperation with potential Islamist allies who might otherwise be enemies (like the IRGC).

154.   Beyond paying al-Qaeda-in-Iraq, the Islamic State, and IRGC directly, Defendants also knew that their partners, consultants, and subcontractors were using the money they received through their illicit transactions with Defendants to flow through Defendants' money to terrorists on Defendants' behalf. With respect to the Iraqi Kurdistan corruption economy — meaning the economy concerning illicit transactions in Iraqi Kurdistan — that practice was an open secret in the Iraqi and Syrian areas that were contested by al-Qaeda, al-Qaeda-in-Iraq, the Islamic State, and IRGC, and was communicated repeatedly to firms operating (or transporting goods) there. When Defendants paid their crooked local partners, consultants, and subcontractors for "security" in that environment, they knew full well where the money was going. Given what the Barzani regime knew about the payments it was making, the operating environment in Iraq, and the sophistication of the FTOs' protection-money schemes, it is certain that the Barzani regime's money ultimately ended up in the hands of violent terrorists.

155.   Defendants simultaneously kept secret their knowledge of the transactions that were instrumental in financing attacks on Americans in Iraq, Afghanistan, and Syria. Defendants did so even when they had affirmative legal obligations requiring disclosure to the U.S. government, among others. By fraudulently concealing such transactions with foreign terrorist organizations (FTOs) when Defendants had a duty to share what it knew, Defendants also provided vital operational aid to the functioning of al-Qaeda's, al-Qaeda in Iraq's and Islamic State's activities — independent of the U.S. dollars that Defendants paid such FTOs — by depriving the U.S.

government of actionable intelligence and accurate information, which prevented U.S. military, intelligence, diplomatic, and law enforcement pressure that would otherwise make it harder for the terrorists to extract comparable value from their activities in Iraqi Kurdistan, and harm Plaintiffs.

156.   Defendants' payments funded attacks by al-Qaeda, al-Qaeda-in-Iraq, the Islamic State, and IRGC that were acts of "international terrorism." 18 U.S.C. § 2333(a).  At all relevant times, the United States designated al-Qaeda, al-Qaeda-in-Iraq, the Islamic State, and IRGC as FTOs, which reflected their status as four of the world's deadliest terrorist groups.  Since the start of U.S.-led humanitarian efforts in Iraq, Syria, and Afghanistan following 9/11, each FTO's core purpose has been to expel Americans from Iraq, Syria, and Afghanistan and overthrow Iraq's and Afghanistan's then-existing U.S.-backed democratic governments—which mission succeeded in Afghanistan in August 2021.  To date, al-Qaeda, al-Qaeda-in-Iraq, the Islamic State, and IRGC have collectively killed, or helped kill, well more than 2,500 U.S. service members and wounded roughly 30,000 more, primarily in Iraq and Afghanistan, but also in Syria and other countries in the Middle East, Europe, Asia, and Africa.  Defendants' payments helped finance those attacks.

157.   Plaintiffs' allegations are not speculative nor implausible .   They are based on Confidential Human Source witnesses, who have direct clandestine access to senior ranking Defendant Iraqi Kurdistan Regional Government and KDP officials, with direct and indirect knowledge of the alleged facts; unclassified and declassified military and intelligence agency reporting; U.S. diplomatic and military cables; Congressional fact-finding; U.S. executive branch reports to Congress; internal U.S. executive branch reports, documents, and papers; personal witness knowledge of U.S. executive branch and military persons;  papers and communiques of the Iraqi Kurdistan Regional Government and its principals; submissions of the Defendant Iraqi Kurdistan Regional Government to agencies of the United States government; United Nations and Financial Action Task Force reports; media accounts; and Plaintiffs' recollections.

158.    In September 2014, ISIS spokesperson Shaykh Abu Muhammad Al-Adnani ash-Shami gave a speech entitled "Indeed, Your Lord is Ever Watchful," in which he explicitly spelled out the anti-American objectives of the ISIS movement, stating, for example:

> *"O Allah, America, France, and their allies transgressed against us. They came with their legions to fight us out of their enmity for your religion. They prevent us from establishing your religion and your hudūd (fixed punishments), and ruling by what you revealed. O Allah, you know our weakness. We have no way to deal with their airplanes. O Allah, you have said what is true, 'So do not weaken and do not grieve, and you will be superior if you are [true]. O Allah, we have believed in you and relied upon you. You are sufficient for us and the best disposer of affairs. O Allah, America and its allies disbelieve in you and associate partners with you."*

A leading terrorism expert testified before the Subcommittee on Counterterrorism and Intelligence of the U.S. House of Representatives Committee on Homeland Security that the "U.S. military has ostensibly become a primary target for the Islamic State."

159.    ISIS's and IRGC's overt acts targeted the United States and U.S. citizens. Defendants conspired with ISIS and IRGC to target, torture, and kill American citizens. As a result of the conspiracy between Defendants and ISIS and IRGC, ISIS's and IRGC's overt acts targeting the United States and U.S. citizens, including Plaintiffs, are attributable to Defendants.

160.    This Court has jurisdiction because acts or omissions in furtherance of the criminal offense occurred within Washington, D.C.  See 18 U.S.C. § 3237.  The United States Department of the Treasury is a federal government agency located in Washington, D.C.  Through its Office of Foreign Assets Control ("OFAC"), also located in Washington, D.C., the United States Department of the Treasury administered and enforced economic and trade sanctions against certain foreign countries, including Iran, as well as individuals and entities associated with those countries.  OFAC was empowered to grant or deny license applications for the export or re-export of U.S. goods to Iran.

161. Further, the United States Department of Commerce is a federal government agency located in Washington, D.C. Through its Patent and Trademark Office ("PTO"), the United States Department of Commerce grants U.S. patents and registers trademarks, administers and enforces trademarks and trademark infringement, protects new ideas and investments in innovation and creativity, and enforces intellectual property infringement, including patent infringement, trademark counterfeiting, copyright piracy, and trade secret theft which cause significant financial losses for American right holders and legitimate businesses around the world. In its most pernicious forms, as accomplished by Defendants' criminal acts, intellectual property infringement endangers the public and harms American workers whose livelihoods are tied to America's innovation-driven sectors.

162. Further, the United States Department of Health and Human Services is a federal government agency located in Washington D.C. Through its Food and Drug Administration ("FDA"), the United States Department of Health and Human Services is responsible for protecting public health by ensuring products intended for human use are safe and effective, including human pharmaceutical and biological products, medical devices, and tobacco products, and to protect human exposure to drugs that may be counterfeit, stolen, contaminated, or otherwise harmful—as are the counterfeit products of the Barzani Continuing Criminal Enterprise.

162. As explained in greater detail below, and upon information and belief, and at all times relevant hereto, Defendants' conduct had a substantial nexus to the United States and to Washington, D.C., including by virtue of repeated and systematic use of U.S. dollar transactions and banks in the United States to pay, conspire with, and aid and abet terrorists. Defendants thereby purposefully availed themselves of U.S. jurisdiction to commit the tortious acts described in the Complaint, which enabled ISIS to carry out terrorist attacks that killed U.S. citizens in Syria, Iraq, and Libya, thereby injuring Plaintiffs.

164.   To carry out their conspiracy, upon information and belief, and at all times relevant hereto, Defendants, and their agents, representatives, and collaborators, purposefully made U.S. dollar payments to terrorist intermediaries and others that were wired through the United States.  Indeed, Defendants' "preferred option" for paying terrorists was to make "bank transfer[s] in USD," which were designed to avoid detection by auditors and governmental entities.

165.   Upon information and belief, and at all times relevant hereto, Defendants communicated that in furtherance of their conspiracy with ISIS payments were made in U.S. dollars.

166.   In addition, upon information and belief, and at all times relevant hereto, Defendants regularly used email accounts serviced by U.S.-based email service providers, to coordinate and carry out elements of their partnership with ISIS.  U.S.-based email service providers are considered more secure than non-U.S.-based providers.

167.   Upon information and belief, and at all times relevant hereto, Defendants are also subject to personal jurisdiction given their participation in a conspiracy with ISIS, whose criminal and tortious actions were at all relevant times directed at the United States.

168.   Upon information and belief, and at all times relevant hereto, Defendants' conduct occurred within the District of Columbia and the extraterritorial jurisdiction of the United States in conspiring to provide material support to terrorists.  The offenses occurred in part within the United States, the offenses occurred in and affected interstate and foreign commerce, and the defendants conspired with enemies of the United States.  Based on these contacts with the United States, the Court has jurisdiction over the Defendants and the subject matter of this action.

169.   An official, employee, or agent of a foreign state designated as a state sponsor of terrorism ... while acting within the scope of his or her office, employment, or agency shall be liable to a United States national or the national's legal representative for personal injury or death caused by acts of that official, employee, or agent for which the courts of the United States may maintain

jurisdiction under [28 U.S.C. § 1605(a)(7)] for money damages which may include economic damages, solatium, pain, and suffering, and punitive damages if the acts were among those described in [§ 1605(a)(7)]. 28 U.S.C. § 1605 note.  Defendants at times relevant have been and are agents and collaborators and co-conspirators of an instrument of a foreign state—the Islamic Republic of Iran, not provincial Defendant Iraqi Kurdistan Regional Government—designated as a state sponsor of terrorism.

170.  Upon information and belief, and at all times relevant hereto, Defendants from, through, and by their Washington D.C. office and their Fairfax Virginia office and through and by their appointed, deputized, designated, and closely supervised Washington D.C. representatives and employed staff, have repeatedly and recurrently violated requirements of the Foreign Agents Registration Act (FARA) which establishes a registration, reporting (of accurate and complete information), and disclosure regime for agents of foreign principals (which includes foreign non-government individuals and entities) so that the U.S. government and the people of the United States are truthfully informed of the source of information and the identity of persons attempting to covertly and overtly influence U.S. public opinion, policy, and law.  Persons subject to the requirements of FARA have a legal duty and among other things are required to submit periodic registration statements containing truthful information about their activities and the income earned from them.  Specifically, in part:

> *FARA states that "[n]o person shall act as an agent of a foreign principal unless he has filed with the Attorney General a true and complete registration statement." 22 U.S.C. § 612(a). Disclosure of the required information allows the United States Government and the American people to evaluate the statements and activities of such persons in light of their function as foreign agents.*

By fraudulently making a false and misleading statement of a material fact and omitting to state a material fact necessary to make the statements made, and disregarding, concealing, and masking

a mountain of incriminating evidence in periodic registration statements required to be filed and other required documents, records, and oral representations, which did not, in reasonable detail, accurately and fairly reflect truths, with the intent to deceive and defraud, and thereby improperly influencing the conduct of United States officers and officials, and to promote and conceal their ongoing transnational criminal schemes, Defendants, especially co-conspirator Defendants Bayan Sami Abdul Rahman, Treefa Aziz, and Hikmat Bamarni, as individuals demonstrated reckless, purposeful, knowing, and willful disregard for the truth in public declarations and filings with agencies of the United States Government. Defendants and their Washington, DC based agents, representatives, advisors, consultants, and attorneys falsified and caused to be falsely stated and certified and submitted or caused to be submitted by the Washington D.C. office of the Defendant Iraqi Kurdistan Regional Government and by its Defendant Iraqi KRG Washington representatives and employed staff, and by the Fairfax, Virginia office of the Kurdistan Democratic Party representative, designated, appointed, empowered, and directed by and reporting to Defendants Masoud Barzani and Masrour Barzani, and its retained Washington D.C. consultants and advisors functioning under their direction, did, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of one and more unlawful activities, repeatedly, knowingly, and purposefully contained untruthful, fabricated, incomplete, deceptive, misleading, fictitious, and mendacious information, at a time contemporaneous with the Barzani continuing criminal enterprise and by trick, scheme, and device did cover up and knowingly failed to disclose and fraudulently concealed material facts and adverse information and failed to disavow their wrongful conduct and misrepresented the truth about the Barzani Continuing Criminal Enterprise in furtherance of the conspiracy and to effect the illegal object thereof, issuance and submission thereof to the executive branch of the United States Government taking place in the District of Columbia and elsewhere and published in English and targeting a

United States audience as part of a broad, premeditated, and calculated effort to covertly and overtly influence, distract, and shape public perceptions of Defendants Masoud Barzani and Masrour Barzani and their subordinates in the United States and around the world, and engaging in an act, practice, and course of conduct which operated and would operate as a fraud and deceit upon an official person, and with the intent to impede, obstruct, mislead, deceive, defraud, or influence the foreign and military policy, opinion, and law decision-making of the Government of the United States and citizens of the United States who relied on said filings to be truthful, and took substantial actions domestically that aided and abetted violations of treaties, conventions, and law, including collaboration with officially designated terrorist organizations, all at all times relevant hereto and in furtherance of the Barzani continuing criminal enterprise and were major factors responsible for the acts complained of herein. Based on these actions repetitively occurring and originating, over a period of years, and at all times relevant, within the District of Columbia, the Court has jurisdiction over the Defendants and the subject matter of this action. Upon information and belief, and at all times relevant hereto, the true names and capacities, whether governmental or otherwise, of additional prospective Defendants are unknown to Plaintiffs at this time. When the true names and capacities of all said Defendants have been ascertained, Plaintiffs will move to amend this Complaint accordingly.

171.    The United State of America, through its Department of State, does not accord official diplomatic mission or consular status to the Defendant Iraqi Kurdistan Regional Government office in Washington D.C. nor grant diplomatic privileges and immunities to its Washington D.C. office representatives, employees, and advisors.

172.    Upon information and belief, and at all times relevant hereto, Defendants inclusive, and unknowns, are responsible, criminally, and/or in some other actionable manner, for the events and

happenings hereinafter referred to, and caused injuries and damages proximately thereby to Plaintiffs John Does 1-5,000 as hereinafter alleged.

173.    At all times relevant herein, Defendants, and each of them, acting as individuals, were the agents, servants, partners, representatives, associates, and employees of and co-conspirators with each and every other Defendant, including Barzani family members and family members by marriage, and were acting within the course and scope of their agency, partnership, agreement, association, and employment, and, to the extent permitted by law, are jointly and severally liable.

174.    The United States Supreme Court has held that "a conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense." See *Salinas v. United States*, 522 U.S. 52, 63 (1997). The 3rd Circuit Court of Appeals emphasized that "one who opts into or participates in a conspiracy is liable for the acts of his [or her] co-conspirators … even if the defendant did not personally agree to do, or conspire with respect to, any particular element." See *Smith v. Berg*, 247 F. 3d 532, 537 (3rd Cir. 2001).

175.  The United States Supreme Court also held that "an overt act of one partner may be the act of all without any new agreement specifically directed to that act." See *United States v. Kissel,* 218 U.S. 601, 608.

176.    The United States Supreme Court further held that "The criminal intent to do the act is established by the formation of the conspiracy.  Each conspirator instigated the commission of the crime.  The unlawful agreement contemplated precisely what was done. It was formed for the purpose.  The act done was in execution of the enterprise.  The rule which holds responsible one who counsels, procures, or commands another to commit a crime is founded on the same principle. That principle is recognized in the law of conspiracy when the overt act of one partner in crime is attributable to all." See *Pinkerton v. United States*, 328 U.S. 640, 66 S. Ct. 1180, 90 L. Ed. 1489, at 647 (1946).

177.    Plaintiffs' claims meet the Supreme Court's "touch and concern" test with sufficient force to displace the general presumption against jurisdiction over extraterritorial claims, first articulated in *Kiobel v. Royal Dutch Petrol. Co.,* and, therefore, the Court has jurisdiction over Plaintiffs' ATS claims. 569 U.S. 108, 124-25, 133 S.Ct. 1659, 185 L.Ed.2d 671 (2013).  Additionally, The D.C. Circuit has held that corporations can be liable under the ATS.  See *Doe I v. Nestle USA, Inc.*, 766 F.3d 1013, 1022 (9th Cir. 2014); *Flomo v. Firestone Nat'l Rubber Co., LLC*, 643 F.3d 1013, 1017-21 (7th Cir. 2011); *Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 57 (D.C. Cir. 2011), *vacated on other grounds*, 527 F. App'x 7 (D.C. Cir. 2013); *Romero v. Drummond Co., Inc.*, 552 F.3d 1303, 1315 (11th Cir. 2008).

## DEFENDANTS' MINIMUM STATUTORY VIOLATIONS

178.    By reason of the conduct alleged herein, the criminal and civil violations of U.S. federal law, Presidential Executive Orders having force of law, and regulations, and treaties, agreements, conventions, and international laws, knowingly or recklessly, directly or indirectly, committed or caused to be committed by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their co-conspirators, agents, representatives, servants, Barzani family members and family members by marriage, are inordinately extensive in number, scope, depth, breadth, magnitude, gravity, continuity, longevity, and criminal severity, and danger to the economic and national security interests of the United States and its citizens, and injured Plaintiffs, have repeatedly, purposefully, knowingly, and in furtherance of multiple international and transnational criminal schemes and to effect its illegal objects, including supportive acts of international terrorism that killed and injured Plaintiffs named and unnamed, in a continuing series of overt acts and violations which undermined the rule of law and violated the law of nations, treaties, agreements, and conventions, and at a minimum the following distinct U.S. federal

statutory provisions, the criminal violations condoned, taken, and being taken, directly and indirectly, by the Defendants have provided the means for Defendants to injure Plaintiffs:

(a)     18 U.S.C. 2339C(a)(1)(B)    Financing Terrorism: The Barzani Continuing Criminal Enterprise is in the global business of financing its own terrorism and that of its co-conspirators.

(b)     21 U.S.C. 848    Continuing Criminal Enterprise: The Barzani Continuing Criminal Enterprise is a global continuing criminal enterprise that has committed or caused to be committed a legion of felonies involving hundreds of people on a global scale and obtained for itself and its partners in the Barzani Continuing Criminal Enterprise billions of dollars. The Barzani family wealth obtained from their criminal enterprise is currently estimated to be in excess of US$100 billion dollars.

(c)     31 U.S.C. 3729    False Claim Act: The Barzani Continuing Criminal Enterprise has repeatedly overcharged the United States by billing for "Ghost personnel", presented false invoices for jet fuel supplied to the U.S. military in Iraq, and created false records of the disposition of U.S. property and materiel.

(d)     18 U.S.C. 2332d    Financial Transactions: Masrour Barzani, a permanent resident alien of the United States, has engaged in financial transactions and suspicious financial structures with Iran and other designated terrorist states and organizations, subjecting him to ten years in prison for each transaction   of which transactions there have been hundreds, if not thousands.

(e)     18 U.S.C. 2339A    Providing Material Support to Terrorists: The Barzani Continuing Criminal Enterprise has been doing business with, and providing material support to designated terrorist organizations for decades, including the Islamic State of Iraq (ISIS).

(f)     18 U.S.C. 1203; 18 U.S.C. 2332(b)(2); 18 U.S.C. 1114; 18 U.S.C. 1116    Hostage taking resulting in death; Conspiracy to Murder United States Citizens Outside the United States; Protection of Officers and Employees of the United States; Murder … of Internationally Protected Persons: Masoud Barzani, Masrour Barzani and Waysi Barzani directing the Barzani Continuing Criminal Enterprise kidnapped and murdered an official of the United States in Balay, Iraqi Kurdistan. He was beaten to death, and his lifeless body was left in Barzan Creek, in the village of Barzan (a town controlled by the Barzani Continuing Criminal Enterprise) in November, 2021. This kidnapping and murder was done with the express purpose of compelling the Government of

the United States to act in a manner dictated by the Barzani Continuing Criminal Enterprise and to thereby financially benefit and perpetuate the Barzani Continuing Criminal Enterprise, all to the detriment of Plaintiffs.

(g)        18 U.S.C. 1958 – Murder for hire:  As identified by Confidential Human Source number #2, who has direct clandestine access to senior ranking Iraqi KRG government officials, the Barzani Continuing Criminal Enterprise under the direction of Masoud Barzani, Masrour Barzani, and Waysi Barzani, during the past several decades and continuing to the present time, have paid as agents of the Barzani Continuing Criminal Enterprise and of the Iraqi KRG Parastin to carry out the extrajudicial murder directives of Masoud Barzani, Masrour Barzani, and Waysi Barzani, Defendants Karim Sinjari, Sidad Barzani, Sirwan Barzani, Fazel Mirani (a U.S. citizen) (AKA Fathal Mirini, Fadal Mirani), Herish (Hersha) Rash, Dilshad Hassan Najar, Ismat Argoshi, Ahmad Kurdu Nori, Wahid Bakukusi, Barzan Kassab, Azad Germari, Azad Germavi, Adil Butani, Ferset Sonofai, Wahid Kuvili, Rajab Germavi, Reco Warmavi, Subhi Male, Subhi Bedouin, Faisal Rustinki, Shukri Hetti, Muhsin Siari, Abu Enter, Peace Kucher, Shepherd Kucher, Shepherd Sindi, Mahdi Boti, Ahmed Kocher ,Tahsin Kemeki, Adib Sindi, Muhammad Rashid Spindari ,Sami Bedouin ,Hakim Kurmei, Khalid Hazani, Shihab Remaini, Agid Doski, Karim Hatuti, Mislih Germavi, Abucurc Germavi, Salim Korean, Saeed Bamerni, Kamiran Sindi, Muhsin Siari, Kovan Kocher Zedki, Muhammad Mirza Zakhoyi, Masud Chalki, Persian Jesus Silvanei, Segvan Jamil, Abu Serko, Ferhan Korean, Kamiran Mufti, Mahdi Boti, Abdulsitar Sonami, Hamza Kocher, Sheikh Seo Mizuri ,Nizar Muhammad, SelimAdib Sindi, Khalid Hamzani, Abuzero Zakho, Aziz Weysi, Ismet Orei, Hikmet Son, Kemal Kurmeyi, Salah Mirani, Saeed Shingali, Ramadan Kocher, Ahmad Hava, Badal Bendi, Ekrem Kovili, Chavu Kovili, Ashur Goran,  Muhyiddin Miziri, Jamal Finished, Meki Tayib Amedi, Shawkat Barbhari, Saeed Ahmed Bewab, Selim Zebari, Kharib Akrei, Muhammad Suleiman Sulaymaniyah, Siamend Sulaymaniyah, Behcet Avdel, Azad Majid Boti, Newzad Boti Doski, Khalil ShaxiMuhammad Sa'don, Bijar Khilbishi, Naji Karbili, Abdullah Bani Mizuri, Herbi Korean, Ibrahim Hamid Pedayi, Bashir Muhammad Tahir, Etrushi, Abdulaziz Etrushi, Hamid Abdlwahid Bendi, Naji Banki Doski, Hamid Emer Sindori, Shihab Mullah Saeed Rekani, Feroq Hetti, Ibrahim Kocher, Meawy Shilani, Dilo Mizo Akrei, Nazim Mirad Ebo Riş, Bapir Abdulqadir Bagheri, Yonis Bagheri, Badal Bagheri, Muhammad Amin, Sorchi, Ahmed Osman, Kamiran Sinduri, Nezhet Haley, Ali Teter Nerwei, Naji Ahmed Bedihi, Sheikh Elo, Emer Orei, Ali Ewni, Sarbest Tirwanishi, Sarbest Babiri, Babekr Zebari, Zeim Ali,, Fahmi Salman, Abdullah Salih, Dilzar Nuri Abbas Shingali, Ilmi Hassan Mizur, Jamal Quasim, United Tribuns mafia, Baval Talibani, "Shalawo", and Sheikh Zanna to murder,

attempt to murder, enforced disappearance, and/or torture in excess of five thousand John Doe Plaintiffs and members of their families located in the United States and in many nations of the world, including the nations of the European Union, and nations in the Middle East.

(h)    18 U.S.C.§§ 1116(a), 1116(c), and 1111(b)    Murder of an Internationally Protected Person.  The Barzani Continuing Criminal Enterprise did in 2021 murder, by means of physical beating, a U.S Government agent employee, an internationally protected person.

(i)    18 U.S.C. 1956    Laundering Money: The Barzani Continuing Criminal Enterprise has for decades been laundering money that is the proceeds of unlawful activity including drug dealing, trading with designated terrorist organizations, arms trading, counterfeiting U.S. brand pharmaceuticals, alcohol, and tobacco. Much of the laundered money passes through U.S. banks and U.S. properties.

(j)    18 U.S.C. 641    Stealing from the United States: The Barzani Continuing Criminal Enterprise acting through the Iraqi Kurdistan Regional Government that it controls knowingly enrich themselves by embezzling, stealing, obtaining by fraud, and otherwise without authority knowingly converting to the use of any person other than the rightful owner and intentionally misapplying, property and money that was owned by, and was under the care, custody, and control of the United States Government, that is, foreign aid and military assistance funds, converts to its own use and the use of others without authority money and property of the United States Government and agencies and departments thereof. The Barzani's receive "Ghost Money" by inflating the number of fighting Iraqi Kurdistan Peshmerga soldiers supported by the United States and diverting arms and other military equipment supplied by the United States received by Barzani's to ISIS and Iran's IRGC, U.S. designated terrorist organizations and combatant enemies of the United States, in violation of U.S. law.

(k)    22 U.S. C. § 2778    Arms Export Control Act    The Barzani Continuing Criminal Enterprise did broker and attempt to broker multiple illicit weapons deals, including other materials constituting "defense articles" on the United States Munitions List, in knowing violation of the Arms Export Control Act, and among other acts traveled to meetings with Iranian representatives and received and passed documentation needed to secure the deals; and subsequently lied to United States diplomatic, intelligence, and law enforcement agents about that conduct.

(l)    28 U.S.C. § 1350 note § 2(a)(1)-(2)    The Torture Act establishes federal jurisdiction and liability for "[a]n individual who, under actual or apparent authority, or color of law, of any foreign nation . . . subjects an

96

individual to torture . . ."; Torture is defined to include acts specifically intended to inflict severe physical or mental pain or suffering. (It does not include such pain or suffering incidental to lawful sanctions.) The statute applies only to acts of torture committed outside the United States. The Barzani Continuing Criminal Enterprise routinely tortures its enemies, including Plaintiffs, to advance the objects of its conspiracy.

(m)       18 U.S.C. § 2340A. defines "Torture" as "an act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control." 18 U.S.C. § 2340(1).

18 U.S.C. § 2340A provides as follows: (a) Offense.    Whoever outside the United States commits or attempts to commit torture shall be fined under this title or imprisoned not more than 20 years, or both, and if death results to any person from conduct prohibited by this subsection, shall be punished by death or imprisoned for any term of years or for life. (b) Jurisdiction.  There is jurisdiction over the activity prohibited in subsection (a) if    (1) the alleged offender is a national of the United States; or (2) the alleged offender is present in the United States, irrespective of the nationality of the victim or alleged offender. (c) Conspiracy.    A person who conspires to commit an offense under this section shall be subject to the same penalties (other than the penalty of death) as the penalties prescribed for the offense, the commission of which was the object of the conspiracy.

(n)       28 U.S.C. §1350    Extrajudicial Killing. Killings constitute "tort[s] ... committed in violation of the law of nations or a treaty of the United States" under the Alien Tort Statute, 28 U.S.C. §1350, in that they were in violation of customary international law prohibiting extrajudicial killings as reflected, expressed, defined and codified in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities. The many killings were not authorized by a judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.

(o)       18 U.S.C. §1091    Genocide. The horrific crimes of genocide perpetrated against Plaintiffs described herein, whether in time of peace or war, with specific intent to destroy, in whole or substantial part, an ethnic or religious group, by killing members, causing serious bodily injury, causing permanent impairment through torture or similar techniques, subjects the group to conditions of life that are intended to cause the physical destruction

97

of that group in whole or in part, imposes measures intended to prevent births within the group, or transfers by force children of that group, has committed genocide. The Defendants knowingly and willfully, directly and indirectly, with malice and forethought, conspired and aided and abetted in genocide of the non-combatant Yazidi religious minority of Kurdistan, for which the criminal punishment may be death or life imprisonment. The U.S. Supreme Court held "The international-law norm against genocide, for example, imposes obligations on all actors. Acts of genocide thus violate the norm irrespective of whether they are committed privately or in concert with the state." See *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 200 L. Ed. 2d 612, 584 U.S. (2018). The U.S. Supreme Court further held "The international-law norm against genocide, for example, imposes obligations on all actors. Acts of genocide thus violate the norm irrespective of whether they are committed privately or in concert with the state. See Convention on the Prevention and Punishment of the Crime of Genocide, Art. II, Dec. 9, 1948, 102 Stat. 3045 (defining "genocide" as "any of the following acts committed with intent to destroy, in whole or in part, a national, ethnical, racial or religious group"); see also 18 U.S.C. § 1091(a). See *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 200 L. Ed. 2d 612, 584 U.S. (2018).

(p)     28 U.S.C. §1350 – Crimes Against Humanity. The crimes against humanity perpetrated against Plaintiffs described herein constitute "tort[s] … committed in  violation of the law of nations or a treaty of the United States" under the Alien Tort Claims Act, 28 U.S.C. §1350, in that they constituted a violation of customary international law as part of the "the law of nations." The acts of torture, arbitrary detention, rape and other inhumane acts alleged herein constitutes crimes against humanity under customary international law. These acts were committed in the context of a widespread and systematic attack against a civilian population. These acts were instigated and/or directed by Defendants and their subordinates, agents and/or co-conspirators in the Iraqi Kurdistan Regional Government and the indistinguishable complementary KDP forces. Defendants and their subordinates and/or co-conspirators sought to conceal and cover up these acts. Further, Defendants failed to prevent abuses or punish the perpetrators.

(q)     22 USC Ch. 108 – Gross Violations of Internationally Recognized Human Rights. The term ''gross violations of internationally recognized human rights'' has the meaning given that term in section 502B(d)(1) of the Foreign Assistance Act of 1961 (22 U.S.C. 2304(d)(1). The Global Magnitsky Human Rights Accountability Act prohibits the conduct and myriad violations by the Barzani Continuing Criminal Enterprise, and of Iraqi Kurdistan Prime Minister Masrour Barzani specifically, and authorizes the President to impose

economic sanctions and deny entry into the United States to any foreign person identified as engaging in human rights abuse or corruption. (1) is responsible for extrajudicial killings, torture, or other gross violations of internationally recognized human rights committed against individuals in any foreign country who seek—(A) to expose illegal activity carried out by government officials; or (B) to obtain, exercise, defend, or promote internationally recognized human rights and freedoms, such as the freedoms of religion, expression, association, and assembly, and the rights to a fair trial and democratic elections; (2) acted as an agent of or on behalf of a foreign person in a matter relating to an activity described in paragraph (1); (3) is a government official, or a senior associate of such an official, that is responsible for, or complicit in, ordering, controlling, or otherwise directing, acts of significant corruption, including the expropriation of private or public assets for personal gain, corruption related to government contracts or the extraction of natural resources, bribery, or the facilitation or transfer of the proceeds of corruption to foreign jurisdictions; or (4) has materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services in support of, an activity described in paragraph (3). The term ''gross violations of internationally recognized human rights'' has the meaning given that term in section 502B(d)(1) of the Foreign Assistance Act of 1961 (22 U.S.C. 2304(d)(1). Such an individual is no longer eligible for admission to the United States and any issued visa or other documentation shall be revoked in accordance with section 221(i) of the Immigration and Nationality Act (8 U.S.C. 1201(i)).

(r)        8 U.S.C. § 666 – Theft from Programs Receiving Federal Funds and Bribery: The Barzani Continuing Criminal Enterprise participates in contracts and programs funded by the United States Government and submits false documents to obtain money for its participation. Money obtained by the Barzani's by fraud from the United States Government exceeds millions of dollars each year. Money fraudulently received from the United States Government by the Barzanis is then partially used to bribe or otherwise improperly influence and covertly recruit and pay U.S. officials acting in their official capacity, to act for and to the benefit of and beneficial to foreign principals of the Iraqi Kurdistan Regional Government and the Barzani Continuing Criminal Enterprise, and to undermine the efforts of the Department of Defense to lawfully contract overseas. Additionally, Confidential Human Sources number #1 and #8, who have direct clandestine access to senior ranking KRG government officials, have witnessed the repeated falsification, directed by Masrour Barzani, of fictitious Peshmerga personnel records submitted to United States foreign military partner capacity building financing programs for financial reimbursement of thousands of non-

existent Peshmerga soldiers. The United States subsidizes Peshmerga salaries nearly a quarter billion dollars annually, issuing these funds through the KRG Ministry of Peshmerga Affairs, controlled by Masrour Barzani, much of which disappears to the Barzani Continuing Criminal Enterprise. Many Peshmerga, especially those who do not serve Masrour Barzani's personal political agenda or hail from his tribe, have not received their salaries.

(s)      18 U. S. C. § 201(c)(1)(A) — Illegal Gratuity.  The "illegal gratuity statute," which prohibits giving "anything of value" to a present, past, or future public official "for or because of any official act performed or to be performed by such public official."  Inducements and gratuities were given because of the U.S. public officials' official positions to provide favorable treatment and influence U.S. contracts and policies.

(t)      22 U.S.C. § 611 — Failure to File Required Registration Statement: Representatives of the Barzani Continuing Criminal Enterprise, including but not limited to corrupted officials of the United States Government acting in their official capacity,  acted for the benefit of and beneficial to foreign principals of the Defendant Iraqi Kurdistan Regional Government and the Barzani Continuing Criminal Enterprise and corruptly publicly supported certain beneficial policies, repeatedly failed to file a required registration statement as an agent of a foreign principal with the Attorney General of the United States.

(u)      18 U.S.C. 1959 — Violent Crimes in Aid of Racketeering:  The Barzani Continuing Criminal Enterprise as part of its vast criminal operations for decades has engaged in, and continues to engage in, murder, threats of murder, kidnapping, robbery, bribery, and dealing in illegal controlled substances. These criminal operations are defined as "Racketeering Activity" in 18 U.S.C. 1961 and perpetrators are subject to the death penalty.

(v)      18 U.S.C. 1621 — Perjury: Masrour Barzani, in his applications to the United States Citizenship and Immigration Services (USCIS), to which he swore an oath to the United States, to obtain the permanent resident status that he presently holds, with premeditated deceit and a knowledge of the falsity (See *Forbes v. INS*, 48 F.3d 439, 442), and with misrepresentations which were material as they had a natural tendency to influence the decisions of the USCIS [then INS]," (See *Kungys v. United States,* 485 U.S. 759, 772, 108 S.Ct. 1537, 99 L.Ed.2d 839 (1988)), and was aided by a co-conspirator, was fraudulently or unlawfully obtained in that he willfully and knowingly committed or caused to be committed perjury on the forms that he signed attesting to his truthfulness, and filed. In answering the question: "Have you ever …

ordered… incited, assisted or otherwise participated in the killing of any person because of race, religion, nationality, ethnic origin or political opinion? Masrour Barzani's answer of "NO" was false. Further, his declared purpose of asylum was and is materially false; at the time his father was ruling Iraqi Kurdistan so his submitted fear argument justifying asylum was false, and thus constitutes asylum fraud. (United States law generally renders such a person forever inadmissible for entry to the United States.)

(w)        18 U.S.C. 371   Immigration, Conspiracy to Defraud the United States: Masrour Barzani conspired with a citizen of the United States (Confidential Human Source #7) to report relevant immigration information on his immigration application that did not happen. Masrour Barzani also conspired with senior officers and officials of the U.S. Departments of State and Defense and of United States military units, U.S. Agency for International Development, and others, to defraud the United States.

(x)        18 U.S.C. 1958 (a)   Travel In or Use of Foreign Commerce or cause another to do so with the intent that a murder be committed in violation of the laws of the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value. Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani used and caused others to use facilities of foreign commerce, including international telecommunications, and with the intent that murder be committed in violation of the laws of Iraq, Iraqi Kurdistan, and the United States in exchange for a promise of money or other pecuniary compensation.

(y)        18 U.S.C. 371 and 3551 et seq.   Conspiracy to Defraud the United States, the Foreign Account Tax Compliance Act (FATCA). Masrour Barzani, as a resident alien (a green card holder) is required by statute, as a term of such granted status, to follow the same tax laws as U.S. citizens and must report worldwide income from all sources, that is, income from both within and outside the United States, must report financial assets outside the United States, and must disclose foreign bank accounts and other offshore international assets & investments. Masrour Barzani willfully and criminally conspired to impede, impair, obstruct and defeat the lawful governmental functions of the Internal Revenue Service in the ascertainment, computation, assessment and collection of revenue, specifically, failing to comply with FATCA, in an effort to defraud the United States, increase illicit wealth, and use wealth to injure Plaintiffs. Defendant Masrour Barzani had the funds to pay his U.S. tax liabilities.

(z)       26 U.S.C. § 720   Attempt to evade or defeat tax:  Masrour Barzani and other Barzani family members knowingly attempted to evade or defeat any tax due the United States and signed, filed, and caused to be filed false and fraudulent or elected to not file U.S. tax documents, knowing it/them to be false and fraudulent, and failed to properly and honestly comply with his legal and substantial tax obligations as a United States person.  Failure to pay proper taxes enriches the criminal enterprise which directly provided the means for Defendants to commit these criminal acts to harm Plaintiffs.  Defendant Masrour Barzani and other Barzani family members  had the funds to pay his U.S. tax liabilities.

(aa)       18 U.S.C. 371   Conspiracy to Defraud the United States: Masoud Barzani, Masrour Barzani, and Waysi Barzani conspired with Public Official #1 and Public Official #2 who were officers of the United States operating in Iraq. The purpose of the conspiracy was to impair, obstruct, and defeat the lawful functions of United States officers of the U.S. Department of State and the United States Department of Defense in the solicitation, award, procurement, supervision and payment contracts, licenses, permits, concessions, and other forms of licensure issued by or facilitated by the United States Government and the Iraqi Kurdistan Government. It was a purpose of the conspiracy to defraud the United States of its right to the conscientious, loyal, faithful, disinterested, and unbiased services, decisions, actions and performance of duties by Defendants Public Official #1 and Public Official #2 in their official capacities as officers in the United States Military operating in Iraq, free from corruption, partiality, improper influence, bias, dishonesty, and fraud in the approval, award, funding and supervision of contracts with the Iraqi Kurdistan Regional Government controlled by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani and their subordinate co-conspirators in the Barzani Continuing Criminal Enterprise.

(bb)       15 U.S. Code § 78dd-1  The Foreign Extortion Prevention Act (FEPA)  which enables criminal prosecution of foreign officials who solicit and receive payments, gifts, or even offers of "anything of value" to an official for the purpose of influencing the official or otherwise "securing any improper advantage" in obtaining, retaining or directing business.  In order to make money to provide means to harm Plaintiffs, Defendants bribed and criminally induced U.S. Public Official #1 and U.S. Public Official #2 and others.

(cc)       18 U.S.C. 201 (b)(1)(A) and (C) and (b)(2)(A) and (C)   Conspiracy to Commit Bribery. The defendants, and others known and unknown, willfully and knowingly, directly and indirectly, combined, conspired, confederated,

and agreed with each other to commit bribery of a United States government employee in performance of official duties.

(dd)     18 U.S.C. 1519 – Falsification of Records with Intent to Influence Immigration Decision: Defendant Masrour Barzani, assisted by Confidential Human Source #14, who has direct clandestine access to senior ranking Iraqi KRG government officials, who did willingly and knowingly make and did cause to be made materially false, fictitious, misleading, and fraudulent statements and representations in the matter within the jurisdiction of the executive branch of the Government of the United States,  and filed or caused to be filed a false document with the US. Immigration and Naturalization Service and USCIS with the intent to influence the investigation and proper administration of his application for permanent resident status in the United States when he was actually inadmissible at the time of admission but for the fraud or misrepresentation.  Defendant Rubar S. Sandi, an American citizen, aided and abetted and facilitated the fraudulent falsification and misrepresentation of immigration documents for Defendant Masrour Barzani with intent to untruthfully influence the U.S. Immigration and Naturalization Service (predecessor agency to USCIS) decision to grant Defendant Masrour Barzani permanent resident status (a green card).  Defendant Masrour Barzani, aided and abetted by Defendant Rubar Sandi, [1] misrepresented or concealed some fact; [2] the misrepresentation and concealment was willful; [3] the fact was material; and [4] Defendant Masrour Barzani procured United States person status as a result of the misrepresentation and concealment.  See *Kungys v. United States*, 485 U.S. 759, 767, 108 S. Ct. 1537, 99 L. Ed. 2d 839 (1988), holding that 8 U.S.C. § 1101(f)(6) "denominates a person to be of bad moral character on account of having given false testimony if he has told even the most immaterial of lies with the subjective intent of obtaining immigration or naturalization benefits" *Kungys*, 485, U.S. 759, 767 (1988).

(ee)     31 U.S.C. § 3729 – False Claims, with Intent to Influence a Tax Decision:  Defendant Masrour Barzani, as chairman of the Barzani Charity Foundation and as part of the Barzani Continuing Criminal Enterprise, and his subordinates, including Omar Barzani as the Fund's principal officer, who acting under direction of Masrour Barzani as Fund chairman committed or caused to be committed perjury on submitted Internal Revenue Service forms, as described in more detail below, conspired to fraudulently obstruct the federal tax function, and with premeditated deceit, fraudulently or unlawfully obtained, as a benefit to the Barzani Continuing Criminal Enterprise to avoid U.S. taxes, a charitable non-profit tax designation and treatment in that he/they knowingly and with deliberate disregard of the clearly delineated requirements of law falsely declared or caused to be falsely declared to the Internal Revenue

Service, and knowingly failed to disclose the defendant's noncompliance with a statutory, regulatory, or contractual requirement, while omitting critical qualifying information, including making actionable misrepresentation and providing materially false information by answering NO to the following questions: (a) Did the organization maintain an office, employees, or agents outside of the United States?; (b) Did the organization have aggregate revenues or expenses of more than $10,000 from grantmaking, fundraising, business, investment, and program service activities outside the United States, or aggregate foreign Investments valued at $100,000 or more?; (c) Did the organization report on Part IX, column (A), line 3, more than $5,000 of grants or other assistance to or for any foreign organization?; (d) Did the organization report on Part IX, column (A), line 3, more than $5,000 of aggregate grants or other assistance to or for foreign individuals?; (e) At any time during the calendar year, did the organization have an interest in, or a signature or other authority over, a financial account in a foreign country (such as a bank account, securities account, or other financial account)?; and knowingly and willfully failed to disclose officers, directors, and trustees.  See *Universal Health Servs. Inc. v. U.S. ex rel. Escobar, 136 S. Ct. 1989, 2001 (2016).*

(ff)      50 U.S.C. 1701, et seq: International Emergency Economic Powers Act (IEEPA)     Defendants as part of the Barzani Continuing Criminal Enterprise, conspired, brokered, attempted to broker, and traded in Iran oil in willful violation of the U.S. sanctions against Iran and the prohibitions of Emergency Economic Powers Act; and brokered deals for sanctioned Iran oil and other goods and services, contrary to the national security, foreign policy, and economic security interests of the United States;  and subsequently lied to U.S. diplomatic, intelligence, security, and law enforcement agents about that conduct.  Properties purchased, owned, or controlled by Defendants through shell companies or other vehicles is property which constitutes or is derived from proceeds traceable to violations of IEEPA and other criminal violations.

(gg)      22 U.S.C. 2778     Export of Arms to Iran and ISIS: The Barzani Continuing Criminal Enterprise has traded in arms with Iran and its IRGC and ISIS and made false reports of its transactions to the United States. Defendants Masoud, Masrour Barzani, and Waysi Barzani, and others, are subject to penalties of $1,000,000 fines and 20 years imprisonment for each of their multiple and continuing violations of the statute.

(hh)      18 U.S.C 2339B     Knowingly and Intentionally Combine, Conspire, Confederate, and Agree to Knowingly and Unlawfully Provide Support and Resources to a Foreign Terrorist Organization.  The Barzani Continuing Criminal Enterprise conspired to and has provided property, personnel,

intelligence, services, and other material support to a designated foreign terrorist organization, namely the Islamic State of Iraq and the Levant, knowing that the organization was a designated terrorist organization, and knowing that the organization had engaged in and was engaging in terrorist activity as that term is defined in Title 8, United States Code, Section 1182(a)(3)(B), and knowing that the organization had engaged in and was engaging in terrorism as that term is defined in Title 22, United States Code, Section 2656f( d)(2), resulting in thousands of deaths and untold numbers of people being tortured.

(ii)      21 U.S.C. 1901-1906 – Foreign Narcotics Traffickers: The Barzani Continuing Criminal Enterprise is a significant foreign narcotics trafficker that threatens the national security, foreign policy, and economy of the United States and whose criminal operations subject its members to the imprisonment and sanctions of 21 U.S.C. 1906.

(jj)      18 U.S.C. 1952 – Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises: The Barzani Continuing Criminal Enterprise is engaged in unlawful interstate and foreign commerce distributing proceeds of unlawful activities, and committing crimes of violence to further its unlawful activities. The unlawful activities include, but are not limited to, promoting and managing counterfeiting of cigarettes, pharmaceuticals, and alcohol; promoting and managing the unlawful manufacture, sale and distribution of methamphetamine; promoting and managing the distribution and sale of cocaine; providing arms and aid to designated terrorist organizations and terrorist states including ISIS and Iran and its IRGC; and paying bribes and financial or favoritism inducements to and otherwise corrupting officials of the United States.

(kk)      18 U. S. C. § 1952 – Violation of the Travel Act. The Travel Act makes it unlawful to use any facility in interstate commerce to distribute the proceeds of an unlawful activity. The Barzani Continuing Criminal Enterprise and its lead principals, particularly Masoud Barzani and Masrour Barzani, have repeatedly and frequently traveled to the United States, and engaged in interstate and foreign commerce, and used and do use facilities in interstate or foreign commerce, including the instrumentalities of mail, telecommunications, wire transfers, or interstate or foreign travel, with intent to (1) distribute the proceeds of any unlawful activity; and (2) commit any crime of violence to further any unlawful activity; or (3) otherwise promoted, managed, established, carried on, or facilitated the promotion, management, establishment, or carrying on, of any unlawful activity, including bribery of U.S. officials. The definition of "unlawful activities" also includes certain

specific violations of federal law, including money laundering offenses under the Money Laundering Control Act and violations of certain financial reporting requirements of the Bank Secrecy Act as amended by the USA Patriot Act. A "facility in interstate or foreign commerce" could include anything that crosses state or national borders, including telecommunications, and that the defendant used a facility of commerce "for the purpose of facilitating the unlawful activity".

(ll)    18 U.S.C. 2320 – Trafficking in Counterfeit Goods: The Barzani Continuing Criminal Enterprise trades in counterfeit goods using counterfeit marks in connection with the counterfeit goods, including counterfeit drugs, pharmaceuticals, and tobacco products.

(mm)    26 U.S.C. 7201 – Attempt to Evade or Defeat Tax: Masrour Barzani is a permanent resident of the United States, and is required to pay U.S. taxes on his worldwide income. Masrour Barzani has knowingly and willfully attempted to evade and defeat a substantial part of the income tax due and owing to the United States for multiple tax years, continuing to the present time in that he signed, filed, and caused to be filed fraudulent and false, or willfully and knowingly failed to file, U.S. Individual Income Tax Returns, Form 1040, and other forms, knowing the returns or omissions to be false and fraudulent. Defendant Masrour Barzani had the funds to pay his U.S. tax liabilities.

(nn)    21 U.S. Code § 848 – Continuing Criminal Enterprise – crimes which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and (B) from which such person obtains substantial income or resources." Section 408(a) [21 U. S. C. § 848(a)] provides that any person who engages in a continuing criminal enterprise shall upon *conviction* for that *offense* be sentenced to a term of imprisonment for not less than 10 years and up to life . . . . If the person engages in this activity subsequent to one or more *convictions under this section,* he shall receive a penalty of not less than 20 years' imprisonment.

(oo)    18 U.S. Code § 2314 – Transportation of Stolen Monies – forbids the transfers in foreign commerce any securities or money, knowing the same to have been stolen, converted or taken by fraud; or devising any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.

(pp)    Public Law 113-54, incorporated in numerous U.S. Codes – Defendants' repeating criminal violations of the Federal Food, Drug, and

Cosmetic Act and the Drug Supply Chain Security Act (DSCSA) of 2013, enabled Defendants' widespread illicit prescription pharmaceutical manufacturing and distribution. Criminal actor defendants' illicit pharmaceutical supply chain—from raw materials, to active ingredients, to initially processed products, to finished products, to repackaged products, finally to patient delivery—is inherently dangerous to human life, producing counterfeit substandard medicines.

(qq)    18 U.S. Code § 1956—Laundering of monetary instruments and numerous related statutes and regulations and treaties—forbids knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity and conducting or attempts to conducting such a financial transaction which in fact involves the proceeds of specified unlawful activity, to promote the unlawful activity or to conceal or disguise the nature, location, source, ownership, or control of the proceeds, or to avoid transaction reporting requirements of State or Federal Law. Section 1956 outlaws four kinds of laundering including concealment, structuring, and tax evasion, in which the BCCE Defendants engage.

(rr)    42 U.S. Code § 1985—Conspiracy to interfere with civil rights and related statutes and regulations and treaties—engaging in and causing acts in the United States whereby another is injured in his person or property and deprived by force, intimidation, or threat of having and exercising rights and privileges guaranteed by the U.S. Constitution and federal statutes.

## STATEMENT OF FACTS

179.    The criminal activities of Masoud Barzani, Masrour Barzani, Waysi Barzani, and their agents, associates, representatives, servants, employees, collaborators, co-conspirators, and Barzani family members and family members by marriage, and others known and unknown, in the Barzani Continuing Criminal Enterprise, at all times relevant to the conduct described in this Statement of Facts, conducted with impunity, and unfailingly as individuals hiding behind the cloak of the authority and contrived protections of their authoritarian government offices and

appointments, were undertaken to provide the substantial money and resources needed to cause injury to the named Plaintiffs herein and to the John Doe Plaintiffs.

180.    The defendants' utterly lawless conduct as described herein has concretely and foreseeably damaged the Plaintiffs.

## A CORRUPT REGIME OF CONCEALMENT, DISINFORMATION,
## FALSE REPRESENTATIONS, AND DEFAMATION

181. Since at least 2007 and continuing to the present time, and on-going, and at all times relevant hereto, and not as an act of war, within the District of Columbia and elsewhere, the Barzani Continuing Criminal Enterprise (BCCE), a transnational criminal organization, using its vast wealth and the skill of lawyers it engages in the United States and elsewhere in the world, has been successful in orchestrating a corrupt regime of concealment of its political and financial affairs involving large volumes of cash proceeds totaling tens of millions of dollars or more, including the laundering of narcotics and counterfeiting proceeds in order to evade detection. The skill of its lawyers in evading lawful financial reporting requirements to disclose true parties in interest owning assets and their willingness to facilitate their concealment regime through an intricate web of real estate assets, private investment accounts, obscured ownership structures, and anonymous shell and front companies, and IOLTA accounts has been instrumental in its success to date.  The types of Defendants' real estate assets fall into five broad categories in numerous states: land/buildings, business facilities, retail spaces, agriculture, and residential properties.  The Defendants' properties were involved in or are traceable to property involved in money laundering transactions or attempted money laundering transactions."  See *U.S. v. All Assets Held at Bank Julius Baer & Co.*, 571 F. Supp. 2d 1, (D.C. 2008).  For example, attorneys and their agents working for the BCCE routinely file false or misleading certification documents to government agencies. The depth and extent of perfidy knows no bounds and includes false documents and false representations in judicial proceedings. In one such example, on March 7, 2024, Defendant Joe R.

Reeder, an attorney at law with the law firm of Greenberg Traurig practicing in this Court, and who previously served as United States Secretary of the Army, and registered pursuant to the Foreign Agents Registration Act as Greenberg Traurig LLP's lobbyist for defendant Iraqi Kurdistan Regional Government filed a pleading in the instant case entitled *Memorandum of Law in Support of Motion to Set a Common Complaint Response Due Date for All Defendants.* In his pleading Mr. Reeder, as an advocate, deliberately and voluntarily facilitating and furthering a deceptive pattern of disinformation, fabrications, and untruths of Defendant Masrour Barzani, Barzani family members and family members by marriage, and the Barzani Continuing Criminal Enterprise and its agents and representatives, and with malicious intention to cause Constitutional or other injury, made the following representations which are false, misleading, malicious, and libel and slander Plaintiff Maki Revend, which "constitutes a breach of professional ethics and invites disrespect for the integrity of the court" (See *Wheat v. United States*, 486 U.S. 153, 108 S. Ct. 1692, 100 L. Ed. 2d 140 (1988), quoting *United States v. Dolan*, 570 F.2d 1177, 1184 (3d Cir. 1978), and which violate Federal Rule of Civil Procedure 11(b)(3):

> A. "The sole named individual plaintiff, Maki Revend, is a German national who, having been criminally convicted and also enjoined by German courts from disparaging members of defendant Prime Minister Barzani's family, now seeks to use this Court as his latest political platform."
>
> B. "The complaint alleges an array of wild and unbelievable misconduct against this strong and longstanding U.S. ally, including atrocity crimes, genocide, murder, and other heinous and unspeakable acts. (Compl. 1–2, at ¶ 2.). The allegations are reckless, inflammatory, untrue, and utterly meritless. They are a blatant attempt at seeking political redress through the court system. The allegations do not belong in this Court or any other."

182.    Contrary to Defendants' baseless, unsubstantiated, inexact, exaggerated, and hyperbolic characterizations of "wild and unbelievable" and "patently insubstantial claims" (See *Tooley v.*

*Napolitano*, 586 F.3d 1006 (D.C. Cir. 2009)) and presentment of conjecture and speculation as evidentiary support for assertions "ask[ing] the court to 'pile conjecture on conjecture'" (See *West v. Lynch*, 845 F.3d 1228, 1237 (D.C. Cir. 2017)), the complaint alleges copious facts and "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'" and "factual content that allows the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged." See *Christopher Eric Fite LLC v. Internal Revenue Service*, Civil Action No. 2016-0728 (D.D.C. 2016), citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556, 570) (citation omitted), that would permit a reasonable jury to find for the Plaintiffs. Defendants' deliberate efforts to obfuscate the very cause of action and falsely paint and distort the instant case as "seeking political redress" is a blatant mischaracterization, using "sweeping statements" in its motion to evoke nonjusticiable political questions on issues of import to the U.S. foreign policy and impede or falsely influence and create a cumulative effect on the fair administration of justice by this Court, in what very clearly reflects bad faith by Defendants' attorneys in trying to use the judicial process to frame a public narrative. "In the landmark case of *Baker v. Carr*, the Supreme Court provided its most comprehensive discussion on the application of the [political question] doctrine. Recognizing that the attributes of the political question doctrine 'diverge, combine, appear, and disappear in seeming disorderliness' in various settings, the Court set out to illuminate the 'contours' of the doctrine." See *Alperin v. Vatican Bank*, 410 F.3d 532 (9th Cir. 2005). "Addressing foreign affairs specifically, *Baker* cautioned against 'sweeping statements' that imply all questions involving foreign relations are political ones." *Id.* at 544. (citing *Baker*, 369 U.S. at 211, 82 S.Ct. 691 (citing *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302, 38 S.Ct. 309, 62 L.Ed. 726 (1918)

183. The Supreme Court identified factors which require dismissal because the case cannot be resolved without making policy determinations that are clearly for nonjudicial discretion. None

of these factors delineated by the Court are "inextricably" present in the instant case and thus the case is justiciable.   See *Baker v. Carr,* 369 U.S. 186, 217, 82 S. Ct. 691 (1962).  Plaintiffs acknowledge "The political question doctrine presents a narrow exception to the judiciary's responsibility to decide cases properly before it."   See *Zivotofsky Ex Rel. Zivotofsky v. Clinton*, 566 U.S. 189, 132 S. Ct. 1421, 1427, 182 L. Ed. 2d 423 (2012).  However, "The political question doctrine" deals with "political questions," not merely "political cases."   See *MINISTRY OF OIL OF THE REPUBLIC OF IRAQ v. 1,032,212 BARRELS OF CRUDE OIL*, Civil Action No. G-14-249 (S.D. Tex. Jan. 7, 2015), citing *Baker,* 369 U.S. at 217.  The doctrine "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch."  See *Japan Whaling Ass'n v. Am. Cetacean Society, et. al.,* 476 U.S. 221, 230, 106 S. Ct. 2860 (1986).

The Supreme Court spoke clearly:

> "Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for nonjusticiability on the ground of a political question's presence. The doctrine of which we treat is one of 'political questions,' not one of 'political cases.' The courts cannot reject as 'no law suit' a bona fide controversy as to whether some action denominated 'political' exceeds constitutional authority. The cases we have reviewed show the necessity for discriminating inquiry into the precise facts and posture of the particular case, and the impossibility of resolution by any semantic cataloging." *Baker*, 369 U.S. at 217.

184.   The Supreme Court distinguished the political question doctrine from subject matter jurisdiction. *Id.* at 202.  It held that the District Court possessed subject matter jurisdiction, that the case was not a non-justiciable political question, and remanded. *Id.* at 237.  The Supreme Court

has stated, "It is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Baker,* 369 U.S. at 211. Nothing in the instant case revolves "around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." The complaint allegations are unambiguously not "political questions" or "political allegations" nor do they require political or policy determinations, but are plainly allegations of crimes—crimes not born of public policy authorities, which are an exception. The analysis called for by *Baker* requires more than a generalization that an issue implicates foreign relations, because not "every case or controversy which touches foreign relations lies beyond judicial cognizance." *Baker,* 369 U.S. at 211. A court "cannot shirk this responsibility merely because [its] decision may have significant political overtones." See *Japan Whaling Ass's v. Am. Cetacean Society, et. al.,* 476 U.S. 221, 230, 106 S. Ct. 2860 (1986). "Courts in the United States have the power, and ordinarily the obligation, to decide cases and controversies properly presented to them." *Alperin v. Vatican Bank,* 410 F.3d 532, 539 (9th Cir. 2005).

185. To have standing to sue in federal court, the Supreme court has made it clear a plaintiff must allege "such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *See Warth v. Seldin,* 422 U.S. 490, 498-499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), quoting *Baker v. Carr,* 369 U.S. 186, 204. Plaintiffs do allege such a personal stake in the outcome of the controversy as to warrant their invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on their behalf. The Plaintiffs have "suffered an 'injury in fact'— an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." See *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)

186.   In fact, the "factual" allegations concerning Plaintiff Maki Revend are a knowing and willful, deliberate and voluntary, deceitful and deceptive attempt to discredit him, are blatantly and manifestly false and unpersuasive, are literally, deliberately, and factually untrue, are "particularly reprehensible" (See *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 376, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974), and at the present time Mr. Revend is under 24-hour police protection in Berlin after multiple attempts by the Barzani Continuing Criminal Enterprise to kill him and his family. Allegations concerning the instant Complaint are also without merit and are constructed on entirely fictitious and frivolous assertions, a farcical arc of attempts to mislead and misinform this Court and which are attributable to vindictiveness and fail as a matter of law.  Mr. Reeder was required to do more than simply *not misinform;* he also had an affirmative obligation to *inform* — a duty of trial advocacy to convey correct and complete  material information to this Court. "Counsel may not bury their heads in the sand and thereafter make affirmative proclamations about what occurred above ground. In such cases, ignorance is not bliss  it is sanctionable." "An attorney's right to free speech while litigating an action is extremely circumscribed." See *King v. Whitmer*, 505 F. Supp. 3d 720 (E.D. Mich. 2020).  *Mezibov v. Allen,* 411 F.3d 712, 717, 720-21 (6th Cir. 2005) (quoting *Gentile v. State Bar of Nev.,* 501 U.S. 1030, 1071, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991)).  As the Sixth Circuit explained in *Mezibov*:

> "It is not surprising that courts have thus far been reluctant to allow the First Amendment to intrude into the courtroom. At first blush, the courtroom seems like the quintessential arena for public debate, but upon closer analysis, it is clear this is not, and never has been, an arena for *free* debate.... An attorney's speech in court and in motion papers has always been tightly cabined by various procedural and evidentiary rules…"

187. "It is not acceptable to support a lawsuit with opinions… which were 'inexact,' 'exaggerate[ed],' and 'hyperbole.' Nor is it acceptable to use the federal judiciary as a political forum to satisfy one's political agenda.   Such behavior by an attorney in a court of law has consequences." "[Defendants'] counsel advanced claims that were also not well-grounded in fact, as demonstrated by [his] (i) failure to present any evidentiary support for factual assertions; (ii) presentment of conjecture and speculation as evidentiary support for factual assertions; (iii) failure to inquire into the evidentiary support for factual assertions…"  See *King v. Whitmer*, 505 F. Supp. 3d 726.

188. Plaintiff Maki Revend has no history of breaking the law or of arrest or conviction for any criminal act.   Mr. Reeder did "at a minimum express, state, and imply a verifiably false fact about [Plaintiff Revend]."  See *Zimmerman v. Al Jazeera America, LLC*, 246 F. Supp. 3d 257, 276 (D.C. 2017).   His statement fell into no privileged category of speech.   The Supreme Court declared, "practices long accepted by ethical lawyers is that under no circumstance may a lawyer either advocate or passively tolerate a client's giving false testimony" … and "in no sense means a lawyer can honorably be a party to or in any way give aid to presenting known perjury." "No system of justice worthy of the name can tolerate a lesser standard."  See *Nix v. Whiteside*, 475 U.S. 157, 174, 106 S. Ct. 988, 89 L. Ed. 2d 123, (1986). The Supreme Court further opined, "To a wide and deep extent, the law depends upon the disciplined standards of the profession and belief in the integrity of the courts."  (See *Schware v. Board of Bar Examiners of NM*, 353 U.S. 232, 77 S. Ct. 752, 1 L. Ed. 2d 796 (1957).  Defendant Reeder, as an experienced advocate of the law firm of Greenberg Traurig, injured and insulted the integrity of this Court by knowingly presenting false statements and demonstrating an appalling and tragic absence of credibility.  Mr. Reeder's statements, with a deliberate disregard for the truth and failure to look beyond apparent prejudices and political beliefs in said motion strongly suggests improper motive, and did not conform to any

particular code of legal ethics.  Defendant Reeder is not "an ordinary citizen" (See *Alabama v. White*, 496 U.S. 325, 329, 110 S. Ct. 2412, 110 L. Ed. 2d 301 (1990) but rather is an accomplished attorney and former official of the national government possessing highest national security clearances, legal expertise, and overseeing over 1 million persons in the United States Army and 330,000 civilian government employees, an honors graduate of the Judge Advocate General Corps School, and regularly lectures on legal ethics.  In short, Mr. Reeder knows better, and with respect due this Court, knows communication with the Court shall contain all information necessary to make the communication not misleading and shall not contain any false or misleading statement or otherwise operate to deceive, with deliberate and conscious indifference exhibits zero regard for the process or for authority, and perpetuates the Barzani defendants' corrupt and continuous pattern of diverting attention away from their criminal behavior and misconduct and acting with a pervasive pattern of deliberate indifference to and above the system's rules, a pattern of constitutional violations and a pattern of tortious conduct, and would not make such a false and defamatory allegation and denunciation accidentally.  Counsel has "the ever-present duty not to mislead." See *Basic Inc. v. Levinson*, 485 U.S. 224, 108 S. Ct. 978, 99 L. Ed. 2d 194, n.18 (1988). In law, perfidious tactics are not only *mala prohibita* ("evil as prohibited"), but also *malae in se* ("evil in themselves").  The untrue statement in Mr. Reeder's motion was as damaging as possible to Plaintiff Revend.

189.. Such unfounded sweeping allegations were intentionally declared to defame, malign, and harm, and did harm, Plaintiff Maki Revend.  The harm from Reeder's statement was inevitable, direct, concrete, immediate, and particularized.  ("For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Spokeo, Inc. v. Robins,* 578 U.S. 330, 339 (2016), as revised (May 24, 2016) (citation omitted).)

190. Plaintiff Revend is a seasoned investigative journalist who provides news about, and exposes, legal and political issues in and of Iraqi Kurdistan and the political and commercial corruption and criminality of the Barzani Continuing Criminal Enterprise, and is a primary source and disseminator of information to the public in Iraqi Kurdistan and the Kurdish worldwide diaspora. Plaintiff Revend's thoughts, ideas, and words carry great significance to millions of Kurds, especially those who do not express political allegiance to the criminal Barzani regime. Mr. Reeder's blatantly false attacks are predictably consistent with the pervasive and continuing intimidation and harassment tactics and orchestrated deceit of Defendant Masrour Barzani and his agents and representatives against Plaintiff Revend and others including political dissidents subject to BCCE abuses including but not limited to physical and psychological abuse, humiliation, rape, torture, starvation, isolation, forced confessions, and murder.

191. Whether Plaintiff Maki Revend harbored actual animus towards any Defendant at any point in the past or present is irrelevant. Defendant Reeder fails to meet his burden of supporting his motion with clear evidence and objective evidence, fails to include any direct evidence in his motion that establishes animus or criminality by Plaintiff Maki Revend, and Defendant's motion consists of assertions irrelevant to his claims, underscoring how weak the defendant's arguments are on the facts. For an attorney representing segments of the Barzani Continuing Criminal Enterprise (BCCE) to make such false allegations in a pleading in this Court is to again illustrate the total and absolute public disrespect and contempt the BCCE has for the United States and its laws and institutions, including this Court. In view of Mr. Reeder's personal participation, as set forth herein, in the BCCE scheme and course of conduct to hide true ownership identity and money and assets in the United States and elsewhere in the world that are the fruits of unlawful activities, the false pleading representations by him are particularly troubling. Pleading false and willful misrepresentations, made with knowledge of its falsity or with gross indifference and reckless

disregard as to its truth or falsity, is egregious professional misconduct, beyond garden-variety neglect (See *Irwin v. Department of Veterans Affairs*, 498 U.S. 89, 96, 111 S. Ct. 453, 112 L. Ed. 2d 435 (1990), is not excusable neglect, fails to meet the District of Columbia Circuit standard, and is material. "A fact is 'material' if it could affect the substantive outcome of the litigation." See *Doe v. District of Columbia*, Civil Action 13-878 (2016), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A false statement is material if it has a natural tendency to influence or [is] capable of influencing the decision of the decision-making body to which it was addressed." See *United States v. Seidling,* 737 F.3d 1155, 1160 (7th Cir. 2013) (quoting *Neder v. United States,* 527 U.S. 1, 16, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999)). "Solemn declarations in open court carry a strong presumption of verity." See *Blackledge v. Allison*, 431 U.S. 63, 97 S. Ct. 1621, 52 L. Ed. 2d 136 (1977).

192. Mr. Reeder's characterization of Plaintiff Revend was not an opinion but a solemn declaration wholly lacking verity, with intent to defame and inflict emotional distress, in the false light in which it would be placed, and aggravated and magnified by its publication in a public court record, equivalent to open court, where the false and defamatory statement was widely published on the court's public digital platform website to third parties, and which Mr. Reeder knew would be published with this falsity and reckless disregard for the truth, and can reasonably be understood to convey a false and defamatory message. Plaintiff Revend suffered actual or potential legal harm, as did all Plaintiffs, and mental distress from having been falsely exposed to public view. "Imputing criminal behavior to an individual is generally considered defamatory *per se,* and actionable without proof of special damages." See *Paul v. Davis*, 424

In U.S. 693, 697, 96 S. Ct. 1155, 47 L. Ed. 2d 405 (1976). The damning and drastic stigma or "badge of disgrace" (See *Wisconsin v. Constantineau*, 400 U.S. 433 (1971)) to Plaintiff Revend's reputation, honor, integrity, good name, and his right to maintain his community standing,

resulting from the defamatory character of Mr. Reeder's baseless declaration and attaching the stigmatizing label "criminal" without the salutary and constitutionally mandated safeguards of a criminal trial or any process whatsoever, constitutes a tort of defamation. "Defamatory meaning and falsity are distinct elements of the tort of defamation." See *White v. Fraternal Order of Police*, 909 F.2d 512 (D.C. Cir. 1990); see also *Libre By Nexus v. Buzzfeed, Inc.*, 311 F. Supp. 3d 149, 155 (D.C. 2018). Mr. Reeder's statements of "deliberate falsehoods or reckless disregard for the truth" (See *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), "w[ere] made with 'actual malice' — that is, with knowledge that it was false or with reckless disregard of whether it was false or not." See *New York Times Co. v. Sullivan*, 376 U.S. 254, 280, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964). Given the worldwide audience of Defendant Revend's media following, where journalistic readership and viewership is rooted in the imperative need for credibility and trust, and journalism being the source of his income, the full and extensive extent of the defamatory implications, including reputation, career, and economic consequences to the victim Plaintiff Revend, cannot yet be known.

193. Plaintiff Maki Revend states a claim for defamation of character under District of Columbia law and alleges "(1) that he was the subject of a false and defamatory statement; (2) that the statement was published to a third party; (3) that publishing the statement was at least negligent; and (4) that the plaintiff suffered actual and legal harm." See *Farah v. Esquire Magazine*, 736 F.3d 528, 533-34 (D.C. Cir. 2013) (citations omitted). Mr. Reeder's defamatory statements were materially and knowingly false or made with reckless disregard for the truth, in a deliberate act of deception in an attempt to mislead and influence this Court to rely on false, deceitful, and material misinformation, thereby resulting in inequity, and not a mere technical falsehood and not harmless. The Supreme Court has defined that "misrepresentation is material" if it "has a natural tendency to influence, or was capable of influencing, the decision of the decision-making body to which it

was addressed." *Kungys v. United States*, 485 U.S. 759, 108 S. Ct. 1537, 99 L. Ed. 2d 839 (1988). Mr. Reeder's false and misrepresenting declarations were clearly made with the intent to influence the court to which it was addressed.  With respect to compensation, the Supreme Court declared, "As we have recognized, '[t]he legitimate state interest underlying the law of libel is the compensation of individuals for the harm inflicted on them by defamatory falsehood.'"  See *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 111 S. Ct. 2419, 115 L. Ed. 2d 447 (1991), quoting *Gertz v. Robert Welch, Inc.*, 418 U. S. 323, 341 (1974).  Relatedly, under District of Columbia law, Plaintiff Maki Revend makes a false light claim, showing (1) publicity by means of the court publishing the complaint and Defendants' defamatory motion on its website, which is widely covered by Kurdistan media; (2) about a false statement, representation or imputation; (3) understood to be of and concerning the plaintiff; and (4) which places the plaintiff in a false light that would be offensive to a reasonable person.  See *Doe v. Bernabei & Wachtel, PLLC*, 116 A.3d 1262, 1267 (D.C. 2015) (alteration in original) (internal quotation marks and citation omitted).

194. The Supreme Court said, "We have regularly acknowledged the 'important social values which underlie the law of defamation,' and recognized that '[s]ociety has a pervasive and strong interest in preventing and redressing attacks upon reputation.' *Rosenblatt v. Baer*, 383 U. S. 75, 86 (1966). Justice Stewart in that case put it with his customary clarity:

> "The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being – a concept at the root of any decent system of ordered liberty…

'The destruction that defamatory falsehood can bring is, to be sure, often beyond the capacity of the law to redeem.  Yet, imperfect though it is, an action for damages is the only hope for vindication or redress the law gives to a man whose reputation has been falsely dishonored." *Id.,*

at 92-93 (concurring opinion).  See *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 23, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990).

195. As defined in the Countering America's Adversaries Through Sanctions Act (CAATSA) and contained in 31 CFR § 561.310, money laundering is defined:  "The term money laundering means engaging in deceptive practices to obscure the nature of transactions involving the movement of illicit cash or illicit cash equivalent proceeds into, out of, or through a country, or into, out of, or through a financial institution, such that the transactions are made to appear legitimate."  31 CFR § 561.311 defines agent: "The term agent includes an entity established by a person for purposes of conducting transactions on behalf of the person in order to conceal the identity of the person." Beginning on a date unknown but at least by 2007 and continuing through in or around the present time, in the District of Columbia and elsewhere, Defendants Masrour Barzani, Mustafa Barzani, Waysi Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani, Sarwar Pedawi, Laween Pedawi, Hamela Gardi, Jonathon R. Moore, Joe R. Reeder, Julie Mai Sanford, identified in documents as administrative assistant to Jonathon R. Moore,  Laura Geho Harris, Valarie Cupp, and Rubar Sandi, middlemen to further disguise and legitimate the corrupt payments and complicit intermediaries in facilitating transactions, together with others, including accountants, to accomplish its purpose did, in a continuum of complicity and enterprise corruption in an international conspiracy, devise and engage in a multi-million dollar scheme or course of conduct and conspiracy with affirmative, planned, and deliberate acts of concealment and methods of obfuscation that they have repeatedly used, in the United States and abroad, to carry out financial crimes, masterminded by Defendant Jonathon R. Moore who frequently collaborated with Defendant Joe R. Reeder as agents of a foreign principal, and their foreign sponsors, and did knowingly, unlawfully, deliberately, voluntarily, and corruptly agree to cooperate in a fraudulent scheme or course of conduct or shared a perfidious purpose and did demand, seek, receive, accept, and agree to receive and accept illicit

foreign funds, and did knowingly and unlawfully combine, conspire, confederate, and agree together and with each other to devise and intend to devise a scheme or course of conduct and artifice to defraud and to deprive, by means of material false and fraudulent pretenses and representations, to conceal source and ownership, knowing that the transactions were designed in whole and in part to directly and indirectly achieve the criminal object of the BCCE, and knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, including funds embezzled from state coffers of the Defendant Iraqi Kurdistan Regional Government, which transactions in fact involved the proceeds of specified unlawful activity, and using their specialized expertise to hide the ill-gotten gains of the BCCE, obscure their nefarious activities, and employ money laundering mechanisms and did launder proceeds generated by and did aid and abet bad acts committed by the malign actors of the BCCE, many of whom are agents or officials of subdivisions of a foreign government, regardless of the predicate criminal activity, that they "knew were designed to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of [the] unlawful activity," See *US v. Harmon*, 474 F. Supp. 3d 76, 83 (D.C. 2020), and played lucrative roles, and did financially profit from the criminal activities of BCCE, as a center for discrete illicit financial dealings, within the District of Columbia and elsewhere, designed to conceal including fake representations concerning ownership structuring, of international money laundering through a series of complex transactions and shell or front companies with bank accounts, some opened by Defendant Moore and/or his subordinates in the U.S. without disclosing as required under the U.S. Patriot Act the foreign beneficial owners or percentage of ownership of the corporations owning said bank accounts, located in the United States and abroad, in this country in whole or in part, repeatedly performed in furtherance of object of the conspiracy and the conspirators' plan and scheme or course of conduct or artifice to launder millions of dollars of ill-gotten criminal proceeds derived from or

121

obtained, directly or indirectly, through the commission of a crime unquestionably in connection with a commercial activity of defendants including the Defendant Iraqi Kurdistan Regional Government and its principal officers and the Barzani Continuing Criminal Enterprise, including Barzani family members and family members by marriage, outside of the United States and said acts caused a direct effect in the United States. See 28 U.S.C. § 1605(a)(2) and numerous other anti-money laundering laws and regulations.  Indeed, the type of the activity at issue here is far from analogous to the type of activity that courts have described as "sovereign" in nature.  See, e.g., *Weltover,* 504 U.S. at 614, 112 S.Ct. 2160.  The Barzani family has been in power in Iraqi Kurdistan for decades, and the corruption of the regime has been widely reported in Department of State communiques and the international media, including substantial misappropriation, theft, and embezzlement of billions of dollars from the Kurdistan treasury, some of which was used to purchase luxurious properties in the United States for use of Barzani family members.  The funds used to acquire these properties are traceable to violations of specified unlawful activities and U.S. law, that is a foreign offense involving the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official, and the international transportation or receipt of stolen of fraudulently obtained property (81 U.S. C §§1956(c)(7)(B)(iv) and 1956(c)(7)(A) respectively).

196. Each of these acts were commercial because they were not acts "only a sovereign state could perform." See *Park v. Shin,* 313 F.3d 1138, 1145 (9th Cir.2002).  The effect is "direct" as it follows "as an immediate consequence of the defendant's... activity.")  See *Weltover,* 504 U.S. at 618, 112 S.Ct. 2160.  "The common-sense interpretation of a direct effect ... is one which has no intervening element, but, rather, flows in a straight line without deviation or interruption." *Guirlando,* 602 F.3d at 74-75 (quotation marks and citation omitted), and occurred in the instant matter.  A U.S. regulator or law enforcement entity was precluded from identifying the beneficial owner because

all shell and front companies were identified solely by a registered Agent or the law firm or one of its subsidiaries, primarily the law office of Defendant Jonathon R. Moore and Ingomar Fiduciary Services, Inc. (a Delaware corporation since 2000, with its offices registered with agencies of the State of Delaware at Defendant Moore's Washington DC law office and since 2016 at his former residence in Wilmington Delaware) and Ingomar Services, Inc. (no longer active), named after the residential street where Defendant Moore lived at 4111 Ingomar Street NW, Washington DC 20015, wholly owned and operated by Defendant Moore and of which he is President, and not a true owner or anyone actually associated with the shell or front company or trust entity.

197.    Ingomar Fiduciary Services, Inc. engages in a substantial, continuous, and systematic course of business, and was and is so dominated by Defendant Moore as to be his alter ego and a repository of at least some of the criminal proceeds monies transferred to the United States by Defendants, and the assets of the corporation actually belong to Defendant Moore or to Barzani Continuing Criminal Enterprise Defendants.    There exists a unity of interest, the identical ownership and control, commingling and diversion of funds and assets, and use of the same office and business location. Separate personalities of Defendant Moore and Ingomar Financial Services, Inc. do not exist. As the Supreme Court explained in *Wellness Intern. Network, Ltd. v. Sharif*, 575 U.S. 665, 135 S. Ct. 1932, 1953,191 L. Ed. 2d 911 (2015), quoting *Sampsell v. Imperial Pape & Color Corp.*, 313 U.S. 215, 218, 61 S.Ct. 904, 85 L.Ed. 1293 (1941), "'[m]ere legal paraphernalia will not suffice to transform … a corporation whose affairs are so closely assimilated to the affairs of the dominant stockholder that in substance it is little more than his corporate pocket.'" Through Ingomar Fiduciary Services, Inc., Defendant Moore "concealed assets and transactions under the veil of a corporate entity that was 'nothing but a sham and a cloak.'" *Wellness*, 757 U.S. 665, 1953, citing *Sampsell*, 313 U.S. 218.    Ingomar Fiduciary Services, Inc. was an "alter ego or business conduit *of the person in control*." See *Labadie Coal Co. v. Black*, 672 F.2d 92, 97 (D.C.

Cir. 1982). Defendant Moore's "control over" Ingomar Fiduciary Services, Inc. was "active and substantial," and "so dominated the [] corporation as to negate its separate personality." See *Material Supply Int'l, Inc. v. Sunmatch Indus. Co., 62 F.Supp.2d 13, 20 (D.D.C. 1999).* "[A]dherence to the fiction of the separate existence of the corporation would sanction a fraud or promote injustice." See *Diamond Chem. Co. v. Atofina Chems., Inc., 268 F.Supp.2d 1, 9 (D.D.C); see also In re Baan Co. Secs. Litig., 245 F.Supp.2d 117,129, (D.D.C.2003).*

198. Each of the individual Plaintiffs have suffered *past* injuries-in-fact, "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." See *Spokeo, Inc. v. Robins,* 578 U.S. 330, 339 (2016) (quoting *Lujan,* 504 U.S. at 560). There exists a "substantial risk" that threatened *future* injury will occur. (See *Stringer v. Whitley,* 942 F.3d 715, 721 (5th Cir. 2019)). Thoroughly documented past harms constitute an injury-in-fact for purposes of pursuing injunctive relief as they cause "continuing, present adverse effects." See *City of Los Angeles v. Lyons,* 461 U.S. 95, 102 (1983) (*quoting O'Shea v. Littleton,* 414 U.S. 488, 495–96 (1974)).

199. Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and named and unnamed co-conspirator Defendants, including Barzani family members and family members through marriage, are directly liable as individuals for extrajudicial killings, murder and attempted murder, genocide, enforced disappearances, hostage taking and kidnapping, torture, inhumane treatment, mental and physical pain and suffering, and other crimes against Plaintiffs. These Defendants exercised command responsibility at all times relevant to this complaint over subordinates engaged in a joint criminal enterprise, were responsible for security and military operations, such as planning, commanding, supervising, controlling, and execution of Defendant Iraqi Kurdistan Regional Government Peshmerga military forces plans, and advocated tactics, with, and/or aided and abetted by their subordinates, including officers in the Defendant Iraqi Kurdistan Regional

Government Peshmerga (the name in Kurdish means "those who risk their lives") military and Asayish Security Forces who planned and/or carried out the operations to commit extrajudicial killings, genocide, inhumane treatment, hostage taking and kidnapping, torture, and crimes against humanity, and other gross crimes. (Asayish Security Forces and Peshmerga military forces are each dependent subordinate units of and wholly controlled by the Defendant Iraqi Kurdistan Regional Government.) Accordingly, Plaintiffs assert that Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents and representatives and co-conspirators, including Barzani family members and family members by marriage, bear direct responsibility for their roles in these acts, bear command responsibility, and bear responsibility for engaging in a joint criminal enterprise with, conspiring with, and/or aiding and abetting their subordinates who planned and carried out the crimes, and are liable under United States and international law for the injuries, pain and suffering by Plaintiffs and their decedent relatives endured.

200.    At all times relevant, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents and representatives and co-conspirators, including Barzani family members and family members by marriage, unlawfully exercised raw power and lethality unconstrained by statutory requirements, constitutional limits, any notions of due process, conflict of interest rules, any rules-based order, or even basic fairness, and where they "pursue[d] their personal predilections." See *Kolender v. Lawson*, 461 U.S. 352, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983).

201.    At all times relevant, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani possessed and exercised command and effective control over their subordinate agents and representatives and permitted them to commit murder, extrajudicial killings, genocide, hostage taking and kidnapping, enforced disappearances, inhumane treatment, torture, rape, crimes against humanity, transactions with terrorists which cost human lives, and multitudinous other unlawful and material acts and gross crimes.

202.    At all times relevant, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani had the legal authority and practical ability to exert control over their subordinates, including Barzani family members and family members by marriage, including those who participated in extrajudicial killings, murder, genocide, hostage taking and kidnapping, enforced disappearances, crimes against humanity, and multitudinous other unlawful acts. Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani's command over their subordinate agents and representatives, and family members and family members by marriage, included the authority and responsibility to give orders and discipline their subordinates and family members and family members by marriage. Furthermore, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani had the actual authority and practical ability and capacity to prevent abuses and committal of crimes and punish those responsible.

203.    At all times relevant, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani knew or reasonably should have known of the pattern and practice of crimes and abuses committed by their subordinate agents and representatives, servants, and Barzani family members and family members by marriage.

204.    At all times relevant, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, in their official positions with the Defendant Iraqi Kurdistan Regional Government, had a duty under international law, multilateral treaties and conventions, and Iraq law to ensure the protection of civilians, to prevent violations of international and Iraqi law and United States law by their subordinates, agents, and representatives, and Barzani family members and family members by marriage, and to ensure that all persons under their command were trained in, and complied with, international and Iraqi law, including the prohibitions against inhumane treatment, extrajudicial killings, genocide, hostage taking and kidnapping, torture, rape, enforced disappearances, crimes against humanity, and multitudinous other unlawful acts. Furthermore, Defendants Masoud

Barzani, Masrour Barzani, and Waysi Barzani were under a duty to investigate, prevent, and punish violations of international and Iraq and United States laws committed by their subordinates.

205.    As the commanders, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani failed or refused to take all reasonable and necessary measures to prevent inhumane treatment, murder, extrajudicial killings, genocide, hostage taking and kidnapping, torture, enforced disappearances, rape, crimes against humanity, and multitudinous other crimes, or to investigate or punish their subordinates for committing such crimes and abuses.

206.    At all times relevant, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani knew or reasonably should have known that by making payments and resource aid to terrorists, they were playing a role in violent anti-American terrorism and necessarily intended that the money or value will reach the violent actor.  An Assistant United States Attorney General said it plainly in a 2007 criminal resolution concerning similar conduct: "corporations are on notice that they cannot make protection payments to terrorists."  Multiple U.S. agencies set up task forces designed to interrupt the flow of money to terrorists in Iraq and Afghanistan, and U.S. officials stated repeatedly that such payments were illegal and counterproductive.  Applicable regulations and financial rules also required companies to ensure that their contracting practices — including the money spent by their subcontractors — did not finance terrorism.  Defendants violated those requirements and concealed their payments in part because they knew the U.S. government considered such payments to be illegal.

207.    The extrajudicial killings, genocide, enforced disappearances, torture, rape, crimes against humanity, and other crimes were part of a pattern and practice of widespread and systemic criminal activity.  At all relevant times, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani knew or should have known of the pattern and practice of gross criminal activity perpetuated.

208.   In addition to their direct responsibility and command responsibility, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani also conspired with their subordinates, including Barzani family members and family members by marriage, who planned and carried out widespread criminal activity.  Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani conspired and acted in concert with one or more subordinate agents and representatives, and Barzani family members and family members by marriage, pursuant to a common plan, design, and scheme to carry out and commit or facilitate committing murder, extrajudicial killings, genocide, hostage taking and kidnapping, torture, rape, enforced disappearances, and multitudinous other high crimes against civilians, including the Plaintiffs.

209.   Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, their agents and representatives, and Barzani family members and family members by marriage, knew about and agreed to facilitate the scheme and knowingly joined and participated in carrying out the common plan, design, and scheme.  In addition to being personally liable for their own actions, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani are jointly and severally liable for the actions of their co-conspirators, including Barzani family members and family members by marriage, all of which were actions undertaken in furtherance of a common plan, design, scheme, and interrelated pattern to commit crimes against civilians including Plaintiffs, motivated by or the effect of which was pecuniary gain and economic threat and physical threat and injury.

210.   In addition to their direct responsibility, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani also aided and abetted their subordinates, including Barzani family members and family members by marriage, who planned and carried out the criminal actions of the Barzani Continuing Criminal Enterprise.  They knew or should have known that their actions and omissions would assist in the commission of these and other crimes at the time they provided assistance to the Barzani Continuing Criminal Enterprise. In addition to being personally liable for their own

actions, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and Barzani family members and family members by marriage, are jointly and severally liable for the actions of those they aided and abetted.

211.    In addition to their direct responsibility and command responsibility, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani also engaged in a joint criminal enterprise with their subordinates, including Barzani family members and family members by marriage, who planned and/or carried out gross criminal activity.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and others, had knowledge of and were active participants in the enforcement of this system of flagrant transnational criminality.

212.    The extrajudicial killings, murder, genocide, enforced disappearances, hostage taking and kidnapping, torture, rape, crimes against humanity, and multitudinous other gross crimes were "reasonably foreseeable or anticipated as a natural consequence of" a common shared intention on the part of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, their subordinate agents and representatives, and Barzani family members and family members by marriage, who planned and carried out the crimes enumerated herein and continuing to the present time and are directly liable.    See *Owens v. BNP Paribas, SA*, 897 F.3d 266 at 794 (D.C. Cir. 2018).    In the instant case, plaintiffs' injuries were not only foreseeable: they were the intended result.

213.    These direct acts and omissions were and are outside the scope of lawful authority of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, their agents and representatives, including Barzani family members and family members by marriage, and were not authorized by international law, Iraqi law, or Kurdistan law, or any regulation or lawful proclamation thereof.    Their conduct was wholly inconsistent with the laws and rules in effect at the time of the conduct and was not due to inadvertent mistakes.

214.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and all named Defendants, cannot point to any "statute, decree, order, resolution or comparable evidence of sovereign authorization for any of the actions in question" or any act "imbued with some level of formality" to show that the actions enumerated herein were or are "the official policy" or "the officially sanctioned policies of" or "statute, decree, order or resolution" of the Republic of Iraq, the foreign sovereign.  "To qualify as official, an act must be imbued with some level of formality, such as the authorization by the foreign sovereign through an official statute, decree, order or resolution." See *Kashef v. BNP Paribas S.A.,* 925 F.3rd 53, 60 (2nd Cir. 2019).

215.    Defendants' acts clearly fall within the Foreign Sovereign Immunities Act ("FSIA") commercial activity exception to sovereign immunity.  See *Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607, 614, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992), and *United States v. Turkiye Halk Bankasi AS,* 16 F. 4th 336 (2nd Cir. 2021).   A foreign state engaging in "commercial" activities "do[es] not exercise powers peculiar to sovereigns"; rather, it "exercise[s] only those powers that can also be exercised by private citizens."  See *Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607, 112 S. Ct. 2160, 119 L. Ed. 2d 394 (1992), quoting *Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 704 (1976).  Illicit commercial activity, in other words activity for financial or pecuniary gain, comprises a substantial component of the gravamen of Plaintiffs' Complaint.

216.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani are recognized, acknowledged, and admitted senior and extensively controlling officials of the Defendant Iraqi Kurdistan Regional Government (KRG), a corrupt, oppressive, violent, and oil rich kleptocratic regime, and of the complementary parallel Kurdistan Democratic Party (KDP),, led by the Barzani family since its establishment in 1946.  The relationship can be accurately characterized as complete domination. As such they have occupied and do occupy positions of public trust

representing the people of ~~Iraqi~~ Kurdistan and have a duty to serve and a responsibility to protect that community.  Instead, the Barzani regime, in willful and deliberate concert with its non-governmental instrumentalities, shirks basic governance obligations of building a functional civil society in favor of funding, conducting, and celebrating, *inter alia*, misinformation, coercive repression, and violent transnational criminal conduct, feigned and used as instruments of governance.  The preamble to the Constitution of the Republic of Iraq, of which ~~the Defendant Iraqi Kurdistan Regional Government~~KRG is a constituent subdivision governate, instrumentality, and part~~, adopted March 8, 2004~~, declares:

> *"The people of Iraq, striving to reclaim their freedom, which was usurped by the previous tyrannical regime, rejecting violence and coercion in all their forms, and particularly when used as instruments of governance, have determined that they shall hereafter remain a free people governed under the rule of law."*

> *Article 10 thereof further states:*

> *"...the governments of the regions, governorates, municipalities, and local administrations shall respect the rights of the Iraqi people..."*

~~217~~63.    The United Nations High Commissioner for Human Rights in its 2021 report entitled *Human Rights and Freedom of Expression: Trials in the Kurdistan Region of Iraq*, an evidence-based analysis of the administration of justice in ~~Iraqi~~ Kurdistan, declares:

> *"The Constitution of Iraq guarantees the independence of the judiciary and the right to be treated with justice in judicial and administrative proceedings. The Constitution also stipulates that the proceedings of a trial are public unless the court decides to make it secret.  In addition, the Iraqi Criminal Procedure Code and other relevant domestic laws contain procedural safeguards aimed at ensuring fair proceedings and protection against arbitrary application of the law, such as the right to a lawyer in all phases of investigation and trial."*

218.   The Defendant Iraqi 64.      "Kurdistan  Regional  Government"  is  the regional government of the Kurdistan Region of Iraq.  The Kurdistan Region of Iraq is not a constituent subdivision region of the Republic of Iraq, having been established nation state; as such by the 2005 Iraqi Constitution (Article 117(First)).

used herein it 219.      Iraqi Kurdistan is a geographical area in within northern Iraq.  Autonomous provincial Iraqi Kurdistan is, recognized in Iraq's constitution as a geographical political and governance federal region.  As a federal region, Iraqi Kurdistan is a subdivision part of the sovereign nation of the Republic of Iraq from which the Defendant Iraqi Kurdistan Regional Government ("The KRG") derives any and all its subordinate governmental authorities.  The Defendant Iraqi Kurdistan Regional Government also has its own provincial government and its own soldiers who exercise authority (independent of Iraq) within Kurdistan.  *See* 28 U.S.C. § 1603(a); *Ministry of Oil of Republic of Iraq v. 1,032,212 Barrels of Crude Oil Aboard United Kalavrvta,* CIV.A. G 14 249, 2015 WL 93900, at *281 (S.D. Tex. Jan. 7, 2015) (noting that Kurdistan "administers a subsidiary region and political subdivision of the Republic of Iraq" and "Kurdistan is a political subdivision of Iraq.") within Kurdistan.  The Iraqi legal system is the foundation of and governing law in the Iraqi Kurdistan region.

. 220.  As an acknowledged subordinate subdivision governmental entity of and empowered by the sovereign Republic of Iraq, the Defendant Iraqi Kurdistan Regional Government KRG and its officials are subject, without exception or excusal unless specifically so declared, to all provisions of bilateral and multilateral treaties, agreements, and conventions to which the Republic of Iraq is a signatory party.

221 65.        In the *Washington Agreement* executed by Defendant Masoud Barzani on behalf of the Defendant Iraqi Kurdistan Regional Government KRG and by the U.S. Secretary of State on

behalf of the United States ~~of America, the Iraqi~~, KRG endorsed "a federative basis" for ~~Iraqi~~ Kurdistan.

~~222~~66.    Official documents submitted by ~~the Defendant Iraqi Kurdistan Regional Government (KRG)~~KRG to the United States Government declare the two organizations, ~~Defendant Iraq~~ KRG and ~~the Kurdish Democratic Party (~~KDP~~), are~~, established by their own self-understanding and declaration, are one-and-the-same.  In one representative instance, in a KRG Supplemental Statement self-filed on May 31, 2009 by the Washington KRG Representative with the ~~U.S.~~ Department of Justice~~, a department within the Executive Branch of the United States Government~~, pursuant to Section 2 of the Foreign Agents Registration Act of 1938, as amended, their authorized and signed submittal states ~~Defendant Iraqi~~ "Kurdistan Regional Government (previously known as Kurdish Democratic Party)."

## JURISDICTION AND VENUE

67.    This Court "must assume the truth of facts plausibly alleged in plaintiffs' … complaint and draw all reasonable inferences in plaintiffs' favor."  See *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 210 (D.C. Cir. 2022).  *Owens v. BNP Paribas, S.A.* (*Owens IV*), 897 F.3d 266, 272 (D.C. Cir. 2018).

68.    In general, the Judiciary has a responsibility to decide cases properly before it, even those it "would gladly avoid." *Cohens v. Virginia,* 6 Wheat. 264, 404, 5 L.Ed. 257 (1821).  Supreme Court precedents have identified a narrow exception to that rule, known as the "political question" doctrine.  *See, e.g., Japan Whaling Assn. v. American Cetacean Soc.,* 478 U.S. 221, 230, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986).  Defendants' beliefs, conduct, and assertions notwithstanding, they are not above the law.  Defendant Masrour Barzani is a "United States person", and "No man in this country is so high that he is above the law."  See *United States* v. *Lee,* 106 U. S., at 220 (1882).

69.     Given the facts contained herein and that no other district has personal jurisdiction over all defendants, the ends of justice require this Court's exercise of jurisdiction over Defendants.

### A.     This Court has Subject-Matter Jurisdiction

70.     This Court has subject-matter jurisdiction under 18 U.S.C. § 2338 and 28 U.S.C. § 1331.

71.     Venue is proper in this District under 18 U.S.C. § 2334(a) because Plaintiffs conduct affairs in the District of Columbia. Venue is also proper in this District under 18 U.S.C. § 2334(a) because Defendants Masoud Barani, Masrour Barzani, Waysi Barzani, Muksi Barzani, Treefa Aziz, Hikmet Bamerni, Hayman Quass, and Dasko Shirwani have (or are) an agent or attorney or representative in this District. Defendants Jeyra Mohamad Khaled, Katja Vrecar Barzani, Mustafa "Babo" Barzani, and Areen Masrour Barzani are beneficial owner of sham or front corporations managed or administered in the District of Columbia. Defendants Jonathon Moore and Joe Reeder are licensed attorneys who office or did office in Washington, D.C.  Defendants Valerie Cupp, Julie Mai Sanford, Laura Geho Harris, and Rubar Sandi office(d) in Washington DC. Venue is also proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District.

72.     Because the TVPA is not a jurisdictional statute, a failure to comply with its requirements will not preclude a U.S. court from hearing a claim under it.   *See Al-Odah v. United States*, 321 F.3d 1134, 1146 (D.C. Cir. 2003) (Randolph concurring). (*See also Abiola v. Abubakar*, 267 F. Supp. 2d 907,910 (N.D. 1112003.))  The statute provides a cause of action for damages to "anyone who suffered torture anywhere in the world at the hands of any individual acting under the law of any foreign nation."  *Id.*  Further, any case brought under the TVPA will also arise under federal law and jurisdiction can then be based on 28 U.S.C.16  § 1331, which expressly grants general federal question jurisdiction. *Id.*  Plaintiffs recognize that the TVPA is subject to all the provisions

of the Foreign Sovereign Immunity Act ("FSIA") (*Cf. Amerada Hess*, 488 U.S. at 438, 109 S.Ct. 683) which is not applicable in the instant case.

73.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 18 U.S.C. § 2333(d), and 18 U.S.C. § 2338, as a civil action brought by citizens of the United States who have been killed, maimed, injured or otherwise harmed by reason of acts of international terrorism at a depth of self-enriching evil beyond horrific; to also include foreign nationals pursuant to 28 U.S.C. 1350 harmed by the BCE operating worldwide, including in the United States; and their estates, survivors, and heirs.

74.    This court has subject matter jurisdiction because "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U. S. C. § 1350.  (See *Sosa v. Alvarez-Machain*, 542 U.S. 692, 124 S. Ct. 2739, 159 L. Ed. 2d 718 (2004)).

75.    This court has subject matter jurisdiction pursuant to 28 U.S. C. § 1331; 28 U.S.C. §§ 1391(b), and (d); 28 U.S.C. § 2331; 18 U.S.C. § 2333(d); and, 18 U.S.C. § 2334(a), as a civil action brought by citizens of the United States who have been killed or injured by reason of acts of international terrorism, and their estates, survivors, and heirs.

76.    This court has jurisdiction for Crime Victims' Rights Act ("CVRA")'s enumerated rights as the district in which the crimes occurred.

77.    This court has jurisdiction because the presumption against extraterritoriality is satisfied. *See Exxon Mobil Corp.*, 2015 WL 5042118, at *5.

**B.    This Court has Federal Question and Personal Jurisdiction**

78.    This court has federal question jurisdiction pursuant to 28 U.S.C. § 1331; and subject matter and personal jurisdiction pursuant to the Torture Victim Protection Act of 1991; 28 U.S.C.

135

1350; 18 U.S.C. § 1961 *et seq.*; the Anti-Terrorism Act, 18 U.S.C.§ 2333 *et seq.*; the Alien Tort Statute of 1789, 28 U.S.C. 1350; and the Torture Act, 28 U.S.C. § 1350 note § 2(a)(1)-(2).

79.    Defendants are subject to personal jurisdiction pursuant to 18 U.S.C. § 2334(a), and Fed. R. Civ. P. 4(k). Acknowledging "a defendant must have minimum contacts with the forum reflecting 'some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum,'" this Court has personal jurisdiction over the Defendants because their extensive forum contacts are all squarely related to Plaintiffs' claims.  (See *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 210 (D.C. Cir. 2022), (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)).

80.    This Court has personal jurisdiction over the Defendants because the Alien Tort Statute, also called the Alien Tort Claims Act (ACTA), 28 U.S.C. § 1350, provides "the district courts shall have jurisdiction over any civil action by an alien for a tort only, committed in violation of the law of nations or treaty of the United States."  Two conditions must exist for this Court to have subject matter jurisdiction under the ATCA.  First, Plaintiffs must be aliens.  Most of the Plaintiffs are citizens of Iraq; Plaintiff Maki Revend, motivated by relentless debilitating fear of and deadly threats and acts by Defendants, has renounced his Iraq citizenship and accepted German citizenship and residence; and are thus aliens.  Second, the tortious conduct Plaintiffs allege must have been committed in violation of the law of nations or a treaty to which the United States is a signatory.  In fact, nothing more than a violation of the law of nations is required to invoke jurisdiction under the ATCA.  *See Tel-Oren v. Libyan Arab Republic*, 726 F.2d at 774, 779 (D.C. Cir. 1984) (Edwards, J. concurring.)

81.    This Court has personal jurisdiction over the Defendants because Defendants had contacts constituting purposeful activity with the District of Columbia and/or the United States.  *See International Shoe Company v. Washington*, 326 U.S. 310, 316 (1945), and could have anticipated

being brought into court here.  See *World-wide Volkswagon Corp. v. Woodson,* 444 U.S. 286, 297 (1980).  At all times relevant, Defendants had "continuous and systematic" contacts between themselves and the District of Columbia, a staffed office with continuous operations in the District, retained lobbyists, representatives, and counsel in the District, and through the acts of its authorized agents and counsel, which give rise to general jurisdiction over Defendants as they traveled to the United States.  See *Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 416 (1984).

82.    This Court has personal jurisdiction over all Defendants because the Alien Tort Statute enacted as part of the Judiciary Act in 1789 provides jurisdiction for the federal courts to hear lawsuits regarding torts "committed in violation of the law of nations." 28 U.S.C. § 1350. See *Doe v. Exxon Mobil Corp*., 654 F.3d 11 at 29 (D.C. Cir. 2011).  "The Alien Tort Statute in its entirety states '[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.' 28 U.S.C. § 1350.  The Torture Act establishes federal jurisdiction and liability for '[a]n individual who, under actual or apparent authority, or color of law, of any foreign nation ... subjects an individual to torture ...' 28 U.S.C. § 1350 note § 2(a)(1)-(2)".  *Doe v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20, at 22 (D.C. 2005).

83.    This Court has personal jurisdiction over all Defendants because the "aiding and abetting liability is well established under the Alien Tort Statute" enacted as part of the Judiciary Act in "that the principle of aiding and abetting liability is well established in customary international law, and that the *mens rea* and *actus reus* requirements are those set out by the Nuremberg Tribunals and the international courts created by the United Nations, which reflect the standard under federal common law."  See *Doe v. Exxon Mobil Corp.*, 654 F.3d 11 at 15 (D.C. Cir. 2011). Federal courts have relied on international criminal law norms in establishing the content of the

law of nations.  See*, e.g., Khulumani,* 504 F.3d at 270 (Katzmann, J., concurring); *Kadic,* 70 F.3d at 241-43; *see also Sosa,* 542 U.S. at 762-63, 124 S.Ct. 2739 (Breyer, J., concurring).  The Court of Appeals for the District of Columbia has acknowledged it is "guided by our recognition of established and fundamental principles of international law." See *FTC v. Compagnie de Saint-Gobain-Pont-a-Mousson*, 636 F.2d 1300, 1304 (D.C. Cir. 1980).  Congress enacted the Justice Against Terrorism Act ("JASTA"), which expands ATA civil liability to reach "any person who aids and abets, by knowingly providing substantial assistance [to], or who conspires with the person who committed such an act of international terrorism." 18 U.S.C. § 2333(d)(2).

84.    This Court has personal jurisdiction over Defendants because they are non-state defendants who have been and are doing business in Washington, D.C., and operate in concert as an operative criminal conspiracy with an element of pecuniary gain and economic and physical threat and injury, and have a registered address at 1532 16th St NW, Washington, D.C., where at all times relevant a staff was and is employed, are not immune from suit, are not relieved of responsibility under law, can point to no statute, decree, order, resolution, or comparable evidence of sovereign authorization for any of the actions in question, and are subject to this Court's jurisdiction.  *See Belhas v. Ya'Alon*, 515 F.3d 1279 (D.C. Cir. 2008), 115 F.3d 1020 (D.C. Cir. 1997), and *Paul Rusesabagina, et al. v The Republic of Rwanda, et al.* (Civil Case No. 22-469(RJL), U.S.D.C.D.C March 16, 2023).

85.    Authorities and sources set forth in the instant Complaint confirm that aiding and abetting and material support or resources liability is clearly established in the law of nations and consequently such liability is available in this Court.  18 U.S.C. § 2339A defines the term "material support or resources" to mean currency or other financial securities, financial services, lodging, training, safehouses, false documentation or identification, communications equipment, facilities,

weapons, lethal substances, explosives, personnel, transportation, and other physical assets, except medicine or religious materials.

86.    This Court has personal jurisdiction over all Defendants because "As to the extent of liability, once the conspiracy has been formed, all its members are liable for injuries caused by acts pursuant to or in furtherance of the conspiracy. *[Davidson v. Simmons,* 203 Neb. 804, 280 N.W.2d 645 (1979)]. This court has jurisdiction because each defendant has/had "sufficient connections to this forum and knew his co-conspirator was carrying out acts in furtherance of the conspiracy in the forum." *EIG Energy Fund XIV, L.P. v. Petróleo Brasileiro S.A*., 246 F. Supp. 3d 52, 91 (D.D.C. 2017) (emphasis in original) (discussing the impact of *Walden* 571 U.S. at 286 on personal jurisdiction), aff'd, 894 F.3d 339 (D.C. Cir. 2018).

87.    With respect to conspiracy, the Supreme Court further stated:  "Secrecy and concealment are essential features of successful conspiracy.  The more completely they are achieved, the more successful the crime.  Hence the law rightly gives room for allowing the conviction of those discovered upon showing sufficiently the essential nature of the plan and their connections with it, without requiring evidence of knowledge of all its details or of the participation of others."  See *Blumenthal v. United States*, 332 U.S. 539, at 557.

88.    This Court has personal jurisdiction over Defendants in that the Torture Victim Protection Act ("TVPA"), codified as 28 U.S.C. § 1350 note, does provide subject matter jurisdiction because Plaintiffs did exhaust, or were obstructed in exhausting, local Kurdistan legal remedies, in that such remedies are neither credible nor available as there is no fair administration of justice, before seeking relief in a United States court.  Courts have consistently recognized the possibility of concurrent jurisdiction in courts of different nations for a single course of conduct. *See e.g., United States v. Rashed, 234 F.3d 1280, 1281-82 (D.C.Cir.2000).*

89.     The TVPA states "a court shall decline to hear a claim ... if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred." 28 U.S.C. § 1350, note 2 (emphasis added).  "Adequate and available remedies" indisputably do not exist for Plaintiffs in Kurdistan, the "place in which the conduct giving rise to the claim occurred."  Plaintiffs cannot find relief in any KRG tribunal, which are manifestly unjust and oppressive, due to the legacy highly documented (by agencies of the United States Government and the United Nations, and in many contemporary public accounts) of an incorrigibly corrupt judiciary, political obstruction, systemic intimidation, administrative sabotage, illicit and arbitrary interference, an absence of judicial independence, deploying instruments of oppression, an absence of accountability or transparency, infliction of harm or injury unjustifiable by any government interest, deliberate indifference to and deprivation of due process and rights of Iraq constitutional law, lacking all protection of the individual against arbitrary action of government and the exercise of power against the individual without any reasonable justification in the service of a legitimate governmental objective, with no reasonable access to documents for purposes of discovery, with magistrates closely aligned with and politically beholden to the Defendants who politicize legal disputes, and where Defendants invent their own judicial standards and contort facts to their liking – all to a degree that would shock the contemporary conscience.  The European Union Agency for Asylum reports that in the KRG "Judges are frequently appointed based on partisanship rather than merit or independence." "There is an overall mistrust in the criminal justice system in Kurdistan with respect to the lack of effective investigations and the atmosphere of impunity, particularly regarding attacks on media professionals."  The KRG judiciary does not resolve cases of abuse filed by civilians against the KRG and its officials, leaders, associates, and subordinates, and any pursuit of remedies against the Defendants in Kurdistan would be futile and presents a substantial and serious real threat of

severe, even deadly, physical or mental harm reprisals against those raising the allegations. Examples of such, and as detailed elsewhere herein, is the two-year torture of American citizen Sidqi Bradosti in a KRG prison, as straightforwardly acknowledged by a judge of that court. The District Court of the District of Columbia has made it clear that "exhaustion is a prudential doctrine that should be applied flexibly and not when further pursuit of remedies is futile." See *Doe v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20, 29 (D.C. 2005); *Cutler v. Hayes*, 818 F.2d 879, 890-91 (D.C.Cir. 1987).

### C.    This Court has Nexus Jurisdiction

90.    This Court has personal jurisdiction over Defendants because Defendants have purposefully directed their conduct at this forum, especially with respect to money laundering and defrauding the U.S. Government.

91.    All Defendants have established a direct or representational presence within the District of Columbia, and a connection there between persons and events especially that is or is part of a chain of causation, maintain substantial, continuous, and systematic contacts, and touch and concern the United States and the District of Columbia with sufficient force.

92.    Pursuant to 28 U.S.C. § 1391(b)(1), venue is proper in this court because all Defendant's principal place of business in the United States is in the District of Columbia, where Defendants have and do maintain offices and employ or engage staff and advisors and counsel and because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

93.    Defendants each and all have sufficient "minimum contacts" with the forum state such that the maintenance of the suit "does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945), and have "continuous and systematic business contacts" with the forum state. *Helicopteros*

*Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415–16, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984).

94.    As explained in greater detail below, Defendants' conduct had a substantial nexus to the United States and to Washington, D.C., including by virtue of repeated and systematic use of U.S. dollar transactions and banks in the United States to pay, conspire with, and aid and abet terrorists or to launder proceeds from such criminal conduct.  Defendants thereby purposefully availed themselves of U.S. jurisdiction to commit the tortious acts described in the Complaint, which enabled terrorist extremist group ISIS and IRGC (Islamic Revolutionary Guard Corps), a unit of the Government of Iran, to carry out terrorist attacks that killed or harmed U.S. citizens and foreign national Plaintiffs in Kurdistan and elsewhere, and further a global covert influence campaign, thereby injuring Plaintiffs.

95.    Acts of Defendants' money laundering crimes were "purposefully directed" at this forum, and the litigation results from alleged injuries that "arise out of or relate to those activities." *Mwani v. bin Laden*, 417 F.3d 1, 12 (D.C.Cir. 2005) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984); *Helicopteros*, 466 U.S. at 414, 104 S.Ct. 1868).

96.    Defendants have purposefully directed tortious activity at residents of this forum. Plaintiffs' claims arise out of, and relate to, Defendants' long-running conspiracy to cause pain and sow terror in the United States injuring Plaintiffs.  Plaintiffs are not the only link between Defendants and the forum; Defendants' tortious conduct forms the necessary connection and has provided means for Defendants to damage Plaintiffs.

97.    This Court has jurisdiction because acts or omissions in furtherance of the tortious offenses occurred within Washington, D.C.  See 18 U.S.C. § 3237.  The Department of the Treasury is a federal government agency located in Washington, D.C.  Through its Office of Foreign Assets Control ("OFAC"), also located in Washington, D.C., the Department of the Treasury administered

142

and enforced economic and trade sanctions against certain foreign countries, including Iran, as well as individuals and entities associated with those countries. OFAC was empowered to grant or deny license applications for the export or re-export of U.S. goods to Iran.

98.    The Department of Commerce is a federal government agency located in Washington, D.C. Through its Patent and Trademark Office ("PTO"), the Department of Commerce grants U.S. patents and registers trademarks, administers and enforces trademarks and trademark infringement, protects new ideas and investments in innovation and creativity, and enforces intellectual property infringement, including patent infringement, trademark counterfeiting, copyright piracy, and trade secret theft which cause significant financial losses for American right holders and legitimate businesses around the world. In its most pernicious forms, as accomplished by Defendants' tortious acts, intellectual property infringement enriches Defendants thereby enabling their harm to Plaintiffs.

99.    The Department of Health and Human Services is a federal government agency located in Washington D.C. Through its Food and Drug Administration ("FDA"), the Department of Health and Human Services is responsible for protecting public health by ensuring products intended for human use are safe and effective, including human pharmaceutical and biological products, medical devices, and tobacco products, and to protect human exposure to drugs that may be counterfeit, stolen, contaminated, or otherwise harmful – as are the counterfeit products of the BCE enriching Defendants.

100.    Defendants' conduct had a substantial nexus to the United States and to Washington, D.C., including by virtue of repeated and systematic use of U.S. dollar transactions and banks in the United States to pay, conspire with, and aid and abet terrorists. Defendants thereby purposefully availed themselves of U.S. jurisdiction to commit the tortious acts described in the Complaint,

which enabled ISIS to carry out terrorist attacks that killed U.S. citizens in Syria, Iraq, and Libya, thereby injuring Plaintiffs.

101.    Defendants regularly used email accounts serviced by U.S.-based email service providers, to coordinate and carry out elements of their criminal enterprise.

102.   Defendants are `subject to personal jurisdiction given their participation in a conspiracy with ISIS, whose criminal and tortious actions were directed at the United States.

103.   Defendants' conduct occurred within the District of Columbia and the extraterritorial jurisdiction of the United States in conspiring to provide material support to terrorists.  The offenses occurred in part within the United States, the offenses occurred in and affected interstate and foreign commerce, and the defendants conspired with enemies of the United States.  Based on these contacts with the United States, the Court has jurisdiction over the Defendants and the subject matter of this action.

104.   An official, employee, or agent of a foreign state designated as a state sponsor of terrorism ... while acting within the scope of his or her office, employment, or agency shall be liable to a United States national or the national's legal representative for personal injury or death caused by acts of that official, employee, or agent for which the courts of the United States may maintain jurisdiction under [28 U.S.C. § 1605(a)(7)] for money damages which may include economic damages, solatium, pain, and suffering, and punitive damages if the acts were among those described in [§ 1605(a)(7)]. 28 U.S.C. § 1605 note.  Defendants have been and are agents and collaborators and co-conspirators of an instrument of a foreign state – the Islamic Republic of Iran, not provincial KRG – designated as a state sponsor of terrorism.

105.   Defendants from, through, and by their Washington D.C. office and their Fairfax Virginia office and through and by their appointed, deputized, designated, and closely supervised Washington D.C. representatives and employed staff, have repeatedly and recurrently violated

requirements of the Foreign Agents Registration Act (FARA), 22 U.S.C. § 611, et seq., which establishes a registration, reporting (of accurate and complete information), and disclosure regime for agents of foreign principals (which includes foreign non-government individuals and entities) so that the U.S. government and the people of the United States are truthfully informed of the source of information and the identity of persons attempting to covertly and overtly influence U.S. public opinion, policy, and law.  Persons subject to the requirements of FARA have a legal duty and among other things are required to submit periodic registration statements containing truthful information about their activities and the income earned from them.

106.    By fraudulently making a false and misleading statement of a material fact and omitting to state a material fact necessary to make the statements made, and disregarding, concealing, and masking a mountain of incriminating evidence in required periodic registration statements and other required documents, records, and oral representations, which did not, in reasonable detail, accurately and fairly reflect truths, with the intent to deceive and defraud, and thereby improperly influencing the conduct of United States officers and officials, and to promote and conceal their ongoing transnational criminal schemes and tortious acts, Defendants, with especially co-conspirators Bayan Sami Abdul Rahman, Defendants Treefa Aziz, Rubart Sandi, and Hikmat Bamarni, as individuals demonstrated reckless, purposeful, knowing, and willful disregard for the truth in public declarations and filings with agencies of the United States Government.  Defendants and their Washington, D.C.-based agents, representatives, advisors, consultants, and attorneys falsified and caused to be falsely stated and certified and submitted or caused to be submitted by the Washington, D.C. office of the KRG and by its KRG Washington representatives and employed staff, and by the Fairfax, Virginia office of the KDP representative, designated, appointed, empowered, and directed by and reporting to Defendants Masoud Barzani and Masrour Barzani, and their retained Washington, D.C. consultants and advisors functioning under their

direction, did, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of one and more unlawful activities, repeatedly, knowingly, and purposefully contained untruthful, fabricated, incomplete, deceptive, misleading, fictitious, and mendacious information, at a time contemporaneous with the BCE and by trick, scheme, and device did cover up and knowingly failed to disclose and fraudulently concealed material facts and adverse information and failed to disavow their wrongful conduct and misrepresented the truth about the BCE in furtherance of the conspiracy and to effect the illegal object thereof, issuance and submission thereof to the United States Government taking place in the District of Columbia and elsewhere and published in English and targeting a United States audience as part of a broad, premeditated, and calculated effort to covertly and overtly influence, distract, and shape public perceptions of Defendants Masoud Barzani and Masrour Barzani and their subordinates in the United States and around the world, and engaging in an act, practice, and course of conduct which operated and would operate as a fraud and deceit upon an official person, and with the intent to impede, obstruct, mislead, deceive, defraud, or influence the foreign and military policy, opinion, and law decision-making of the Government of the United States and citizens of the United States who relied on said filings to be truthful, and took substantial actions domestically that aided and abetted violations of treaties, conventions, and law, including collaboration with officially designated terrorist organizations, and in furtherance of the BCE and were major factors responsible for tortious acts complained of herein.

107.    Plaintiffs' claims meet the Supreme Court's "touch and concern" test with sufficient force to displace the general presumption against jurisdiction over extraterritorial claims, first articulated in *Kiobel v. Royal Dutch Petrol. Co.*, and, therefore, this Court has jurisdiction over Plaintiffs' ATS claims. 569 U.S. 108, 124-25, 133 S.Ct. 1659, 185 L.Ed.2d 671 (2013).

108.    Much of the tortious acts of Defendants have been carried out through sham corporations and lawyer corporations, acting on behalf of Defendants.   The D.C. Circuit has held that corporations can be liable under the ATS.  See *Doe I v. Nestle USA, Inc.*, 766 F.3d 1013, 1022 (9th Cir. 2014); *Flomo v. Firestone Nat'l Rubber Co., LLC*, 643 F. 3d 1013, 1017-21 (7th Cir. 2011); *Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 57 (D.C. Cir. 2011), *vacated on other grounds*, 527 F. App'x 7 (D.C. Cir. 2013); *Romero v. Drummond Co., Inc.*, 552 F.3d 1303, 1315 (11th Cir. 2008).

109.    This court has jurisdiction because each defendant has/had "sufficient connections to this forum and knew his co-conspirator was carrying out acts in furtherance of the conspiracy in the forum." *EIG Energy Fund XIV, L.P. v. Petróleo Brasileiro S.A*., 246 F. Supp. 3d 52, 91 (D.D.C. 2017) (emphasis in original) (discussing the impact of *Walden* 571 U.S. at 286 on personal jurisdiction), aff'd, 894 F.3d 339 (D.C. Cir. 2018).

110.    This court has jurisdiction because acts of BCE affected interstate commerce through activities relating to their counterfeiting of U.S. products.

### D.    This Court Is Bound by the Law of Nations

111.    The claims hereunder the law of nations are based on norms that are definable, obligatory, and universally recognized.

112.    "The Court is bound by the law of nations which is a part of the law of the land."  *THE NEREIDE, BENNETT, MASTER*, 13 U.S. 388, 3 L. Ed. 769 (1815).  Also *Ali v. Rumsfeld*, 649 F.3d 762 (D.C. Cir. 2011).  The Supreme Court declared, "For two centuries we have affirmed that the domestic law of the United States recognizes the law of nations."  See *Sosa v. Alvafez-Jachain*, 542 US 692 SCOTUS.  Treaties are binding agreements between nations that govern the rights and obligations of participating countries.  The use of international conventions, i.e., treaties, was codified in the 1969 Vienna Convention on the Law of Treaties, and the treaty text is legally binding on the Defendants.  As a ratified treaty, the Vienna Convention has the status of federal

law. "[T]reaties are recognized by our Constitution as the supreme law of the land." See *Breard v. Greene,* 523 U.S. 371, 118 S. Ct. 1352, 140 L. Ed. 2d 529 (1998).

113. The Supreme Court held, "In modern times, there is no doubt, of course, that 'the international community has come to recognize the common danger posed by the flagrant disregard of basic human rights,' leading 'the nations of the world to recognize that respect for fundamental human rights is in their individual and collective interest.' *Filartiga,* 630 F.2d, at 890.

114. That principle and commitment support the conclusion that human-rights norms must bind the individual men and women responsible for committing humanity's most terrible crimes, not just nation-states in their interactions with one another. 'The singular achievement of international law since the Second World War has come in the area of human rights,' where international law now imposes duties on individuals as well as nation-states. *Kiobel,* 621 F.3d, at 118." *Jesner v. Arab Bank, PLC*, 584 US 241, Supreme Court 2018.

115. The tortious actions Plaintiffs allege are violations of the law of nations. Courts have held that torture, summary execution, crimes against humanity and cruel, inhuman and degrading treatment are acts that violate international law; therefore, they meet the ATCA's criterion that Plaintiffs' claims violate the law of nations. *See FIS*, 993 F. Supp. at 4, 8; *Xuncax*, 886 F. Supp.

116. The Torture Act establishes federal jurisdiction and liability for "[a]n individual who, under actual or apparent authority, or color of law, of any foreign nation ... subjects an individual to torture …" 28 U.S.C. § 1350 note § 2(a)(1)-(2). Defendants did act under color of law, because all acts were under the command and control of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, who at all times "wear their official hats" even when acting with no lawful authority.

117. "Although the United States has not joined the International Criminal Court, U.S. law recognizes the definition of crimes against humanity as stated in the Rome Statute." *Ofisi v. BNP*

*Paribas, S.A.*, 278 F. Supp. 3d 84 (D.D.C. 2017), quoting *Almog v. Arab Bank, PLC*, 471 F.Supp.2d 257, 275 n.23 (E.D.N.Y. 2007).   Universal jurisdiction is extended to "crimes against humanity," *Sosa v. Alvarez-Machain*, 542 U.S.692, 762 (2004) (Breyer, J., concurring).

118.    The Republic of Iraq is a participating nation, as is the United States, of the United Nations Convention Against Corruption and the International Convention for the Suppression of the Financing of Terrorism, which Defendants have knowingly, deliberately, and willfully aided and abetted the KRG and its principal officers and agents in violating and breaching the provisions of these treaties and international law.

119.    Plaintiffs have "establish[ed] that 'the conduct relevant to the statute's [Alien Tort Statute] focus occurred in the United States . . . even if other conduct occurred abroad.'"  *Nestle USA, Inc. v. Doe*, 593 US 628 - Supreme Court 2021, quoting *RJR Nabisco*, 579 U. S., at 337, and the presumption against extraterritoriality is satisfied.  As alleged, Defendants' conduct relevant to the focus of the Alien Tort Statute significantly occurred in the United States.  Plaintiffs injuries have occurred internationally and domestically.  As established herein, Defendants violated "'a norm that is specific, universal, and obligatory'" under international law.  *Sosa v. Alvarez-Machain*, 542 U. S. 692, 732  (2004). Supreme Court precedents have also stated that courts may exercise common-law authority under the Alien Tort Statute. See, e.g., *Sosa 542 U. S., at* 724; *Hernández v. Mesa*, 589 U. S. 93, 206 L.Ed 2d 29, 2020.

120.    The United States Government has often expressed commitment to fundamental human rights norms.  For example, in *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980), the Departments of State and Justice submitted an amicus brief urging that the court exercise its jurisdiction. The brief posited that where a law recognized by the international community has clearly been violated, "a refusal to recognize a private cause of action in these circumstances might seriously damage the credibility of our nation's commitment to the protection of human rights"

and the fundamental human rights of freedom from torture and summary execution would be considered peremptory.

**E.      Defendants Have No Claim to Sovereign Immunity**

121.    No Defendant is immune from this civil suit for the conduct at issue.

122.    The immunity protecting foreign officials for their official acts ultimately belongs to the sovereign rather than the individual. See, e.g., *Arrest Warrant of 11 Apr. 2000 (Dem. Rep. Congo v. Belgium)*, 2002 I.C.J. 3, ¶ 61 (Feb. 14) (Merits).  Only actions by officials taken in an official capacity are entitled to immunity under customary international law.  "[W]e find nothing in the statute's [FSIA] origin or aims to indicate that Congress similarly wanted to codify the law of foreign official immunity." *Samantar*, 130 S. Ct. 2278.

123.    Defendants are not entitled to assert common law immunity or other forms of immunity.  An "individual employed by a foreign state enjoys no FSIA immunity for acts that are `beyond the scope' of her official responsibilities," i.e., acts that are "personal and private in nature." *Leutwyler*, 184 F.Supp.2d at 287 (quoting *Cabiri, v. Assasie-Gyimah,* 921 F.Supp. 1189, 1197 (S.D.N.Y.1996)); *accord Jungguist,* 115 F.3d at 1027; *Kline,* 685 F.Supp. at 389.  Moreover, acts outside an official's scope of authority cannot be acts of state because they cannot "give effect to a State's public interests." *Sharon*, 599 F. Supp. at 544 (citing *Restatement (Second) of Foreign Relations Law* § 41 (1962)).  Violations of international human rights, such as extrajudicial killings and torture or cruel, inhuman and degrading treatment or punishment cannot be in the public interest. See *Liu Qi*, 349 F. Supp. 2d at 1306; *Doe v. Unocal Corp.*, 963 F. Supp. 880, 893 (C.D. Cal. 1997).  The TVPA's legislative history makes clear that "no state officially condones torture or extrajudicial killings."

124.    The claims of this lawsuit address conduct, not status.  It is "the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies

in a given case." *Usoyan v. Republic of Turkey*, Civil Action No. 2018-1141 (D.D.C. 2020), quoting *United States v. S.A. Empresa De Viacao Aerea Rio Grandense*, 467 U.S. 797, 813 (1984).

125.    The foreign sovereign, the Republic of Iraq, is not responsible for the actions of any Defendant, which do not serve any legitimate governmental interest nor were an exercise of governmental authority, nor does the sovereign exercise the necessary degree of control over any Defendant to create a principal/agent relationship and thus permit this court to deem Iraq responsible for their actions. *See Foremost-McKesson v. Islamic Republic of Iran*, 905 F. 2d 438 - Court of Appeals, Dist. of Columbia Circuit 1990.  BCE is not an entity of the responsible sovereign.

126.    Defendants' tortious acts are not lawfully attributable to the sovereign, cannot be imputed to the sovereign, have consistently violated *jus cogens*, have consistently violated universally accepted rules of conduct and breached multilateral obligations, have dishonored the obligations of the responsible sovereign state, the sovereign is not the beneficiary of the BCE's profits or Defendants' conduct, the sovereign is not a real party in interest, and the complaint seeks no relief against the sovereign.  Defendants Masoud Barzani, Masrour Barani, and Waysi Barzani, and their agents, acted outside the scope of their authority and cannot claim to have acted under a valid grant of authority for purposes of the FSIA.  While Defendants may inaptly claim principles of international comity, they are not "a matter of absolute obligation" under constitutional or international law and are of no relevance in the instant matter.  See *Hilton v. Guyot*, 159 US 113, 163 (1895).  Defendants cannot claim lessened culpability and responsibility for their criminal conduct merely because they engaged in this conduct while holding government positions.  The doctrine of comity is not applicable in the instant case.

127.    Defendants' conduct was not grounded in social, economic, or political policy and was not "of the nature and quality that Congress intended to shield from tort liability." S.*A. Empresa De Viacao Aerea Rio Grandense*, 467 U.S. at 813.

128.    "Officials receive no immunity for acts that violate international *jus cogens* human rights norms (which by definition are not legally authorized acts.)"); *Cabiri v. Assasie-Gyimah,* 921 *1287 F.Supp. 1189, 1198 (S.D.N.Y.1996).  No government asserts a right to or has the lawful authority to torture. See *Belhas v. Ya'Alon*, 515 F.3d 1279 (D.C. Cir. 2008), citing *Filartiga v. Pena-Irala,* 630 F.2d 876, 884 (2d Cir.1980)); *Prosecutor v. Furundija,* Case No. IT-95-17/1-T, Judgement, ¶ 156 (Dec. 10, 1998).  As defined in the Vienna Convention on the Law of Treaties, a *jus cogens* norm, also known as a "peremptory norm" of international law, "is a norm accepted and recognized by the international community of states as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character." Vienna Convention on the Law of Treaties, art. 53, May 23, 1969, 1155 U.N.T.S. 332, 8 I.L.M. 679 [hereinafter "Vienna Convention"].  *See Belhas v. Ya'Alon.*

129.    With respect to Defendants' crimes of assassination, the Supreme Court has been clear: "Whenever policy options may exist for a foreign country, it has no 'discretion' to perpetuate conduct to result in the assassination of an individual or individuals, action that is clearly contrary to the precepts of humanity as recognized in both national and international law."  *Letelier v. Republic of Chile*, 488 F. Supp. at 673 (D.D.C. 1980)  "…[P]lanning and conducting the murder of [victim] could not have been a discretionary function as defined by the FSIA."  *Liu v, Republic of China*, 642 F. Supp, at 305 (N.D.Cal. 1986). This Court has held "Political assassinations ordered by foreign states outside their territory, however, are not valid acts of state."  See *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, at 24 (D.C. 1998).

130.    The Supreme Court held the FSIA, which governs the immunity of foreign states in U.S. courts, does not apply in suits against foreign officials.  The ruling clarifies that officials of foreign governments, whether present or former, are not entitled to invoke the FSIA as a shield, unless the foreign state is the real party in interest in the case. *Samantar v. Yousef*, 130 S. Ct. 2278 (2010). "The Samantar decision clarified that the FSIA does not govern lawsuits against foreign officials, current or former." (See Congressional Research Service, *Samantar v. Yousef: The Foreign Sovereign Immunities Act (FSIA) and Foreign Officials*.  The FSIA, 28 U.S.C. §§ 1602 et seq., does not provide immunity for Defendants.)

131.    The United States, through its Department of State, accords no official diplomatic mission or consular status to the KRG office in Washington, D.C. nor grants diplomatic privileges and immunities to its Washington, D.C. office representatives, employees, and advisors.

132.    The predicate tortious acts at issue here are far from analogous to the type of activity that courts have described as "sovereign" in nature.  See*, e.g., Weltover,*

133.    The Barzani family has been in power in Kurdistan for decades, and the corruption of the regime has been widely reported in Department of State communiques and the international media, including substantial misappropriation, theft, and embezzlement of billions of dollars from the Kurdistan treasury, some of which was used to purchase luxurious properties in the United States for use of Barzani family members.  The funds used to acquire properties in the United States are traceable to violations of specified unlawful activities and U.S. law, that is a foreign offense involving the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official, and the international transportation or receipt of stolen of fraudulently obtained property (81 U.S. C. §§ 1956(c)(7)(B)(iv) and 1956(c)(7)(A) respectively).

Each of these acts were commercial because they were not acts "only a sovereign state could perform."  See *Park v. Shin,* 313 F.3d 1138, 1145 (9th Cir.2002).

134.   Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and all named Defendant agents of the KRG, do not enjoy conduct-based immunity.  Defendants cannot demonstrate that any of the tortious acts in question was "imbued with some level of formality" to show that the actions enumerated herein were or are "the official policy" or "the officially sanctioned policies of" or "statute, decree, order or resolution" of the Republic of Iraq, the foreign sovereign.  "To qualify as official, an act must be imbued with some level of formality, such as the authorization by the foreign sovereign through an official statute, decree, order or resolution." See *Kashef v. BNP Paribas S.A.,* 925 F.3rd 53, 60 (2nd Cir. 2019).

135.   FSIA establishes a default rule granting foreign sovereigns immunity from the jurisdiction of United States courts.  See 28 U.S.C. § 1604; *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 13 (D.C.Cir.2015).   That baseline grant of immunity, however, is subject to a number of exceptions.  See 28 U.S.C. §§ 1605-07; see also id. § 1604. While the FSIA "establishes a general rule granting foreign sovereigns immunity from the jurisdiction of United States courts," there are "a number of exceptions" to that rule that apply here.  See *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, Case 1:22-cv-00245-RJL Document 17-1 Filed 06/11/22 Page 14 of 33 9 13–14 (D.C. Cir. 2015).  The facts herein constitute comprehensive tortious and commercial conduct subject to exceptions enumerated therein, where Defendants were not acting under the auspices or lawful authority of a state but only as private individuals.  Moreover, the non-commercial tort "exception to the FSIA does not apply to any claim arising out of malicious prosecution, abuse of process ..., misrepresentation, [or] deceit," id. § 1605(a)(5)(B).   See *MacArthur Area Citizens Ass'n v. Republic of Peru, 809 F.2d 918, 921 (D.C. Cir.) (citation omitted), modified 823 F.2d 606 (D.C. Cir. 1987).  MacArthur Area Citizens Ass'n v. Republic of Peru,* 809 F.2d 918, 921 (D.C. Cir.) (citation omitted), modified, 823 F.2d 606 (D.C. Cir. 1987).  Defendants consistently deploy social media, broadcasting, and KRG representation for manipulation and misrepresentation of

information.  Plaintiffs herein produce evidence that the exception applies.  *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013).  Once Plaintiffs make this showing, "the sovereign bears the ultimate burden of persuasion to show the exception does not apply." *Id.*

136.    The FSIA, like FTCA, does not shield all exercises of discretion.  The discretionary function exception "protects only governmental actions and decisions based on considerations of public policy." See *Berkovitz v. United States*, 486 U.S. 531, 108 S. Ct. 1954, 100 L. Ed. 2d 531 (1988).  Mere "garden-variety" discretion receives no protection. See *Cope v. Scott*, 45 F.3d 445, 448 (D.C.Cir.1995).  Only discretionary actions "grounded in social, economic, and political policy" fall within the exception.  See *United States v. Gaubert*, 499 U.S. at 323, 111 S. Ct. 1267, 113 L. Ed. 2d 335 (1991).

137.    The claims of this complaint are not directed toward a sovereign government but are directed at individuals.  Under the tortious acts exception, "[a] foreign state shall not be immune from the jurisdiction of the courts of the United States … in any case … in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment." 28 U.S.C. § 1605(a)(5).  No Defendant can assert they were "acting within the scope of [their] office or employment" and merit immunity.  *See Usoyan v. Republic of Turkey*, Civil Action No. 2018-1141 (D.D.C. 2020).

138.    Defendants' acts fall within FSIA commercial activity exception to sovereign immunity.  See *Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607, 614, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992), and *United States v. Turkiye Halk Bankasi AS,* 16 F. 4th 336 (2nd Cir. 2021).  A foreign state engaging in "commercial" activities "do[es] not exercise powers peculiar to sovereigns";

rather, it "exercise[s] only those powers that can also be exercised by private citizens."  See *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 112 S. Ct. 2160, 119 L. Ed. 2d 394 (1992), quoting *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 704 (1976).  Illicit commercial activity, in other words activity for financial or pecuniary gain, comprises a substantial component of the gravamen of Plaintiffs' Complaint.

139.    Defendants might contend that FSIA itself obligates a plaintiff to exhaust domestic remedies before attempting to bring suit against a foreign sovereign (which Plaintiffs do not herein do, and Defendants are not a foreign sovereign) in United States courts.  The Court of Appeals for the District of Columbia Circuit held that FSIA itself imposes no exhaustion requirement.  See *Simon v. Republic of Hungary, 812 F.3d 127, 148 (D.C. Cir. 2016);  Chabad, 528 F.3d at 948-49; accord Abelesz, 692 F.3d at 678.*

140.    In FSIA, the Congress enacted a "comprehensive framework for resolving any claim of sovereign immunity."  *Republic of Austria v. Altmann*, 541 U.S. 677, 699, 124 S.Ct. 2240, 159 L.Ed.2d 1 (2004).  The purpose of FSIA was "to free the Government from . . . case-by-case diplomatic pressures."  *Verlinden B.V. v. Cent. Bank of Nigeria,* 461 U.S. at 488, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983)  The statute effectuates this purpose by "set[ting] forth 'the sole and exclusive standards to be used in resolving questions of sovereign immunity raised by foreign states before Federal and State courts in the United States.'" *MacArthur*, 809 F.2d at 919 (emphasis added) (*quoting* H.R. Rep. 94-1487, at 12.)  No defendants have absolute immunity, and their tortious conduct falls outside the outer perimeter of any lawfully empowered official responsibilities.  FSIA does not immunize criminal conduct.  "No officer of the law may set that law at defiance with impunity."  *United States v. Lee*, 106 U.S. 196, 220 (1882).

141.    Defendants are not entitled to assert common law immunity, which applies only for official acts within the lawful scope of the individual's duties and where a lawsuit against the individual would impose an obligation on the foreign government.

142.    Nonetheless, should Defendants incorrectly assert that such sovereign immunity is applicable, the FSIA terrorism exception strips immunity from a foreign state that "specifically instructs" a terrorist organization to carry out an attack and from a foreign state that "only provides general support, but was not involved with the" specific act.  See *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004)).  Under the causation standard imposed by FSIA, a plaintiff need not establish but-for causation and instead may articulate a claim by showing (1) the defendant's actions were "a 'substantial factor' in the sequence of events that led to the plaintiff's injury; and (2) the plaintiff's injury was "'reasonably foreseeable or anticipated as a natural consequence' of the defendant's conduct."  See *Owens v. BNP Paribas, SA,* 897 F.3d 266, 794 (D.C. Cir. 2018). ~~223~~

143.    Defendant Masoud Barzani has been listed in documents filed by ~~Defendant Iraqi Kurdistan Regional Government (the~~ KRG~~)~~ with the ~~U.S.~~ Departments of State and Justice, and in written communications with the White House and the Executive Office of the President, as the President of the ~~Iraqi~~ Kurdistan Region, a position he vacated in 2017.  The United States Supreme Court held that a former official is not covered by FSIA.  See *Samantar v. Yousuf*, 560 U.S. 305, 130 S. Ct. 2278, 176 L. Ed. 2d 1047 (2010).  Former Presidents of the KRG enjoy no special conditions on their civil liability.

144    The Supreme Court also held that the term "agency or instrumentality" in FSIA does not refer to natural persons, such as individual government officials. *Id. at 2286-87.* "The fact that a person who committed an act which constitutes a crime under international law acted as Head of State or responsible Government official does not relieve him or her of responsibility under

international law."  See *U.N. International Law Commission, Principles of International Law Recognized in the Charter of the Nürnberg Tribunal and in the Judgment of the Tribunal, in Report of the International Law Commission on its Second Session, 5 June to 29 July 1950, (Document A/1316), reprinted in II YEARBOOK OF INTERNATIONAL LAW COMMISSION 1950, 374, 375 U.N. Doc. A/CN. 4/SER.A/1950/Add. 1 (Jun. 6, 1957).*

145.   "The official position of any accused person, whether as Head of State or Government or as a responsible Government official, shall not relieve such person of criminal responsibility nor mitigate punishment."  See *U.S. Department of Defense Law of War Manual, 2015, p. 1150.*

146.   Acting pursuant to orders does not relieve a person of responsibility.  The International Law Commission has declared:

> "The fact that a person acted pursuant to orders of his or her Government or of a superior does not relieve that person from responsibility under international law, provided it was possible in fact for that person to make a moral choice."  See *U.S. Department of Defense Law of War Manual, 2015.*

The standard for Defendants' liability for criminal acts exceeds that for civil liability of those acts.

### F.    TVPA Provides Liability Even If Defendants' Conduct Was Authorized

147.   FSIA does not preclude Plaintiffs' claims pursuant to the Torture Victims Protection Act ("TVPA"), the unambiguous language of which provides for liability where an "individual who, under actual or apparent authority or color of law, of any foreign nation...subjects an individual to extrajudicial killing...." 28 U.S.C. § 1350 note, sec. 2(a)(2). The term "actual authority" has well established meaning (see, e.g., *Hatahley v. United States*, 351 U.S. 173, 180-181 (1956)) and "arises from a manifestation of consent from principal to agent." *Dover Ltd. v. A.B. Watley, Inc.*, No. 04 Civ. 7366 (FM), 2006 U.S. Dist. LEXIS 13621, at *22 (S.D.N.Y. Mar. 27, 2006) (internal quotations omitted).  Actual authority to do an act must come from "a government official

empowered to authorize" the act. *U.S. v. Giffen*, 379 F. Supp. 2d 337, 342 (S.D.N.Y. 2004). In this context even if Defendant were to provide evidence that he was "authorized" to participate in an "extrajudicial killing," (i.e., had "actual" authority) he would not be immune under the TVPA.

148.    Courts in this District have concluded that injuries "resulting from 'deliberate' attempts to kill fall within the scope" of the terrorism exception.  *See Cabrera v. Islamic Republic of Iran*, Civil Action No. 19-3835, 81 (JDB) (D.C. Jan. 27, 2023); *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 58 (D.C. 2019); accord *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 99 (D.D.C. 2017).

149.    Against the explicit language of the TVPA, FSIA makes no reference to the extension of sovereign immunity to officials.  It is well settled that, when general and specific statutes conflict, the specific statute prevails. *U.S. v. Mohammed*, 27 F.3d 815, 817 (2d Cir. 1994). Here, the TVPA specifically provides that those with actual authority (i.e., officials acting within the scope of their authority) can be sued, whereas the FSIA does not specifically exclude officials (that meaning has been read into an "agency or instrumentality of a foreign state."). On that basis alone, inferences drawn from the FSIA do not negate the clear language of the TVPA. Further, the TVPA is the later of the two statutes, and therefore should take precedence. *Id.*   TVPA clearly reaches foreign officials acting within the scope of their authority.

### G.    The Act of State Doctrine Does Not Bar Plaintiffs' Claims

150.    That Act of State Doctrine is not implicated to bar a claim in the present case, because the validity of no "official action by a foreign sovereign" is at issue. The instant case implicates no state secrets privilege. "The Act of State Doctrine does not establish an exception for cases and controversies that may embarrass foreign governments, but merely requires that, in the process of deciding, the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid." *W.S. Kirkpatrick & Co. v. Evtl. Tectonics*, 493 U.S. 400 (1990).  The Supreme Court made clear

that the Act of State Doctrine is not required by international law.  *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964).

151.    The Act of State Doctrine applies only to those acts that are "official", except extrajudicial killings, torture and other cruel, inhuman or degrading treatment or punishment can never be considered official acts of state. "[*J*]*us cogens* violations are considered violations of peremptory norms, from which no derogation is permitted. Acts of state to the contrary are invalid." *Presbyterian Church*, 244 F.Supp.2d at 345.  Violations of international human rights cannot be in the public interest.  *See Liu Qi*, 349 F. Supp. 2d at 1306; *Doe v. Unocal Corp.*, 963 F. Supp. 880, 893 (C.D. Cal. 1997).

152.    Further, plaintiffs' claims under the TVPA alleged are not barred by the doctrine.  See *Rusesabagina v. Republic of Rwanda*, Civil Action No. 2022-0469 (D.D.C. 2023). The acts claimed by Plaintiffs are not an official act of the Iraq or KRG government, and are illegal in Iraq; the Act of State Doctrine does not bar those claims.  (The party invoking the Act of State Doctrine bears the burden of proving its applicability.  See *Agudas Chasidei Chabad of United States v. Russian Federation*, 528 F.3d.934, 951 (D.C. Cir. 2008).  Defendants cannot prove (or even argue) that the acts at issue were in fact an "act of state".  *See Banco Nacional de Cuba v. Sabbatino*, 376 U.S. at 401 (1964). *See Galu v. SwissAir*, 873 F.2d 650, 654 (2d Cir. 1989) (defendant bears the burden "to establish foreign law to the extent necessary to establish its entitlement to the act of state defense."))  The TVPA's legislative history makes clear that no state officially condones torture or extrajudicial killings.

153.    "The burden of providing a factual basis for acts of state rests on [Defendants]."  *Agudas Chasidei Chabad of US v. Russian Fed.*, 528 F. 3d 934, D.C.C 2008. Here, neither Iraq nor Kurdistan, or its agencies or instrumentalities, are the defendants.  Defendants cannot meet their burden to prove an Act of State, which defense "must be made on the basis of the pleadings alone."

160

*Daventree Ltd. v. Republic of Azer.*, 349 F. Supp. 2d 736, 754 (S.D.N.Y. 2004); accord, *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998). See *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 691, 695 (1976); *Bigio v. Coca-Cola Co.*, 239 F.3d 440, 453 (2d Cir. 2000).

154.    The Act of State Doctrine does not apply to acts outside of a sovereign's territory. See *Underhill,* 168 U.S. at 252; *Sabbatino*, 376 U.S. at 401; *W. S. Kirkpatrick & Co. v. Environmental Tectonics Corp., Int'l*, 493 U.S. 400, 405 (1990); *Republic of Aus. v. Altmann,* 541 U.S. 677, 700 (2004).

155.    Defendants cannot provide evidence of a "statute, decree, order, or resolution" of the Iraq Government authorizing any of the tortious acts of Defendants resulting in the injuries and harms to Plaintiffs. *Dunhill*, 425 U.S. at 695; *Sharon*, 599 F. Supp. at 544; *Liu v. Republic of China*, 892 F.2d 1419, 1432 (9th Cir. 1989) (ASD burden requires "some evidence that the government acted in its sovereign capacity…"

156.    Torture or cruel, inhuman and degrading treatment or punishment, and extrajudicial killings can never be considered official acts of state. "[*J*]*us cogens* violations are considered violations of peremptory norms, from which no derogation is permitted. Acts of state to the contrary are invalid." *Presbyterian Church*, 244 F.Supp.2d at 345. The Second Circuit has confirmed, "[W]e doubt that the acts of even a state official, taken in violation of a nation's fundamental law and wholly unratified by that nation's government, could properly be characterized as an act of state." *Kadic*, 70 F.3d at 250; accord, *Filartiga v. Pena-Irala*, 630 F.2d 876, 889 (2d Cir. 1980).

## H.    Defendant Masrour Barzani Explicitly and Implicitly Waived and Relinquished Sovereign Immunity

157.    Defendant Masrour Barzani, as an individual, explicitly and implicitly waived, relinquished, and disclaimed any claim to sovereign immunity when, in voluntarily seeking and accepting a green card and receiving "United States person" status, as defined in 18 U.S.C. § 2331(2) and 8 U.S.C. § 1101(a)(22), "a person who, though not a citizen of the United States, owes permanent allegiance to the United States" with an obligation to obey its laws.

158.    FSIA does not preempt a constitutional oath of allegiance to the United States and its laws, for such would be incompatible with the dignity and supremacy of the Constitutional pledge.  In the instructive words of Chief Justice Marshall, albeit with a differing application, "He divested himself of any sovereign character and takes that of a private citizen."  See *Bank of United States v. Planters' Bank of Georgia*, 22 U.S. (9 Wheat) 904, 907-908 (1824).  Basic principles of sovereignty, nonetheless, provide that a state generally has a right to exercise jurisdiction over its residents. See, e.g., *Schooner Exchange*, 11 U.S. at 136.

159.    Defendant Masrour Barzani is not a recognized head of state or head of government, and the United States has accorded no head of state or head of government immunity to him.

   **I.    Defendants' Violated Existing International Agreements and Treaties**

160.    No dispute of international law is present.  Defendants have abused and dishonored treaties, partially listed in attached Exhibit D, with impunity and reckless abandon to, knowingly and willfully, criminally and tortiously harm Plaintiffs.

161.    The Supreme Court held, "The Judiciary Act of 1789 included what is now known as the ATS, which provides: 'The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.'" 28 U.S.C. § 1350. See *Jesner v. Arab Bank*, PLC, 584 US 241, Supreme Court 2018.

134.    The Supreme Court has been equally clear on federal court jurisdiction regarding treaties. "It is a general principle of construction with respect to treaties that they shall be liberally

construed, so as to carry out the apparent intention of the parties to secure equality and reciprocity between them." *Geofroy v. Riggs*, 133 U.S. 258, 10 S. Ct. 295, 33 L. Ed. 642 (1890). With relevance in the instant matter, with respect to another "Convention" the Supreme Court said it is "a multilateral treaty to which approximately 160 countries, including the United States. . . are signatories. As a ratified treaty, [it] has the status of federal law." "[T]reaties are recognized by our Constitution as the supreme law of the land." *Breard v. Greene,* 523 U.S. 371, 118 S. Ct. 1352, 140 L. Ed. 2d 529 (1998). U.S. Constitution, Article VI, clause 2 (all treaties shall be supreme law of the land).

162.    The Department of State, in an amicus brief submitted to the Second Circuit Court of Appeals, expressed the United States' position that "the sources of international law are international agreements, international custom, general principles of law recognized by civilized nations, and judicial decisions and the teachings of learned commentators." "General principles of law recognized by civilized nations also establish that there are certain fundamental human rights to which all individuals are entitled, regardless of nationality." "Every multilateral treaty dealing generally with civil and political human rights proscribes torture." "Official torture is a tort and gives rise to a judicially enforceable remedy." See *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980).

163.    In committing these tortious acts against Plaintiffs, Defendants knowingly, willingly, and substantially violated treaties, as defined by the Vienna Convention on the Law of Treaties:

(a)  Article 2(a): "treaty" means an international agreement concluded between States in written form and governed by international law, whether embodied in a single instrument or in two or more related instruments and whatever its particular designation;

(b) Article 2 (b): "ratification", "acceptance", "approval" and "accession" mean in each case the international act so named whereby a State establishes on the international plane its consent to be bound by a treaty;

(c) Article 2(g): "party" means a State which has consented to be bound by the treaty and for which the treaty is in force;

(d) Article 18: A State is obliged to refrain from acts which would defeat the object and purpose of a treaty when: (a) it has signed the treaty or has exchanged instruments constituting the treaty subject to ratification, acceptance or approval, until it shall have made its intention clear not to become a party to the treaty; or (b) it has expressed its consent to be bound by the treaty, pending the entry into force of the treaty and provided that such entry into force is not unduly delayed.

(e) Article 27: A party may not invoke the provisions of its internal law as justification for its failure to perform a treaty.

(f) Article 29: …a treaty is binding upon each party in respect of its entire territory.

164. The Court of Appeals for the District of Columbia held, "The FSIA's baseline grant of immunity to foreign sovereigns is '[s]ubject to existing international agreements to which the United States [was] a party at the time of enactment of th[e] Act.' 28 U.S.C. § 1604. That proviso is known as the FSIA's treaty exception. 'Any conflict between a [pre-existing] treaty and the FSIA immunity provisions, whether toward more or less immunity, is within the treaty exception.'" *See Simon v. Republic of Hungary*, 812 F.3d 127, (DC Cir. 2016), quoting *Abelesz v. Magyar Nemzeti Bank,* 692 F.3d 661, 669 (7th Cir.2012); *accord Moore,* 384 F.3d at 1084-85.

165. The International Court held an interstate treaty may create individual rights, whether or not they are classified as human rights. *LaGrand Case (Ger. v. U.S.)*, Merits (Int'l Ct. Justice June 27, 2001).

### J.    Plaintiffs' Claims Do Not Implicate the Political Question Doctrine

166.    The present matter involves no "political question", does not engage foreign policy, does not disrespect the judicial processes of any nation, and presents no nonjusticiable political questions; thus, this court has jurisdiction of the matters raised herein.  See *Zivotofsky Ex Rel. Zivotofsky v. Clinton*, 566 U.S. 189, 132 S. Ct. 1421, 182 L. Ed. 2d 423 (2012).  There is no danger of inadvertent interference with foreign relations.  See *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, at 16 (D.C. 1998).

167.    "In the landmark case of *Baker v. Carr,* the Supreme Court provided its most comprehensive discussion on the application of the [political question] doctrine.  Recognizing that the attributes of the political question doctrine 'diverge, combine, appear, and disappear in seeming disorderliness' in various settings, the Court set out to illuminate the 'contours' of the doctrine." See *Alperin v. Vatican Bank*, 410 F.3d 532 (9th Cir. 2005).  "Addressing foreign affairs specifically, *Baker* cautioned against 'sweeping statements' that imply all questions involving foreign relations are political ones." *Id.* at 544.  (citing *Baker*, 369 U.S. at 211, 82 S.Ct. 691 (citing *Oetjen v. Cent. Leather Co.,* 246 U.S. 297, 302, 38 S.Ct. 309, 62 L.Ed. 726 (1918)

168.  None of the factors delineated by the Supreme Court which require dismissal because the case cannot be resolved without making policy determinations are "inextricably" present in the instant case, and thus the case is justiciable.  See *Baker v. Carr,* 369 U.S. 186, 217, 82 S. Ct. 691 (1962).  The instant case poses no "delicate" and "complex" questions involving "large elements of prophecy . . . for which the Judiciary has neither aptitude, facilities nor responsibility." *Chicago & Southern Air Lines, Inc. v. Waterman S. S. Corp.*, 333 U. S. 103, 111 (1948) (Jackson, J., for the Court).  The Supreme Court spoke clearly:

> "Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for nonjusticiability on the ground of a political question's presence. The

doctrine of which we treat is one of 'political questions,' not one of 'political cases.' The courts cannot reject as 'no law suit' a bona fide controversy as to whether some action denominated 'political' exceeds constitutional authority. The cases we have reviewed show the necessity for discriminating inquiry into the precise facts and posture of the particular case, and the impossibility of resolution by any semantic cataloging." *Baker*, 369 U.S. at 217.

169.    The Supreme Court distinguished the political question doctrine from subject matter jurisdiction. *Id.* at 202.  It held that the District Court possessed subject matter jurisdiction, that the case was not a non-justiciable political question, and remanded. *Id.* at 237.  The Supreme Court has stated, "It is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Baker,* 369 U.S. at 211.  Nothing in the instant case revolves "around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch."  The complaint allegations are unambiguously not "political questions" or "political allegations" nor do they require political or policy determinations but are plainly allegations of torts not born of public policy authorities, which are an exception.

170    A court "cannot shirk this responsibility merely because [its] decision may have significant political overtones."  See *Japan Whaling Ass's v. Am. Cetacean Society, et. al.,* 476 U.S. 221, 230, 106 S. Ct. 2860 (1986).  "Courts in the United States have the power, and ordinarily the obligation, to decide cases and controversies properly presented to them." *Alperin v. Vatican Bank,* 410 F.3d 532, 539 (9th Cir. 2005).

## K.    Plaintiffs Are Crime Victims of Defendants' Offenses

171.    All plaintiffs, parties in interest to the suit, are "crime victims", as defined by the CVRA, and their rights are not illusory.  Congress designed the CVRA "to be a 'broad and encompassing' statutory victims' bill of rights," *United States v. Degenhardt*, 405 F. Supp. 2d 1341, 1343 (D. Utah 2005) (quoting 150 CONG. REC. S4261 (Apr. 22, 204) (statement of Sen. Feinstein)), thereby "making victims independent participants in the criminal justice process." See *Kenna v. US Dist. Court for CD Cal*., 435 F. 3d 1011, 1016, (9th Cir. 2006).

172.    "[T]he term 'crime victim' means a person directly and proximately harmed as a result of the commission of a Federal offense or an offense in the District of Columbia. (*See Paroline v. United States*, 572 U.S. 434, 446 (2014) "Proximate cause is a standard aspect of causation in criminal law and the law of torts.")  CVRA extends crime victims' protections to many persons who may not have been the target of a crime.  See 18 U.S.C. § 3771(6)(a).

173.    The CVRA's legislative history demonstrates Congress's intent that the "victim" definition should be construed broadly.  *See Kenna v. U.S. Dist. Court C.D.Cal.,* 435 F.3d 1011, 1013 (9th Cir. 2006) (stating that § 3771 "guarantees crime victims eight different rights, and unlike the prior crime victims' rights statutes, allows both the government and the victims to enforce them.").  Congress also added a provision including as a victim "any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." See *Hughey v. United States*, 495 U.S. 411 (1990).  The Ninth Circuit held, "Our interpretation also serves to effectuate other statutory aims: (1) To ensure that the district court doesn't discount the impact of the crime on the victims; (2) to force the defendant to confront the human cost of his crime; and (3) to allow the victim "to regain a sense of dignity and respect rather than feeling powerless and ashamed." *Kenna*, 435 F.3d at 1013.  It is well established that a person need not be present at a crime scene to be a "victim," so long as the person's interests are ultimately harmed. *See, e.g.,*

167

*Morris v. Nielsen*, 374 F. Supp. 3d 239, 254 (E.D.N.Y. 2019).  The crime or violation may have harmed the victim directly or indirectly.

174.    CVRA attaches whether or not the government brings formal charges against a defendant. Subsections (a)(2) and (a)(3) provide rights that attach to "any public court proceeding ... involving the crime." Similarly, subsection (b) requires courts to ensure CVRA rights in "any court proceeding involving an offense against a crime victim."

175.    Each of the Plaintiffs have been harmed by Defendants' acts, and the harm was foreseeable by Defendants.  The CVRA requires that an individual suffer "harm" from a crime to be protected by the law.  Under Congress's broad definition, any person who is directly and proximately harmed in any way – including suffering dignitary or emotional harm to any degree – is a CVRA "victim." Victim status does not require proof that a person claiming victim status was the crime's target. Instead, under the CVRA's plain language, victim status exists whenever a crime has directly and proximately harmed a person.  "[A] person is proximately harmed when the harm is a reasonably foreseeable consequence of the criminal conduct."  *United States v. GiraldoSerna*, 118 F. Supp. 3d 377, 383 (D.D.C. 2015).  "[A]n inquiry into proximate cause has traditionally been deemed unnecessary in suits against intentional tortfeasors."  *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 548 (1983) (Marshall, J., dissenting).  The Supreme Court explained, "it is not unusual to punish individuals for the unintended consequences of their unlawful acts." *Dean v. United States*, 556 U.S. 568, 575 (2009).

176.    The CVRA's victim definition extends rights to a person directly and proximately harmed "as a result of the *commission of a Federal offense*."  18 U.S.C. § 3771(e)(2)(A) (emphasis added). The definition also applies to "an offense in the District of Columbia," which raises issues similar

to those discussed in text regarding "Federal offense." Defendants' offenses are all "Federal offense[s]."

177.    "Under the plain language of the statute, a party may qualify as a victim, even though it may not have been the target of the crime, as long as it suffers harm as a result of the crime's commission." *In re Wellcare Health Plans, Inc.*, 754 F.3d 1234, 1239 (11th Cir. 2014) (internal quotation marks omitted) (quoting *In re Stewart*, 552 F.3d 1285, 1289 (11th Cir. 2008)); accord *In re Fisher*, 640 F.3d 645, 648 (5th Cir. 2011).

178.    Plaintiffs are also directly injured by multitudinous beaches of international law, including customary law on state responsibility for wrongful acts adopted by the International Law Commission, an organ of the United Nations. The *UN Basic Principles on the Right to a Remedy and Reparation for Victims of Gross Violations of Human Rights and Serious Violations of International Humanitarian Law (Basic Principles)* defines victims as persons who individually or collectively suffered harm, including physical or mental injury, emotional suffering, economic loss or substantial impairment of their fundamental rights, through acts or omissions that constitute gross violations of international human rights law, or serious violations of international humanitarian law.

179.    Victims are people or institutions who suffered personal harm because of the serious crimes or violations that harmed the victim directly or indirectly. Family members of people who are forcibly disappeared may themselves be victims of distinct personal harm.

180.    Intangible harms such as emotional distress, affront to dignity, or invasion of privacy also trigger CVRA protection. *See, e.g.*, *United States v. Maldonado-Passage*, 4 F.4th at 1103 (holding "emotional harm" is sufficient to trigger the CVRA).

191.    Plaintiffs suffering financial harm have clearly suffered direct and proximate harm from the crime and are victims under the CVRA (or similar federal statutes).  See, e.g., *Jordan v. Department of Justice*, 173 F.Supp.3d 44 (S.D.N.Y. 2016); *United States v. Thetford,* 935 F. Supp. 2d 1280, 1283 (N.D. Ala. 2013).

192.    An official, employee, or agent of a foreign state designated as a state sponsor of terrorism ... while acting within the scope of his or her office, employment, or agency shall be liable to a United States national or the national's legal representative for personal injury or death caused by acts of that official, employee, or agent for which the courts of the United States may maintain jurisdiction under [28 U.S.C. § 1605(a)(7)] for money damages which may include economic damages, solatium, pain, and suffering, and punitive damages if the acts were among those described in [§ 1605(a)(7)]. 28 U.S.C. § 1605 note.  Defendants have been and are agents and collaborators and co-conspirators of an instrument of a foreign state – the Islamic Republic of Iran, not provincial KRG – designated as a state sponsor of terrorism.

193.    The Defendants' tortious conduct is a factual cause of the harm.  Criminal law recognizes "harm" when there is an invasion of *any* social interest which has been placed under the protection of a criminal sanction (whether by common law or statute).  In using the unqualified term "harm" as the CVRA's trigger, Congress protected all persons who are harmed in any way by any federal crime.  This Circuit expressly recognized that even where various causes might be at play, a defendant's crime could still directly harm a victim, and also held that a victim invoking the CVRA need not demonstrate "direct traceability" between a defendant's crime and subsequent harm..." See *United States v. Giraldo-Serna*, 118 F. Supp. 3d 377, 387 (D.D.C. 2015) (mandamus granted in part by *In re de Henriquez*, 2015 WL 10692637 (D.C. Cir. 2015)).

170

194.    And the CVRA specifically "places responsibility on the [district] court for its implementation, requiring that 'the court shall ensure that the crime victim is afforded [those] rights.'" *United States v. Atl. States Cast Iron Pipe Co*., 612 F. Supp. 2d 453, 458 (D.N.J. 2009) (citing 18 U.S.C. § 3771(b)(1)) (emphasis added); see also *Stevens*, 239 F. Supp. 3d at 421 (explaining that "the CVRA imposes no less than an affirmative obligation on judges to ensure that the victim's rights are respected" (emphasis in original)).

### L.    Plaintiffs Satisfy All Requirements of Standing

195.    Each and all Plaintiffs have a "personal stake in the outcome of the controversy." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citation omitted).

196.    To have standing to sue in federal court, the Supreme Court has made it clear a plaintiff must allege "such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *See Warth v. Seldin*, 422 U.S. 490, 498-499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), quoting *Baker v. Carr,* 369 U.S. 186, 204.  Plaintiffs do allege such a personal stake in the outcome of the controversy as to warrant their invocation of federal court jurisdiction and to justify exercise of the court's remedial powers on their behalf.

197.    "Article III does not require each of the [] Plaintiffs to establish standing; only one Plaintiff need do so."  *Al-Tamimi v. Adelson*, Civil Action No. 2016-0445 (D.D.C. 2024), quoting *Del. Dep't of Nat. Res. & Env't Control*, 785 F.3d at 8 (citation omitted).  Plaintiff Shakhwan Abdulrahman has done just that, and possesses a "direct" and "personal" "stake in the outcome" of the case. *Hollingsworth V. Perry*, 570 US 693, 133 S.Ct. 2652, 188 L. Ed. 2d 768, citing *Arizonans for Official English*, supra, at 64, 117 S.Ct. 1055.

198.    "To establish Article III standing, a plaintiff must show (1) an "injury in fact," (2) a sufficient "causal connection between the injury and the conduct complained of," and (3) a "likel[ihood]" that the injury "will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Plaintiffs have "suffered an 'injury in fact' – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical," particularized "causal connection between the injury and the conduct complaint of," and particularized that the injury "will be redressed by a favorable decision." *Id.* None of Plaintiffs' injuries are "conjectural or hypothetical."

199.    Each of the individual Plaintiffs have suffered *past* injuries-in-fact, "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." See *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560). There exists a "substantial risk" that threatened *future* injury will occur. (See *Stringer v. Whitley,* 942 F.3d 715, 721 (5th Cir. 2019)). Thoroughly documented past harms constitute an injury-in-fact for purposes of pursuing injunctive relief as they cause "present adverse effects." See *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (*quoting O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)).

200.    Plaintiffs' injuries were and are caused by and are fairly traceable to the intentional and knowing conduct of the Defendants – and Plaintiffs continue to incur substantial harms.

201.    The requirements of Article III standing are familiar: First, the plaintiff must have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be fairly

traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *United States v. Windsor, 570 U.S. 744, 133 S.Ct. 2675, 2685-86, 186 L.Ed.2d 808 (2013). See Indigenous People of Biafra v. Blinken,* Civil Action No. 2021-2068 (D.D.C. 2022).

202.    The BCE, typically acting under the false and intentionally misleading cloak of officialdom, has been responsible for the deliberated extrajudicial murder of in excess of five thousand men, women, and children during the decades of its criminal activity. John Doe victims have surviving families and dependents that deserve compensation for the loss of their loved ones. Members of surviving families fear reprisals and imminent threats, and are afraid to come forward and seek redress because in their autocratic control of the Kurdistan judicial system Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their co-conspirator agents and representatives, and others, have purposefully limited all avenues and access for victims and their families, including the impossibility of safely conducting investigation and discovery in Kurdistan, to obtain justice and redress.

203.    The term "victim" confers legal status under domestic and international law. According to the *UN Basic Principles on the Right to a Remedy and Reparation for Victims of Gross Violations of Human Rights and Serious Violations of International Humanitarian Law (Basic Principles),* victims "are persons who individually or collectively suffered harm, including physical or mental injury, emotional suffering, economic loss or substantial impairment of their fundamental rights, through acts or omissions that constitute gross violations of international human rights law, or serious violations of international humanitarian law." See *UN General Assembly Resolution 60/147, Basic Principles and Guidelines on the Right to a Remedy and Reparation for the Victims*

*of Gross Violations of International Human Rights Law and Serious Violations of International Humanitarian Law*, A/ RES/60/147 (March 21, 2006), para. 8, https://undocs.org/A/RES/60/147

204.    Plaintiff Shakhwan Abdulrahmanm as Representative of Jihan Taha Abdulrahman, Deceased, has standing pursuant to the Crime Victims Protection Act (and other crime victims' rights laws): "In the case of a crime victim who is … deceased, the … the representatives of the crime victim's estate, family members, or any other persons appointed as suitable by the court, may assume the crime victim's rights…" 18 U.S.C. § 3771(6)(e).

205.    "'[T]he doctrine of associational standing recognizes that the primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others.'); *Oregon Advocacy Ctr. v. Mink,* 322 F.3d 1101, 1111 (9th Cir.2003) (reasoning that although the putative members 'do not have all the indicia of membership that the *Hunt* apple growers and dealers possessed,' there were sufficient indicia of membership 'to satisfy the purposes that undergird the concept of associational standing: that the organization is sufficiently identified with and subject to the influence of those it seeks to represent as to have a personal stake in the outcome of the controversy.'" *Institute of Cetacean v. Sea Shepherd Conservation*, 153 F. Supp. 3d 1291 - Dist. Court, WD Washington 2015

206.    In *Hunt v. Washington State Apple Advertising Commission*, the Supreme Court set forth the criteria for associational standing. 432 U.S. 333. Under the so-called Hunt test, a plaintiff at the motion to dismiss stage must plausibly allege or otherwise offer facts sufficient to permit the reasonable inference (1) that the plaintiff has at least one member who "would otherwise have standing to sue in [her] own right;" (2) that "the interests" the association "seeks to protect are germane to [its] purpose;" and (3) that "neither the claim asserted nor the relief requested requires

the participation of [the] individual members in the lawsuit." *Id*. at 343. (See *Public Citizen, Inc.*

*v. Trump*, Civil Action No. 2017-0253 (D.D.C. 2018).

207.    Plaintiff Shakhwan Abdulrahman is a member of Plaintiff Kurdistan Victims Fund.

208.    The Supreme Court explained that there are "special features, advantageous both to the

individuals represented and to the judicial system as a whole, that distinguish suits by associations

on behalf of their members from class actions." *Int'l Union, UAW v. Brock*, 477 U.S. 274, 290,

106 S.Ct. 2523, 91 LEd.2s 228 (1986). These special features include: (1) the ability of "an

association suing to vindicate the interests of its members [to] draw upon a pre-existing reservoir

of expertise and capital," and (2) the fact "that the primary reason people join an organization is

often to create an effective vehicle for vindicating interests that they share with others." *Id.* at 289-

90, 106 S.Ct. 2523. The Supreme Court also noted that "[t]he very forces that cause individuals

to band together in an association will . . . provide some guarantee that the association will work

to promote their interests." *Id.* at 290, 106 S.Ct. 2523.

209.    Plaintiffs have engaged in association for precisely the reasons prescribed by the Supreme

Court: "It is beyond debate that freedom to engage in association for the advancement of beliefs

and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the

Fourteenth Amendment… Of course, it is immaterial whether the beliefs sought to be advanced

by association pertain to political, economic, religious or cultural matters, and state action which

may have the effect of curtailing the freedom to associate is subject to the closest scrutiny."

*NAACP v. Alabama, ex rel. Patterson*, 357 U.S. 449, 460 (1958).

210.    "Victim group members who engage in any of the strategies … to advance justice may face

serious personal risks. Depending on the context, victim group members and their families may

face reprisals, threats, attacks, and imprisonment, among other possibilities. Those risks may be particularly heightened for victim group members—as opposed to other civil society actors—if they belong to a group or community that has already been targeted for violence." SOURCE: Simon-Skjodt Center for the Prevention of Genocide of The United States Holocaust Memorial Museum, an independent establishment of the United States Government.

211.    Plaintiffs have established and incorporated a United States voluntary non-political non-profit 501(c)(3) charitable entity, the "Kurdistan Victims Fund", a victim-centered civil society association with grave responsibility on behalf of victims, dedicated to deterring torture, atrocity crimes, genocide, crimes against humanity, and other serious human rights abuses and tortious acts by Defendants, and. embracing the pursuit of justice for victims of Defendants and their heirs as a solemn obligation, to compensate from any recovery in the instant case the John Doe victims and their families (who have a significant privacy interest in avoiding being identified as targets for murder, torture, or enforced disappearance or other non-trivial injury by the BCE); and have included the Kurdistan Victims Fund as a plaintiff. Kurdistan Victims Fund has no parent corporation, no publicly traded stock, and no publicly held corporation ownership.

212.    As an association, the Kurdistan Victims Fund meets the requirements for standing. This court has previously stated an association has standing. "An organization can establish standing 'by showing either an injury to itself' (organizational standing) or 'a cognizable injury to one or more of its members' (associational standing). *Indigenous People of Biafra v. Blinken*, Civil Action No. 2021-2068 (D.D.C. 2022), quoting *Kingman Park Civic Ass'n v. Bowser*, 815 F.3d 36, 39 (D.C. Cir. 2016).

213.    "Even in the absence of injury to itself, an association may have standing solely as the representative of its members." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). "The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result

of the challenged action of the sort that would make out a justifiable case had the members themselves brought suit.," *Sierra Club v. Morton*, 405 U.S. 727, 731-734 (1972) as Plaintiffs do in the instant complaint. *Black's Law Dictionary* defines association as "The act of a number of persons who unite or join together for some special purpose or business."

214.   "As an initial matter, to establish associational standing [KVF] bears the burden of demonstrating that at least one of its members would have standing to bring suit in his or her own capacity. Thus, [KVF] must prove that one of its members at UCSC (1) has the requisite injury-in-fact and (2) can illustrate an appropriate causal connection between that injury and actions taken by the Secretary, and (3) that the relief requested by YAF here would redress that member's injury. *See Young America's Foundation v. Gates, 560 F. Supp. 2d 39, D.C.C. 2008, quoting Defenders of Wildlife,* 504 U.S. at 561, 112 S.Ct. 2130. Shakhrawn Abdulrahman has such associational standing. Members of KVF would have standing to bring this lawsuit in their personal capacities.

215.   No requirement mandates that Kurdistan Victims Fund disclose its members. The Supreme Court held that "compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment." *Buckley v. Valeo,* 424 U.S. 1, 64, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (citing, inter alia, *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958)). The Supreme Court held the State of Alabama could not require disclosure of the local membership list of the National Association for the Advancement of Colored People (NAACP), because the organization "made an uncontroverted showing" – as Plaintiffs have done in the instant case – that on past occasions revelation of the identity of its rank-and-file members has exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility." *NAACP,* 357 U.S. at 462, 78 S.Ct. 1163.

216.   "The D.C. Circuit has translated the requirement into a single question: 'did the [defendant]'s actions materially increase the probability of injury?'" *Huddy v. FCC*, 236 F.3d 720, 722 (D.C.Cir. 2001).  All of Plaintiffs' injuries are "the consequence of the defendants' actions...." See *Warth v. Seldin, 422 U.S. 490, 504-05, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).*  Actual injury is "fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision." See *Equal Rights Ctr. v. Post Props., Inc*., 633 F.3d 1136, 1138 (D.C. Cir. 2011).  None of defendants' acts were "acts of war" as defined in 18 U.S.C. § 2331(4).

217.    The International Criminal Court states, "Civil society organizations are important partners for national authorities and international accountability mechanisms in our collective pursuit of justice for international crimes."

218.    The United Nations International Criminal Tribunal for Rwanda (ICTR), an entity of the United Nations of which the Republic of Iraq is a member state, held that "the act [of genocide] must have been committed against one or several individuals, because such individual or individuals were members of a specific group, and specifically because they belonged to this group."  The ICC affirmed that "what matters is the intent to discriminate: to attack persons on account of their ethnic, racial, or religious characteristics."  When this is met, "the victim of the crime of genocide is the group itself and not only the individual."

**M.    John Doe Plaintiffs – Victims Without a Voice – Warrant Pseudonymity**

219.   John Doe plaintiffs, protectively shielding identity, as Defendants' victims in Kurdistan where their voices are refuted and justice is disregarded, where the judiciary is paralyzed by Defendants intimidating judges and impeaching prosecutors, and where Plaintiffs live in constant fear of deprivation of liberty or death, are particularly vulnerable individuals who, with compelling reason, have sought pseudonymous protection as the only means to pursue important substantive rights.  Identification poses a credible, substantial, and historically documented, danger, threat,

and concern about reprisals from Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and Barzani family members, and their agents and representatives, including retaliatory death, torture, physical or mental harm, and financial retribution to plaintiffs or even more critically to innocent non-parties such as family members.  (In *Doe v. Stegall, 653 F.2d 180, 186 (5th Cir. 1981)* clarified that the court also consider threats of violence and the age of the plaintiffs' children).  Plaintiff's own privacy interests are paramount, and are recognized privacy rights under the Federal Constitution.   Although right to privacy is not specifically mentioned in the Constitution, the Supreme Court determined it is an unenumerated right under the Fourteenth Amendment's substantive due process clause.  See *Griswold v. Connecticut*, 381 U.S. 479 (1965).

220.    In the most famous case of a pseudonymous plaintiff, *Roe v. Wade*, the Court noted that the plaintiff's name was a pseudonym and held that despite the pseudonym, she presented a justiciable controversy. *Roe v. Wade*, 410 U.S. at 120 n.4, 121 n.5 (1973).  The Court made the same notation in *Doe v. Bolton*, 410 US 179, 184 n.6 & 187(1973).

221.    As the Eleventh Circuit explained, "the ultimate test for permitting a plaintiff to proceed anonymously is whether the plaintiff has a *substantial privacy right* that outweighs the customary and constitutionally-embedded presumption of openness in judicial proceedings."   *See Roe v. Aware Women Center for Choice*, 253 F.3d 678 (11th Cir. 2001).  Plaintiffs' privacy right to remain alive is paramount.

222.    The Court of Appeals for the District of Columbia has held: "See *Doe v. Alexian Bros. Med. Ctr.*, No. 96-C-2042, 1996 WL 210074, at *1 (N.D. Ill. Apr. 25, 1996) (finding that pseudonymous plaintiff's "press disclosures would [not] influence the outcome of a trial, affect the [d]efendant's rights, or prejudice this case in any way"); cf. *New York Blood Ctr.*, 213 F.R.D. at 112 ("[A]ny additional prejudice to the defendant's reputation or ability to operate merely by

the pursuit of the action under a pseudonym appears minimal" despite negative publicity regarding the defendant.) *Doe v. Cabrera*, 307 F.R.D. 1 (D.D.C. 2014).

223.    "In some cases disclosing mere association with an organization may cause substantial harm. *See National Ass'n of Mfrs. v. Taylor, 582 F. 3d 1, (D.C. Cir. 2009),* citing *NAACP, 357 U.S. at 462, 78 S.Ct. 1163.* With Federal Rules of Civil Procedure 10(a) being acknowledged, in exceptional circumstances courts have allowed a party to proceed in their suit anonymously where plaintiff(s) "(1) have a fear of severe harm and (2) the fear of severe harm is reasonable." See *Doe v. Megless* 654 F.3d 404, 411 (3d Cir. 2011). In the instant case, pseudonymous plaintiffs are terrified of Defendants, and "(1) have a fear of severe harm and (2) the fear of severe harm is reasonable." Plaintiffs respect, as the Court of Appeals for the District of Columbia stated in 2020, "parties who seek to proceed pseudonymously seek a 'rare dispensation' from the court. *Microsoft,* 56 F.3d at 1464 (quoting *James v. Jacobson,* 6 F.3d 233, 238 (4th Cir. 1993)). Plaintiffs have a proven record of a concrete need for secrecy; the assertions of severe harm are not speculative but are undisputed facts. *See In re Sealed Case*, 971 F.3d 324, Court of Appeals, District of Columbia Circuit 2020. The injuries and torts being litigated would be incurred as a result of the disclosure of plaintiff identities which poses an acute and well-documented risk of retaliatory physical harm or death.

224.    As demonstrated by extensively documented prior express conduct by Defendants, Plaintiffs have a "reasonable" "fear" of "retaliatory physical … harm to the requesting party or even more critically to innocent non-parties." *See Doe v. Kamehmeha Sch./Bernice Pauahi Bishop Est*., 596 F.3d 1036, 1045 (9th Cir. 2010); *Doe v. Bennett*, No. 19-cv-1253-DLF, 2020 WL 11885577, at *3, (D.D.C. July 27, 2020); *K.J. v. United States*, No. 1:22-cv-00180-JEB, at 6-7 (D.D.C. Jan. 23, 2022). Fear of harm in a foreign country or from a foreign government, which

Plaintiffs each possess, would also qualify.  See e.g., *Cengiz v. Bin Salman*, No. 1-20–cv-03009 (D.D.C. Sept. 16, 2021); *Chang v. Republic of South Sudan*,  NO. 21-cv-1821, 2021, WL 2946160, at *3 (D.D.C. July 9, 2021).  Shielding families is of utmost importance.

225.    Plaintiffs, and/or their families in Kurdistan and beyond, face grave, specific, and targeted implicit and expressed retributive policies, and statements and disparagement, and threats to their safety and lives, and of which Defendants have a long and well-documented demonstrated history, are likely to suffer largely irreversible retaliation, retribution, and other intimidation measures and further human rights abuses and violence, even murder, and grave threats to the integrity of this proceeding, at the hands of the BCE if their identities become public, and thus are listed anonymously herein.  18 U.S.2332(a)(1), 2, and 3551 et seq. Protecting their identities is also essential to advance the compelling interests of ensuring a fair trial free from outside influence and untainted by harassment, intimidation, and threats directed towards or murder of or enforced disappearance of witnesses and other trial participants.  Courts not only have the power, but the duty, to "protect their processes from prejudicial outside interferences" and to ensure a fair trial. See *Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966).

226.    "An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur."  This is "sufficient to confer Article III standing."  *Susan B. Anthony List v. Driehaus*, 134 S.Ct. 2334, 2341 (2014) (quotations omitted).

227.    Here, Plaintiff's harms are not only "future harms," including re-traumatization and vicarious or secondary trauma, but ongoing, present, distinct, and palpable harms, and fairly traceable to Defendants.

228.    The "assurance of fairness preserved by a public trial at a trial is not lost when one party's cause is pursued under a fictitious name."  *See Doe v. Stegall*, 653 F.2d 180, 185 (5th Cir. 1981).

181

In the instant case, plaintiffs welcome a public trial.  Plaintiff pseudonymity does not present prejudice or unfairness to the defendants.

229.    Contemporaneous with filing of this Complaint, Plaintiffs will file a motion seeking the court's permission for Plaintiff pseudonymity, taking into account the totality of the circumstances.

### N.    *Forum Non Conveniens*

230.    A safe alternate forum is not available. See *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 n.22 (1981).  An independent judiciary willing to administer justice and rectify the incalculable damage inflicted by Defendants' practices is imperative.  Many of the elements of the tortious scheme are local to this forum.

231.    Kurdistan is not the more convenient forum, and denies even the possibility of relief. Litigating Plaintiffs' claims there is a genuine risk of reprisals if they publicly identify themselves by attempting to litigate in Kurdistan.  Plaintiffs herein provide particularized evidence and describe judicially noticeable press reports about the disappearance of numerous Kurds investigating alleged BCE crimes and human rights abuses.  This adequately supports Plaintiffs' contention that prosecution of this suit in KRG would be futile. *See Doe v. Exxon Mobil Corp., 393 F. Supp. 2d 20 (D.D.C. 2005),* quoting *Rasoulzadeh v. Assoc. Press,* 574 F. Supp. 854, 861 (S.D.N.Y.1983) (dismissing defendant's *forum non conveniens* motion when litigating plaintiffs' claims in Iran posed a significant risk to plaintiffs' safety), *aff'd without op.* 767 F.2d 908 (2nd Cir.1985).  KRG presents "a genuine risk of reprisals" if Plaintiffs litigated in Kurdistan; *see HSBC USA, Inc. v. Prosegur Paraguay, SA,* 2004 WL 2210283, at *3-4 (S.D.N.Y. Sept. 30, 2004) (holding that Paraguay was an inadequate alternative forum because the Paraguayan Government was implicated in the alleged wrongdoing and individuals investigating the case had been murdered).

232.    A Department of State Level-4 Travel Advisory shows that Iraq is unsafe for U.S. citizens generally: "Do not travel to Iraq due to terrorism, kidnapping, armed conflict, civil unrest, and the U.S. government's limited capacity to provide assistance to U.S. citizens."  (See Department of State Travel Advisory for Iraq, updated November 22, 2024.)

233.    "[T]he Court has determined that Iraq is not an adequate alternative forum."  *WYE OAK TECHNOLOGY, INC. v. Republic of Iraq*, 941 F. Supp. 2d 53 (D.D.C. 2013)  "There is a 'substantial presumption' in favor of a plaintiff's chosen forum.  *Agudas Chasidei Chabad Of Us V. Russian Fed.,* 528 F. 3d at 950, Court of Appeals, Dist. of Columbia Circuit, 2008.

234.    "A court will not force plaintiffs to litigate in a forum where they would face a particularized and 'serious risk to their safety.'" *WYE OAK*, quoting  *Doe v. Exxon Mobil Corp.,* 393 F.Supp.2d 20, 29 (D.D.C.2005).

235.    Plaintiffs cannot and have not sought compensation from a foreign state, KRG or the Republic of Iraq, because such adjudication is unavailable, and is irrelevant to jurisdictional analysis.  The victims of these tortious acts who live on – parents, siblings, spouses, families, and friends of those they killed or harmed – have no voice and can expect no accountability there. They have no realistic hope to obtain justice in the Republic of Iraq or KRG or from any court of KRG controlled and directed by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barani, and lacking protection from reprisals or other intimidation and retributive measures, they severely fear Defendants Masoud Barzani, Masrour Barzani,  Waysi Barzani, and the BCE.

236.    The unavailability of access to justice, equated to denial of justice, has had a severe and detrimental impact on the Plaintiffs.  Access to justice in and of itself can have a beneficial impact on the victim's healing process. In contrast, a denial of access to justice can compound existing trauma. This is precisely what has happened in the case of the Plaintiffs

237.    No adequate and available remedies exist for Plaintiffs to exhaust in Kurdistan.

**FACTUAL ALLEGATIONS**

**I.      INTRODUCTORY ALLEGATIONS**

**Upon Information And Belief And At All Times Relevant To This Complaint, Unless Otherwise Stated:**

238.    Defendants' acts were as individuals and not a lawful act of any sovereign.  Each had a participatory role in the criminal enterprise and the joint criminal plan and its tortious acts.

239.    Fear in each and every cited instance is neither imaginary nor wholly speculative.

240.    The KRG is a constituent subdivision region of the recognized sovereign, the Republic of Iraq, having been established as such by the 2005 Iraqi Constitution (Article 117(First)), with powers both devolved from the federal national Iraq state and illegitimately self-ascribed, and governed by its federal Constitution, laws, treaties, and international agreements.  The United States, through its Department of State, does not accord official diplomatic mission or consular status to the KRG office in Washington, D.C. nor grant diplomatic privileges and immunities to its Washington, D.C. personnel.

241.    Defendant members of the BCE are primarily officials, employees, agents, lawyers, representatives or agents of the KRG or its principal officers.  Other co-conspirators members of the Barzani family are close relatives of high-executives of the KRG, and other co-conspirators named and unnamed, and are all part of the hierarchical BCE.  "Barzani family members" at all times includes family members by marriage.

242.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barxani are the principal or one of several principal administrators, organizers, or leaders of the conspiracy, BCE, KRG, and KDP, and bear direct responsibility for their role in these tortious acts, and bear responsibility for conspiring with and/or aiding or abetting their subordinates to commit these acts, and bear

command responsibility.  Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani substantially assisted and directed the parties who personally committed the injuries and abuses of Plaintiffs.  They knew that their actions would facilitate these abuses at the time they provided the assistance and direction, and are personally liable for acts of torture, arbitrary detention and cruel, inhuman or degrading treatment or punishment committed against Plaintiffs by virtue of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani's direct or indirect participation, including directing or ordering their subordinates or persons or groups acting in coordination with them or under their control, to commit these acts.  They knew their actions would facilitate these abuses at the time they provided the assistance and direction.  Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani are therefore also jointly and severally liable for the actions committed against Plaintiffs by persons under their command, all of which were undertaken as part of a common plan, design and scheme.

243.    Masrour Barzani is a United States person and citizen of Iraq.  ("United States person" is defined by the Foreign Intelligence Surveillance Act of 1978, 18 U.S.C. § 2331(2) and 8 U.S.C. § 1101(a)(22), and other federal statutes. 50 U.S.C. § 1801(i),  (as defined in section 1101(a)(20) of title 8).  The term ''United States person'' has the meaning given in section 595.315 of title 31, Code of Federal Regulations, and elsewhere.)  Having the status of legal permanent resident of the United States, albeit a status fraudulently obtained, Defendant Masrour Barzani has responsibilities under U.S. statutes that are known to him and result from his status as a United States person (a green card holder).

244.    Under the Foreign Corrupt Practices Act, any person "acting in an official capacity. or on behalf of " a foreign government, a department, agency, or instrumentality thereof… is a foreign official.  (Section 30A(f )(1)(A), 15 U.S.C. § 78dd-1(f )(1)(A).

245.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents and representatives and co-conspirators, unlawfully exercised raw power and lethality unconstrained by statutory requirements, constitutional limits, any notions of due process, conflict of interest rules, any rules-based order, or even basic fairness, and where they "pursue[d] their personal predilections."  See *Kolender v. Lawson*, 461 U.S. 352, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983). The widespread and sustained tortious acts described herein, including mass atrocities, exceed the lawful authority of any Defendant, subordinate agents, or representatives, and were not authorized by any international, Iraq, or Kurdistan tribunal, law, or regulation.

246.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani possessed and exercised command and effective control over the Peshmerga, the KRG, Asayish, and KDP and their members and permitted them to commit flagrant grotesque crimes and human rights abuses.

247.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani had the practical ability to exert control over their subordinates, including those who participated in extrajudicial killings, genocide, torture, and crimes against humanity during the Yazidi Massacre.  Defendants Masoud Barzani's, Masrour Barzani's, and Waysi Barzani's command over such forces included the authority and responsibility to give orders to and discipline their subordinates.    224.

Confidential Human Sources #1, #2, and #3, who have direct clandestine access to senior ranking Defendant Iraqi Kurdistan Regional Government and KDP officials, identify Jowaira as Defendant Masoud Barzani's wife and his cousin and mother of eight known children, five known sons: Masrour, Mansour, Mustafa "Babo", Muksi, and Waysi; and three known daughters: Nabila, Monira, and Urfa.

225.    Confidential Human Sources Number #1, #2, and #3 identify Defendant Masrour Barzani's first wife as his cousin Siran Saber Mustafa, an American permanent resident and therefore a "United States person".  With her, Defendant Masrour Barzani has four children, Defendant Areen,

Yasmin, Barzin and Aran. Two of them, Aran Barzani and Barzin Barzani, were born in the United States and are American citizens. Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani had the actual authority and practical ability to prevent abuses and punish those responsible.

248.   Plaintiffs allege that Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani are personally liable for acts of torture, arbitrary detention and cruel, inhuman or degrading treatment or punishment committed against Plaintiffs by virtue of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani's direct or indirect participation, including directing or ordering subordinates or groups acting in or under their control, to commit these acts.

249.   Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani are therefore also jointly and severally liable for the actions committed against Plaintiffs by subordinates under their command, all of which were undertaken as part of a common plan, design and scheme.

## II.     BARZANI  CRIMINAL ENTERPRISE

250.   The BCE, an association-in-fact, is a tortious incarnation of evil itself. The BCE is an ongoing organization that functions as a continuing unit, created and used as a tool to effectuate Defendants' pattern of tortious activity. The impact magnitude and financial and other costs to victims (and society), both tangible and intangible, including indirect losses suffered by crime victims, and pain and suffering, of Defendants' tortious acts is incalculable.

251.   Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and complicit Defendants, and others known and unknown, and at all times relevant to this Complaint, acting with Masoud Barzani, Masrour Barzani and Waysi Barzani, with excessive rapacity and by means of coercion and violence controlling the engines of centralized power and wealth of Kurdistan, concentrated with close conspirator insiders, and dictating authoritarian controls of the administrative,

bureaucratic, judicial, military, and commercial structures, with policies and governance driven by self-interest and self-protectionism, with the rule of law eviscerated, and with the intent to assure secrecy and concealment, who rule by force and fear, and not by the verifiable consent of the governed, and in more detail described below and incorporated by reference as if fully set forth herein, have for the past several decades willfully and knowingly, directly and indirectly, combined, conspired, confederated, and agreed together and with each other to operate a significant worldwide criminal conspiracy network and enterprise in an international racketeering scheme to obtain money and retain political power by fraud, torture, murder, coercion, and abduction, the tortious conduct giving rise to this complaint having all occurred during their concurrent tenure, but not as an official or lawfully authorized act, as leaders of the KDP and the KRG. The criminal enterprise spans the globe in its scope, has resulted in acts of murder, genocide, inhumane treatment, hostage taking and kidnapping, torture, rape, enforced disappearance, which according to the United Nations Committee on Enforced Disappearances report of November 2022 "continue to occur" and is a "problem of massive proportions in Iraq", and murder and extermination of over 12,000 people, mostly civilians including men, woman, and children, who were not victims of a sovereign state military action or war, the torture of Plaintiffs, and the corruption of public officials of the United States and other nations, massive illicit financial enrichment, concealment of said enrichment in numerous countries including the United States, and continues at the present time in violation of the laws, treaties, and conventions of the Republic of Iraq and the United States.

252.    The extensive, calculated, and intentional tortious activities of the BCE, a multibillion-dollar, transnational criminal organization ongoing for decades and to the present time, formally and informally, deliberately plotted to subvert the laws, in concert and conspiracy with individuals and a group of five or more individuals associated in fact, with supervisors, although sometimes

not a legal entity, and functioning as a unit, with a series of violations and very substantial income, to extensively pursue the enterprise's habitual criminal practices and purpose, that include, but are not limited to, murder, attempted murder, extrajudicial murder, genocide, hostage taking and kidnapping, murder-for-hire,, murder of a U.S. government agent, enforced disappearance, deprivation of freedom, torture, arson, robbery, bribery, extortion, dealing in controlled substances, counterfeiting, embezzlement, misappropriation, and peculation of public funds, trafficking weapons, violation of international sanctions, trading with the enemy, sale or trade of classified U.S. intelligence documents and information, fraud and related activity in connection with immigration documents, wire fraud, financial institution fraud, disguised financial structures, theft of depositor funds, repression and suppression of speech and expression and democratic participation, targeting of dissidents who oppose the regime's violations of human rights, procurement of United States citizenship or nationalization unlawfully, fraud of naturalization or citizenship papers, fraud of offshore asset disclosures, fraud of resident alien tax compliance, obstruction of criminal investigations, retaliating against a witness, victim, or an informant, false statement in application and use of visa, false use of visas, permits, and other documents, categorically and materially false, fictitious, and fraudulent statements to the U.S. Government, economic espionage and theft of trade secrets, interference with commerce, laundering of monetary instruments, monetary transactions in property derived from specified unlawful activity, illegal money transmitters, international transportation of stolen property, criminal infringement of a copyright or trademark, international trafficking in certain motor vehicles or motor vehicle parts, trafficking in contraband cigarettes, felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance, acts violating the Currency and Foreign Transactions Reporting Act, acts violating the Immigration and Nationality Act, acts violating the Torture Victims Protection Act, acts violating the Alien Tort Statute, acts

violating multiple other U.S. federal statutes, and violation of numerous international treaties, conventions, and international laws.

### A.    BCE Is A Criminal Enterprise

253.    Title 18 U.S.C. § 1961 (4) provides: "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.  "The enterprise is an entity, for present purposes, a group of persons associated together for a common purpose of engaging in a course of conduct."  *United States v. Turkette*, 452 U.S. 576 (1981).

254.    All Defendants (Masoud Barzani, Masrour Barzani, Waysi Barzani, Muksi Barzani, Mulla 'Babo" Mustafa Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani, Areen Masrour Barzani, and Barzani family members, Jonathon S. Moore, Joe R. Reeder, Valerie Cupp, Juli Mai Sanford, Laura Geho Harris, Rubar Sandi, Treefa Aziz, Arfan Saleh Omar Sherwani, Omar S. Barzini, Entifadh Kamal Qanbar, Hamza Salim, Hikmet Bamerni, Hayman Quass, Dasko Shirwani) as participants, contributors, accomplices, co-conspirators, partakers, and beneficiaries deriving improper advantage of the BCE, have each engaged in innumerable, uncountable, and premeditated gross violations of internationally recognized human rights violations and atrocities and corruption as described herein and in furtherance of the criminal enterprise scheme, and employed many sophisticated methods to violate U.S. law  – to harm Plaintiffs.

255.    The various entities partially listed in Appendices B and C and elsewhere herein are collectively tools, components, and fruits constituting an "enterprise" as defined in 18 U.S.C. § 1961(4), that is, a group of legal entities associated in fact (hereinafter the "enterprise", as part of the BCE).  The enterprise constituted an ongoing organization whose members and co-conspirators functioned as a unit for a common purpose of achieving the tortious objectives of the enterprise. The enterprise was engaged in, and its activities affected, interstate and foreign commerce using

legal entities by criminal actors to hold assets, purchase real estate, conduct wire transfers, burnish the appearance of legitimacy when dealing with counterparties (including financial institutions and contracting with the United States Government), and control legitimate businesses for ultimately illicit ends.

256.   The United Nations Office on Drugs and Crime defines organized crime as "a criminal enterprise that rationally works to profit from illicit activities that are often in great public demand. Its existence is maintained through corruption of public officials and the use of intimidation, threats or force to protect its operations." This definition accurately and explicitly describes the BCE, and is especially descriptive of the knowing and willful tortious acts of Defendant Mulla "Babo" Mustafa Barzani who specializes in extortion threats, enforcing payments by Kurds for their right to work, and other unlawful financial acts to enrich Defendants and harm Plaintiffs.

257.   For a period of decades, Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and agents, representatives, employees, associates, servants, and others, far in excess of five persons, have associated-in-fact together for a common purpose of engaging in criminal conduct (See *Boyle v. United States*, 556 U.S. 938, 945-46 (2009) (quoting *United States v. Turkette*, 452 U.S. 576, 580 (1981)), with no particular organizational structure, separate or otherwise but functioning as a unit (*See Odom*, 486 F.3d at 551) and with a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit associates to pursue the enterprise's purpose, and have engaged in a prolonged, sustained, and open-ended continuity of criminal enterprise that has become their regular way of doing business.

258.   Defendants Masrour Barzani and Waysi Barzani, with co-conspirator Nihad Barzani functioning as a principal subordinate, are the heads of a sophisticated, well-entrenched, successful criminal narcotic drug distribution enterprise, proceeds of which are deployed to financially enrich the Defendants, further their other criminal activities, and to harm Plaintiffs.

259.    "The mere fact that a given enterprise is favored with a legal existence does not prevent that enterprise from proceeding along a wholly illegal course of conduct."  "To establish the existence of such enterprise, a plaintiff must allege 'evidence of an ongoing organization, formal or informal,' and 'evidence that the various associates function as a unit.'" See *United States v. Turkette,* 452 U.S. 576, 583 (1981).  The BCE has proceeded and is proceeding "along a wholly illegal course of conduct," is "an ongoing organization", and the co-conspirators and "various associates function as a unit."

    **B.    Defendants' Organization and Operation of the BCE**

260.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani are the undisputed and unquestioned leaders of the BCE, who manage and mastermind various offenses, and whose conduct is plainly inconsistent with the duty of their KRG offices. (The Circuit Court of the District of Columbia does not require unanimity as to identity of the supervisees. See *United States v. Anderson*, 705 F. Supp. 2d 1 (D.D.C. 2010)).

261.    BCE derives extraordinary illicit financial benefit from its wide-reaching criminal, unlawful, and tortious activities, predominantly unreported, concealed, and secreted from public or taxing authority exposure, frequently through other co-conspirators named and unnamed herein.  The BCE's money-making schemes are criminal in nature and provide the financial means to pay for the torture and harm to Plaintiffs and others – thus enabling the BCE to operate.

262.    The BCE, aided and abetted by all defendants and other co-conspirators, named and unnamed, fallaciously hiding behind legal formalities and avoiding accountability, whose members including all Defendants and others known and unknown, functioned as a unit for a common purpose of achieving the objectives of the enterprise and knowing that the transactions were designed in whole and in part and the property involved in the financial transactions represented the proceeds of some form of unlawful activity, which transactions in fact involved

the proceeds of specified unlawful activity, and other acts as opportunities arose. "When men enter into an agreement for an unlawful end, they become ad hoc agents for one another. What one does pursuant to their common purpose, all do." See *Van Riper v. United States*, 13 F.2d 961, 967 (2d Cir. 1926) (Learned Hand, 3.).

263.    Defendants, and others known and unknown, are "persons" within the meaning of 18 U.S.C. § 1961(3) who conduct the affairs of the BCE, consisting of Defendants, including each of their employees, agents, contractors, servants, and Barzani family members, and others, comprising a transnational organized crime association of individuals who operate, wholly or in part, by illegal means.

264.    The BCE falls within the meaning of 18 U.S.C. § 1961(4) and consists of a group of "persons" associated together for the common purpose of: (i) accumulating wealth for the enterprise's leadership, through both legal and illegal means; (ii) concealing and refusing to report the criminal activity of its members; (iii) preventing its members' victims, including member victims, from reporting crimes to governmental authorities and/or cooperating with governmental authorities; (iv) preventing witnesses of its members' crimes from cooperating with governmental authorities; and (v) engaging in punitive harassment campaigns against perceived enemies, including victims and witnesses who cooperate with governmental authorities. To achieve their common goals, and to harm Plaintiffs, Defendants hid and do hide the Enterprise's crimes from the public, from governmental authorities, and from Plaintiffs, and prevented or attempted to prevent others, often violently or lethally, including but not limited to Plaintiffs, from approaching governmental authorities regarding Defendants' horrendous crimes.

265.    The BCE includes many individuals, including the named individual Defendants, and a number of corporate and affiliated non-profit entities. Agents, employees, contractors, and/or representatives of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani when

committing the criminal acts alleged herein were at all times acting within the course and scope and purpose of their authority as agents, employees, contractors, servants, representatives, and/or with the permission and consent of Defendants Masoud Barzani, Masrour Barzani, and/or Waysi Barzani.

266.    Confidential Human Sources Number #1, #2, and #3 identify Defendant Masrour Barzani's first wife as his cousin Siran Saber Mustafa, an American permanent resident and therefore a "United States person".  With her, Defendant Masrour Barzani has four children, Defendant Areen, Yasmin, Barzin and Aran.  Two of them, Aran Barzani and Barzin Barzani, were born in the United States and are American citizens.  All of the Barzani family members participated in and aided and abetted and have informed insider knowledge of the Barzani Continuing Criminal EnterpriseBCE, in particular example the assassination attempt firebombing of Plaintiff Maki Revend's residence bragged about by knowing Defendant Areen Barzani.

267226.    Defendant Masrour Barzani, Masoud Barzani's eldest son, a "United States person," previously listed in documents filed by the Iraqi KDP and KRG with the United States Government and in written communications with the White House and the Executive Office of the President of the United States, as General Director of the Defendant Iraqi Kurdistan Regional Government Security Protection Agency and formerly Director of the Intelligence and Security Agency (the successor agency to Parastin), was later appointed by his father as the first Chancellor of the Defendant KRG's Security Council, and succeeded to Prime Minister of Defendant Iraqi Kurdistan Regional Government when Defendant Masoud Barzani left office.  Defendant Waysi Barzani, now entrusted with the Kurdistan Democratic Party's intelligence and counter-terrorism portfolios, is Masrour's younger brother.  Inside sources advise that among all his several brothers, Defendant Masrour Barzani's ties to Waysi are strongest.  The two share a bond of trust, tactics,

criminality, and common vision and objectives for the Barzani Continuing Criminal Enterprise and pursuit of illicit wealth and power.

227. Insider Confidential Human Source #8, who has direct clandestine access to senior ~~ranking Defendant Iraqi Kurdistan Regional Government~~ KRG officials, confirms that all major business, including but not limited to oil, aviation, commercial buildings, fuel, infrastructure, and especially business that relies on airport or oil industry revenue, must now ~~go~~operate through Defendants Waysi Barzani and Masrour Barzani.

268. The criminal activity and the pattern of criminal activity of the BCE alleged herein and the KRG are not separate and distinct from each other. They act as state-embedded criminal actors, together with corrupted law enforcement and military under command and control of Defendants Masrour Barzani and Waysi Barzani and their agents and representatives. KRG politicians all have an interest in maintaining and expanding the illicit economy. ~~228.     In order to provide substantial money to fund the Barzani Continuing Criminal Enterprise (BCCE) and pay fees, salaries, and expenses to co-conspirator managers and agents of the BCCE engaged in the torture, attempted murder, and murder of Plaintiffs and Plaintiffs' families, Defendants Ameer Saadallah Rasheed, an American citizen, Baz Karim Al-Barzanji, Mahmoud Karim Al-Barzanji, Hamela Gardi, Serwar Pedawi, each residing in Erbil, Kurdistan, Iraq, and Laween Pedawi, and others, knowingly and willfully combined and conspired with Defendant Masrour Barzani, and continue to conspire with Masrour Barzani, to corrupt the economy of Iraqi Kurdistan. As Prime Minister of Defendant Iraqi Kurdistan Regional Government, Masrour approves Defendant Iraqi Kurdistan Regional Government contracts principally to those businesses endorsed or operated by Defendants Ameer Saadallah Rasheed, Baz Al-Barzanji, Mahmoud Karim Al-Barzanji, Sarwar Pedawi, Laween Pedawi, Mulla "Babo"~~

~~Mustafa Barzani, and other co-conspirators.  The monopoly power granted businesses referred by~~ ~~Defendants Rasheed, Baz Al Barzanji, Mahmoud Karim Al Barzanji, Sarwar Pedawi, Laween~~ ~~Pedawi, Mulla "Babo" Mustafa Barzani, and other corrupt individuals allows those favored~~ ~~businesses to corruptly inflate the prices for the goods and services provided to the~~The KRG and the BCE have effectively integrated terror and criminal tactics and strategies, and converged economic and ideological goals creating a *hybrid criminal-political entity*.  In the fluidity of the crime-terror nexus, the operational and organizational evolution of the two have converged, made possible by the weakened and fragile state apparatus of Kurdistan controlled by the BCE which in some respects constitutes *de facto* government while furthering its tortious criminal activities.  The corruption of the BCE is a crucial instrument for crime, and has been able to prevent any Republic of Iraq government attempt to disrupt its illicit activities. The result of the BCE corruption has enabled Defendants to torture and otherwise injure and damage Plaintiffs.

269.    True to its multinational structure, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents and representatives calculated, devised, and oversaw the financial structure, mechanisms, and apparatuses and operation of the BCE throughout Iraq, and beyond, which they operationalized and executed at the national, provincial, and local levels throughout Iraq, and beyond, and purposely built to ensure that the money at any level was optimized to maximize the lethality and profitability of Barzani's control in Kurdistan and beyond. This effective multinational structure of the BCE has made possible the torture, and other injuries and damage that the BCE has inflicted upon Plaintiffs.

270.    Each criminal activity of Defendants was related, had similar purposes – to harm Plaintiffs and enrich Defendants – and involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs.  Defendants' conduct is part of their on-going business and constitutes a threat to Plaintiffs.

271.    The BCE, while presenting itself outwardly as the KRG as a respectable organization under the management of Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, their agents and representatives, and other co-conspirators, has implemented a conduct or disposition or demonstrated behavior of terrorizing victims (and witnesses) of its crimes – especially amongst Kurds – into keeping Barzani's crimes secret. As with many criminal enterprises, the BCE takes significant lawful and unlawful steps to protect itself and its co-conspirators from governmental authorities, and terrorizes any who speak out about its unlawful activity.  An object of the BCE is to intimidate opponents and dissuade them from seeking protection from law enforcement or cooperating with governmental authorities that would otherwise come to their aid.   For those who do find the courage to go to authorities, the Defendants and their agents engage in a coordinated effort to wreak havoc on that person's life through a targeted campaign of harassment, intimidation, persecution, oppression, financial ruination, reputational devastation, physical beating, torture, enforced disappearance, and even extrajudicial murder.  The BCE also uses its significant resources – including the proceeds of its criminal endeavor – to hire outside agents to implement and carry out its targeted harassment and intimidation campaigns, and to hide evidence of their multitudinous crimes.

272.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents and representatives, and the KRG have a longstanding policy and practice of operating an intelligence and spying organization that tracks, monitors, and directs retaliation campaigns and ruinous and malicious litigation against critics of Defendants and/or those who publicize the BCE or reports its crimes to law enforcement or other public authorities.

273.    All of the criminal actions and tortious actions taken in furtherance and support of criminal activities described above were committed by Defendants, their agents, employees and/or

representatives, or were carried out by or at the direction of Defendants and their employees, agents and/or representatives, as individuals, to harm Plaintiffs.

### C. BCE Is A Corrupt Regime of Concealment, Disinformation, False Representations, and Defamation

274.   As part of its conspiracy to disguise its true criminal activity, and with the intent to deceive and defraud, the BCE, acting through the KRG, has issued numerous well-documented intentionally and calculated misleading and deceptive statements, to be presented at trial, including communiques to and filings with the United States Government, often by its Washington representatives and agents, including to the White House and the President.

275.   In a well-documented pattern and practice, and absent diplomatic status or immunity, KRG Washington Representatives, most recently Defendant Treefa Aziz, repeatedly, knowingly, and willfully falsify, conceal and cover up material facts, make false, fictitious and fraudulent statements or representations, make and uses false writing and documents knowing the same to contain false, fictitious and fraudulent statements, in knowing violation of the False Statements Accountability Act (18 U.S.C. Section 1001).

276.   Since at least 2007 and to the present time, and on-going, within the District of Columbia and elsewhere, the BCE, using its vast wealth and the skill of lawyers it engages in the United States and elsewhere in the world, has been successful in orchestrating a corrupt regime of concealment of its political and financial affairs involving large volumes of cash proceeds totaling tens of millions of dollars or more, including the laundering of narcotics and counterfeiting proceeds in order to evade detection. The skill of its lawyers in evading lawful financial reporting requirements to disclose true parties in interest owning assets and their willingness to facilitate their concealment regime through an intricate web of real estate assets, private investment accounts, obscured ownership structures, and anonymous shell and front companies, and IOLTA accounts has been instrumental in its success to date.  The types of Defendants' real estate assets fall into five broad categories in numerous states: land/buildings, business facilities, retail spaces,

agriculture, and residential properties. The Defendants' properties were involved in or are traceable to property involved in money laundering transactions or attempted money laundering transactions."  See *U.S. v. All Assets Held at Bank Julius Baer & Co.*, 571 F. Supp. 2d 1, (D.C. 2008).  For example, attorneys and their agents working for the BCE routinely file false or misleading certification documents to government agencies in the United States.  The depth and extent of perfidy knows no bounds and includes false documents and false representations in judicial proceedings.

277.    In one such example, on March 7, 2024, Defendant Reeder, an attorney at law with the law firm of Greenberg Traurig practicing in this Court, and who previously served as United States Under Secretary of the Army, and registered pursuant to the Foreign Agents Registration Act as Greenberg Traurig LLP's lobbyist for KRG, filed a pleading in the instant case entitled *Memorandum of Law in Support of Motion to Set a Common Complaint Response Due Date for All Defendants.* In his pleading Defendant Reeder, as an advocate, deliberately and voluntarily facilitating and furthering a deceptive pattern of disinformation, fabrications, and untruths of Defendant Masrour Barzani, Barzani family members and family members by marriage, and the BCE and its agents and representatives, and with malicious intention to cause Constitutional or other injury, made the following representations which are false, misleading, malicious, and libel and slander Plaintiff Maki Revend, which "constitutes a breach of professional ethics and invites disrespect for the integrity of the court" (See *Wheat v. United States*, 486 U.S. 153, 108 S. Ct. 1692, 100 L. Ed. 2d 140 (1988), quoting *United States v. Dolan*, 570 F.2d 1177, 1184 (3d Cir. 1978), and which violate Federal Rule of Civil Procedure 11(b)(3):

> A. *"The sole named individual plaintiff, Maki Revend, is a German national who, having been criminally convicted and also enjoined by German courts from disparaging members of defendant Prime Minister Barzani's family, now seeks to use this Court as his latest political platform."*
>
> B. *"The complaint alleges an array of wild and unbelievable misconduct against this strong and longstanding U.S. ally, including atrocity crimes, genocide, murder, and*

*other heinous and unspeakable acts. (Compl. 1–2, at ¶ 2). The allegations are reckless,*
*inflammatory, untrue, and utterly meritless. They are a blatant attempt at seeking*
*political redress through the court system. The allegations do not belong in this Court*
*or any other."*

278.  In fact, the "factual" allegations concerning Plaintiff Maki Revend are a knowing and willful, deliberate and voluntary, deceitful and deceptive attempt to discredit him, are blatantly and manifestly false and unpersuasive, are literally, deliberately, and factually untrue, are "particularly reprehensible" (See *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 376, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974), and at the present time Mr. Revend is under 24-hour police protection in Berlin after multiple attempts by the BCE to assassinate him and his family. Allegations concerning the instant Complaint are also without merit and are constructed on entirely fictitious and frivolous assertions, a farcical arc of attempts to mislead and misinform this Court and which are attributable to vindictiveness and fail as a matter of law.  Defendant Reeder was required to do more than simply *not misinform;* he also had an affirmative obligation to *inform* – a duty of trial advocacy to convey correct and complete material information to this Court.  "Counsel may not bury their heads in the sand and thereafter make affirmative proclamations about what occurred above ground. In such cases, ignorance is not bliss – it is sanctionable." "An attorney's right to free speech while litigating an action is extremely circumscribed." See *King v. Whitmer*, 505 F. Supp. 3d 720 (E.D. Mich. 2020).  *Mezibov v. Allen*, 411 F.3d 712, 717, 720-21 (6th Cir. 2005) (quoting *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1071, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991)).  As the Sixth Circuit explained in *Mezibov:*

"It is not surprising that courts have thus far been reluctant to allow the First Amendment to intrude into the courtroom. At first blush, the courtroom seems like the quintessential arena for public debate, but upon closer analysis, it is clear this is not, and never has been,

an arena for *free* debate.... An attorney's speech in court and in motion papers has always been tightly cabined by various procedural and evidentiary rules…"

279.    The BCE, through KRG/KDP, under the direction and command of Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their agents and representatives, has created and does use a host of social-media and electronic accounts under false names on U.S. social media platforms to disseminate and amplify often mendacious and misleading messages as part of a broad effort to influence and shape public perceptions of the BCE/KRG/KDP and especially its Barzani co-conspirator leaders in the United States and around the world.  The KRG/KDP uses its misattributed and purposefully misleading social media accounts to accomplish this mission both by disseminating and amplifying messages that promote what Defendant Masrour Barzani perceives as favorable attributes of the BCE-dominated political system, and by seeking to undermine and discredit the systems and policies of perceived adversaries, including the Plaintiffs and United States Government, democracy, and open societies generally.

### D.    BCE Is A Criminal Regime of Self-Enrichment, Fear, Intimidation, and Death

280.    Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their agents and representatives of the BCE, willfully and knowingly and void of humanity sacrificing human lives in ceaseless pursuit of greed, power, and illicit wealth, have directly and indirectly inflicted injury and lasting damage to the Plaintiffs.

281.    Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their sycophantic subordinate co-leaders, agents and representatives, serving under their command and control in the KRG and the corresponding and interchangeable KDP apparatus and in the BCE, have also used their power and privilege, generally arrogated, with privileged access to everything from regulatory exemptions to generous pensions, to pay themselves exorbitant salaries; and, to help

establish and promote their nepotistic networks and ensure the loyalty of their cronies, have overseen a system in which countless others are generously rewarded, thereby pirating from the Kurdistan economy resulting in severe economic injustice and extreme hardship throughout the Kurdistan populace. Losers, often along with their families, are usually eliminated in the most horrible and permanent ways. Confidential Human Sources #1, #2, #3, #4, #5, and #7, and others, declare that if you cross Defendant Masrour Barzani, ultimately, you're likely to die.

### E.    Defendants' Enterprise Is A Conspiracy, With Overt Acts to Effect the Object of the Conspiracy

282.    Defendants' multitude of predicate crimes are a conspiracy. This principle that a crime's harm extends beyond the elements of the crime also applies to what are known as " offenses." An offense is one that involves ongoing perpetration, producing an ongoing threat of harm. *See United States v. Brazell*, 489 F.3d 666, 668 (5th Cir. 2007); *United States v. Yashar*, 166 F.3d 873, 875 (7th Cir. 1999). The prototypical offense is conspiracy, which "continues as long as the conspirators engage in overt acts in furtherance of their plot," and "each day's acts bring a renewed threat of the substantive evil Congress sought to prevent." *Toussie v. United States*, 397 U.S. 112, 122 (1970).

283.    "The essence of conspiracy is an agreement, together with an overt act, to do an unlawful act, or a lawful act in an unlawful manner." *Cooper v. O'Connor,* 99 F.2d 135, 142 (D.C.Cir.), *cert. denied,* 305 U.S. 643, 59 S.Ct. 146, 83 L.Ed. 414 (1938). *Accord Edwards v. James Stewart & Co.,* 160 F.2d 935, 936-37 (D.C. Cir.1947); *International Underwriters, Inc. v. Boyle,* 365 A.2d 779, 784 (D.C.1976). Subsequent cases emphasize that agreement can only lead to liability if an act pursuant to it causes injury, as in the instant case. *See DeBobula v. Goss,* 193 F.2d 35, 36 (D.C.Cir.1951); *Blankenship v. Boyle,* 329 F.Supp. 1089, 1099 (D.D.C.1971)

284.    "A civil conspiracy is defined as an agreement between two or more people to participate in an unlawful act or a lawful act in an unlawful manner."   "It is enough that members of the conspiracy in some way or manner, or through some contrivance, positively or tacitly[,] came to a mutual understanding to try to accomplish a common and unlawful plan." See *Thompson v. Trump*, 590 F. Supp. 3d 46, (D.C. 2022), citing *Hobson v. Wilson,* 737 F.2d 1, 51 (D.C. Cir. 1984). "All co-conspirators must share in the general conspiratorial objective, though they need not know all the details of the plan or even possess the same motives."  *Hobson,* 737 F.2d at 51. "They need not know the identities of other co-conspirators. In short, a civil conspiracy requires a showing that there was a single plan, the essential nature and general scope of which were known to each person who is to be held responsible for its consequences."  *"*And, to be actionable, there must be an overt act in furtherance of the conspiracy that results in injury." *Thompson* at 52. "A civil conspiracy requires (1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner."  See *Vindman v. Trump*, Civil Action No. 22-257 (JEB) (D.C. Nov. 8, 2022); see also *Halberstam v. Welch*, 705 F.2d 472, 486 (D.C. Cir 1983).

285.    "Under D.C. law, a plaintiff must plead four elements, as has been pled in the instant case, to establish a civil conspiracy claim: "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme." *Ofisi v. BNP Paribas, S.A*., 278 F. Supp. 3d 84 (D.D.C. 2017), quoting *United States v. Eisenberg*, 149 F.Supp.3d 71, 94 (D.D.C. 2015) (quoting *Halberstam v. Welch,* 705 F.2d 472, 477 (D.C. Cir. 1983)).

286.    The BCE was an agreement between two or more persons, to participate in unlawful acts, with injuries to Plaintiffs caused by overt acts of the parties, all of which was done in furtherance of the common tortious scheme.  The object of this conspiracy has been and is to conduct or

participate in, directly or indirectly, the conduct of the affairs of the enterprise described herein; and to receive income derived from a pattern of criminal activity, to obscure the whereabouts, control, and ownership of such income, and to use such income in the operation of that enterprise and to harm Plaintiffs.

287.    All Defendants and their co-conspirators were aware of the essential nature and scope of the BCE and intended to participate in the BCE.  Each co-conspirator of the BCE has a systemic linkage to each other participant through corporate ties, employment, family relationship, political party membership, and other contractual relationships, and agency relationships, and function as a unit for the purpose of furthering the scheme and common purposes of the enterprise.  Each Defendant knew his co-conspirator was carrying out acts in furtherance of the conspiracy in this forum.  *See Cengiz v. Bin Salman*, Civil Action No. 2020-3009 (D.D.C. 2022)

288.    Defendants have knowingly, willfully and intentionally conspired and agreed to conduct and participate in the conduct of the affairs of the enterprise described herein through a pattern of criminal activity.  Defendants have knowingly, willfully and intentionally conspired and agreed to receive income derived from a pattern of tortious acts and to use such income or the proceeds of such income in the establishment and operation of the tortious enterprise to harm Plaintiffs.

289.    Each of the Defendants knew such a chain of transactions was prohibited by law,  agreed to the commission of those acts to further the conspiratorial scheme described herein, and tried to evade the requirements of the law, or aided or abetted another person in so doing.  Each and every named Defendant conspirator has not withdrawn from nor ceased participation in the BCE.

290.    As a direct and proximate consequence of the Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, Plaintiffs have been injured, causing Plaintiffs to suffer, said damages to be proven at trial.

291.    Each and all of the tortious acts of the brazen BCE were committed or caused to be committed by one or more individuals, including KRG and non-government actors, involved in the corrosive Barzani kleptocracy conspiracy.

292.    There existed (1) an agreement among defendants and other persons, the object of which is an offense against the United States; (2) defendants knowing and willful joinder in that conspiracy; and (3) commission of an overt act in furtherance of the conspiracy by at least one of the co-conspirators.  See *United States v. Svoboda,* 347 F.3d 471, 476 (2d Cir. 2003).

293.    Each of the Defendants are principals.  18 U.S.C. § 2 provides: (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal; (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is liable as a principal.

294.    A component part, object, and purpose of the conspiracy was a money laundering plan, coordinated primarily by Defendants Jonathon Moore and Joe Reeder, the essential unlawful nature and general scope of which were known to the defendants, and to their foreign sponsors, and there were overt acts in furtherance of the conspiracy – providing substantial resources to enable defendants to injure Plaintiffs.

### III.    DEFENDANTS TORTIOUS ACTS WERE KNOWING AND INTENDED

295.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani knew that the United States government has denounced the tortious acts and other cruel, inhuman, and degrading treatment of Defendants at all times, and knew that it was illegal for them to participate in, instigate, direct, or aid and abet such tortious acts.

296.    In the ordinary course of events to commit the tortious acts, Defendants were and are aware that their conduct would contribute to their commission.  For a federal criminal statute to satisfy

the requirements of due process under the Fifth Amendment it must not be so vague that "it fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden." *See United States v. Quinn,* 401 F. Supp. 2d 80 (D.D.C. 2005), citing *Papachristou v. City of Jacksonville,* 405 U.S. 156, 162, 92 S. Ct. 839, 31 L. Ed. 2d 110 (1972).

297.    All Defendants are not average and not uninformed.  Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, Joe Reeder, and other co-conspirators, are recipients of countless documented U.S. Government policy, intelligence, and law briefings and sensitive information. Their principal U.S. representative, Defendant Treffa Aziz, is a licensed attorney (though presently suspended), a former U.S. House of Representatives staff member, and a frequent participant in Congressional briefings.  Numerous public declaration filings by KRG with agencies of the U.S. Government also affirm Defendants received substantial legal guidance and assistance from representatives and former senior U.S. Government officials of the United States.  Defendant Joe Reeder, a licensed practicing attorney and counsel for at least Defendant Masrour Barzani, is a former senior United States Government officer holding highest security clearances and is a law lecturer.  A U.S. financial advisor to Barzanis, Defendant Jonathon Moore is a licensed practicing attorney.

298.    Accordingly, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents and representatives and co-conspirators are liable under United States and international law for the injuries, pain and suffering by Plaintiffs and their decedent relatives.

> **A.      Defendants Masoud Barzani,  Masrour  Barzani, and Waysi Barzani Are the Master Criminals of the BCE**

299.   At all times relevant to this Amended Complaint and the crimes claimed therein, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, acting as individuals with individual criminal responsibility and no lawful authority, mastermind and lead the powerful BCE, and should be adjudged liable of collective criminal responsibility in the intent of BCE that led to

genocide, torture, crimes against humanity, and myriad violations of the laws and treaties. Their abuse of entrusted power for private gain was accompanied by secrecy, betrayal, deception, and callous disregard for a consequence suffered by the plaintiffs and millions of citizens of Kurdistan who are victims of the underlying predicate crimes of this scheme.

300. Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani are mastermind planners and organizers (i.e. indirect perpetrators who are ultimately responsible for orchestrating these crimes without necessarily being physically involved in their commission) who direct perpetrators (those individuals who physically perpetrate these tortious acts) who assist, execute, and implement their orders.

301. Defendant Masrour Barzani's awareness of Defendants' criminality and tortious activity immeasurably eclipses "generally aware." He is American-educated, appreciably informed, and knows Defendants are engaged in illegal activity. He holds a bachelor's and master's degree from a Washington D.C. university, is the recipient of countless documented U.S. Government policy, intelligence, and law briefings from high-level United States government officials, including classified briefings of and access to detailed national security intelligence and sensitive national defense information by the agencies of the U.S. Intelligence Community and the Departments of State and Defense, and the laws, rules, and agreements governing its usage, and has knowledge, skill, experience, training, and education beyond the ordinary lay person about U.S. law and policy. Though a "United States person", through his willful, knowing, and abundant tortious acts he has demonstrated no sworn allegiance to the United States.

302. Under the leadership of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, the BCE-controlled KRG has become an entrenched transnational kleptocracy, with the BCE dominating every public and enterprise sector in the region including armed forces, law

enforcement, the judiciary, banking, communications, media, construction, and oil and gas sectors with massive revenues and enormous illicit diversion of petrodollars and other criminal proceeds, and spreading purposely and knowingly deceptive and manipulative news through their rigorously controlled satellite television channels and print media.

**B.      Defendants Acts Constituted Pattern and Practice**

303.    The extrajudicial killings, genocide, arbitrary deprivation of life, arbitrary detention, torture, enforced disappearances, rape, crimes against humanity, extreme brutality, enforced disappearances, kidnapping, extortion, denial of fair public trial, transnational repression, property seizure, censorship, abuse of human rights, systemic discrimination, and other tortious acts are part of a pattern and practice of widespread and systemic criminal activity of the autocratic and authoritarian governance of Defendants Masoud Barzani, Masrour  Barzani, and Waysi Barzani and their BCE, to tortiously harm Plaintiffs.

304.    The United States and the United Nations have comprehensively documented, which will be presented at trial, that Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, Barzani family members, and their agents, in a pattern of viewpoint intolerance and discrimination to intimidate critics, systematically target ordinary citizens perceived as opponents of the Barzani regime and subject them to prolonged arbitrary and extrajudicial detention, brutal interrogation, and torture.

305.    Article 38 of the Iraqi Constitution guarantees the right to freedom of opinion and expression without requiring this right to be regulated by law.  Article 13F of the 2004 Transitional Administrative Law contains a powerful Bill of Rights which guarantees Each Iraqi has the right to freedom of thought, conscience, and religious belief and practice.  Coercion in such matters shall be prohibited."  Similarly, Article 19 of the International Covenant on Civil and Political Rights also guarantees this right with very narrow restrictions.   Disregarding these legal

obligations, and in his continual effort to remove certain ideas or perspectives from broader debate, Defendant Masrour Barzani recurrently engages in speech suppression and silences journalism when the public expression of ideas, though not lawfully prohibited, are offensive to him or are viewpoints he disfavors. Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents, arrested and arbitrarily detained civilians based on their clan affiliation and/or perceived opposition to the government. These measures were intended to terrorize the civilian population and deter it from supporting the growing opposition movements.

306. Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani knew or reasonably should have known of the pattern and practice of tortious acts and civil rights and humanitarian abuses committed by themselves, their subordinate agents and representatives, and servants. The robust culpability of Defendants Masoud Barzani, Mansour Barzani, and Waysi Barzani is attested by the pattern and practice of rewarding its key operatives, agents, and representatives, while retributively retaliating against whistleblowers, dissidents, and opponents. These measures were intended to terrorize the civilian population and deter it from supporting the growing opposition movements.

### C. Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani Exercised Command Responsibility At All Times

307. Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani possessed and exercised command and effective control over their subordinate agents and representatives and permitted them to commit murder, extrajudicial killings, genocide, hostage taking and kidnapping, enforced disappearances, inhumane treatment, torture, rape, crimes against humanity, transactions with terrorists which cost human lives, and multitudinous other unlawful and material acts and gross crimes.

308.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani had the legal authority and practical ability to exert control over their subordinates, including those who participated in extrajudicial killings, murder, torture, genocide, hostage taking and kidnapping, enforced disappearances, crimes against humanity, and multitudinous other unlawful acts.  Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani's command over their subordinate agents and representatives included the authority and responsibility to give orders and discipline their subordinates.  Furthermore, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani had the actual authority and practical ability and capacity to prevent abuses and committal of crimes and punish those responsible.

Defendant Iraqi Kurdistan Regional Government. In return for the award of the contracts, Defendants Rasheed, Baz Al-Barzanji, Mahmoud Karim Al-Barzanji, Sarwar Pedawi, Laween Pedawi, Mulla "Babo" Mustafa Barzani, and other co-conspirators are paid kickbacks by the businesses receiving the contracts from the Defendant Iraqi Kurdistan Regional Government and from the U.S. Department of Defense and related U.S. agencies including the Defense Logistics Agency. As part of the conspiracy, Defendant Masrour Barzani is paid hundreds of thousands of dollars per month by Defendants Rasheed, Baz Al-Barzanji, Mahmoud Karim Al-Barzanji, Sarwar Pedawi, Laween Pedawi, and other co-conspirators from funds received by favored businesses from the Defendant Iraqi Kurdistan Regional Government headed by Defendant Masrour Barzani, its Prime Minister,, and U.S. government agencies.

309.    A superior is responsible for failing to prevent or punish a subordinate's actions of which the superior knew or should have known.  *See e.g., Hilao*, 103 F.3d at 777; *Ford ex rel. Estate of Ford v. Garcia*, 289 F.3d 1283, 1288 (11th Cir., 2002); *accord, In re Yamashita*, 327 U.S. 1, 16 (1946).

310229.        As a part of the BCCE effort to obtain funds to enable the torture, attempted

murder, and murder of Plaintiffs and Plaintiffs' families, Defendants Baz Karim Al-Barzanji and Mahmoud Karim Al-Barzanji, acting for and in conspiracy with Defendant Masrour Barzani, knowingly and willfully, in violation of Iraq law and international law and the provisions and requirements of IEEPA, operates the KAR Group Refinery and oversees and manages smuggling oil to Iran and other prohibited destinations. Defendants Baz Al-Barzanji and Mahmoud Karim Al-Barzanji purposely employ United States persons and a former United States Government official in their criminal operations.

230. Defendant Ameer Saadallah Rasheed, who controls the Renos Company, corruptly solicits and receives contracts from the U.S. Defense Logistics Agency. Acting in conspiracy with Defendant Masrour Barzani and his agents Defendants Serwan Perdawi and Shimal Jawhar Salin, Defendant Rasheed is successful in securing these U.S. Government procurement contracts because Defendants Masrour Barzani and his agents block other companies from competing for contract awards. As a result of their criminal conspiracy, Renos can rig bids, and fix prices—thus enabling Defendant Masrour Barzani and Defendants conspiring and acting with Masrour Barzani to use aid provided to the Defendant Iraqi Kurdistan Regional Government by taxpayers of the United States to substantially fund the BCCE and enable the torture, attempted murder, and murder of Plaintiffs and Plaintiffs' families.

231. Defendant Masrour Barzani, as a U.S. permanent resident (i.e., a "green card holder") is deemed a "United States Person." "United States person" means a citizen of the United States, or an alien lawfully admitted for permanent residence…" "United States person" is defined by the Foreign Intelligence Surveillance Act of 1978, and other federal statutes. 50 U.S.C. § 1801(i). (as defined in section 1101(a)(20) of title 8). The term ''United States person'' has the meaning given in section 595.315 of title 31, Code of Federal Regulations, and elsewhere.

232.    Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and complicit Defendants, including Barzani family members and family members by marriage, and others known and unknown, and at all times relevant to this Complaint, acting with Masoud Barzani, Masrour Barzani and Waysi Barzani, with excessive rapacity and by means of coercion and violence controlling the engines of centralized power and wealth of Iraqi Kurdistan, concentrated in the Barzani family and family members by marriage and close conspirator insiders, and dictating authoritarian controls of the administrative, bureaucratic, judicial, military, and commercial structures, with policies and governance driven by self interest and self protectionism, with the rule of law eviscerated, and with the intent to assure secrecy and concealment, who rule by force and fear, which is not imaginary nor wholly speculative, and not by the verifiable consent of the governed, and in more detail described below and incorporated by reference as if fully set forth herein, have for the past several decades willfully and knowingly, directly and indirectly, combined, conspired, confederated, and agreed together and with each other to operate a significant worldwide criminal conspiracy network and enterprise in an international racketeering scheme to obtain money and retain political power by fraud, torture, murder, coercion, and abduction, the criminal conduct giving rise to this complaint having all occurred during their concurrent tenure, but not as an official or lawfully authorized act, as leaders of the Kurdistan Democratic Party and Defendant Iraqi Kurdistan Regional Government.  The criminal enterprise spans the globe in its scope, has resulted in acts of murder, genocide, inhumane treatment, hostage taking and kidnapping, torture, rape, enforced disappearance, which according to the United Nations Committee on Enforced Disappearances report of November 2022 "continue to occur" and is a "problem of massive proportions in Iraq", and murder and extermination of over 5,000 people, mostly civilians including men, woman, and children, who were not victims of a sovereign state military action or war, the torture of Plaintiffs, and the corruption of public officials of the

United States and other nations, massive illicit financial enrichment, concealment of said enrichment (often through Barzani family members or family members by marriage) in numerous countries including the United States, and continues at the present time in violation of the laws, treaties, and conventions of the Republic of Iraq and the United States.

233.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani played essential and, controlling roles in coordinating, with other high-ranking senior Iraqi Kurdish political and military leaders under their direct command, the design and implementation of the abovementioned overwhelming criminality and criminal acts, and were in full control of all branches of the "apparatus" of the administratively corrupt [Defendant] Iraqi Kurdistan Regional GovernmentKRG, lacking all accountability and transparency, including the Peshmerga Armed Forces, the Defendant Iraqi Kurdistan Regional GovernmentKRG Police Force, the Defendant Iraqi Kurdistan Regional GovenrmentKRG Asayish Security Force (Barzani's blunt-force strength and unforgiving enforcement arm), and the Defendant Iraqi Kurdistan Regional GovernmentKRG Parastan Intelligence Service; and that they used and do use such control.

311.    Lacking all statutory or other lawful authority, Defendants Masoud Barani, Masrour Barzani, and Waysi Barzani unreservedly used and do use such control to design and implement, and utilize these KRG resources, to further the object of the overwhelming criminality and tortious acts particularized herein, and to secure the implementation of the common plan of inhumane treatment, hostage taking and kidnapping, torture, rape, enforced disappearance, murder and extermination, and crimes of counterfeiting, finance, trade, and commerce.

234312.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, together with subordinate agents and representatives under their command, including Barzani family members and family members by marriage, are each criminally responsible as perpetrators or as an indirect co-perpetrator, intentionally directing attacks against a civilian population as such or against

~~individual civilians not taking direct part in hostilities of war, murder as a crime against humanity,~~ , including extermination ~~as a crime against humanity~~, enforced disappearance ~~as a crime against humanity~~, hostage taking and kidnapping ~~as a crime against humanity~~, torture ~~as a crime against humanity~~, and rape as ~~a crime~~crimes against humanity.

~~235~~313.        In furtherance of their criminal object, Defendants, as well as others not named as defendants, serving under the command and control of Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their agents and representatives, ~~including Barzani family members and family members by marriage,~~ conspire, plan, utilize, and deploy torture, a deliberate and calculated act of an extremely cruel and inhuman nature, specifically intended to inflict excruciating and agonizing physical or mental pain or suffering, as a primary and principal tool and mechanism to achieve their ~~criminal~~tortious objectives against Plaintiffs.

~~236~~314.        In their malevolent and inhumane criminal enterprise, Defendants, as well as others ~~not named as defendants~~, including ~~those who acted as an agent, representative, employee~~agents, representatives, employees, or ~~servant~~servants, or any person who acted in any other capacity at the order, request, or under the direction or control of Defendants Masoud Barzani, Masrour Barzani, or Waysi Barzani, ~~including Barzani family members and family members by marriage,~~ who ~~at all times relevant to this complaint possessed all relevant levers of power and exercised the power and authority to~~ control all ~~actions~~ tortious acts referred to herein ~~and engage in the wrongful acts complained of herein, and used~~, and use the means and instrumentalities of that power to further their criminal enterprise and committed or caused to be committed overt acts to effect the ~~objectives~~object of the enterprise, ~~or their subordinate agents and employees, and associates~~, or of a person any of whose activities are directly or indirectly supervised, directed, controlled, financed, or subsidized in whole or in major part by Defendants Masoud Barzani, Masrour Barzani, or Waysi Barzani ~~or their subordinate agents and employees and associates and servants, and Barzani family~~

~~members and family members by marriage~~, and any person who agreed, consented, assumed or purported to act as, or who is or holds himself/herself out to be, whether or not pursuant to contractual relationship, an agent of Defendants Masoud Barzani, Masrour Barzani, or Waysi Barzani or their ~~subordinate agents and employees and associates and servants, including Barzani family members and family members by marriage, or acted for or~~associates, or acted in the interests of Defendants Masoud Barzani, Masrour Barzani, or Waysi Barzani, did knowingly combine, conspire, confederate, and agree with co-conspirators, known and unknown, and did knowingly become a member of the conspiracy, and while aiding and abetting one another did play some part in the agreed course of conduct in furtherance of the ~~criminal~~tortious purpose which the agreed course of action was intended to achieve, and have materially assisted or provided consultative, representational, financial, material, or technological support for or goods or services to or in support of corruption, and have unlawfully and persistently consolidated, misused, and abused the acquired power of the political, economic, judicial, and security apparatus of their official offices and the cloak of officialdom for personal privilege and massive illicit personal financial gain, and using a deadly mixture of hard power, secrecy, inflicted fear, and corruption have methodically dismantled or neutered real and perceived political opposition, have organized a centralized authoritarian power structure and a Barzani-centric hierarchical administrative bureaucracy, informal and unwritten, are responsible for, complicit in, or have directly or indirectly engaged in serious widespread human rights abuse~~, and~~.

315.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani have treated the public ~~treasury of the Defendant Iraqi Kurdistan Regional Government~~KRG treasury as a personal piggy bank, including for the past two years stealing the salaries of ~~public~~KRG employees ~~of Defendant Iraqi Kurdistan Regional Government~~ and putting the money in their own pockets, creating and expanding under the leadership of Defendant Masrour Barzani a Barzani-controlled kleptocratic

system of sweeping implications of corruption and deceit with a robust portfolio of opaque commercial and trade interests throughout Kurdistan and cozy relationships with some of the region's most notable terrorist organizations as the ~~Barzani Continuing Criminal Enterprise seeks to hide~~BCE hides the sources of their illicit wealth and use international institutions to launder ill-gotten gains in rule-of-law societies abroad~~;~~ and to harm Plaintiffs.

316.    By means of overt acts in furtherance of the crimes through the ~~criminal enterprise and~~BCE conspiracy,  Defendants have collectively enriched themselves by billions of U.S. dollars using the tools of violence, fraud, theft, and bribery, ~~all~~ in a climate of complete impunity as they assertively ignore the rule of law.  (In one instance example, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents and representatives, ~~and the Barzani family and family members by marriage,~~ and with no lawful authority, arbitrarily and unilaterally took what they and the central federal Iraq Government have later publicly acknowledged as $4-5 billion of Kurdish depositors' monies from the TBI Bank, and publicly stated they would repay and never have repaid.)

~~237.    Presently, of the central Iraq Government's current monthly budget distribution of approximately $350 million to the Defendant Iraqi Kurdistan Regional Government, the central federal Iraq Government is deducting amounts to repay depositors who Barzanis have not repaid. Because of their many types of privileges and other unearned advantages of the seat of power and money in Iraqi Kurdistan, and having mastered the tools of authority and with a recurrently repeated claim (albeit disputed) of elite tribal superiority and entitlement, and using the proceeds of their continuing criminal enterprise to consolidate control, privilege, and dominance, Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, as the leaders of the criminal enterprise, and those in their innermost circle, especially the far more opaque, concentrated, and unaccountable Barzani family members and family member by marriage, Defendants, acting as~~

individuals with and for them, by facilitating criminal actions of Defendants and manipulating the apparatus of Defendant Iraqi Iraqi Kurdistan Government for personal, non-governmental, non-official purposes and by exercising political clout and raw power to evade or finesse jeopardy, by repeatedly and widely disseminating, including in official submissions to the United States Departments Justice and State and to the executive office of the President of the United States and to Members of the United States Congress, untruthful information and claims in the United States and worldwide to create the appearance of legitimacy and by untruthfully claiming to have no knowledge of or responsibility for innumerable heinous acts, have largely been able to escape serious and meaningful consequences and evade legal accountability and tangible legal consequences for their decades-long crime spree which includes a conspiracy to harm Americans, including Plaintiffs, and American national security, defense, and economic interests.

238.    The remarkable global criminality of Defendants is knowingly, willingly, and substantially contrary to the protocols of the United Nations Convention Against Transnational Organized Crime, a treaty to which the United States and the Republic of Iraq are parties.  The treaty states, in relevant part:

> (a) Article 2(a): "'Organized criminal group' shall mean a structured group of three or more persons, existing for a period of time and acting in concert with the aim of committing one or more serious crimes or offenses established in accordance with this Convention, in order to obtain, directly or indirectly, a financial or other material benefit;"

> (b) Article 5(a): "Either or both of the following as criminal offenses distinct from those involving the attempt or completion of the criminal activity: (i) Agreeing with one or more other persons to commit a serious crime for a purpose relating directly or indirectly to the obtaining of a financial or other

material benefit and, where required by domestic law, involving an act undertaken by one of the participants in furtherance of the agreement or involving an organized criminal group; (ii) Conduct by a person who, with knowledge of either the aim and general criminal activity of an organized criminal group or its intention to commit the crimes in question, takes an active part in: a. Criminal activities of the organized criminal group; b. Other activities of the organized criminal group in the knowledge that his or her participation will contribute to the achievement of the above-described criminal aim; (b) Organizing, directing, aiding, abetting, facilitating or counseling the commission of serious crime involving an organized criminal group. 2. The knowledge, intent, aim, purpose or agreement referred to in paragraph 1 of this article may be inferred from objective factual circumstances."

(c) Article 6 (a) (i): "The conversion or transfer of property, knowing that such property is the proceeds of crime, for the purpose of concealing or disguising the illicit origin of the property or of helping any person who is involved in the commission of the predicate offense to evade the legal consequences of his or her action; (ii) The concealment or disguise of the true nature, source, location, disposition, movement or ownership of or rights with respect to property, knowing that such property is the proceeds of crime; (b) Subject to the basic concepts of its legal system: (i) The acquisition, possession or use of property, knowing, at the time of receipt, that such property is the proceeds of crime; (ii) Participation in, association with or conspiracy to commit, attempts to commit and aiding, abetting,

~~facilitating and counseling the commission of any of the offenses established in accordance with this article." These crimes are committed, aided and abetted by prominent Iraqi Kurdistan business persons Defendants Baz Karim Al-Barzanji, Mahmoud Karim Al-Barzanji, Ghafoor Khosnaw, Hamela Gardi, Sarwar Pedawi, Laween Pedawi, and Ameer Saadallah Rasheed, and others, acting in conspiracy with Defendant Iraqi Kurdistan Prime Minister Masrour Barzani.~~

~~239.    Each and every named defendant conspirator has not withdrawn from nor ceased participation in the Barzani Continuing Criminal Enterprise, nor has any Defendant conspirator committed "[a]ffirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators." *United States v. United States Gypsum Co.,* 438 U.S. 422, 464-65 (1978); *see Pinkerton v. United States,* 328 U.S. 640, 644-46 (1946).~~

317.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani conspired and acted in concert with one or more subordinate agents and representatives pursuant to a common plan, design, and scheme to carry out and commit or facilitate committing murder, extrajudicial killings, genocide, hostage taking and kidnapping, torture, rape, enforced disappearances, and multitudinous other high crimes, motivated by or the effect of which was pecuniary gain and economic threat and physical threat and injury against Plaintiffs.

318.    In addition to being personally liable for their own actions, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani are jointly and severally liable for the actions of their co-conspirators all of which were actions undertaken in furtherance of a common plan, design, scheme, and interrelated pattern to commit tortious acts against Plaintiffs.

**D.    Defendants Knowingly and Willfully Violate Law, Treaties, Conventions**

319240.     Each and all of the crimes of the brazen Barzani continuing criminal enterprise were committed or caused to be committed by one or more individuals, including Defendant Iraqi Kurdistan Regional Government and non-government actors, involved in the corrosive Barzani kleptocracy conspiracy.  The U.S. National Endowment for Democracy, an agency of the United States Government, declares:

> *"'Kleptocracy' literally means 'rule by thieves.'"  "Autocracies are not run by one bad guy but by sophisticated networks composed of kleptocratic financial structures, security services (meaning police, military, paramilitary groups, and surveillance), and professional propagandists."*

241.   Defendant Masrour Barzani, Prime Minister of Defendant Iraqi Kurdistan Regional Government, a United States person, is considered a strongman who ignores and flouts the rule of law, rules by decree, violates civil rights, suppresses freedom of expression and speech, — each a defense against tyranny, — suppresses democratic participation, illegally detains and tortures his own citizens, orders extrajudicial murder, and terrorizes many of Iraq's Kurdish population in Iraqi Kurdistan and worldwide.

242.   The United Nations Convention Against Corruption (UNCAC), of which the Republic of Iraq is a ratifying nation state, is the only legally binding universal anti-corruption instrument, containing many mandatory provisions, foremost of which are prevention of public corruption, transparency, accountability, standards of conduct, prosecution of offenders, and seizure and confiscation of the proceeds of corruption.  The egregiously corrupt practices of the Defendant Iraqi Kurdistan Regional Government and its principal leaders Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their agents and representatives of the Barzani Continuing Criminal Enterprise, including Barzani family members and family members by marriage, are in knowing, willful, flagrant, blatant, and grievous violation, disregard, and desecration of this ratified controlling international convention.

243. Nation states, in this instance the Republic of Iraq, and thus its inferior subdivision parts, including ~~Defendant Iraqi Kurdistan Regional Government~~the KRG and the officials thereof, are bound by those obligations to which ~~they have~~the state has consented, arguably the oldest principle of international law, and no treaty-based immunities have any relevance in this case and ~~have~~provided no material ~~significance~~defense for the Defendants.

320.    In their official positions with the KRG, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and others, have a duty under international law, multilateral treaties and conventions, and Iraq law, to ensure the protection of civilians, to prevent violations of international and Iraqi law and United States law by their subordinates, agents, and representatives, and to ensure that all persons under their command were trained in, and complied with, international and Iraqi law, and duty to investigate, prevent, and punish violations of international, Iraq, and U.S. law committed by themselves, family, and subordinates.

321.    The horrendous global tortious acts of Defendants are in knowing, willing, flagrant, blatant, and grievous violation, disregard, and desecration of the United Nations Convention Against Transnational Organized Crime and the United Nations Convention Against Corruption, treaties to which the United States and the Republic of Iraq are parties and which contain mandatory provisions, acting in conspiracy with prominent Kurdistan business persons and U.S. representatives and co-conspirators, and others.

322.    As the commanders, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani failed or refused to take all reasonable and necessary measures to prevent multitudinous tortious acts, or to investigate or punish their subordinates for committing such tortious acts.

323. The treaties, conventions, agreements, and accords to which the Republic of Iraq is party and which have been willfully violated by Defendants are legion, and were not due to inadvertent mistakes.  A partial listing is in Exhibit D.

**F.      Defendants' Harm to Plaintiffs Was a Foreseeable and Natural Consequence of Intentions**

324.    All Defendants' multitudinous other gross tortious acts were "reasonably foreseeable or anticipated as a natural consequence of" a common shared intention on the part of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their subordinate agents and representatives, who planned and carried out the tortious acts enumerated herein and to the present time and are directly liable.  Plaintiffs' injuries were not only foreseeable; they were the intended result.

**IV.    DEFENDANTS ACTED IN CONCERT WITH AL-QAEDA AND ISLAMIC STATE AS PART OF AL-QAEDA'S AND ISLAMIC STATE'S TRANSNATIONAL TERRORIST CAMPAIGNS TO HARM PLAINTIFFS, AMERICANS AND EXPEL THE UNITED STATES FROM THE MIDDLE EAST**

325.    To harm Plaintiffs, Defendants' conduct occurred partially within the District of Columbia and the extraterritorial jurisdiction of the United States in conspiring to provide material support to terrorists, affecting interstate and foreign commerce, and the defendants conspired with enemies of the United States, all to be more fully particularized at trial.

**Upon information and belief, and at all times relevant hereto:**

**A.      Defendants Traded With The Enemy and Conspired With And Provided Material Support To Foreign Terrorist Organizations**

326.    To provide the means to continue its transnational criminal enterprise to injure and damage Plaintiffs, Defendants Masoud Barzani, Masrour Barzani, and Waysi continue their unrestrained and profitable trade with terrorists.  Their tortious acts have actual effect across national borders, violate a declared U.S. national emergency, offend fundamental values of the international community and the American system of law, help finance and logistically aid America's enemies,

and provide material support to a Designated Foreign Terrorist Organization ("FTO"), ISIL and ISIS, in violation of 18 U.S.C. 2339B(a)(1), thereby financing the growth of ISIS and ISIL to enrich Defendants' ill-gotten earnings – and to harm Plaintiffs.  The United States designated Iran as a state sponsor of terrorism in 1984, and that designation remains.

327.    "The origin of the laws that defendants are accused of violating can be traced back nearly 100 years to the *Trading With the Enemy Act of 1917* ("TWEA"), (italics added) considered to be the predecessor to the present-day International Emergency Economic Powers Act ("IEEPA")", 50 U.S.C. §§ 1701-06 (2005). *See US v. Quinn, 401 F.Supp. 2d 80, D.D.C. 2005,* quoting *United States v. Arch Trading,* 987 F.2d 1087, 1093 (4th Cir.1993) (describing IEEPA as an "extension to" the TWEA).

328.    The President issued Executive Order 13224, subsequently amended and renewed, invoking the powers of IEEPA (50 U.S.C. 1701 et seq.), the National Emergencies Act (50 U.S.C. 1601 et seq.) (NEA), section 5 of the United Nations Participation Act of 1945, as amended (22 U.S.C. 287c)(UNPA), and 3 U.S.C. § 301.  The State Department designated al-Qaeda a foreign terrorist organization, and AQI, ISIS's predecessor, a designation that remains in effect for ISIS. The President, invoking IEEPA, NEA, and the Global Magnitsky Human Rights Accountability Act (Public Law 114-328), in a publicized Executive Order declared "serious human rights abuse and corruption around the world constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States," and declared "a national emergency to deal with that threat."  The President designated the IRGC as an FTO.   The BCE was doing business with and receiving substantial money from unlawful trade with the IRGC long before the FTO designation – providing illicit resources for the BCE to damage and injure Plaintiffs.

329.    The Department of the Treasury's Office of Foreign Assets Control (OFAC) issued the Transnational Criminal Organizations Sanctions Regulations, 31 CFR part 590 (77 FR 1864).

Collectively known as the Iranian Transaction Regulations ("ITR"), these rules are codified as Part 560 of Title 31 of the Code of Federal Regulations.  Defendants have continually violated said regulations in furtherance of the BCE and to harm Plaintiffs.

330.    The Antiterrorism Act (18 U.S.C. § 2339B) makes it unlawful, within the United States, or for any person who is subject to the jurisdiction of the United States anywhere, to knowingly provide material support to a foreign terrorist organization that has been designated by the Secretary of State.  IEEPA makes it a crime to "willfully violate[], or willfully attempt[] to violate, any license, order, or regulation issued under [IEEPA]," *see* 50 U.S.C. § 1705(b).  Defendants systematically and criminally violate the United States Iranian Trade Embargo.  Defendant Masrour Barzani as a United States person, and the U.S.-based Defendants, are each subject to these laws.

331.    Defendants, and their retained attorneys and Washington advisors, are relatively sophisticated individuals who are deliberately engaged in international commerce and, therefore, familiar with various legal regimes  e.g., customs duties and tariffs  in multiple countries. The statutes and regulations can hardly be seen as enigmatic.  See *United States v. Quinn*, 401 F. Supp. 2d 80 (D.D.C. 2005).

332.    Defendants Masoud Barzani, Masrous Barzani, and Waysi Barzani routinely engage in substantial illicit financial transactions, and through intermediary partners and subcontractors, BCE made substantial payments to al-Qaeda, al-Qaeda-in-Iraq, and ISIS in U.S. dollars and in state-of-the-art communications devices, using U.S. communications technologies, that provided encryption, thereby intentionally obstructing vital U.S. government counterterror efforts through their repeated lies to the U.S. government about the terrorists and their operations, and which provided key "cover" and "concealment" to al-Qaeda's and ISIS's financial relationships while these FTOs were killing and kidnapping Americans and harming Plaintiffs.

333.    "Iran is a major state sponsor of global terrorism, and particularly of terrorism against the United States."  "The IRGC [the Islamic Revolutionary Guard Corps] is 'the primary driver of Iran's terror activities.'"  "The IRGC protects Iran's regime and attempts to impose its clerical regime on other Muslim nations throughout the Middle East, providing military forces, directing much of Iran's economy, and implementing a global campaign of terrorist activity."  *See Cabrera v. Islamic Republic of Iran*, Civil Action No. 19-3835 (JDB) (D.C. Jan. 27, 2023).  (The U.S. government often designates one element of a terrorist group before the group itself, like the IRGC's Qods Force (designated as an SDGT organization in 2007) and its parent group, the IRGC (designated in 2017)).  (See *Cabrera v. Islamic Republic of Iran*, Civil Action No. 19-3835 (JDB) at 17 (D.C. Jan. 27, 2023).)

334.    All of Defendants Masoud Barzani, Masrour Barzani, and Wayi Barzani's' tortious conduct occurred against the backdrop of several decades of al-Qaeda, ISIS, and IRGC history as a globalized terrorist campaign known for U.S. Government-documented extreme violence and radical interpretation of Islamic law in which such designated foreign terrorist organizations needed Defendants' money to kill and injure Americans, including Plaintiffs, and to affect such conduct by mass destruction, assassination, and kidnapping to achieve violent political ends and further the BCE.  Defendants knew they were dealing with terrorist organizations because the people and entities that Defendants interacted with held themselves out as representatives of these terrorist organizations, and concealed their actions in part because they knew the U.S. and other governments considered such actions to be illegal.

345.    Defendants' intent is to seek profit rather than prevent the financing of terrorist activities or follow basic societal, legal, and treaty norms.  Defendants' behavior was especially culpable because a substantial portion of the resources, weapons, cash, oil, and sensitive U.S. national defense intelligence unlawfully and willfully shared by the Barzanis with foreign terrorist

organizations, occurred while Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their Washington, D.C. agents and representatives were publicly and in filings with the United States Government, including communiques to the Executive Office of the President of the United States, deceptively expressing allegiance, fidelity, and cooperation with and to U.S. interests and policy, and respect for anti-corruption while simultaneously scheming to route resources, weapons, materiel, cash, oil, and sensitive U.S. national defense intelligence to al-Qaeda and al-Qaeda-in-Iraq and Islamic State.

### B.    Defendants Knowingly Provided Substantial Assistance to Terror

346.    "By knowingly providing substantial assistance," (*See Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 210 (D.C. Cir. 2022), Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani's conduct supported Islamic State's violent global terrorist campaign and acts against Americans in Iraq, Afghanistan, and Syria, and to harm Plaintiffs.  Defendants' conduct knowingly translated directly into substantial numbers of terrorists, weapons, and bombs that the Islamic State and IRGC (two groups formerly identified as complicit with Hamas, officially the Islamic Resistance Movement, in the massacre of Americans and others in Israel in October, 2023, including beheading of babies and the use of inhuman and barbaric sexual violence against women and children.  The founding Hamas Covenant spells out clearly Hamas's genocidal intentions, and is branded by the United States as "a genocidal terrorist organization, worse than ISIS", and in which Iran "was complicit".  Hamas' violent nature has been noted in several federal court decisions. See *In re Abu Marzook,* 924 F.Supp. 565 (S.D.N.Y. 1996) (recounting numerous incidents of Hamas terrorism against civilians in the Mideast), *U.S. v. One 1997 E35 Ford Van,* 50 F.Supp.2d 789 (N.D.Ill.1999) (describing Hamas' covert financial transactions in the U.S.), (D.D.C. 2000), *Eisenfeld v. Islamic Republic of Iran,* 172 F.Supp.2d 1 (D.D.C.2000), *Mousa v.*

*Islamic Republic of Iran,* 238 F.Supp.2d 1 (2001), *Weinstein v. Islamic Republic of Iran,* 244.

The United Nations states:

*"Corruption undermines democratic institutions, slows economic development, contributes to governmental instability,* 184 F.Supp.2d 13 (D.D.C.2002).

347. To increase profit margins by redirecting attacks *the foundation of democratic institutions, pervert[s] the rule of law and creat[es] bureaucratic quagmires whose only reason for existing is the soliciting of bribes. Economic development is stunted because foreign direct investment is discouraged and small businesses within the country often find it impossible to overcome the 'start-up costs'' required because of corruption."*

245. away from their BCE business interests, Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their agents and representatives of the Barzani Continuing Criminal Enterprise, in ceaseless, calculated, and corrupt pursuit of personal illicit wealth and unaccountable political and governance power, willfully and co-conspirators, knowingly and void of humanity sacrificing human lives in pursuit of greed, power, and wealth, have willfully and knowingly, directly and indirectly, inflicted this injury and lasting damage to the Plaintiffs and to the Iraqi Kurdistan region, potentially an existential risk to Iraqi Kurdistan in political, economic, and, perhaps most fundamentally, moral terms, and harmed not only the well-being of their own citizens but also that of Kurdish people elsewhere facilitated protection money or "tax" payments to al-Qaeda, al-Qaeda-in-Iraq, and ISIS in Iraq and Syria, and thereby annually provided millions in U.S. dollars to these FTOs.

348. ISIS continuously ran a sophisticated protection money operation in Iraq, including Kurdistan, and Syria from 2014 through at least 2021. ISIS raised hundreds of millions of U.S. dollars through protection money it extracted from businesses in Iraq, including Kurdistan, with the knowledge and facilitation of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents and representatives. ISIS's Finance Council oversaw its protection

rackets and illicit taxation of goods and cash that, with Barzani foreknowledge and facilitation, transited territory where ISIS operated.

349.  ISIS reached what amounted to a global protection money agreement with Defendants Masoud Barzani and Masrour Barzani, even though Islamic State terrorists were waging a relentless campaign against Kurds in neighboring Syria. Defendants Masoud Barzani and Masrour Barzani prioritized their own power and financial interests over that of the broader Kurdish cause and reached a protection money accord with Islamic State that has largely held from 2014 through today.  Under this informal accord, BCE agents collected protection money for and provided to ISIS weapons and sensitive U.S. national defense intelligence.

350.  Through these rackets, and with facilitation of Defendants Masoud Barzani and Masrour Barzani, ISIS generated millions in monthly cash flow – mostly denominated in U.S. dollars – from businesses in Iraq, including Kurdistan, which ISIS styled as zakat, commercial taxes, income taxes, administrative fees, customs taxes, and/or road tolls.

351.  Defendants also knew that their partners, consultants, and subcontractors were using the money they received through their illicit transactions with Defendants to flow through Defendants' money to terrorists on Defendants' behalf.  Illicit transactions in Kurdistan are an open secret in the Iraqi and Syrian areas that were contested by al-Qaeda, al-Qaeda-in-Iraq, ISIS, and IRGC, and was communicated repeatedly to firms operating (or transporting goods) there.  When Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani paid their crooked local partners, consultants, and subcontractors for "security" in that environment, they knew full well where the money was going.  Given what the BCE knew about the payments it was making (and continues to make), the operating environment in Iraq, and the sophistication of the FTOs' protection-money schemes, it is certain that the BCE's money ultimately ended up in the hands of violent terrorists. These tortious transactions enabled BCE to harm Plaintiffs.

352.    Defendants, using their agents and subcontractors to supply their own security to the American and Iraqi customers who hired them by paying off Iraqi insurgents with protection money, resulting in American money sustaining al-Qaeda, al-Qaeda-in-Iraq, and ISIS. Defendants actively benefited from such payments, enabling BCE's capacity to harm Plaintiffs.

353.    From 2004 through present time, it was common knowledge among operatives and businesses operating in Kurdistan, including Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their agents, that illicit transactions were typically designed for the purpose of causing U.S. dollars, weapons, oil, and sensitive U.S. national defense intelligence, to flow to terrorists in Iraq and Kurdistan, in the form of transactions that were plainly illicit on their face. Because al-Qaeda, al-Qaeda-in-Iraq, and ISIS, and the BCE, always openly demanded the money – and because local agents usually paid it through relatively straightforward, albeit highly illegal, means – the prevailing understanding being that their illicit BCE transactions were foreseeably flowing to al-Qaeda, al-Qaeda-in-Iraq, and ISIS, and BCE.

### C.    Defendants Knowingly Made Payments to Terrorists

354.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani knew or reasonably should have known that by making payments and resource aid to terrorists, they were violating U.S. law. Applicable regulations and financial rules also required companies to ensure that their contracting practices – including the money spent by their subcontractors – did not finance terrorism. 246. Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their sycophantic subordinate co-leaders, agents and representatives, including Barzani family members and family members by marriage, serving under their command and control in the Defendant Iraqi Kurdistan Regional Government and the corresponding and interchangeable Kurdistan Democratic Party apparatus and in the Barzani Continuing Criminal Enterprise, have also used their power and privilege, often arrogated, with privileged access to everything from regulatory

229

exemptions to generous pensions, to pay themselves exorbitant salaries; and, to help establish and promote their nepotistic networks and ensure the loyalty of their cronies, have overseen a system in which countless others are generously rewarded, thereby pirating from the Iraqi Kurdistan economy resulting in severe economic injustice and extreme hardship throughout the Iraqi Kurdistan populace. Since its inception, the party has had a history of fierce power struggles. Losers, often along with their families, are usually eliminated in the most horrible and permanent ways. Barzani's have competed for power and assumed prestige over decades. Confidential Human Sources #1, #2, #3, #4, #5, and #7, and others, declare that if you cross Defendant Masrour Barzani, ultimately, you're likely to die.

247. Under the leadership of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani and their family members and family members by marriage, many of whom actively distrust and fear Defendant Masrour Barzani, Defendant Iraqi Kurdistan Regional Government has become an entrenched transnational kleptocracy, with the Barzani Continuing Criminal Enterprise dominating every public and enterprise sector in the region including armed forces, law enforcement, the judiciary, and banking, communications, media, construction, and oil and gas sectors with massive revenues and enormous illicit diversion of petrodollars and other criminal proceeds, and spreading purposely and knowingly deceptive and manipulative news through their rigorously controlled satellite television channels and print media.

248. Defendants violated those requirements and actively concealed their payments.

355. The President issued multiple Executive Orders, including 12,170, 12,957, 12,959, 13,059, and 13,224 (collectively, the "Executive Orders"), and the Treasury Department issued the Iranian Transactions Regulations (renamed the Iranian Transactions and Sanctions Regulations, ("ITSR") implementing the sanctions imposed by the Executive Orders. 31 C.F.R. Part 560.

356.    The ITSR provides that the transfer of funds, directly or indirectly, from the United States or by a U.S. person to the Islamic Republic of Iran or its Government is prohibited. See 31 C.F.R. § 560.427(a). The Department of the Treasury also designated the National Iranian Oil Company ("NIOC") and National Iranian Tanker Company ("NITC")  as prohibited entities.

357.    Defendant Masrour Barzani, a United States person, knowingly and willfully combined, conspired, confederated, and agreed, with persons including the IRGC, without a U.S. government license, as part of the conspiracy and scheme, to deceive, mislead, and defraud the United States, by materially assisting and providing financial and materiel support to a terrorist organization, concealing the end user and destination of oil and oil revenues shipped to and from Iran, and evading and causing others to evade or violate the regulations, orders, prohibitions, and licensing requirements of IEEPA and the ITSRs – thereby significantly enriching themselves and obtaining substantial resources enabling them to injure Plaintiffs.   50 U.S.C. § 1705.

358.    Defendants operated in a Kurdistan business environment that posed extreme terrorist finance risks because Iraq is hyper-corrupt and Western companies there – and their regional and local partners, consultants, and contractors – routinely made protection payments to terrorists as the cost of doing business.  These conditions were always obvious to Defendants, who willfully directly, and indirectly participated in such transactions and profited thereby to harm Plaintiffs..

   **D.    Defendants' Acts Were Knowing, Intentional, and Facilitated by Washington, D.C. Counsel, Lobbyists, and Representatives**

359.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and other subordinates, received and do receive frequent U.S. Government-documented briefings and consultations with U.S. Government officials, including officers of the Departments of State and Defense and the National Security Council staff, the U.S. military and intelligence services, the U.S. Embassy in Iraq, including the U.S. Ambassador, the U.S. Consulate in Erbil, and even with the President, to be presented at trial.

231

360.    All Defendants knew and understood that the United States does not condone their tortious acts.  No Defendant can credibly claim that their wrongful, criminal, and tortious conduct of certain subordinates misled them into thinking such acts were permissible.

361.    ~~Former Defendant Iraqi Kurdistan Regional Government President and Defendant Masoud Barzani, having seemingly secured lifelong immunity from prosecution and retained power post-presidency, and his son, current Defendant Iraqi Kurdistan Regional Government Prime Minister and Defendant Masrour Barzani, perfected these internal power struggle mechanisms, transforming the Iraqi Kurdistan region into a supposed modern liberal democracy governed more by the principles of its former Soviet-trained past rather than by the rule of law, mirroring (and aligning with) the deceptive, unscrupulous, brutal, violent, and vicious tactics of the Bathist regime of former Republic of Iraq President Saddam Hussein responsible for the genocide against the Kurds and the architect of state-sponsored Kurdish destruction by way of the Anfal Campaign in 1988 and once branded by *U.S. News and World Report* "the World's Most Dangerous Man," who Voice of America said maintained power "by force and fear, not by the consent of the governed," and who current U.S. President Biden said "provided safe havens for the world's most infamous terrorists," by whom Defendant Masoud Barzani and his close associates were once tutored and were once secretly and duplicitously loyal — notwithstanding Saddam's documented genocidal slaughter (murders) of over 182,000 of Iraq's Kurdish peoples (a number officially provided by the Defendant Iraqi Kurdistan Regional Government and by the Defendant Iraqi Kurdistan Regional Government parliament) — aiding and abetting and acting in secret concert and traitorous collaboration with Saddam Hussein, who was emboldened to believe himself immune from consequence as the Defendants now do, including the unauthorized and unlawful sharing of American national security intelligence information, much of which is classified and sensitive U.S. national defense information, gathered and owned by and under the control of the United States~~

government, including information from agencies that comprise the United States Intelligence Community and the United States Department of Defense, including information on defense and weapons capabilities of both the United States and foreign countries, potential vulnerabilities of the United States and its allies to military attack, and plans for retaliation in response to foreign attack, to agents of designated foreign terrorist states and organizations, and operating the lucrative smuggling trade with Iran and Turkey, all while publicly professing friendship to the United States. The United Nations Committee on Enforced Disappearances report dated April 2023 states "an estimated 100,000 Kurds were forcibly disappeared as part of Saddam Hussein's genocidal campaign in Iraqi Kurdistan," with which Defendants Masoud Barzani, and Masrour Barzani deliberately, deceptively, and perfidiously collaborated in their effort to maintain power and control, inviting Saddam's tanks and Republican Guards army into the Kurdish provincial capital city of Erbil on the condition they weed out Barzani's Kurdish opponents. The United Nations estimates hundreds of thousands of men, women and children were executed during a systematic attempt — by Barzani's collaborator associate Saddam Hussein — to exterminate the Kurdish population in Iraq in the Anfal operations in the late 1980s. Men, women, and children were tied together and shot—falling into mass graves.

249    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and others, were appreciably and unambiguously more than "generally aware" they were engaged in illegal activity, through abundant classified and highly informative U.S. and Allied intelligence, provided by U.S. agents and officials to Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani as leaders of the KRG and its Peshmerga,, and through the guidance of their retained Washington, D.C. counsel, lobbyists, and representatives acting within the scope of their office to provide legal, national and economic security information, contemporaneous executive and legislative branch policy guidance, and by widely circulated public and media reports of these organizations as

foreign terrorist organizations, and were knowledgeable of public, classified, and unclassified U.S. Government and United Nations reports extensively documenting the Iranian Government's role in terrorism against American interests and the primary terrorist mission of IRGC, ISIS, and Hamas.

362.    Defendants knew that their transnational criminal enterprise strategy to generate concealed unlawful cash sources through uncontrolled slush funds for their illicit transactions caused U.S. dollar, cash-based protection payments to terrorists, the currency of choice for terrorists worldwide.    Numerous ignored U.S. Government reports alerted Defendants, and their Washington, D.C. agents, representatives, and attorneys that U.S. dollar cash payments and associated cash smuggling were a known key strategy to route payments to terrorists.

### E.    Defendants' Acts Targeted United States and Plaintiffs

363.    As a result of the conspiracy between Defendants and ISIS and IRGC, and Defendants depriving the U.S. government of actionable intelligence and accurate information, ISIS's and IRGC's overt acts targeting the United States and U.S. citizens, including Plaintiffs, are attributable to Defendants Masoud Barznai, Masrour Barzani, and Waysi Barzani.

364.    Defendants' payments funded attacks by al-Qaeda, al-Qaeda-in-Iraq, ISIS, and IRGC that were acts of "international terrorism." 18 U.S.C. § 2333(a).  The United States designated al-Qaeda, al-Qaeda-in-Iraq, ISIS, and IRGC as FTOs, which reflected their status as four of the world's deadliest terrorist groups.  To date, al-Qaeda, al-Qaeda-in-Iraq, ISIS, and IRGC have collectively killed, or helped kill, well more than 2,500 U.S. service members and wounded roughly 30,000 more.   Defendants' payments helped finance those attacks, harming Plaintiffs.

### F.    Defendants Shared Classified U.S. National Defense Intelligence with the Enemy

234

365.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their subordinate agents and representatives, ~~including Barzani family members and family members by marriage,~~ under their direction and command, ~~during the period of United States military presence in Iraqi Kurdistan and continuing to this day~~, were sharing, always verbally and never in writing, and with actual knowledge such transfer was unlawful, sensitive and classified U.S. national defense information and intelligence, ~~gathered and owned by and under~~ with the ~~control~~Islamic Republic of Iran.  This secret intelligence was received by Defendants in their official capacities with the ~~United States government, including information from agencies that comprise the United States Intelligence Community and the United States Department of Defense which are responsible for the protection of U.S. national security, including~~KRG, and included information on defense and weapons capabilities of ~~both~~ the United States and ~~foreign~~Allied countries, potential vulnerabilities of the United States and its allies to military attack, plans for retaliation in response to foreign attack, and about U.S. operations and personnel in the ~~Iraqi Kurdistan region, received by Defendants in their official capacities with the Defendant Iraqi Kurdistan Regional Government,~~ Kurdistan region, to the mortal endangerment of ~~United States~~U.S. diplomatic and military personnel ~~with~~, and took other illicit steps that secretly aided the ~~senior officials of the~~ Islamic Republic of Iran~~, which since 1984 has been designated by the United States as a state sponsor of terrorism~~.

~~250.    At all times relevant,~~366.    ~~Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their agents and representatives, knew that Iran is a major state sponsor of global terrorism, and particularly of terrorism against the United States.  (U.S. Department of State's 2007 Country Reports of Terrorism describing Iran as "the most active state sponsor of terrorism".)  See Cabrera v. Islamic Republic of Iran, Civil Action No. 19-3835 , 19 (JDB) (D.D.C. Jan. 27, 2023).~~

251.   At all times relevant, Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their agents and representatives, knew the disclosure of this and any classified and sensitive information owned, sourced, or provided by the United States intelligence community was unlawful and that their conduct was *ultra vires* and contrary to U.S. law, and could and did put at risk Plaintiffs, the national security of the United States, its foreign relations, the safety of the United States military and diplomatic personnel, human sources, and the continued viability of sensitive intelligence collection methods, and Plaintiffs.

252367.        Confidential Human Sources #2, #3, and #4, who havehaving direct clandestine access to senior Defendant Iraqi Kurdistan Regional GovernmentKRG and KDP officials, confirm thethat a sometimes conduit for this classified information was "Masoud", an Iranian spy operating in the Iraqi Kurdistan city of Erbil under the cover of a construction company.  This sensitive classified U.S. national defense information and intelligence, gathered and owned by the United States government, including information from agencies that comprise the United States Intelligence Community and the United States Department of Defense, was then carried to the Iranian Supreme Leader.  In return for sharing with and conveying to Iran sensitive and classified U.S. national defense intelligence and information, gathered and owned by the United States government, including information from agencies that comprise the United States Intelligence Community and the United States Department of Defense, and other steps that secretly aided Iran, the Barzani Continuing Criminal EnterpriseBCE received and maintains secret Iranian permission and collaboration to smuggle contraband drugs, money, oil, weapons, and other goods and services through controlled checkpoints, operated by the Iraqi KDP under the command and control of BCE Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, into and through Iran.

253.   The Islamic State, also known as the Islamic State of Iraq and the Levant, Islamic State of Iraq and Syria, ISIL and ISIS, and by its Arabic acronym Da'ish or Daesh, is a transnational

militant Islamist terrorist group self-declaratively dedicated to the destruction of the United States of America.  The thoroughly documented United Nations Committee on Enforced  – knowingly violating embargoes**Disappearances** report dated April 2023 states:

> "Over the 2014–2017 period, Da'esh also carried out abductions and mass killings of members of the Iraqi army and security forces, such as the Camp Speicher massacre.  Ethnic and religious minorities were also targeted by acts amounting to enforced disappearance.  On 3 August 2014 in the Yazidi-majority district of Sinjar, Da'esh abducted and disappeared thousands of women and girls for forced marriage or sexual slavery, while men and boys were separated, massacred and buried in mass graves.  It is estimated that around 6,800 Yazidis were abducted and around 3,100 killed over a period of a few days.  An estimated 3,000 are still disappeared.  Hundreds of Assyrian Christian, Shabak and Shia Turkmen women were also abducted from areas under Da'esh control, and the fate of many of them remains unknown."

254.   The Islamic State is also known as the Islamic State of Iraq and the Levant, Islamic State of Iraq and Syria, and by its Arabic acronym Da'ish or Daesh, and as ISIS.  Islamic State's terrorist campaign against the United States in Afghanistan, Iraq, and Syria was guided by a number of terrorist first principles, including, but not limited to, Islamic State's: (1) emulation of al-Qaeda and al-Qaeda in Iraq, and absorption of their networks, personnel, funds, and relationships; (2) operating as an integrated global network, which disregarded national boundaries; (3) a multinational corporation model, which emphasized partnership between Islamic State branches; (4) reliance upon money payments extracted from companies to finance terrorist operations; and (5) the practice of flowing value from Islamic State terrorists in Iraq and Syria to Islamic State terrorists in Afghanistan and Pakistan.

255.   Theevading U.S. Government has also recognized these connections through the close partnership between the IRGC and al-Qaeda.  In July 2011, the U.S. sanctions by facilitating financial transactions on behalf of Iran.   The Treasury Department designated as Specially

Designated Global Terrorists (SDGTs) six members of al-Qaeda operating in Iran under a secret agreement between the IRGC and al-Qaeda.  In so doing, the Treasury Department concluded that the secret deal provided that al-Qaeda terrorists "must refrain from conducting any operations within Iranian territory and recruiting operatives inside Iran while keeping Iranian authorities informed of their activities.  In return, the Government of Iran gave the Iran-based al-Qa'ida network freedom of operation and uninhibited ability to travel for extremists and their families" and permitted al-Qaeda to use Iran as a "critical transit point for funding to support [al-Qaeda's] activities."  The U.S. Treasury Department also found disclosed that "Iran's secret deal with al-Qa'ida" facilitated a terrorist network that "serves as the core pipeline through which al-Qa'ida moves money, facilitators and operatives from across the Middle East to Asia." Indeed, al-Qaeda has honored its commitment to the IRGC despite its attacks on Shiite Muslims elsewhere in the Middle East.

368.  Defendants knew that their large money payments, weapons transfers, and sharing of sensitive U.S. national defense intelligence, to al-Qaeda, al-Qaeda-in-Iraq, and ISIS strengthened the Foreign Terrorists Organizations' (FTOs') racketeering enterprise both through resourcing its operation, and by generally causing dramatic inflation in the prices – and associated terrorist finance extracted by the FTOs – attendant to the illicit economy in Kurdistan.  Thus, Defendants knew that their conduct made kidnapping and murders more likely by (a) facilitating the growth of the entire protection money racket while simultaneously (b) causing dramatic price inflation, pricing out people at the lower end of the new illicit economy Defendants helped birth and sustain.

256.  "Although Defendants' protection payments to and collaboration with al-Qaeda is a Sunni jihadist organization that seeks to establish a global caliphate." See *Cabrera v. Islamic Republic of Iran,* Civ. A. No. 18-2065 (JDB), 2022 WL 2817730, at 17 (D.D.C. July 19, 2022).

257.   ~~Islamic State copy-catted or otherwise absorbed al-Qaeda's hatred of,~~ al-Qaeda-in-Iraq, and ISIS agents provided especially valuable aid for such FTOs' terrorist attacks, the causal nexus was not limited to such violations. Defendants' transactions with the specific intent of routing money directly to terrorist groups targeting the United States ~~and targeting of Americans in the Middle East to drive the~~ – which intermediaries flowed through Defendants' resources to their intended terrorist recipients – supplied al-Qaeda, al-Qaeda-in-Iraq, and ISIS with U.S. dollars, sourced from transactions processed by U.S. banks in the ~~region; Salafist ideology; organizational structure; specific bureaucracies; and policies and procedures.  Islamic State also assumed possession of al-Qaeda-in-Iraq's weapons stockpiles, cash reserves, safe houses, logistics pipelines, facilitators,~~U.S., and ~~protection rackets (~~valuable U.S. goods, including ~~the associated relationships with business~~valuable American high-tech communications technologies that provided encrypted communication and ~~their agents) in Iraq and Syria.  Islamic State fully adopted and applied the terrorist logistics, finance, and operational infrastructure and practices of al-Qaeda-in-Iraq from its inception in 2014 through the present. For example, Islamic State's finance apparatus was structurally similar to that of Qaeda~~doubled as cash-equivalents in Kurdistan, which al-Qaeda, al-Qaeda-in-Iraq, and ~~Islamic State operated similar internal bureaucracies dedicated to the raising and movement of funds, especially U.S. dollars, and through which the Barzani Continuing Criminal Enterprise surreptitiously participated, aided and abetted, and benefitted.~~

ISIS used~~258.        Islamic State viewed their operations in Afghanistan, Pakistan, Iraq, Iran, Syria, and the Persian Gulf as a single integrated campaign whose purpose was~~ to ~~expel the United States from the entire region to facilitate Islamic State's caliphate there.  Abu Bakr al-Baghdadi, the leader of Islamic State until his death in 2019, repeatedly called for Islamic State supporters worldwide to facilitate Islamic State's~~fund attacks against Americans in Iraq, Afghanistan, and Syria ~~through his public statements from 2014 through 2019~~, and harm Plaintiffs.

259.   Islamic State followed al-Qaeda's time-honored playbook, in which al-Qaeda terrorists operating in one theater regularly redeployed, or cross-pollinated, with terrorists in other theaters. Al-Qaeda and al-Qaeda-in-Iraq, from whose ranks Islamic State populated its fighters, routinely did so from the 1990s through 2021. 269.   From 2003 through 2022the present time, the U.S. Government, media, terrorism scholars, and others published other reports and statements that ., readily apparent to Defendants' Washington agents, representatives, attorneys, and advisors, and frequent briefings by U.S. Government officials in Kurdistan and Washington, alerted and informed Defendants thattheir resource transfers and payments, weapons transfers, and sharing of sensitive U.S. national defense intelligence, aided al-Qaeda-in-Iraq's and ISIS's terrorist campaign against the United States.

370.   Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents and representatives, had direct relationships with relevant tortfeasors al-Qaeda, al-Qaeda-in-Iraq, and Islamic State inextricably linked their campaigns in Iraqthe ISIS and Afghanistan togetherunderstood and knew their actions to provide resources, including weapons, and sensitive U.S. national defense intelligence to FTOs in and around Kurdistan was detrimental, damaging, and injurious to Plaintiffs and U.S. interests.  Defendants further always knew that al-Qaeda-in-Iraq and ISIS terrorists regularly provided key logistical aid to al-Qaeda and ISIS terrorists in Afghanistan and Pakistan.

260.   Defendants knew that through their criminal enterprise and collaboration they were supplying resources to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State terrorists who were intent on attacking Americans in Iraq, Syria, and Afghanistan.  Defendants 371.   Confidential Human Sources #1, #2, #3, #4, and #5, who have direct clandestine access to senior KRG officials and BCE leadership, state that Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their subordinate agents and representatives and co-conspirators in the BCE, knowingly, willingly,

purposefully, and intentionally conspired, affiliated with, and murderously collaborated with Saddam Hussein and ISIS, and its affiliates, in atrocities against the Iraqi Kurdish people for the purpose of expanding Barzani political power and the BCE and to harm Plaintiffs.

### G.     Defendants' Acts Were Knowing and Intentional

372.    Defendants knowingly engaged in corrupt practices of funneling illicit payments, weapons, sensitive U.S. national defense intelligence, ~~gathered and owned by the United States government, including information from agencies that comprise the United States Intelligence Community and the United States Department of Defense,~~ (received by Defendants in their official capacities with the ~~Defendant Iraqi Kurdistan Regional Government),~~KRG, and other assistance, often through others, which only heightens Defendants' culpability. Defendants intentionally used oblique, circuitous, and scheming methods to insulate themselves from the illicit payments and weapons transfer on paper while avoiding accountability.  Defendants knew their unlawful acts were occurring and purposefully orchestrated them.  That is because Defendants could only obtain their desired criminal enterprise outcome by ensuring that their money ~~circuitous, and scheming methods to insulate themselves from the illicit payments and weapons transfer on paper while avoiding accountability.  Defendants knew their unlawful acts were occurring and purposefully orchestrated them.  That is because Defendants could only obtain their desired criminal enterprise outcome by ensuring that their money.~~ weapons, and sensitive U.S. national defense intelligence actually reached al-Qaeda, al-Qaeda-in-Iraq, and ~~Islamic State.~~ ISIS.

372.  Defendants' acts were not unknowing.  Plaintiffs' allegations are not speculative nor implausible. ~~261.      From 2004 through present time, it was common knowledge among operatives and businesses operating in Iraqi Kurdistan, including Defendants, that illicit transactions were typically designed for the purpose of causing U.S. dollars, weapons, oil, and sensitive U.S. national defense intelligence, gathered and owned by the United States government,~~

including information from agencies that comprise the United States Intelligence Community and the United States Department of Defense, to flow to terrorists in Iraq and Iraqi Kurdistan, including al-Qaeda and al-Qaeda-in-Iraq (from 2004 through 2014) and Islamic State (from 2014 through 2021), in the form of transactions that were usually plainly illicit on their face.  Because al-Qaeda, al-Qaeda in Iraq, and Islamic State, and the Barzani Continuing Criminal Enterprise, always openly demanded the money — and because local agents usually paid it through relatively straightforward, albeit highly illegal, means — the prevailing understanding being that their illicit Iraqi Kurdistan transactions were foreseeably flowing to al-Qaeda, al-Qaeda in Iraq, and Islamic State, and the Barzani Continuing Criminal Enterprise.

They are based on Confidential Human Source witnesses, who have direct clandestine access to Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and senior  KRG and KDP officials, with direct and indirect knowledge of the alleged facts; unclassified and declassified military and intelligence agency reporting; U.S. diplomatic and military cables; Congressional fact finding; U.S. executive branch reports to Congress; internal U.S. executive branch reports, documents, and papers; personal witness knowledge of U.S. executive branch and military persons; papers and communiques of the KRG and its principals; submissions of KRG to agencies of the U.S.262.        Indeed, Defendants knew that their large money payments, weapons transfers, and sharing of sensitive U.S. national defense intelligence, gathered and owned by the United States government, including information from agencies that comprise the United States Intelligence Community and the United States Department of Defense, (received by Defendants' in their official capacities with the Defendant Iraqi Kurdistan Regional Government) to  al-Qaeda, al-Qaeda-in-Iraq, and Islamic State strengthened the Foreign Terrorists Organizations' (FTOs') racketeering enterprise both through resourcing its operation, and by generally causing dramatic inflation in the prices — and associated terrorist finance extracted by the FTOs — attendant to the

illicit economy in Iraqi Kurdistan.  Thus, Defendants knew that their conduct made kidnapping and murders more likely by (a) facilitating the growth of the entire protection money racket while simultaneously (b) causing dramatic price inflation, pricing out people at the lower end of the new illicit economy Defendants helped birth and sustain.  Although Defendants' protection payments to and collaboration with al-Qaeda, al-Qaeda-in-Iraq, and Islamic State agents provided especially valuable aid for such FTOs' terrorist attacks, the causal nexus was not limited to such violations. Defendants' transactions with the specific intent of routing money directly to terrorist groups targeting the United States—which intermediaries flowed through Defendants' resources to their intended terrorist recipients—supplied al-Qaeda, al-Qaeda-in-Iraq, and Islamic State with U.S. dollars, sourced from transactions processed by U.S. banks in the U.S., and valuable U.S. free goods, including valuable American high-tech communications technologies that provided encrypted communication and doubled as cash-equivalents in Iraqi Kurdistan, which al-Qaeda, al-Qaeda-in-Iraq, and Islamic State used to fund attacks against Americans in Iraq, Afghanistan, and Syria.

263.   Defendants knew that al-Qaeda waged a global terrorist campaign against the United States in which al-Qaeda and its branches and allies in Iraq, Afghanistan, Syria, and elsewhere attacked Americans to drive the United States out of the Middle East.

264.   Defendants knew resources and weapons transfers and sharing of sensitive U.S. national defense intelligence aided al-Qaeda's and Islamic State's operations worldwide.

265.   United States government reports, readily apparent to Defendants' Washington DC representatives, agents, attorneys, and advisors, and frequent briefings by U.S. Government officials in Iraqi Kurdistan, alerted Defendants that their resource transfers and payments aided al-Qaeda-in-Iraq and Islamic State.  From 2003 through the present time, the U.S. Government, media, terrorism scholars, and others published reports and statements have alerted and informed

Defendants, and especially their representatives, agents, attorneys, and advisors in Washington, D.C., that resource payments, weapons transfers, and sharing of sensitive U.S. national defense intelligence, gathered and owned by the United States government, including information from agencies that comprise the United States Intelligence Community and the United States Department of Defense, received by Defendants in their official capacities with the Defendant Iraqi Kurdistan Regional Government, aided al-Qaeda-in-Iraq's and Islamic State's terrorist campaign against the United States. Indeed, these and other sources alerted Defendants to four ways that al Qaeda and Islamic State operatives in Iraqi Kurdistan, and beyond, aided their counterparts in Afghanistan: (a) funding; (b) fighters; (c) training; and (d) logistics.

266. At all times relevant, Defendants, and their agents and representatives including Barzani family members and family members by marriage, understood and knew their actions to provide resources, including weapons, and sensitive U.S. national defense intelligence, gathered and owned by the United States government, including information from agencies that comprise the United States Intelligence Community and the United States Department of Defense, to al-Qaeda and Islamic State in and around Iraqi Kurdistan was detrimental, damaging, and injurious to U.S. interests, national security and economic security. Indeed, Defendants always knew that al-Qaeda-in-Iraq and Islamic State terrorists regularly provided key training to al-Qaeda and Islamic State core terrorists, and their Taliban (including Haqqani Network) allies in Afghanistan and Pakistan. Defendants further always knew that al-Qaeda-in-Iraq and Islamic State terrorists regularly provided key logistical aid to al-Qaeda and Islamic State terrorists in Afghanistan and Pakistan.

267 Government; United Nations and Financial Action Task Force reports; media accounts; and Plaintiffs' recollections, all of which will be presented at trial.

373. Defendants had highly culpable mental states because Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani occupied sophisticated positions as, respectively, leaders of

the Defendant Iraqi Kurdistan Regional GovernmentKRG, and well knew that their sharing of resources, weapons, materiel, and sensitive U.S. national defense intelligence, gathered and owned by the United States government, including information from agencies that comprise the United States Intelligence Community and the United States Department of Defense, to al-Qaeda, al-Qaeda-in-Iraq, and Islamic StateISIS would aid anti-American terrorism. The, and violated the Iranian Transaction Regulations ("ITR"). The willful decision of Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, their agents and representatives, including Barzani family members and family members by marriage, to provide resources, cash, oil, weapons, and sensitive U.S. national defense intelligence, gathered and owned by the United States government, including information from agencies that comprise the United States Intelligence Community and the United States Department of Defense, to al-Qaeda, al-Qaeda-in-Iraq, and Islamic StateFTOs was highly culpable and Defendants chose, knowing full-well the resources, weapons, materiel, cash, oil, and shared sensitive U.S. national defense intelligence would be used for bombs and weapons to take the lives of others.

## V.    DEFENDANTS' GENOCIDE AGAINST OWN NATIONALS

374.    The Yazidi genocide shocked the world's conscience as a mass atrocity. Genocidal acts of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani were not legally authorized acts of state, with general intent and specific intent targeted all Yazidi, and are unequivocally genocide acts enumerated in the Convention on the Prevention and Punishment of the Crime of Genocide. Whether perpetrators of genocidal acts targeted all members of a protected group or just a portion of the group further informs a finding of genocidal intent. See *Prosecutor v. Akayesu*, International Criminal Tribunal for Rwanda (ICTR), Case No. ICTR-96-4-T (1998).

375.     The Republic of Iraq (and the United States) are signatory parties to the Genocide Convention, which delineates that prohibition of genocide has the character of a peremptory norm *(jus cogens)*, and obligations which protect essential humanitarian values, and which are owed *erga omnes* by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani.  (The breach of such an obligation is of concern not only to the victims but also to all members of the international community.)

376.     Genocide has been defined as "acts calculated to bring about the physical destruction, in whole or in part, of a national, ethnic, racial, or religious group." *Tel-Oren v. Libyan Arab Repub.,* 726 F.2d 774, 806 (D.C.Cir.1984) (Bork, J., concurring) (citation omitted). Similarly, a systematic attack on certain segments of a population is a crime against humanity. *See Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 226 F.R.D. 456, 479-80 (S.D.N.Y.2005) (citations omitted).

### A.     Plaintiffs' Allegations Establish a Genocide of Yazidi in Kurdistan

377.     Characterized as the "crime of crimes," genocide is the "denial of the right of existence of entire human groups, a denial which shocks the conscience of mankind and results in great losses to humanity." *Reservations to Convention on Prevention and Punishment of Crime of Genocide*, Advisory Opinion, 1951 I.C.J. 15, at 23 (May 28) [hereinafter *Genocide Convention Advisory Opinion*].  See also 18 U.S. Code § 1091.

378.     The customary international law norm prohibiting genocide is reflected in the Genocide Convention. The peremptory legal norm (from which no State may derogate or suspend compliance) prohibiting genocide imposes obligations on all States, including the specific duties to prevent genocide and avoid complicity in its commission. Genocide Convention, Arts. I, III(e). Each obligation is clearly justiciable; international courts and tribunals have routinely applied well-defined and judicially manageable standards to address genocidal conduct.

379.    The requisite intent for genocide may be inferred from a totality of circumstances, including the overall context and systematic nature, scale, or repetition of attacks directed against the same group.  While genocide requires the physical or biological destruction of a group, facts demonstrating the requisite intent to destroy a group, as contained herein, also focus on the intangible characteristics that cohere a group.  In order for the crime of genocide to exist, the perpetrator's actions must have been motivated by two separate constituent elements.  The first is the physical element, namely the acts perpetrated (which are set out in Article II and include, in particular, killing members of the group (subparagraph *(a)*) and causing serious bodily or mental harm to members of the group (subparagraph *(b)*). The second is the mental element, namely the intent to destroy, in whole or in part, a national, ethnical, racial or religious group such as the Yazidi.  See *International Law Commission, Report of the International Law Commission*, pp. 45–46.  Both elements are present in the instant matter.

380.    On March 14, 2016, the U.S. House of Representatives unanimously passed a resolution finding that ISIS's crimes against religious minorities in Iraq and Syria constitute genocide, war crimes, and crimes against humanity. On March 17, 2016, the Secretary of State declared ISIS had committed genocide and crimes against humanity against Yazidis, Christians, Shi'a Muslims, and others.

### B.    Defendants' Complicit Acts of Genocide

381.    Failing their statutory duty, Defendants Masoud Barzani and Masrour Barzani's religious discriminatory practice abandoned Yazidi minority of Kurdistan national origin trapped in a terror zone imminently threatened by ISIS, exacerbating their suffering and leaving them in life-threatening conditions with no clear path to safety.

382.    Under customary international law governing both state responsibility and individual criminal liability, the requisite *mens rea* for complicity via aiding and abetting is knowledge of

the perpetrator's genocidal intent, rather than shared genocidal intent.  See ILC Articles on State Responsibility, at 65 (Article 16) (State Responsibility); *Prosecutor v. E. Ntakirutimana & G. Ntakirutimana*, Cases Nos. ICTR-96-10-A & ICTR-96-17-A, Appeal Judgement, ¶¶ 500-501 (Int'l Crim. Trib. for Rwanda Dec. 13, 2004) (individual criminal liability).  Awareness that crimes of genocide "would probably be committed, and one of these crimes is in fact committed" is sufficient to establish an individual's "knowledge." *Karadžić*, ¶ 577.

383.    The *actus reus* for complicity by aiding and abetting requires "acts or omissions specifically directed to assist, encourage or lend moral support to the perpetration of a certain specific crime," which "have a substantial effect upon the perpetration of the crime," a "fact-based inquiry." *Karadžić*, ¶ 575-576 (internal quotations omitted).  ISIS forces facilitated by Defendants Masoud Barzani and Masrour Barzani committed killings of and caused serious bodily or mental harm to members of the Yazidi ethnic group.  These acts constituted the *actus reus* of genocide within the meaning of Article II *(a)* and *(b)* of the Convention.  Defendants have to date evaded justice and accountability.

384.    This Complaint alleges sufficient 3ortious conduct by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani to establish each clearly defined legal element of complicity in genocide.  The allegations present actions and purposeful inactions taken by Defendants Masoud Barzani, Masrour Barzani, and their agents, had a substantial effect upon the perpetration of genocide.  The actual ISIS attacks on and destruction of villages in Kurdistan and systematic execution of Yaaizi men, subsequent rape, murder, and pillaging, systematic rapes and gang-rapes in several villages, acts of sexual violence perpetrated against Yazidi women and girls, assaults, displacement, caused the starvation and malnutrition of women, children, and elderly within the community, and other systematic instances of tortious conduct would not have

occurred in the same magnitude, ferocity, savagery, bloodthirstiness, brutality, or viciousness if Defendants Masoud Barzani and Masrour Barzani had not purposefully facilitated ISIS.

385.    The scale, systematic nature, and the atrociousness of the attacks verifies that the massacres were aimed at exterminating the group that was targeted.  The killing of even newborn babies and pregnant women evinced the atrocious nature of the killings.

386.    The United States Commission on International Religious Freedom, an agency of the U.S. Government, affirms "ISIS advanced on Sinjar, the Yazidi homeland in Nineveh, and murdered, kidnapped, or drove out almost of all of Sinjar's approximately 400,000 Yazidis, summarily executing at least 12,000 people — especially men and older women—and dumping their bodies in mass graves.  Fighters demolished Yazidi shrines and seized boys and young men for forced conversion to Islam, enslaved labor, and conscription into ISIS's ranks. ISIS also abducted over 6,000 younger women and children and sold them into sexual slavery and forced marriage to its leaders and fighters, whose religious framework permits the rape of "infidels" such as Yazidis. (The Department of State estimates ISIS executed, displaced, or trafficked as sex slaves 60,000 Christians in Mosul alone.)

387.    The unspeakable acts of Defendants' role in genocide of Yazidi in Sinjar, to assert strategic territorial control, seize Yazidi wealth, and sexually enslave Yazidis, and the exceptional gravity of the crime, are all attributable to Defendants Masoud Barzani and Masrour Barzani, who as long-established leaders of the KRG knew or should have reasonably known, of the *jus cogens* character of the prohibition of genocide and the *erga omnes* and *erga omnes partes* character of the obligations owed by states, including Iraq and the KRG, under the Genocide Convention.

388.    Defendants Masoud Barzani and Masrour Barzani, and their co-conspirator agents and representatives, including Barzani family members, failed to prevent genocide, facilitated genocide, and committed genocide on non-combatant civilians of minority ethnicity, including the

shooting of children and those who posed no imminent threat, in manifest violation of the Genocide Convention, and who have also violated and do violate their other fundamental obligations under the Genocide Convention, including by failing to prevent or punish the direct and public incitement to genocide. Acts and omissions of Defendants Masoud Barzani and Masrour Barzani meet the legal definition of genocide, as contained in the Genocide Convention, and were aimed at not just simply the killing of innocent people and the destruction of their livelihoods but a systematic effort to empty Kurdistan of its Yazidi people. Entire multi-generational families have been wiped out completely and thousands displaced. Further, Defendants Masoud Barzani and Masrour Barzani knowingly and willfully, directly and indirectly, failed in their governmental duties for protection of civilians and upholding legal and humanitarian obligations.

389. The physical hardships faced by the Yazidi are compounded by the immense mental anguish and debilitating distress caused by the genocide. Because most Yazidis continue to live under the very same political sphere that orchestrated their massacre and enslavement – the BCE controlling the KRG – most live in tents in refugee camps dotting the Kurdistan region controlled by the KRG, struggling daily to survive amidst food shortages, lack of hygiene, limited access to clean water, and in unrelenting fear that another genocide may soon take place, even though ISIS has largely, but not entirely, been vanquished. As internally displaced persons, thousands of Yazidis remain at grave and immediate risk of further acts of genocide as Yazidi people have sought refuge in refugee facilities across Kurdistan, under control of Defendant Masrour Barzani, creating overcrowded, undignified, unhygienic, unsafe, and impoverished conditions. These conditions, combined with the prolonged separation from family and the KRG's lack of responsiveness, have compounded Yazidi's severe mental anguish, extreme distress, and heartbreak to debilitating levels.

390.    Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, their agents, representatives, servants, collaborators, and co-conspirators, including Barzani family members, and others, have knowingly and willfully, directly and indirectly, planned, schemed, orchestrated, aided and abetted, conspired, financed, and committed multitudinous crimes, including acts and omissions, in each of four criminal categories, only partially delineated herein.

## C.    Defendants' Acts Constitute Atrocity Crimes

391.    *Atrocity cri*mes, the most serious crimes against humankind because of the unspeakable cruelty that constitute and accompany these atrocities, constituting crimes of hate and violent crimes of the state and state-like organizations orchestrated against citizens as a means to destroy and to gain or attain power, are the wanton barbarous acts of Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their servile agents and representatives, including Barzani family members, in their transnational BCE.

392.    The White House-led interagency Atrocity Prevention Task Force broadly defines *atrocities* as "widespread, intentional violence against civilians, including genocide, war crimes, crimes against humanity and ethnic cleansing."  Executive Order 13729, issued by the President, further defines atrocities "as large scale and deliberate attacks on civilians, and includes acts falling within the definition 'genocide' as defined in international law and under U.S. domestic statute," and declares "*preventing mass atrocities and genocide is a core national security interest and a core moral responsibility of the United States*."  (Italics added)

393.    Attacks facilitated by Defendants Masoud Barzani and Masrour Barzani were both widespread and systematic. "They were 'widespread' because they involved a 'large scale action' that was directed against— and inflicted casualties upon—a 'multiplicity of victims.'" *Doe v. Qi*, 349 F.Supp.2d 1258, 1308 (N.D. Cal. 2004); see *Wiwa*, 2002 WL 319887, at \*10; *Prosecutor v. Limaj*, Judgment, Case No. IT-03-66-T, ¶ 183 (ICTY Nov. 30, 2005).  "The attacks were

'systematic' because they were 'thoroughly organized,' 'methodical,' and followed 'a regular pattern on the basis of a common policy'" by ISIS.  *Almog v. Arab Bank*, 471 F.Supp.2d at 275 (E.D.N.Y. 2007); *Bowoto*, 2007 WL 2349343, at *3; *Wiwa*, 2002 WL 319887, at *10; *Prosecutor v. Rutaganda*, Case No. IT-96-3-T, ¶ 69 (ICTR Dec. 6, 1999);." *Ofisi v. BNP Paribas*, S.A., 278 F. Supp. 3d 84 (D.D.C. 2017).

### D.      Defendants Are Common Enemies of All Mankind and All Nations

394.    Torturers and those who commit genocide are now fairly viewed, like pirates, as "common enemies of all mankind and all nations have an equal interest in their apprehension and punishment."  See *Kiobel v. Royal Dutch Petroleum*, 569 U.S. at 129, 131, 133 S. Ct. 1659 (Breyer, J. concurring in judgment) (2013).

395.    This complaint provides the Court with allegations sufficient to demonstrate that a genocide of Yazidi in Kurdistan did occur, and is unfolding, and of Defendants Masoud Barzani and Masrour Barzani's failure in their duty to prevent genocide as well as their complicity. Defendants Masoud Barzani and Masrour Barzani's acts were and are a substantial breach of international law, and used this breach as a license to violate other fundamental customary international law norms in a manner that did destroy and does threaten vulnerable communities in Kurdistan and that can harm U.S. moral and strategic interests and the plaintiffs.

396.    The Court of Appeals of the District of Columbia Circuit "adopted the definition of genocide set forth in the Convention on the Prevention of the Crime of Genocide."  See *Philipp v. Federal Republic of Germany, 894 F.3d 406, 411 (D.C. Cir. 2018).*  The Court emphasized that "the definition of genocide includes an '*intent* to destroy.'"  The Court further declared, "We adopted the definition of genocide set forth in the *Convention on the Prevention of the Crime of Genocide. Id.* at 143. '[A]dopted by the United Nations in the immediate aftermath of World War II,' *id.,* the Convention defines genocide, in relevant part, as '[d]eliberately inflicting" on "a

252

national, ethnical, racial or religious group.... conditions of life calculated to bring about its physical destruction in whole or in part,' *Convention on the Prevention and Punishment of the Crime of Genocide* (Genocide Convention), art. 2, Dec. 9, 1948, 78 U.N.T.S. 277." See *Philipp v. Federal Republic of Germany*, 894 F.3d 406 (D.C. Cir. 2018).

397.    The Convention defines genocide as any of five "acts committed with intent to destroy, in whole or in part, a national, ethnical, racial or religious group."  These five acts include killing members of the group, causing them serious bodily or mental harm, imposing living conditions intended to destroy the group, preventing births, and forcibly transferring children out of the group. Victims are targeted because of their real or perceived membership of a group, not randomly.  The convention further criminalizes "complicity, attempt, or incitement of its commission."  Member states [including the Republic of Iraq] are prohibited from engaging in genocide and obligated to pursue the enforcement of this prohibition.  All perpetrators are to be tried regardless of whether they are private individuals, public officials, or political leaders with sovereign immunity."  These are the tortious acts of Defendants Masoud Barzani and Masrour Barzani, and their co-conspirator agents and representatives, including Barzani family members, in aiding and abetting and enabling the killing, harming and destroying of Yazidi people, and creating conditions of life calculated to bring about their physical destruction as a group.

398.   During the 2005 United Nations World Summit, heads of state and government accepted the responsibility of every state to protect its population from four crimes: genocide, war crimes, crimes against humanity, and ethnic cleansing.  The first three crimes are legally defined in various international legal documents, such as the 1948 Convention on the Prevention and Punishment of the Crime of Genocide, the obligations under which bind Iraq and its instrumentalities are owed *erga omnes* and *erga omnes partes*, the 1949 Geneva Conventions and their 1977 Additional Protocols, and the 1998 Rome Statute of the International Criminal Court.  ("Although the United

States has not joined the International Criminal Court, U.S. law recognizes the definition of crimes against humanity as stated in the Rome Statute." See *Ofisi v. BNP PARIBAS, SA*, 278 F. Supp. 3d 84, n.16 (D.C. 2017). *Also Almog v. Arab Bank, PLC, 471 F.Supp.2d 257, 275 n.23 (E.D.N.Y. 2007).)* Member states are prohibited from engaging in genocide and obligated to pursue the enforcement of this prohibition and obligates all perpetrators be tried regardless of whether they are private individuals, public officials, or political leaders with sovereign immunity. Their status as international crimes is based on the universal belief that the acts associated with them affect the core dignity of human beings, both in times of peace and in times of war.

399.   Acts of genocide, as a matter of law and morality, are distinct from other violations of international law and are sanctioned and perpetuated by BCE – though there is often a close connection between all such acts – including the serious and ongoing violations of international law associated therewith, including grave breaches of numerous international treaties and agreements, and other crimes against humanity. Defendants Masoud Barzani and Masrour Barzani's acts and omissions are genocidal in character, as they are committed with the requisite specific intent to destroy, in whole or in part, including the purposeful targeted elimination of Yazidi racial, ethnic, and culture identity.

### E.    Defendants Acted with Intent to Destroy Religious Minority

400.   Genocide is seeking to "destroy, in whole or in part, a national, ethnical, racial or religious group, as such." See *Convention on the Prevention and Punishment of the Crime of Genocide*, art. II, Dec. 9, 1948, S. Exec. Doc. O, 81-1 (1949), 78 U.N.T.S. 277 [hereinafter Genocide Convention]. It is the "as such" element that "makes genocide an exceptionally grave crime." *Prosecutor v. Karadžić*, Case No. IT-95-5/18-T, Trial Judgement Vol. I, ¶ 551 (Int'l Crim. Trib. for the former Yugoslavia Mar. 24, 2016).

401.   A federal court defined ethnic cleansing: "As has been extensively documented by international bodies, human rights organizations, and other bodies, ethnic cleansing also followed a distinct pattern and practice… These attacks were designed to terrorize and displace the Muslim population. As there was little or no military resistance, these attacks were not part of a military campaign, but rather were ethnic cleansing operations directed against civilians and civilian objects." *Mehinovic v. Vuckovic,* 198 F. Supp. 2d 1322 (N.D. Ga. 2002) (quoting Paul, Tr. Vol. II at 13:19-21:6; Paul. P.T. ¶¶ 46-49).

402.   Defendants' willful and calculated acts of failure (omission) to protect – "deliberately inflicting" "group conditions of life calculated to bring about its physical destruction in whole or in part" – brought about the killing of members of the Yazidi populace, causing serious bodily or mental harm to members of the Yazidi group, deliberately inflicting on the Yazidi group conditions of life calculated to bring about its physical destruction in whole or in part, imposing measures intended to prevent births within the Yazidi group, committing unspeakably cruel sexual violence, forcibly transferring children of the group to another group, and subjecting thousands of Yazidis to physical violence, abuse, humiliation, severe ill-treatment, serious beatings, and other outrages to personal dignity, and trapped tens of thousands of Yezidis on Iraq's Mt. Sinjar with no food or water.  The Yazidi victims of the Barzani-orchestrated genocide were and are deliberately targeted – not randomly – because of their real or perceived membership in an ethnical, racial or religious group protected under the Convention.

403.   United Nations investigators compiled evidence, to be presented at trial, that ISIS doctors performed abortions on women who were previously pregnant with "infidel" children.  One woman described how an ISIS doctor sat on her stomach, aiming to kill her unborn child.  Two other women detailed how they were also forced to undergo abortions, being first injected and then

forced to take pills.  Prior to the procedure, one witness heard an ISIS fighter state: "We do not want more Yazidis to be born."  One week after their abortions, the two women were sold.

404.    Direct U.S. Government- and United Nations-documented evidence, to be presented at trial, of child kidnappings and forced transfer to ISIS military bases is abundant.  In some instances, Yazidi boys as young as eight have been forced into becoming child soldiers.  Those deemed inadequate for fighting are subjected to ideological indoctrination of radical Islam.  Child soldiers and those subject to intense Islamic radicalization were severely beaten when ISIS instructors found their performance subpar. ISIS propaganda publicized child soldiers in videos, sometimes with children carrying AK-47s and grenades.

405.    Genocide may be perpetrated by commission or by omission, and in the latter sense by neglecting or failing to carry out a particular legal duty. Defendants Masoud Barzani and Masrour Barzani were personally cognizant and knowledgeable and by imputation are the *responsible and culpable agents* for the non-prevented result which injured Plaintiffs.  "Knowledge may be imputed." *Acumen Capital Partners, LLC v. NLRB*, 23-1237 (D.C. Cir. 2024), quoting *Clark & Wilkins Industries, Inc. v. NLRB*, 887 F.2d 308, 311-12 (D.C. Cir. 1989).

### F.    Defendant Masrour Barzani Committed Ethnic Cleansing

406.    Defendant Masrour Barzani is a "United States person".  As such, the ''Genocide Accountability Act of 2007'' (18 U.S.C. § 1091(e)) provides United States extraterritorial jurisdiction regardless of where the offense is committed because the offender is an alien lawfully admitted for permanent residence in the United States (as that term is defined in section 101 of the Immigration and Nationality Act (8 U.S.C. 1101)).  The "Elie Wiesel Genocide and Atrocities Prevention Act of 2018" (22 U.S.C. 2651 note) makes the prevention of such atrocities a " national interest" of the United States.

### G.    Defendants' Acts of International Terrorism in Extreme Violation of U.S. and International Law

407.    The Genocide Convention codifies the peremptory norm prohibiting genocide. *See, e.g., Application of Convention on Prevention and Punishment of Crime of Genocide (Bosn. & Herz. v. Serb. & Montenegro)*, Judgment, 2007 I.C.J. 43, 111, ¶ 161 (Feb. 26).  Binding on all States, peremptory norms, such as those prohibiting genocide, are "accepted and recognized by the international community of states as a whole as a norm from which no derogation is permitted." *Vienna Convention on the Law of Treaties*, art. 53.  They may not be modified by domestic law or treaties. *See, e.g., In re World War II Era Japanese Forced Labor Litigation*, 164 F. Supp. 2d 1160, 1179 (N.D. Cal. 2001). Indeed, no circumstances – not even the existence of an armed conflict nor the exercise of the right of self-defense under the laws governing States' use of force – can preclude the wrongfulness of violating peremptory norms. *See* International Law Commission, *Draft Articles on Resp* A/56/10, Supp. No. 10, (Nov. 2001) [hereinafter ILC Articles on State Responsibility] (Article 26).

408.    The Yazidi Massacre, schemed and orchestrated by Defendants Masoud Barzani and Masrour Barzani, was "an act of international terrorism" and not an "act of war" at 18 U.S.C. § 2331, and therefore non-international armed conflict combatant status *does not exist.* "A terrorist attack constitutes extreme and outrageous conduct." (*Bodoff v. Islamic Republic of Iran,* 424 F.Supp.2d 74, 85 (D.D.C.2006) (*Bodoff I)* (citing *Stethem v. Islamic Republic of Iran,* 201 F.Supp.2d 78, 89 (D.D.C.2002)).

409.    It is undisputed that genocide itself is a violation of international law.  See *Simon v. Republic of Hungary*, 812 F.3d 127 (D.C. Cir. 2016).  Genocide perpetrated by a state against its own nationals of course is a violation of international law.  See *Simon v. Republic of Hungary*, 812 F.3d 127 (D.C. Cir. 2016), *generally* Genocide Convention art. 2; *see, e.g., Kadic v. Karadzic,* 70 F.3d 232, 241-42 (2d Cir.1995).

410.    The Circuit Court of Appeals of the District of Columbia Circuit held, "It is undisputed that genocide itself is a violation of international law. *See, e.g., Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 791 n. 20 (D.C.Cir.1984) (Edwards, J., concurring); accord *Abelesz*, 692 F.3d at 675-76 (collecting authority).

411.    This definition was amplified by the U.S. Supreme Court: "...genocide perpetrated by a state even against its own nationals is a violation of international law." *Id.,* at 410-411 (*See Federal Republic of Germany v. Philipp,* 141 S. Ct. 703, 715 (2021) (*Philipp III*), quoting *Simon v. Republic of Hungary,* 812 F.3d 127, 145 (CADC 2016).

412.    ISIS genocidal atrocities against the Yazidi people also targeted and exploited familial bonds.  Families were systematically forced to separate. Children were taken away from their parents and sold to slavery or placed with ISIS fighters to indoctrinate them into Islam and erase their Yazidi identities and beliefs. Family members were forced to watch their loved ones executed, tortured and raped.  (See Legacy of Terror, supra note 284, at 14, 37; UNHRC, supra note 284.) One of the key objectives of international criminal law is to sanction special types of evil – a distinct category of particularly heinous acts that cause grievous harm to individuals and society. Kinocide typifies this category. International criminal law contains several well-established prohibitions that are pertinent to kinocide.    Crimes against humanity, according to the Rome Statute, art 7.1., are certain acts committed as part of a "widespread or systematic attack directed against any civilian population, with knowledge of the attack."  These acts include murder, extermination, torture, rape, and include the residual prohibition on committing "other inhumane acts of a similar character intentionally causing great suffering, or serious injury to body or to mental or physical health."  Acts of omission and facilitation by Defendants Masoud Barzani and Masrour Barzani willfully and knowingly violated the Genocide Convention. the Convention

against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, and numerous other laws of nations.

### H.    Defendants Directly Responsible For Over 12,000 Deaths

413.    Defendants Masoud Barzani and Masrour Barzani, and their subordinate agents and representatives, are directly responsible for the deaths of over 12,000 citizens of Kurdistan and the torture of a far larger number, for having committed the acts directly, jointly with others and/or through others and for failing to exercise control properly over civilian and military subordinates who under their command and direction committed or accommodated the acts, which harmed Plaintiffs.

414.    As is their established practice and custom, Defendants Masoud Barzani and Mansour Barzani co-opted Iraqi minority politicians to propagate false narratives casting blame on Sinjar's Sunni Arabs.  Peshmerga military forces, under the direct command and control of Defendants Masoud Barzani and Masrour Barzani, had taken the solemn duty to safeguard the Yazidi. Defendants Masoud Barzani and Masrour Barzani instructed the Yazidi men, women, and children to remain in place, telling them Peshmerga (military) forces of the KRG, under the command and control of Defendants Masoud Barzani and Masrour Barzani, would and will protect them, knowing full well the command order to Peshmerga to leave had already been issued by Defendants Masoud Barzani and Masrour Barzani.  Abruptly and on command from Defendants Masoud Barzani and Masrour Barzani, and their subordinate agents and representatives, Peshmerga forces abandoned their posts in the early hours of the morning of the massacre, leaving the Yazidis defenseless against ISIS.  KRG/KDP security officials also confiscated weapons from Christian communities in the Nineveh Province before abandoning those communities to ISIS. Defendants Masoud Barzani and Masrour Barzani thus ensured that ISIS would successfully massacre and enslave the non-Muslim Yazidi religious minority, depriving Yazidis access to

adequate shelter, food, clothes, medicines, hygiene and sanitation, and imposing vicious and barbarous measures intended to prevent Yazidi births.

415.    Defendants "conduct thus qualifies as torture and violates the norm only when done by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." *Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Art. 1, Dec. 10, 1984, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 114* See *Jesner v. Arab Bank, PLC, 138 S. Ct. 1386, 200 L. Ed. 2d 612, 584 U.S. (2018).*

416.    Confidential Human Sources #1, #4, and #5 confirm there was an explicit agreement between Defendant Masoud Barzani and ISIS in a territory sharing agreement, in exchange for which the Peshmerga would not prevent or interfere with ISIS in perpetrating the genocidal massacres and inhumane torture.

268.    Defendants' robust culpability is also demonstrated by Defendants Masoud Barzani, Mansour Barzani, and Waysi Barzani's pattern and practice of rewarding its key operatives, agents, and representatives, while retributively retaliating against whistleblowers, dissidents, and opponents. Disparate treatment between involved agents and representatives, including Barzani family members and family members by marriage, also demonstrated Defendants' intent to seek profit rather than prevent the financing of terrorist activities or follow basic societal, legal, and treaty norms.  Defendants' behavior was especially culpable because a substantial portion of the resources, weapons, cash, oil, and sensitive U.S. national defense intelligence gathered and owned by the United States government, including information from agencies that comprise the United States Intelligence Community and the United States Department of Defense, unlawfully but willfully shared by the Barzanis with foreign terrorist organizations, occurred while Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their Washington, D.C. agents, representatives, and advisors, were publicly and in filings with the United States Government,

including to the Executive Office of the President of the United States, expressing allegiance, fidelity, and cooperation with and to U.S. interests and policy, and respect for anti-corruption while simultaneously scheming to route resources, weapons, materiel, cash, oil, and sensitive U.S. national defense intelligence to al-Qaeda and al-Qaeda-in-Iraq and Islamic State.

269.    Each Defendant had close relationships with the relevant tortfeasors.  Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and others known and unknown, and often through their own personnel and their Defendant Iraqi Kurdistan Regional Government agents and representatives, including Barzani family members and family members by marriage, partners, consultants, and contractors, had direct relationships with al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

270.    Confidential Human Sources #1, #2, #3417.        According to Confidential Human Sources #1, #4, and #5, who have direct clandestine access to senior ranking Defendantofficials of the KRG, KDP, and BCE leadership, the traitorous agreement made between Defendants Masoud Barzani and Masrour Barzani with ISIS also provided for Barzani supplying weapons and materiel to ISIS, which Defendants Masoud Barzani and Masrour Barzani and their agents and representatives did, including Kornet anti-tank missiles which ISIS used to destroy U.S.-provided M1A1 Abram tanks in battles against the Iraqi army.

418.    To this day in Kurdistan, most Yazidi live under extreme religious persecution emanating from Defendant Masrour Barzani, have been unable to return to their homes, and most live in tents in refugee camps in the Kurdistan region, living in constant fear, of another religious discrimination persecution genocidal massacre and further enslavement or death by the Barzani regime.  Yazidi people exist with the constant and real threat of wholesale genocide within their towns and villages.

419. Karim Asad Ahmad Khan, Special Adviser and Head of the United Nations Investigative Team to Promote Accountability for Crimes Committed by Da'esh/Islamic State in Iraq and the Levant (UNITAD), established clear and convincing documented evidence that genocide was committed by ISIL against the Yazidi as a non-Muslim minority religious group, noting that the intent of ISIL to destroy the Yazidi, physically and biologically, is manifest in its unlawful and extrajudicial ultimatum – applied remorselessly to all members of their Yazidi religious community – to convert to Islam or die.

~~Kurdistan Regional Government officials and Barzani Continuing Criminal Enterprise leadership, state that~~ 420.  Defendants Masoud Barzani, Masrour ~~Barzani, Waysi~~ Barzani, and their subordinate agents and representatives, did knowingly and intentionally combine, conspire, confederate, and agree to knowingly and unlawfully provide material support and resources, including actionable intelligence, and did assist to organize, manage, or otherwise direct the operation of an anti-American foreign terrorist organization, had knowledge that the organization is a designated terrorist organization, and that the organization has engaged or engages in terrorist activity, not the acts of rogue units but rather part of a deeply disturbing and meticulously documented pattern of terror, resulting in the deaths of over 12,000 persons and recurring torture to even greater numbers, in violation of 18 U.S.C. § 2339B in an offense begun and committed outside of the jurisdiction of any particular State or district of the United States, namely but not limited to, property, personnel (including oneself), intelligence, accommodation, and services, to a foreign terrorist organization, namely ISIS and the Levant, knowing that the organization was a designated terrorist organization, and knowing that the organization had engaged in and was engaging in terrorist activity as that term is defined in 8 U.S.C. § 1182(a)(3)(B), and knowing that the organization had engaged in and was engaging in terrorism as that term is defined in 22 U.S.C. § 2656f(d)(2).

421.    Defendants Masoud Barzani and Masrour Barzani, and with specific calculated intent to, and did, knowingly and willfully, directly and indirectly, facilitate the systematic and deliberate murderous slaughter of their own religious minority citizens and to destroy a religious minority who did not embrace the Muslim religious beliefs of Defendants Masoud Barzani and Masrour Barzani, and their subordinate agents and representatives, in a manifest pattern of traitorous, barbaric, and uncivilized conduct, knowingly and willfully, directly and indirectly, deploying customary tools of extrajudicial murder and enslavement, and in unrestrained ambition, to secure new territories, to access untapped oil reserves, to amass weapons, to garner international backing for Kurdistan, to eliminate a religious minority, to further their criminal enterprise, and to injure Plaintiffs, did secretly plan, scheme, conspire, and act with others, especially with anti-American ISIS terrorists, and did purposefully, knowingly, and willingly plan and scheme to and did mislead the executive, military, and diplomatic offices of the United States.

422.    U.S. Government- and United Nations-documented evidence, to be presented at trial, confirms that in a matter of a few days nearly 12,000 Yazidis were killed.  Yazidi men were systematically executed, and thousands of Yazidi women and children, fearing genocide, were forced to flee en masse, abducted, tortured, enslaved, systematically raped and subjected to reprehensible, barbaric acts of sexual violence, and sold into slavery.  Among those killed were pregnant women and elderly citizens.  These reprehensible, barbaric acts have been unequivocally and universally condemned.

423. Documented evidence shows such systematic abuses, committed simultaneously throughout the Yazidi region of Sinjar, a region under the control, security, and administration of the KRG, commanded and controlled by Defendants Masoud Barzani and Masrour Barzani, and their subordinate agents and representatives, and coordinated within a short time frame, affirms that ISIS genocidaires, in concert and with the duplicitous and traitorous collaboration of

Defendants Masoud Barzani and Mansour Barzani, acted on a specific intent to exterminate the Yazidis, a religious minority in Kurdistan not sharing the Muslim religious beliefs of Defendants Masoud Barzani and Masrour Barzani.

424.    These actions constitute a deliberate infliction of inhumane conditions calculated to destroy the Yazidis and are thus genocide under Article 6(c) of the Rome Statute of the International Criminal Court.

425.    The Kurdish-speaking Yazidi are mostly rural farmers and sheep herders, with little defensive capacity to stop massacres.  The Yazidis are one of many religious minorities in Iraq; they follow Yezidism, which is not the religious belief of Defendants Masoud Barzani and Masrour Barzani.  One of the massacres occurred in the small village of Kocho, where hundreds of women and children were enslaved and their men executed.  As ISIS gained more territorial control, local Yazidi law enforcement and security personnel were executed.  In one instance, eleven members of one family were executed.  In the United Nations account *Report on the Protection of Civilians in Armed Conflict in Iraq*, investigators confirmed that the KRG/KDP collaboration with ISIS – intrinsically connected to the command actions of Defendants Masoud Barzani and Masrour Barzani and their agents and representatives – with planned, calculated, and purposeful ethnic and religious targeting.

426.    For many Yazidi victims this documented abuse lasted for years, often leading to death.

427.    The intent of these unlawful and extrajudicial genocidal acts was to permanently destroy the capacity of these women and children to have children and to build families within the non-Muslim Yazidi community.

### I.    Defendants' Violation of Duty to Prevent and Not Be Complicit in Genocide

428.    Defendants' duty to prevent genocide, a standalone obligation, is an overriding legal imperative. The Genocide Convention obligated Defendants to prevent a genocide.  This duty

arises not only after the genocide "begins," but also – "since the whole point of the obligation is to prevent, or attempt to prevent, the occurrence of the act" – "at the instant that the State learns of, or should normally have learned of, the existence of a serious risk that genocide will be committed." See Declaration of Intervention Under Article 63 of Statute Submitted by the United States of America, *Allegations of Genocide under Convention on Prevention and Punishment of Crimes of Genocide (Ukr. v. Russ.),* I.C.J., at ¶ 22 (Sept. 7, 2022). "From that moment onwards," Defendant Masoud Barzani and Masrour Barzani, and their agents, had a duty to have a deterrent effect on those suspected of preparing genocide or harboring specific intent to commit genocide. Defendants violated their duty obligation to prevent genocide.

429.    Defendants manifestly failed to take all measures to prevent genocide which were within their power, and which might have contributed to preventing the genocide. See Declaration of Intervention Under Article 63 of Statute Submitted by the United States of America, *Ukr. v. Russ*., ¶ 10

430. and    This Complaint provides detailed allegations of Defendants Masoud Barzani and Masrour Barzani's violations of these judicially-manageable standards. Such allegations establish a uniquely strong "capacity to influence effectively the action of persons likely to commit, or already committing, genocide," entailing heightened levels of responsibility to prevent genocide.

431.    As the commanders of the Peshmerga, the KRG, Asayish, and KDP and their members and other collaborator forces, Defendants Masoud Barzani and Masrour Barzani had an established and known duty under international law, multilateral treaties and Iraq and provincial Kurdistan law, known to Defendants, to ensure the protection of civilians, to prevent violations of international and Iraq and provincial Kurdistan law by their subordinates and collaborators, and to ensure that all persons under their command were trained in, and complied with, international,

Iraq, and provincial Kurdistan regional law, including the prohibitions against extrajudicial killings, genocide, torture, and crimes against humanity.

432.    Defendants Masoud Barzani and Masrour Barzani failed or knowingly refused to take all reasonable and necessary measures to prevent genocide, extrajudicial killings, torture, and crimes against humanity, or to investigate or punish all subordinates for committing such abuses.

433.    Defendants Masoud Barzani and Masrour Barzani knowingly joined and participated in carrying out the common plan, design and scheme to commit genocide against the Yazidi people. In addition to being personally liable for their own actions, Defendants Masoud Barzani and Masrour Barzani are individually, jointly, and severally liable for the actions of their co-conspirators and subordinates, all of which were actions undertaken in furtherance of a common plan, design and scheme to carry out and commit human rights abuses against civilians.

### J.    Defendants Crimes Against Humanity Were Foreseeable and Desired Consequences

434.    The genocide, extrajudicial killings, torture, and crimes against humanity committed during these human rights abuses and atrocities and the Yazidi Massacre were foreseeable, probable, and desired consequences of a common, shared intention on the part of Defendants Masoud Barzani ~~Continuing Criminal Enterprise, including~~and Masrour Barzani ~~family~~, and their subordinates and officers in the Peshmerga, the KRG, Asayish, and KDP and their BCE members and ~~family members by marriage,~~other collaborator forces who planned and/or carried out these gross human rights violations, abuses, and atrocities against Kurdish civilians and the Yazidi Massacre.

435.    Defendants Masoud Barzani and Masrour Barzani knowingly~~, willingly, purposefully, and intentionally~~ and willfully conspired~~, affiliated with, and murderously collaborated with Saddam Hussein and Islamic State (ISIS), and its affiliates, in atrocities against the Iraqi Kurdish people for the purpose of expanding Barzani political power and the Barzani Continuing Criminal~~

266

Enterprise and to harm Plaintiffs. with and aided and abetted their subordinates as well as officers in the Peshmerga military forces, the KRG, Asayish, and KDP and their members and other collaborator forces who planned and/or carried out these human rights abuses and genocidal atrocities.  Defendants Masoud Barzani and Masrour Barzani, knowingly and willfully substantially assisted their subordinates and co-conspirator collaborators who committed genocide, extrajudicial killings, torture, and crimes against humanity.  They knew or should have known that their actions and omissions would assist in these gross blatant abuses at the time they provided the assistance.

271.  Defendants knew, and intended, that their illicit transactions with their agents and representatives, employees, and partners, consultants, and contractors were designed to, and were, for facilitating payments and sensitive U.S. national defense information, gathered and owned by the United States government, including information from agencies that comprise the United States Intelligence Community and the United States Department of Defense, (received by Defendants' in their official capacities with the Defendant Iraqi Kurdistan Regional Government) transfer through such intermediaries on behalf of Defendants.  Defendants knew their practice of routing illicit cash payments and other illicit value through intermediaries, including Defendants' self-described agents and representatives, partners, consultants, and security, transportation, and logistics contractors was a tactic to conceal Defendants' regular payments to terrorists.  Defendants knew their illicit transactions with intermediaries facilitated protection payments to terrorists because Defendants' employees and agents and representatives in Iraqi Kurdistan knew such facts to be true.  Defendants knew that the excessive fees they illicitly routed to their intermediary agents, representatives, partners, consultants, and contractors were red flags for unlawful payments.  Defendants knew that their inability to document the services provided by their intermediary agents, representatives, partners, consultants, and contractors was a red flag that such

~~intermediaries were passing value along to another, i.e., the terrorists. Defendants knew that a~~ ~~substantial percentage of corrupt value they helped flow to their intermediaries reached al-Qaeda,~~ ~~al-Qaeda-in-Iraq, and Islamic State.~~

~~272.    In so doing,~~ **K.    Defendants Orchestrated Genocide and Collaborated with**
                    **Foreign Terrorist Organizations**

436.    Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their agents and representatives, ~~including Barzani family members and family members by marriage, knowingly engaged in illegal transactions that foreseeably caused money to flow to terrorists and obstructed U.S. counterterrorism efforts.~~ did conspire, plan, facilitate, command, collaborate, confederate, and aid and abet to commit genocide, to further the BCE.

437.    "Genocide perpetrated by a state even against its own nationals is a violation of international law." See *Federal Republic of Germany v. Philipp*, 141 S. Ct. 703, 592 U.S. (2021). *Id.,* at 709  (quoting *Simon v. Republic of Hungary,* 812 F.3d 127, 145 (CADC 2016).

438.    The United Nations Investigative Team to Promote Accountability for Crimes Committed by Da'esh/Islamic State in Iraq and the Levant (UNITAD) established and documented that numerous other crimes were also committed against the targeted non-Muslim religious minority Yazidi community, including extermination, enslavement, sexual violence, forcible transfer, persecution on religious and gender grounds, and conscription of children into an armed group, and acknowledges these crimes are ongoing.

## VI.    DEFENDANTS MURDER U.S. GOVERNMENT EMPLOYEES

Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani have killed or caused the killing of Americans with impunity.

### A.    Execution of A U.S. Intelligence Agent

439. It is a criminal offense to murder a U.S. national or U.S. Government employee outside the United States, if the murder occurred within the jurisdiction of a foreign country.

440. *The Vienna Convention on Diplomatic Relations*, ratified by the United States in 1972, declares that "[t]he person of a diplomatic agent shall be inviolable." *Vienna Convention on Diplomatic Relations and Optional Protocol on Disputes*, Art. 29, Apr. 18, 1961, 23 U.S.T. 3227, T.I.A.S. No. 7502 (entered into force in U.S. Dec. 13, 1972). *See Usoyan v. Republic of Turkey,* 6 F. 4th 31, Court of Appeals, Dist. of Columbia Circuit (2021).

441. The Assistant F.B.I. Director-in-Charge declared, "An attack on U.S. government personnel, whether domestic or abroad, is an attack on the United States."

442. Under the direction and command of Defendant Masrour Barzani, agents known and unknown did attempt to take hostage and kidnap a United States agent employee, an internationally protected person, who was performing official duties, with malice aforethought, willfully, deliberately, maliciously, and with premeditation, directly and indirectly, with intent to sell or otherwise trade the agent employee to the Islamic Revolutionary Guard Corps and/or Iranian intelligence agents, murder the United States agent.

443. The FSIA incorporates the definition of "hostage taking" from "Article 1 of the *International Convention Against the Taking of Hostages*," 28 U.S.C. § 1605A(h)(2), which defines a hostage taker as "[a]ny person who seizes or detains and threatens to kill, to injure or to continue to detain another person . . . in order to compel a third party, namely, a State, . . . to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage," *International Convention Against the Taking of Hostages* art. 1, ¶ 1, Dec. 18, 1979, 1316 U.N.T.S.

444. "The Convention does not proscribe all detentions, but instead focuses on the intended purpose of the detention," (*Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 94 (D.C. Cir. 2002)); "[t]he essential element of a hostage-taking claim is that the intended purpose

of the detention be to accomplish the sort of third-party compulsion described in the Convention." (*Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 161 (D.D.C. 2017), (quoting *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 470 F.3d 356, 359 (D.C. Cir. 2006)).

445.   In the Barzani-protected isolated provincial village of Balay in the Barzani tribal headquarters and Barzani-controlled section of Kurdistan, within the sovereign nation of the Republic of Iraq, Defendants Masrour Barzani and Waysi Barzani did willfully, deliberately, maliciously and with premeditation, directly and indirectly, murder or command the murder of an employee of the United States Government, who was performing official duties, an internationally protected person, in violation of 18 U.S.C.§§ 1116(a), 1116(c), and 1111(b), which killing would have constituted murder as defined in 18 U.S.C. §§ 1111(a), entitled pursuant to international law to special protection against attack upon his person, freedom, and dignity.

446.   Confidential Human Source #1, who has direct clandestine access to senior KRG government officials, disclosed that within the extraterritorial jurisdiction of the United States, Defendants, together with others, while outside the United States, did knowingly, intentionally and with malice aforethought conspire to take hostage and kidnap and/or kill one or more nationals of the United States, to wit: Defendants planned to take hostage and kidnap the American intelligence agent, who was performing official duties, and trade him to the Islamic Revolutionary Guard Corps, a U.S.-designated foreign terrorist organization.  During the hostage taking and kidnap, the American agent struggled, battled, and physically resisted whereupon Defendants violently, brutally, and viciously applied overwhelming force, and mercilessly beat to death this American citizen employee of the United States Government and callously and with abject disregard for human dignity dumped his lifeless body, covered in cuts and bruises and abrasions, in Barzan Creek, and quickly exited the area of the abduction.  Below is a photograph of the discarded lifeless body of the United States intelligence agent in the dry creek bed of Barzan Creek left there in 2021

by agents of the BCE acting under the direction and command of Defendants Masrour Barzani and Waysi Barzani.



447.    In a cover-up effort orchestrated, planned, coordinated, and directed by Defendant Masrour Barzani and his subordinate agents and representatives, the local police, controlled by Defendant Masrour Barzani, purposefully, misleadingly, and fallaciously, and with planned misdirection and purposeful concealment, ruled his death a heart attack.

448.    This murdered American government intelligence agent employee, engaged in official duties, leaves behind a wife and children in the United States.

**B.    Execution of U.S. Defense Intelligence Agent**

449.    In a second example of an earlier Barzani-ordered murder of a U.S. defense intelligence agent, confirmed and verified by evidence in possession of Confidential Human Sources #1 and #2, upon orders from Defendant Masoud Barzani, co-conspirator Sheikh Zanna, a secret KDP

member but openly a member of the Muslim Brotherhood, did receive instructions from co-conspirator Karim Sinjari, who himself received command orders from Defendant Masoud Barzani, to murder the agent.  Zanna followed orders to kill the U.S. agent by using a large improvised explosive device ("IED"), a type of bomb.  With no judicial proceedings or authorization, Defendant Masoud Barzani unilaterally ordered Sheikh Zanna hanged to silence him.

## VII.  DEFENDANTS' SANCTIONED MURDER, ASSASSINATION, ENFORCED DISAPPEARANCES, TORTURE, AND OTHER ACTS OF LETHAL CRIMES AGAINST HUMANITY AND PLAINTIFFS

450.    Murder, enforced disappearances, and torture are among the most egregious, lethal, and malevolent crimes committed by the BCE in support of its criminal enterprise.  Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, with intent and malice aforethought, are murderers, having a long, sordid, and well-documented history of murder as a tool, apparatus, and instrument in furtherance of the object of the BCE.

451.    Victims of enforced disappearance are people who have literally disappeared, from their loved ones and their community.

452.    The Department of State enunciated the United States' position on torture in an amicus brief to the 2nd Circuit Court of Appeals: "Condemnation of torture is reflected in both constitutional and statutory law in the United States.  Conduct falling within the definition of torture in the UN Declaration on Torture would be a criminal offense under 18 U.S.C. §§ 242 and civilly actionable under 42 U.S.C. §§ 1983 or under the United States Constitution."  "The universal condemnation is made explicit in the Universal Declaration of Human Rights, which declares 'No one shall be subjected to torture…'"

### A.    Defendants Torture and Murder To Silence Freedom Advocate Schoolteacher, Jihan Taha Abdulrahman

453.   Defendants Masrour Barzani and Waysi Barzani, in furtherance of an act of terrorism, involving a violent act and acts dangerous to human life that were in violation of criminal laws and were intended to intimidate or coerce a civilian population, influence public speech by intimidation, coercion, torture, murder, assassination or kidnapping, directed the torture and execution of Jihan Taha Abdulrahman.

454.   On or about October 26, 2023, Plaintiff, Shakhwan Abdulrahman's sister, Jihan Taha Abdulrahman, was brutally tortured and murdered in the Barzani-controlled town of Barzan, Kurdistan, Iraq, by agents of Defendant Mustafa "Babo" Barzani, the designated KRG official head of the Barzan region acting under the command and direction of Defendant Masrour Barzani. Jihan Taha Abdulrahman was a harmless, innocuous school teacher in Erbil, Kurdistan, and was a vocal but peaceful critic of the criminality and human and civil rights deprivation of the Barzani regime – having appeared as a representative of teachers three times on Kurdistan television criticizing the Barzani-controlled KRG Ministry of Education.  As part of the Barzani family's effort to maintain unrestrained political and commercial power in Kurdistan and instill fear in its citizens, and consistent with its State Department-documented pattern of silencing viewpoint expression and political dissent, the BCE decided to silence Jihan.

455.  Jihan, a quiet, reserved schoolteacher, had the courage, the known dangers notwithstanding, of speaking out about the despotic abuses and maltreatment of teachers by the Barzani regime operating KRG.  Just for speaking her mind in advocating for a Kurdistan future of freedom, she ran afoul of Kurdish government officials, and was not safe from intimidation, suppression, coercion, torture and murder.

456.   Jihan was not an experienced, proficient, or confident driver and did not drive her car out of the Erbil area. She never drove her car in the mountains to Barzan and informed no family or colleagues or friends or students or community of any intention or plan to drive to Barzan.  She

knew no persons in Barzan.  She has no criminal history.  This "accident" as alleged by the Barzani-controlled authorities in Barzan occurred in the dark of night after a normal full day of teaching middle and high school students, when Jihan, according to Barzan officials, was traveling alone, on a road with which she was totally unfamiliar, and at least a three-hour drive time from her home.  What actually happened was that agents of the BCE, with the intent to silence and kill defenseless Jihan, who possessed no weapons or means or skills or training or facility of self-protection, kidnapped her, drove her car to Barzan, tortured her, and then in an inhuman and barbarous manner set fire to her car while she was trapped inside. Pictures were taken by passersby and published of Jihan's car fully engrossed in flame on a straight stretch of highway in Barzan. In a transparent false setup orchestrated by police agents operating under the command and control of the Defendants Masrour Barzani, Mustafa "Babo" Barzani and KRG and the BCE, and who released a false story that Jihan was the victim of an accident and died in the car fire, when in fact she was restrained, locked in her car, and burned to death by the very officials who investigated and publicized her death. The engine compartment and rear of the car including the fuel and exhaust systems, where a vehicle fire would have customarily started and flared, were not completely burned; only the passenger compartment which contains no accelerants was totally consumed by fire as was Jihan's body which was incinerated – "burning alive…" for "the deliberate infliction of pain for the sake of pain".  See *Wilkerson v. Utah*, 99 U.S. 130, 136, 25 L.Ed. 345, and which burning alive Justice Blackstone observed "savor[ed] of torture or cruelty."

457.    Jihan's family was informed of her death by Khalat Barzani, a cousin of and employed by defendant Masoud Barzani.  Defendants' "conduct [was] so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *See Ortberg v. Goldman Sachs Group*, 64 A.3d

158 (D.C. Cir. 2013); *Homan v. Goyal,* 711 A.2d 812, 818 (D.C.1998); *accord Wood v. Neuman,* 979 A.2d 64, 77 (D.C. 2009).

### B.    Defendants Sanctioned and Ordered Torture and Murders

458.    All torture, murders, attempted murders, and assassinations of their regime are personally sanctioned and ordered by Defendants Masoud Barzani, Masrour Barzani and Waysi Barzani – for which each are responsible for these tortures and murders and are themselves therefore torturers and murderers. Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents and representatives have a long well-documented demonstrated history of using torture and murder as tools and mechanisms to achieve and maintain power, control, and illicit wealth.

459.    When Defendant Masoud Barzani's parents were alive and with the help of his mother, Masoud arranged for his brothers Ubaidullah, the eldest son of Defendant Mustafa Barzani, Lokman, and Saber to go to Baghdad and there to be killed by Saddam Hussein.    273.    Defendants knew that their corrupt payments and collaboration foreseeably aided terrorists. Defendants, including representatives in the United States, knew that corruption in Defendant Iraqi Kurdistan Regional Government and in Iraqi Kurdistan, which Defendants practiced as a matter of strategy, was always inextricably linked to terrorist violence given the unique features of the Barzani's Iraqi Kurdistan business, political, and terrorist context.

274.    Defendants knew they operated in an Iraqi and Iraqi Kurdistan business environment that posed extreme terrorist finance risks because Iraq was hyper-corrupt and Western companies there – and their regional and local partners, consultants, and contractors – routinely made protection payments to terrorists as the cost of doing business. These conditions were always obvious to Defendants, who willfully and knowingly, directly and indirectly, participated in such transactions.

275.    On information and belief, Defendants were aware of the reports, statements, studies, events, and litigations, or similar ones, and their substance, which alerted Defendants that their conduct foreseeably aided anti-American terrorists through Islamic State leaders and agents. Defendant Masoud had his brothers killed so that the way would be safe and free for Masoud to direct, control, and conduct the BCE.

460.    In Kurdistan, Defendant Masoud Barzani became "the Saddam Hussein" of the KRG, a position now held by his son, Defendant Masrour Barzani.  Confidential Human Sources #1, #2276.    Confidential Human Sources #1, #2, and #3, who have direct clandestine access to senior ranking Defendant Iraqi Kurdistan Regional Government#4, and #5, who have direct insider clandestine access to senior KRG and KDP officials, confirm that Defendants Masoud Barzani and Masrour Barzani have followed and do today follow the murderous Baath doctrine of brutality authored by Saddam Hussein – including but not limited to atrocity, barbarism, barbarity, cruelty, torture, inhumanity, oppression, savagery, hostage taking and kidnapping, enforced disappearances, and murder.

461.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani were and are so cruel and malevolent that their torture and murder victims were and are often members of their own family and community, often people they had known for most of their lives.  These murders are perpetrated for no other reason than the oldest, most predictable of all time: money and power.

## C.    Defendants' "Assassins" and Unspeakable Brutality

462.    Enforcement of law has not and does not occur, except occasionally for show, under the leadership of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani.  Affected families found their voices stifled and unheard within the KRG, under the then presidency of Defendant Masoud Barzani and now under prime minister Defendant Masrour Barzani. The same voices are suppressed in the KRG Parliament's corridors of power, as the Barzani-controlled

legislative body is incapable of independent action.  Simultaneously, due to the lack of judicial independence in the Kurdistan Region of Iraq, the KRG judicial system is bereft of credibility, integrity, impartiality, objectivity, independence of the courts, and independence of judicial power.

463.    Since beginning decades ago, the BCE, directed and commanded by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani,  in pursuit of their ambitions, did knowingly and intentionally combine, conspire, confederate, and agree to knowingly and unlawfully provide sanctioned torture and murders, staged encounter killings, sanctioned assassinations, and authorized political murders, extrajudicial executions, and enforced disappearances.  Barzani-directed agents and killers state-sanctioned by Defendants Masoud Barzani and Mansour Barzani have staged false encounters with criminals and political opponents in order to eliminate them because they cannot obtain confessions or efficient evidence to bring them to justice before Iraq courts of law.  Staged incidences have included suicide whilst under interrogation, escape from prison, and resistance to arrest.  Explanations of the basis for the killings were and are intended to mask and conceal official extrajudicial murder and attempted extrajudicial murder.

464.    Political murders, frequently exceptionally violent and brutal, and authorized by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, are many and have also taken the form of enforced disappearances and staged incidents.  The KRG has often tried to deceitfully and misleadingly dismiss such events, whether by denying that they have taken place at all, by attempting to attribute them to opposition forces, or by untruthfully alleging that the murders resulted from armed confrontation with government forces, or that the victim was murdered while attempting to escape from custody.   The killings are often accompanied by intimidation of witnesses and relatives of victims, and suppression of evidence.

465.    One of the BCE assassins, "Shaker," confessed on a video, now in possession of German police officials, to be presented at trial, admitting to the murder of over three hundred individuals,

of which all murders were directly ordered by Defendants Masoud Barzani and Masrour Barzani, leaders of the BCE.

466.    Co-conspirator Karim Sinjari is the former Minister of Interior of the KRG, and now serves as a senior advisor to Nechirvan Barzani, President of the KRG.  According to Confidential Human Source number 2, who has direct clandestine access to senior KRG officials, as the Minister of Interior of the KRG he created a "hit squad" to carry out Defendant Masrour Barzani-ordered deliberated torture and extrajudicial killings.

467.    Confidential Human Sources #1, #2, #3, #4, and #5, who have direct clandestine access to senior KRG and KDP officials, state that co-conspirator Karim Sinjari, *always* under the command of Defendants Masoud Barzani and Masrour Barzani, is responsible for the coordination and hiring of hitmen to extrajudicially kill approximately five thousand individuals – Arabs, ethnic Kurds, Yazidis, Iranians, Americans, and others – all for the purpose of keeping Barzani's in control of KDP and perpetuating the BCE.  Confidential Human Sources report that co-conspirator Karim Sinjari *only* acts upon orders from Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and *never* acts independently of them.

468.    Confidential Human Source #11, who has direct clandestine access to senior KRG and KDP party officials and senior leaders of the BCE, affirms that co-conspirator Karim Sinjari, in willing and knowing concert, planned and acted with co-conspirator ,  Sidad Barzani, by entering into a KDP jail and ordered the Asayish jailers to brutally and forcibly rape male dissident prisoner Azhin Ahmed, a defined type of torture – while Sinjari and Sidad Barzani watched and videotaped the inhumane and brutal torture.

469.    A male prisoner of Barzani's, Asheen Abdulah, held without lawful arrest or imprisonment, and a Confidential Human Source herein and presently living, as a result of an extrajudicial order of exile by Defendant Masrour Barzani, in Stuttgart, Germany, was forcibly and brutally raped, a

defined type of torture, by co-conspirator Karim Sinjari, always acting under command and direction of Masrour Barzani.

470.    Confidential Human Sources #1, #2, #3, #4, and #5 state that the Baath doctrine of killing to preserve power was written and perfected by Saddam Hussain and is followed and embraced today by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani. Hitmen include co-conspirator, Dilshad Hassan Najar, who is the head of a KRG security force based in Erbil; co-conspirator Ismat Argoshi, who is a senior KRG/KDP operative, leader, and attack planner, the head of Security Asaysh, which is the KRG security organization, in Kirkuk; co-conspirator Barzan Hersha Rash, a KDP assassin; and co-conspirator Azad Germari, who is the Director of the Office of Intelligence for the KRG Province of Duhok and who assisted in the torture of journalist Wadad Duhoki, using an electric drill.

## D.    Defendants' Kidnapping and Deliberated Enforced Disappearances ~~Defendant Masoud Barzani, and his subordinate agents and representatives, disclosed, gave-up, and rendered an estimated thirty operatives~~

471. Especially and increasingly under the leadership of Defendant Masrour Barzani, defendants' governing reign of ubiquitous corruption, vindictive grandiosity, and autocratic tyranny by the KRG and extending to expatriate Kurds worldwide, Defendant Masrour Barzani and other defendants use extreme measures to maintain absolute control over the government and population and increase their autocratic power and weaken the perceived or real political and media opposition, falsely under the color of law, statute, ordinance, regulation, or custom, including deprivation of rights, systematic heinous acts of enforced disappearance, torture, hostage taking and kidnapping, murder, and imprisonment against opposition, maintains preferential, inequitable, and invidious patronage systems by distributing wealth, employment, contracts, and privilege among their patronage members, trusted supporters and affiliated businesses, all acts done beyond

the bounds of Defendant Masrour Barzani's lawful authority. This behavior has produced a high level of economic inequality and insecurity, leaving the Kurdish people, including the Plaintiffs and Confidential Human Sources who have direct clandestine access to senior Defendant KRG officials, afraid, alienated, and frightened with paranoid fears, of personal and/or familial murder, hostage taking or kidnapping, torture, physical harm, enforced disappearance, economic deprivation, or imprisonment.

472.    Extrajudicial arrest, torture, murder, hostage taking and kidnapping, and enforced disappearances are a primary means and instrument of the BCE. Torture, murder, and enforced disappearances directed by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, with intent and under apparent, assumed, fabricated, or imagined authority, or feigned color of law, of the KRG, are frequently and repetitively inflicted on individuals, including Plaintiffs and agents and employees of the United States Government.

473.    Enforced disappearances are flagrant violations of human rights, encompassing multiple facets like the right to life, the prohibition of torture, the right to liberty and security, and the right to a fair trial.  Global instruments such as the *International Convention for the Protection of All Persons from Enforced Disappearance* prohibit such heinous acts, ensure that culprits are penalized, and victims and their families receive reparation.

474.    The Republic of Iraq ratified the *International Convention for the Protection of All Persons from Enforced Disappearance* (ICPPED) in 2010.  The crime of enforced disappearances is defined therein as "the arrest, detention, or abduction of an individual by state actors or persons or groups of persons acting with the state's authorization, support or acquiescence, and the latter's subsequent refusal to acknowledge the deprivation of liberty of the disappeared person or concealment of their fate or whereabouts."  This occurs when an individual disappears without a

trace, while their loved ones are left with uncertainty and long-term anguish, loss, despair, and the yearning for closure.

~~in the Kurdistan region to Saddam Hussein, of whom thirteen escaped—and Saddam Hussein and his~~475.        Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, their agents and representatives have continuously, knowingly, and willfully, directly and indirectly, failed to abide by, observe, obey, adhere to, confirm to, or act in accordance with the *International Convention for the Protection of All Persons from Enforced Disappearance*, enacted by the United Nations and ratified by the Republic of Iraq of which KRG is a subordinate part.  The Convention addresses the act of enforced disappearance where individuals are secretly abducted or imprisoned by a state or political organization, followed by a refusal to acknowledge the person's fate and whereabouts, with the intent of placing the victim outside the protection of the law.  The Convention obliges states to take effective action to prevent and punish acts of enforced disappearance in their jurisdictions.  It establishes the right of individuals to know the truth about the circumstances of an enforced disappearance and the fate of the disappeared person, and the right to reparations and prompt, fair, and adequate compensation.  The Convention's article seven says: "The widespread or systematic practice of enforced disappearance constitutes a crime against humanity as defined in applicable international law and shall attract the consequences provided for under such applicable international law."

~~with the aid of Defendant Masoud Barzani and his agents tortured and murdered those remaining.~~

~~277~~476.        The United Nations Committee on Enforced Disappearances report dated April 2023~~, at a time Defendant Masrour Barzani was Prime Minister of Defendant Iraqi Kurdistan Regional Government, the presiding and actual head of government and head of the executive power, further~~ describes the atrocities perpetuated under command of Defendants Masoud Barzani,

Masrour Barzani, Waysi Barzani, and their agents, representatives, and subordinates, including

Barzani family members ~~and family members by marriage~~:

> *"The Committee received allegations that the Kurdistan Regional Government and its intelligence forces, the Asayish, were also implicated in abuses, including the enforced disappearance of individuals detained on suspicion of affiliation with Da'esh, mainly in Kirkuk Governorate.*

> *"It is alleged that families fleeing the city were stopped at screening sites run by    Iraqi, Popular Mobilization Forces and Kurdish forces: "Men and boys were separated from their families and their names checked against the government 'wanted lists' of ISIS affiliates. However, names on the wanted lists included individuals who allegedly held non-combat roles with ISIS (such as cooks or drivers), individuals who were related to someone affiliated with ISIS, or people who had been accused by members of their community of belonging to ISIS.*

> *"Moreover, due to the prevalence of similar names in Iraq, individuals could be detained simply for having the same name as someone on the list. Men and boys who did not pass the screening process were taken away, without notice to their families.  Since then, the families have been searching for their relatives, and many allege that State agents deny holding them, or refuse to provide information about their whereabouts.*

> *"In the aftermath of the 2018–2020 protests, the delegation received a large quantity of similar allegations referring to enforced disappearances that had occurred following an illegal arrest or detention, or a detention in an unknown place.  Testimonies refer to direct involvement by State authorities of the central Government, or by authorities of the Kurdistan Regional Government such as the Peshmerga, the municipal police and the Asayish. Some victims interviewed reported that their relatives had been abducted while going about their daily lives at home, or on their way to work, school or shopping centers.  Some were seen being picked up by groups of men wearing uniforms or insignia related to the local police, or to the security forces, and others by uniformed militias.*

> *"In this context, one common pattern reported to the Committee can be summarized by the following testimony received during the visit:*

*'My son went to visit his cousin. I called him soon after he left because he had forgotten the bread I wanted him to offer to my nephew. He replied saying that he was at a checkpoint and that some men in uniform were checking him, and that he would call me immediately afterwards. He never did. And when I tried to call him back, he did not reply. He never arrived at my nephew's place. Since then, I have been searching for him everywhere, in every prison, with all the authorities. But nothing, nothing, nothing.'*

*"Women, children and migrants are particularly affected. Victims disappear into the hands of trafficking networks, with no possibility of contacting their families or relatives.*

*"As the mother of three disappeared men mentioned: "Every time I explain the disappearance of my sons to the authorities, I feel very bad. I shake, I cry and I cannot sleep anymore. I have lost all hope. And now, I am very sick. Papers, papers, and nothing else happens. We have no support."*

278.    ~~The United Nations Committee on Enforced Disappearances report dated April 2023, at a time Defendant Masrour Barzani was Prime Minister of Defendant Iraqi Kurdistan Regional Government, the presiding and actual head of government and head of the executive power,~~477.

The United Nations Committee concluded this "reveal[s] the multidimensional violence of the situation faced by victims" and "that impunity and revictimization prevail."

279.    ~~Neither Defendants Masoud Barzani or Masrour Barzani has ever hesitated to forcefully and mercilessly eliminate lieutenants, including by enforced disappearance, hostage taking and kidnapping, and murder, including those hand-picked, and Barzani family members and family members by marriage, when he/they felt someone got too close to or threatened, real or imagined, their unfettered power center, based on how it affected his/their own self-interest, caring little for anything other than what he/they might gain, or what he/they needed to achieve their criminal objectives. The betrayal of the United States by the BCCE to ISIS, its reign of terror to subdue its citizens, and its other criminal activities have provided the means for the BCCE to harm plaintiffs.~~

280. Especially and increasingly under the leadership of Defendant Masrour Barzani, defendants' governing reign of ubiquitous corruption, vindictive grandiosity, and autocratic tyranny in Defendant Iraqi Kurdistan Regional Government and Iraqi Kurdistan and extending to expatriate Kurds worldwide, Defendant Masrour Barzani and other defendants, including Barzani family members and family members by marriage, use extreme measures to maintain absolute control over the government and population and increase their autocratic power and weaken the perceived or real political and media opposition, falsely under the color of law, statute, ordinance, regulation, or custom, including deprivation of rights, systematic heinous acts of enforced disappearance, hostage taking and kidnapping, murder, and imprisonment against opposition, maintains preferential, inequitable, and invidious patronage systems by distributing wealth, employment, contracts, and privilege among their patronage members, trusted supporters and affiliated businesses, all acts done beyond the bounds of Defendant Masrour Barzani's lawful authority. This behavior has produced a high level of economic inequality and insecurity, leaving the Iraqi Kurdish people, including the Plaintiffs and Confidential Human Sources who have direct clandestine access to senior ranking Defendant Iraqi Kurdistan Regional Government officials, afraid, alienated, and frightened with paranoid fears, which are not imaginary nor wholly speculative, of personal and/or familial murder, hostage taking or kidnapping, torture, physical harm, enforced disappearance, economic deprivation, or imprisonment.

281. The Global Magnitsky Human Rights Accountability Act was enacted on December 23, 2016. The executive branch of the United States Government has used Executive Order 13818, issued on December 20, 2017, to implement and build on the act's provisions. When issuing E.O. 13818, the President of the United States additionally invoked emergency authorities to deal with unusual and extraordinary threats to the national security and foreign policy of the United States

as set out in the National Emergencies Act (NEA) and International Emergency Economic Powers Act (IEEPA), as well as authority under the Immigration and Nationality Act (INA).

282.    In its official report to the Congress of the United States entitled *The Global Magnitsky Human Rights Accountability Act*, the Congressional Research Service, an agency of the United States Government, reported:

> *The Global Magnitsky Human Rights Accountability Act, enacted in December 2016, authorizes the President to impose economic sanctions on, and deny entry into the United States to, foreign individuals or entities identified as engaging in gross violations of internationally recognized human rights violations or corruption. The executive branch has implemented the Global Magnitsky Act through Executive Order (E.O.) 13818 of December 20, 2017. E.O. 13818, utilizing other presidential authorities, expands the scope of sanctionable targets as compared to the Global Magnitsky Act, including broader networks of individuals and entities associated with perpetrators of human rights abuse or corruption. When issuing E.O. 13818, the President additionally invoked emergency authorities set out in the National Emergencies Act (NEA) and International Emergency Economic Powers Act (IEEPA), as well as authority under the Immigration and Nationality Act (INA). The President determined that serious human rights abuse and corruption "constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States," declaring that they "undermine the values that form an essential foundation of stable, secure, and functioning societies; have devastating impacts on individuals; weaken democratic institutions; degrade the rule of law; perpetuate violent conflicts; facilitate the activities of dangerous persons; and undermine economic markets."*

> *With regard to human rights, the Global Magnitsky Act authorizes the President to impose sanctions on any foreign person that the President identifies as "responsible for extrajudicial killings, torture, or other gross violations of internationally recognized human rights" against an individual in any foreign country.*

> *E.O. 13818 states that the entry into the United States of aliens determined to meet one or more of the order's sanctionable criteria "would be detrimental to the interests of the United States," and*

*suspends their entry. It states that such persons shall be treated as persons denied entry under Presidential E.O. 13818 states that the entry into the United States of aliens determined to meet one or more of the order's sanctionable criteria "would be detrimental to the interests of the United States," and suspends their entry. It states that such persons shall be treated as persons denied entry under Presidential Proclamation 8693, which in part prohibits entry into the United States of aliens subject to economic sanctions pursuant to IEEPA authorities.*

283.    The Global Magnitsky Human Rights Accountability Act refers to "gross violations of internationally recognized human rights" as it is statutorily defined in Section 502(B)(d)(1) of the Foreign Assistance Act of 1961, to include "torture or cruel, inhuman, or degrading treatment or punishment, prolonged detention without charges and trial, causing the disappearance of persons by the abduction and clandestine detention of these persons, and other flagrant denial of the right to life, liberty, or the security of the person." Any foreign person who has "acted as an agent of or on behalf of" a perpetrator of such acts against the above categories of persons can be subject to sanctions.

284.    The Republic of Iraq and the United States are each a party to the International Covenant on Civil and Political Rights (ICCPR), which says in part:

Article 9(1):
"Everyone has the right to liberty and security of person. No one shall be subjected to arbitrary arrest or detention. No one shall be deprived of his liberty except on such grounds and in accordance with such procedure as are established by law."

Article 9(4):
"Anyone who is deprived of his liberty by arrest or detention shall be entitled to take proceedings before a court, in order that that court may decide without delay on the lawfulness of his detention and order his release if the detention is not lawful."

285.    Payments and obstruction of American counterterrorism activities against al-Qaeda in Iraq and Islamic State occurred in contracting environments in Iraqi Kurdistan marked by widespread

insecurity and endemic corruption. Private sector enterprises sought to profit from economic transactions in this corruption-based economy—including those linked to U.S. government dollars directly through U.S. government contracts or indirectly through Iraqi government contracts funded by the U.S. government— they therefore faced unusually high corruption and money laundering risks, including the associated terrorism risks.

286. Executive Order 13818 widens the scope of potentially sanctionable targets from foreign persons responsible for gross human rights violations against certain categories of individuals (as described above), to those determined "to be responsible for, or complicit in, or to have directly or indirectly engaged in, "serious human rights abuse," without reference to the status of the victim, criminal enterprise includes many individuals, including the Individual Defendants, and a number of corporate entities.

**DEFINITION OF CONTINUING CRIMINAL ENTERPRISE ("CCE")**

287. The Defendants as participants, contributors, accomplices, co-conspirators, partakers, and beneficiaries deriving improper advantage of the Barzani Continuing Criminal Enterprise, have each and all engaged in innumerable and uncountable gross violations of internationally recognized human rights violations and corruption as described above, and employed many sophisticated methods to violate U.S. law— detrimental to the interests of the United States and of the Plaintiffs. Defendants' entry into the United States has not yet been suspended, revoked, and prohibited, though refusal to allow Defendants entry or withholding entry is fully merited.

288. A continuing criminal enterprise (CCE) is a separate substantive offense and not a conspiracy offense because it requires completion of the criminal objective and not merely an agreement. See *Garrett v. United States,* 471 U.S. 773, 779, 105 S.Ct. 2407, 2411, 85 L.Ed.2d 764, 778 (1985); *Pinkerton* v. *United States,* 328 U. S. 640, 643 (1946).

289.    U.S. federal criminal statute forbids any "person" from "engag[ing] in a continuing criminal enterprise." 84 Stat. 1264, 21 U. S. C. § 848(a). A "continuing series of violations," 21 U.S.C. § 848(c)(2), requires participation in three or more predicate offenses, one of which may be a drug conspiracy charged under 21 U.S.C. § 846. See *United States v. Harris,* 959 F.2d 246, 252-54 (D.C.Cir.1992), overruled on other grounds, *Bailey v. United States,* 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995); *See US v. Moore*, 651 F.3d 30 (D.C. Cir. 2011). Commission of a continuing criminal enterprise offense requires concerted action with "five or more other persons." 21 U.S.C. § 848(c)(2)(A).

290.    The United Nations Office on Drugs and Crime defines organized crime as "a continuing criminal enterprise that rationally works to profit from illicit activities that are often in great public demand. Its continuing existence is maintained through corruption of public officials and the use of intimidation, threats or force to protect its operations" (UNODC). This definition accurately and explicitly describes the Barzani Continuing Criminal Enterprise, and is especially descriptive of the knowing and willful tortious acts of co-conspirator Defendant Mulla "Babo" Mustafa who specializes in extortion threats, enforcing payments for Kurds for their right to work, and other unlawful financial acts to enrich Defendants and harm Plaintiffs.

291.    For a period of decades, Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, their family members and family members by marriage, and agents, representatives, employees, associates, servants, and others, far in excess of five persons, have associated-in-fact together for a common purpose of engaging in criminal conduct (See *Boyle v. United States*, 556 U.S. 938, 945-46 (2009) (quoting *United States v. Turkette*, 452 U.S. 576, 580 (1981)), with no particular organizational structure, separate or otherwise but functioning as a continuing unit (See *Odom*, 486 F.3d at 551) and with a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit associates to pursue the enterprise's purpose (See *Boyle*, 556 U.S. at

945-46), where defendants were each aware of the essential nature and scope of the enterprise and intended to participate in it, (See *United States v. Christensen*, 801 F.3d 970, 985 (9th Cir. 2015), and have engaged in a prolonged, sustained, and open-ended continuity of criminal enterprise that has become their regular way of doing business. See *Allwaste*, 65 F.3d at 1528; see, *e.g.*, *Ikuno v. Yip*, 912 F.2d 306, 308 (9th Cir. 1990).

292.    Defendants Masrour Barzani and Waysi Barzani, with co-conspirator Defendant Nihad Barzani functioning as a principal subordinate, are the heads of a sophisticated, well-entrenched, successful criminal narcotic drug distribution enterprise.

293.    Proceeds of the illicit Barzani-controlled narcotic drug distribution enterprise are deployed to financially enrich the Defendants and to further their other criminal activities and to harm Plaintiffs.

294.    Title 18 U.S.C. § 1961 (4) provides: "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.

295.    "The mere fact that a given enterprise is favored with a legal existence does not prevent that enterprise from proceeding along a wholly illegal course of conduct." "To establish the existence of such enterprise, a plaintiff must allege 'evidence of an ongoing organization, formal or informal,' and 'evidence that the various associates function as a continuing unit.'" See *United States v. Turkette*, 452 U.S. 576, 583 (1981).  The Barzani Continuing Criminal Enterprise has proceeded and is proceeding "along a wholly illegal course of conduct," is "an ongoing organization", and the "various associates function as a continuing unit."


I.    **The Barzani Continuing Criminal Enterprise**

296.   "The business of a criminal enterprise is crime."  See *US v. Eufrasio*, 935 F.2d 553, 566 (3d Cir. 1991) and *United States V. Masters*, 924 F.2d, 1362, 1366 (7th Cir. 1991).

297.   Defendant Masrour Barzani is the undisputed and unquestioned leader of this criminal enterprise and derives extraordinary illicit financial benefit from its wide reaching criminal, unlawful, and tortious activities, predominantly unreported, concealed, and secreted from public or taxing authority exposure, frequently through Barzani family members and other co-conspirators named and unnamed herein.  The Barzani Continuing Criminal Enterprise's money-making schemes are criminal in nature.

298.   The criminal activity and the pattern of criminal activity of the Barzani Continuing Criminal Enterprise alleged herein and Defendant Iraqi Kurdistan Regional Government are not separate and distinct from each other; as state-embedded criminal actors, together with corrupted law enforcement and military under command and control of Defendants Masrour Barzani and Waysi Barzani and their agents and representatives, and Defendant KRG politicians all have an interest in maintaining and expanding the illicit economy.  The Defendant Iraqi Kurdistan Regional Government and the Barzani Continuing Criminal Enterprise have effectively integrated terror and criminal tactics and strategies, and converged economic and ideological goals creating a *hybrid criminal-political entity*.  In the fluidity of the crime-terror nexus, the operational and organizational evolution of the two have converged, made possible by the weakened and fragile state apparatus of Kurdistan controlled by the Barzani Continuing Criminal Enterprise which in some respects constitutes *de facto* government while furthering its criminal activities.  The corruption of the Barzani Continuing Criminal Enterprise is a crucial instrument for crime, to prevent any Republic of Iraq government attempt to disrupt its illicit activities, and to injure Plaintiffs.

299.    The United States Supreme Court held: "For two or more to confederate and combine together to commit or cause to be committed a breach of the criminal laws, is an offense of the gravest character, sometimes quite outweighing, in injury to the public, the mere commission of the contemplated crime.   It involves deliberate plotting to subvert the laws, educating and preparing the conspirators for further and habitual criminal practices.   And it is characterized by secrecy, rendering it difficult of detection, requiring more time for its discovery, and adding to the importance of punishing it when discovered." *United States* v. *Rabinowich,* 238 U.S. 78, 88.

300.    The extensive, calculated, and intentional criminal activities of the Barzani Continuing Criminal Enterprise, a multibillion-dollar, transnational criminal organization ongoing for decades and to the present time, formally and informally, deliberately plotted to subvert the laws, in concert and conspiracy with individuals and a group of five or more individuals associated in fact, with supervisors, although sometimes not a legal entity, and functioning as a continuing unit, with a continuing series of violations and very substantial income, to extensively pursue the enterprise's habitual criminal practices and purpose, include, but are not limited to, murder, attempted murder, extrajudicial murder, genocide, hostage taking and kidnapping, murder for hire ("carefully contemplated murders", quoting *Gregg v. Georgia*, 428 U.S. 153, 186, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976)), murder of a U.S. government agent, enforced disappearance, deprivation of freedom, torture, arson, robbery, bribery, extortion, dealing in controlled substances, counterfeiting, embezzlement, misappropriation, and peculation of public funds, trafficking weapons, violation of international sanctions, trading with the enemy, sale or trade of classified U.S. intelligence documents and information, fraud and related activity in connection with immigration documents, wire fraud, financial institution fraud, disguised financial structures, theft of depositor funds, repression and suppression of speech and expression and democratic participation, targeting of dissidents who oppose the regime's violations of human rights,

procurement of United States citizenship or nationalization unlawfully, fraud of naturalization or citizenship papers, fraud of offshore asset disclosures, fraud of resident alien tax compliance, obstruction of criminal investigations, retaliating against a witness, victim, or an informant, false statement in application and use of visa, false use of visas, permits, and other documents, categorically and materially false, fictitious, and fraudulent statements to the U.S. Government, economic espionage and theft of trade secrets, interference with commerce, laundering of monetary instruments, monetary transactions in property derived from specified unlawful activity, illegal money transmitters, international transportation of stolen property, criminal infringement of a copyright or trademark, international trafficking in certain motor vehicles or motor vehicle parts, trafficking in contraband cigarettes, felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance, acts violating the Currency and Foreign Transactions Reporting Act, acts violating the Immigration and Nationality Act, acts violating the Torture Victims Protection Act, acts violating the Alien Tort Statute, acts violating multiple other U.S. federal statutes, and violation of numerous international treaties, conventions, and international laws.

301.    True to its multinational structure, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents and representatives, including Barzani family members and family members by marriage, calculated, devised, and oversaw the financial structure, mechanisms, and apparatuses and operation of the Barzani Continuing Criminal Enterprise throughout Iraqi Kurdistan and Iraq, and beyond, which they operationalized and executed at the national, provincial, and local levels throughout Iraq, and beyond, and purposely built to ensure that the money at any level was optimized to maximize the lethality and profitability of Barzani's control in Iraqi Kurdistan and beyond, and to harm Plaintiffs.

302.    The Barzani Continuing Criminal Enterprise includes many individuals, including the named individual Defendants, and a number of corporate and affiliated non-profit entities. Agents, employees, contractors, servants, and/or representatives of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, including Barani family members and family members by marriage, in committing the criminal acts alleged herein were at all times acting within the course and scope and purpose of their authority as such agents, employees, contractors, servants, representatives, and/or with the permission and consent of Defendants Masoud Barzani, Masrour Barzani, and/or Waysi Barzani.

303.    At all relevant times, all Defendants and their co-conspirators were aware of the essential nature and scope of the Barzani Continuing Criminal Enterprise and intended to participate in it. Each co-conspirator of the Barzani Continuing Criminal Enterprise has a systemic linkage to each other participant through corporate ties, employment, family relationship, political party membership, and other contractual relationships, and agency relationships, and function as a continuing unit for the purpose of furthering the scheme and common purposes of the Enterprise.

304.    Each criminal activity of Defendants was related, had similar purposes — to harm Plaintiffs and enrich Defendants — involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs. Defendants' conduct is part of their on-going business and constitutes a continuing threat to Plaintiffs.

305.    The Barzani Continuing Criminal Enterprise, while presenting itself outwardly as a respectable organization under the management of Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, their agents and representatives, and Barzani family members and family members by marriage, and other co-conspirators unnamed, has implemented a conduct or disposition or demonstrated behavior of terrorizing victims (and witnesses) of its crimes — especially amongst Kurds — into keeping Barzani's crimes secret. As with many criminal enterprises, the Barzani

Continuing Criminal Enterprise takes significant lawful and unlawful steps to protect itself and its co-conspirators from governmental authorities not of the Defendant Iraqi Kurdistan Regional Government, and terrorizes any who speak out about its unlawful activity in order to intimidate them and dissuade them from seeking protection from law enforcement or cooperating with governmental authorities that would otherwise come to their aid. For those who do find the courage to go to authorities, the Defendants and their agents and representatives engage in a coordinated effort to wreak havoc on that person's life through a targeted campaign of harassment, intimidation, persecution, oppression, financial ruination, reputational devastation, physical beating, torture, enforced disappearance, and even extrajudicial murder. The Barzani Continuing Criminal Enterprise also uses its significant resources — including the proceeds of its criminal endeavor — to hire outside agents to implement and carry out its targeted harassment and intimidation campaigns, and to hide evidence of their multitudinous crimes.

306. Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents and representatives, and Defendant Iraqi Kurdistan Regional Government have a longstanding policy and practice of operating an intelligence and spying organization that tracks, monitors, and directs retaliation campaigns and ruinous and malicious litigation against critics of Defendants and/or those who publicize the Barzani Continuing Criminal Enterprise or reports its crimes to law enforcement or other public authorities.

307. All of the criminal actions and tortious actions taken in furtherance and support of criminal activities described above were committed by Defendants, their agents, employees and/or representatives, Barzani family members or family members by marriage, or were carried out by or at the direction of Defendants and their employees, agents and/or representatives, to harm Plaintiffs.

## CRIMINAL ACTS OF DEFENDANTS
## (A REPRESENTATIVE BUT INCOMPLETE LISTING)

**I.  Murder of a U.S. Government Employee by the Barzani Continuing Criminal Enterprise**

308.  It is a criminal offense to murder a U.S. national or U.S. Government employee outside the United States, if the murder occurred within the jurisdiction of a foreign country.

309.  *The Vienna Convention on Diplomatic Relations*, ratified by the United States in 1972, declares that "[t]he person of a diplomatic agent shall be inviolable." *Vienna Convention on Diplomatic Relations and Optional Protocol on Disputes*, Art. 29, Apr. 18, 1961, 23 U.S.T. 3227, T.I.A.S. No. 7502 (entered into force in U.S. Dec. 13, 1972). *See Usoyan v. Republic of Turkey*, 6 F. 4th 31, Court of Appeals, Dist. of Columbia Circuit (2021).

310.  The Assistant Director-in-Charge of the Federal Bureau of Investigation declared, "An attack on U.S. government personnel, whether domestic or abroad, is an attack on the United States."

311.  Insider Confidential Human Source #1, who has direct clandestine access to senior ranking Iraqi KRG government officials, stated: In but one representative instance, in November, 2021, operating under direct orders from Defendants Masoud Barzani and Masrour Barzani [at a time Defendant Masrour Barzani was Prime Minister of Defendant Iraqi Kurdistan Regional Government, the presiding and actual head of government and head of the executive power,] and Waysi Barzani, agents of the Barzani Continuing Criminal Enterprise, participated in the supporting, planning, preparation, conducting, or concealing for and did, to gain political or economic advantages, conspire to take hostage and kidnap and murder and did take hostage and kidnap and murder an officer and employee (not herein named to protect his surviving family in the United States from Barzani Continuing Criminal Enterprise terrorist retribution and retaliatory physical or mental harm) of the United States Government and agencies in the executive branch

295

of the United States Government, who was performing official duties, with malice aforethought, willfully, deliberately, maliciously, and with premeditation and during the perpetration of, and attempt to perpetrate, a hostage taking and kidnapping, while such officer and employee was engaged in and on account of the performance of his official duties, in the village of Balay in Iraqi Kurdistan, within the Republic of Iraq. with intent to kidnap and sell or otherwise trade the agent employee to the Islamic Revolutionary Guard Corps and/or Iranian intelligence agents, did commit murder, as defined in Title 18, United States Code, Section 1111(a), by killing an officer and employee of the United States and agencies in the executive branch of the United States Government, with malice aforethought, willfully, deliberately, maliciously, and with premeditation and during the perpetration of, and attempt to perpetrate, a hostage taking and kidnapping, while such officer and employee was engaged in and on account of the performance of his official duties. (Murder of an officer or Employee of the United States, in violation of Title 18, United States Code, Sections 1114 and 1111; Aiding and Abetting and Causing an Act to Be Done, in violation of Title 18, United States Code, Section 2).

312.    Under the direction and command of Defendant Masrour Barzani, agents known and unknown did attempt to take hostage and kidnap a United States agent employee, an internationally protected person, who was performing official duties, with malice aforethought, willfully, deliberately, maliciously, and with premeditation, directly and indirectly, with intent to sell or otherwise trade the agent employee to the Islamic Revolutionary Guard Corps and/or Iranian intelligence agents, and during the perpetration of, and attempt to perpetrate, a hostage taking and kidnapping. (Attempted Murder of an Internationally Protected Person, in violation of Title 18, United States Code, Sections 1116(a) and 1113; Aiding and Abetting and Causing an Act to Be Done, in violation of Title 18, United States Code, Section 2).    Defendants' actions were "a

'substantial factor' in the sequence of events that led to" the death of the American agent.  See *Owens v. BNP PARIBAS, SA*, 897 F.3d 266, 794 (D.C. Cir. 2018).

313.    The Foreign Sovereign Immunities Act (FSIA) incorporates the definition of "hostage taking" from "Article 1 of the *International Convention Against the Taking of Hostages*," 28 U.S.C. § 1605A(h)(2), which defines a hostage taker as "[a]ny person who seizes or detains and threatens to kill, to injure or to continue to detain another person . . . in order to compel a third party, namely, a State, . . . to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage," *International Convention Against the Taking of Hostages* art. 1, ¶ 1, Dec. 18, 1979, 1316 U.N.T.S. 205. "The Convention does not proscribe all detentions, but instead focuses on the intended purpose of the detention," (*Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 94 (D.C. Cir. 2002)); "[t]he essential element of a hostage-taking claim is that the intended purpose of the detention be to accomplish the sort of third-party compulsion described in the Convention." (*Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 161 (D.D.C. 2017), (quoting *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 470 F.3d 356, 359 (D.C. Cir. 2006)).

314.    "That one of Iran's proxies acted to abduct and detain Americans is not only a 'reasonably foreseeable' 'natural consequence,' but a desired result of Iran's training and directives.  That one of the Americans was also brutally killed was, 'by any reasonable measure, a foreseeable consequence of Iran's support.'" (citation omitted)); cf. *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 204 (D.D.C. 2017) (applying similar reasoning with respect to Syria's support for a terrorist group)" See *Cabrera v. Islamic Republic of Iran*, Civil Action No. 19-3835, at 89. (JDB) (D.D.C. Jan. 27, 2023).

315.    In the Barzani-protected isolated provincial village of Balay in the Barzani tribal headquarters and Barzani-controlled section of Iraqi Kurdistan, within the sovereign nation of the

Republic of Iraq, Defendants did willfully, deliberately, maliciously and with premeditation, directly and indirectly, murder an employee of the United States Government, who was performing official duties, an internationally protected person, in violation of 18 U.S.C.§§ 1116(a), 1116(c), and 1111(b), which killing would have constituted murder as defined in Title 18, United States Code, Section 1111(a), entitled pursuant to international law to special protection against attack upon his person, freedom, and dignity.

316.    Confidential Human Source #1, who has direct clandestine access to senior ranking Iraqi KRG government officials, disclosed that within the extraterritorial jurisdiction of the United States, Defendants, together with others, while outside the United States, did knowingly, intentionally and with malice aforethought conspire to take hostage and kidnap and/or kill one or more nationals of the United States, to wit Defendants planned to take hostage and kidnap the American intelligence agent, who was performing official duties, and trade him to the Islamic Revolutionary Guard Corps, a U.S. designated foreign terrorist organization.  During the hostage taking and kidnap, the American agent struggled, battled, and physically resisted whereupon Defendants violently, brutally, and viciously applied overwhelming force, and mercilessly beat to death this American citizen employee of the United States Government and callously and with abject disregard for human dignity dumped his lifeless body, covered in cuts and bruises and abrasions, in Barzan Creek, and quickly exited the area of the abduction.  Below is a photograph of the discarded lifeless body of the United States intelligence agent in the dry creek bed of Barzan Creek left there in 2021 by agents of the Barzani Continuing Criminal Enterprise acting under the direction and command of Defendants Masrour Barzani and Waysi Barzani.



317.    In a cover-up effort orchestrated, planned, coordinated, and directed by Defendant Masrour Barzani and his subordinate agents and representatives, the local police, controlled by Defendant Masrour Barzani, purposefully, misleadingly, and fallaciously, and with planned misdirection and purposeful concealment, ruled his death a heart attack.

318.    This murdered American government intelligence agent employee, engaged in official duties, leaves behind a wife and children in the United States.

319.    In a second example of an earlier Barzani-ordered murder of a U.S. defense intelligence agent, confirmed and verified by evidence in possession of Confidential Human Sources #1 and #2, upon orders from Defendant Masoud Barzani, Sheikh Zanna, a secret KDP member but openly a member of the Muslim Brotherhood, did receive instructions from Defendant Karim Sinjiri, who himself received command orders from Defendant Masoud Barzani, to murder the agent.  Zanna followed orders to kill the U.S. agent by using a large improvised explosive device ("IED"), a type

of bomb. With no judicial proceedings or authorization, Defendant Masoud Barzani unilaterally ordered Sheikh Zanna hanged to silence him.

**II.    Murder, Attempted Murder, Assassination and Deliberated Enforced Disappearances – as a Primary Tool of the Barzani Continuing Criminal Enterprise**

320.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, with intent and malice aforethought, are murderers.

321.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents and representatives, including Barzani family members and family members by marriage, have a long well-documented demonstrated history of using murder as a tool and mechanism  to achieve and maintain power, control, and illicit wealth.

322.    The Kurdistan Democratic Party (KDP), predecessor to the Defendant Iraqi Kurdistan Regional Government (KRG) and its corollary political entity partner, was founded by Mustafa Barzani, father of Defendant Masoud Barzani and grandfather of Defendants Masrour Barzani and Waysi Barzani. As he aged and his health deteriorated, in keeping with the patrilineal traditions of the Barzani tribe, Mustafa was under enormous pressure from his last wife, Hemauil, to designate her son as successor. Hemauil was of the Zebari tribe and was not a Barzani; thus, Masoud is only half Barzani. Her clan were well known as collaborators with the central Iraq government, against the Kurds. As a youth, Defendant Masoud Barzani was raised by his godfather, Mahmood Agaha, a well-known murderer, gangster, smuggler, and traitorous collaborator where Defendant Masoud Barzani learned and was tutored in criminality and mistrust throughout his childhood. It is that traditional and common style of Zebari mercenary, murderer, collaborator, and criminal leadership that Defendant Masoud Barzani brought to his provincial regional presidency and which his sons Defendants Masrour and Waysi continue and perpetuate.

323. In this family succession power struggle, several of Mulla Mustafa's sons, including sons Obaydulla and Luqman, and 36 other family members who opposed Defendant Masoud Barzani's succession to the Presidency of the Defendant Iraqi Kurdistan Regional Government, were eliminated by assassination ordered by Defendant Masoud Barzani. In his grandiose and manic quest for power, Defendant Masoud Barzani benefitted from and capitalized on the assassination of his own brother by Saddam Hussein. When Mustafa Barzani died, his wealth was left to Masoud's mother. Nothing was left to the other wives. Thus, every means of power remained with Masoud and his mother.

324. When Defendant Masoud Barzani's parents were alive and with the help of his mother, Masoud arranged for his brothers Ubaidullah, the eldest son of Defendant Mustafa Barzani, Lokman, and Saber to go to Baghdad and there to be killed by Saddam Hussein. Defendant Masoud had his brothers killed so that the way would be safe and free for Masoud to direct, control, and conduct the Barzani Criminal Enterprise.

325. In Iraqi Kurdistan, Defendant Masoud Barzani became "the Saddam Hussein" of Defendant Iraqi Kurdistan Regional Government, a position now held by his son, Defendant Masrour Barzani. Confidential Human Sources #1, #2 #3, #4, and #5, who have direct insider clandestine access to senior Defendant Iraqi Kurdistan Regional Government and KDP officials, confirm that Defendants Masoud Barzani and Masrour Barzani have followed and do today follow the murderous Baath doctrine of brutality authored by Saddam Hussein — including but not limited to atrocity, barbarism, barbarity, cruelty, inhumanity, oppression, savagery, hostage taking and kidnapping, enforced disappearances, and murder.

326. In just one typical representative instance of murder and the unrivaled, disproportionate, and barbarous brutality of Wajih Mustafa Barzani and Defendant Masoud Barzani against Barzani family members, Confidential Human Source 9# and #10 witnessed the following:

301

"*Kurd citizens Swar Mohammed Amin Swar, Khalil Miran, Rashid Mohammed Amin Swar (Swar's brother), Mustafa Mohammed, Aziz Mustafa Mohammed (the driver), went to Pirmam, in Masif Salahaddin to meet Masrour Barzani for assistance, who directed them to his uncle Wajih Mustafa Barzani who is the special brigade commander. A few days later, an estimated twenty five to thirty Barzani operatives of the Special Brigade force commanded by Wajih Mustafa Barzani, acting under the direction of his brother Masoud Barzani, in eight vehicles, converged on the Sebiran community, Khabat sub-district, of Erbil province to arrest Fatah Issas and Issa Majid. Three of these men, each agents of the KDP, were identified as Ahmad Osman Mohammed, Mohammed Jawhar Hussein, and Mushir Fariq Mohammed; the other men were not identified. Fatah and Issa were arrested for unspecific charges and were hauled to Masif Salahuddin, a special brigade prison operated by Wajih Mustafa Barzani, acting under the direction of his brother Masoud Barzani, and were locked up in the same room as Swar Mohammed Amin and Khalil Miran. They were personally physically attacked by Wajih Mustafa Barzani and Masoud Barzani.*

"*Ghazi Haji Agha was at the time a houseguest of Masif Salahaddin at the home of his sister, Amina Haji Aagha. Amina is the wife of Luqman Mustafa, who is the brother of Masoud Barzani. Shvan Luqman, who is Amina's son and Ghazi's nephew, sent word of the arrest to Wajih Mustafa Barzani that Ghazi was a house guest. Ghazi was imprisoned by Wajih Mustafa Barzani and transferred to the same prison and same room as Fatah and Issa.*

"*At the command of Masoud Barzani and his brother Wajih Mustafa Barzani, the men were held for forty days, without charges or trial, in Masif Salahaddin prison operated by the KRG, whereupon Rashid Mohammed Amin was released and the others were transferred by Barzani agents to an unknown location and disappeared forever.*

"*Luqman Mustafa is Masoud Barzani's brother. His wife is Amina Haji Aagha. Her son is Shvan Luqman, who is the uncle of Ghazi Haji Agha. He was disappeared and never seen again.*"

327. For the purpose of perpetuating their power base and governance positions and financially enriching the continuous Barzani Continuing Criminal Enterprise, under the direct command and

control of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and to the harm and detriment and life safety of the Plaintiffs and others, most especially Iraqi Kurdish citizens, arrest, murder, hostage-taking and kidnapping, and enforced disappearances are a primary means and instrument of the Barzani Continuing Criminal Enterprise. Murder and enforced disappearances directed by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, with intent and under apparent, assumed, fabricated, or imagined authority, or feigned color of law, of the inferior provincial Defendant Iraqi Kurdistan Regional Government, absent any statute, decree, order, resolution or comparable evidence of sovereign authorization for any of the actions in question, and were and are not the official policy or the officially sanctioned policies of the superior Republic of Iraq (the foreign sovereign), the Defendant Iraqi Kurdistan Regional Government, or international treaty, convention, or bilateral agreement, and not as any act of war, are frequently and repetitively inflicted on individuals, including Plaintiffs and agents and employees of the United States Government.

328.   Enforced disappearances are flagrant violations of human rights, encompassing multiple facets like the right to life, the prohibition of torture, the right to liberty and security, and the right to a fair trial. Global instruments such as the International Convention for the Protection of All Persons from Enforced Disappearance aim to prevent such heinous acts, ensure that culprits are penalized, and victims and their families receive reparation.

329.   Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, their agents and representatives, including Barzani family members and family members by marriage, have continuously, knowingly, and willfully, directly and indirectly, failed to abide by, observe, obey, adhere to, confirm to, or act in accordance with the International Convention for the Protection of All Persons from Enforced Disappearance, enacted by the United Nations and ratified by the Republic of Iraq of which the Defendant Iraqi Kurdistan Regional Government is a subordinate

~~part.  The Convention addresses the act of enforced disappearance where individuals are secretly abducted or imprisoned by a state or political organization, followed by a refusal to acknowledge the person's fate and whereabouts, with the intent of placing the victim outside the protection of the law.  The Convention obliges states to take effective action to prevent and punish acts of enforced disappearance in their jurisdictions.  It establishes the right of individuals to know the truth about the circumstances of an enforced disappearance and the fate of the disappeared person, and the right to reparations and prompt, fair, and adequate compensation.  The Convention's article seven says: "The widespread or systematic practice of enforced disappearance constitutes a crime against humanity as defined in applicable international law and shall attract the consequences provided for under such applicable international law."~~

## ~~DELIBERATED EXTRAJUDICIAL MURDER~~

### ~~330~~  E.    Defendants' Atrocity Crimes and Arbitrary Deprivation of Life

478.    The Torture Victim Protection Act of 1991 ("TVPA"). 28 U.S.C. § 1650A(h)(7), defines "extrajudicial killing" to mean "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as *indispensable by civilized peoples*," but does not include "any such killing that, under international law, is lawfully carried out under the authority of a foreign nation."  "There are three elements to this definition: '(1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted court.'"  See *Cabrera v. Islamic Republic of Iran*, Civil Action No. 19-3835 (JDB) (D.D.C. Jan. 27, 2023).  All extrajudicial ~~murder~~murders in the instant complaint were and are deliberated.

~~331~~479.    Section 1605A(h)(7) of the FSIA also provides that the term "extrajudicial killing" has the meaning given to it in § 3(a) of the Torture Victim Protection Act of 1991, which defines an extrajudicial killing as:

> "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.  Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation." "On its face, this definition contains three elements: (1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted court.  *See Owens v. Republic of Sudan*, 864 F.3d 751, 770 (D.C. Cir. 2017).

~~332~~480.    Plaintiffs "need only establish that [the attack] was unauthorized, deliberate, and that there were casualties"; "[i]t is not necessary . . . for one of the plaintiffs to have died in the attack in order for the state-sponsor-of-terrorism exception to apply."  (*Cabrera v. Islamic Republic of Iran*, Civil Action No. 19-3835, 81 (JDB) (D.D.C. Jan. 27, 2023); *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 81 (D.D.C. 2017)).

~~333~~481.    Unlawful extrajudicial killing, also known as an extrajudicial execution or extralegal killing, is the deliberated killing of a person without the lawful authority granted by a judicial proceeding, which in implementation may have become attempted murders. Unlawful deliberated extrajudicial killings, sanctioned and ordered by Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani~~, and absent any statute, decree, order, resolution or comparable evidence of sovereign authorization for any of the actions in question, and were and are not the official policy or the officially sanctioned policies of the Republic of Iraq, the foreign sovereign, any international treaty or convention, and not as any act of war~~, who did knowingly and intentionally combine, conspire, and confederate with their subordinate agents and representatives, including hired assassins, such as ~~Defendant~~co-conspirator Kamal Kirkuki, for the purpose of perpetuating, financially enriching, and expanding the ~~Barzani Continuing Criminal Enterprise~~BCE and thus its

305

capacity to harm, injure, threaten, harass, intimidate, silence, discredit, torture, take hostage and kidnap, and murder Plaintiffs, may be categorized in the following general groupings:

(a)    Widespread killing of political and ethnic opponents of its own citizens.

The United Nations Human Rights Council Special Rapporteur on extrajudicial, summary or arbitrary executions in Iraq reports "arbitrary arrests by Kurdish security forces and in some cases were forcibly disappeared." "retaliatory attacks" especially against "internally displaced persons (IDPs)."  "Tens of juveniles remain detained by the Kurdish authorities under the counter-terrorism regime, which due to a lack of procedural guarantees places them at risk of human rights violations, including of death in detention. This risk is increased by the severely limited access to detention facilities by local and international organizations rendering monitoring of the situation almost impossible."

Extensively documented evidence confirms the Iraqi KDP, under the command and direction of Masrour Barzani, and his agents and representatives, especially ~~Defendant~~co-conspirator Dindar Zebari, a prime communicator of purposeful misinformation for Defendant Masrour Barzani to agencies and representatives of the United Nations~~, and including Barzani family members and family members by marriage,~~ to preserve and expand the Barzani political power base and expand the ~~Barzani Continuing Criminal Enterprise~~BCE did and do plan, conspire and act in concert to use internally displaced Iraqis ("IDFs") as propaganda and a purposefully misrepresented messaging tool of the ~~Barzani Continuing Criminal Enterprise~~BCE to motivate and secure sympathy and funding from the international community, and to present a false, fabricated, and intentionally misleading public image of a regime concerned with human rights, which itself constitutes human rights abuse, and at a time when hundreds of thousands of IDPs are housed in tents in currently 25 IDP camps (hosting some 180,000 IDPs, the majority being Sunni Arabs) in Iraqi Kurdistan, facing security and protection risks, lacking local integration opportunities, having limited livelihood opportunities and financial resources, lacking civil documents. and lacking basic human necessities and suffering malnutrition, sickness, and death at a time the ~~Barzani Continuing Criminal Enterprises~~BCEs continues to enrich itself.

(b)    Targeted killing of individual name-specific perceived threats of its own citizens.

(c)      Targeted killing of individual name-specific journalists.

In a report, *Mountain of Impunity Looms Over Kurdistan Journalists*, the independent New York–based Committee to Protect Journalists painted a very grim picture of the lack of rule of law in the ~~Defendant~~ Iraqi Kurdistan Regional Government.

The Special Rapporteur of the United Nations Human Rights Council was informed of several attacks on journalists and media professionals in recent years, including threats, intimidation, physical assaults and killings, in particular in the Kurdistan region of Iraq.

One Kurdish journalist calls Kurdish journalism "a profession of death. There is no room for any criticism."

(d)      Targeted killing of individual name-specific American citizens.

(e)      Targeted killing of individual name-specific political opponents of its own citizens.

(f)      Targeted killing of individual name-specific perceived threats of its own citizens.

(g)      Targeted killing of individual name-specific American agents and employees.

~~334~~482.      Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani and their associates and subordinate agents, ~~including Barzani family members and family members by marriage, in order to enrich themselves and hold onto political, civil, and governance power and authority over the Defendant Iraqi Kurdistan Regional Government legislative, executive, and judicial branches of the governate and the Iraqi Kurdistan commercial, enterprise, financial, and business sectors, most especially its oil and gas sectors, over which they maintain authoritarian and tyrannical control,~~ have knowingly, admittedly, and willfully, directly and indirectly, sanctioned and deployed willful torture, murder and deliberated extrajudicial killing, willful hostage taking, kidnapping, and enforced disappearances, willful causing of great suffering, abducting and sequestration, and attacks against the civilian population, as an unsanctioned and

unallowed tool of power and governance, for suppression of human rights, for silencing journalists and political opponents and those who present perceived threats to Defendants' political, economic, and commercial power, and for concealing, facilitating, and expanding Defendants' widespread criminal actions in pursuit of illicit wealth and to injure Plaintiffs.

335.   All murders, attempted murders, and assassinations of their regime are personally sanctioned and ordered by Defendants Masoud Barzani, Masrour Barzani and Waysi Barzani – for which each are responsible for these murders and are themselves therefore murderers.

336483.    These deliberated extrajudicial murders were not acts of war and were neither "authorized by a previous judgment pronounced by a regularly constituted court" nor "lawfully carried out under the authority of a foreign nation." Pub. L. No. 102-256, § 3(a), 106 Stat. 73, 73 (1992); cf. Han Kim, 774 F.3d at 1050–51.  No regularly constituted Iraq or Defendant Iraqi Kurdistan Regional GovernmentKRG court or legislative body ever authorized such attacks and murders.   The Defendant Iraqi Kurdistan Regional GovernmentThe KRG was not, nor is, neithereither a foreign nation noror a military force.  See *Cabrera v. Islamic Republic of Iran*, Civil Action No. 19-3835 (JDB) (D.C. Jan. 27, 2023).  "A 'deliberated' killing is simply one undertaken with careful consideration, not on a sudden impulse." See *Force v. Islamic Republic of Iran*, Civil Action No. 2016-1468 (D.D.C. 2020), citing *Owens v. Republic of Sudan*, 174 F. Supp. 3d 242, 263 (D.D.C. 2016) .

337.   Contemporary international criminal law holds that head of state immunity – which does not apply to any Defendant Barzani – does not extend to atrocity crimes.   Extrajudicial murders are atrocity crimes.   Nothing in American jurisprudence justifies the absolute immunity that principal Defendants often claim.

338.   Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani were and are so cruel and malevolent that their murder victims were and are often members of their own family and

~~community, often people they had known for most of their lives. These murders are perpetrated~~

~~for no other reason than the oldest, most predictable of all time: money and power.~~

**F.    Defendants' Extreme Violation of Human Rights, International Law, and Treaties**

484.    ~~339.    Having a long, sordid, and well-documented history of murder as a tool, apparatus, and instrument of the Barzani Continuing Criminal Enterprise, and~~ With malice and forethought, after attaining political power and governance control of the ~~Defendant Iraqi Kurdistan Regional Government~~KRG, Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and at their direction their associates and subordinate agents~~, including Barzani family members and family members by marriage,~~ and especially ~~Defendant~~co-conspirator Dilshad Barzani, orchestrated, decreed, and sanctioned extrajudicial torture, murder and assassination – aimed directly and primarily (but not exclusively) at the citizens of ~~Iraqi~~ Kurdistan – to pursue their twin objectives of countering real or perceived threats, challenges, and opponents of their prevailing political power system and the accumulation of wealth, and to injure Plaintiffs.

~~340.    These killings flout the absolute universal principle that governments must protect their citizens against arbitrary deprivation of life, which cannot be abandoned under any circumstances, however grave. Such~~485.    Such torture and killings are crimes for which Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani and their subordinate agents are responsible and accountable under Iraq and international law and the laws of the United States~~, and all executive and judicial measures are warranted and overdue to ensure that those responsible are brought to justice and compensate their victims~~.

~~341.    The International Organization for Migration, a United Nations agency, at the time Defendant Masrour Barzani was and is Prime Minister of Defendant Iraqi Kurdistan Regional Government, the presiding and actual head of government and head of the executive power, reports hundreds of thousands of refugees from Iraqi Kurdistan, including women, children and ill~~

~~persons, have tried to cross the Belarus-Poland border to enter the European Union and are making perilous journeys across open waters to reach Europe. Unknown thousands have perished in the journey. The reasons given by the United Nations agency are Kurdish anger at the growing authoritarianism by the Barzani family rule, endemic Barzani corruption, rising unemployment, state payrolls unlawfully withheld by the Barzani Defendant Iraqi Kurdistan Regional Government regime, and employment illegitimately limited by Defendants Masoud Barzani and Masrour Barzani to favored Iraqi KDP members.~~

~~342~~486.     Under orders from Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, their subordinate agents have staged false encounters with criminals and political opponents in order to eliminate them without a public trial – since there is no evidence of their victims' committing criminal acts. Staged incidences have included "suicide whilst under cross-examination", "battle encounters", "escape from prison" and "resistance to arrest". ~~In fact,~~ These are terms intended to mask "official" extrajudicial murder orders that were ordered and sanctioned by Defendants Masrour Barzani and Waysi Barzani.

~~343~~487.     Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents and ~~representatives~~secret police or other illegal underground operatives under their command and control, have ~~also~~ hunted down opponents like mad dogs and arranged assassinations and assassination attempts of political opponents and ~~of~~ journalists and ~~of~~ leaders of international movements or organizations ~~by secret police or other illegal underground operatives under their command and control~~, and arrested or caused to be arrested men and women who were never seen again.

~~344~~488.     In its extensive wide-ranging criminal scheme, the ~~Barzani Continuing Criminal Enterprise (BCCE)~~BCE has repeatedly violated and does repeatedly violate numerous laws of the United States and international treaties, agreements, and conventions to which Iraq is a signatory

nation.  Human rights monitors and Confidential Human Sources #1, #2, and #5 say that members of the business community who do not pay Barzani's kickbacks are imprisoned, and official records of the United States and the United Nations confirm journalists and activists who criticize the Barzani's disappear, often forever.

345489.    Murders for political purposes extrajudicially authorized by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and accomplished by their agents and representatives, ~~including Barzani family members and family members by marriage,~~ have taken the form of enforced disappearances, hostage taking and kidnapping, staged incidents, "suicides", or death "caused by tribal warfare."  Barzani-appointed officials of the ~~Defendant Iraqi Kurdistan Regional Government~~KRG, which they dominate and authoritatively control, often try to dismiss such events, whether by denying that they have taken place at all, by attempting to attribute them to opposition forces, or by alleging they resulted from armed confrontation with government forces, or that the victim was murdered while attempting to escape from custody.  The killings are often accompanied by intimidation of witnesses and relatives of victims, and suppression of evidence.  Victims have often been chosen for their political or other beliefs and activities, or tribal origin and affiliation.  There is occasionally a staged and orchestrated show trial to falsely demonstrate lack of ~~Defendant Iraqi Kurdistan Regional Government~~KRG involvement ~~and, given the nature of the complicity, it is virtually impossible to judicially appeal against the verdict or otherwise hope for justice.~~.

346490.    Such actions are prohibited by international law, multiple international treaties, agreements, and conventions known to ~~the Defendant Iraqi Kurdistan Regional Government~~Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani and to which the controlling superior federal Government of the Republic of Iraq is a signatory party, including but not limited to the United Nations Charter, the United Nations Declaration of Human Rights, the

Convention on the Prevention and Punishment of the Crime of Genocide, and the International Covenant on Civil and Political Rights.

347491.    The United Nations Charter in its preamble affirms "faith in fundamental human rights, in the dignity and worth of the human person." The Charter further sets forth as one of its purposes the "promoting and encouraging respect for human rights and for fundamental freedom for all…" Contrary to their lawful and binding obligations as officials operating under professed color of law, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, their agents and representatives acting under the direction of Defendants, including Barzani family members and family members by marriage, have used have used torture abduction, hostage taking, kidnapping, enforced disappearance, imprisonment, murder, attempted murder, and assassination as tools of Iraqi Kurdistan state governance to maintain power and financially enrich their family and themselves personally andtheir governance and to injure Plaintiffs.

348492.    Unlike the United Nations Charter, the Declaration of Human Rights contains a list of specific rights and freedoms, including those traditionally found in state constitutions and others which are the expression of modern, cultural, and social ideas. Article 2 of the Universal Declaration provides that "[e]veryone is entitled to all the rights and freedoms set forth in this Declaration, without distinction of any kind, such as race, colour, sect, language, religion, political or other opinion, national or social [tribal] origin, property, birth, or other status." These two provisions, taken together, have been universally construed to cover governmental mass killing. Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents and representatives, including Barzani family members and family members by marriage, acting under the direction of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, have used murder, attempted murder, torture and assassination as a tool and apparatus of Defendant Iraqi Kurdistan Regional Governmenttheir governance to maintain power and financially enrich their

family and themselves personally and injure Plaintiffs in knowing and willful violation of Article 2.

349493.    The International Covenant and Civil and Political Rights, in Article 6 Section 1, provides "that every human being has the inherent right to life.  This right shall be protected by law.  No one shall be arbitrarily deprived of his life."  Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, their agents and representatives, including Barzani family members and family members by marriage, acting under the direction of Defendants have used torture, murder, attempted murder, and assassination as a tool of Defendant Iraqi Kurdistan Regional Governmentthe BCE to maintain power and enrich themselves personally in violation of Article 6, Section 1.

**Genocide Orchestrated and Collaborated by Defendants in Confederation with Foreign Terrorist Organizations**

350.    Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their agents and representatives, including Barzani family members and members by marriage, did conspire, plan, facilitate, command, collaborate, confederate, and aid and abet to commit genocide, to further the Barzani Continuing Criminal Enterprise.

351.    It is undisputed that genocide itself is a violation of international law.  See *Simon v. Republic of Hungary*, 812 F.3d 127 (D.C. Cir. 2016).  *e.g., Tel-Oren v. Libyan Arab Republic,* 726 F.2d 774, 791 n. 20 (D.C.Cir.1984) (Edwards, J., concurring); *accord Abelesz,* 692 F.3d at 675-76 (collecting authority).  Genocide perpetrated by a state against its own nationals of course is a violation of international law.  See *Simon v. Republic of Hungary*, 812 F.3d 127 (D.C. Cir. 2016), *generally* Genocide Convention art. 2; *see, e.g., Kadic v. Karadzic,* 70 F.3d 232, 241-42 (2d Cir.1995).

352.   In international law, the Genocide Convention of 1948 makes it clear one way to commit the crime is by "deliberately inflicting on [a] group conditions of life calculated to bring about its physical destruction in whole or in part." (Article II c)

353.   The Circuit Court of Appeals of the District of Columbia Circuit defines genocide:

> "It is undisputed that genocide itself is a violation of international law. See, e.g., Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 791 n. 20 (D.C.Cir.1984) (Edwards, J., concurring); accord Abelesz, 692 F.3d at 675-76 (collecting authority).

> "The Convention on the Prevention of the Crime of Genocide, adopted by the United Nations in the immediate after-math of World War II and ratified or acceded to by nearly 150 nations (including the United States), defines genocide as follows:

> [A]ny of the following acts committed with intent to destroy, in whole or in part, a national, ethnical, racial or religious group, as such: (a) Killing members of the group; (b) Causing serious bodily or mental harm to members of the group; [or] (c) Deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part ... (Convention on the Prevention and Punishment of the Crime of Genocide (Genocide Convention), art. 2, Dec. 9, 1948, 78 U.N.T.S. 277 (emphasis added)). That definition is "generally accepted for purposes of customary [international] law." Restatement (Third) of the Foreign Relations Law of the United States § 702 cmt. d. It appears not only in the Genocide Convention itself, but also in numerous other international treaties. See, e.g., Rome Statute of the International Criminal Court art. 6, July 17, 1998, 2187 U.N.T.S. 90; Statute of the International Tribunal for Rwanda Art. 2 (1994); Statute of the International Criminal Tribunal for the Former Yugoslavia Art. 4 (1993). The offense of genocide under our domestic law uses the same definition. See 18 U.S.C. § 1091(a). (See Simon v. Republic of Hungary, 812 F.3d 127, 141 (D.C. Cir. 2016))

> "Even though international human rights law did not even exist when the First Congress enacted the Alien Tort Statute in 1789, the statute's reference to 'law of nations' encompasses conduct universally accepted as violating international law today, see Sosa v. Alvarez-Machain, 542 U.S. 692, 732-33, 124 S.Ct. 2739, 159

> *L.Ed.2d 718 (2004), including genocide and certain other offenses committed by a sovereign against its own subjects, e.g., Kadic, 70 F.3d at 242 (genocide); Abebe Jira v. Negewo, 72 F.3d 844, 845-46 (11th Cir. 1996) (torture); Tel-Oren, 726 F.2d at 791 n. 20 (Edwards, J., concurring) (genocide, torture, summary execution, slavery)."*

354.    This definition was amplified by the United States Supreme Court: "...genocide perpetrated by a state even against its own nationals is a violation of international law." *Id.,* at 410-411 (*See Federal Republic of Germany v. Philipp,* 141 S. Ct. 703, 715 (2021) (*Philipp III*), quoting *Simon v. Republic of Hungary,* 812 F.3d 127, 145 (CADC 2016).

355.    The Court of Appeals of the District of Columbia Circuit emphasized that "the definition of genocide includes an '*intent* to destroy.'"  The Court further declared, "We adopted the definition of genocide set forth in the *Convention on the Prevention of the Crime of Genocide. Id.* at 143. '[A]dopted by the United Nations in the immediate aftermath of World War II,' *id.,* the Convention defines genocide, in relevant part, as '[d]eliberately inflicting" on "a national, ethnical, racial or religious group.... conditions of life calculated to bring about its physical destruction in whole or in part,' *Convention on the Prevention and Punishment of the Crime of Genocide* (Genocide Convention), art. 2, Dec. 9, 1948, 78 U.N.T.S. 277." See *Philipp v. Federal Republic of Germany*, 894 F.3d 406 (D.C. Cir. 2018).

356.    Where their continued use of political rhetoric provides a cover for their criminal activities, in furtherance of the pursuit of growth of illicit earnings capacity, to maintain and expand its political power base, to marginalize certain social, poltical, ethnic, and religious groups, to gain control over lucrative economic sectors of Iraqi Kurdistan, and to preserve and swell the power of its commercial monopoly of the Barzani Continuing Criminal Enterprise, often using terror tactics, and to restrict religious freedom and belief by destroying a minority religious and ethnic group by aiding and abetting the killing of members of the group in large scale, systematic violence against

civilian populations; aiding and abetting the causing of serious bodily and mental harm to members of the group; aiding and abetting a real risk and imminent risk to the health and life of the Yazidi population; and deliberately aiding and abetting the infliction on the group conditions of life calculated to bring about its physical destruction in whole or in part, with a clear intent to destroy, Defendants Masoud Barzani and Masrour Barzani, and their subordinate agents and representatives, including Barzani family members and family members by marriage, are directly responsible for the deaths of over 10,000 citizens of Iraqi Kurdistan and the torture of a far larger number, for having committed the acts directly, jointly with others and/or through others and for failing to exercise control properly over civilian and military subordinates who under the command and direction of Defendants Masoud Barzani and Masrour Barzani committed the acts, which harmed Plaintiffs.

357.    Defendants Masoud Barzani, then President of the Defendant Iraqi Kurdistan Regional Government, and Masrour Barzani, as General Director of the Defendant Iraqi Kurdistan Regional Government Security Protection Agency and formerly Director of the Intelligence and Security Agency (the successor agency to Parastin), and later the first Chancellor of the Defendant Iraqi Kurdistan Regional Government's Security Council, and at present the Prime Minister of Defendant Iraqi Kurdistan Regional Government, and their subordinate agents and representatives, including Barzani family members and family members by marriage, and absent any statute, decree, order, resolution or comparable evidence of sovereign authorization for any of the actions in question, and were and are not the official policy or the officially sanctioned policies of the Republic of Iraq, the foreign sovereign, any international treaty, and not as any act of war, did knowingly and intentionally combine, conspire, confederate, and agree to knowingly and unlawfully provide material support and resources, including actionable intelligence, and did assist to organize, manage, or otherwise direct the operation of an anti-American foreign terrorist

316

organization, had knowledge that the organization is a designated terrorist organization, and that the organization has engaged or engages in terrorist activity, not the acts of rogue units but rather part of a deeply disturbing and meticulously documented pattern of terror, resulting in the deaths of over 10,000 persons and recurring torture to even greater numbers, in violation of Title 18, United States Code, Section 2339B in an offense begun and committed outside of the jurisdiction of any particular State or district of the United States, namely but not limited to, property, personnel (including oneself), intelligence, accommodation, and services, to a foreign terrorist organization, namely Islamic State of Iraq and the Levant, knowing that the organization was a designated terrorist organization, and knowing that the organization had engaged in and was engaging in terrorist activity as that term is defined in Title 8, United States Code, Section 1182(a)(3)(B), and knowing that the organization had engaged in and was engaging in terrorism as that term is defined in Title 22, United States Code, Section 2656f(d)(2).

358.    "A terrorist attack constitutes extreme and outrageous conduct." (*Bodoff v. Islamic Republic of Iran,* 424 F.Supp.2d 74, 85 (D.D.C.2006) (*Bodoff I*) (citing *Stethem v. Islamic Republic of Iran,* 201 F.Supp.2d 78, 89 (D.D.C.2002)).

359.    Defendants Masoud Barzani and Masrour Barzani, and their agents and representatives and servants, including Barzani family members and family members by marriage, cannot point to any statute, decree, order, resolution or comparable evidence of sovereign authorization for any of the actions in question to show that the actions enumerated herein were or are the official policy or the officially sanctioned policies of the Republic of Iraq, the foreign sovereign.  To qualify as official, an act must be imbued with some level of formality, such as the authorization by the foreign sovereign through an official statute, decree, order or resolution.  No such relevant official statute, decree, order or resolution or comparable evidence of sovereign authorization existed or exists.

360.    Section 1189(a)(1), as added by the Antiterrorism and Effective Death Penalty Act of 1996, Pub L. No. 104-132, § 302, 110 Stat. 1214, 1248, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub.L. No. 104-208, § 356, 110 Stat. 3009, 3009-644, empowers the Secretary of State to designate a "foreign terrorist organization" if the Secretary finds three things: "(A) the organization is a foreign organization"; "(B) the organization engages in terrorist activity" as defined in the provisions set forth in the margin; and "(C) the terrorist activity of the organization threatens the security of United States nationals or the national security of the United States." Such activities threaten the "national security" when they threaten the "national defense, foreign relations, or economic interests of the United States." (See 8 U.S.C. § 1189(c)(2)).

361.    The knowing provision of material support or resources to a designated organization is a crime punishable by a fine or up to ten years imprisonment, or both. *See* 18 U.S.C. § 2339B(a)(1). Alien members or representatives of designated organizations may not be admitted to the United States. See 8 U.S.C. § 1182(a)(3)(B)(i)(IV), (V).

362.    Defendants Masrour Barzani and Waysi Barzani, and their agents and subordinates, including Barzani family members and family members by marriage, were in fact "representatives" of designated foreign terrorist organizations in their active and willful role of collaborators and co-conspirators.

363.    In a January 2004 letter to al-Qaeda attributed by the U.S. Government to one of its most notorious terrorist leaders, Abu Musab al-Zarqawi, al-Zarqawi asked for al-Qaeda's aid and support for his terrorist campaign against Americans in Iraq, and wrote:

> *"We need to create armies of mujahidin ... to fight the enemy – the Americans ... We are continuing to train ourselves and strengthen our ranks. We will strike at them with suicide operations and car bombs. ... If you are of the same opinion, if you adopt it as your program, ... and you are convinced by the idea of fighting the infidels, we will be your soldiers, under your banner, obeying your orders ..."*

Powered in substantial part by the reliable, potent, and hard to trace U.S. dollars gained by al-Qaeda through its rackets in Iraq, al-Qaeda launched a devastating terrorist campaign in Iraq in 2004 that was designed to expel America from Iraq and the Middle East, which al Qaeda and its branches have pursued ever since.

364.    On May 15, 2014, the United States Secretary of State amended the designation of al-Qa'ida in Iraq ("AQI") as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section l(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary also added the following aliases to the ISIL listing: the Islamic State of Iraq and al-Sham ("ISIS"), the Islamic State of Iraq and Syria ("ISIS"), ad-Dawla al-Islamiyaa fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production.  Although the group has never called itself Al-Qaeda in Iraq (AQI), this name has frequently been used to describe it throughout its history.   On October 15, 2004, the United States Secretary of State designated al-Qa'ida in Iraq (AQI), then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist under section l(b) of Executive Order 13224.  On December 17, 2004, the U.S. State Department designated al-Qaeda-in-Iraq as an FTO, and it has maintained that designation ever since.  On February 3, 2014, al-Qaeda in Iraq split from al-Qaeda core and Jabhat al-Nusra and asserted its identity as ISIS, which was led by former al-Qaeda/al-Qaeda-in-Iraq polyterrorist Abu Bakr al-Baghdadi.  On June 29, 2014, Abu Bakr al-Baghdadi announced from Mosul, Kurdistan—long Islamic State's Iraq headquarters—that the group known as al-Qaeda-in-Iraq and ISIS was now a caliphate that would henceforth be known as "Islamic State."  To date, ISIL remains a designated FTO.  ISIL is engaged in a concerted campaign to acquire by force

substantial land in Syria and Iraq in order to create an Islamic caliphate. ISIL has engaged in terrorist activity against United States citizens and against the national security interests of the United States. This activity includes the capture and murder of non-military United States citizens.

365. From Islamic State's formation in 2014 through the present, Islamic State—secretly aided and abetted by the Barzani regime—has sought to expel Americans from the Middle East through a campaign of terrorist violence targeting Americans worldwide, all of which was in service of Islamic State's existence as a purported "caliphate" dedicated to propagating its radical Salafist Sunni terrorist ideology. The U.S. Under Secretary for Terrorism and Financial Intelligence, at the U.S. Department of the Treasury, publicly stated in 2014 that Islamic State "terrorists have slaughtered thousands of innocent people" and "threatened "American personnel and facilities in Iraq," and "could ultimately pose a direct threat to [U.S.] citizens … outside of the Middle East."

366. The objective of the terrorist organization is the forcible acquisition of territory for the stated goal of creating an Islamic State without recognizing any national boundaries. ISIL seeks to accomplish its goals through the commission of various criminal acts and acts of terror against the United States and the world community. The criminal acts committed by members of the organization include murder, kidnapping, hostage taking, enslavement of women, sex trafficking, and more. On or about September 22, 2014, the chief spokesman for ISIL, Abu Mohammad Al Adnani, referenced the United States of America and other opponents of ISIL and stated that the organization intended to "enslave your women" and called for attacks on U.S. citizens around the world in retaliation for American airstrikes against Islamic State terrorists in Iraq.

367. At the time Defendant Masoud Barzani was President of Defendant Iraqi Kurdistan Regional Government and Defendant Masrour Barzani was General Director of the Defendant Iraqi Kurdistan Regional Government Security Protection Agency and formerly Director of the Intelligence and Security Agency (the successor agency to Parastin), and with specific calculated

intent to, and did, knowingly and willfully, directly and indirectly, facilitate the systematic and deliberate murderous slaughter of their own religious minority citizens and to destroy a religious minority who did not embrace the Muslim religious beliefs of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their subordinate agents and representatives, including Barzani family members and family members by marriage, in a manifest pattern of traitorous, barbaric, and uncivilized conduct, knowingly and willfully, directly and indirectly, deploying customary tools of extrajudicial murder and enslavement, and in unrestrained ambition, to secure new territories, to access untapped oil reserves, to amass weapons, to garner international backing for Iraqi Kurdistan, to eliminate a religious minority, to further their continuing criminal enterprise, and to injure Plaintiffs, did secretly plan, scheme, conspire, and act with others, especially with anti-American ISIS terrorists, and did purposefully, knowingly, and willingly plan and scheme to and did mislead the executive, military, and diplomatic offices of the United States. For the crime of genocide to be complete, both mental (*mens rea*) and physical (*actus reus*) elements must be present. Under the *mens rea* component, Article 30 of the Rome Statute of the International Criminal Court has two components: (1) knowledge threshold; and (2) specific intent. Both elements are integral in the determination of whether legally defined genocide has been committed against a specifically targeted group and set it apart from other international crimes. To find legal genocide, the acts committed must be intended to destroy a specific group, "in whole or part."

368.    The massacre of non-combatant Yazidis, orchestrated, accommodated, and facilitated, and without moral or legal consideration, by Defendants Masoud Barzani and Masrour Barzani, and their subordinate agents and representatives, has been officially recognized as the *Genocide of Yazidis* by several bodies of the United Nations and the European Parliament.

369.    On August 3, 2023, Defendant Dindar Zebari, the Defendant KRG Coordinator for International Advocacy, speaking for the Defendant Iraqi Kurdistan Regional Government, albeit

purposely and knowingly with misleading concealment and misrepresentation to further the object of the Barzani Continuing Criminal Enterprise, acknowledged, "The atrocities committed against the Yazidi community were nothing short of unspeakable.  Thousands of Yazidis were uprooted, captured, or slaughtered during ISIS's 2014 invasion of Sinjar.  Many people took refuge atop Mount Sinjar, where they suffered for months from lack of food and water.  In the aftermath of the attack 'no free Yazidis remained in the Sinjar region, the 400,000-strong community had all been displaced, captured, or killed'."

370.    The United States Department of State, in its *2021 Report to Congress Pursuant to Section 5 of the Elie Wiesel Genocide and Atrocities Prevention Act of 2018,* stated: "The U.S. government is committed to combating ISIS and the risk it poses to civilians, particularly in Iraq and Syria." "...then-U.S. Secretary of State John Kerry determin[ed] in 2016 that ISIS was responsible for genocide against groups in areas under its control in Iraq and Syria, including Yazidis… He found that ISIS was also responsible for crimes against humanity and ethnic cleansing against these same groups."

371.    Under the Genocide Convention and the Rome Statute of the International Criminal Court, ISIS genocidaires are guilty by the commission, in a systematic manner, of all five enumerated acts of genocide: (1) killing, primarily of non-combatant Yazidi men by targeted execution;  (2) causing serious bodily or mental harm, primarily to non-combatant Yazidi women by sexual violence and enslavement; (3) deliberately inflicting conditions of life calculated to bring about physical destruction, primarily of besieging trapped non-combatant Yazidi civilians men, women, and children;  (4) imposing measures to prevent births, primarily by forced abortions and the separation of Yazidi men and women; and (5) forcible transfer of children, primarily by abduction.

372.    Sufficient evidentiary findings support the legal inference of a requisite specific intent "to destroy, in whole or in part" the Yazidis as a protected group.

373.    Documented evidence confirms that in a matter of a few days, nearly 10,000 Yazidis were killed.  Yazidi men were systematically executed, and thousands of Yazidi women and children, fearing genocide, were forced to flee en masse, abducted, tortured, enslaved, systematically raped and subjected to reprehensible, barbaric acts of sexual violence, and sold into slavery.  Among those killed were pregnant women and elderly citizens.  These reprehensible, barbaric acts have been unequivocally and universally condemned.

374.    Documented evidence shows such systematic abuses, committed simultaneously throughout the Yazidi region of Sinjar, a region under the control, security, and administration of the Defendant Iraqi Kurdistan Regional Government, commanded and controlled by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents and representatives, including Barzani family members and family members by marriage, and coordinated within a short time frame, affirms that ISIS genocidaires, in concert and with the duplicitous and traitorous collaboration of Defendants Masoud Barzani and Mansour Barzani, acted on a specific intent to exterminate the Yazidis, a religious minority in Iraqi Kurdistan not sharing the Muslim religious beliefs of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and the Barzani family members and family members by marriage.

375.    Ethnic, cultural, and religious discrimination played dominant roles in the killing and inhumane mistreatment the Yazidi endured at the hands of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, their agents and subordinates, and the Barzani family members and family members by marriage and their co-conspirators.

376.    ISIS militants have systematically expelled Yazidis from their homes and have forced those seeking shelter to flee into the wilderness surrounding their villages.  During their attacks on Sinjar in August 2014, ISIS militants trapped terrified and defenseless Yazidi refugees on Mount Sinjar.  By surrounding and blockading these refuges in the mountains above Sinjar, ISIS members have

caused the starvation and malnutrition of women, children, and elderly within the community. The Yazidis seeking refuge on Mount Sinjar were forced from their homes by ISIS militants. An officially estimated fifty-thousand Yazidis sought refuge on the mountain, surrounded by ISIS soldiers threatening to kill them, similar to the situation in the Al-Anfal case. Without water and food, intentionally withheld, many within the community fell ill and perished.

377.    These actions constitute a deliberate infliction of inhumane conditions calculated to destroy the Yazidis and are thus genocide under Article 6(c) of the Rome Statute of the International Criminal Court, and at a time Defendant Masoud Barzani was President of Defendant Iraqi Kurdistan and Defendant Masrour Barzani was General Director of the Defendant Iraqi Kurdistan Regional Government Security Protection Agency, which he controlled and directedly absolutely, and formerly Director of the Defendant Iraqi Kurdistan Regional Government's Intelligence and Security Agency (the successor agency to Parastin), which is controlled and directed absolutely by the BCCE and its leaders.

378.    United Nations investigators compiled evidence that ISIS doctors performed abortions on women who were previously pregnant with "infidel" children. One woman described how an ISIS doctor sat on her stomach, aiming to kill her unborn child. Two other women detailed how they were also forced to undergo abortions, being first injected and then forced to take pills. Prior to the procedure, one witness heard an ISIS fighter state: "We do not want more Yazidis to be born." One week after their abortions, the two women were sold.

379.    Direct documented evidence of child kidnappings and forced transfer to ISIS military bases is abundant. In some instances, Yazidi boys as young as eight have been forced into becoming child soldiers. Those deemed inadequate for fighting are subjected to ideological indoctrination of radical Islam. Child soldiers and those subject to intense Islamic radicalization were severely

beaten when ISIS instructors found their performance subpar. ISIS propaganda publicized child soldiers in videos, sometimes with children carrying AK-47s and grenades.

380. The Kurdish-speaking Yazidi are mostly rural farmers and sheep herders, with little defensive capacity to stop massacres. The Yazidis are one of many religious minorities in Iraq; they follow Yezidism, which is not the religious belief of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and the Barzani family members and family members by marriage. One of the massacres occurred in the small village of Kocho, where hundreds of women and children were enslaved and their men executed. As ISIS gained more territorial control, local Yazidi law enforcement and security personnel were executed. In one instance, eleven members of one family were executed. In the United Nations account *Report on the Protection of Civilians in Armed Conflict in Iraq*, investigators confirmed Defendant Iraqi Kurdistan Regional Government/KDP collaboration with ISIS — intrinsically connected to the command actions of Defendants Masoud Barzani and Masrour Barzani and their agents and representatives — with planned, calculated, and purposeful ethnic and religious targeting.

381. As is their established practice and custom, Defendants Masoud Barzani and Mansour Barzani co-opted Iraqi minority politicians to propagate false narratives casting blame on Sinjar's Sunni Arabs. Defendant Iraqi Kurdistan Regional Government Peshmerga military forces, under the direct command and control of Defendants Masoud Barzani and Masrour Barzani, had taken the solemn duty to safeguard the Yazidi. Defendant Masrour Barzani, as General Director of the Defendant Iraqi Kurdistan Regional Government Security Protection Agency and formerly Director of the Defendant Iraqi Kurdistan Regional Government's Intelligence and Security Agency (the successor agency to Defendant Iraqi Kurdistan Regional Government intelligence agency Parastin), both of which he controlled and directly absolutely, and later the first Chancellor of the Defendant Iraqi Kurdistan Regional Government's Security Council, and at present the

Prime Minister of Defendant Iraqi Kurdistan Regional Government, instructed the Yazidi men, women, and children to remain in place, telling them Peshmerga (military) forces of the Defendant Iraqi Kurdistan Regional Government, under the command and control of Defendants Masoud Barzani and Masrour Barzani, would and will protect them, knowing full well the command order to Peshmerga to leave had already been issued by Defendants Masoud Barzani and Masrour Barzani. Abruptly and on command from Defendants Masoud Barzani and Masrour Barzani, and their subordinate agents and representatives, Peshmerga forces abandoned their posts in the early hours of the morning of the massacre, leaving the Yazidis defenseless against ISIS. Defendant Iraqi Kurdistan Regional Government/KDP security officials also confiscated weapons from Christian communities in the Nineveh Province before abandoning those communities to ISIS. Defendants Masoud Barzani and Masrour Barzani thus ensured that ISIS would successfully massacre and enslave the non-Muslim Yazidi religious minority, depriving Yazidis access to adequate shelter, food, clothes, medicines, hygiene and sanitation, and imposing vicious and barbarous measures intended to prevent Yazidi births.

382. Defendants "conduct thus qualifies as torture and violates the norm only when done by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." *Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Art. 1, Dec. 10, 1984, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 114* See *Jesner v. Arab Bank, PLC, 138 S. Ct. 1386, 200 L. Ed. 2d 612, 584 U.S. (2018).*

383. Confidential Human Sources #1, #4, and #5 confirm there was an explicit agreement between Defendant Masoud Barzani and ISIS in a territory sharing agreement, in exchange for which the Peshmerga would not prevent or interfere with ISIS in perpetrating the genocidal massacres and inhumane torture.

384.    According to Confidential Human Sources #1, #4, and #5, who have direct clandestine access to senior ranking officials of the Defendant Iraqi Kurdistan Regional Government, KDP party officials, and Barzani Continuing Criminal Enterprise leadership, the traitorous agreement made between Defendants Masoud Barzani and Masrour Barzani with ISIS also provided for Barzani supplying weapons and materiel to ISIS, which Defendants Masoud Barzani and Masrour Barzani and their agents and representatives did, including Kornet anti-tank missiles, which ISIS used to destroy U.S. provided M1A1 Abram tanks in battles against the Iraqi army.

385.    To this day in Iraqi Kurdistan, now led and governed by Defendant Iraqi Kurdistan Regional Government Prime Minister and Defendant Masrour Barzani, most Yazidi live under extreme religious persecution emanating from Defendant Masrour Barzani, have been unable to return to their homes, and most live in tents in refugee camps in the Iraqi Kurdistan region, living in constant fear, which is not imaginary nor wholly speculative, of another religious discrimination persecution genocidal massacre and further enslavement or death by the Barzani regime.  Yazidi people exist with the constant and real threat of wholesale genocide within their towns and villages.

386.    Karim Asad Ahmad Khan, Special Adviser and Head of the United Nations Investigative Team to Promote Accountability for Crimes Committed by Da'esh/Islamic State in Iraq and the Levant (UNITAD), established clear and convincing documented evidence that genocide was committed by ISIL against the Yazidi as a non-Muslim minority religious group, noting that the intent of ISIL to destroy the Yazidi, physically and biologically, is manifest in its unlawful and extrajudicial ultimatum – applied remorselessly to all members of their Yazidi religious community – to convert to Islam or die.

387.    Thousands were killed pursuant to this unlawful and extrajudicial ultimatum, facilitated and made possible by the knowing and willful collaboration of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents and representatives, and Barzani family

members and family members by marriage, either executed en masse, shot as they fled, or dying from exposure on Mount Sinjar as they tried to escape, said Karim Asad Ahmad Khan, Special Adviser and Head of the United Nations Investigative Team to Promote Accountability for Crimes Committed by Da'esh/Islamic State in Iraq and the Levant (UNITAD), adding that thousands more were enslaved, with women and children abducted from their families and subjected to the most brutal abuses, including serial rape and other forms of unendurable sexual violence, with many women and girls trafficked into sex slavery. For many this documented abuse lasted for years, often leading to death.

388. The intent of these unlawful and extrajudicial genocidal acts was to permanently destroy the capacity of these women and children to have children and to build families within the non-Muslim Yazidi community.

389. Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, as commanders, took no steps to prevent their subordinates in the Peshmerga military, the Defendant Iraqi Kurdistan Regional Government, Asayish, and KDP, or any other subordinate capacity, which Defendants control absolutely, from committing gross abuses and violations of internationally recognized human rights against civilians, including those committed during the Yazidi Massacre.

390. The acts described herein were carried out under actual or apparent authority or feigned color of law of the Defendant provincial regional government of Iraqi Kurdistan. Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani bear direct responsibility for their role in these acts, bear command responsibility as the commanders of the Peshmerga military forces, the Defendant Iraqi Kurdistan Regional Government, Asayish, and KDP, and bear responsibility for engaging in a joint criminal enterprise with, conspiring with, and/or aiding and abetting their subordinates as well as officers in the Peshmerga, the Defendant Iraqi Kurdistan Regional

Government, Asayish, and KDP who planned and/or carried or aided and abetted or assisted in carrying out these gross genocidal atrocities.

391. At all relevant times, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, as absolute commanders of the Peshmerga, the Defendant Iraqi Kurdistan Regional Government, Asayish, and KDP, possessed and exercised command and effective control over the Peshmerga, the Defendant Iraqi Kurdistan Regional Government, Asayish, and KDP and their members and permitted them to commit flagrant grotesque human rights abuses.

392. At all relevant times as commanders of the Peshmerga, the Defendant Iraqi Kurdistan Regional Government, Asayish, and KDP and their members, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani had the legal authority and practical ability to exert control over their subordinates, including those who participated in extrajudicial killings, genocide, torture, and crimes against humanity during the Yazidi Massacre. Defendants Masoud Barzani's, Masrour Barzani's, and Waysi Barzani's command over such forces included the authority and responsibility to give orders to and discipline their subordinates. Furthermore, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani had the actual authority and practical ability to prevent abuses and punish those responsible.

393. Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani knew or should have known about human rights abuses committed by their subordinates and collaborators including those committed during the Yazidi Massacre. Moreover, human rights abuses committed by the Peshmerga, the Defendant Iraqi Kurdistan Regional Government, Asayish, and KDP and their members and other collaborator forces were widely reported in Kurdistan, Iraq, United States, and international media, and to which Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani knowingly, purposefully, and deceitfully supplied misleading and untruthful information to intentionally mask and conceal their role, leadership responsibility, and complicity. Politicians,

human rights organizations, and others openly voiced their concerns about these abuses. At all relevant times, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani knew or reasonably should have known of the pattern and practice of human rights abuses perpetrated by the Peshmerga military forces, the Defendant Iraqi Kurdistan Regional Government, Asayish, and KDP and their members and other collaborator forces operating under their command and control.

394. As the commanders of the Peshmerga, the Defendant Iraqi Kurdistan Regional Government, Asayish, and KDP and their members and other collaborator forces, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani had an established and known duty under international law, multilateral treaties and Iraq and provincial Iraqi Kurdistan law, known to Defendants, to ensure the protection of civilians, to prevent violations of international and Iraq and provincial Iraqi Kurdistan law by their subordinates and collaborators, and to ensure that all persons under their command were trained in, and complied with, international, Iraq, and provincial Iraqi Kurdistan regional law, including the prohibitions against extrajudicial killings, genocide, torture, and crimes against humanity.

395. As the commanders of the Defendant Iraqi Kurdistan Regional Government Peshmerga military forces, the Defendant Iraqi Kurdistan Regional Government, Asayish, and KDP and their members and other collaborator forces, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani failed or knowingly refused to take all reasonable and necessary measures to prevent genocide, extrajudicial killings, torture, and crimes against humanity, or to investigate or punish all subordinates for committing such abuses.

396. In addition to their direct responsibility and command responsibility, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani also knowingly and willfully conspired with their subordinates as well as officers in the Defendant Iraqi Kurdistan REgional Government Peshmerga military forces, which Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani control

and direct absolutely, the Defendant Iraqi Kurdistan Regional Government, Asayish, and KDP and their members and other subordinate collaborator forces who planned and/or carried out these atrocities.  Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani conspired and acted in concert with one or more members of the Peshmerga, the Defendant Iraqi Kurdistan Regional Government, Asayish, and KDP and their members and other collaborator forces, pursuant to a common plan, design, and scheme to carry out and commit human rights abuses against civilians. Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani knowingly joined and participated in carrying out the common plan, design and scheme.  In addition to being personally liable for their own actions, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani are jointly and severally liable for the actions of their co-conspirators and subordinates, all of which were actions undertaken in furtherance of a common plan, design and scheme to carry out and commit human rights abuses against civilians.

397.    In addition to their direct responsibility and command responsibility, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani also knowingly and willfully conspired with and aided and abetted their subordinates as well as officers in the Peshmerga military forces, the Defendant Iraqi Kurdistan Regional Government, Asayish, and KDP and their members and other collaborator forces who planned and/or carried out these human rights abuses and genocidal atrocities.  Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani knowingly and willfully substantially assisted their subordinates and co-conspirator collaborators who committed genocide, extrajudicial killings, torture, and crimes against humanity.  They knew or should have known that their actions and omissions would assist in these gross blatlant abuses at the time they provided the assistance.  In addition to being personally liable for their own actions, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani are jointly and severally liable for the actions of those they aided and abetted.

398.    In addition to their direct responsibility and command responsibility, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani also engaged in a joint criminal enterprise with their subordinates as well as officers in the Peshmerga, the Defendant Iraqi Kurdistan Regional Government, Asayish, and KDP and their members and other collaborator forces who planned and/or carried out these human rights abuses and atrocities. The deliberated extrajudicial killings, genocide, torture, and crimes against humanity committed during these human rights abuses and atrocities, and the Yazidi Massacre, carried out in an intimidatory manner unrelated to security, disrespectful of all civilian well being and going well beyond the needs of any legally valid military or police necessity, were a part of an organized system of repression against the civilian Kurdish population in Iraqi Kurdistan.  Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani had knowledge of and were active participants in the enforcement of this system of repression against the civilian population of provincial Iraqi Kurdistan.  It was the intent of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents and representatives including Barzani family members and family members by marriage, to further this system of orchestrated repression politically and financially advantageous to the Barzani Continuing Criminal Enterprise and thereby harmful to Plaintiffs.

399.    The genocide, extrajudicial killings, torture, and crimes against humanity committed during these human rights abuses and atrocities and the Yazidi Massacre were foreseeable, probable, and desired consequences of a common, shared intention on the part of Defendants Masoud Barzani, Masrour Barzani, and Waysi Bartzani, their subordinates and officers in the Peshmerga, the Defendant Iraqi Kurdistan Regional Government, Asayish, and KDP and their members and other collaborator forces who planned and/or carried out these gross human rights violations, abuses, and atrocities against Kurdish civilians and the Yazidi Massacre.

400. These acts and omissions were outside the scope of Defendant Masoud Barzani's, Masrour Barzani's, and Waysi Barzani's lawful authority, or any subordinate agents and representatives, and were not authorized by any international, Iraq, or provincial Iraqi Kurdistan tribunal, law, regulation, or policy. The Yazidi Massacre, orchestrated and schemed by Defendants, was "an act of international terrorism" and not an "act of war" at 18 U.S.C. § 2331, and therefore non-international armed conflict combatant status *does not exist.*

401. "Genocide perpetrated by a state even against its own nationals is a violation of international law." See *Federal Republic of Germany v. Philipp*, 141 S. Ct. 703, 592 U.S. (2021). *Id.,* at 709 (quoting *Simon v. Republic of Hungary,* 812 F.3d 127, 145 (CADC 2016).

398. Furthermore, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani were under a duty to investigate, prevent and punish violations of international, Iraq, and Iraqi Kurdistan law committed by their subordinates; no such action was taken.

402. Furthermore, the United Nations Investigative Team to Promote Accountability for Crimes Committed by Da'esh/Islamic State in Iraq and the Levant (UNITAD) established and documented that numerous other crimes were also committed against the targeted non Muslim religious minority Yazidi community, including extermination, enslavement, sexual violence, forcible transfer, persecution on religious and gender grounds, and conscription of children into an armed group, and acknowledges these crimes are ongoing.

403. To increase their profit margins by redirecting attacks away from their business interests, Defendants knowingly facilitated protection money or "tax" payments to al-Qaeda, al-Qaeda in Iraq, and Islamic State terrorists in Iraq and Syria between at least 2004 and at least 2019, and thereby provided millions in U.S. dollars to these FTOs each year.

404. Islamic State continuously ran a sophisticated protection money operation in Iraq, including Iraqi Kurdistan, and Syria from 2014 through 2021. Throughout, Islamic State's

campaign in Iraq, Syria, and Afghanistan was powered by its protection rackets in Iraq and Syria. According to one confidential U.S. government report published in 2015, Islamic State raised hundreds of millions of U.S. dollars through protection money it extracted from businesses in Iraq, including Iraqi Kurdistan, with the knowledge and facilitation of Masoud Barzani, Masrour Barzani, and Waysi Barzani, their agents and representatives, and Barzani family members and family members by marriage. Islamic State's Finance Council oversaw its protection rackets and illicit taxation of goods and cash that, with Barzani foreknowledge and facilitation, transited territory where Islamic State operated.

405. In late 2014, Islamic State reached what amounted to a global protection money agreement with Defendants Masoud Barzani and Masrour Barzani, which the two sides reached even though Islamic State terrorists were waging a relentless campaign against Kurds in neighboring Syria. Defendants Masoud Barzani and Masrour Barzani prioritized their own power and financial interests over that of the broader Kurdish cause and reached a protection money accord with Islamic State that has largely held from 2014 through today. 494. Under this accord, Defendant Iraqi Kurdistan Regional Government agents collected protection money for and provided weapons and sensitive U.S. national defense intelligence, gathered and owned by the United States government, including information from agencies that comprise the United States Intelligence Community and the United States Department of Defense, to the Islamic State.

Defendants' acts were actions by individuals. "In general, resolving claims of complicity in arbitrary detention, torture, and extrajudicial killing pose less of a threat of infringing [a sovereign's] sovereignty. These allegations are more targeted to actions by individuals, rather than a plan of mass killing or mayhem. They also conceivably violate the law of nations. *See Sosa,* 124 S. Ct. at 2768 (citing with approval the Restatement (Third) of Foreign Relations Law's conclusion that a 'state violates international law if, as a matter of state policy, it practices, encourages, or

condones ... prolonged arbitrary detention'") (citation omitted); *id.* at 2763 (holding that the Torture Act contains 'a clear mandate ... providing authority that `establish[es] an unambiguous and modern basis for' federal claims of torture and extrajudicial killing') (citation omitted); *see also Tel-Oren v. Libyan Arab Repub.*, 726 F.2d 774, 777 (D.C.Cir.1984) (Edwards, J., concurring)." *Doe v. Exxon Mobil Corp*., 393 F. Supp. 2d 20 (D.D.C. 2005).

## VIII.  DEFENDANTS' ACTS OF MURDER, ATTEMPTED MURDER, AND TORTURE OF JOURNALISTS AND DISSIDENTS

### A.  Censorship Scheme to Inflict Severe Physical and Mental Pain and Suffering to Silence Journalists and Political Speech of Dissidents

495.~~406.~~    ~~Through these rackets, and with facilitation of Defendants Masoud Barzani and Masrour Barzani, Islamic State generated millions in monthly cash flow—mostly denominated in U.S. dollars—from businesses in Iraq, including Iraqi Kurdistan, which Islamic State styled as zakat, commercial taxes, income taxes, administrative fees, customs taxes, and/or road tolls.~~

~~407.   Defendants, using their agents and subcontractors to supply their own security to the American and Iraqi customers who hired them by paying off Iraqi insurgents with protection money, resulting in American money sustaining al-Qaeda, al-Qaeda-in-Iraq, and Islamic State. Defendants actively facilitated and benefited from such payments that their agents and subcontractors delivered on their behalf.~~

-    Murder, ~~Assassinations, Enforced Disappearances, Torture, and Other Acts of Lethal Violence Sanctioned and Ordered by the Barzani Continuing Criminal Enterprise~~

~~408.   Murder, enforced disappearances, and torture are among the most egregious, lethal, and malevolent crimes committed by the Barzani Continuing Criminal Enterprise in support of its continuing criminal enterprise.~~

409.    The Republic of Iraq, as a sovereign state of which Iraqi Kurdistan is part, ratified the *International Convention for the Protection of All Persons from Enforced Disappearance* (ICPPED) in 2010.   The crime of enforced disappearances is defined therein as "the arrest, detention, or abduction of an individual by state actors or persons or groups of persons acting with the state's authorization, support or acquiescence, and the latter's subsequent refusal to acknowledge the deprivation of liberty of the disappeared person or concealment of their fate or whereabouts."   In other words, This occurs when an individual disappears without a trace, while their loved ones are left with uncertainty and long-term anguish, loss, despair, and the yearning for closure.

410.    Enforced disappearances are flagrant violations of human rights, encompassing multiple facets like the right to life, the prohibition of torture, the right to liberty and security, and the right to a fair trial. Global instruments, treaties, and conventions, including the International Convention for the Protection of All Persons from Enforced Disappearances, aim to prevent such heinous acts, ensure that culprits are penalized, and victims and their families receive reparation.   No realistic opportunity or assured mechanism for such exists in the Barzani-controlled judicial system of Iraqi Kurdistan.

411.   The International Convention for the Protection of All Persons from Enforced Disappearance, to which Iraq is a party, codifies the prohibition on enforced disappearances and, among other things, sets out the obligations of states to prevent, investigate, and prosecute all enforced disappearances.

412.    Enforcement of law has not and does not occur, except occasionally for show, under the Defendant Iraq Kurdistan Regional Government leadership of Defendants Masoud Barzani and Masrour Barzani.   Affected families find their voices stifled and unheard within the Defendant Iraqi Kurdistan Regional Government, under the then presidency of Defendant Masoud Barzani

and now prime ministership of Defendant Masrour Barzani, and in the Defendant Iraqi Kurdistan Regional Government Parliament's corridors of power, as the Barzani-controlled legislative body is incapable of action. Simultaneously, due to the lack of judicial independence in the Kurdistan Region of Iraq, the Defendant Iraqi Kurdistan Regional Government judicial system is bereft of credibility, integrity, impartiality, objectivity, independence of the courts, and independence of judicial power.

413. Since its decades ago beginning, the Barzani Continuing Criminal Enterprise, directed and commanded by Defendants Masoud Barzani, then President of the provincial Iraqi Kurdistan Regional Government, and Masrour Barzani, as General Director of the Defendant Iraqi Kurdistan Regional Government Security Protection Agency and formerly Director of the Defendant Iraqi Kurdistan Regional Government Intelligence and Security Agency (the successor agency to Parastin), and later the first Chancellor of the Defendant Iraqi Kurdistan Regional GOvernment's Security Council, and at present the Prime Minister of the Defendant Iraqi Kurdistan Regional Government, and Waysi Barzani, and their subordinate agents and representatives, including Barzani family members and family members by marriage, has, under the claimed cloak of Defendant Iraqi Kurdistan Regional Government authority, yet absent any statute, decree, order, resolution or comparable evidence of sovereign authorization for any of the actions in question, and were and are not the official policy or the officially sanctioned policies of the Republic of Iraq, the foreign sovereign, or any international treaty, and not as any act of war, in pursuit of their ambitions, did knowingly and intentionally combine, conspire, confederate, and agree to knowingly and unlawfully provide sanctioned murders, staged encounter killings, sanctioned assassinations, and authorized political murders, extrajudicial executions, and enforced disappearances. Barzani-directed agents and killers state-sanctioned by the President of Defendant Iraqi Kurdistan Regional Government Masoud Barzani and the Defendant Iraqi Kurdistan

Regional Government Prime Minister Defendant Masrour Barzani, have staged false encounters with criminals and political opponents in order to eliminate them because they cannot obtain confessions or efficient evidence to bring them to justice before Iraq courts of law. Staged incidences have included suicide whilst under interrogation, escape from prison, and resistance to arrest. Explanations of the basis for the killings were and are intended to mask and conceal official extrajudicial murder and attempted extrajudicial murder.

414. Political murders, frequently exceptionally violent and brutal, and authorized by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, are many and have also taken the form of enforced disappearances and staged incidents. The Defendant Iraqi Kurdistan Regional Government has often tried to deceitfully and misleadingly dismiss such events, whether by denying that they have taken place at all, by attempting to attribute them to opposition forces, or by untruthfully alleging that the murders resulted from armed confrontation with government forces, or that the victim was murdered while attempting to escape from custody. The killings are often accompanied by intimidation of witnesses and relatives of victims, and suppression of evidence.

415. Victims have been selected by Defendants Masoud Barzani, Masrour Barzani and Waysi Barzani, and by their subordinate agents and representatives, for their political beliefs, religion, ethnic origin, tribe, or language; but most often victims are selected when they are perceived to be a political threat to the Barzani Continuing Criminal Enterprise. These victim selections are driven by the paranoia, insecurity, and anxiety of the leaders of the Barzani Continuing Criminal Enterprise — Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani. There is occasionally a show trial in a tightly controlled court of the Defendant Iraqi Kurdistan Regional Government to "prove" lack of government involvement; but Plaintiffs, and others, had and have a reasonable fear of reprisals and retribution against themselves and members of their families

which served as an insurmountable deterrent and makes it impossible to appeal to any part of the government of Defendant Iraqi Kurdistan to obtain redress for the murders and other atrocity crimes committed by the Barzani Continuing Criminal Enterprise which completely administers, controls, and directs the government including its judiciary.

416.    One of the Barzani Continuing Criminal Enterprise hitmen, "Shaker," confessed on a video, now in possession of German police officials, admitting to the murder of over three hundred individuals, of which all murders were directly ordered by Defendants Masoud Barzani and Masrour Barzani, leaders of the Barzani Continuing Criminal Enterprise.

417.    Defendant Karim Sinjari is the former Minister of Interior of Defendant Iraqi Kurdistan Regional Government, and now serves as a senior advisor to Nechirvan Barzani, President of the Defendant Iraqi Kurdistan Regional Government.    He is from Shingal ("Sinjar" in Arabic), his mother is Arab and his father is a Muslim Kurd.    He started in Baghdad and, according to Confidential Human Source number 2, who has direct clandestine access to senior ranking Defendant Iraqi Kurdistan Regional Government officials, when he was a law student he collaborated with the Muslim Brotherhood.    He came to the Kurdish Galla Mountains near the Iran border in 1973 and was recruited to manage part of the KDP Parastin.    He received progressively senior positions in Masoud Barzani's Defendant Iraqi Kurdistan Regional Government, and as the Minister of Interior of Defendant Iraqi Kurdistan Regional Government he created a "hit squad" to carry out Barzani-ordered deliberated extrajudicial killings.

418.    Confidential Human Sources #1, #2, #3, #4, and #5, who have direct clandestine access to senior Defendant Iraqi Kurdistan Regional Government and KDP party officials, state that Defendant Karim Sinjari, *always* under the command of Defendants Masoud Barzani and Masrour Barzani, is responsible for the coordination and hiring of hitmen to kill approximately five thousand individuals—Arabs, ethnic Kurds, Yazidis, Iranians, Americans, and others—all for the

purpose of keeping Barzanis in control of KDP and perpetuating the Barzani Continuing Criminal Enterprise—and absent any statute, decree, order, resolution or comparable evidence of sovereign authorization for any of the actions in question, and were and are not the official policy or the officially sanctioned policies of the Republic of Iraq, the foreign sovereign, any international treaty, and not as any act of war, or an official authorized act of state, did knowingly and intentionally combine, conspire, confederate, and agree to knowingly and unlawfully act in furtherance of the Barzani Continuing Criminal Enterprise, and that Defendant Karim Sinjari *only* acts upon orders from Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and *never* acts independently of them.

419. Confidential Human Source #11, who has direct clandestine access to senior ranking Defendant Iraqi Kurdistan Regional Government and KDP party officials and senior leaders of the Barzani Continuing Criminal Enterprise, affirms that Defendant Karim Sinjari, in willing and knowing concert, planned and acted with co-conspirator Defendant Sidad Barzani by entering into a KDP jail and ordered the Asayish jailers to brutally and forcibly rape male dissident prisoner Azhin Ahmed, a defined type of torture—while Defendants Sinjari and Barzani watched and videotaped the inhumane and brutal torture.

421. A male prisoner of Barzani's, Asheen Abdulah, held without lawful arrest or imprisonment, and a Confidential Human Source herein and presently living, as a result of an extrajudicial order of exile by Defendant Masrour Barzani, in Stutgardt, Germany, was forcibly and brutally raped, a defined type of torture, by Defendant Karim Sinjari, always acting under command and direction of Masrour Barzani.

422. Confidential Human Sources #1, #2, #3, #4, and #5 state that the Baath doctrine of killing to preserve power was written and perfected by Saddam Hussain and is followed and embraced today by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani. Hitmen include

Dilshad Hassan Najar, who is the head of a Defendant Iraqi Kurdistan Regional Government security force based in Erbil; Defendant Ismat Argoshi, who is a senior Defendant Iraqi Kurdistan Regional Government/KDP operative, leader, and attack planner, the head of Security Asaysh, the Defendant Iraqi Kurdistan Regional Government security organization, in Kirkuk; Defendant Barzan Hersha Rash, a Kurdish Democratic Party (KDP) hitman; and Defendant Azad Germari, who is the Director of the Office of Intelligence for the Defendant Iraqi Kurdistan Regional Government Province of Duhok and who assisted in the torture of journalist Wadad Duhoki, using an electric drill.

**Killing, Attempted Killing, and Torture of Journalistsby the Barzani Continuing Criminal Enterprise**

423.    The United States Supreme Court has declared:

> *"In the First Amendment the Founding Fathers gave the free press the protection it must have to fulfill its essential role in our democracy. The press was to serve the governed, not the governors. The Government's power to censor the press was abolished so that the press would remain forever free to censure the Government. The press was protected so that it could bare the secrets of government and inform the people. Only a free and unrestrained press can effectively expose deception in government. And paramount among the responsibilities of a free press is the duty to prevent any part of the government from deceiving the people…" United States v. Washington Post Co. et al., on certiorari to the United States Court of Appeals for the District of Columbia Circuit. 403 U.S. 713 (1971)*

424.    The United Nations Educational, Scientific and Cultural Organization (UNESCO), of which the Republic of Iraq is a member nation since 1948, declared in 1997:

*"to condemn assassination and any physical violence against*attempted murder, torture and disappearance of journalists *as a crime against society, since this curtails freedom of expression and, as a consequence, the other rights and freedoms set forth in international human rights*

*instruments;* has enabled in substantial part the continuation and expansion of the BCE that has damaged Plaintiffs.

> *"to urge that the competent authorities discharge their duty of preventing, investigating and punishing such crimes and remedying their consequences;*
>
> *"Calls upon Member states to take the necessary measures to implement the following recommendations:*
>
> *"that governments adopt the principle that there should be no statute of limitations for crimes against persons when these are perpetrated to prevent the exercise of freedom of information and expression or when their purpose is the obstruction of justice;*
>
> *"that governments refine legislation to make it possible to prosecute and sentence those who instigate the assassination of persons exercising the right to freedom of expression;*
>
> *"that legislation provide that the persons responsible for offenses against journalists discharging their professional duties or the media must be judged by civil and/or ordinary courts."*

425.    In a November 2003 statement, UNESCO reinforced its earlier positions:

> *"Putting an end to impunity for crimes against journalists ... constitutes a fundamental issue in guaranteeing the full exercise of the right to freedom of expression and the open, free and dynamic exchange of ideas and information for all people."*

426.    While 496.    The constitution and laws of the government of the Republic of Iraq purport to guarantee its citizens the freedom of speech and expression, the Defendant Iraqi Kurdistan Regional Government leadership .    In tyrannical and violent defiance thereof, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their subordinates, agents, employees, and representatives, including Barzani family members and family members by marriage – regard any political dissent as a threat not only to their own political interests, but also to the Defendant

~~Iraqi Kurdistan Regional Government's~~KRG's dominant one-party system of government itself and to the monopolistic continuation of the BCE.

497.   The Department of State *2016 Country Report on Human Rights* contains a staggering description and inventory of violence, including unlawful or arbitrary killings by members of the KRG security forces, directed by Defendant Masrour Barzani, and non-state groups, hostage taking and kidnapping, enforced disappearances, torture, restrictions on free expression in the press and the Internet, widespread official corruption, and violence against women.

498.   The Department of State has documented use of KRG assets, directed by Defendant Masrour Barzani and his agents and representatives to collect information about, among other things, individuals and groups viewed by them as potentially adverse to the interests of the KRG and the BCE.

499.~~Barzani Continuing Criminal Enterprise.   Thus, the Defendant Iraqi Kurdistan Regional Government's~~ The KRG's security and law enforcement agencies, tightly directed, controlled, empowered, and extrajudicially deployed by Defendants Masrour Barzani and Waysi Barzani, regard political dissent as a security threat and routinely monitor and actively censor political speech inconsistent with Barzani-approved political viewpoints, as well as speech that threatens to damage the reputation of the Barzani regime or ~~the Iraqi~~ KDP ~~which they control~~, or threatens to undermine the Barzani's ~~Iraqi~~ KDP-dominated social order, or weaken, imperil, impede, or expose the ~~Barzani continuing criminal enterprise~~BCE, thereby having created a chilling effect on freedom of expression and democratic participation.

~~427.   When a government acts illegally and violently, in this instance the Defendant Iraqi Kurdistan Regional Government under the command and control of~~ 500.   Defendants    Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their co-conspirator agents and representatives,

~~it loses its legitimacy~~have conducted a campaign of, but not limited to, verbal, visual, electronic, print, broadcast, and physical harassment and implicit and ~~some citizens turn to resistance.~~

428.   Attacking the people responsible for holding Defendants Masoud Barzani, Masrour ~~Barzani, Waysi Barzani,~~expressed threats of financial and ~~their agents~~physical harm against dissidents and ~~representatives~~journalists, including ~~Barzani family members~~inflicting physical assault, as part of their broader BCE effort to marginalize, prevent, impede, and ~~family members by marriage, to account is one of Defendants' specialties~~silence dissent or public criticism.

~~429~~501.    A primary focus of the ~~Defendant Iraqi Kurdistan Regional Government~~BCE censorship scheme ~~of its unchallenged and undisputed leaders Masoud Barzani, Masrour Barzani, and Waysi Barzani~~ is the control of information that is available to Kurdish citizens ~~within the Iraqi Kurdistan autonomous region of Iraq, and in the~~ worldwide ~~Kurdish diaspora.~~. The ~~Barzani Continuing Criminal Enterprise~~BCE, in order to continue its existence, suppresses messengers and information that could allow for the dissemination and discussion of content that runs afoul of messaging approved by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their subordinates, agents, and representatives~~, including Barzani family members and family members by marriage,~~ and the ~~Defendant Iraqi Kurdistan Regional Government~~KRG they unilaterally operate and control, to manipulate public perceptions of the ~~Barzanis~~Barzani's, by seeking to undermine and discredit the systems and policies of perceived adversaries (including the United States government), democracy, and open societies generally, to suppress and censor political dissent, to promote the ~~Barzanis'~~Barzani's preferred and often fabricated narratives and messaging, and deter critics from ~~continuing to criticize the Defendant Iraqi Kurdistan Regional Government and its leaders~~ criticizing Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani – all with the object of preserving, perpetuating, and prolonging their control of the ~~Defendant Iraqi Kurdistan Regional Government and their counterpart Barzani Continuing~~

Criminal Enterprise—all enabling them to harm and damageKRG and their controlling BCE, and thereby continue to injure Plaintiffs.

502.    430.    Under the leadership of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, It is an object of the conspiracyscheme to threaten and intimidate individuals, by means of physical and psychological intimidation, false imprisonment, torture, attempted murder, or murder, to silence journalists, authors, and protestors who have raised their voices against corruption and injustice, to ensure the unimpeded continuance of the Barzani Continuing Criminal Enterprise.BCE.    It is also an object of the conspiracyscheme to intimidate journalists by demonstrating through torture what could happen to them if they try to interfere with or shed the light of public exposure on the Barzani continuing criminal enterpriseBCE, to commit acts, in furtherance of the Barzani Continuing Criminal EnterpriseBCE, specifically intended to inflict severe physical and mental pain and suffering (other than pain and suffering incidental to lawful actions), commit and attempt to commit torture, while acting under the color of law, by committing and causing and aiding and abetting others to commit acts against another person.

431503.        Confidential Human Sources #1, #4, and #5, who have direct clandestine access to senior ranking officials of Defendant Iraqi Kurdistan Regional GovernmentKRG, disclosed that in an extraordinary act of duplicity against the United States, and without legal foundation, and absent any statute, decree, order, resolution or comparable evidence of sovereign authorization for any of the actions in question, and were and are not the official policy or the officially sanctioned policies of the Republic of Iraq, the foreign sovereign, any international treaty, and not as any act of war, Defendant Masrour Barzani, acting as Prime Minister of Defendant Iraqi Kurdistan Regional Government, did knowingly. intentionally, unlawfully, and arbitrarily order the arrestsextrajudicial tracking, detention, arrest, and torture of journalists on charges of treason for meeting with the United States Consul-General in Erbil.

432.   The Barzani Continuing Criminal Enterprise, commanded and controlled by 504.

Defendants Masoud Barzani, and Masrour Barzani, and Waysi Barzani, provided the essential means by which the Plaintiffs and similarly situated persons were tracked, detained, and tortured.

433.   Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents, representatives, and Barzani family members and family members by marriage, did knowingly and intentionally aid, abet, counsel, command, induce, and procure each other's participation in the commission of said offenses.

434.   In furtherance of the conspiracy and to accomplish the objects of the conspiracy, the acts, in furtherance of the Barzani Continuing Criminal Enterprise, described below, among many others, were committed in the Kurdistan region of Iraq and beyond.

435.   Under the administration of Defendant Masoud Barzani and Masrour Barzani, who have full control and command of the Peshmerga military, which overshadow the official Defendant Iraqi Kurdistan Regional Government police forces, police, and Defendant Iraqi Kurdistan Regional Government intelligence services, and absent any statute, decree, order, resolution or comparable evidence of sovereign authorization for any of the actions in question, and were and are not the official policy or the officially sanctioned policies of the Republic of Iraq, the foreign sovereign, not of any international treaty or convention, and not as any act of war, journalists have beenhave harassed, jailed, tortured, taken hostage and kidnapped, enforced disappeared, and murdered journalists.   Journalists who write, broadcast, or podcast criticallycritical of DefendantDefendants Masoud Barzani and Masrour Barzani or his father Defendant Masoud Barzani often disappear or are imprisoned and never seen again.  As a result of this repression of journalists, Plaintiffs continue to suffer enforced disappeareances, torture, and harm.

346

436.    It is well documented by agencies of the United Nations and the United States Government, and by Confidential Human Sources #1, #3, #4, and #5, who have direct clandestine access to senior ranking officials of Defendant Iraqi Kurdistan Regional Government, that Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents and representatives, have conspired, planned, and acted in concert to undermine and discredit the systems and policies of perceived adversaries (including the United States of America), democracy, and open societies generally, and unlawfully targeted individuals who have engaged in actions they deem hostile or unsympathetic to their governance power and thus to their continuing criminal enterprise.

437.    The Defendant Iraqi Kurdistan Regional Government is tyrannically and fiercely dominated by one political party controlled by the Barzani Continuing Criminal Enterprise and is in practicality a one-party substate whose government, deriving any and all legal authorities delegated from the central government of the Republic of Iraq, is in practicality entirely controlled by the Kurdistan Democratic Party (KDP).  While the constitution and laws of the Republic of Iraq and the Defendant Iraqi Kurdistan Regional Government purport to guarantee Iraqi Kurdistan citizens the freedom of speech and expression and association and democratic participation, Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their agents and representatives, regard any political dissent as a threat not only to their own political interests, but also to the KDP's one-party system of government itself.  Thus, the Defendant Iraqi Kurdistan Regional Government's state security and law enforcement agencies, acting under direct and unquestioned command and control of Defendant Mansour Barzani, arbitrarily and autocratically regard political dissent as a state security threat and routinely monitor and actively censor political speech and expression inconsistent with KDP-approved political viewpoints, as well as speech and expression that KDP officials, acting without any lawfully prescribed measurement or assessment formula, deem to threaten or may threaten to damage the reputation of the Barzani-controlled and

347

dominated Defendant Iraqi Kurdistan Regional Government or its Barzani leaders or the KDP, or which Defendant Masoud Barzani or his agents and representatives arbitrarily and autocratically deem to threaten to undermine the Defendant KRG/KDP-dominated and controlled social order.

438.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their co-conspirator agents and representatives, including Barzani family members and family members by marriage, have conducted a campaign of, but not limited to, verbal, visual, electronic, print, broadcast, and physical harassment and implicit and expressed threats of financial and physical harm against dissidents and journalists, including inflicting physical assault, as part of their broader effort to marginalize, prevent, impede, and silence dissent or public criticism of their regime and its Barzani leaders.

439.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their co-conspirator agents and representatives, including Barzani family members and family members by marriage, have used and do use U.S.-based social media accounts to disseminate propaganda and narratives that mirror and amplify the Barzani-controlled Defendant Iraqi Kurdistan Regional Government's and the KDP's orchestrated and misleading, slanted, biased, and often calculatedly untruthful public messaging.  This content—often featuring claims that appear to sow discord and distort facts about issues and persons in the United States and elsewhere—is meant to appear as if generated organically by users unaffiliated with the Defendant Iraqi Kurdistan Regional Government and the KDP, many of whom are purportedly located in the United States.

440.    A primary focus of the deliberate and calculated censorship scheme, under the direction of Defendants Masrour Barzani and Waysi Barzani, is the control of information that is available to Kurds within the Iraqi Kurdistan region and beyond.  With the advent of the digital age, Defendant Iraqi Kurdistan Regional Government has built a system of controls operated and enforced primarily by agents of Defendant Masrour Barzani, and used to monitor and prevent Kurdish

citizens from accessing Internet platforms and services, including on U.S.-based platforms, that might allow for the dissemination and discussion of truthful information that runs afoul of messaging approved by the Defendant Iraqi Kurdistan Regional Government and the KDP under personal control and direction of Defendant Masrour Barzani.

441.    Defendant Iraqi Kurdistan Regional Government's efforts, directed by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani and their agents and representatives, including Barzani family members and family members by marriage, to censor political dissent do not end at the Defendant Iraqi Kurdistan Regional Government's regional borders. Indeed, the Defendant Iraqi Kurdistan Regional Government and the KDP have identified the unchecked use of foreign social media sites beyond the jurisdiction of the Defendant Iraqi Kurdistan Regional Government as a threat to them because of content that portrays the Defendant Iraqi Kurdistan Regional Government and the KDP, and the dictatorial and despotic leadership of Defendant Masrour Barzani, in a manner they arbitrarily deem unfavorable.  Although Asayish, reporting directly to and commanded by Masrour Barzani, is generally identified as the Defendant Iraqi Kurdistan Regional Government's primary domestic law enforcement agency, responsible for public safety, general criminal investigation, state security and Internet security, its mission extends beyond law enforcement and into functions more associated with an intelligence service.  The Asayish, under command and control of Defendants Masrour Barzani and Waysi Barzani, routinely monitors, among others, perceived Kurdish political dissidents and democracy advocates who live in the United States, Europe, and in other locations outside Iraqi Kurdistan. The Asayish regularly uses cooperative contacts both inside Iraqi Kurdistan and around the world to both overtly and covertly influence, threaten, coerce, and often physically harm perceived political dissidents and democracy advocates abroad. Asayish has developed, used, and uses various practices and procedures for targeting and threatening individuals, including those residing in the United States, and for

propagating Defendant Iraqi Kurdistan Regional Government and KDP official statements through misattributed and falsely labeled social media accounts. The Defendant Iraqi Kurdistan Regional Government also engages in active measures, frequently distorted, misleading, and untruthful, to shape public and other governmental perception, both domestically and abroad, through broad dissemination of propaganda and narratives favored and often fabricated by the Defendant Iraqi Kurdistan Regional Government via official substate social media accounts of the Defendant Iraqi Kurdistan Regional Government, as well as anonymized fake accounts that often appear to belong to users located outside of Iraqi Kurdistan.

442.    The fear, which is not imaginary nor wholly speculative, motivating the individual Plaintiffs' self censorship is far from hypothetical.  Rather, the fear is grounded in the very real censorship injuries they have previously suffered to their expression and speech and association and democratic participation on social media, which are evidence of the likelihood of a future injury, and it is clear the alleged wrongful behavior could reasonably be expected to recur. Supported by this evidence, the individual Plaintiffs' self-censorship is a cognizable, ongoing harm resulting from their past censorship injuries, and therefore constitutes injury-in-fact upon which those Plaintiffs pursue relief.  See *Los Angeles v. Lyons*, 461 U.S. 95, 102-103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983).

443.    As the U.S. Supreme Court has recognized, this chilling of the individual Plaintiffs' exercise of their First Amendment rights is, itself, a constitutionally sufficient injury. *See Laird v. Tatum*, 408 U.S. 1, 11 (1972).

444.    The KDP party-backed and shadow media, under the command of Defendants Masrour Barzani, Waysi Barzani, and their agents and representatives, including Barzani family members and family members by marriage, occupy most of the broadcast, print, and social media space in Iraqi Kurdistan, and the KDP provides jobs for journalists, co-opts some journalists, strengthens

the personality cults of some leaders, provides KDP party propaganda, forms and influences public opinion, and attacks independent media.

445.   The Defendant Iraqi Kurdistan Regional Government/KDP, under the direction and command of Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their agents and representatives, including the Barzani family and family members by marriage, has created and used and does use a host of accounts under false names on U.S. social media platforms to disseminate and amplify messages as part of a broad effort to influence and shape public perceptions of the Defendant Iraqi Kurdistan Regional Government, the KDP and especially its Barzani co-conspirator leaders in the United States and around the world.   The Defendant Iraqi Kurdistan Regional Government/KDP uses its misattributed and purposefully misleading social media accounts to accomplish this mission both by disseminating and amplifying messages that promote what the Defendant Iraqi Kurdistan Regional Government and KDP perceive to be favorable attributes of the Defendant Iraqi Kurdistan Regional lGovernment's KDP dominated political system, and by seeking to undermine and discredit the systems and policies of perceived adversaries (including the United States Government), democracy, and open societies generally.

446.   The social media accounts controlled by the Barzani Continuing Criminal Enterprise often purport to belong to authentic individual users, and unlike the official social media accounts of Defendant Iraqi Kurdistan Regional Government agencies and officials, conceal from social media services and U.S. users that their content is posted on behalf of the Defendant Iraqi Kurdistan Regional Government or the Barzani Continuing Criminal Enterprise.   As described herein, some of these social media accounts are created to give the appearance that they are controlled by U.S.-based users, and, in certain instances, communicate directly with U.S. users about subjects of interest to the Defendant Iraqi Kurdistan Regional Government and the Barzani Continuing Criminal Enterprise.   This practice gives users of the social media platforms the false impression

that multiple U.S. persons, especially exiled Kurds, unaffiliated with the Defendant Iraqi Kurdistan Regional Government, agree with narratives generated by the Defendant Iraqi Kurdistan Regional Government and the Barzani Continuing Criminal Enterprise about a variety of topics, and disagree with the publicly held views of Kurdish dissidents and democracy advocates. By hiding the Defendant Iraqi Kurdistan Regional Government or KDP or Barzani Continuing Criminal Enterprise affiliation of the accounts from other users, social media platforms and the U.S. Government, the Barzani Continuing Criminal Enterprise seeks to misleadingly influence and manipulate online discourse, including public and Iraqi Kurd policy discourse in the United States, toward positions favored by the Defendant Iraqi Kurdistan Regional Government, the KDP, and the Barzani Continuing Criminal Enterprise.

447.   The Barzani Continuing Criminal Enterprise has utilized social media platforms to publicize "dissidents" actual physical location, a harassment tactic known as "doxing," which is a well-known and documented tool of unlawful transnational repression.

448.   The Barzani Continuing Criminal Enterprise uses its misattributed social media accounts to threaten, harass and intimidate, and to identify, detain, and torture, specific victims, located in the United States, Europe, and elsewhere, that the Defendant Iraqi Kurdistan Regional Government and the KDP perceive as critical of the Defendant Iraqi Kurdistan Regional Government, the KDP and especially Masrour Barzani, and the policies of the Defendant Iraqi Kurdistan Regional Government.   Through this campaign of implicit and expressed threats, harassment and intimidation, the Barzani Continuing Criminal Enterprise seeks to undermine the credibility of these critics, promote the Barzani-controlled and dominated Defendant Iraqi Kurdistan Regional Government's preferred and often untruthful narratives and calculated messaging, deter these and other critics from continuing to criticize the Defendant Iraqi Kurdistan Regional Government and the KDP and especially Masrour Barzani, and to compromise journalists' ability to locate

witnesses, cultivate sources, obtain information, and communicate confidential information to their sources and news agencies.

449.   Defendant Masrour Barzani and his agents and representatives have repeatedly and continuously attempted to pressure U.S. social media companies to remove Plaintiff, Maki Revend, and U.S.-based and Europe-based associates from social media platforms.

450.   The U.S. Department of State *2016 Country Report on Human Rights*, issued at the time Defendant Masoud Barzani was then President of the Defendant Iraqi Kurdistan Regional Government, and Defendant Masrour Barzani was General Director of the Defrendant Kurdistan Regional Government Security Protection Agency and formerly Director of the Defendant Iraqi Kurdistaan Regional Government's Intelligence and Security Agency (the successor agency to Parastin), and later the first Chancellor of the Defendant Iraqi Kurdistan Regional Government's Security Council, and at present the Prime Minister of Defendant Iraqi Kurdistan Regional Government, contains a staggering description and inventory of violence, including unlawful or arbitrary killings by members of the Defendant Iraqi Kurdistan Regional Government security forces, directed by Defendant Masrour Barzani, and non-state groups, hostage taking and kidnapping, enforced disappearances, torture, restrictions on free expression the press and the Internet, widespread official corruption, violence against and restrictions on women, violence against lesbian gay, bisexual, transgender, and intersex (LGBT) individuals and the effective criminalization of LGBT status, violence against internally displaced persons and restrictions on worker rightsand harm.

505451.     Human Rights Watch documented "torturing children'' by the Barzani-controlled Defendant Iraqi Kurdistan Regional Government.

452.   The U.S. Department of State has documented use by Defendant Iraqi Kurdistan Regional Government assets directed by Defendant Masrour Barzani and his agents and representatives,

including Barzani family members and family members by marriage, to collect information about, among other things, individuals and groups viewed by them as potentially adverse to the interests of the Defendant Iraqi Kurdistan Regional Government and the Barzani Continuing Criminal Enterprise.

453.   Records of the Parliament of Defendant Iraqi Kurdistan Regional Government reveal that more than television journalists and opposition activists were arrested in the Duhok province for criticizing the government and its leaders and for organizing peaceful civil demonstrations. Among those arrested, two journalists and six activists were sentenced by Barzani subjugated courts of the Defendant Iraqi Kurdistan Regional Government to six years in prison – based on their social media activities and exchanging journalistic information over messaging apps.

454.   According to media watchdog Metro Center for Journalists Rights and Advocacy, an Iraq organization established by journalists and human rights advocates and supported by the international Institute for War and Peace Reporting and aimed at monitoring free press situations in Kurdistan Region of Iraq, more than 385 violations against 291 journalists were lodged in 2021. One of the most striking crackdowns occurred in 2020, when Barzani arrested and put more than 80 journalists and activists behind bars in Duhok province after demonstrating against corruption and poor public services.  Metro Center reported that between 2011 and 2020 more than 2,100 violations against journalists and media outlets were recorded in Iraqi Kurdistan.  In a long and documented history these violations ranged from harassment and destruction of equipment, to kidnappings and assassinations.

455.   The United Nations' Iraq Mission and the Office of its High Commissioner for Human Rights in 2021, at a time Defendant Masrour Barzani was Prime Minister of Defendant Iraqi Kurdistan Regional Government, the presiding and actual head of government and head of the executive power, reported:

> *"Over the last year, journalists, human rights activists and protestors who questioned or criticized actions by the Kurdistan regional authorities have faced intimidation, threats, and harassment as well as arbitrary arrest and detention."*

456.    The United Nations report further exposed that thirty-three journalists, activists or human rights defenders had been arrested without being told why, denied access to lawyers or held without their families being notified.

457.    The Special Rapporteur of the United Nations Human Rights Council reported at a time Defendant Masrour Barzani was Prime Minister of Defendant Iraqi Kurdistan Regional Government, the presiding and actual head of government and head of the executive power:

> *"Concerns raised focused in particular on the reported lack of effective investigations into the killings of Kurdish journalists and media professionals, and little or no accountability. This impunity has led to an overall mistrust in the criminal justice system and in turn increased fear among the media community to continue their critical reporting. This fear is heightened by their impression that the powerful figures who were the subject of criticism by the deceased journalists might be behind their killings and may even enjoy the protection of the justice system."*

458.    Confidential Human Sources #1, #2, #3, #4, #5, and #6, who have direct clandestine access to senior ~~ranking Defendant Iraqi Kurdistan Regional Government and KDP party~~KRG and KDP officials, and especially to Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani and their immediate subordinates, have documented extrajudicial killing or attempts to kill dozens of activists, including journalists, coordinated, planned, and implemented by Defendants Masrour Barzani, Waysi Barzani, and their co-conspirator agents and representatives, often killed by men on motorcycles or in vehicles with blacked-out side windows – killed by gunshots to the head or chest – are ~~Barzani Continuing Criminal Enterprise~~BCE representatives, instances of what the United Nations Educational, Scientific and Cultural Organization *Director-General's Report on*

*the Safety of Journalists and the Danger of Impunity* condemns as the "assassination and any physical violence against journalists as a crime against society."

459.    Murder, attempted murder, torture **B. BCE Silences Journalists** and **Dissidents on U.S.-based Electronic Platforms**

506. disappearance of journalists has enabled in substantial part    With the continuation and expansion advent of the digital age, the BCE has built a system of controls in the information and communication technologies (ICT) domain, operated and enforced primarily by agents of Defendant Masrour Barzani Continuing Criminal Enterprise, and used to monitor and prevent Kurdish citizens from accessing Internet platforms and services, including U.S.-based platforms, that might allow for the dissemination and discussion of truthful information that runs afoul of messaging approved under personal direction of Defendant Masrour Barzani.

507.    BCE agents constantly monitor social media sites where content reveals the dictatorial and despotic leadership of Defendant Masrour Barzani.

508.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their co-conspirator agents and representatives, to shift public opinion, coordinate manipulation to push false narratives or change behaviors, have and do use U.S.-based social media accounts to disseminate propaganda and narratives that mirror and amplify the BCE controlled, orchestrated, misleading, and often calculatedly untruthful KRG/KDP public messaging.  This content – often featuring claims that appear to sow discord and distort facts about issues and persons in the United States and elsewhere – is meant to appear as if generated organically by users unaffiliated with BCE organs, many of whom are purportedly in the United States.

509.    BCE agents actively disseminate distorted and untruthful Defendant Masrour Barzani statements through misattributed and falsely labeled and anonymized fake U.S.-based social media accounts to shape public and other governmental perception.

510.    The social media accounts controlled by the BCE often purport to belong to authentic individual users, and unlike the official social media accounts of the KRG agencies and officials, conceal from social media services and U.S. users that their content is posted on behalf of the KRG or the BCE.  As described herein, some of these social media accounts are created to give the appearance that they are controlled by U.S.-based users, and, in certain instances, communicate directly with U.S. users about subjects of interest to KRG and the BCE.  This practice gives users of the social media platforms the false impression that multiple U.S. persons, especially exiled Kurds, unaffiliated with KRG, agree with narratives generated by KRG and the BCE about a variety of topics, and disagree with the publicly held views of Kurdish dissidents and democracy advocates. By hiding KRG or KDP or BCE affiliation of the accounts from other users, social media platforms and the U.S. Government, the BCE seeks to misleadingly influence and manipulate online discourse, including United States executive and legislative branch policy discourse, toward positions favored by KRG, KDP, and BCE.

511.    The BCE has ~~damaged Plaintiffs~~utilized social media platforms to publicize "dissidents" actual physical location, a harassment tactic known as "doxing," which is a well-known and documented tool of unlawful transnational repression.

512.    The malicious agents of BCE use its misattributed social media accounts to threaten, harass and intimidate, and to identify, detain, and torture, specific victims, located in the United States, Europe, and elsewhere, that KRG and KDP perceive as critical of KRG, KDP and especially Defendant Masrour Barzani, and his KRG policies.  Through this campaign of implicit and expressed threats, harassment and intimidation, and manipulation of social media algorithms, the BCE seeks to undermine the credibility of these critics, promote the Barzani-controlled and dominated KRG 's preferred and often untruthful narratives and calculated messaging, deter these and other critics from criticizing KRG and KDP and especially insecure Defendant Masrour

Barzani, and to compromise journalists' ability to locate witnesses, cultivate sources, obtain information, and communicate confidential information to their sources and news agencies.

513.    Defendant Masrour Barzani and his agents and representatives have repeatedly and continuously attempted to pressure U.S. social media companies to remove Plaintiff Maki Revend and U.S.-based and Europe-based associates from social media platforms.

514.    The fear motivating the individual Plaintiffs' reluctant self-censorship on social media platforms and elsewhere is far from hypothetical.  Fear is grounded in the very real censorship injuries they have previously suffered to their expression, speech, association, and democratic participation on social media, which are evidence of the likelihood of a future injury and wrongful behavior could reasonably be expected to recur.  Supported by this evidence, the individual Plaintiffs' self-censorship is a cognizable, ongoing harm resulting from their past censorship injuries, and therefore constitutes injury-in-fact upon which those Plaintiffs pursue relief.  See *Los Angeles v. Lyons*, 461 U.S. 95, 102-103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983).


**C.    BCE Uses Law Enforcement to Silence Journalists and Dissidents**

515.    Although Asayish, reporting directly to and commanded by Defendants Masrour Barzani and Waysi Barzani, is generally identified as the KRG's primary domestic law enforcement agency, its operation extends into an intelligence service, routinely overtly and covertly monitoring, influencing, threatening, coercing, and often physically harming perceived dissidents and democracy advocates who live in the United States, Europe, and in internationally including Plaintiffs. Asayish propagates KRG/KDP official statements through misattributed and falsely labeled social media accounts including in the United States.

516.    In violation of U.S. law, Asayish routinely monitors, among others, perceived Kurdish political dissidents and democracy advocates who live in the United States, and worldwide.

Asayish has developed, used, and uses various practices and procedures for targeting and threatening websites, publications, and individuals, including those residing in the United States, and Plaintiffs.

517.    These unlawful efforts, directed by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani and their agents and representatives, to censor political dissent do not end at KRG's regional borders.

### D.    Defendants Attempted Murder to Silence Plaintiff Maki Revend

460.  518.    As part of a pattern and practice to use extrajudicial murder to silence dissidents, Defendant Masrour Barzani has directed and commanded attempted assassination of Plaintiff Maki Revend.

519.    A globally respected professional Kurdish journalist and admired born chronicler of Barzani Continuing Criminal EnterpriseBCE abuses, crimes, and atrocities, with a worldwide audience of his writings and podcasts, Plaintiff Maki Revend is an openly vocal and peaceful critic and exposer of Barzani governance policies, political exploitation, oppression of speech and media, deprivation of rights and human dignity, denigration of human rights, suppression of basic civil liberties, limits on political pluralism, ruthless intimidation, plots to subdue and control the citizenry, embezzlement, pilfering, theft, sanctions violations, theft of U.S. government assets, manipulation, mistreatment, violence, genocide, enforced disappearances, murder, hostage taking, terror, and other heinous crimes pervasively perpetrated by the Defendants.  He is known through Confidential Human Sources to be perceived by the Barzani regime to be a provocative and challenging threat to their concentration of despotic governance power.

461.    Plaintiff Maki Revend, a native Kurd, was born in Iraqi Kurdistan in 1965.

462520.        In a concerted plan, intent, and effort to silence and oppress Plaintiff, Maki Revend, he was targeted by Defendant Masrour Barzani and his agents and representatives,

exercising imagined and feigned authority not granted by the laws, regulations, or policies of the Republic of Iraq or the Defendant Iraqi Kurdistan Regional Government, subjected to acts of harassment, surveillance, intimidation, invasion of privacy, and/or stalking carried out by or at the direction of Defendants and their employees, agents and/or representatives, intentionally caused Plaintiff Maki Revend and his family emotional distress to silence and intimidate them, and forced Plaintiff Maki Revend to leave his home in Iraqi Kurdistan and abandon his family members. Defendants Masrour Barzani and his agents and representatives thereby intentionally and recklessly inflicted extreme emotional distress upon Maki which could foreseeably lead to violence. Fearing for his life, in 1993 Plaintiff Maki involuntarily fled from his native and beloved Iraqi Kurdistan to Germany where he sought political asylum, at which time he necessarily (but regrettably) renounced his Iraqi citizenship and was granted citizenship and safe haven by the Republic of Germany; and where he now maintains residence. German law enforcement police currently protectsprotect Plaintiff Maki Revend by armed police guardguards.

463521.    Because of his open and widespread public analysis, evaluation, condemnation, disparagement, and exposure of the criminality of the Barzani governance regime and criminal enterprise, Plaintiff, Maki Revend has been repeatedly unlawfully targeted, through violent threats and repetitive unlawful acts of transnational repression for kidnapping, torture, and attempted murder by the Defendants, and lives in existential dread and fear of assassination by Defendants, and in constant hiding and 24-hour police protection from assassins of the Barzani Continuing Criminal Enterprise, as described more fully herein.  These actions have the object of facilitating economic, political, military, financial, and commercial decision making and improper advantage in and for the Barzani Continuing Criminal Enterprise.BCE, as more fully particularized herein.

464522.    The ability of Defendant's malicious cyber activity to steal data allowed them to alter or destroy Plaintiff, Maki Revend's, electronic data and content.

465.   The Defendant Iraqi Kurdistan Regional Government's efforts under the direction and control of Masrour Barzani, acting without any and all lawful authority of the Republic of Iraq or the Defendant Iraqi Kurdistan Regional Government523.   Defendant Masrour Barzani, to overtly and covertly censor, influence, coerce, and sometimes murder political dissidents to silence them extends far beyond the Iraqi KRG's ill-defined regional borders.

466524.      Plaintiff, Maki Revend, a resident of Germany, has on at least five distinct occasions, each thoroughly documented by police, been the target of assassination attempts and aggravated assault with a deadly weapon by the Defendants' agents and representatives, in furtherance of a criminal enterprise, including:

a.   In September, 2017, German police advised Plaintiff Maki Revend his life was in danger from the Barzani Continuing Criminal EnterpriseBCE, and that unsuccessful attempts on his life had been made.  From this event, to protect Plaintiff Maki Revend, police began to visit the Revend residence every two hours.

b.   On May 14, 2018, Plaintiff Maki Revend was physically attacked by eight people, confirmed by police to be members of the Kurdistan Democratic Party, a parallel organization to the Defendant Iraqi Kurdistan Regional Government directed and controlled by Defendants Masrour Barzani and Waysi Barzani.KDP.  A colleague of Plaintiff Revend was severely beaten and injured as a result.  Revend was able to protect himself from death by deploying eye-burning gas during the attack.

c.   A third assassination attempt was made on July 15, 2020, as two masked agents of Defendants Masrour Barzani and Waysi Barzani dressed in the false counterfeit uniform of postal workers attempted an attack at his residence.  They attempted to gain uninvited entry to the residence but were thwarted by a family member.  From that day,

police placed a permanent 24-hour police guard around the residence through the end of 2021.

d.   On October 2, 2022, two male agents of Defendants Masrour Barzani and Waysi Barzani came to the residence of Plaintiff, Maki Revend, in the middle of the night and in an assassination attempt deployed a hand-thrown incendiary weapon, known as an incendiary bomb, constructed from a frangible container filled with flammable substances in an attempt to assassinate Plaintiff Maki Revend by firebombing Plaintiff's residence while Plaintiff was sleeping.  Firebombs combine high explosive and incendiary effects and release a large quantity of extremely flammable material (gelled-fuel mixtures, magnesium, white phosphorus, etc.) which immediately bursts into flame.  Incendiary weapons are weapons or munitions designed to set fire to objects or cause burn or respiratory injury and death to people through the action of flame, extreme heat, or combination thereof, resulting from a chemical reaction of a flammable substance such as napalm or white phosphorus.  Plaintiff, Maki Revend, and his wife were sleeping inside the residence and were exposed to and dangerously endangered by smoke inhalation.  The house and Plaintiff were saved from fatal fire by an iron door.  At this time continuous 24-hour police guard was reinstated and continues to the present time.

e.   On September 21, 2023, two persons, identified by police as Russian assassination agents hired by Defendants Masrour Barzani and Waysi Barzani, attempted an assassination at the residence of Maki Revend but were apprehended in the act by police officers.  Two other criminal assassins fled the scene, escaped, and have not yet been identified.

Each of these assassination attempts are known to ~~the German police~~ and ~~are~~ documented by ~~them.~~the German police.  Below are ~~snapshots~~photographs of concealed security surveillance camera video recordings taken during the ~~assassination attempt~~ firebombing of ~~Maki's~~Plaintiff Maki Revend's residence on October 2, 2022:





467





525.    Subsequent to the firebombing of ~~Maki's~~Plaintiff Maki Revend's residence, Defendant Areen Barzani, son of Defendant Masrour Barzani, while attempting to scare, control, and intimidate a confidential informant hostile to him, acknowledged and boasted of the conspiratorial activities of the Defendants to incendiary bomb the Revend residence in an effort to intimidate, silence, and assassinate Plaintiff, Maki Revend.  Defendant Areen Barzani could only have access

to such incriminating information of activities by the ~~Barzani Continuing Criminal Enterprise~~BCE by himself being an insider co-conspirator.

~~468~~526.    In the calculated and planned efforts of Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, ~~and~~ their agents, and representatives, ~~and Barzani family members and family members by marriage,~~ to silence or to spread disinformation, often to falsely denigrate Plaintiff, Maki Revend, agents and representatives of Defendants Masoud Barzani and Masrour Barzani, directed and deployed by them, have visited known associates and family members of Plaintiff, Maki Revend, including Maki's associates and family members in the United States, and attempted through intimidation, implicit and expressed threats and acts of attempted bodily harm, enforced disappearance, or assassination, family imprisonment and isolation, to overtly and covertly dissuade and coerce Plaintiff, Maki Revend, from further critical social media postings, writing, ~~and peaceful justice~~, accountability, and democracy advocacy with the object to discredit and smear the respected and trusted reputation of Plaintiff, Maki Revend.  To avoid accountability and divert attention away from the ~~Barzani Continuing Criminal Enterprise~~BCE acts, Defendants have consistently disseminated lies through electronic and other means, not tethered to facts or reason, about Plaintiff, Maki Revend, to a global audience.

~~469~~527.    Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their agents and representatives, ~~including Barzani family members and family members by marriage,~~ operating under their command, did knowingly and willfully, directly and indirectly, ~~and with the intent to harass, intimidate, and place under surveillance~~ with the intent to harass and intimidate one or more persons, conspire to use one or more interactive computer services and electronic communication systems of interstate commerce, and transmitted through interstate and foreign commerce in one or more communications containing one or more implicit and expressed threats to injure the person of another, including Plaintiff Maki Revend, and used one or more other

facilities of interstate and foreign commerce to engage in a course of conduct that caused, attempted to cause and would be reasonably expected to cause substantial emotional distress to one or more persons and their immediate family members, contrary to ~~Title~~ 18~~, United States Code, Section 2261A~~( U.S.C. § 2261(A)(2)(B), all part of a broader concerted ~~Barzani Continuing Criminal Enterprise~~BCE effort to ban from their venues people whom they say are adversarial toward him/them and to send a message to millions of involuntarily exiled Kurds worldwide that if they don't fall in line and do what the Barzani political establishment tells them to do – then they too will be targeted for investigation, indictment, ~~arrest,~~ imprisonment, torture, enforced disappearance, or even murder, thereby alienating and disenfranchising much of the ~~Iraqi~~ Kurdistan population.

~~470~~528.    In knowing and willful violation of the Computer Fraud and Abuse Act ~~(CFAA),~~, codified under ~~Titl~~eas 18 U.S. ~~Code~~C. § 1030, by using U.S.-based and other technologies, Defendants have gained illicit and unauthorized access to Plaintiff Maki Revend's computers with intent to damage or defraud, to deploy destructive malware and take other disruptive actions, for the strategic benefit of the ~~Barzani Continuing Criminal Enterprise~~BCE, through unauthorized access to Plaintiff Maki Revend's computers.  Masking their identities, Defendants' acts included cyber-enabled malicious actions aimed at supporting broader Barzani regime efforts regardless of the consequences to innocent parties and critical infrastructure worldwide, to undermine, retaliate against, or otherwise destabilize journalistic independence essential to democratic society, to probe Plaintiff Maki Revend's computer networks, register malicious websites and domains with names mimicking legitimate ones, send spear phishing emails and other intrusion communications, store and distribute additional malware, manage malware, transfer stolen data, and negatively influence the public perception of Plaintiff Maki Revend. The conspirators reused some of the same

infrastructure to unlawfully target multiple individuals in order to protect and promote the ~~Barzani Continuing Criminal Enterprise~~BCE.

~~471~~529.        The Defendants performed a variety of functions targeting Plaintiff~~,~~ Maki Revend, and designed to identify, collect, package, and view targeted data on Plaintiff Maki Revend's computers, including stealing credentials that allowed the Defendants to move laterally and exponentially throughout Maki's computer networks. The Defendants also overwrote files and erased data from Maki's computers. In addition, both during and after operational activity, the Defendants made efforts to cover their tracks by deleting information from their operational accounts and deleting data on servers they controlled or had compromised.

~~472.    Further,~~530.    In knowing and willful violation of the U.S. Identity Theft and Assumption Deterrence Act, codified under ~~Title~~ 18 U.S. ~~Code~~C § 1028(a)(7), and involving violations of other statutes such as identification fraud (18 U.S.C. § 1028), computer fraud (18 U.S.C. § 1030), and wire fraud (18 U.S.C. § 1343), as acts of aggravated identity theft Defendants have without lawful authority fraudulently and knowingly transferred or used identification of another person, Plaintiff Maki Revend, in violation of 18 U.S. ~~Code~~C. § 1028A(a)(1) with the intent to commit, or aid or abet, an unlawful activity by creating hundreds of counterfeit video accounts on Facebook in the name of and impersonating Plaintiff Maki Revend and using other personally identifiable information, and conveying and publishing demonstrably false information, resulting in Facebook implementing administrative use prohibitions, cancellations, and injunctions against Plaintiff Maki Revend.  Additionally, Defendants have aggressively and with malice aforethought attempted to deplatform Plaintiff Maki Revend on every social media platform available, an action or practice of preventing publication of views regarded by Defendants as unacceptable or politically threatening, thereby creating financial harm, reputational annihilation, and emotional and mental anguish and suffering to Plaintiff Maki Revend.

473531.    In order to monitor his perceived political rivals, adversaries, and antagonists, Defendant Masrour Barzani's agents and representatives, including Barzani family members and family members by marriage, have scrutinized and disrupted individuals who post online content, commonly and frequently using U.S.-based internet providers.  It was and is an object of the Barzani conspiracy to instigate, perpetuate, and commit acts in furtherance of the Barzani Continuing Criminal EnterpriseBCE specifically intended to threaten and intimidate Plaintiff Maki Revend and his family, and other Plaintiffs, by inflicting severe physical and mental pain and suffering upon them.  These repeating and unforeseen torturous attacks by Defendants have changed every aspect of Plaintiff Maki Revend's and his family's lives, home, work, and their sense of safety and mental health.  Without lawful authority, including unlawfully using identification of another person, the conspirators did affect, disrupt, and impede foreign electronic commerce of Plaintiff Maki Revend, all with the object of preserving the Barzani power base and perpetuating the Barzani Continuing Criminal EnterpriseBCE, all to the harm of the Plaintiffs.

474532.    When Masrour Barzani and his agents and representatives hacked the Internet connection of Plaintiff Maki Revend's residence, they stole many of his family's personal documents and personal photos of his children and his wife, and without authorization published them on social media platforms.

475533.    Defendant Masrour Barzani and his agents and representatives, frequently employing U.S. technology and expertise and personnel, have attempted to pressure and otherwise overtly and covertly intimidate and threaten and coerce U.S. social media companies and platforms, through private communications and legal threats, into censoring certain social-media content and divisive deplatforming, in violation of the First Amendment, to remove posts and stories the content of which touched on topics deemed problematic and unacceptable by Defendant Masrour Barzani, which were authored by Plaintiff Maki Revend and supportive U.S.-based and

European-based associates from social media platforms posts and stories removed or downgraded by the platforms.

476534.     To this day, Defendants persist in their pattern of willful, extreme, and malicious criminaltortious conduct, including attempted assassination and extreme damage to and destruction of property, with knowing and conscious disregard for Plaintiff Maki Revend's rights. Plaintiff Maki Revend continues to be threatened, alarmed, harassed, followed, stalked, photographed, and surveilled by DefendantsDefendant Masrour Barzani and/or theirhis agents, employees, and/or representatives.  As asa result of the foregoing, Plaintiff Maki Revend and his family continue to be reasonably in fear for their lives and the safety of their family, and have suffered significant damage to be determined at trial.  The Defendants' pattern of conduct outlined above, including information suppression, invasion of privacy and/or capturing visual images of Plaintiff's private, personal and/or familial activities, and trespassing upon Plaintiff Maki Revend's land by Defendants, would cause a reasonable person to suffer substantial emotional distress.  The foregoing conduct of the Defendants was and is a part of a continuous course of conduct which wasis intentional, outrageous, malicious, and done with ill will on the part of the Defendants, done with the intent of causing Plaintiff Maki Revend to suffer humiliating mental anguish, cruel and unjust hardship, interference with income, and emotional and physical distress, and with the knowledge that Plaintiff Maki's emotional and physical distress would thereby increase.

### **E.       Defendants Knowingly and Willfully Defame Plaintiff Maki Revend**

535.     "The liberty of speech and the liberty of the press do not authorize malicious and injurious defamation." *Dexter v. Spear,* 7 F. Cas. 624 (No. 3,867) (C.C. R.I. 1825).

536.     Plaintiff Maki Revend has no history of breaking the law or of arrest or conviction for any criminal act.  Defendant Reeder did "at a minimum express, state, and imply a verifiably false fact

about [Plaintiff Revend]" to this court.  See *Zimmerman v. Al Jazeera America, LLC*, 246 F. Supp. 3d 257, 276 (D.C. 2017).  477.          Defendant Dindar Zebari, as the Defendant Iraqi Kurdistan Regional Government'sHis statement, with intent to publicly hurt, was and remains categorically false, and was made with actual malice or with reckless disregard for the truth, and fell into no privileged category of speech, and was neither confusing nor ambiguous.  The Supreme Court declared, "practices long accepted by ethical lawyers is that under no circumstance may a lawyer either advocate or passively tolerate a client's giving false testimony" … and "in no sense means a lawyer can honorably be a party to or in any way give aid to presenting known perjury." "No system of justice worthy of the name can tolerate a lesser standard."  See *Nix v. Whiteside*, 475 U.S. 157, 174, 106 S. Ct. 988, 89 L. Ed. 2d 123, (1986).  The Supreme Court further opined, "To a wide and deep extent, the law depends upon the disciplined standards of the profession and belief in the integrity of the courts."  (See *Schware v. Board of Bar Examiners of NM*, 353 U.S. 232, 77 S. Ct. 752, 1 L. Ed. 2d 796 (1957).  Defendant Reeder, as an experienced advocate of the law firm of Greenberg Traurig, injured and insulted the integrity of this Court by knowingly presenting false statements and demonstrating an appalling and tragic absence of credibility.  Defendant Reeder's statements, with a deliberate disregard for the truth and failure to look beyond apparent prejudices and political beliefs in said motion strongly suggests improper motive, and did not conform to any code of legal ethics.

537.    Defendant Reeder made these defamatory statements, which were communicated and published by the court to third parties, within the scope and course of his representation of other defendants with intent to harm Defendant Reeder given that, *inter alia*, Defendant Reeder was and is aware of the truth.  The statements were prepared and written in advance.

538.    Defendant Reeder is not "an ordinary citizen" (See *Alabama v. White*, 496 U.S. 325, 329, 110 S. Ct. 2412, 110 L. Ed. 2d 301 (1990) but rather is an accomplished attorney, shareholder of

a multi-national law firm, and former official of the national government possessing highest national security clearances, legal expertise, and assisting to oversee over 1 million persons in the United States Army and 330,000 civilian government employees, an honors graduate of the Judge Advocate General Corps School, and regularly lectures on legal ethics. In short, Defendant Reeder knows better, and with respect due this Court, knows communication with the Court shall contain all information necessary to make the communication not misleading and shall not contain any false or misleading statement or otherwise operate to deceive, with deliberate and conscious indifference exhibits zero regard for the process or for authority, and perpetuates the Barzani defendants' corrupt and continuous pattern of diverting attention away from their criminal behavior and misconduct and acting with a pervasive pattern of deliberate indifference to and above the system's rules, a pattern of constitutional violations and tortious conduct, and would not make such a false and defamatory allegation and denunciation accidentally. Counsel has "the ever-present duty not to mislead." See *Basic Inc. v. Levinson*, 485 U.S. 224, 108 S. Ct. 978, 99 L. Ed. 2d 194, n.18 (1988). In law, perfidious tactics are not only *mala prohibita* ("evil as prohibited"), but also *malae in se* ("evil in themselves"). The untrue statement in Defendant Reeder's motion was as damaging as possible to Plaintiff Revend.

539.     Such unfounded sweeping allegations were intentionally declared to defame, malign, and harm, and did harm, Plaintiff Maki Revend. The harm from Defendant Reeder's statement was inevitable, direct, concrete, immediate, and particularized. ("For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Spokeo, Inc. v. Robins,* 578 U.S. 330, 339 (2016), as revised (May 24, 2016) (citation omitted).)

540.     The Supreme Court held, "Words also tending to scandalize a magistrate, or person in a public trust, are reputed more highly injurious than when spoken of a private man." *McKee v. Cosby*, 139 S. Ct. 675, 586 US ___, 203 L. Ed. 2d 247, quoting Blackstone.

541.    Plaintiff Revend, a person in a public trust, is a seasoned investigative journalist who provides news about, and exposes, legal and political issues in and of Kurdistan and the political and commercial corruption and criminality of the BCE, and is a primary source and disseminator of information to the public in Kurdistan and the Kurdish worldwide diaspora.  Plaintiff Revend's thoughts, ideas, and words carry great significance to millions of Kurds, especially those who do not express political allegiance to the criminal Barzani regime. Defendant Reeder's blatantly false attacks are predictably consistent with the pervasive and  intimidation and harassment tactics and orchestrated deceit of Defendant Masrour Barzani and his agents and representatives against Plaintiff Revend and others including political dissidents subject to BCE abuses including but not limited to physical and psychological abuse, humiliation, rape, torture, starvation, isolation, forced confessions, and murder.

542.    Whether Plaintiff Revend harbored actual animus towards any Defendant at any point in the past or present, as Defendant Reeder asserts, is irrelevant. Defendant Reeder fails to meet his burden of supporting his motion with clear and objective evidence, fails to include any direct evidence in his motion that establishes animus or criminality by Plaintiff Revend, and Defendant's motion consists of assertions irrelevant to his claims, underscoring how weak the defendant's arguments are on the facts. For an attorney representing segments of the BCE to make such false allegations in a pleading in this Court is to again illustrate the total and absolute public disrespect and contempt the BCE has for the United States and its laws and institutions, including this Court.

543.    In view of Defendant Reeder's personal participation, as set forth herein, in the BCE scheme and course of conduct to hide true ownership identity and money and assets in the United States and elsewhere in the world that are the fruits of unlawful activities, the false pleading representations by him are particularly troubling.  Pleading false and willful misrepresentations, made with knowledge of its falsity or with gross indifference and reckless disregard as to its truth

or falsity, is egregious professional misconduct, beyond garden-variety neglect (See *Irwin v. Department of Veterans Affairs*, 498 U.S. 89, 96, 111 S. Ct. 453, 112 L. Ed. 2d 435 (1990), is not excusable neglect, fails to meet the District of Columbia Circuit standard, and is material. "A fact is 'material' if it could affect the substantive outcome of the litigation." See *Doe v. District of Columbia*, Civil Action 13-878 (2016), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A false statement is material if it has a natural tendency to influence or [is] capable of influencing the decision of the decision-making body to which it was addressed." See *United States v. Seidling,* 737 F.3d 1155, 1160 (7th Cir. 2013) (quoting *Neder v. United States,* 527 U.S. 1, 16, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999)). "Solemn declarations in open court carry a strong presumption of verity." See *Blackledge v. Allison*, 431 U.S. 63, 97 S. Ct. 1621, 52 L. Ed. 2d 136 (1977).

544.    A person of ordinary intelligence would have found the statements to be defamatory.

545.    Defendant Reeder's characterization of Plaintiff Revend was not an opinion but a solemn declaration wholly lacking verity, with intent to defame and inflict emotional distress, in the false light in which it would be placed, and aggravated and magnified by its publication in a public court record, equivalent to open court, where the false and defamatory statement at issue in this case was widely published on the court's public digital platform website to third parties, and which Defendant Reeder knew would be published with this falsity and reckless disregard for the truth, and can reasonably be understood to convey a false and defamatory message. The statement at issue does not contain any cautionary language. Plaintiff Revend suffered actual or potential legal harm, as did all Plaintiffs, and mental distress from having been falsely exposed to public view. "Imputing criminal behavior to an individual is generally considered defamatory *per se,* and actionable without proof of special damages." See *Paul v. Davis*, 424 In U.S. 693, 697, 96 S. Ct. 1155, 47 L. Ed. 2d 405 (1976). The damning and drastic stigma or "badge of disgrace" (See

*Wisconsin v. Constantineau*, 400 U.S. 433 (1971)) to Plaintiff Revend's reputation, honor, integrity, good name, and his right to maintain his community standing, resulting from the defamatory character of Defendant Reeder's baseless declaration and attaching the stigmatizing label "criminal" without the salutary and constitutionally mandated safeguards of a criminal trial or any process whatsoever, constitutes a tort of defamation.  "Defamatory meaning and falsity are distinct elements of the tort of defamation." See *White v. Fraternal Order of Police*, 909 F.2d 512 (D.C. Cir. 1990); see also *Libre By Nexus v. Buzzfeed, Inc.*, 311 F. Supp. 3d 149, 155 (D.C. 2018). The Supreme Court has recognized that [e]ven if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18-19, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990).

546.    Defendant Reeder's statements were and remain demonstrably false, and are "deliberate falsehoods or reckless disregard for the truth" (See *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), "w[ere] made with 'actual malice' – that is, with knowledge that it was false or with reckless disregard of whether it was false or not."  See *New York Times Co. v. Sullivan*, 376 U.S. 254, 280, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964). Defendant Reeder acted with a primary motive to defame and injure the plaintiff personally, which malice may be inferred from the language itself.  Given Plaintiff Revend's worldwide media following, where journalistic readership and viewership is rooted in the imperative need for credibility and trust, the full and extensive extent of the defamatory implications, including reputational and foreseeable future consequences to the victim Plaintiff Revend, cannot yet be known.

547.    Plaintiff Revend states a claim for defamation of character under District of Columbia law and alleges "(1) that he was the subject of a false and defamatory statement; (2) that the statement

374

was published to a third party; (3) that publishing the statement was at least negligent; and (4) that the plaintiff suffered actual and legal harm." See *Farah v. Esquire Magazine*, 736 F.3d 528, 533-34 (D.C. Cir. 2013) (citations omitted).  Notwithstanding his reputation, Defendant Reeder's defamatory multiple and disparaging statements were materially and knowingly false or made with reckless disregard for the truth, in a deliberate act of deception in an attempt to mislead and influence this Court to rely on false, deceitful, and material misinformation, thereby resulting in inequity, and not a mere technical falsehood and not harmless.

548.    The Supreme Court has defined that "misrepresentation is material" if it "has a natural tendency to influence, or was capable of influencing, the decision of the decision-making body to which it was addressed."  *Kungys v. United States*, 485 U.S. 759, 108 S. Ct. 1537, 99 L. Ed. 2d 839 (1988).  Defendant Reeder's false and misrepresenting declarations were clearly made with the intent to influence the court to which it was addressed.  With respect to compensation, the Supreme Court declared, "As we have recognized, '[t]he legitimate state interest underlying the law of libel is the compensation of individuals for the harm inflicted on them by defamatory falsehood.'"  See *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 111 S. Ct. 2419, 115 L. Ed. 2d 447 (1991), quoting *Gertz* v. *Robert Welch, Inc.,* 418 U. S. 323, 341 (1974).  Relatedly, under District of Columbia law, Plaintiff Maki Revend makes a false light claim, showing (1) publicity by means of the court publishing the complaint and Defendants' defamatory motion on its website, which is widely covered by Kurdistan media; (2) about a false statement, representation or imputation; (3) understood to be of and concerning the plaintiff; and (4) which places the plaintiff in a false light that would be offensive to a reasonable person.  See *Doe v. Bernabei & Wachtel, PLLC*, 116 A.3d 1262, 1267 (D.C. 2015) (alteration in original) (internal quotation marks and citation omitted).

549.    The Supreme Court said, "We have regularly acknowledged the 'important social values which underlie the law of defamation,' and recognized that '[s]ociety has a pervasive and strong interest in preventing and redressing attacks upon reputation.' *Rosenblatt v. Baer*, 383 U. S. 75, 86 (1966). Justice Stewart in that case put it with his customary clarity:

> "The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being – a concept at the root of any decent system of ordered liberty… The destruction that defamatory falsehood can bring is, to be sure, often beyond the capacity of the law to redeem.  Yet, imperfect though it is, an action for damages is the only hope for vindication or redress the law gives to a man whose reputation has been falsely dishonored."

*Rosenblatt v. Baer,* U.S. 75, 92(1966); See *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 23, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990).

550.    Co-conspirator, Dindar Zebari, as KRG's Coordinator for International Advocacy acting under the direction of Defendant Masrour Barzani, and aiding, abetting, and agreeing in the planned scheme to perpetuate their false arrest and provide the public with calculated misdirection and knowingly false and untruthful statements and to facilitate the unlawful imprisonment of at least the eight example journalists referenced herein, ~~acting under direct command of Defendant Masrour Barzani~~ fabricated and issued knowingly false, fallacious, fraudulent, and misleading public statements, declaring "neither conviction was related to the defendants' journalistic work" and that they "were found guilty of gathering sensitive and classified U.S. national defense information (received by Defendants in their official capacities with ~~the Defendant Iraqi Kurdistan Regional Government~~KRG) and passing it covertly to foreign actors in exchange for substantial

sums of money", of "illegally possessing weapons, engaging in forgery, and using false fingerprints or signatures."

(a    **F.    Defendants Use Kidnapping and Assassination to Silence Journalists**

551.    In all these instances, the harassment, unjustified arrest, prosecution, kidnapping, and assassination of journalists effectively led to the infringement of the rights to freedom of opinion, expression and information.  Freedom of expression has been enshrined in the Iraqi constitution since 1925, the date of the first Iraqi constitution, which was then called the Basic Law of Iraq.  The constitution, in the first part titled Rights of the People, states in Article 18 that "Iraqis have the freedom to express their opinions, publish them, assemble, and form associations and participate in them within the bounds of the law."   The permanent Iraqi Constitution, the final document ratified in 2005, addresses "freedom," with Article (38) according freedom of expression by all means.  Paragraph (2) of the same article guarantees freedom of the press.

**(1)    Sardasht Osman Hassan Hamad (Zardasht Osman)**

————On or about May 6, 2010 a young journalist was kidnapped and assassinated in the Iraqi Kurdistan capital of Erbil and killed in the vicinity of the Iraqi city of Mosul. Zardasht Osman criticized corruption, family rule, and nepotism; and specifically criticized the Barzani's in several journalistic pieces. Confidential Human Source #1, who has direct clandestine access to senior ranking Defendant Iraqi Kurdistan Regional GovernmentKRG officials, confirms that Defendant Masrour Barzani was involved inone of the conspirators who caused Osman's Murder.

————Voice of America, an agency of the United States Government, reports credible evidence that authorities of the Defendant Iraqi Kurdistan Regional GovernmentKRG were directly involved in the murder of Osman, and that in the

years since Osman's death, at least 22 other journalists have been killed in Iraq, including several who died in KRG-controlled areas.

**(~~b~~2)**     **Wedat Hussein (Wadat Hussein Ali)**

———Hussein, an ethnic Kurd, worked as a journalist for Roj News, a newspaper affiliated with the PKK, archrival of ~~Defendant Iraqi Kurdistan Regional Government and KRG.~~KRG.  Confidential Human Source #1, who has direct clandestine access to senior ~~ranking Defendant Iraqi Kurdistan Regional Government~~KRG officials, credits his murder to Barzani's loyal security forces. Witnesses saw Hussein, 28, being dragged from his car at gunpoint by two men in the Malta district of the northern Iraqi city of Duhok and abducted. The men forced a mask onto Hussein's face and drove away.  Road cameras show vehicles heading toward the KDP intelligence agency, but later content from all the road cameras recording the abduction were deleted by KDP security agents.  Amir Daud, the owner of a nearby supermarket. who witnessed the incident, posted a descriptive explanation on Facebook the same day, but deleted it one hour later after expressed threats by Barzani security agents.  Two hours later Hussein's lifeless body was discovered near Semel with signs of severe torture on the Semel-Duhok highway in ~~Iraqi~~ Kurdistan that night.  They had assassinated him in a cruel way. They had cut off three of his fingers, broken his leg and popped out both of his eyes.  The United Nations Human Rights Council Special Rapporteur reported "his body showing clear marks of torture."  Multiple witnesses are incorporated herein as Confidential Human Sources.

**(~~c~~3)**     **Qaraman Shukri**

~~Iraqi~~  Kurdish photojournalist Qaraman Shukri works as a freelance photographer and has contributed to the news website Roj News and the broadcaster Sterk TV, which support the opposition Kurdistan People's Party. KDP Asayish security forces arrested Shukri at his home in Shilazdeh, a village near Duhok. Asayish agents, who arrived in seven or eight cars and wore full face masks, did not disclose any reason for Shukri's arrest and did not present a warrant or any court papers. They handcuffed Shukri and shoved the journalist's mother during the raid. After being convicted on or about June, 2021 on anti-state charges during a closed trial in the ~~northwestern~~ Kurdish city of Duhok ~~without a~~with no defense lawyer ~~present~~, he is serving a prison term in Zirka prison in Duhok, a jail where prisoners often cannot access toilet paper and walls are speckled with feces and blood.

### (d4)    **Kawa Garmyane (Garmyani)**

Garmyane was the editor-in-chief of the news website Rayel and a correspondent for the Kurdish-language newspaper Awene. Garmyane had published several reports alleging corruption among Kurdish politicians~~,~~. Unknown gunmen shot and killed Garmyane on or about December 5, 2013, outside his home in the town of Kalar~~, south of the Kurdish Iraqi city of Sulaymaniyah.~~. Confidential Human Sources #1 and #11, who have direct clandestine access to senior ~~ranking Defendant Iraqi Kurdistan Regional Government officials~~KRG, and Sulaymaniyah-based Press Freedom Group Metro Center for Journalist Rights and Advocacy, say ~~Garmyane was murdered~~Garmyane's murder was ordered by the Barzani Defendants in retaliation for his work.

### (e5)    **Soran Mohammed Aziz**

————At 9pm on 21 July 2008 in Shorja-Karkuk in ~~Iraqi~~ Kurdistan, there was a knock on the family residence door.  When Soran opened the door, he was met by three men who shot him.  His last words spoken were "they killed me." Confidential Human Sources #12 and #13, who have direct clandestine access to senior ~~ranking Defendant Iraqi Kurdistan Regional Government~~ KRG officials, were previously told by Soran that he was being seriously threatened by the KDP for his journalist work, and identified the assassins as ~~Iraqi~~ KDP agents. ~~Contemporaneously,~~ Confidential Human Source #1, who has direct clandestine access to senior ~~ranking Defendant Iraqi Kurdistan Regional Government~~KRG officials, was confidentiality informed by the Kirkuk branch of the Union of Journalists and by Levin magazine about the implicit and expressed KDP death threats to Soran. The Barzani-ordered assassination of Soran was witnessed by Confidential Human Source #13.

————~~The Barzani-ordered assassination of Soran was also witnessed by Confidential Human Source #13.~~

### (f(6)  Guhdar Zebari

————Zebari reports and edits for the news website Wllat Media in Akre, a ~~northern~~ Kurdish city. At the time of his arrest, Kurdish security forces in 13 vehicles raided Zebari's house and arrested him.  After pleading not guilty, ~~on~~ 16 February 2021 the politically-directed KRG criminal court ~~of the Defendant Iraqi Kurdistan Regional Government~~ convicted him of being part of a group that gathered information about ~~Iraqi~~ Kurdistan and sentenced journalist Guhdar Zebari to six years imprisonment on charges of destabilizing the security and stability of ~~Iraq's~~the Kurdistan region ~~and.~~ Zebari is serving his sentence at the Asayish general

380

directorate in Erbil.  In the weeks leading up to ~~the~~his arrest Zebari had been "living in fear" and hiding because he had received threatening messages.  Confidential human source #1, who has direct clandestine access to senior ~~ranking Defendant Iraqi Kurdistan Regional Government~~ KRG officials, said witnesses of the trial said prosecutors produced flimsy, circumstantial, and fabricated evidence to substantiate the allegations against Zebari and his co-defendant, journalist Sherwan Amin Sherwani.

## (~~g~~7)   **Sherwan Sherwani**

———Sherwani is editor-in-chief of monthly magazine Bashur, which is critical of the semi-autonomous Kurdish region's political elite and especially the ~~Kurdistan Democratic Party (~~KDP~~)~~ and the powerful Barzani family.  He was arrested on 7 October 2020 by Asayesh security forces at his home in Sebiran, ~~a village on the outskirts of the Iraqi Kurdistan provincial capital city of Erbil,~~ and accused of "endangering the Kurdistan region's security".  He was held in solitary confinement for nearly two months and was tortured by security forces in Erbil. The Barzani-controlled puppet judiciary in ~~the Defendant~~KRG ~~Iraqi Kurdistan Regional Government~~ sentenced Sherwani ~~of~~on 18 February 2021 to six years, and subsequently on 20 July 2023 further sentenced Sherwani to an additional four years in jail on charges of alleged forgery, in a jail where prisoners are threatening suicide every day and no psychological treatment is available.  Sherwani has been arrested multiple times in Kurdistan by agents of Defendant Masrour Barzani.

## (~~h~~8)   **Arkan Sharifi**

————On the morning of 30 October 2017 Arkan Sharifi, a cameraman for Kurdistan TV, was stabbed to death in his home by eight Barzani agents in front of his family in Daquq in north central Iraq.

478552.    Journalists Sherwan Sherwani and Guhdar Zebari, imprisoned by ~~Defendant Iraqi Kurdistan Regional Government~~the KRG since October 2020, ~~at a time Defendant Masrour Barzani was Prime Minister of Defendant Iraqi Kurdistan Regional Government, the presiding and actual head of government and head of the executive power,~~following a biased trial manipulated and fabricated by ~~Barzani~~BCE agents and representatives operating under the command and control of Defendants Masoud Barzani and Masrour Barzani using torture-tainted confessions and refusing to allow defense attorneys timely access to case files, are facing new spurious charges. Guhdar Zebari was scheduled to be released on 16 August 2023 but was informed by ~~Defendant Iraqi Kurdistan Regional Government~~KRG officials on the same day that he has been charged with another offense.  Sherwan Sherwani was due to be released on 9 September 2023, but on 20 July 2023 a court controlled ~~court~~ by Barzani Defendants sentenced him to an additional four years in prison.  The journalists were initially sentenced to six years in prison by the Erbil KRG Criminal Court in February 2021 along with three democracy and freedom of expression activists.

479553.    Confidential Human Sources #1, #2, #3, #4, #5, #9, #10, #11, #12, and #13, who have direct clandestine access to senior ~~ranking Defendant Iraqi Kurdistan Regional Government~~KRG officials, describe conditions where these journalists have been jailed as "horrendous", "a political prison for the enemies of the Barzani regime," "a veritable hell on earth," "a permanent measure of repression and violations of human rights," and meeting no international standards, as 120 prisoners are placed in a hall that was designed for 40 people and without ventilation.  The prisoners must take turns sleeping, where some of them sleep at night and the other part during the day, because the place is very small.  The food is very bad and health care is

almost non-existent.  Prisoners suffer from dehydration, malnutrition, severe body insect infestation, untreated decompensated schizophrenia, filthy housing teeming with insects, rampant violence resulting in death and injuries, and officers using excessive force, overcrowding, inmate deaths, excessive force from officers, structural issues, outbreaks of lice and scabies, and muscle wasting commonly seen in people with late-stage cancers.  These prisons contain hundreds of unindicted prisoners.

480554.        Defendants Masrour Barzani and Waysi Barzani, together with their agents and representatives, including Barzani family members and family members by marriage, together did knowingly and intentionally aid, abet, command, induce, agree, scheme, and procure each others' participation in and did commit overt acts, in furtherance of the Barzani Continuing Criminal EnterpriseBCE, in the commission of the heinous crimes against these eight example and representative instance journalists (there are countless other examplesothers), as a mechanism, strategy, and act to perpetuate and expand the Barzani Continuing Criminal EnterpriseBCE and power base. These tortious acts against journalists and other critics of the Barzani's and the BCE are intended by Defendants Masrour Barzani and Waysi Barzani to torture Plaintiff Maki Revend and others similarly situated by instilling constant fear of severe physical torture, death, family harm Plaintiffs, or enforced disappearance.

481.   By reason of the conduct alleged herein, the criminal and civil violations of U.S. federal law, Presidential Executive Orders having force of law, and regulations knowingly or recklessly, directly or indirectly, committed or caused to be committed, or aided and abetted by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their co-conspirators, including Barzani family members and family members by marriage, are inordinately extensive in number, scope, depth, magnitude, gravity, and criminal severity, and danger to the national and economic

security interests of the United States and its citizens, and injure Plaintiffs, and have violated at a minimum the distinct statutory provisions enumerated herein.

482555.    The criminal activities of Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their agents and associates, including Barzani family members and family members by marriage, in the Barzani Continuing Criminal EnterpriseBCE were undertaken to maintain control of KRG and provide the money and resources needed to cause injury to the named Plaintiffs herein and to the John Doe Plaintiffs.

## OTHER HUMANIX.    DEFENDANT MASROUR BARZANI – A UNITED STATES PERSON –

### COMMANDS CIVIL RIGHTS ABUSES, TRANSNATIONAL REPRESSION, AND CRIMES AGAINST HUMANITY

483.    Defendants Masoud Barzani and Masrour Barzani, in their unapologetic authoritarian and autocratic control of the Defendant Iraqi Kurdistan Regional Government and the Kurdistan Democratic Party, at variance with free market liberal democracy they publicly espouse, treat political dissent, real or imagined, and free expression and democratic participation as a threat not only to their own political interests and imperiling their centralized grip on power, but also to the Defendant Iraqi Kurdistan Regional Government's one dominant political party system of government and their continuing criminal enterprise.   The Defendant Iraqi Kurdistan Regional Government's efforts, and those of the complementary and interrelated Barzani Continuing Criminal Enterprise, each directed by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani and their agents and representatives, including Barzani family members and family members by marriage, to suppress and censor political dissent and free expression and association and democratic participation, even violently, inflicting unending cruelties and miseries, beyond the loosely defined regional borders of Defendant Iraqi Kurdistan Regional Government, including into the United States of America, is well documented.

484.    The Defendant Iraqi Kurdistan Regional Government, and in particular the subordinate Defendant Iraqi Kurdistan Regional Government Security Protection Agency and the subordinate Defendant Iraqi Kurdistan Regional Government's Intelligence and Security Agency (the successor agency to Parastin), which are the intelligence and secret police agencies of the Defendant Iraqi Kurdistan Regional Government responsible for counterintelligence, espionage

384

and political security, and which are tightly directed, commanded, and controlled by Defendant Masrour Barzani — absent any statute, decree, order, resolution or comparable evidence of sovereign authorization for any of the actions in question, and who has without lawful authority of either the superior Republic of Iraq and the inferior provincial Defendant Iraqi Kurdistan Regional Government, broadened and expanded its mission to extend beyond law enforcement and into functions more associated with a personal international intelligence service — conduct improper cross-border operations and often unlawfully censor disfavored political speech that is deemed or perceived to potentially be damaging to the reputation of the Defendant Iraqi Kurdistan Regional Government or the Barzani Continuing Criminal Enterprise, collect information through extraterritorial clandestine and covert human source operations, and monitor, and conduct illegal surveillance at residence and places of work.  Persons targeted include those voicing peaceful Iraqi Kurdish political dissent or counter viewpoints, particularly Ayoub Barzani, a respected and revered Kurdish leader and voice of democracy amongst Iraqi Kurds worldwide, and vocal journalistic critic of the dangerous Barzani Continuing Criminal Enterprise, among many others.

485.   In recent years, expatriates of Iraqi Kurdistan lawfully residing in other countries, including in the United States, and including U.S. citizens, and in other locations outside Iraqi Kurdistan, conducting their lives in a manner understood to be lawful, are also unlawfully targeted for kidnapping, torture, and murder, as described more fully herein.

486.   All of these actions have the object of facilitating economic, political, military, financial, and commercial decision making and improper advantage in and for the Barzani Continuing Criminal Enterprise.

## MURDER TO SILENCE FREEDOM ADVOCATE SCHOOLTEACHER, JIHAN TAHA ABDULRAHMAN

487. On or about October 26, 2023, Plaintiff, Shakhwan Abdulrahman's sister, Jihan Taha Abdulrahman, was brutally tortured and murdered in the Barzani-controlled town of Barzan, Kurdistan, Iraq, by agents of Defendant Mustafa "Babo" Barzani, the designated Iraqi Kurdistan Regional Government official head of the Barzan region acting under the command and direction of Defendant Masrour Barzani. Jihan Taha Abdulrahman was a harmless, innocuous school teacher in Erbil, Iraqi Kurdistan, and was a vocal but peaceful critic of the criminality and human and civil rights deprivation of the Barzani regime—having appeared as a representative of teachers three times on Kurdistan television criticizing the Barzani-controlled KRG Ministry of Education. As part of the Barzani family's continuing effort to maintain unrestrained political and commercial power in Kurdistan and instill fear in its citizens, and consistent with its State Department-documented pattern of silencing viewpoint expression and political dissent, the BCCE decided and acted to silence Jihan.

488. Many members of the Iraqi Kurdish community are strongly opposed to the Defendant Iraqi Kurdistan Government's prime minister, Masrour Barzani, an autocratic leader. They consider him a strongman who, with a proven history of intolerance for dissent, despotically rules Iraq's Kurdish population and its worldwide expatriate community. Jihan, a quiet, reserved school teacher, had the courage, the known dangers notwithstanding, of speaking out about the abuses and maltreatment of teachers by the Barzani regime operating the defendant Iraqi Kurdistan Regional Government. Just for speaking her mind in advocating for a Kurdistan future of freedom, she ran afoul of Kurdish government officials, and was not safe from intimidation, suppression, coercion, and murder.

489. Jihan was not an experienced, proficient, or confident driver and did not drive her car out of the Erbil area. She never drove her car in the mountains to Barzan and informed no family or colleagues or friends or students or community of any intention or plan to drive to Barzan. She

386

knew no persons in Barzan.  She has no criminal history.  This "accident" as alleged by the Barzani controlled authorities in Barzan occurred in the dark of night after a normal full day of teaching middle and high school students, when Jihan, according to Barzan officials, was traveling alone, on a road with which she was totally unfamiliar, and at least a three-hour drive time from her home. What actually happened was that agents of the BCCE, with the intent to silence and kill defenseless Jihan, who possessed no weapons or means or skills or training or facility of self-protection, kidnapped her, drove her car to Barzan, tortured her, and then in an inhuman and barbarous manner set fire to her car while she was trapped inside. Pictures were taken by passersby and published of Jihan's car fully engrossed in flame on a straight stretch of highway in Barzan.  In a transparent fraudulent and false setup orchestrated by police agents operating under the command and control of the defendants Masrour Barzani, Mustafa "Babo" Barzani and Iraqi Kurdistan Regional Government and the BCCE, and who released a false story that Jihan was the victim of an accident and died in the car fire, when in fact she was restrained, locked in her car, and burned to death by the very officials who investigated and publicized her death. The engine compartment and rear of the car including the fuel and exhaust systems, where a vehicle fire would have customarily started and flared, were not completely burned; only the passenger compartment which contains no accelerants was totally consumed by fire as was Jihan's body which was incinerated – "burning alive…" for "the deliberate infliction of pain for the sake of pain".  See *Wilkerson v. Utah*, 99 U.S. 130, 136, 25 L.Ed. 345, and which burning alive Justice Blackstone observed "savor[ed] of torture or cruelty."  The United States National Institutes of Health says "Burn injuries … cause one of the most excruciating forms of pain imaginable." These inhumane acts of torture were committed "by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." See *Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Art. 1.*

490. Jihan's family was informed of her death by Khalat Barzani, a cousin of and employed by defendant Masoud Barzani. Defendants' "conduct [was] so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *See Ortberg v. Goldman Sachs Group*, 64 A.3d 158 (D.C. Cir. 2013); *Homan v. Goyal*, 711 A.2d 812, 818 (D.C.1998); *accord Wood v. Neuman*, 979 A.2d 64, 77 (D.C. 2009).

491. Defendant Masrour Barzani, prime minister of Defendant Iraqi Kurdistan Regional Government, was scheduled to visit (and did visit) Washington DC on and around February 29, 2024. Learning of this, Plaintiff Shakhwan Abdulrahman, an American citizen, traveled to Washington,. D.C. with the intent to speak with Defendant Masrour Barzani about Jihan's murder. Shakhwan dearly missed Jihan and suffered anguish and grief that he could not protect her, and thought about the unspeakable fear and agony she surely endured when kidnapped, tortured, and incinerated. Absent success in obtaining a meeting, denied by Defendant Masrour Barzani, Shakhwan's intent was to express his protected political dissent in a public and lawful political expression in Washington, D.C., with others, on February 29, 2024, by merely standing on the public sidewalk holding a large picture of his murdered sister and verbally expressing sadness and anger and seeking accountability, engaging in political speech that is granted the broadest swath of First Amendment privilege.

### ASSAULT, BATTERY, AND REPRESSIONABUSE OF AMERICAN CITIZEN CITIZENS AND FREEDOM ADVOCATE SHAKHWAN ABDULRAHMAN

492. Plaintiff, Shakhwan Abdulrahman, is a citizen of the United States and resides in the United States. Upon learning that Defendant, Iraqi Kurdistan Prime Minister Masrour Barzani, was visiting the United States on a public relations tour and would be in Washington D.C. at the end of February 2024, Plaintiff Shakhwan Abdulrahman traveled to Washington, D.C. to exercise his First Amendment right to speech and expression and his clearly established federal

556.constitutional and statutory right to peacefully demonstrate against the despotic and imperious Barzani regime in and of Iraqi Kurdistan, and specifically in remonstration of the concealed murder of his sister, Jihan, a young mother of two children.

493. Defendant Masrour Barzani, prime minister of Defendant Iraqi Kurdistan Regional Government, was scheduled to visit (and did visit) Washington DC on and around February 29, 2024. Learning of this, Plaintiff Shakhwan Abdulrahman, an American citizen, traveled to Washington,. D.C. with the intent to speak with Defendant Masrour Barzani about Jihan's murder. Shakhwan dearly missed Jihan and suffered anguish and grief that he could not protect her, and thought about the unspeakable fear and agony she surely endured when kidnapped, tortured, and incinerated. Absent success in obtaining a meeting, denied by Defendant Masrour Barzani, Shakhwan's intent was to express his protected political dissent in a public and lawful political expression in Washington, D.C., with others, on February 29, 2024, by merely standing on the public sidewalk and engaging in political speech. "[P]ublic places historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are considered, without more, to be public forums." See *Frederick Douglass Found. v. District of Columbia*, 531 F. Supp. 3d 316 (D.C. 2021), citing *United States v. Grace*, 461 U.S. 171, 177 (1983); see also *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 27, 45 (1983) (explaining that streets — which "have immemorially been held in trust for the use of the public" and "have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions" — are "quintessential" example of public forums) (citation omitted).

494. Defendant Masrour Barzani's and his agents' unlawful and violent reaction and use of disproportionate and unreasonable bodily force, reasonably foreseeable to restrain free speech, in a manner abhorrent to our civil liberty protections and in ways that are unnecessary and unlawful to that expression is an example of the utter contempt that Masrour Barzani and the BCCE hold

for the United States, its values of the rule of law, human rights, and democracy, and the constitutional rights and privileges of its citizens and those who visit its shores. Defendant Masrour Barzani and his accompanying agents and representatives ignored and evidenced contemptuous disdain for what the Supreme Court declared is America's "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," See *New York Times Co. v. Sullivan*, 376 U. S. 254, 270 (1964).

495. This recurring pattern or practice of unreasonable, excessive, and unlawful force in its State Department documented pattern of silencing viewpoint expression and political dissent is directly attributable to the willfulness, negligence, and failure of Defendant prime minister Masrour Barzani, who is directly liable, to properly supervise subordinates and to identify and address unreasonable force which has allowed unlawful conduct, including unlawful violence committed in his presence, to continue.

496. Plaintiff Shakhwan Abdulrahman arrived on February 29, 2024 at the headquarters building of the U.S. Chamber of Commerce at 1615 H St. NW, Washington, D.C.— one block from the White House— where Masrour Barzani and those traveling with him were scheduled to hold an event, and proceeded to exercise his legal rights and did peacefully and lawfully voice protected political expression in protest of the murder of his sister by Defendant Masrour Barzani, Mustafa "Babo" Barzani, and the agents and representatives of the continuing criminal enterprise they direct.

497. The entire objective and purpose of Defendant Masrour Barani and his agents' confrontation was to silence Plaintiff Shakhwan Abdulrahman from expressing his viewpoint, disagreeable or belligerent to the Barzani regime, in a public place, where he could be seen and heard by officials of the United States Government and by American media in America's Federal City. As the Supreme Court has emphasized, "[t]he right to free speech ... may not be curtailed simply because

the speaker's message may be offensive to his audience." *Hill v. Colorado,* 530 U.S. 703, 716, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000).

498. Shortly after Plaintiff Shakhwan Abdulrahman began his peaceful and non-threatening demonstration against the BCCE in the capital city of the United States of America, in retaliation by Defendants for speaking out and to silence him, Defendant Omet Derbendi did physically intervene and attempt to prevent Plaintiff Shakhwan Abdulrahman from exercising public expression and aggressively threatened him with bodily harm and did intentionally inflict emotional distress. Plaintiff Shakhwan Abdulrahman was aggressively attacked, assaulted, and battered by Defendants Arfan Salih Omer Sherwani, who attempted to destroy the phone, and Hamza Salim, and Defendants Hikmet Bamerni, who was supervising the agents and did nothing to stop the assault, Hayman Quassi, and Dasko Shirwani who, employing or accommodating violent bodily force "as an instrument of oppression" (See *Davidson v. Cannon,* 474 U.S. 344, 348, 106 S. Ct. 668, 88 L. Ed. 2d 677 (1986), had a "'sufficiently culpable state of mind," which is one of "deliberate indifference.'" "'[D]eliberate indifference describes a state of mind more blameworthy than negligence,'" "but does not require proof that the defendant purposefully caused harm or acted with 'a knowing willingness that [harm] occur.'" See *Doe v. District of Columbia,* Civil Action No. 2013-0878 (D.D.C. 2016), citing *Farmer v. Brennan,* 511 U.S. 825, 836 (1994). "[A] supervisor may be held individually liable … if he directly participates in a constitutional violation or if a failure to properly supervise and train the offending employee caused a deprivation of constitutional rights." See *Andrews v. Fowler,* 98 F.3d 1069 (8th Cir. 1996). Barzani agents and Defendants at the scene of the attack on Shakhwan who were not physically attacking Plaintiff Shakhwan were negligently supervising or overseeing Defendants Sherwani and Salim, and were culpably careless in their supervisory roles and who "acquiesced in or tacitly authorized [their] subordinates unlawful actions" (See *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 737, 109 S.Ct.

2702, 105 L.Ed.2d 598 (1989), and assisted (or indirectly assisted, and did nothing to stop the attack. They were agents and representatives of Defendant Masrour Barzani, with a goal of curtailing and depriving the federal constitutional and statutory rights and other constitutionally protected interests of an American citizen, and in a conspiracy to commit a crime of violence against him. In performing these acts which caused injury, defendants intended to do great bodily harm to Plaintiff Shakhwan Abdulrahman, or knew that such acts would cause injury to Plaintiff, or knew that such acts create a strong probability of great bodily harm to Plaintiff, and acting together committed a forcible felony, in the course of or in furtherance of crime. These human rights include violations and abuses involving the repression of a member of civil society.

499. In their unprovoked and illegal physical attack on Plaintiff Shakhwan Abdulrahman while freely, lawfully, and peacefully exercising a fundamental right, Defendants Arfan Salih Omer Sherwani and Hamza Salim, acting for and on behalf of Defendant Masrour Barzani, in a civil rights violation under 42 U.S.C. § 1985, and in an effort to destroy evidence of Defendants' unlawful conduct, physically attempted (without success) to illegally steal and confiscate or destroy Shakhwan's cell phone that he had been using to lawfully and freely film and record the violent reaction of the Barzani group to his tiny peaceful demonstration. The two Barzani bodyguards who attacked Shakhwan tried to force the phone out of his hand but could not take it away. Then the attackers tried to break the phone in Shakhwan's hand, which caused pain in his hands and back, which persists. As a direct and proximate cause of Defendants' actions, Shakhwan continues to suffer crippling physical and emotional effects of the attack.

500. The attackers tried to also kick Shakhwan, but when police arrived, the attack was halted. They also boldly and powerfully kicked the photo of Shakhwan's murdered Kurdish sister, in an intentional act of disrespect and repression of a Constitutionally protected liberty. Shakhwan was displaying a photo, a protected medium of free speech equivalent to displaying a political sign in

one's front yard, which the Supreme Court has held is substantive speech. See *City of Ladue v. Gilleo,* 512 U.S. 43, 54-56, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994).

501. With regard to a prior similar incident in Washington, D.C. against Kurdish dissidents, the United States Secretary of State expressed the position of the United State Government: "The United States does not tolerate individuals who use intimidation and violence to stifle freedom of speech and legitimate political expression." Although the Circuit Court for the District of Columbia "has established that the [Kurdish] security detail had a right to protect [prime minister Barzani]", that does not automatically grant Barzani's security personnel "discretion to commit criminal assaults." See *Usoyan v. Republic of Turkey*, 6 F.4th 31 (D.C. Cir. 2021). Further, Defendants cannot identify any statute, regulation, or other source of law that confers its discretion to act nor can Defendants identify any such specific authorization in this case. The FSIA, like the FTCA, does not shield all exercises of discretion. The discretionary function exception "protects only governmental actions and decisions based on considerations of public policy." See *Berkovitz v. United States*, 486 U.S. 531, 108 S. Ct. 1954, 100 L. Ed. 2d 531 (1988). Mere "garden-variety" discretion receives no protection. See *Cope v. Scott*, 45 F.3d 445, 448 (D.C.Cir.1995). Only discretionary actions "grounded in social, economic, and political policy" fall within the exception. See *United States v. Gaubert*, 499 U.S. at 323, 111 S. Ct. 1267, 113 L. Ed. 2d 335 (1991). None of defendants' violent actions were grounded in any lawfully constituted public policy.

502. As the Circuit Court of the District of Columbia stated in a similar case, "Although the [Kurdish] security detail's protective mission was discretionary as a general matter, that does not mean that every action a [Kurdish] officer may take is an immunized exercise of that discretion." Discrete injury-causing actions can, in certain cases, be "sufficiently separable from protected discretionary decisions to make the discretionary function exception inapplicable" and "do not fall within the discretionary function exception." See *Usoyan v. Republic of Turkey*, 6 F.4th 31 (D.C.

Cir. 2021). *Moore v. Valder*, 65 F.3d 189, 197 (D.C. Cir. 1995), *abrogated on other grounds by Ziglar v. Abbasi*, U.S., 137 S. Ct. 1843, 198 L.Ed.2d 290 (2017). U.S. law "does not rule the world" but there is a presumption that it "governs domestically." *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 115, 133 S.Ct. 1659, 185 L.Ed.2d 671 (2013) (quoting *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 454, 127 S.Ct. 1746, 167 L.Ed.2d 737 (2007)). Defendant Barzani's KRG agents violated several District of Columbia laws, including assault with a dangerous weapon and aggravated assault, *see* D.C. Code §§ 22-402, 404.01, and committed civil rights violations under 42 U.S.C. § 1985. These actions occurred during a physical attack by Kurdish government agents and representatives, in America's capital, to stifle the First Amendment rights of people protesting the treatment of a minority group in Iraqi Kurdistan.

503. Plaintiff Shakhwan Abdulrahman acknowledges the Kurdish security detail has a right to protect Prime Minister Masrour Barzani. The Iran-US Claims Tribunal in *Sedeo, Inc v Iran* recognized a "police powers" exception thus: "[It is a] principle of international law that a state is not liable for economic injury which is a consequence of bona fide 'regulation' within the accepted police powers of states." *Sedeo, Inc v Iran*, 9 Iran-US Claims Tribunal Reports 248, at para 275. However, defendants Iraqi Kurdistan Regional Government, Masrour Barzani, and his agents and bodyguards do not have police powers or law enforcement authority inside the United States and did not have discretion to commit criminal assault and battery. The violent assault and battery committed by Defendant Masrour's agents against Plaintiff Shakhwan Abdulrahman was not plausibly grounded in considerations of security-related policy.

504. Plaintiff Shakhwan Abdulrahman suffered physical injuries and emotional distress as a result of the attack by Defendants Arfan Salih Omer Sherwani and Hamza Salim and sought medical care. The extent and severity of Plaintiff Shakhwan Abdulrahman's cumulative injuries resulting

from the attack on him by Defendants Arfan Salih Omer Sherwani and Hamza Salim are not currently fully known.

505. Plaintiff Shakhwan Abdulrahman also brings this action on his behalf and as representative of his murdered sister's estate pursuant to 18 U.S.C. § 2333, which provides that any U.S. national may sue for an injury sustained "by reason of an act of international terrorism." 18 U.S.C. § 2333(a). "International terrorism" is defined as activities that: (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State; (B) appear to be intended – (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination or kidnapping; and (C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum[.]

506. "An act of international terrorism" subjecting defendants to civil suit under the Antiterrorism Act (ATA), which, in relevant part, permits "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, [to] sue … in any appropriate district court of the United States." 18 U.S.C. § 2333(a). Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold damages.

507. Plaintiff Shakhwan Abdulrahman also brings this action on his behalf and as representative of his sister's estate pursuant to the Alien Tort Claims Act ("ATS"), 28 U.S.C. § 1350. Both U.S. nationals and foreign nationals may assert federal common law claims, namely, assisting in the

intentional injury of others, reckless disregard of injury to others, wrongful death, survival, and negligent and intentional infliction of emotional distress against defendants whose actions meet the statutory requirements, as in the instant case.

## TRANSNATIONAL DELIBERATED EXTRAJUDICIAL DEATH THREATS, REPRESSION, AND EXILE OF AYUB BARZANI

508.    Ayoub Barzani is an internationally recognized Kurdish writer and admired critic.  He is the son of Babo Barzani, nephew of Ahmed Barzani (the head of the Barzan tribe), and brother-in-law and first cousin of Defendant Masoud Barzani, the former President of Iraqi Kurdistan Region.  He is presently extrajudicially exiled under threat of death should he return to Kurdistan, and is living in existential dread, and isolated from his family by Defendants Masoud Barzani and Masrour Barzani in Switzerland, where he is a co-founder of a democracy advocacy organization, counter to the Barzani-controlled KDP, and known as Kurdistan Democratic Alliance, and lives every day in his hope of seeing his children and grandchildren again which keeps him, amidst mental torture, from wishing to die.

509.    The Defendant Iraqi Kurdistan Regional Government's efforts under the direction of Defendant Masrour Barzani, acting without any and all lawful authority of the Republic of Iraq or the Defendant Iraqi Kurdistan Regional Government, to overtly and covertly censor, influence, coerce, and sometimes murder political dissidents to silence them extends far beyond the Defendant Iraqi Kurdistan Regional Government's regional borders.  In order to monitor his perceived enemies, agents and representatives, including Barzani family members and family members by marriage, Defendant Masrour Barzani has scrutinized and disrupted individuals who post online content, frequently using US-based internet providers.  Ayoub Barzani, who at extreme personal cost and sacrifice, has been and is a distinguished, venerated, peaceful, outspoken

396

advocate for human rights, the advance of democracy, and of fair and impartial and accountable justice and the rule of law in the territory of Defendant Iraqi Kurdistan Regional Government, was targeted by Defendant Masrour Barzani and his agents and representatives, was forced and ordered by Defendants Masoud Barzani and Masrour Barzani, exercising imagined and feigned authority not granted by the laws, regulations, or policies of Republic of Iraq nor the Defendant Iraqi Kurdistan Regional Government, to leave his home in Iraqi Kurdistan and abandon his family members, thereby intentionally and recklessly inflicting extreme emotional distress.  Ayoub Barzani has been an unlawfully exiled Iraqi Kurd living for many years as a long-time expatriate resident of Switzerland.

510.    In the calculated and planned efforts of Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their agents, representatives, and Barzani family members and family members by marriage, to silence Ayoub Barzani, agents and representatives of Defendants Masoud Barzani and Masrour Barzani, directed and deployed by them, have visited known associates and family members of Ayoub Barzani and attempted through intimidation, implicit and expressed threats of bodily harm, enforced disappearance, or assassination, family imprisonment and isolation, to overtly and covertly dissuade and coerce Ayoub Barzani from further critical social media postings, writing, and peaceful justice, accountability, and democracy advocacy with the object to discredit and smear the respected and trusted reputation of Ayoub Barzani.

511.    Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their agents and representatives, including Barzani family members and family members by marriage, operating under their command, did knowingly and willfully, directly and indirectly, and with the intent to harass, intimidate, and place under surveillance with the intent to harass and intimidate one or more persons, conspire to use one or more interactive computer services and electronic communication systems of interstate commerce, and transmitted through interstate and foreign

commerce in one or more communications containing one or more implicit and expressed threats to injure the person of another, including Ayoub Barzani, and used one or more other facilities of interstate and foreign commerce to engage in a course of conduct that caused, attempted to cause and would be reasonably expected to cause substantial emotional distress to one or more persons and their immediate family members, contrary to Title 18, United States Code, Section 2261A(2)(B), all part of a broader concerted Barzani Continuing Criminal Enterprise effort to ban from their venues people whom they say are adversarial toward him/them and to send a message to millions of exiled Kurds worldwide, including American citizens of Kurdish origin, that if they don't fall in line and do what the Barzani political establishment tells them to do—then they too will be targeted for investigation, indictment, arrest, imprisonment, enforced disappearance, or even murder, thereby alienating and disenfranchising much of the Iraqi Kurdistan population.

512.   Defendant Masrour Barzani and his agents and representatives, frequently employing U.S. technology and expertise and personnel, have attempted to pressure and otherwise overtly and covertly intimidate and threaten and coerce U.S. social media companies and platforms, through private communications and legal threats, into censoring certain social-media content and divisive deplatforming, in violation of the First Amendment, to remove posts and stories the content of which touched on topics deemed problematic and unacceptable by Defendant Masrour Barzani, which were authored by Ayoub Barzani and supportive U.S.-based and European-based associates from social media platforms posts and stories removed or downgraded by the platforms.

513.   In an 8 July 2022 notice, when Defendant Masrour Barzani was at the time and is Prime Minister of Iraqi Kurdistan, the presiding and actual head of government and head of the executive power, the U.S. Department of States defined transnational repression as:

> *"activities includ[ing] attempts by a government to target individuals located outside of its territory for peacefully exercising their human rights and fundamental freedoms, through various*

forms of harassment, intimidation, and coercion" ...with "condemnation of transnational repression activities occurring in the United States and elsewhere. Such activities include attempts by a government to target individuals located outside of its territory for peacefully exercising their human rights and fundamental freedoms, through various forms of harassment, intimidation, and coercion."

514.    The United States Government in its *Declaration of Principles to Combat Transnational Repression*, issued at the time Defendant Masrour Barzani was and is Prime Minister of Defendant Iraqi Kurdistan Regional Government, the presiding and actual head of government and head of the executive power, affirms that "transnational repression is a threat to democracy and human rights worldwide."

515.    Transnational repression is governments reaching across borders to silence dissent among diasporas and exiles, including through assassinations, illegal deportations, abductions, digital threats, Interpol abuse, and family intimidation.  Autocrats today have access to a range of tools to extend their reach by thousands of miles, sometimes in fractions of a second.  Some schemes rely on 21st century technologies to hack, surveil, and intimidate targets, while others use blunter tactics such as extortion, abduction, and assassination.  This practice of transnational repression constitutes a wholesale assault on the rule of law internationally.

516.    Insider Confidential Human Sources #1, #2, #3, #4, #5, and #8, who have direct clandestine access to senior ranking Defendant Iraqi Kurdistan Regional Government officials, have documented a growing number of instances where Defendants Masrour Barzani and Waysi Barzani, and their subordinate agents and representatives, including Barzani family members and family members by marriage, operating under their command, did knowingly and willfully conspire, commit, and aid and abet, and in connection with, did commit unlawful activity by using the tools of transnational repression, including violence and intimidation, to reach beyond the loosely defined borders of Defendant Iraqi Kurdistan Regional Government, to silence peaceful

dissent, and are becoming more aggressive and more coordinated in their efforts to target, silence, and harass Kurdish opposition voices, including in Europe and the United States, and perceived threats to their power, commercial money-making ventures both licit and illicit, and continuing criminal enterprise.

517.    Without lawful authority and in an effort to police the Kurdish diaspora worldwide, including in the United States, silence political opposition, and suppress or quash the free exchange of information about their regime, and in furtherance of its continuing criminal enterprise, the Barzani regime, directed, commanded, and controlled by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and its co-conspirators, including Barzani family members and family members by marriage, did knowingly and willfully, directly and indirectly, conspire, commit, and aid and abet, and in connection with, unlawful activity, with the intent to harass and intimidate one or more persons, to place that person and persons in reasonable fear, that is not imaginary or wholly speculative, of the death, enforced disappearance, and serious bodily injury, did knowingly and willfully make one or more materially false, fictitious and fraudulent statements and representations, and to engage in a course of conduct that caused, attempted to cause and would be reasonably expected to cause substantial emotional distress and anguish, severe financial deprivation, extreme familial isolation and separation, travel limitations and restrictions, and forced exile, each and all a form of extrajudicial imprisonment and mental torture, absent any statute, decree, order, resolution or comparable evidence of sovereign authorization for any of the actions in question, and were and are not the official policy or the officially sanctioned policies of the Republic of Iraq, the foreign sovereign, the Defendant Iraqi Kurdistan Regional Government, or international law or treaty, on Ayoub Barzani in Switzerland, his children and grandchildren and extended family members in Iraqi Kurdistan and elsewhere, and others.

518.    From Europe, far outside the territory of Defendant Iraqi Kurdistan Regional Government, Ayoub Barzani has continually, repeatedly, and peacefully exercised his human rights and fundamental freedoms and as a result has for more than twenty years suffered endless planned harassment, intimidation, Defendant Iraqi Kurdistan Regional Government surveillance, monitored voice conversations, coercion, and the eliciting and publicizing of false derogatory information about Ayoub Barzani.    Defendants Masoud Barzani, Masrour Barzani and Waysi Barzani have engaged other agents to assist in the scheme to undermine Ayoub Barzani – attempting to falsely discredit him in the eyes of his extended family, fellow Kurds, and the United States and Europe and the international public.    These agents have been directed by Defendants Masoud Barzani, Masrour Barzani and Waysi Barzani, aided and abetted by their co-conspirators, subordinates, and representatives, including Barzani family members and family members by marriage, each and all deceptively, knowingly, and falsely professing to act under the color of lawful authority of Defendant Iraqi Kurdistan Regional Government, which lawful authority did not and does not exist.

519.    It was and is an object of the Barzani conspiracy to instigate, perpetuate, and commit acts in furtherance of the Barzani Continuing Criminal Enterprise specifically intended to threaten and intimidate Ayoub Barzani and his family, and Plaintiffs, by inflicting severe physical and mental pain and suffering upon them.    Without lawful authority the conspirators did affect, disrupt, and impede foreign commerce of Ayoub Barzani, all with the object of preserving the Barzani power base and perpetuating the Barzani continuing criminal enterprise, all to the harm of the Plaintiffs.

520.    Ayoub Barzani, without lawful authority from the government of the Republic of Iraq or the Defendant Iraqi Kurdistan Regional Government, and contrary to international law and treaties and the laws of the Republic of Iraq and the Defendant Iraqi Kurdistan Regional Government, was extrajudicially expelled from the territory of Defendant Iraqi Kurdistan Regional Government by

Defendant Masoud Barzani after an unsuccessful attempt on Ayoub Barzani's life ordered by Defendant Masoud Barzani.  Ayoub Barzani was involuntarily and forcefully expelled from his Kurdistan home without due process or judicial engagement or lawful authority.  Defendant Masoud Barzani, without lawful authority, personally ordered and told Ayoub Barzani: "Leave Kurdistan or be killed."  He was and is forced to live without his family, including his wife, in isolated exile in Switzerland.  In Kurdish Middle East culture, there are two ways to inflict pain: physically, and damage the family name.

521.    During his unlawfully and extrajudicially forced extrajudicial exile, Ayoub Barzani continues to be the recipient of emotional torment, distress, and familial separation anguish instigated by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and enforced by their agents and representatives, including Barzani family members and family members by marriage. His children and grandchildren are unlawfully kept from him by Defendant Masrour Barzani and his agents and representatives and detained in territory of Defendant Iraqi Kurdistan Regional Government, without due process or judicial engagement or lawful authority, by the Barzani regime controlled by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani. These acts, in furtherance of the Barzani Continuing Criminal Enterprise, of attempted murder, forced deliberated extrajudicial exile, and continuing intimidation and physical, financial, and other endangering threats against him and his extended family, have inflicted severe mental and extreme emotional pain and suffering for over twenty years.  For over twenty years the Barzani regime, directed and commanded by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, has inflicted constant and severe humiliation on Ayoub Barzani's brothers, who at the command and direction of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and public and social media humiliation efforts under their command and direction, are treated like lepers.

522.    Through unlawful orchestrated intimidation and fear, which is not imaginary nor wholly speculative, induced by violence at the unlawful command and direction of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, resulting in forced societal isolation and financial deprivation of Ayoub Barzani, and intentional destruction of his family reputation and association (the biggest and most severe form of torture and suffering in Kurdish culture), including preventing people from speaking to them.

523.    The most extreme, severe, and purposeful mental torture and painful familial humiliation inflicted by Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their agents and representatives, acting contrary to the laws of the Government of the Republic of Iraq and the Defendant Iraqi Kurdistan Regional Government and international law, was their coordinated, willful, and wholly unlawful denial and prevention of Ayoub Barzani to attend the funeral of his beloved wife in Iraqi Kurdistan—an intentionally inflicted pain and public humiliation, a form of torture very significant in Kurdish culture, which was widely noted throughout Iraqi Kurdistan and the global Kurdish diaspora.

524.    Under the doctrine of command responsibility, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani are legally responsible for the unlawful torture, suffering, and prolonged and sustained mental, emotional, psychological, and reputational anguish of Ayoub Barzani and his family members inflicted at the command of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani and perpetuated as part of the Barzani Continuing Criminal Enterprise and the pursuit of its objectives for illicit financial gain and to injure Plaintiffs.


**DELIBERATED EXTRAJUDICIAL EXILE AND DEATH THREATS TO KAMAL**

525.    Another representative example of a Kurd living in constant fear, which is not imaginary nor wholly speculative, in forced exile—among thousands of other such refugees—is "Kamal", a

peaceful scholarly dissident and advocate for democracy, accountability, legality, and transparency of governance, who with his immediate family, was extrajudicially forced to flee Iraqi Kurdistan by Defendants Masoud Barzani and Masrour Barzani, without legal authority of the laws, regulations, or policies of the Republic of Iraq or the Defendant Iraqi Kurdistan Regional Government, and has lived in Sweden in fear, which is not imaginary nor wholly speculative, in arbitrarily and extrajudicially imposed exile for twenty years. In furtherance of the objectives and purposes of the Barzani Continuing Criminal Enterprise, and absent lawful evidence or proper due process, Confidential Human Source #1 reports "Kamal" has been indicted in the acquiescent Defendant Iraqi Kurdistan Regional Government judicial system controlled and commanded by Defendants Masoud Barzani and Masrour Barzani in at least eighty seven mostly secret legal cases. While living in Sweden, Kamal has been the victim of at least two Barzani-directed (and unsuccessful) assassination attempts in Sweden.

### DELIBERATED EXTRAJUDICIAL EXILE AND THREATS
### TO TWANA NODER KARIM

526. Another representative example of a Kurd living in constant fear, anxiety, fright, and worry, which is not imaginary nor wholly speculative, in deliberated extrajudicial exile, ordered, forced, and persisted by Defendants Masoud Barzani and Masrour Barzani, and their agents and representatives serving at their command and direction, is Twana Noder Karim, aka Qader Nader, a Kurdish activist journalist living in exile in Sweden. He was physically attacked in Stockholm, outside his home, by two men of the United Tribuns organized crime mafia employed in Europe by the Iraqi Parastin, a subordinate agency of the Defendant Iraqi Kurdistan Regional Government and who function at the command and control of Defendant Masrour Barzani, and directed by Defendant Herish Rash, head of Parastin who became Peshmerga in 1987. At the command of

Defendants Masoud Barzani and Masrour Barzani, and absent any and all legal authority, Iraqi KDP Parastin has killed hundreds of people. KDP Parastin is directly commanded and controlled by Defendant Masrour Barzani, and by Defendant Ahmad Kurdu Nori, the Barzani's and Rash's representative and agent in Nuremberg, Germany. Confidential Human Sources #5 and #8, who have direct clandestine access to senior ranking Defendant Iraqi Kurdistan Regional Government and KDP party officials, and especially to Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani and their immediate subordinates, report that Parastin officials, aiding and abetting and acting as directed by Defendant Masrour Barzani, issued the assassination order, and which was communicated to an Iraqi KDP hitman Defendant "Shalawo". Confidential Human Source #9, a servant in the Barzani household, and who has direct clandestine access to senior ranking Defendant Iraqi Kurdistan Regional Government and KDP party officials, and especially to Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani and their immediate subordinates and family, witnessed the order being given to assassinate three exiled Kurds in Europe, including Twana. All such orders in Defendant Iraqi Kurdistan Regional Government are verbal.

**DELIBERATED EXTRAJUDICIAL EXILE AND THREATS TO FATAH ZAXOIY**

527. Confidential Human Source #1 disclosed yet another example of an Iraqi Kurd unlawfully forced into exile by Defendant Masrour Barzani — Kurdish exile Fatah Zaxoiy. Mr. Zaxoiy was the target of a Barzani ordered assassination attempt that failed. Zaxoiy now lives in forced extrajudicial exile in Canada.

**DELIBERATED EXTRAJUDICIAL IMPRISONMENT AND TORTURE**

**OF ROZHGAR RIZGAR MOHAMMED MOHYADDIN**

528.    Rozhgar Rizgar Mohammed Mohyaddin is a Kurdish Iraqi from the Kurdistan province of Sulaimani.  On May 1, 2019, he was serving as the head of the guards for the Minister of Finance of the Defendant Iraqi Kurdistan Regional Government when he was seized and abducted, without legal justification or authorization, by agents of Asayish, which is commanded and directed by Defendant KRG prime minister Masrour Barzani.  He was initially confined within the grim walls of a civil building in the Bakhtiari Quarter.  The property where he was held captive, Bakhtiyari, is associated with the KRG Ministry of Finance and overseen by Rebaz Hamlan, the KRG Finance Minister at the time under the command and control of Defendant KRG prime minister Masrour Barzani. Later, Rozhgar was forcibly transferred to the austere confines of the general directorate of Asayish in Erbil, also under the command and control of Defendant KRG prime minister Masrour Barzani.

529.    During his captivity, which lasted 27 months, he endured physical beatings and torture for many days, left to suffer in a small dark chamber.  This relentless mistreatment stripped him of all semblance of humanity. Psychological tactics used by police "undermin[e]" the individual's "will to resist," and "the very fact of custodial interrogation . . . trades on the weakness of individuals").  See *Miranda v. Arizona*, 384 U.S. 436, 455 (1966).

530.  Rozhgar suffered emotionally through isolation, fear, and uncertainty throughout his entire captivity.  He suffered mental and emotional despair, with each day bringing new anguish.  For many months he was deprived of medical care, and later in his imprisonment he had limited access to medication, which further exacerbated his mental and emotional and physical suffering.  During his imprisonment he was not allowed to communicate with his spouse and family.  To the present day he suffers from post-traumatic stress disorder and emotional and psychological pain.

531.    Rozhgar describes his being "stripped of all semblance of humanity" as characterizing the inherently coercive and inhumane treatment he endured, including isolation, denial of contact with

family, lack of legal representation, absence of due process, and complete dehumanization he experienced during his captivity.

532.    During his 27 months of imprisonment, Rozhgar was never advised of any legal rights, was never given oral or written notice of the charges warranting his confinement, was never allowed to consult with or speak to an attorney, was never arraigned before any magistrate, was never held for trial before any magistrate, and was never informed of any judicial sentence.    Each of these deprivations are a violation of the Constitution of the Republic of Iraq, which guarantees the rule of law, a presumption of innocence, right to counsel, and right to a public trial.    Legal redress in the corrupted judicial system of Defendant Iraqi Kurdistan Regional Government, commanded and controlled by Defendant prime minister Masrour Barzani, is neither credible nor available.    Lacking any notice from any court or magistrate, he was released on December 22, 2022.

**DELIBERATED EXTRAJUDICIAL EXILE AND DEATH THREATS TO**

**AND UNLAWFUL EXPROPRIATION OF PROPERTY RIGHTS**

**OF QASIM OMER ABDULAKDIR BNDEAN**

533.    Coercive behavior can include the inherent violation of a range of rights, such as freedom of speech and of the press, repression in physical integrity rights, such as disappearances, political imprisonments, and the killing and torture of dissidents and other groups by state agents. Repression and expropriation, in which rights in property are taken in violation of international law, are interrelated: both are part of the Barzani Continuing Criminal Enterprise's and Defendant Iraqi Kurdistan Regional Government's state repertoire of coercive activities, coercive state strategies of repression, intimidation and coercion against its own citizens and others, human rights violations, suppression of expression, cruelty, corporate complicity in

various human rights violations, unlawful expropriation of private property and private business interests, and other repressive state and individual and commercial behavior by the Defendant Iraqi Kurdistan Regional Government and its principal officers, acting as individuals without lawful authority, under the control and command of Defendant Masrour Barzani.

534.    In the instant case, the plaintiffs do not bring a basic international law expropriation claim, but present such unlawful expropriation of private property and private business interests as part and parcel of the continuing criminal conduct of Defendant Kurdistan Regional Government, its affiliated KDP, the Barzani family members and family members by marriage, and other corporate entities where the Barzani beneficial ownership and financial interest is hidden, all part of the Barzani Continuing Criminal Enterprise to harm Plaintiffs and others, and thereby through "a handful of heinous actions—each of which violates definable, universal and obligatory norms" (See *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 782 (D.C. Cir. 1984)), causing irreparable damage to the Plaintiffs.  Mr. Bndean's civil rights have been severely infringed.

535.    Qasim Omer Abdulakdir Bndean is a Kurd living near London, England, in exile born of fear that he will be singled out for persecution or other severe harm by the BCCE on account of speaking freely against the corruption of the Barzani regime.  He is a citizen of Iraq and since the 1980s additionally holds citizenship of Sweden.  Mr. Bndean lives in constant peril and fear of being killed by the Barzani Defendants.  In 2016, he was interviewed on a Kurdish television channel in Sweden.  During that interview, and for his first time, he revealed on air the staggering amount of illegal oil contracts, totaling billions of U.S. dollars, perpetuated by the Barzani Continuing Criminal Enterprise.  Retaliatory threats have continued since that time, including expropriation of Mr. Bndean's commercial and investment interests in Iraqi Kurdistan by agents, representatives, and co-conspirators of the BCCE and in close association with

Defendant Masrour Barzani. Succinctly stated, they stole his properties and commercial rights. These acts constitute "malicious interference with an existing contractual relationship," (See *Jin v. Ministry of State Security*, 557 F. Supp. 2d 131, 136 (D.C. 2008), which qualifies as commercial activities to invoke the FSIA subject-matter jurisdiction of this court (*Jin* at 142), causing severe economic harm to Mr. Brdean and his company Wzakan, and to U.S. business grantors of Wzakan's hotel licenses.   Mr. Bndean received no due process, no legal process, and no compensation for this illegal expropriation facilitated by the criminally corrupt Iraqi Kurdistan Regional Government and its co-conspirators and front companies.

536.    Continuing to the present time, Mr. Bndean began to receive death threats by way of social media, posted by Rahand Kurdi, a known associate in Iraqi Kurdistan of Defendants Masoud Barzani and Masrour Barzani.  In his social media posts, Mr. Rahand self-identifies as KRG security chief and KDP member.  The KRG security is under the command, control, and supervision of Defendant KRG prime minister Masrour Barzani.  In those same death threat postings Mr. Kurdi repeatedly expressed support for and allegiance to Defendant KRG prime minister Masrour Barzani, wherein Mr. Rahand called on "loyalists" to the Barzani regime to "sacrifice anyone" and "cut into pieces and hang it in the city so that it will become a lesson," and "must be killed at any cost," and "go and kill them."   Because of these and other death threats, Mr. Bndean has lived in exile, in constant fear for his life, fears to speak out freely without anxiety of personal or familial physical or economic harm, and because of that fear was unable to return to Iraq for the funerals of his brother and sister.

537.    In a media interview with Xandan Online News website in Kurdistan, Mr. Bndean exposed the corruption of the Dabin Group, controlled by Defendant Masrour Barzani and the BCCE.  It, and its associates, reciprocated by severing the electricity to his residence thereby causing him and his family to reside in darkness and harsh, cold conditions.

538.    For time immemorial it is a well settled principle of international law that sovereigns possess the power of *dominium eminens* as an inherent attribute of their political authority to take or expropriate private property for "public uses, when public necessity or utility require it," (see *Gardner v. Village of Newburgh,* 2 Johns. Ch. 162, 167 (1816)), but on the basis of due process of law, equitable indemnification, and just compensation to the aggrieved private stakeholder. The BCCE took rights in property without making just compensation at the time or to the present day and without due process of law, in violation of the *International Law Commission's Article on State Responsibility* and of Iraq law, and which do not authorize the Defendant Iraqi Kurdistan Regional Government, Defendant prime minister Masrour Barzan, and/or its agents and representatives to enlarge or abridge those rights of law.  These claims fit within the FSIA's "expropriation exception," which provides jurisdiction over certain claims involving "rights in property taken in violation of international law."  See 28 U.S.C. 1605(a)(3).  The *World Bank Guidelines on Expropriation and Unilateral Alterations or Termination of Contracts,* state that: "A state may not expropriate or otherwise take in whole or in part a foreign private investment in its territory, or take measures which have similar effects, except where this is done in accordance with applicable legal procedures, in pursuance in good faith of a public purpose, without discrimination on the basis of nationality and against the payment of appropriate compensation". In the instant example, no expropriation review mechanism was existent; expropriation was without due process by an independent administrative authority or tribunal of the state, indemnification, compensation, or judicial adjudication and is a salient breach of international law and of Article 17 of the *Universal Declaration of Human Rights*, causing severe and lasting economic and emotional harm to Mr. Brdean, Wzakan, and to Wzakan's investors.  (The *Universal Declaration*, while not a treaty, has come to be accepted internationally as an important legal document.)

## DELIBERATED EXTRAJUDICIAL IMPRISONMENT AND TORTURE OF
## AMERICAN CITIZEN SIDQI BRADOSTI

539.    American citizen Sidqi Bradosti was detained and falsely imprisoned by Asayish (Kurdish Security) agents of the Defendant Iraqi Kurdistan Regional Government acting under the direction and command of Defendants Masoud Barzani, Masrour Barzani and Waysi Barzani. Defendants, and their agents and representatives, including Barzani family members and family members by marriage, knew and intended that the arbitrary arrest on false criminal charges would be utilized by Iraqi KDP officers, each an employee or agent of the Defendant Iraqi Kurdistan Regional Government and operating under Defendants' command and direction, to eavesdrop, tap and intercept the communications of Sidqi Bradosti while incarcerated; surveil, detect, monitor and track his online communication; apprehend, interrogate, ideologically persuade and in other ways torture and detain him because of his political beliefs, with the specific purpose of suppressing Sidqi Bradosti's political beliefs through the perpetration of these and other egregious human rights abuses against him, all in violation of international, United States, Iraq, and Defendant Iraqi Kurdistan Regional Government law.

540.    The Court of Appeals for the District of Columbia Circuit held that "Government conduct that 'shocks the conscience' violates the Fifth Amendment guarantee against deprivation of 'life, liberty, or property, without due process of law.'" See *Harbury v. Deutch*, 233 F.3d 596, 602 (D.C. Cir. 2000), quoting *Rochin V. California,* 342 U.S. 165, 172-173, 72 S. Ct, 205, 96 L. Ed. 183 (1952). The conduct of the agents of the Defendant Iraqi Kurdistan Regional Government, under the command and control of Defendant Masrour Barzani, a United States person, though acting without lawful authority but in the name of government, shocks the conscience, (noting that the Due Process Clause must at least "give protection against torture, physical or mental"). *Benton v. Maryland* 395 U.S. 784, 89 S. Ct. 2056, 23 L.Ed.2d 707 (1969).

411

541.    The state security service Asayish (al-amn al-'am, or asayish in Kurdish) is not an ordinary crime control apparatus.   While it does perform some standard crime control police functions, Asayish differs exponentially from all standard crime control initiatives in scale, complexity, intelligence, and technological sophistication – all of which are directly related to its major purpose or functionality, i.e., to find, track, and suppress, through arbitrary and discriminatory enforcement, dissenters to the Barzani regime wherever found in Iraqi Kurdistan and worldwide. Defendants Masrour Barzani and Waysi Barzani, along with other subordinate Defendant Iraqi Kurdistan Regional Government officials and KDP party officers, set policy for Asayish and micromanage the persecution and elimination of political dissidents, and provide extensive resource support to the persecutory purpose of its Asayish apparatus.   This resource support includes technology to secure provincial security databases, allowing for thorough cross-checking of names, affiliations, political behavior, family history, and "footprints" for the surveillance, apprehension, and suppression of unlawfully targeted individuals, including Sidqi Bradosti.   It even includes the capacity and technology needed to read the content of email, figure out if someone had uploaded a new website, and monitor the Internet surfing history and email of designated persons, for repressive uses in furtherance of the Barzani CCE persecutory objective. According to a recent Human Rights Watch report, the Asayish has detained hundreds of suspects without trial and often for years, most of whom were allegedly tortured and ill-treated in establishments which, over time, have morphed into symbols of oppression, where dissent is crushed, and voices silenced.

542.    The arrest of Sidqi Bradosti, on false and fabricated criminal charges, was just such conducted outside of the authority of the state and without the constraint of legal due process or any form of objective hearing or regulation or law.   Instead, Asayish agents, each an employee or agent of the Defendant Iraqi Kurdistan Regional Government, aware of the widespread persecutory

~~campaign against so-called dissidents and under the command of Defendants Masrour Barzani and Waysi Barzani who exercise a high level of control over day-to-day operations, relied on party orders and officers to identify targets, ban targets and their activities, initiate their condemnation in the KDP's official mouthpieces, and then subject them to violent persecution either through direct action by KDP personnel or via low-level Defendant Iraqi Kurdistan Regional Government officers. The scope of the campaign by the Barzani Continuing Criminal Enterprise, including the inhumane treatment and torture and other forms of severe abuse employed to persecute so-called dissidents, is common knowledge amongst Kurds both inside and outside of Iraqi Kurdistan, has been documented by the Special Rapporteur of the United Nations Human Rights Council, and continues at the present time.~~

~~543. The life of Sidqi Bradosti, who's previously sterling reputation has been dragged through the mud, and those of his family are irreparably altered by his baseless arrest and prosecution.~~

~~544. Targets of the Barzani Continuing Criminal Enterprise, including Sidqi Bradosti, are purposefully and calculatedly subjected to public, community, familial, and personal demonization and humiliation, beatings, ideological conversion and other forms of inhumane treatment and torture in ad hoc Iraqi KDP detention facilities, a system of initial administrative detention imposed without judicial authorization or review. Beginning in his first week in detention, Sidqi was tortured and interrogated.~~

~~545. The demonization of such individuals, including Sidqi Bradosti, as state enemies, anti-humanity, anti-society, dangerous criminals and other dehumanizing comparisons has been used by the Iraqi KDP and the Barzani Continuing Criminal Enterprise to instigate, incite and justify the human rights abuses carried out against successive target individuals including Sidqi Bradosti, peaceful reformist intellectuals, and pro-democracy advocates.~~

546.   So-called dissidents, including Sidqi Bradosti, are demonized by Defendant Masrour Barzani, Waysi Barzani, and their agents and representatives, as "party enemies," "hostile elements," "terrorists" and other dehumanizing and discrediting imagery to legitimize their regular subjection to human rights abuses.

547.   At all relevant times, defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, acting as senior Defendant Iraqi Kurdistan Regional Government officials, were and are part of a pattern and practice of systematic, systemic, and unlawful human rights violations committed in Iraqi Kurdistan, and bear personal responsibility.

548.   As members of the highest Defendant Iraqi Kurdistan Regional Government leadership, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani had and have a duty — under customary international law, multilateral treaties, Iraq law, and Kurdistan law — to ensure the protection of prisoners; to prevent violations of international law by the prison and security personnel; and to ensure that all persons under their command were trained in, and complied with Iraq law, Defendant Iraqi Kurdistan Regional Government law, and international law, including the Iraq, Defendant Iraqi Kurdistan Regional Government, and international law prohibitions against torture, crimes against humanity, arbitrary detention, and cruel, inhuman and degrading treatment or punishment.  Further, the Defendants were under a duty to investigate, prevent and punish violations of Iraq law, Defendant Iraqi Kurdistan Regional Government law, and international law committed by officials and staff of the prison and Asayish security forces under their command.

549.   Defendants Masrour Barzani and Waysi Barzani, and their co-conspirators, conspired to violate Iraq law, Defendant Iraqi Kurdistan Regional Government law, and international and domestic law and carried out a series of overt acts in furtherance of this conspiracy, including inter alia, detaining and torturing Sidqi Bradosti and forcing him to witness the torture of others.

Defendants and their co-conspirators further conspired to conceal and cover up these violations of Iraq law, Defendant Iraqi Kurdistan Regional Government law, and international and domestic law in furtherance of this conspiracy.

550.    As an ulterior but parallel motive of the efforts by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents, representatives, including Barzani family members and family members by marriage, through anti-competitive practices, to control and monopolize all Iraqi Kurdistan commerce, licit and illicit, by holding and increasing its monopolistic market share and continuing to generate enormous profits, conspired and acted to destroy, degrade, and eliminate commercial competition by sabotaging and debasing the established and respected reputation of a prominent family and the long-established relationship of the Bradosti family with the government of Turkey.  Under the command and control of Defendants Masrour Barzani and Waysi Barzani, the Iraqi KDP broadcast the videoed photographs of Sidqi Bradosti, characterized as a terrorist, on Iraqi KDP owned and controlled television with the willful, purposeful, and calculated objective to soil Sidqi Bradosti's established reputation for Barzani Continuing Criminal Enterprise economic and financial gain, with the object of taking for their own commercial businesses contracts Sidqi Bradosti and his business interests had with the United States Government military.

551.    Under Iraq and Defendant Iraqi Kurdistan Regional Government law, its citizens are free to associate and practice their beliefs and speak and express freely without fear, that is not imaginary or wholly speculative, of systematic persecutory reprisal anywhere.  However, under the command, control, and direction of Defendants Masoud Barzani, Masrour Barzani and Waysi Barzani, the Defendant Iraqi Kurdistan Regional Government and KDP, operationally indistinguishable in practicality, and both controlled by Masoud Barzani, Masrour Barzani, and Waysi Barzani, their agents, representatives, including Barzani family members and family

members by marriage, as masters of deception and centralized power, emphasized the Barzani leadership over all aspects of governance, and breached their duties and have implemented a widespread persecutory campaign against those Iraqi Kurds, including Sidqi Bradosti, politically opposed to the Barzani regime to ideologically convert and suppress political and ideological opponents, real and perceived, controlling the message, censoring speech and expression, and controlling the opposition, through inhumane treatment, torture, enforced disappearance, murder and in other unlawful ways, frequently aiding and abetting foreign intelligence activities in alleged human rights and trade violations, all contrary to and not authorized by Iraq law or Defendant Iraqi Kurdistan Regional Government law.  Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents and representatives, including Iraqi KDP party agents and low-level security officers under their direct command and control have operated and continue to operate *ultra vires*, i.e., outside of and beyond the constraints of statutory law or precedent or government regulations or treaties and agreements.

552.   To ensure the suppression of Iraqi Kurdish citizens, and family members including their sons and daughters, where they live etc., who are deemed by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents and representatives, Barzani family members and family members by marriage, to be a real or potential threat to Barzani influence and ideological and commercial control and the Barzani Continuing Criminal Enterprise, are still today systematically targeted, often using proprietary American technology, that they specifically tailor and deploy to surveil, torture and in other ways suppress dissent and for human rights abuse. These activities include, but are not limited to, arbitrary arrest, detention, harassment, inhumane treatment, mental and physical torture, and death resulting from torture and other abuse, and instill a reasonable fear of reprisals against themselves and members of their families.  The resulting reasonable fear of reprisals against themselves or members of their families residing in Kurdistan

and the impossibility of safely conducting investigation and discovery in Iraqi Kurdistan, serves as an insurmountable deterrent to obtain any form of legal redress.

553.    Parallel and complementary to technology abuses, Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their agents, representatives, and Barzani family members and family members by marriage, regularly employ, retain, contract, and otherwise engage recent former diplomatic, administrative, intelligence, and military personnel of the United States Government who were trained by the United States Government and thus knowledgeable as to its inside workings, policies, procedures, rules, tactics, and secrets, who thus become collaborative, complicit, and conspirator agents and representatives in the Barzani Continuing Criminal Enterprise to further, expand, and profit from its illicit continuing criminal enterprise.

554.    Defendants furthered, facilitated, purposefully authorized, participated in, and ratified alleged realistic and impending threat of direct injury, abuses, and all tortious conduct in all factual allegations herein, with knowledge and intent, and who's activities were the proximate cause of Sidqi Bradosti's injury in fact.  Sidqi Bradosti as an incarcerated prisoner was in no position or capacity to evade or avoid injury.

555.    In a clear and premeditated miscarriage of and denial of justice against a citizen of the United States, and with an astounding paucity of credible evidence, criminal charges against Sidqi Bradosti were fabricated and material facts were knowingly misstated, ignored, or hidden in an orchestrated malicious prosecution, abuse of process, misrepresentation, and deceit, and in a culture of sustained impunity at the command of Defendants Masoud Barzani, Masrour Barzani and Waysi Barzani as part of Defendants' criminal enterprise object to maintain power, unlawfully enrich themselves, eliminate commercial competition, avoid appropriate accountability, and sow fear, that is not imaginary or wholly speculative, in the hearts of opponents and perceived potential

~~opponents including precipitating a retaliatory spiral, to enrich themselves and provide a means to~~ ~~harm Plaintiffs, all of which are criminal activities in violation of 18 U.S.C. §§ 242 and 2.~~

The denial of constitutional rights is an irreparable injury per se. *Elrod v.Burns*, 427 U.S. 347, 373 (1976).

### A.    Defendant Masrour Barzani's Violence And Lack Of Respect For Human Rights to Harm Plaintiffs

557.    Defendant Masrour Barzani is known for his authoritarianism, violence, and ~~556.~~

~~Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their direct subordinates operating under their command and control, have, contrary to Iraq law and Defendant Iraqi Kurdistan Regional Government law and without lawful authority, repeatedly, frequently, nefariously, and extrajudicially used the force of Defendant Iraqi Kurdistan Regional Government to target and imprison their real and perceived political, commercial, and financial opposition, as they have done to Sidqi Bradosti, perpetrating on him human rights violations, especially violations of privacy, freedom of expression, freedom of association, and freedom of liberty, and physical abuse in the form of unlawful arrest and detention.~~

~~557.    While deprived of individual liberty and incarcerated by and at the direction of Defendants, and as a direct and proximate result of Defendants' breach of official duties, Sidqi Bradosti suffered bestial, brutish, and barbaric action injuries, including pain and suffering, which required medical treatment, and a resultant prolonged detrimental effect on his physical and mental health.~~

~~558.    Sidqi Bradosti has long suffered from epilepsy, predating his incarceration. At the beginning of his incarceration, and despite his blatantly ignored pleas and pleas by his family, Sidqi's essential prescription medications were knowingly, intentionally, and sadistically withheld from him at the direction of Defendants.~~ ~~Sidqi's arrest and incarceration on fabricated charges, with inclusion of fictitious evidence and not supported by the facts of their investigation, was directed by Defendant, Masrour Barzani, and carried out by Defendant, Waysi Barzani, head of~~

Defendant Iraqi Kurdistan Regional Government intelligence; Defendant Dilshad Yousef, of Defendant Iraqi Kurdistan Regional Government security, and Ismat Argoshi, of Defendant Iraqi Kurdistan Regional Government security. These individuals, as well as other employees and agents operating under their direction, engaged in a systematic fabrication accompanied by prejudicial outside influences, preventing a fair and orderly administration of justice, in order to obtain a conviction of an American citizen, thereby knowingly depriving him of all his Constitutional and legal rights accorded by laws of the Republic of Iraq, Defendant Iraqi Kurdistan Regional Government, and the United States, by the law of nations, and by international treaty and convention.

559. The arrest of Sidqi Bradosti caused severe and traumatic emotional and psychological harm and distress to his spouse, suffering from the agonizing uncertainty of not knowing whether her husband was dead or alive, and to their three children, each a citizen of the United States of America, who were terrified and overcome by fear and paranoia which is not imaginary nor wholly speculative. See *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). Upon Sidqi's arrest, Defendant Ismat Argoshi, with subordinate colleagues, acting as part of Defendants' criminal enterprise to gain wealth and maintain power ordered his subordinates to go to the Bradosti residence, where, by use of force and illegal entry, and having the apparent cloak of authority over the Bradosti household, and using foreboding, inflammatory, and threatening phraseology, pillaged and violently destroyed its furnishings, removed money and personal items, causing members of the Bradosti family to fear, which is not imaginary nor wholly speculative, for their lives and suffer from immense mental and emotional dread and terror. Haza Mustafa Mahmood Bradosti, spouse of Sidqi Bradosti, suffered horrific violation and deprivation of dignity, a profound sense of injustice and pain, that has caused her immense physical and emotional trauma that she will carry for the rest of her life.

560.    Sidqi Bradosti was incarcerated in the summer of 2019 in a jail operated by the Kurdistan Democratic Party and held against his will and inhumanely treated and tortured during the time he was incarcerated in the perilous Asayish jail in Erbil, Kurdistan, Iraq—a facility responsible for the custody, control, care and safety of inmates, including "pretrial detainees" (people who have been detained following arrest, but have not yet been convicted of committing an offense).

561.    In its *2020 Country Reports on Human Rights Practices: Iraq*, at a time Defendant Masrour Barzani was Prime Minister of Defendant Iraqi Kurdistan Regional Government, the presiding and actual head of government and head of the executive power, the United States Department of State published a report supporting Sidqi Bradosti's account of his arrest:

> *"Impunity effectively existed for government officials and security force personnel, including the Iraqi Security Forces, Federal Police, Popular Mobilization Forces, and certain units of Kurdistan Regional Government Asayish internal security services."*

> *"There were numerous reports of arbitrary arrest or unlawful detention by government forces, including the ISF [Iraqi Security Forces], NSS [National Security Service], PMF [Popular Mobilization Forces], Peshmerga, and Asayish."*

> *"Officials in federal Iraq and the IKR [Iraqi Kurdistan Region] frequently engaged in corrupt practices with impunity."*

The Asayish, reporting directly to and commanded by Defendants Masrour Barzani and Waysi Barzani, are responsible for maintaining the internal security of the Defendant Iraqi Kurdistan Regional Government alongside the Defendant Iraqi Kurdistan Regional Government police, also controlled, commanded, and directed by Defendants Masrour Barzani and Waysi Barzani as employees and agents of the Defendant Iraqi Kurdistan Regional Government.

562.    The courts of the Defendant Iraqi Kurdistan Regional Government have no judicial independence, conduct themselves in a manner incompatible with the role of courts in the administration of justice, are puppet operatives of the corrupt, tyrannical, and dictatorial Barzani

regime which controls all the levers of power, and serves the criminal enterprise operated by Defendants to inhumanely treat, torture, kill, and bring fear, which is not imaginary nor wholly speculative, and coercion to silence and eliminate all opposition—all with the object of obtaining money and wealth and power by unlawful means, and provide the financial capacity to harm the Plaintiffs.

563. A senior official of the U. S. Department of Defense, in a published written document, reported "The highly centralized judicial system under the two KRG Ministries of Justice (MOJ) was not independent and lacked a constitutional court and uniform legal code."

564. In its *2022 Country Report on Human Rights Practices: Iraq*, at a time Defendant Masrour Barzani was Prime Minister of Defendant Iraqi Kurdistan Regional Government, the presiding and actual head of government and head of the executive power, the United States Department of State report supports Sidqi Bradosti's account of the continuing actions by Defendants to maintain power and gain wealth:

> *The Kurdistan Judicial Council is legally, financially, and administratively independent from the KRG Ministry of Justice, but KRG senior leaders reportedly influenced politically sensitive cases. The IKR's strongest political parties, the Kurdistan Democratic Party (KDP) and the Patriotic Union of Kurdistan (PUK) also reportedly influenced judicial appointments and rulings.*

> *Corruption or intimidation reportedly influenced some judges in criminal cases at the trial level and on appeal at the Court of Cassation.*

> *Numerous threats and killings by sectarian, tribal, violent extremist, and criminal elements impaired judicial independence.*

> *… Defendants and their attorneys were not always granted access to evidence, or government officials demanded a bribe in exchange for access to the case files. In numerous cases judges reportedly relied on forced or coerced confessions as the primary or sole*

*source of evidence in convictions, without the corroboration of forensic evidence or independent witness testimony. …*

*…Although the constitution prohibits torture and forced confessions, there is no law setting out the legal conditions and procedural safeguards to prevent torture. Torture in jails, detention facilities, and prisons was often hidden from effective legal oversight. Moreover, the types of conduct that constitute torture are not legally defined under the law, and the law gives judges full discretion to determine whether a defendant's confession is admissible, often without regard for the way it was obtained. Courts routinely accepted forced confessions as evidence, which in some ISIS related counterterrorism cases was the only evidence considered. Numerous reports from local and international NGOs indicated government officials employed torture and other cruel, inhuman, or degrading treatment or punishment. Federal Police, the PMF, and certain units of Kurdistan Regional Government (KRG) Asayish internal security services operated with impunity.*

*Human rights organizations reported both Interior Ministry and Defense Ministry personnel tortured detainees. According to government forensics officials, some victims showed signs of extensive beatings, in addition to bone fractures. Local NGOs reported deaths at pretrial detention facilities, deportation prisons, and prisons were due to the continuation of systematic torture and the poor conditions in detention centers.*

*On March 21, the GCHR issued a report documenting dozens of allegations of torture of detainees including through beating, hanging, and suffocation between 2019 and year's end. In a September report, the GCHR alleged "systematic perpetration of torture in places of detention [and] the fostering of a culture of impunity through a reliance on forced confessions and a lack of effective investigations into allegations of torture."*

*In April the UN Committee against Torture (CAT) reported in its second periodic report the committee received reports "indicating that persons in custody, including in the facilities under the authority of security forces and facilities reportedly unknown to detainees' families, were subjected to torture or ill treatment, particularly during the investigation stage of the proceedings." The committee also observed that the existing mechanisms to receive*

*and investigate complaints of torture were "not leading in practice to meaningful accountability for perpetrators."*

*Prison and detention center conditions were harsh and occasionally life threatening due to food shortages, gross overcrowding, physical abuse, inadequate sanitary conditions and medical care, and the threat of communicable illnesses.*

*In May the United Nations Committee against Torture reported its concern "about continued reports of torture or ill treatment in detention facilities"*

*Human rights organizations reported the ISF, among them the Federal Police, the NSS, the PMF, as well as the Peshmerga and Asayish security forces in the Kurdistan Region, frequently ignored the law.*

*According to the IHRCKR, some detainees remained in KRG internal security service facilities for extended periods even after court orders were issued for their release.*

*Reports from international human rights groups stated government forces, including Federal Police, the NSS, the PMF, and Asayish, abused prisoners and detainees...*

565.    In the United Nations High Commissioner for Human Rights report entitled *Human Rights and Freedom of Expression: Trials in the Kurdistan Region of Iraq*, at a time Defendant Masrour Barzani was Prime Minister of Defendant Iraqi Kurdistan Regional Government, the presiding and actual head of government and head of the executive power, an evidence-based analysis of the administration of justice in Defendant Iraqi Kurdistan Regional Government documented and observed the following:

*"...a consistent lack of respect for the legal conditions and procedural safeguards necessary to guarantee fair judicial proceedings before an independent and impartial tribunal." "In breach of the principle of legality, the criminal law provisions applied in these cases were formulated in broad and imprecise terms, leading to inconsistent interpretation of these provisions by the courts and a lack of clarity relating to the specific charges. In*

*addition, the prosecution failed to clearly identify which specific underlying alleged acts formed the basis of the criminal charges, nor did it provide concrete evidence to substantiate those charges. Although at least eight of the accused submitted in court that their confessions had been extracted under torture, the trial judge dismissed these submissions without further examination. Safeguards in place to prevent torture, including medical exams, access to defence lawyers, video recording of interrogation, and processes for reporting torture and other ill treatment, were not respected. Systematic barriers prevented defence lawyers from preparing an effective defence. All were denied regular access to their families. Additionally, various actions by the authorities – which could be perceived as attempts to unduly influence the outcome of the judicial proceedings - were observed."*

*"...documented several statements by Kurdistan Regional authorities that may amount to undue influence in the judicial process, including over the outcome of any subsequent appeal proceedings. Such statements bear the risk of undermining the presumption of innocence, which is fundamental to the protection of human rights."*

*"The OHCHR/UNAMI findings highlight a number of human rights concerns in relation to the trials against these individuals, placing the accused at a serious disadvantage, and casting considerable doubt on the overall fairness and legality of the proceedings. All were charged with serious crimes, based on broad and imprecise provisions without sufficient reasoning with regards to the judgments of the court and after failing to identify or sufficiently substantiate the underlying individual conduct."*

*"In addition, the initiation of legal proceedings against persons who had questioned the proceedings and outcome, and disregarding complaints made to the authorities, including in court, about violations of procedural safeguards, in effect deters those, who are denied their fair trial rights, from seeking justice and an effective remedy."*

These documented and impartial United Nations observations are consistent with the improper judicial treatment accorded Sidqi Bradosti.

424

566.    In the case of Sidqi Bradosti's torture while incarcerated, the judge of the Defendant Iraqi Kurdistan Regional Government court overseeing Sidqi's case, having a duty under the laws of Iraq and Defendant Iraqi Kurdistan regional Government to promote confidence in the independence, integrity, and impartiality of the judiciary and an obligation over provision of due process, but the judge was deprived of authority by Defendants Masrour Barzani and Waysi Barzani to decide the issues before the court, unavoidably and irreparably tainting these proceedings.  This judge cautiously came to the Bradosti home and, acknowledged the judicial misconduct, and in ascribing brazen malintent said that he was taking orders from the Barzani's, who had clear and present disqualifying interests and little interest in complying with the terms of international treaties, Iraq law or Defendant Iraqi Kurdistan Regional Government law that did not further the interests of the Barzani Continuing Criminal Enterprise and which were unconstitutional, illegal, and ethically improper for this court and disrupting the administration of justice, stating to family members present in a stunning factual admission: "I was forced to do this by the Barzani's," acknowledging orders issued by Masrour Barzani, Waysi Barzani, and Ismat Argoshi which were contemptuous, disrespectful, and constitute a knowing disobedience of judicial rules and duty of truthful inquiry of the tribunal—a calculated abolishment of the Court's impartiality and independence, and purposeful political meddling with sweeping implications of corruption and deceit, and a willful abrogation of Sidqi Bradosti' rights under Iraq and Defendant Iraqi Kurdistan Regional Government law and international treaties, constituting a self-admission that the Court's posture in this matter was adversarial, not adjudicatory.

567.    This judicial conduct in Sidqi Bradosti's case was not merely the appearance of impropriety; this conduct was and is actual judicial impropriety, designed to settle this matter in collaboration with and at the direction and command of a coordinate branch of government.  There was no presumption of innocence, no provision of due process, and the judicial conduct was

prejudicial to the administration of justice and contrary to law. This was an emasculation of judicial power by Defendant Masrour Barzani, a commanded judicial misconduct, and prejudicial to the administration of justice. In the words of the United States Supreme Court in *Mistretta v. United States,* 488 U.S. 361, 407, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989), allowing the reputation of the Judicial Branch to be "borrowed by the political Branches to cloak their work in the neutral colors of judicial action." Judges in Defendant Iraqi Kurdistan Regional Government are employees of the Defendant Iraqi Kurdistan Regional Government, controlled absolutely by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani.

568. It was impossible for Sidqi Bradosti, a citizen of the United States of America, to receive a fair and impartial trial, and no just outcome was available to him. The entire judicial proceeding was tainted by a lack of Iraq and Defendant Iraqi Kurdistan Regional Government law-based procedural guarantees, by the close internal cooperation of the Defendant Iraqi Kurdistan Regional Government ministerial ecosystem, and by legally improper influences, including assaulting the integrity of the judiciary by a corrupted legal establishment weaponized by Defendant Masoud Barzani and by Defendant Masrour Barzani who had and has a duty of his Prime Ministerial of Defendant Iraqi Kurdistan Regional Government office to the law and to the administration of justice. This unlawful weaponization had and has the purpose of pronouncing and condemning Barzani's political opponents, which had a harmful chilling effect on witnesses and adversely affected the fair administration of justice in Sidqi Bradosti's prosecution. Prosecution was in bad faith, nefarious, and a representative instance of prosecutorial misconduct. Sidqi Bradosti's rights were violated. Having no concern for justice or their compliance with law or codes or judicial standards, at the direction of Defendants Masrour Barzani, Waysi Barzani, and their subordinates, particularly Ismat Argoshi and Dilshad Yousef, Defendants knowingly falsified and made a false entry in a record and document with the intent to impede, obstruct, and influence the investigation

and adjudication of the matter, and Sidqi Bradosti was knowingly prosecuted by the Defendant Iraqi Kurdistan Regional Government, under the command and control of Defendant Masrour Barzani, for crimes he did not commit.

569.   Sidqi Bradosti continues to suffer from the long-term psychological effects of his torture.

570.   Notwithstanding the repeated pleas by Sidqi Bradosti and his wife and family, and by U.S. Government diplomatic officials, there was never an official misconduct investigation by any agency or office of the Defendant Iraqi Kurdistan Regional Government.

571.   lack of respect for human rights.  He has violently, repeatedly, manifestly, and impermissibly violated constitutional rights of American citizens, and unlawfully uses his KRG position to impinge upon obvious constitutional freedoms; no reasonable official or government would sanction such actions.

558.   Defendant Masrour Barzani, having resident permanent alien status granted by the United States Government, and at the time Prime Minister of Defendant Iraqi Kurdistan Regional Government, the presiding and actual head of government and head of the executive power, as a condition of said status known to him has a legal obligation of United States law and said permanent alien status to obey and venerate all laws and Constitutional rights of the United States and its citizens – something fully and clearly known to Defendant Masrour Barzani as a prerequisite, provision, and requirement of permanent alien status.  Defendant Masrour Barzani's autocratic actions and commands in the arrest, incarceration, trial, and imprisonment of Sidqi Bradosti, none of which were authorized by Iraq law or regulation or by Defendant Iraqi Kurdistan Regional Governmentthe KRG law or regulation or treaty or international law, were and are a brazen lack of respect for the U.S. Constitution and a knowing abandonment, rejection, and denial of those rights of American citizenship of Sidqi Bradosti and was deliberate and premeditated civil rights intimidation against a fellow American which includes the right of a pretrial detainee to be

427

free from a jail official's deliberate indifference to his serious medical needs.  As U.S. Citizenship and Immigration Services of the ~~U.S.~~ Department of Homeland Security clearly declares: "As a permanent resident, you are required to obey all laws of the United States and localities." Defendant Masrour Barzani, a permanent resident of the United States, knowingly abandoned, rejected, and intentionally and purposefully, and to further the ~~Barzani Continuing Criminal Enterprise~~BCE, forsook his duties of permanent resident alien status to faithfully promote the rule of law, prevent executive overreach, protect due process and equal protection, and ensure to Sidqi Bradosti the individual rights guaranteed under the Constitution and laws and treaties of the United States.  Defendant Masrour Barzani had a duty of care which he knowingly and intentionally abrogated in order to further the ends of the ~~Barzani Continuing Criminal Enterprise~~BCE and to injure Sidqi Bradosti.

~~572~~559.    18 U.S.C. § 2340A.  ~~A report by Amnesty International describes conditions of prisons in Iraq as overcrowded, lacking requirements to meet basic needs, steeped with nauseating, pervasive, and inescapable aromas of human waste, and have poor medical facilities, resulting in the prevalence of diseases such as scabies, allergies, skin infections and other conditions:~~

> ~~"Detainees had been blindfolded, stripped and suspended by their wrists or hung in contorted stress positions for hours at a time. In addition to being subjected to electric shocks to the genitals, ears, tongue and fingers; beaten on the soles of their feet (falaqa), whipped and beaten with canes, hosepipes and metal rods; burnt with cigarettes or having their hands pierced by electric drills or having their toe or fingernails ripped out."~~

~~573.    The Independent Human Rights Commission Kurdistan Region (IHRCKR), at a time Defendant Masrour Barzani was Prime Minister of Defendant Iraqi Kurdistan Regional Government, the presiding and actual head of government and head of the executive power, reported Defendant "IKR [Iraqi Kurdistan Region] correctional centers suffered from long-term problems of overcrowding, inadequate water, sanitation, and hygiene facilities, use of violence~~

during preliminary detention, and outdated infrastructure at women's and juvenile centers. Limited medical staff was unable to provide adequate medical services to all prisoners," including Sidqi Bradosti.

574.   The United Nations Committee Against Torture, at a time Defendant Masrour Barzani was Prime Minister of Defendant Iraqi Kurdistan Regional Government, the presiding and actual head of government and head of the executive power, reported to the Defendant Iraqi Kurdistan Regional Government and to the world its concern "about continued reports of torture or ill treatment in detention facilities" [operated by Defendant Iraqi Kurdistan Regional Government or its partners] and observed the "existing mechanisms to investigate the acts of torture and ill treatment committed by officials do not effectively hold the perpetrators to account."  Both local and international human rights organizations asserted judges frequently failed to investigate credible allegations that security forces tortured terrorism suspects and often convicted defendants based solely on both overtly and covertly coerced confessions.  In addition, despite their concerns being raised, authorities ignored physical signs of torture, and the complaints procedures appeared to be neither fair nor effective.  Many detainees chose not to report such mistreatment due to a lack of trust or fear, that is not imaginary or wholly speculative, of reprisals.

575.   At the direction of Defendants Masrour Barzani and Waysi Barzani, and implemented by subordinates Defendants Ismat Argoshi and Dilshad Yousef and others, Sidqi Bradosti was inhumanely treated and medically tortured while imprisoned.  It was and is widely known in Erbil and was and is fully known to the Barzani's and their subordinates Defendants Ismat Argoshi and Dilshad Yousef and others, including Asayish jailers, that Sidqi Braqdosti suffers the acute chronic noncommunicable disease of epilepsy, a severe neurological disorder of the brain characterized by repeated and potentially fatal seizures.  Yet under the direction of  Defendant Masrour Barzani, while acting under imagined color of law, but without legal authority of Iraq or Defendant Iraqi

Kurdistan Regional Government, and while aiding and abetting one another, these individuals willfully, directly and indirectly, deprived Sidqi of all medications that are required for an epilepsy sufferer and of the right, protected and secured by the Constitution and laws of the United States, to due process of law, which includes the right of a pretrial detainee to be free from a jail official's deliberate indifference to his serious medical needs.

576.    Sidqi Bradosti's family exceedingly feared, which is not imaginary nor wholly speculative, that as a result of his inhumane imprisonment he might die.  This vicarious suffering in family members, itself a recognized type of psychological torture, left permanent mental damage to victims.

577.    The National Library of Medicine of the U.S. National Institutes of Health, an agency of the United States Government, characterizes the health impacts of traumatic events:

> *"In general, those exposed to a traumatic event show increased rates of acute stress disorder, posttraumatic stress disorder (PTSD), major depression, panic disorder, generalized anxiety disorder, and substance use disorder.*
>
> *"The childhood experience of traumatic events induces immediate biological and psychological reactions, some of which may persist for an extended period."*
>
> *"Youth exposed to traumatic events also can develop depression, other anxiety disorders, substance use disorders, and problems with school performance."*
>
> *"This fear can spread rapidly and is not limited to those experiencing the event directly – others that are affected include family members of victims and survivors, and people who are exposed through broadcast images. Psychological suffering is usually more prevalent than the physical injuries…"*

578.    Missed or withheld medicines can trigger seizures and death in people with both well-controlled and poorly-controlled epilepsy.  Seizures can happen more often than normal, be more intense or develop into long seizures called status epilepticus.  Status epilepticus is a medical

emergency and can lead to death if the seizures are not stopped. If seizures cannot be stopped or repeated seizures occur one right after another, permanent injury or death can occur. People with epilepsy can also die from problems that occur during or after a seizure, such as inhaling vomit. Death can result. The withholding of needed medicine and the resulting fear, that is not imaginary or wholly speculative, was inhumane treatment and torture of Sidqi Bradosti, resulting in prolonged bodily injury all in violation of 18 U.S.C. §§ 242 and 2.

579. The premeditated and malicious torture of Sidqi Bradosti by Defendants, as directed by Masrour Barzani and his subordinates, particularly Ismat Argoshi and Delshat Najar, resulting in creating a state of helplessness, psychological regression, and depersonalization, continued for months until unremitting and insistent intervention efforts by diplomatic officials of the U.S. Embassy were finally successful in arranging for Sidqi Bradosti to receive his essential life-saving prescription medications.

580. Categories of psychological torture include debilitation, isolation, implicit and expressed threats, degradation, pharmacological manipulation, food, water, and sleep deprivation, no privacy, and poor ventilation. Defendants repeatedly and continually subjected Sidqi Bradosti to each of these categories of psychological torture, where the pervasive odor of fear, that is not imaginary or wholly speculative, and doubts and the specter of dying clung to him like a constant sharp headache, with a persistent psychological system of pressure akin to combat fatigue.

581. During his imprisonment, Sidqi was not allowed visitors. No family members or physicians were allowed to see him. Despite concentered and relentless efforts of the Deputy United States Consul General in Erbil to obtain proper treatment, care, and familial visitations, all visitations were denied by the Defendant Iraqi Kurdistan Regional Government at the direction of Defendants Masrour Barzani, Waysi Barzani, Dilshad Yousef, and Ismat Argoshi. Defendants ordered Sidqi Bradosti be deprived of familial comfort and Defendants' orders were obeyed by the jailers.

582.   Section 2340A of Title 18, United States Code, prohibits torture committed by public officials under color of law against persons within the public official's custody or control.  Torture is defined to include acts specifically intended to inflict severe physical or mental pain or suffering. (It does not include such pain or suffering incidental to lawful sanctions.)  The statute applies only to acts of torture committed outside the United States.  There is Federal extraterritorial jurisdiction over such acts whenever the perpetrator is a national of the United States.  Defendant Masrour Barzani, under whose command, control, and direction all torture of Sidqi Bradosti occurred and was allowed to occur, is a United States person.

560.   Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their associates, proceeded with their criminal activities to retain power and gain money regardless of who their victims were, including victims who were citizens of the United States of America.  Defendant Masrour Barzani led these criminal activities against a fellow national of the United States in violation of his known legal obligation which resulted from his permanent resident status.

### B.  Defendants Violate Plaintiff Shakhwan Abdulrahman's Constitutional Rights

561.   As the Supreme Court recognized, chilling of the individual Plaintiffs' exercise of their First Amendment rights is, itself, a constitutionally sufficient injury. *See Laird v. Tatum*, 408 U.S. 1, 11 (1972). "Because petitioners' [] conduct concerns political speech, it is certainly affected with a constitutional interest." *Babbitt v. Farm Workers*, 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979).

562.   The Supreme Court affirmed the right to peaceably protest, stating that students marching to protest "reflect[s] *an exercise of these basic constitutional rights in their most pristine and classic form*." *Edwards v. South Carolina*, 372 U.S. 229, 235 (emphasis added).  This "basic constitutional right" is what Defendants Masrour Barzani and Waysi Barzani chose to trample. This court found that the discretionary function rule did not apply to foreign security forces beating

a protesting citizen.. *See Miango v. Democratic Republic of Congo*, 288 F. Supp. 3d 117 (D.D.C. 2018).

563.    Defendants Masrour Barzani, Arfan Salih Omer Sherwani, Hamza Salim. Hikmet Bamerni, Hayman Quass, and Dasko Shirwani, lacking all respect for freedom of expression, (See International Covenant on Civil and Political Rights art. 19, Mar. 23, 1976, 999 U.N.T.S. 171, 6 I.L.M. 368, decreeing a universal right to freedom of opinion and expression), did knowingly combine, conspire, confederate, and agree with co-conspirators, known and unknown, to injure, oppress, threaten, and intimidate Plaintiff Shakhwan Abdulrahman in the free exercise and enjoyment of a right and privilege secured to him by the Constitution and laws of the United States, and did engage in prohibited conduct when targeting a particular individual, deploying threat of force and force, to violate Defendant Shakhwan Abdulrahman's rights or to prevent him from exercising his rights.

564.    Defendants willfully violated 42 U.S.C. § 1985(3) and 18 U.S.C. § 241 by conspiring to injure, oppress, threaten, or intimidate Plaintiff Shakhwan Abdulrahman in the exercise of his Constitutional rights.

565.    Plaintiff Shakhwan Abdulrahman is a citizen and resident of the United States. Upon learning that Defendant Masrour Barzani would be in Washington, D.C. at the end of February 2024, Plaintiff Shakhwan Abdulrahman traveled to Washington, D.C. to exercise his First Amendment right to speech and expression and his clearly established federal constitutional and stat5utory right to peacefully demonstrate against the despotic and imperious Barzani regime in and of Kurdistan, and specifically in remonstration of the concealed murder of his sister, Jihan, a young mother of two children.

566.    Defendant Masrour Barzani did visit Washington, D.C. in February 2024.  Plaintiff Shakhwan Abdulrahman traveled to Washington, D.C. with the peaceful intent to speak with

Defendant Masrour Barzani about Jihan's murder. Shakhwan dearly missed Jihan and suffered anguish and grief that he could not protect her and thought about the unspeakable fear and agony she surely endured when kidnapped, tortured, and incinerated.  Absent success in obtaining a meeting, denied by Defendant Masrour Barzani, Shakhwan's intent was to express his protected political dissent in a public and lawful political expression in Washington, D.C., with others, on February 29, 2024, by merely standing on the public sidewalk and engaging in political speech, clearly established as protected political expression. *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949). "Streets, sidewalks, parks, and other similar public places are so historically associated with the exercise of First Amendment rights that access to them for the purpose of exercising such rights cannot constitutionally be denied broadly and absolutely." *Carey v. Brown*, 447 U.S. 455, 460 (1980).  "[P]ublic places historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are considered, without more, to be public forums."  See *Frederick Douglass Found. v. District of Columbia*, 531 F. Supp. 3d 316 (D.C. 2021), citing *United States v. Grace*, 461 U.S. 171, 177 (1983); see also *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 27, 45 (1983) (explaining that streets – which "have immemorially been held in trust for the use of the public" and "have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions" – are "quintessential" example of public forums) (citation omitted).

567.    Defendant Masrour Barzani's and his agents Arfan Salih Omer Sherwani, Hamza Salim. Hikmet Bamerni, Hayman Quass, and Dasko Shirwani's unlawful and violent reaction and use of disproportionate and unreasonable bodily force and violent physical obstruction, reasonably foreseeable to restrain free speech, in a manner abhorrent to our civil liberty protections and in ways that are unnecessary and unlawful to that expression is an example of the utter contempt that Defendant Masrour Barzani and the BCE hold for the United States, its values of the rule of law,

human rights, and democracy, and the constitutional rights and privileges of its citizens and those who visit its shores. Defendants Masrour Barzani, Arfan Salih Omer Sherwani, Hamza Salim. Hikmet Bamerni, Hayman Quass, and Dasko Shirwani, ignored and evidenced contemptuous disdain for what the Supreme Court declared is America's "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," See *New York Times Co. v. Sullivan*, 376 U. S. 254, 270 (1964).

568.   This recurring pattern or practice of unreasonable, excessive, and unlawful force in its State Department-documented pattern of silencing viewpoint expression and political dissent is directly attributable to the willfulness, negligence, and failure of Defendant Masrour Barzani, who is directly liable, to properly supervise subordinates and to identify and address unreasonable force which has allowed unlawful conduct, including unlawful violence committed in his presence, to continue.

569.   Plaintiff Shakhwan Abdulrahman arrived on February 29, 2024 at the headquarters building of the U.S. Chamber of Commerce at 1615 H St. NW, Washington, D.C. – one block from the White House – where Defendant Masrour Barzani and those traveling with him were scheduled to hold an event, and proceeded to exercise his legal rights and did peacefully and lawfully voice protected political expression in protest of the murder of his sister by Defendants Masrour Barzani, Mustafa "Babo" Barzani, and their agents and representatives of the BCE they direct.

570.   The entire objective and purpose of Defendants Masrour Barzani, Arfan Salih Omer Sherwani, Hamza Salim. Hikmet Bamerni, Hayman Quass, and Dasko Shirwani's physical confrontation was to silence Plaintiff Shakhwan Abdulrahman from expressing his viewpoint, disagreeable or belligerent to the Barzani regime, in a public place, where he could be seen and heard by officials of the United States Government and by American media in America's Federal

City.  As the Supreme Court has emphasized, "[t]he right to free speech ... may not be curtailed simply because the speaker's message may be offensive to his audience." *Hill v. Colorado*, 530 U.S. 703, 716, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000).

571.    Shortly after Plaintiff Shakhwan Abdulrahman began his peaceful and non-threatening demonstration against the BCE in the United States' capital city, in retaliation by Defendants for speaking out and to silence him, Omet Derbendi did physically intervene and attempt to prevent Plaintiff Shakhwan Abdulrahman from exercising public expression and aggressively threatened him with bodily harm and did intentionally inflict emotional distress. Plaintiff Shakhwan Abdulrahman was violently and aggressively attacked, assaulted, and battered by Defendants Arfan Salih Omer Sherwani, who attempted to destroy the phone, and Hamza Salim, Hikmet Bamerni, who was supervising the agents, and did nothing to stop the assault, Hayman Quassi, and Dasko Shirwani who, employing or accommodating violent bodily force "as an instrument of oppression" (See *Davidson v. Cannon*, 474 U.S. 344, 348, 106 S. Ct. 668, 88 L. Ed. 2d 677 (1986), had a "'sufficiently culpable state of mind," which is one of "deliberate indifference.'" "'[D]eliberate indifference describes a state of mind more blameworthy than negligence,'" "but does not require proof that the defendant purposefully caused harm or acted with 'a knowing willingness that [harm] occur.'" See *Doe v. District of Columbia*, Civil Action No. 2013-0878 (D.D.C. 2016), citing *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). "[A] supervisor may be held individually liable … if he directly participates in a constitutional violation or if a failure to properly supervise and train the offending employee caused a deprivation of constitutional rights." See *Andrews v. Fowler*, 98 F.3d 1069 (8th Cir. 1996).

572.    Barzani agents at the scene of the attack on Shakhwan who were not physically attacking Plaintiff Shakhwan were negligently supervising or overseeing Defendant Arfan Saleh Omar Sherwani, Arfan Salih Omer Sherwani, Hamza Salim. Hikmet Bamerni, Hayman Quass. Dasko

Shirwani, and the other co-conspirators, and were culpably careless in their supervisory roles and who "acquiesced in or tacitly authorized [their] subordinates unlawful actions" (See *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989), and assisted (or indirectly assisted, and did nothing to stop the attack. They were agents and representatives of Defendant Masrour Barzani, with a goal of curtailing and depriving the federal constitutional and statutory rights and other constitutionally protected interests of an American citizen, and in a conspiracy to commit a crime of violence against him. In performing these acts which caused injury, defendants intended to do great bodily harm to Plaintiff Shakhwan Abdulrahman, or knew that such acts would cause injury to Plaintiff, or knew that such acts create a strong probability of great bodily harm to Plaintiff, and acting together committed a forcible felony, in the course of or in furtherance of crime. These human rights violations and abuses include the repression of a member of American civil society.

573. In their unprovoked and illegal physical attack on Plaintiff Shakhwan Abdulrahman while freely, lawfully, and peacefully exercising a fundamental right, Defendants Arfan Salih Omer Sherwani, Hamza Salim. Hikmet Bamerni, Hayman Quass, and Dasko Shirwani, and their co-conspirators acting for and on behalf of Defendant Masrour Barzani, did conspire in a civil rights violation under 42 U.S.C. § 1985, and in an effort to destroy evidence of Defendants' unlawful conduct, physically attempted (without success) to illegally steal and confiscate or destroy Shakhwan's cell phone that he had been using to lawfully and freely film and record the violent reaction of the Barzani group to his tiny peaceful demonstration. The two Barzani bodyguards who attacked Shakhwan tried to force the phone out of his hand but could not take it away. Then the attackers tried to break the phone in Shakhwan's hand, which caused pain in his hands and back, which persists. As a direct and proximate cause of Defendants' actions, Shakhwan continues to suffer crippling physical and emotional effects of the attack.

574.    The attackers tried to also kick Shakhwan, but when police arrived, the attack was halted. They also boldly and powerfully kicked the photo of Shakhwan's murdered Kurdish sister, in an intentional act of disrespect and repression of a Constitutionally protected liberty.  Shakhwan was displaying a photo, a protected medium of free speech equivalent to displaying a political sign in one's front yard, which the Supreme Court has held is substantive speech. See *City of Ladue v. Gilleo,* 512 U.S. 43, 54-56, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994).

575.    These unlawful acts unjustly restrained Shakhwan's free movement, invaded his privacy, interfered with his right to anonymity, degraded his personal dignity, denigrated his expressive activity, restrained his personal autonomy, injured his ability to speak to Defendant Masrour Barzani, and silenced his First Amendment right to engage in protected advocacy.

576.    With regard to a prior similar incident in Washington, D.C. against Kurdish dissidents, the United States Secretary of State expressed the position of the United State Government: "The United States does not tolerate individuals who use intimidation and violence to stifle freedom of speech and legitimate political expression." Although the Circuit Court for the District of Columbia "has established that the [Kurdish] security detail had a right to protect [prime minister Barzani]", that does not automatically grant Barzani's security personnel "discretion to commit criminal assaults." See *Usoyan v. Republic of Turkey*, 6 F.4[th] 31 (D.C. Cir. 2021).  Further, Defendants cannot identify any statute, regulation, or other source of law that confers its discretion to act in the manner they did against Plaintiff Shakhwan Abduhralman, nor can Defendants identify any such specific authorization in this case.  None of defendants' violent actions were grounded in any lawfully constituted public policy.

577.    As the District of Columbia Circuit Court stated in a similar case, with materially equivalent facts, "Although the [Kurdish] security detail's protective mission was discretionary as a general matter, that does not mean that every action a [Kurdish] officer may take is an immunized

exercise of that discretion." Discrete injury-causing actions can, in certain cases, be "sufficiently separable from protected discretionary decisions to make the discretionary function exception inapplicable" and "do not fall within the discretionary function exception."  See *Usoyan v. Republic of Turkey*, 6 F.4th 31 (D.C. Cir. 2021).  *Moore v. Valder*, 65 F.3d 189, 197 (D.C. Cir. 1995), *abrogated on other grounds by Ziglar v. Abbasi*, U.S., 137 S. Ct. 1843, 198 L.Ed.2d 290 (2017).  U.S. law "does not rule the world" but there is a presumption that it "governs domestically." *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 115, 133 S.Ct. 1659, 185 L.Ed.2d 671 (2013) (quoting *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 454, 127 S.Ct. 1746, 167 L.Ed.2d 737 (2007)).  Defendant Barzani's BCE agents violated several District of Columbia laws, including assault with a dangerous weapon and aggravated assault, *see* D.C. Code §§ 22-402, 404.01, and committed civil rights violations under 42 U.S.C. § 1985.  These actions occurred during a physical attack by BCE agents and representatives, in America's capital, to stifle the First Amendment rights of citizens freely protesting the treatment of a minority group in Kurdistan.

578.   Plaintiff Shakhwan Abdulrahman acknowledges the Kurdish security detail has, within bounds of reason and law, a right to protect Defendant Masrour Barzani.  The Iran-US Claims Tribunal in *Sedco, Inc v Iran* recognized a "police powers" exception thus: "[It is a] principle of international law that a state is not liable for economic injury which is a consequence of bona fide 'regulation' within the accepted police powers of states."  *Sedco, Inc v Iran*, 9 Iran-US Claims Tribunal Reports 248, at para 275.  However, Defendant Masrour Barzani, and his agents and bodyguards, do not have police powers or law enforcement authority inside the United States and did not have discretion to commit criminal assault and battery as civil rights violations. The violent assault and battery committed by Defendant Masrour Barzani's agents against Plaintiff Shakhwan Abdulrahman was not plausibly grounded in considerations of security-related policy.

577.    Plaintiff Shakhwan Abdulrahman suffered physical injuries and emotional distress as a result of the attack by Defendant Arfan Salih Omer Sherwani and his co-conspirators and sought medical care. The extent and severity of Plaintiff Shakhwan Abdulrahman's cumulative injuries resulting from the attack on him by Defendants Arfan Salih Omer Sherwani, Arfan Salih Omer Sherwani, Hamza Salim. Hikmet Bamerni, Hayman Quass, and Dasko Shirwani and their co-conspirators acting for and on behalf of Defendant Masrour Barzani are not currently fully known.

578.    Plaintiff Shakhwan Abdulrahman also brings this action on his behalf and as representative of his murdered sister's estate pursuant to 18 U.S.C. § 2333, which provides that any U.S. national may sue for an injury sustained "by reason of an act of international terrorism." 18 U.S.C. § 2333(a). "International terrorism" is defined as activities that: (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State; (B) appear to be intended – (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination or kidnapping; and (C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum[.]

579.    "An act of international terrorism" subjecting defendants to civil suit under the Antiterrorism Act (ATA), which, in relevant part, permits "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, [to] sue … in any appropriate district court of the United States." 18 U.S.C. § 2333(a).  Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors,

or heirs, may sue therefore in any appropriate district court of the United States and shall recover threefold damages.

580.    Plaintiff Shakhwan Abdulrahman also brings this action on his behalf and as representative of his sister's estate pursuant to the Alien Tort Claims Act ("ATS"), 28 U.S.C. § 1350.  Both U.S. nationals and foreign nationals may assert federal common law claims, namely, assisting in the intentional injury of others, reckless disregard of injury to others, wrongful death, survival, and negligent and intentional infliction of emotional distress against defendants whose actions meet the statutory requirements, as in the instant case.

### 583.   C.    Defendants Falsely Imprison And Torture American Citizen Sidqi Bradosti

581.    The sovereign nation of the Republic of Iraq, is, as of July 7, 2011, a signatory nation to The Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT").  In the matter of the arrest and incarceration torture of Sidqi Bradosti, which prolonged torture occurred in the jail operated by the KDP and controlled by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, these (and other) relevant provisions of Article Part 1, Article 1; Article 2; and Article 16 were knowingly and willfully, directly and indirectly, violated by the Defendants Masrour Barzani and Waysi Barzani and at their direction by their agents.

582.    American citizen Sidqi Bradosti was detained and falsely imprisoned by Asayish (Kurdish Security) agents of the BCE acting under the direction and command of Defendants Masoud Barzani, Masrour Barzani and Waysi Barzani. Defendants, and their agents and representatives, knew and intended that the arbitrary arrest on false criminal charges would be utilized by KDP officers, each an employee or agent of the KRG and operating under Defendants' command and direction, to eavesdrop, tap and intercept the communications of Sidqi Bradosti while incarcerated;

surveil, detect, monitor and track his online communication; apprehend, interrogate, ideologically persuade and in other ways torture and detain him because of his political beliefs, with the specific purpose of suppressing Sidqi Bradosti's political beliefs through the perpetration of these and other egregious human rights abuses against him, all in violation of international, United States, Iraq, and KRG law.

583.    The Court of Appeals for the District of Columbia Circuit held that "Government conduct that 'shocks the conscience' violates the Fifth Amendment guarantee against deprivation of 'life, liberty, or property, without due process of law.'" See *Harbury v. Deutch*, 233 F.3d 596, 602 (D.C. Cir. 2000), quoting *Rochin V. California,* 342 U.S. 165, 172-173, 72 S. Ct, 205, 96 L. Ed. 183 (1952). The conduct of the agents of the KRG, under the command and control of Defendant Masrour Barzani, a United States person, though acting without lawful authority but in the name of government, shocks the conscience, (noting that the Due Process Clause must at least "give protection against torture, physical or mental"). *Benton v. Maryland* 395 U.S. 784, 89 S. Ct. 2056, 23 L.Ed.2d 707 (1969).

584.    The state security service Asayish is not an ordinary crime control apparatus. While it does perform some standard crime control police functions, Asayish differs exponentially from all standard crime control initiatives in scale, complexity, intelligence, and technological sophistication – all of which are directly related to its major purpose or functionality, i.e., to find, track, and suppress, through arbitrary and discriminatory enforcement, dissenters to the Barzani regime wherever found in Kurdistan and worldwide. Defendants Masrour Barzani and Waysi Barzani, along with other subordinate KRG officials and KDP officers, set policy for Asayish and micromanage the persecution and elimination of political dissidents, and provide extensive resource support to the persecutory purpose of its Asayish apparatus. This resource support includes technology to secure provincial security databases, allowing for thorough cross-checking

of names, affiliations, political behavior, family history, and "footprints" for the surveillance, apprehension, and suppression of unlawfully targeted individuals, including Sidqi Bradosti. It even includes the capacity and technology needed to read the content of email, figure out if someone had uploaded a new website, and monitor the Internet surfing history and email of designated persons, for repressive uses in furtherance of the BCE persecutory objective. According to a recent Human Rights Watch report, the Asayish has detained hundreds of suspects without trial and often for years, most of whom were allegedly tortured and ill-treated in establishments which, over time, have morphed into symbols of oppression, where dissent is crushed, and voices silenced.

585.    The life of Sidqi Bradosti, who's previously sterling reputation has been dragged through the mud, and those of his family are irreparably altered by his baseless arrest and prosecution.

586.    Targets of the BCE, including Sidqi Bradosti and John Doe Plaintiffs, are purposefully and calculatedly subjected to public, community, familial, and personal demonization and humiliation, beatings, ideological conversion and other forms of inhumane treatment and torture in ad hoc KDP detention facilities, a system of initial administrative detention imposed without judicial authorization or review.  Beginning in his first week in detention, Sidqi was tortured and interrogated, suffering well documented devastating psychological and physical effects.

587.    The demonization of such individuals, including Sidqi Bradosti, as state enemies, anti-humanity, anti-society, dangerous criminals and other dehumanizing comparisons has been used by the KDP and the BCE to instigate, incite and justify the human rights abuses carried out against successive target individuals including Sidqi Bradosti, peaceful reformist intellectuals, and pro-democracy advocates.

588.    So-called dissidents, including Sidqi Bradosti, are demonized by Defendants Masrour Barzani, Waysi Barzani, and their agents and representatives, as "party enemies," "hostile

elements," "terrorists" and other dehumanizing and discrediting imagery to legitimize their regular subjection to human rights abuses.

589.    At all relevant times, defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani were and are part of a pattern and practice of systematic, systemic, and unlawful human rights violations committed in Kurdistan, and bear personal responsibility.

590.    As members of the highest KRG leadership, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani had and have a duty – under customary international law, multilateral treaties, Iraq law, and Kurdistan law – to ensure the protection of prisoners; to prevent violations of international law by the prison and security personnel; to ensure that all persons under their command were trained in, and complied with Iraq law, KRG law, and international law, including the Iraq, KRG, and international law prohibitions against torture, crimes against humanity, arbitrary detention, and cruel, inhuman and degrading treatment or punishment: and to investigate, prevent and punish violations of Iraq law, KRG law, and international law committed by officials and staff of the prison and Asayish security forces under their command.

591.    Defendants Masrour Barzani and Waysi Barzani, and their co-conspirators, conspired to violate Iraq law, KRG law, and international and domestic law and carried out a series of overt acts in furtherance of this conspiracy, including inter alia, detaining and torturing Sidqi Bradosti and forcing him to witness the torture of others.  Defendants and their co-conspirators further conspired to conceal and cover up these violations of Iraq law, KRG law, and international and domestic law in furtherance of this conspiracy.

592.    As an ulterior but parallel motive of the efforts by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents, representatives, through anti-competitive practices, to control and monopolize all Kurdistan commerce, licit and illicit, by holding and increasing its monopolistic market share and  to generate enormous profits, conspired and acted to destroy,

degrade, and eliminate commercial competition by sabotaging and debasing the established and respected reputation of a prominent family and the long-established relationship of the Bradosti family with the government of Turkey.  Under the command and control of Defendants Masrour Barzani and Waysi Barzani, the KDP broadcast the videoed photographs of Sidqi Bradosti, characterized as a terrorist, on KDP owned and controlled television with the willful, purposeful, and calculated objective to soil Sidqi Bradosti's established reputation for BCE economic and financial gain, with the object of taking for their own commercial businesses contracts Sidqi Bradosti and his business interests had with the United States military.

593.   Under Iraq and KRG law, its citizens are free to associate and practice their beliefs and speak and express freely without fear of systematic persecutory reprisal anywhere.  However, under the command, control, and direction of Defendants Masoud Barzani, Masrour Barzani and Waysi Barzani, the KRG and KDP, operationally indistinguishable in practicality, and both controlled by Masoud Barzani, Masrour Barzani, and Waysi Barzani, their agents, representatives, as masters of deception and centralized power, emphasized the Barzani leadership over all aspects of governance, and breached their duties and have implemented a widespread persecutory campaign against those Iraqi Kurds, including Sidqi Bradosti, politically opposed to the Barzani regime to ideologically convert and suppress political and ideological opponents, real and perceived, controlling the message, censoring speech and expression, and controlling the opposition, through inhumane treatment, torture, enforced disappearance, murder and in other unlawful ways, frequently aiding and abetting foreign intelligence activities in alleged human rights and trade violations, all contrary to and not authorized by Iraq law or KRG law.  Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents and representatives, including KDP agents and low-level security officers under their direct command and control have

445

operated and continue to operate *ultra vires*, i.e., outside of and beyond the constraints of statutory law or precedent or government regulations or treaties and agreements.

594.    To ensure the suppression of Kurdish citizens, and family members including their sons and daughters, where they live etc., who are deemed by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents and representatives, to be a real or potential threat to Barzani influence and ideological and commercial control and the BCE, are still today systematically targeted, often using proprietary American technology, that they specifically tailor and deploy to surveil, torture and in other ways suppress dissent and for human rights abuse.  These activities include, but are not limited to, arbitrary arrest, detention, harassment, inhumane treatment, mental and physical torture, and death resulting from torture and other abuse, and instill a reasonable fear of reprisals against themselves and members of their families.  The resulting reasonable fear of reprisals against themselves or members of their families residing in Kurdistan and the impossibility of safely conducting investigation and discovery in Kurdistan, serves as an insurmountable deterrent to obtain any form of legal redress.

595.    Parallel and complementary to technology abuses, Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their agents and representatives, regularly employ, retain, contract, and otherwise engage recent former diplomatic, administrative, intelligence, and military personnel of the United States Government who were trained by the United States Government and thus knowledgeable as to its inside workings, policies, procedures, rules, tactics, and secrets, who thus become collaborative, complicit, and conspirator agents and representatives in the BCE to further, expand, and profit from its illicit criminal enterprise.

596.    Defendants furthered, facilitated, purposefully authorized, participated in, and ratified alleged realistic and impending threat of direct injury, abuses, and all tortious conduct in all factual allegations herein, with knowledge and intent, and whose activities were the proximate cause of

Sidqi Bradosti's injury in fact.  Sidqi Bradosti as an incarcerated prisoner was in no position or capacity to evade or avoid injury.

597.    The devastating psychological and physical effects of prolonged solitary confinement are well documented by social scientists: prolonged solitary confinement causes prisoners significant mental harm and places them at grave risk of even more devastating future psychological harm. Researchers have demonstrated that prolonged solitary confinement causes a persistent and heightened state of anxiety and nervousness, headaches, insomnia, lethargy or chronic fatigue (including lack of energy and lack of initiative to accomplish tasks), nightmares, heart palpitations, and fear of impending nervous breakdowns. Other documented effects include obsessive ruminations, confused thought processes, an oversensitivity to stimuli, irrational anger, social withdrawal, hallucinations, violent fantasies, emotional flatness, mood swings, chronic depression, feelings of overall deterioration, as well as suicidal ideation. Individuals in prolonged solitary confinement frequently fear that they will lose emotional control, and thereby be punished further.

598.    In a clear and premeditated miscarriage of and denial of justice against a citizen of the United States, and with an astounding paucity of credible evidence, criminal charges against Sidqi Bradosti were fabricated and material facts were knowingly misstated, ignored, or hidden in an orchestrated malicious prosecution, abuse of process, misrepresentation, and deceit, and in a culture of sustained impunity at the command of Defendants Masoud Barzani, Masrour Barzani and Waysi Barzani as part of Defendants' criminal enterprise object to maintain power, unlawfully enrich themselves, eliminate commercial competition, avoid appropriate accountability, and sow fear in the hearts of opponents and perceived potential opponents including precipitating a retaliatory spiral, to enrich themselves and provide a means to harm Plaintiffs, all of which are criminal activities in violation of 18 U.S.C. §§ 242, et seq.

599.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their direct subordinates operating under their command and control, have, contrary to Iraq law and KRG law and without lawful authority, repeatedly, frequently, nefariously, and extrajudicially used the force of the KRG to target and imprison their real and perceived political, commercial, and financial opposition, as they have done to Sidqi Bradosti, perpetrating on him human rights violations, especially violations of privacy, freedom of expression, freedom of association, and freedom of liberty, and physical abuse in the form of unlawful arrest and detention.

600.    While deprived of individual liberty and incarcerated by and at the direction of Defendants, and as a direct and proximate result of Defendants' breach of official duties, Sidqi Bradosti suffered bestial, brutish, and barbaric action injuries, including pain and suffering, which required medical treatment, and a resultant prolonged detrimental effect on his physical and mental health.

601.    Sidqi Bradosti has long suffered from epilepsy, predating his incarceration. At the beginning of his incarceration, and despite his blatantly ignored pleas and pleas by his family, Sidqi's essential prescription medications were knowingly, intentionally, and sadistically withheld from him at the direction of Defendants.  Sidqi's arrest and incarceration on fabricated charges, with inclusion of fictitious evidence and not supported by the facts of their investigation, was directed by Defendant Masrour Barzani, and carried out by Defendant Waysi Barzani; co-conspirators Dilshad Yousef and Ismat Argoshi of KRG security.  These individuals, as well as other employees and agents operating under their direction, engaged in a systematic fabrication accompanied by prejudicial outside influences, preventing a fair and orderly administration of justice, in order to obtain a conviction of an American citizen, thereby knowingly depriving him of all his Constitutional and legal rights accorded by laws of the Republic of Iraq, KRG, the United States, and the law of nations.

602.    The arrest of Sidqi Bradosti caused severe and traumatic emotional and psychological harm and distress to his spouse, suffering from the agonizing uncertainty of not knowing whether her husband was dead or alive, and to their three children, each a citizen of the United States of America, who were terrified and overcome by fear and paranoia.  Upon Sidqi's arrest, co-conspirator Ismat Argoshi, with subordinate colleagues, acting as part of Defendants' criminal enterprise to gain wealth and maintain power, ordered his subordinates to go to the Bradosti residence, where, by use of force and illegal entry, and having the apparent cloak of authority over the Bradosti household, and using foreboding, inflammatory, and threatening phraseology, pillaged and violently destroyed its furnishings, removed money and personal items, causing members of the Bradosti family to fear for their lives and suffer from immense mental and emotional dread and terror.  Haza Mustafa Mahmood Bradosti, spouse of Sidqi Bradosti, suffered horrific violation and deprivation of dignity, a profound sense of injustice and pain, that has caused her immense physical and emotional trauma that she will carry for the rest of her life.

603.    Sidqi Bradosti was incarcerated in the summer of 2019 in a jail operated by the Kurdistan Democratic Party and held against his will and inhumanely treated and tortured during the time he was incarcerated in the perilous Asayish jail in Erbil, Kurdistan – a facility responsible for the custody, control, care and safety of inmates, including "pretrial detainees" (people who have been detained following arrest, but have not yet been convicted of committing an offense).

604.    The courts of KRG have no judicial independence, conduct themselves in a manner incompatible with the role of courts in the administration of justice, are puppet operatives of the corrupt, tyrannical, and dictatorial Barzani regime which controls all the levers of power, and serves the criminal enterprise operated by Defendants to inhumanely treat, torture, kill, and bring fear, and coercion to silence and eliminate all opposition – all with the object of obtaining money

and wealth and power by unlawful means, and provide the financial capacity to injure the Plaintiffs.

605.    In the case of Sidqi Bradosti's torture while incarcerated, the judge of the KRG court overseeing Sidqi's case, having a duty under the laws of Iraq and the KRG to promote confidence in the independence, integrity, and impartiality of the judiciary and an obligation over provision of due process,  was deprived of authority by Defendants Masrour Barzani and Waysi Barzani to decide the issues before the court, unavoidably and irreparably tainting these proceedings.  This judge cautiously came to the Bradosti home and, acknowledged the judicial misconduct, and in ascribing brazen malintent said that he was taking orders from the Barzani's, who had clear and present disqualifying interests and little interest in complying with the terms of international treaties, Iraq law or KRG law that did not further the interests of the BCE and which were unconstitutional, illegal, and ethically improper for this court and disrupting the administration of justice, stating to family members present in a stunning factual admission: "I was forced to do this by the Barzani's," acknowledging orders issued by Defendants Masrour Barzani, Waysi Barzani, and co-conspirator Ismat Argoshi, which were contemptuous, disrespectful, and constitute a knowing disobedience of judicial rules and duty of truthful inquiry of the tribunal – a calculated abolishment of the Court's impartiality and independence, and purposeful political meddling with sweeping implications of corruption and deceit, and a willful abrogation of Sidqi Bradosti's rights under Iraq and KRG law and international treaties, constituting a self-admission that the Court's posture in this matter was adversarial, not adjudicatory.

606.    This judicial conduct in Sidqi Bradosti's case was not merely the appearance of impropriety; this conduct was and is actual judicial impropriety, designed to settle this matter in collaboration with and at the direction and command of a coordinate branch of government.  There was no presumption of innocence, no provision of due process, and the judicial conduct was

prejudicial to the administration of justice and contrary to law. This was an emasculation of judicial power by Defendant Masrour Barzani, a commanded judicial misconduct, and prejudicial to the administration of justice. Judges in KRG are employees of KRG, controlled absolutely by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani.

607.    It was impossible for Sidqi Bradosti, a citizen of the United States of America, to receive a fair and impartial trial, and no just outcome was available to him. The entire judicial proceeding was tainted by a lack of Iraq and KRG law-based procedural guarantees, by the close internal cooperation of KRG ministerial ecosystem, and by legally improper influences, including assaulting the integrity of the judiciary by a corrupted legal establishment weaponized by Defendant Masoud Barzani and by Defendant Masrour Barzani who had and has a duty of his Prime Ministerial of KRG office to the law and to the administration of justice. This unlawful weaponization had and has the purpose of pronouncing and condemning Barzani's political opponents, which had a harmful chilling effect on witnesses and adversely affected the fair administration of justice in Sidqi Bradosti's prosecution. Prosecution was in bad faith, nefarious, and a representative instance of prosecutorial misconduct. Sidqi Bradosti's rights were violated. Having no concern for justice or their compliance with law or codes or judicial standards, at the direction of Defendants Masrour Barzani, Waysi Barzani, and their subordinates, particularly co-conspirators Ismat Argoshi and Dilshad Yousef, Defendants knowingly falsified and made a false record entry with the intent to impede, obstruct, and influence the investigation and adjudication of the matter, and Sidqi Bradosti was knowingly prosecuted by KRG, under the command and control of Defendant Masrour Barzani, for crimes he did not commit.

608.    Sidqi Bradosti continues to suffer from the long-term psychological effects of his torture.

451

609.    Notwithstanding the repeated pleas by Sidqi Bradosti and his wife and family, and by U.S. Government diplomatic officials, there was never an official misconduct investigation by any agency or office of KRG.

610.    The Barzani Defendants and their subordinate judges, each of whom is required by Defendants Masoud Barzani and Masrour Barzani to be a member of the KDP to receive a judicial appointment, and jailers under their command and control, had actual knowledge, as repeatedly affirmed to them by officials of the United States Embassy and Consulate, that Sidqi Bradosti, and his three minor children were and are American citizens.  Sidqi's wife, Haza Mustafa Mahmood Bradosti, at the time held the status of a permanent resident of the United States, ensuring her the same inalienable Constitutional rights and protections as a U.S. citizen, which Defendant Masrour Barzani as himself a legal permanent resident knows full well.  Their American citizenship status was wholly and intentionally ignored by Defendants Masoud Barzani and Masrour Barzani.

611.    A report by Amnesty International describes conditions of prisons in Iraq as overcrowded, lacking requirements to meet basic needs, steeped with nauseating, pervasive, and inescapable aromas of human waste, and have poor medical facilities, resulting in the prevalence of diseases such as scabies, allergies, skin infections and other conditions:

> *"Detainees had been blindfolded, stripped and suspended by their wrists or hung in contorted stress positions for hours at a time. In addition to being subjected to electric shocks to the genitals, ears, tongue and fingers; beaten on the soles of their feet (falaqa), whipped and beaten with canes, hosepipes and metal rods; burnt with cigarettes or having their hands pierced by electric drills or having their toe or fingernails ripped out."*

612.    The Independent Human Rights Commission Kurdistan Region reported Defendant "IKR [Iraqi Kurdistan Region] correctional centers suffered from long-term problems of overcrowding, inadequate water, sanitation, and hygiene facilities, use of violence during preliminary detention,

and outdated infrastructure at women's and juvenile centers. Limited medical staff was unable to provide adequate medical services to all prisoners," including Sidqi Bradosti.

613.    The United Nations Committee Against Torture reported its concern "about continued reports of torture or ill treatment in detention facilities" [operated by the KRG or its partners] and observed the "existing mechanisms to investigate the acts of torture and ill treatment committed by officials do not effectively hold the perpetrators to account." Both local and international human rights organizations asserted judges frequently failed to investigate credible allegations that security forces tortured terrorism suspects and often convicted defendants based solely on both overtly and covertly coerced confessions. In addition, despite their concerns being raised, authorities ignored physical signs of torture, and the complaints procedures appeared to be neither fair nor effective. Many detainees chose not to report such mistreatment due to a lack of trust or fear of reprisals.

614.    At the direction of Defendants Masrour Barzani and Waysi Barzani, and implemented by subordinate co-conspirators Ismat Argoshi and Dilshad Yousef and others, Sidqi Bradosti was inhumanely treated and medically tortured while imprisoned. It was and is widely known in Erbil, and was and is fully known to the Barzani's and their subordinates, co-conspirators Ismat Argoshi and Dilshad Yousef and others, including Asayish jailers, that Sidqi Braqdosti suffers the acute chronic noncommunicable disease of epilepsy, a severe neurological disorder of the brain characterized by repeated and potentially fatal seizures. Yet under the direction of Defendant Masrour Barzani, while acting under imagined color of law, but without legal authority of Iraq or the KRG, and while aiding and abetting one another, these individuals willfully, directly and indirectly, deprived Sidqi of all medications that are required for an epilepsy sufferer and of the right, protected and secured by the Constitution and laws of the United States, to due process of

law, which includes the right of a pretrial detainee to be free from a jail official's deliberate indifference to his serious medical needs.

615.    Sidqi Bradosti's family exceedingly feared that as a result of his inhumane imprisonment he might die.  This vicarious suffering in family members, itself a recognized type of psychological torture, caused permanent mental damage to victims.

616.    Missed or withheld medicines can trigger seizures and death in people with both well-controlled and poorly-controlled epilepsy.  Seizures can happen more often than normal, be more intense or develop into long seizures called status epilepticus.  Status epilepticus is a medical emergency and can lead to death if the seizures are not stopped.  If seizures cannot be stopped or repeated seizures occur one right after another, permanent injury or death can occur.  People with epilepsy can also die from problems that occur during or after a seizure, such as inhaling vomit.  The withholding of needed medicine and the resulting fear was inhumane treatment and torture of Sidqi Bradosti, resulting in prolonged bodily injury.

617.    The premeditated and malicious torture of Sidqi Bradosti by Defendants, as directed by Defendant Masrour Barzani and his subordinates, particularly co-conspirators Ismat Argoshi and Delshat Najar, resulting in creating a state of helplessness, psychological regression, and depersonalization, continued for months until unremitting and insistent intervention efforts by diplomatic officials of the U.S. Embassy were finally successful in arranging for Sidqi Bradosti to receive his essential life-saving prescription medications.

618.    Categories of psychological torture include debilitation, isolation, implicit and expressed threats, degradation, pharmacological manipulation, food, water, and sleep deprivation, no privacy, and poor ventilation.  Defendants repeatedly and continually subjected Sidqi Bradosti to each of these categories of psychological torture, where the pervasive odor of fear, doubts and the

specter of dying clung to him like a constant sharp headache, with a persistent psychological system of pressure akin to combat fatigue.

619.    During his imprisonment, Sidqi was not allowed visitors. No family members or physicians were allowed to see him.  Despite concentered and relentless efforts of the Deputy United States Consul General to obtain proper treatment, care, and familial visitations, all visitations were denied by the KRG at the direction of Defendants Masrour Barzani, Waysi Barzani, and co-conspirators Dilshad Yousef, and Ismat Argoshi.  Defendants ordered Sidqi Bradosti be deprived of familial comfort and Defendants' orders were obeyed by the jailers.

Defendant Masrour Barzani, his subordinates Defendants 620.    Under the direction and command of Defendant Masrour Barzani, his subordinate co-conspirators Ishat Argoshi and Dilshad Yousef, acting as private judicial enforcement on behalf of Defendants Masrour Barzani and Waysi Barzani, physically severely beat Sidqi Bradosti severely.

584 621.        The Government of the Republic of Iraq became a signatory nation to The International Covenant on Civil and Political Rights with its ratification on 25 January 1971 and which became effective in Iraq on 23 February 1976.  In the matter of the arrest and trial and torture of Sidqi Bradosti, a citizen of the United States of America, the relevant provisions of several Articles Articles Part 2, Article 2; Article 7; Article 0; Article 14 (in part); and Article 17 were knowingly and willfully, directly and indirectly, desecrated, disobeyed, and disregarded by Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani and their agents:.

> *Part 2, Article 2*
> *3. Each State Party to the present Covenant undertakes:*
>
> *(a) To ensure that any person whose rights or freedoms as herein recognized are violated shall have an effective remedy, notwithstanding that the violation has been committed by persons acting in an official capacity;*

*(b) To ensure that any person claiming such a remedy shall have his right thereto determined by competent judicial, administrative or legislative authorities, or by any other competent authority provided for by the legal system of the State, and to develop the possibilities of judicial remedy;*

*Article 7*

*No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment. In particular, no one shall be subjected without his free consent to medical or scientific experimentation.*

*Article 9*

*1. Everyone has the right to liberty and security of person. No one shall be subjected to arbitrary arrest or detention. No one shall be deprived of his liberty except on such grounds and in accordance with such procedure as are established by law.*

*3. Anyone arrested or detained on a criminal charge shall be brought promptly before a judge or other officer authorized by law to exercise judicial power and shall be entitled to trial within a reasonable time or to release. It shall not be the general rule that persons awaiting trial shall be detained in custody, but release may be subject to guarantees to appear for trial, at any other stage of the judicial proceedings, and, should occasion arise, for execution of the judgment.*

*4. Anyone who is deprived of his liberty by arrest or detention shall be entitled to take proceedings before a court, in order that that court may decide without delay on the lawfulness of his detention and order his release if the detention is not lawful.*

*Article 14 (in part)*

*1. All persons shall be equal before the courts and tribunals. In the determination of any criminal charge against him, or of his rights and obligations in a suit at law, everyone shall be entitled to a fair and public hearing by a competent, independent and impartial tribunal established by law.*

*Article 17*

*1. No one shall be subjected to arbitrary or unlawful interference with his privacy, family, home or correspondence, nor to unlawful attacks on his honour and reputation.*

*2. Everyone has the right to the protection of the law against such interference or attacks.*

Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their associates, proceeded with their criminal activities to retain power and gain money regardless of who their victims were, including victims who were citizens of the United States of America.  Defendant Masrour Barzani led these criminal activities against a fellow national of the United States of America in violation of his known legal obligation which resulted from his permanent resident status.

585622.    At the pre-trial, trial, and post-trial stages, at the direction of Defendants Masrour Barzani and Waysi Barzani, Sidqi Bradosti was incarcerated in inhuman and degrading conditions by their immediate subordinate agents ~~Defendants~~co-conspirators Ismat Arogoshi and Dilshad Najar in the Erbil jail operated by the ~~Kurdistan Democratic Party~~KDP, which Defendants Masrour Barzani and Waysi Barzani control and govern and have directive power and in which appropriate security procedures and protective orders were absent.  In its *2022 Country Reports on Human Rights Practices: Iraq*, ~~at a time Defendant Masrour Barzani was Prime Minister of Defendant Iraqi Kurdistan Regional Government, the presiding and actual head of government and head of the executive power, the United States~~the Department of State described jail conditions:

> "*Prison and detention center conditions were harsh and occasionally life threatening due to food shortages, gross overcrowding, physical abuse, inadequate sanitary conditions and medical care, and the threat of communicable illnesses.*
>
> *The Iraqi War Crimes Documentation Center released a report detailing the deaths of 49 inmates between January 2021 and August that the center concluded resulted from "torture and medical negligence" in federal prisons.  The report alleged the government held thousands of detainees in "inhumane conditions," including "overcrowded and unsanitary cells," often due to "revenge and sectarian motivation."  The report stated the lack of "sanitary conditions" and cells' "high temperature and humidity '' directly harmed inmates' health.*

457

> *The Independent Human Rights Commission Kurdistan Region (IHRCKR) reported IKR correctional centers suffered from long-term problems of overcrowding, inadequate water, sanitation, and hygiene facilities, use of violence during preliminary detention, and outdated infrastructure at women's and juvenile centers.  Limited medical staff was unable to provide adequate medical services to all prisoners."*

586623.     In the kangaroo court proceeding on bogus criminal charges against Sidqi Bradosti in the Defendant Iraqi Kurdistan Regional Government KRG court of Erbil, Kurdistan, where justice is disregarded, Bradosti was not accorded "a fair and public hearing by a competent, independent, and impartial tribunal," and in furtherance of their scheme, members of the enterprise harassed Bradosti, intimidated him, and solicited him to falsely confess to crimes that he did not commit, prejudicing the administration of justice.

587624.     The courts of the Defendant Iraqi Kurdistan Regional GovernmentKRG lack judicial independence and fail to act as an independent institution, as affirmed by Iraq's Democracy and Human Rights Development Center in concert with the United States Government's National Endowment for Democracy, an agency of the United States Government, declaring them to be fraught with "political and executive power intervention in the judiciary." The judiciary system works as subordinate to the executive power.  The judiciary in the Defendant Iraqi Kurdistan Regional GovernmentKRG is not financially independent, as the budget is allocated by the regional cabinet, not by the Judiciary Council as required by the Iraq Judiciary Law.

588625.     A cable of the U.S. Department of State, originating through the U.S. Embassy in Baghdad, Iraq, affirms and acknowledges the absence of judicial independence in Defendant Iraqi Kurdistan Regional Government:KRG:  "The parties' Soviet-style political system in which the formal government, including the judicial and legislative branches, is subordinate to the party robbed both KRGs of independent oversight."

589626.        The ~~United States~~ Department of State in its *2022 Country Reports on Human Rights Practices: Iraq*~~, at a time Defendant Masrour Barzani was and is Prime Minister of Defendant Iraqi Kurdistan Regional Government, the presiding and actual head of government and head of the executive power~~, stated: "The constitution and law provide for the right to a fair and public trial, but the judiciary did not enforce this right for all Defendants." "KRG senior leaders reportedly influenced politically sensitive cases.    The IKR's [Iraqi Kurdistan Regional Government] strongest political parties, the Kurdistan Democratic Party (KDP) and the Patriotic Union of Kurdistan (PUK), also reportedly influenced judicial appointments and rulings."  The Erbil court sitting in judgment of Sidqi Bradosti lacked judicial independence and freedom from "political and executive power intervention" by Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani (collectively the Barzani's) and their subordinate agents and representatives.

~~590.    The sovereign nation of the Republic of Iraq, of which the Defendant Iraqi Kurdistan Regional Government is a subdivision regional and subordinate governate and instrumentality and from which the Defendant Iraqi Kurdistan Regional Government derives all its subordinate governing authorities, is, as of July 7, 2011, a signatory nation to The Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT"), at the time Defendant Masoud Barzani was President of Defendant Iraqi Kurdistan Regional Government and Defendant Masrour Barzani was General Director of the Defendant Iraqi Kurdistan Regional Government Security Protection Agency and formerly Director of the Defendant Iraqi Kurdistan Regional Government Intelligence and Security Agency (the successor agency to Parastin).  In the matter of the arrest and incarceration torture of Sidqi Bradosti, which prolonged torture occurred in the jail operated by the Kurdistan Democratic Party imperiously and tyrannically controlled by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, these (and other) relevant~~

provisions of several Articles were knowingly and willfully, directly and indirectly, violated by the Barzani's and at their direction by their agents:

> *Part 1, Article 1*
>
> *For the purposes of this Convention, the term "torture" means any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.*

*Article 2.*

> *1. Each State Party shall take effective legislative, administrative, judicial or other measures to prevent acts of torture in any territory under its jurisdiction.*
>
> *2. No exceptional circumstances whatsoever, whether a state of war or a threat of war, internal political instability or any other public emergency, may be invoked as a justification of torture.*
>
> *3. An order from a superior officer or a public authority may not be invoked as a justification of torture.*

*Article 16.*

> *1. Each State Party shall undertake to prevent in any territory under its jurisdiction other acts of cruel, inhuman or degrading treatment or punishment which do not amount to torture as defined in article 1, when such acts are committed by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. In particular, the obligations contained in articles 10, 11, 12 and 13 shall apply with the substitution for references to torture of references to other forms of cruel, inhuman or degrading treatment or punishment.*
>
> *2. The provisions of this Convention are without prejudice to the provisions of any other international instrument or national law*

460

*which prohibits cruel, inhuman or degrading treatment or punishment or which relates to extradition or expulsion.*

*591. The International Guidelines on Human Rights and Drug Policy, developed by United Nations agencies UNDP, the Joint United Nations Programme on HIV/AIDS (UNAIDS), the Office of the United Nations High Commissioner for Human Rights (UNHCR) and the World Health Organization, declares:*

> *II. Obligations arising from human rights standards*

> *6. Freedom from torture, cruel, inhuman, or degrading treatment or punishment:*

> *The withholding of drugs from those who need them for medical purposes, including for drug dependence treatment and pain relief, is considered a form of torture. Government failure to ensure access to controlled medicines for pain relief may also constitute cruel, inhuman, or degrading treatment or punishment, where, for example, a person's suffering is severe and meets the minimum level of severity under the prohibition against torture and ill-treatment; where the State is, or should be, aware of the person's suffering, including when no appropriate treatment was offered; and where the State failed to take all reasonable steps to protect the person's physical and mental integrity.*

592627.    Sidqi Bradosti was tortured in a sustained manner and in several ways in clear violation of international law.  First, as a person publicly known to suffer from epilepsy and its accompanying recurrent unprovoked seizures, some of which seizures can be very serious, essential medication was withheld from Sidqi Bradosti, and complaints of pain were ignored. Seizures can disrupt the normal electrical brain pattern by sudden and synchronized bursts of electrical energy that may briefly affect consciousness, and which can result in permanent injury, damage, or death.

593628.    Sidqi Bradosti's repeated pleas over a prolonged time period for epilepsy medication and treatment were ignored and denied by Defendants Masrour Barzani and Waysi

Barzani and their agents and representatives.  Jail officers, acting as officials of ~~the Defendant Iraqi Kurdistan Regional Government and the Kurdistan Democratic Party~~KRG and KDP and under the direction and control of Defendants Masrour Barzani and Waysi Barzani, were aware or should have reasonably been aware of ~~Plaintiff~~ Bradosti's suffering, including that no appropriate treatment or medication was offered or accorded or provided; and that ~~the Defendant Iraqi Kurdistan Regional Government~~KRG and its complementary parallel ~~Kurdistan Democratic Party~~KDP failed to take any and all reasonable steps to protect Sidqi Bradosti's physical and mental integrity.  Sidqi Bradosti's mental health deteriorated over the course of his incarceration.

~~594~~629.    The severity of purposefully denied medications, as suffered by Sidqi Bradosti at the Defendants' direction, cannot be overstated, and may cause death.  The ~~U.S.~~ Centers for Disease Control and Prevention~~, an agency of the United States Government,~~ lists missed medication as the foremost reason people with controlled seizures have breakthrough seizures (sudden, unexpected seizures).  Missing medication can cause seizures to occur more often or to be more intense, and lead to death.

~~595.    The Epilepsy Foundation considers missed medications as dangerous, and asserts:~~

> ~~"Stopping seizure medication without your doctor's advice is dangerous. Missing doses of seizure medicine is the most common cause of breakthrough seizures. Missed medicines can trigger seizures in people with both well-controlled and poorly controlled epilepsy. Seizures can happen more often than normal, be more intense or develop into long seizures called status epilepticus. Status epilepticus is a medical emergency and can lead to death if the seizures aren't stopped. Missing doses of medicine can also lead to falls, injuries and other problems from seizures and changes in medicine levels."~~

~~596~~630.    Nothing in the medical care and attention of Sidqi Bradosti while incarcerated by the ~~Kurdistan Democratic Party~~KDP met accepted standards of prisoner medicinal care.  Sidqi

Bradosti suffered from gross intentional medical negligence, intentionally caused by Defendants Masoud Barzani and Masrour Barzani and their directed subordinates.

597.   Human Rights Watch described 630.   Prison conditions as "where Sidqi was incarcerated were extremely overcrowded, so that no detainee can lie down to sleep. and because of the overcrowding and lack of proper ventilation, the makeshift prison cells arewere overheated, with an incredible stench.".

598631.   Medical science recognizes that olfactory stimulation – smells – can trigger seizures in epilepsy patients.  Sidqi Bradosti, helpless to shield himself and trying to tune out the hell of Kurdish imprisonment, was knowingly engrossed, immersed, and inflected twenty-four hours daily for two years in teeming, fetid, fusty, malodorous, foul smelling stench of human excrement, human urine, and  human sweat, and the din of noise and commotion saturated with the sounds of prisoner agony and desperate cries as political prisoners were being beaten, raped, and interrogated by the Defendants Masrour Barzani's and Waysi Barzani's agents of tyranny, each. This torture of Sidqi was aggravated and worsened by the oppressive Iraq heat,; and all knownof the torturous conditions  are triggers for epileptic seizures.

599632.   Sidqi Bradosti is an American citizen and as such was guaranteed such proper treatment by treaty while incarcerated in Kurdistan.  Yet, medical intervention efforts made in behalf of and for Sidqi Bradosti by diplomatic representatives of the Government of the United States of America assigned to the Deputy United States Consul General in Erbil, Kurdistan, Iraq, were repeatedly denied by agents of Defendants Masrour Barzani and Waysi Barzani, operating under their direct command and control, and their subordinate representatives of the Defendant Iraqi Kurdistan Regional GovernmentKRG and of the Kurdistan Democratic PartyKDP.  After substantial delays, it was only upon vigorous and repeated appeal and direct intervention by diplomatic representatives of the Government of the United States of America based at the

463

Embassy ~~of the United States of America in Baghdad~~ that permission was granted ~~by prison officers~~ for Sidqi Bradosti to finally and belatedly receive his essential prescribed epilepsy medications.

~~600.    Compounding torture-effected stress, the long-term consequences of status epilepticus, especially when intentionally unmedicated, are well known to include permanent injury or excessive death of nerve cells (neurons) in the brain and permanent alteration of the neuronal networks in the brain.  The resulting brain damage can have long term effects on behavior, can impair ability to learn and can cause intellectual disability.~~

~~601~~633.    Sidqi Bradosti was subjected to multiple forms of sustained mental, psychological, and emotional torture, sensory deprivation, and life-threatening stress as the Defendants Masrour Barzani and Waysi Barzani directed officials to destroy Sidqi Bradosti's public and respected and established family reputation, vital in Kurdish culture.  Defendants publicly and repeatedly defamed Sidqi by fabricated accusations of providing arms to terrorists and aiding an agent assassin of the Turkish Kurdistan Workers' Party (PKK).

~~602~~634.    In a planned, calculated, and purposeful effort and with no legitimate purpose other than to publicly humiliate and destroy Sidqi Bradosti's respected reputation in the ~~Iraqi~~ Kurdistan region and among the Kurdish people, Defendant Masrour Barzani directed ~~subordinates Defendants~~subordinate co-conspirators Ismat Argoshi, and Dilshad Yousef, to walk Sidqi Bradosti, as an arrestee, through a public area so he could be seen and photographed by the pre-alerted media, and to present his face and arrest story on ~~Defendant Iraqi Kurdistan Regional Government~~KRG-controlled television. The intentional public humiliation committed against Sidqi Bradosti by the ~~Barzani Continuing Criminal Enterprise~~ BCE is another example of intentional public humiliation acts committed by the ~~Barzani Continuing Criminal Enterprise~~

similar toBCE like those committed against Plaintiff, Maki Revend and John Doe Plaintiffs– including false allegations.

603635.    Defendants Masrour Barzani and Waysi Barzani and their subordinates willfully and intentionally deprived Sidqi Bradosti of individual liberty, restrained his physical movement, physically abused him, intentionally and recklessly inflicted him with emotional distress, and threatened him with death, all of which acts were expected by Defendants to cause substantial emotional and lasting distress.

604636.    A medically documented seizure precipitating factors for patients with epilepsy are stress, including the pervasive and debilitating sounds of racking coughs and agonizing screams and the ever-present wrenching stench of body fluids, misery, and despair while incarcerated. Being imprisoned in an abnormal environment and being tortured induced stress for Sidqi Bradosti in multiple medically devastating, lasting, and irreversible forms: psychological (isolation, sensory deprivation, sensory overload, sleep deprivation, temporal disorientation); psychophysiological (thermal, stress positions), and psychosocial (cultural humiliation), which resulted in a systemic cluster of untreated health extremis.

605637.    As a result of the unlawful and wrongful actions of Defendants Masrour Barzani and Waysi Barzani and their subordinates, Sidqi Bradosti suffers long-term effects of being deprived by his KDP jailers of indispensable prescribed medications.  Sidqi Bradosti suffers from complex memory images coupled with dissociation, and from archetype post-traumatic stress disorder (PTSD) symptoms brought on by torture during his wrongful imprisonment, and post-incarceration syndrome (PICS) disorder, all of which conditions are permanent injuries.

606638.    As a second and parallel form of mental and psychological torture to Sidqi Bradosti and to his wife and children –Sidqi Bradosti was deprived of visits by his wife and any of his three American citizen children for most of the period he was incarcerated from mid-2019 to mid-2021.

This presented severe (and potentially irreversible) mental, psychological, and emotional stress to Sidqi Bradosti and to his wife and their three children.

607639.    A third additional form of torture employed by Defendants Masrour Barzani and Waysi Barzani, in coordination with agents of the Government of the Republic of Turkey, persuaded that government to support false accusations against Sidqi Bradosti.  As time passed and Sidqi Bradosti suffered in his prison cell, it was only foreign government influence and intervention with Defendant Masrour Barzani which eventually was able to exonerate Sidqi Bradosti.  Realizing that the allegations were false and fabricated by the KDP intelligence officials – Defendants Waysi Barzani, and co-conspirators Ismat Argoshi, and Dilshad Yousef – agents of Turkey apologized to the Bradosti family and acknowledged, acknowledging to the court that the accusations and charges were fabricated and executed upon inducements from Defendants Masrour Barzani and Waysi Barzani.

608640.    The actual killers of the Turkish intelligence agent were later arrested, and the killers admitted in open Kurdistan court that Sidqi Bradosti had nothing whatsoever to do with the assassination.

609.    The Universal Declaration of Human Rights which is enforced by the Vienna Declaration, provides that "No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment".

610641.    Sidqi Bradosti, his wife, and their three children were each and all "subjected to torture [and] to cruel, inhuman, [and] degrading treatment [and] punishment," and intentional and reckless infliction of emotional distress, by Defendants Masrour Barzani, Waysi Barzani, and subordinate agents and representatives under their command and control.

611642.    The Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (commonly known as the United Nations Convention Against Torture

(UNCAT)) is an international human rights treaty to which the Republic of Iraq, of which ~~Defendant Iraqi Kurdistan Regional Government~~KRG is a subordinate part, ~~formalized accession thereto on July 7, 2011~~is a signatory nation.

~~612~~643.        Defendants Masrour Barzani and Waysi Barzani, as part of their ~~continuing~~ criminal enterprise, and as part of their torture of Sidqi Bradosti, also violated his rights under the United Nations Convention on the Rights of Persons with Disabilities, Article 25, which provides as follows:

> States Parties recognize that persons with disabilities have the right to the enjoyment of the highest available standard of care without discrimination on the basis of disability. States Parties shall take all appropriate measures to ensure access for persons with disabilities to health services…. In particular, States Parties shall: …
>
> f) Prevent discriminatory denial of health care or health services….

~~613~~644.        The torture of Sidqi Bradosti, and all others, did not arise from and was not inherent in or incidental to lawful actions.

~~614~~645.        At the time of ~~the~~his torture ~~of,~~ Sidqi Bradosti~~, he~~ was in the custody or physical control of Defendants Masrour Barzani and Waysi Barzani and/or their subordinates.

~~615~~646.        In torturing Plaintiff Maki Revend, Sidqi Bradosti, Ayoub Barzani, and thousands of other John Doe Plaintiffs, Defendants and others, acting under the direction of Defendant Masrour Barzani, were knowingly and willingly in violation of the laws of the government of the Republic of Iraq and ~~the Defendant Iraqi Kurdistan Regional Government~~KRG, under arrogated color of whose law they conducted and do conduct their murderous and unlawful criminal enterprise.  Under the Convention Against Torture~~, which the Republic of Iraq joined in 2011~~, torture is defined as the deliberate infliction of severe pain or suffering, physical or mental, by a public official for a specific purpose such as obtaining information or confession or as punishment.

The torture of Plaintiff Maki Revend, and others, violates laws of the United States which prohibit torture and provide a civil remedy in the United States courts for those who are tortured.

616647.    The Barzani Defendants and their subordinate judges, each of whom is required by Defendants Masoud Barzani and Masrour Barzani, without lawful authority, to be a member of the Iraqi KDP to receive a judicial appointment, and jailers under their command and control, had actual knowledge, as repeatedly affirmed to them by officials of the United States Embassy and Consulate, that Sidqi Bradosti, and his three minor children were and are American citizens. Sidqi's wife, Haza Mustafa Mahmood Bradosti, at the time held the status of a permanent resident of the United States, ensuring her the same inalienable Constitutional rights and protections as a U.S. citizen, which Defendant Masrour Barzani as himself a legal permanent resident knows full well.  Their American citizenship status was wholly and intentionally ignored by Defendants Masoud Barzani and Masrour Barzani.

617648.    Under the doctrine of command responsibility, Defendants Masrour Barzani and Waysi Barzani are legally responsible for the torture of Plaintiff Maki Revend, and of Sidqi Bradosti, his family members, and Ayoub Ibrahim, and many others.

**618    D.    Defendants Torture Driver of American Citizen**

649.    Sidqi Bradosti's driver, Ayoub Ibrahim, a citizen of the Kurdistan province of Iraq, was severely physically tortured – they beat him severely – by agents of Defendants Masrour Barzani and Waysi Barzani, to forcibly induce and overtly and covertly coerce him to make knowingly false statements, confessions, declarations, and testimony that Sidqi Bradosti and his brothers, many of whom were involved in businesses competing with the Barzani's, had a role in the assassination of a Turkish intelligence agent working at the Turkish Consulate in Erbil.

619650.    The torture of Ayoub Ibrahim, and all others, did not arise from and was not inherent in or incidental to lawful actions.

620651.    At the time these acts occurred, Ayoub Ibrahim was in the custody or physical control of Defendants Masrour Barzani and Waysi Barzani and/or their subordinates.

**Commercial Corruption Orchestrated by**
**IX.    DEFENDANTS' HUMAN RIGHTS ABUSES, TRANSNATIONAL REPRESSION, AND CRIMES AGAINST HUMANITY**

652.    "Crimes against humanity have longstanding recognition under customary international law and are actionable under the ATS."  *Ofisi v. BNP Paribas, S.A.*, 278 F. Supp. 3d 84 (D.D.C. 2017)  "It is well settled that a party who commits a crime against humanity violates international law and may be held liable under the ATCA.". *Id.*

653.    Defendants' acts are clearly contrary to the precepts of humanity as recognized in both national and international law.

654.    Plaintiffs have plausibly enumerated all elements:(1) commission of one of the enumerated acts; (2) as part of a widespread or systematic attack; (3) directed against a civilian population; and (4) committed with knowledge of the attack.  See *e.g., Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 257 (2d Cir. 2009). Defendants' crimes against humanity are systematic, continuing, against civilians, not an act of war, and committed knowingly and willfully.

655.    "The *áctus reus* for aiding and abetting under customary international law must consist of 'practical assistance, encouragement, or moral support which has a substantial effect on the perpetration of the crime.'" See *Ofisi v. BNP Paribas,* quoting *Exxon Mobil Corp.*, 2015 WL 5042118, at *9 (quoting Prosecutor v. Sainovic, Case No. IT-05-87-A, Appeal Judgement, ¶ 1649 (ICTY Jan. 23, 2014)).  All acts of Defendants and their co-conspirators had a "substantial effect on the perpetration of the crime[s]."

656.    The *mens rea* element requires an evaluation of the defendant's state of mind. Defendants knew " that their acts assist the commission of the principal *109offense." See *Ofisi v. BNP Paribas* (citing Sainovic ¶, 1649). "A defendant need not have certain knowledge that a particular crime will be committed, so long as it is 'aware that one of a number of crimes will probably be committed, and one of those crimes is committed.'" *Id.* (citing *Prosecutor v. Popovic*, Case No. IT-05-88A, Appeal Judgement, ¶ 1732 (ICTY Jan. 30, 2015)).

657.    The allegations in the complaint are sufficient to demonstrate that BCE' Defendants aided and abetted an extrajudicial killing, in violation of the law of nations.

658.    Defendants' acts have de facto stripped victims of their citizenship rights and rendered some de facto stateless by Kurdistan.

### A.    Defendants' Deliberated Extrajudicial Death Threats, Transnational Repression, and Forced Exile of Ayub Barzani

459.    Other persons targeted by Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, the BCE, and the KRG that they control include those voicing peaceful Kurdish political dissent or counter viewpoints, particularly Ayoub Barzani, a respected and revered Kurdish leader and voice of democracy amongst Kurds worldwide, and among many others a vocal journalistic critic of the dangerous BCE.

460.    In recent years, expatriates of Kurdistan lawfully residing in other countries, including in the United States, and including U.S. citizens, and in other locations outside Kurdistan, conducting their lives in a manner understood to be lawful, are also unlawfully targeted for kidnapping, torture, and murder by Defendants, as described more fully herein.

461.    All of these actions have the object of facilitating economic, political, military, financial, and commercial decision making and improper advantage in and for the BCE.

462.    Ayoub Barzani is an internationally recognized Kurdish writer and admired critic.  He is the son of Babo Barzani, nephew of Ahmed Barzani (the head of the Barzan tribe), and brother-in-law and first-cousin of Defendant Masoud Barzani, the former President of KRG.  He is presently extrajudicially exiled under threat of death should he return to Kurdistan, and is living in existential dread, and isolated from his family by Defendants Masoud Barzani and Masrour Barzani in Switzerland, where he is a co-founder of a democracy advocacy organization, counter to the Barzani-controlled KDP, and known as Kurdistan Democratic Alliance, and lives every day in his hope of seeing his children and grandchildren again which keeps him, amidst mental torture, from wishing to die.

463.    The KRG's efforts under the direction of Defendant Masrour Barzani, acting without any and all lawful authority of the Republic of Iraq or KRG, to overtly and covertly censor, influence, coerce, and sometimes murder political dissidents to silence them extends far beyond KRG's regional borders.  In order to monitor his perceived enemies, agents and representatives, including Barzani family members and family members by marriage, Defendant Masrour Barzani has scrutinized and disrupted individuals who post online content, frequently using US-based internet providers.  Ayoub Barzani, who at extreme personal cost and sacrifice, has been and is a distinguished, venerated, peaceful, outspoken advocate for human rights, the advance of democracy, and of fair and impartial and accountable justice and the rule of law in the territory of KRG, was targeted by Defendant Masrour Barzani and his agents and representatives, was forced and ordered by Defendants Masoud Barzani and Masrour Barzani, exercising imagined and feigned authority not granted by the laws, regulations, or policies of Republic of Iraq nor KRG, to leave his home in Kurdistan and abandon his family members, thereby intentionally and recklessly inflicting extreme emotional distress.  Ayoub Barzani has been an unlawfully exiled Iraqi Kurd living for many years as a compelled resident of Switzerland.

464.    In the calculated and planned efforts of Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their agents, representatives, and Barzani family members, to silence Ayoub Barzani, agents and representatives of Defendants Masoud Barzani and Masrour Barzani, directed and deployed by them, have visited known associates and family members of Ayoub Barzani and attempted through intimidation, implicit and expressed threats of bodily harm, enforced disappearance, or assassination, family imprisonment and isolation, to overtly and covertly dissuade and coerce Ayoub Barzani from further critical social media postings, writing, and peaceful justice, accountability, and democracy advocacy with the object to discredit and smear the respected and trusted reputation of Ayoub Barzani.

465.    Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their agents and representatives, operating under their command, did knowingly and willfully, directly and indirectly, and with the intent to harass, intimidate, and place under surveillance with the intent to harass and intimidate one or more persons, conspire to use one or more interactive computer services and electronic communication systems of interstate commerce, and transmitted through interstate and foreign commerce in one or more communications containing one or more implicit and expressed threats to injure the person of another, including Ayoub Barzani, and used one or more other facilities of interstate and foreign commerce to engage in a course of conduct that caused, attempted to cause and would be reasonably expected to cause substantial emotional distress to one or more persons and their immediate family members, contrary to 18 U.S.C.§ 2261A(2)(B), all part of a broader concerted BCE effort to ban from their venues people whom they say are adversarial toward him/them and to send a message to millions of exiled Kurds worldwide, including American citizens of Kurdish origin, that if they don't fall in line and do what the Barzani political establishment tells them to do – then they too will be targeted for

investigation, indictment, arrest, imprisonment, enforced disappearance, or even murder, thereby alienating and disenfranchising much of the Kurdistan population.

466.    Defendant Masrour Barzani and his agents and representatives, frequently employing U.S. technology and expertise and personnel, have attempted to pressure and otherwise overtly and covertly intimidate and threaten and coerce U.S. social media companies and platforms, through private communications and legal threats, into censoring certain social-media content and divisive deplatforming, in violation of the First Amendment, to remove posts and stories the content of which touched on topics deemed problematic and unacceptable by Defendant Masrour Barzani, which were authored by Ayoub Barzani and supportive U.S.-based and European-based associates from social media platforms posts and stories removed or downgraded by the platforms.

467.    In an 8 July 2022 notice, the Department of State defined transnational repression as:

> *"activities includ[ing] attempts by a government to target individuals located outside of its territory for peacefully exercising their human rights and fundamental freedoms, through various forms of harassment, intimidation, and coercion" ...with "condemnation of transnational repression activities occurring in the United States and elsewhere. Such activities include attempts by a government to target individuals located outside of its territory for peacefully exercising their human rights and fundamental freedoms, through various forms of harassment, intimidation, and coercion."*

468.    The United States in its *Declaration of Principles to Combat Transnational Repression*, affirms that "transnational repression is a threat to democracy and human rights worldwide."

469.    Transnational repression is governments reaching across borders to silence dissent among diasporas and exiles, including through assassinations, illegal deportations, abductions, digital threats, Interpol abuse, and family intimidation.  Autocrats today have access to a range of tools to extend their reach by thousands of miles, sometimes in fractions of a second.  Some schemes rely on 21st century technologies to hack, surveil, and intimidate targets, while others use blunter

tactics such as extortion, abduction, and assassination. This practice of transnational repression constitutes a wholesale assault on the rule of law internationally.

470. Insider Confidential Human Sources #1, #2, #3, #4, #5, and #8, who have direct clandestine access to senior KRG officials, have documented a growing number of instances where Defendants Masrour Barzani and Waysi Barzani, and their subordinate agents and representatives operating under their command, did knowingly and willfully conspire, commit, and aid and abet, and in connection with, did commit unlawful activity by using the tools of transnational repression, including violence and intimidation, to reach beyond the loosely defined borders of KRG, to silence peaceful dissent, and are becoming more aggressive and more coordinated in their efforts to target, silence, and harass Kurdish opposition voices, including in Europe and the United States, and perceived threats to their power, commercial money-making ventures both licit and illicit, and criminal enterprise.

471. Without lawful authority and in an effort to police the Kurdish diaspora worldwide, including in the United States, silence political opposition, and suppress or quash the free exchange of information about their regime, and in furtherance of its criminal enterprise, the Barzani regime, directed, commanded, and controlled by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and its co-conspirators, did knowingly and willfully, directly and indirectly, conspire, commit, and aid and abet, and in connection with, unlawful activity, with the intent to harass and intimidate one or more persons, to place that person and persons in reasonable fear of the death, enforced disappearance, and serious bodily injury, did knowingly and willfully make one or more materially false, fictitious and fraudulent statements and representations, and to engage in a course of conduct that caused, attempted to cause and would be reasonably expected to cause substantial emotional distress and anguish, severe financial deprivation, extreme familial isolation and separation, travel limitations and restrictions, and forced exile, each and all a form of

474

extrajudicial imprisonment and mental torture, on Ayoub Barzani in Switzerland, his children and grandchildren and extended family members in Kurdistan and elsewhere, and others.

472.    Far outside the territory of KRG, Ayoub Barzani has continually, repeatedly, and peacefully exercised his human rights and fundamental freedoms and as a result has for more than twenty years suffered endless planned harassment, intimidation, KRG surveillance, monitored voice conversations, coercion, and the eliciting and publicizing of false derogatory information about Ayoub Barzani.  Defendants Masoud Barzani, Masrour Barzani and Waysi Barzani have engaged other agents to assist in the scheme to undermine Ayoub Barzani – attempting to falsely discredit him in the eyes of his extended family, fellow Kurds, and the United States and Europe and the international public.  These agents have been directed by Defendants Masoud Barzani, Masrour Barzani and Waysi Barzani, aided and abetted by their co-conspirators, subordinates, and representatives, each and all deceptively, knowingly, and falsely professing to act under the color of lawful albeit nonexistent authority of KRG.

473.    It was and is an object of the BCE to instigate, perpetuate, and commit acts in furtherance of the BCE specifically intended to threaten and intimidate Ayoub Barzani and his family, and Plaintiffs, by inflicting severe physical and mental pain and suffering upon them.  Without lawful authority the conspirators did affect, disrupt, and impede foreign commerce of Ayoub Barzani, all with the object of preserving the Barzani power base and perpetuating the BCE, all to the harm of the Plaintiffs.

474.    Contrary to international law and treaties and the laws of the Republic of Iraq and KRG, Ayoub Barzani was extrajudicially expelled from the territory of KRG by Defendant Masoud Barzani after an unsuccessful attempt on Ayoub Barzani's life ordered by Defendant Masoud Barzani.  Ayoub Barzani was involuntarily and forcefully expelled from his Kurdistan home without due process or judicial engagement or lawful authority.  Defendant Masoud Barzani

personally extrajudicially ordered and told Ayoub Barzani: "Leave Kurdistan or be killed." He is forced to live without his family, including his wife, in isolated exile in Switzerland. In Kurdish Middle East culture, there are two ways to inflict pain: physically, and damage the family name.

475.    During his unlawfully and extrajudicially forced extrajudicial exile, Ayoub Barzani continues to be the recipient of emotional torment, distress, and familial separation anguish instigated by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and enforced by their agents and representatives. His children and grandchildren are unlawfully kept from him by Defendant Masrour Barzani and his agents and representatives and extrajudicially detained in KRG. These acts, in furtherance of the BCE, of attempted murder, forced deliberated extrajudicial exile, intimidation, and physical, financial, and other endangering threats against him and his extended family, have inflicted severe mental and extreme emotional pain and suffering for over twenty years. For over twenty years the Barzani regime, directed and commanded by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, has inflicted constant and severe humiliation on Ayoub Barzani's brothers, who at the command and direction of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and public and social media humiliation efforts under their command and direction, are treated like lepers.

476.    Through unlawful orchestrated intimidation and fear, induced by violence at the unlawful command and direction of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, resulting in forced societal isolation and financial deprivation of Ayoub Barzani, and intentional destruction of his family reputation and association (the biggest and most severe form of torture and suffering in Kurdish culture), including preventing people from speaking to them.

477.    The most extreme, severe, and purposeful mental torture and painful familial humiliation inflicted by Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their agents and representatives, acting contrary to the laws of the Government of the Republic of Iraq, KRG, and

international law, was their coordinated, willful, and wholly unlawful denial and prevention of Ayoub Barzani to attend the funeral of his beloved wife in Kurdistan – an intentionally inflicted pain and public humiliation, a form of torture very significant in Kurdish culture, which was widely noted throughout Kurdistan and the global Kurdish diaspora.

478.    Under the doctrine of command responsibility, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani are legally responsible for the unlawful torture, suffering, and prolonged and sustained mental, emotional, psychological, and reputational anguish of Ayoub Barzani and his family members inflicted at the command of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani and perpetuated as part of the BCE and the pursuit of its objectives for illicit financial gain and to injure Plaintiffs.  The injuries to Ayoub Barzani inflicted by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani follow the same pattern as the injuries inflicted by the same Defendants on Plaintiff Maki Revend and John Doe Plaintiffs.

## B.    Defendants' Deliberated Extrajudicial Exile And Attempted Assassination of Kamal

479.    Another representative example of a Kurd living in constant fear, in forced exile – among thousands of other such refugees – is "Kamal", a peaceful scholarly dissident and advocate for democracy, accountability, legality, and transparency of governance, who with his immediate family, was extrajudicially forced to flee Kurdistan by Defendants Masoud Barzani and Masrour Barzani, and has lived in Sweden in fear, in arbitrarily and extrajudicially imposed exile for twenty years.  In furtherance of the objectives and purposes of the BCE, and absent lawful evidence or proper due process, Confidential Human Source #1 reports "Kamal" has been indicted in the acquiescent KRG judicial system controlled and commanded by Defendants Masoud Barzani and Masrour Barzani in at least eighty-seven mostly secret legal cases.  While living in Sweden, Kamal has been the victim of at least two Barzani-directed (and unsuccessful) assassination attempts in Sweden.

477

### C.    Defendants' Deliberated Extrajudicial Exile And Threats To Twana Noder Karim

480.    Another representative example of a Kurd living in constant fear, anxiety, fright, and worry, in deliberated extrajudicial exile, ordered, forced, and persisted by Defendants Masoud Barzani and Masrour Barzani, and their agents and representatives serving at their command, is Twana Noder Karim, aka Qader Nader, a Kurdish activist journalist living in exile in Sweden.  He was physically attacked in Stockholm, outside his home, by two men of the United Tribuns organized crime mafia employed in Europe by the KRG Parastin, who function at the command and control of Defendant Masrour Barzani, and directed by co-conspirator Herish Rash, head of Parastin that became Peshmerga in 1987.  At the command of Defendants Masoud Barzani and Masrour Barzani, KDP Parastin has killed hundreds of people.  KDP Parastin is directly commanded and controlled by Defendant Masrour Barzani, and by co-conspirator Ahmad Kurdu Nori, the Barzani's and Rash's representative and agent in Nuremberg, Germany.  Confidential Human Sources #5 and #8, who have direct clandestine access to senior KRG and KDP officials, and especially to Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani and their immediate subordinates, report that Parastin officials, aiding and abetting and acting as directed by Defendant Masrour Barzani, issued the assassination order that was communicated to a KDP assassin, co-conspirator, "Shalawo".  Confidential Human Source #9, a servant in the Barzani household, and who has direct clandestine access to senior KRG and KDP officials, and especially to Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani and their immediate subordinates, witnessed the order being given to assassinate three extrajudicially exiled Kurds in Europe, including Twana.  All such orders in the BCE/KRG/KDP are verbal.

### D.    Defendants' Deliberated Extrajudicial Exile And Threats To Fatah Zaxoiy

481.    Confidential Human Source #1 disclosed yet another example of an Iraqi Kurd unlawfully forced into exile by Defendant Masrour Barzani: Kurdish exile Fatah Zaxoiy.  Mr. Zaxoiy was the

target of a Barzani ordered assassination attempt that failed. Zaxoiy now lives in forced extrajudicial exile in Canada.

### E.    Defendants' Deliberated Extrajudicial Imprisonment And Torture Of Rozhgar Rizgar Mohammed Mohyaddin

482.    Rozhgar Rizgar Mohammed Mohyaddin is from the Kurdistan province of Sulaimani. On May 1, 2019, he was serving as the head of the guards for the Minister of Finance of the KRG when he was extrajudicially seized and abducted by agents of Asayish. He was initially confined within the grim walls of a civil building in the Bakhtiari Quarter. The property where he was held captive, Bakhtiyari, is associated with KRG Ministry of Finance and overseen by co-conspirator, Rebaz Hamlan, KRG Finance Minister at the time under the command and control of Defendant Masrour Barzani. Later, Rozhgar was forcibly transferred to the austere confines of the general directorate of Asayish in Erbil, also under the command and control of Defendant Masrour Barzani.

483.    During his captivity, which lasted 27 months, he endured physical beatings and torture for many days and was left to suffer in a small dark chamber. This relentless mistreatment stripped him of all semblances of humanity. Psychological tactics used by police "undermin[e]" the individual's "will to resist," and "the very fact of custodial interrogation . . . trades on the weakness of individuals"). See *Miranda v. Arizona*, 384 U.S. 436, 455 (1966).

484.    Rozhgar suffered emotionally through isolation, fear, and uncertainty throughout his entire captivity. He suffered mental and emotional despair, with each day bringing new anguish. For many months he was deprived of medical care, and later in his imprisonment he had limited access to medication, which further exacerbated his mental and emotional and physical suffering. During his imprisonment he was not allowed to communicate with his spouse and family. To the present day he suffers from post-traumatic stress disorder and emotional and psychological pain.

485.    Rozhgar describes his being "stripped of all semblance of humanity" as characterizing the inherently coercive and inhumane treatment he endured, including isolation, denial of contact with family, lack of legal representation, absence of due process, and complete dehumanization he experienced during his captivity.

486.    During his 27-months of extrajudicial imprisonment, Rozhgar was never advised of any legal rights, never given oral or written notice of the charges warranting his confinement, never allowed to consult with or speak to an attorney, was never arraigned before any magistrate, never held for trial before any magistrate, and never informed of any judicial sentence.  Each of these deprivations are a violation of the Constitution of the Republic of Iraq, which guarantees the rule of law, a presumption of innocence, right to counsel, and right to a public trial.  Legal redress in the corrupted judicial system of KRG is neither credible nor available.  Absent any hearing or notice from any court or magistrate, Rozhgar was released on December 22, 2022.

**F.    Defendants' Deliberated Extrajudicial Exile And Death Threat To And Unlawful Expropriation Of Property Rights of Qasim Omer Abdulakdir Bndean**

487.    Coercive behavior can include the inherent violation of a range of rights, such as freedom of speech and of the press, repression in physical integrity rights, such as disappearances, political imprisonments, and the killing and torture of dissidents and other groups by state agents. Repression and expropriation, in which rights in property are taken in violation of international law, are interrelated: both are part of the BCE's and KRG's state repertoire of coercive activities, coercive state strategies of repression, intimidation and coercion against its own citizens and others, human rights violations, suppression of expression, cruelty, corporate complicity in various human rights violations, unlawful expropriation of private property and private business interests, and other repressive state and individual and commercial behavior by the KRG and its

principal officers, acting as individuals without lawful authority, under the control and command of Defendant Masrour Barzani.

488.     In the instant case, the plaintiffs do not bring a basic international law expropriation claim, but present unlawful expropriation of private property and private business interests, without compensation, as part and parcel of the criminal conduct of Defendants Masrour Barzani and Waysi Barzani, and other corporate entities where the Barzani beneficial ownership and financial interest is hidden, all part of the BCE scheme's "handful of heinous actions – each of which violates definable, universal and obligatory norms" (See *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 782 (D.C. Cir. 1984)), causing irreparable damage to the Plaintiffs.  Mr. Bndean's civil rights have been severely infringed.  This expropriation was in time of peace and not an act of war, of law-of-war military commission, or a wartime taking.

489.     Qasim Omer Abdulakdir Bndean is a Kurd living near London, England, in involuntary exile born of fear that he will be singled out for persecution or other severe harm by the BCE on account of speaking freely against the corruption of the Barzani regime.  He is a citizen of Iraq and since the 1980s additionally holds citizenship of Sweden.  Mr. Bndean lives in constant peril and trepidation of being killed by the Barzani Defendants.  In 2016, he was interviewed on a Kurdish television channel in Sweden.  During that interview, and for his first time, he revealed on air the staggering amount of illegal oil contracts, totaling billions of U.S. dollars, perpetuated by the BCE.  Retaliatory threats have continued since that time, including expropriation of Mr. Bndean's commercial and investment interests in Kurdistan by agents, representatives, and co-conspirators of the BCE and in close association with Defendant Masrour Barzani. Succinctly stated, they stole his properties and commercial rights (including American hotel rights).  These acts constitute "malicious interference with an existing contractual relationship," (See *Jin v. Ministry of State Security*, 557 F. Supp. 2d 131, 136 (D.C. 2008), which qualifies as commercial

activities to invoke the FSIA subject-matter jurisdiction of this court (*Jin* at 142), causing severe economic harm to Mr. Brdean and his company Wzakan, and to U.S. business grantors of Wzakan's hotel licenses. Mr. Bndean received no due process, no legal process, and no compensation for this illegal expropriation facilitated by the criminally corrupt KRG and its co-conspirators and front companies.

490.    To the present time, Mr. Bndean began to receive death threats by way of social media, posted by Rahand Kurdi, a known associate in Kurdistan of Defendants Masoud Barzani and Masrour Barzani. In his social media posts, Mr. Rahand self-identifies as KRG security chief and KDP member. In those same death threat postings Mr. Kurdi repeatedly expressed support for and allegiance to Defendant Masrour Barzani, wherein Mr. Rahand called on "loyalists" to the Barzani regime to "sacrifice anyone" and "cut into pieces and hang it in the city so that it will become a lesson," and "must be killed at any cost," and "go and kill them." Because of these and other death threats, Mr. Bndean lives in forced exile, in constant fear for his life, fears to speak out freely without anxiety of personal or familial physical or economic harm, and because of that fear was unable to return to Iraq for the funerals of his brother and sister.

498.    In a media interview with Xandan Online News website in Kurdistan, Mr. Bndean exposed the corruption of the Dabin Group, controlled by Defendant Masrour Barzani and the BCE. It, and its associates, reciprocated by severing the electricity to his residence, thereby causing him and his family to reside in darkness and harsh, cold conditions.

492.  In the instant example, no expropriation review mechanism was existent; expropriation was without due process by an independent administrative authority or tribunal of the state, indemnification, compensation, or judicial adjudication and is a salient breach of international law and of Article 17 of the *Universal Declaration of Human Rights*, causing severe and lasting economic and emotional harm to Mr. Brdean, Wzakan, and to Wzakan's investors. (The

*Universal Declaration*, while not a treaty, has come to be accepted internationally as an important legal document.)

**the Barzani Continuing Criminal Enterprise**

621.    The multi-billion-dollar Barzani Continuing Criminal Enterprise, a group of individuals associated in fact, including Barzani family members and family members by marriage, well documented in media and by the United States Government and others, is a continuous large-scale transnational criminal monopoly with no apparent limitations, which poses a threat of continued criminal activity, and its de facto monarchic rule over the Iraqi Kurdistan autonomous constituent region of Iraq.    It is a tightly controlled family conspiracy enterprise with a clearly identified hierarchy engaged for decades in significant criminal activity, acting in concert with others, not in furtherance of the interests of the sovereign Republic of Iraq; but is a personal and private criminal conspiracy that exercises the type of criminal actions by which a private party criminally engages in unlawful trade and traffic or commerce.

622.    Secrecy and concealment are predominant, essential, and fundamental features of their successful continuing criminal conspiracy while operating their Barzani Continuing Criminal Enterprise.

623.    The Defendants and other members and associates of the enterprise, including Barzani family members and family members by marriage, had and have connections and relationships with one another and with the Barzani Continuing Criminal Enterprise.

624.    The Barzani Continuing Criminal Enterprise constitutes an ongoing organization whose members and associates function as a continuing and continuous unit for a common purpose of achieving the objectives of the Barzani Continuing Criminal Enterprise.  The Barzani Continuing

Criminal Enterprise has operated for a period of time sufficient to permit its members and associates to pursue its objectives.

625.    Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their agents and representatives, including Barzani family members and family members by marriage, were enabled to commit the offenses, over a substantial decades long period of time, because of their positions in the Barzani Continuing Criminal Enterprise and their involvement in and control over the enterprise's affairs, and served as a central force in the conspiracy, as part of a long term association that exists for criminal purposes, and with relationships among those associated with the Barzani Continuing Criminal Enterprise, with longevity sufficient to permit those associates to pursue the enterprise's purposes, with a common or shared purpose amongst its members, having continuity of structure and hierarchy, and a goal of maintaining and expanding political power, minimizing or eliminating perceived or real political opposition, maximizing revenues and receiving proceeds from the illicit activities, preventing the infiltration of legitimate enterprise competition, and protecting and securing the discreet continuing criminal scheme for future continuity.

626.    An internal cable of the United States Department of State, a department within the Executive Branch of the United States Government, noted that "The KDP consists of family clans, operating very much like a mafia organization."  Another United States Department of State internal cable noted the Defendant Iraqi Kurdistan Regional Government directed and governed by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzzani, is "an often stifling authoritarian style of democracy and pervasive corruption."

627.    A third internal cable of the United States Department of State, originating through the U.S. Embassy in Iraq, further describes, characterizes, acknowledges, and assesses, in these unambiguous quoted excerpts, the pervasive systemic corruption of the Defendant Iraqi Kurdistan

Regional Government governance leaders (including Defendants Masoud Barzani, Masrour Barzani and Waysi Barzani) and their impact on democracy:

(a)     "Corruption is Kurdistan's biggest economic problem."

(b)     "In Kurdistan corruption spread from the top down."

(c)     "Corruption relies on family-clan and/or peshmerga ties. Kurdish corruption starts at the top with a few political 'godfathers' who quietly distribute contracts among themselves."

(d)     "The biggest complaint most ordinary Kurds have about both the Kurdistan Democratic Party (KDP) and the Patriotic Union of Kurdistan (PUK) is their extreme corruption.   Most Kurds believe corruption permeates every level of the parties and the two Kurdistan Regional Governments (KRGs) they control: KRG-Erbil (KRG-E) and KRG-Sulaymaniyah (KRG-S).  Most believe the two parties see the ubiquitous political controls they put on public life as necessary to protect their respective sources of illicit funds.  Thus, common wisdom in Kurdistan links corruption and the democracy deficit."

(e)     "Corruption in Kurdistan follows a patron-client model.  KRG-E corruption centers more on the Barzani clan."

(f)     "Government contracting is predictably rife with corruption."

(g)     "Corruption has warped the growth of the entire Kurdistan economy. For example, the leading private companies in Kurdistan are all vertically integrated cross-sectoral conglomerates, e.g., Diyar Group, Eagle Group, Falcon Group, KAR Group, Nasri Group, Sandi Group, Silver Star Group and Ster Group. These conglomerates tend to have construction, import-export, logistics, real estate and security subsidiaries.  All of these companies are alleged to be allied to one or more non-competing 'godfathers' in the local ruling party."

(h)     "The economies and governments of the Kurdish north are tightly wrapped in the tentacles of the KDP…"

(i)     "Corruption is the main economic problem in the north. Corruption chases away much legitimate investment (although the Kurds have been wise enough to wield corruption as a tax and not a confiscatory device), delegitimizes the whole idea of free markets and democracy, increases the (still small but growing) support for Islamic parties and increases the power of the corrupt, making it less likely they can be pried out of their positions. Furthermore, intra-Kurd corruption feeds the fears of Arab, Christian and Turcoman minorities in Kirkuk that they will be completely shut out of government jobs (still the vast majority of all jobs here), contracts and markets by KDP and PUK loyalists."

"'[A] record or statement of a public office' is admissible if it contains 'factual findings' . . 'from a legally authorized investigation" and does not "indicate a lack of trustworthiness.' Fed. R. Evid. 803(8); see also *Owens v. Republic of Sudan*, 864 F.3d 751, 792 (D.C. Cir. 2017).  A court may also admit 'conclusion[s] or opinion[s]' contained within a public record." See *Fritz v. Islamic Republic of Iran*, Civil Action No. 2015-0456 (D.D.C. 2018).

628.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, assisted by their agents and representatives including Barzani family members and family members by marriage, are "responsible for and complicit in ordering, controlling, or otherwise directing, acts of significant corruption, including the expropriation of private or public assets for personal gain, corruption related to government contracts or the extraction of natural resources, bribery, or the facilitation of or transfer of the proceeds of corruption to foreign jurisdictions," and have "materially assisted, sponsored, or provided financial, material or technological support for, or goods and services in support of" such acts, in knowing and willful violation of the Foreign Assistance Act of 1961 and subject to immediate Presidential sanctions.  By their knowing and willful violation of the Foreign Assistance Act, Defendants have been enabled to finance the Barzani Continuing Criminal Enterprise and obtain the means to harm Plaintiffs.

629.    The World Bank, of which the Republic of Iraq is a member nation, defines corruption as "the abuse of public power for private benefit."

630.    Defendant Masrour Barzani, having the status of legal permanent resident of the United States, albeit a status fraudulently obtained, has responsibilities under U.S. statutes that are known to him and result from his status as a United States person (a green card holder).

631.    In but one example of the responsibilities of U.S. resident status, Defendant Masrour Barzani, as a resident alien (a green card holder) having a legal obligation to follow the same tax laws as U.S. citizens, including reporting worldwide income from all sources, that is, income from both within and outside the United States, and annually report financial assets outside the United States, with willful and criminal intent, at all times relevant to this complaint, did not and does not submit the required annual truthful reporting to the United States Government.  The failure to truthfully declare and pay U.S. taxes on Defendant's earnings provides a substantial part of the means enabling the Barzani Continuing Criminal Enterprise to harm Plaintiffs.

632.    At all times relevant to this complaint, in a knowing and willful conspiracy to defraud the United States in furtherance of the Barzani Continuing Criminal Enterprise, Defendant Masrour Barzani, a resident alien of the United States—a "United States person"—together with others did knowingly and willfully, directly and indirectly, and with criminal intent conspire to defraud the United States. Defendants designed and implemented a fraudulent, dishonest, and deceitful scheme to divert criminal proceeds and misappropriated Defendant Iraqi Kurdistan Regional Government, Republic of Iraq Government, and United States foreign assistance funds, and conceal income and assets traceable to the conspiracy.  Defendant Masrour Barzani used undeclared bank accounts, the assets held therein, and the income earned thereon, and monies from unlawful conduct passed through intermediary accounts, to conceal the true source of the funds from the Internal Revenue Service.  Defendants used fraudulent, deceitful, and dishonest means to conceal the existence of bank accounts maintained by and for Defendants Masrour Barzani and Waysi Barzani, and others known and unknown, including Barzani family members and family members by marriage, in

order to help the Defendants purposefully evade U.S. taxes. Defendant Masrour Barzani, having financial accounts in a foreign country with an aggregate value of more than $10,000, while violating another law of the United States and as part of a pattern of any illegal activity involving more than $100,000 in a 12-month period, has failed to be truthful in his filings of a Report of Foreign Bank and Financial Accounts with the U.S. Department of Treasury, thereby financially facilitating a criminal activity. By defrauding the United States, the Barzani Continuing Criminal Enterprise gains additional resources to harm the Plaintiffs, as described herein.

633. Defendants have, through their unlawful conduct, willfully and knowingly impeded, impaired, obstructed and defeated the lawful governmental functions of the Internal Revenue Service in the ascertainment, computation, assessment and collection of revenue, specifically, by knowingly and willfully failing to comply with the Foreign Account Tax Compliance Act (FATCA) and the Corporate Transparency Act (CTA), to fraudulently, in whole or in part, conceal, misrepresent, and disguise the nature, location, source, control and true beneficial ownership interests in offshore accounts, various assets including real property and money accounts, investments, and income, in the United States and outside the United States.

634. For example, 983 Washington SB, LLC, owner of record of a commercial property in Miami, Florida; an office building in Delaware owned by the CT Corporation, an American branch of a Dutch company; multi million dollar residential properties owned by LLCs in McLean, Virginia and Beverly Hills, California; all purchased and acquired with illicit proceeds of the unlawful activities of the Barzani Continuing Criminal Enterprise. Defendant Masrour Barzani exercised full dominion and control over these and other hidden assets, and willfully and criminally failed to report foreign bank accounts, and willfully and criminally submitted false offshore disclosure submissions, all of which actions were taken to impede, impair, obstruct and defeat the lawful governmental functions of the Internal Revenue Service in the ascertainment, computation,

assessment and collection of revenue. Defendant Masrour Barzani, by failing to comply with FATCA and CTA and other statutes, used monies gained by hiding his assets to promote the carrying on of unlawful activity and to harm Plaintiffs. Defendant Masrour Barzani further knowingly and willfully, directly and indirectly, violated numerous U.S. criminal statutes including 18 U.S.C § 2314 in the international transfer of monies stolen, converted, or taken by fraud, artifice, bribery and misrepresentation, and violated 18 U.S.C. § 1956, knowing that the property involved in Defendant's financial transactions represents proceeds of unlawful activity.

### MONEY LAUNDERING, WIRE FRAUD, AND CONCEALMENT

636.    As defined in the Countering America's Adversaries Through Sanctions Act (CAATSA) and contained in 31 CFR § 561.310, money laundering is defined: "The term money laundering means engaging in deceptive practices to obscure the nature of transactions involving the movement of illicit cash or illicit cash equivalent proceeds into, out of, or through a country, or into, out of, or through a financial institution, such that the transactions are made to appear legitimate." 31 CFR § 561.311 defines agent: "The term agent includes an entity established by a person for purposes of conducting transactions on behalf of the person in order to conceal the identity of the person." Beginning on a date unknown but at least by 2007 and continuing through in or around the present time, in the District of Columbia and elsewhere, Defendants Masrour Barzani, Mustafa Barzani, Waysi Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani, Sarwar Pedawi, Laween Pedawi, Hamela Gardi, Jonathon R. Moore, Joe R. Reeder, Julie Mai Sanford, identified in documents as administrative assistant to Jonathon R. Moore,  Laura Geho Harris, Valarie Cupp, and Rubar Sandi, middlemen to further disguise and legitimate the corrupt payments and complicit intermediaries in facilitating transactions, together with others, including accountants, to accomplish its purpose did, in a continuum of complicity and enterprise corruption,

devise and engage in a multi-million dollar scheme or course of conduct and conspiracy with affirmative, planned, and deliberate acts of concealment and methods of obfuscation that they have repeatedly used, here and abroad, to carry out financial crimes, masterminded by Defendant Jonathon R. Moore who frequently collaborated with Defendant Joe R. Reeder as agents of a foreign principal, and their foreign sponsors, and did knowingly, unlawfully, deliberately, voluntarily, and corruptly demand, seek, receive, accept, and agree to receive and accept illicit foreign funds, and did knowingly and unlawfully combine, conspire, confederate, and agree together and with each other to devise and intend to devise a scheme or course of conduct and artifice to defraud and to deprive, by means of material false and fraudulent pretenses and representations or omissions, to conceal source and ownership, knowing that the transactions were designed in whole and in part to directly and indirectly achieve the criminal object of the BCCE, and knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, which transactions in fact involved the proceeds of specified unlawful activity, and using their specialized expertise to hide the ill-gotten gains of the BCCE, obscure their nefarious activities, and employ money laundering mechanisms and did launder proceeds generated by and did aid and abet bad acts committed by the malign actors of the BCCE, many of whom are agents or officials of subdivisions of a foreign government, regardless of the predicate criminal activity, that they "knew were designed to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of [the] unlawful activity," See *US v. Harmon*, 474 F. Supp. 3d 76, 83 (D.C. 2020), and played lucrative roles, and did financially profit from the criminal activities of BCCE, as a center for discrete illicit financial dealings, within the District of Columbia and elsewhere, designed to conceal including fake representations and omissions concerning ownership structuring, of international money laundering through a series of complex transactions and shell or front companies with bank accounts located in the United

States and abroad, in this country in whole or in part, repeatedly performed in furtherance of object of the conspiracy and the conspirators' plan and scheme or course of conduct or artifice to launder millions of dollars of ill-gotten criminal proceeds derived from or obtained, directly or indirectly, through the commission of a crime unquestionably in connection with a commercial activity of defendants including the Defendant Iraqi Kurdistan Regional Government and its principal officers and the Barzani Continuing Criminal Enterprise, including Barzani family members and family members by marriage, outside of the United States and Said acts caused a direct effect in the United States. See 28 U.S.C. § 1605(a)(2) and other anti-money laundering laws and regulations..  Indeed, the type of the activity at issue here is far from analogous to the type of activity that courts have described as "sovereign" in nature. *See, e.g., Weltover,* 504 U.S. at 614, 112 S.Ct. 2160.

636. Each of these acts were commercial because they were not acts "only a sovereign state could perform."  See *Park v. Shin,* 313 F.3d 1138, 1145 (9th Cir.2002).  The effect is "direct" as it follows "as an immediate consequence of the defendant's... activity.")  See *Weltover,* 504 U.S. at 618, 112 S.Ct. 2160 (citation omitted).  "The common-sense interpretation of a direct effect ... is one which has no intervening element, but, rather, flows in a straight line without deviation or interruption," *Guirlando,* 602 F.3d at 74-75 (quotation marks and citation omitted); and occurred in the instant matter.

637. Further, defendants did engage in and materially assist monetary transactions in the United States in criminally derived properties, and in furtherance of the conspiracy and to effect its objects, knowingly and willfully conspired, confederated, and agreed with each other and others known and unknown, including Barzani family members and family members by marriage, to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce by, through, and to a financial institution, which transactions involved the proceeds of specified unlawful activity.

638. The funds used to acquire these properties are traceable to violations of specified unlawful activities and U.S. law, including according to documents of the U.S. Department of State a foreign offense involving the misappropriation, theft, or embezzlement of billions of dollars of public funds by or for the personal benefit of a public official, and the international transportation or receipt of stolen of fraudulently obtained property (18 U.S.C §1956(c)(7)(B)(iv) and 1956(c)(7)(A) respectively. Defendants knew that the funds are the proceeds of criminal offenses including money laundering and wire fraud in violation of 18 U.S.C. § 1343, 18 U.S.C. § 1349, and 18 U.S.C. § 1956(h), knowing that the transactions were designed in whole and in part in a purposeful concealment architecture and course of conduct to purposefully conceal proceeds from various unlawful schemes and course of conduct of the Barzani Continuing Criminal Enterprise, thereby aiding and abetting and facilitating the Barzani Continuing Criminal Enterprise by allowing criminals to illegally access and transact in the U.S. economy, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form derived from or obtained, directly or indirectly, through the commission of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(Xi); (a)(2)(B)(i); and 1956 (H) and 1956 (a)(3)(A). ("Financial transaction" means any "transaction," which in any way or degree affects interstate (or foreign) commerce and involves the movement of funds by wire or other means, involves one or more monetary instruments), involves the transfer of title to any real property, vehicle, vessel or aircraft, or involves the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree, 18 U.S.C. § 1956(c)). The Supreme Court also found, "Since some of the money-laundering conducted in the world today also defrauds foreign governments, it would be hostile to the intent of the USA PATRIOT Act." See *RJR*

*Nabisco, Inc. v. European Community*, 136 S. Ct. 2090, 195 L. Ed. 2d 476, 579 U.S. 325 (2016), FN 3.

639. There existed (1) an agreement among defendants and other persons, the object of which is an offense against the United States; (2) defendants knowing and willful joinder in that conspiracy; and (3) commission of an overt act in furtherance of the conspiracy by at least one of the co-conspirators. See *United States v. Svoboda,* 347 F.3d 471, 476 (2d Cir. 2003).

640. "A civil conspiracy is defined as an agreement between two or more people to participate in an unlawful act or a lawful act in an unlawful manner." See *Thompson v. Trump*, 590 F. Supp. 3d 46 (D.C. 2022), citing *Hobson v. Wilson,* 737 F.2d 1, 51 (D.C. Cir. 1984). "It is enough that members of the conspiracy in some way or manner, or through some contrivance, positively or tacitly[,] came to a mutual understanding to try to accomplish a common and unlawful plan." *Thompson v. Trump*, 590 F. Supp. 3d 46 (D.C. 2022). "All co-conspirators must share in the general conspiratorial objective, though they need not know all the details of the plan or even possess the same motives." *Hobson,* 737 F.2d at 51. "They need not know the identities of other co-conspirators. In short, a civil conspiracy requires a showing that there was a single plan, the essential nature and general scope of which were known to each person who is to be held responsible for its consequences." "And, to be actionable, there must be an overt act in furtherance of the conspiracy that results in injury." *Thompson* at 52. "A civil conspiracy requires (1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner." See *Vindman v. Trump*, Civil Action No. 22-257 (JEB) (D.C. Nov. 8, 2022); see also *Halberstam v. Welch*, 705 F.2d 472, 486 (D.C. Cir 1983). There was a single plan, coordinated primarily by defendants Jonathon Moore and Joe Reeder, the essential unlawful nature and general scope of which were known to the defendants, and to their foreign sponsors, and there

were overt acts in furtherance of the conspiracy — providing substantial resources to enable defendants to injure Plaintiffs.

641. Defendants, as part of the scheme and artifice, did knowingly and willfully engage in the transportation, transmission and transfer of monetary instruments from and through a place outside of the United States to and within the United States with the intent to promote the carrying on of illegal activities, that is knowing that the monetary instruments and funds involved in the transportation, transmission and transfer represented the proceeds from some form of unlawful activity and knowing that such transportation, transmission and transfer was designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of unlawful activity.

642. The Barzani Continuing Criminal Enterprise (BCCE), aided and abetted by defendants and other co-conspirators, named and unnamed, constitutes an ongoing organization or enterprise, as defined in Title 18, United States Code, §1961(4), whose members including Defendants Masrour Barzani, Mustafa Barzani, Waysi Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani, Sarwar Pedawi, Laween Pedawi, Hamela Gardi, Jonathon R. Moore, Joe R. Reeder, Julie Mai Sanford, Laura Geho Harris, Valarie Cupp, Rubar Sandi, and other Barzani family members and family members by marriage, and others known and unknown, functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise and knowing that the transactions were designed in whole and in part and the property involved in the financial transactions represented the proceeds of some form of unlawful activity, which transactions in fact involved the proceeds of specified unlawful activity, and other acts as opportunities arose. "When men enter into an agreement for an unlawful end, they become ad hoc agents for one another. What one does pursuant to their common purpose, all do." See *Van Riper v. United States*, 13 F.2d 961, 967 (2d Cir. 1926) (Learned Hand, 3.).

643. Defendants  Masrour Barzani,  Mustafa Barzani, Waysi Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani, Sarwar Pedawi, Laween Pedawi, Hamela Gardi, Jonathon R. Moore, Joe R. Reeder, Julie Mai Sanford, Laura Geho Harris, Valeris Cupp, Haval Dosky and Rubar Sandi, and others, knew that the transaction or transactions were designed in whole or in part to conceal or disguise the nature, location, course, ownership, or control of the proceeds, in whole or in part of that unlawful activity in federal or foreign law, and in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i), and to avoid reporting requirements, and to evade, *inter alia*, U.S. regulations and tax laws by establishing sham or front corporations and opaque structures in order to conceal in records, documents and tangible objects their clients' true beneficial ownership from United States taxes.  Defendants also knowingly, willfully, deliberately, and fraudulently treated sizable expenses for purported "client reimbursable" to pay expenses of client investments and properties.  Money movement was knowingly, deliberately, and frequently falsely declared as "loans" papered with promissory notes, agreements, etc.  Defendants did knowingly and willfully conspire and collude to defraud the United States by impeding, impairing, influencing, obstructing and defeating the lawful governmental functions of the Internal Revenue Service ("IRS") in the ascertainment, computation, assessment and collection of revenue, thereby enriching the Barzani Continuing  Criminal  Enterprise.  The  monetary  gains  achieved  provided  a  major  source  of resources enabling the BCCE to harm plaintiffs and continue their reign in Iraqi Kurdistan upheld by violence, theft, and fear.

644. Defendant  Moore, and Defendant Reeder, acting together, are both subject to a range of ethical obligations and the Code of Professional Responsibility of the District of Columbia Bar and, in the words of the Supreme Court, each has a "*solemn duty* to comply with the law and standards of professional conduct." See *Nix v. Whiteside*, 475 U.S. 157, 169, 106 S. Ct. 988, 89 L. Ed. 2d 123 (1986).  The Supreme Court further declared,

"Although counsel must take all reasonable lawful means to attain the objectives of the client, counsel is precluded from taking steps or in any way assisting the client in presenting false evidence or otherwise violating the law. This principle has consistently been recognized in most unequivocal terms by expositors of the norms of professional conduct since the first Canons of Professional Ethics were adopted by the American Bar Association in 1908. The 1908 Canon 32 provided:

"No client, corporate or individual, however powerful, nor any cause, civil or political, however important, is entitled to receive nor should any lawyer render any service or advice involving disloyalty to the law whose ministers we are, or disrespect of the judicial office, which we are bound to uphold, or corruption of any person or persons exercising a public office or private trust, or deception or betrayal of the public. . . . He must . . . observe and advise his client to observe the statute law . . . ."These principles have been carried through to contemporary codifications[4] of an attorney's professional responsibility. Disciplinary Rule  7-102 of the Model Code of Professional Responsibility (1980), entitled "Representing a Client Within the Bounds of the Law," provides:
In his representation of a client, a lawyer shall not:

4.  Knowingly make a false statement of law or fact.

5.  Counsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent.

8.  Knowingly engage in other illegal conduct or conduct contrary to a Disciplinary      Rule.  (See *Nix v. Whiteside*, 475 U.S. 157, 166, 106 S. Ct. 988, 89 L. Ed. 2d 123 (1986)."
Disciplinary Rule 1-102: "A lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation."

644.  Each betrayed the law as they, with colleagues, explicitly declared in written communications to Defendant members of the BCCE and others that the purpose of the transactions and structuring scheme and course of conduct they intended to devise and did devise to circumvent federal laws, transmitted by means of wire communications in interstate and foreign commerce, writings, signs, signals, and sounds for the purpose of executing such scheme and course of conduct and artifice, was to conceal the ownership and source of proceeds of unlawful activities and criminality, disguise the identities of those involved in unlawful activities, and evade and violate U.S. securities and tax laws by establishing sham and front Limited Liability Corporations layered to conceal their clients' true beneficial ownership. Defendant Jonathon R. Moore, aided and abetted by Defendant Joe R. Reeder, is an individual engaged by and associated

with the BCCE, primarily in Washington DC, where he oversaw complicit administrative staff, each accomplices, for various shell and front corporations and other opaque corporate ownership structures, as a tool to disguise and move illicit funds, the structure of which he created, incorporated, oversaw, and was at various times a corporate officer thereof, and served as an access point to the U.S. financial system.  Acts of Defendants were "purposefully directed" at this forum, and the litigation results from alleged injuries that "arise out of or relate to those activities." *Mwani v. bin Laden,* 417 F.3d 1, 12 (D.C.Cir.2005) (quoting *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984); *Helicopteros,* 466 U.S. at 414, 104 S.Ct. 1868).

## 645X.  DEFENDANTS HARM PLAINTIFFS AND FINANCE CRIMINALITY BY LAUNDERING MONEY INSTRUMENTS AND CONSPIRACY TO COMMIT MONEY LAUNDERING

### A.    Defendants' Criminal Money Laundering Threatens United States National Security And Democracy Itself

493.    Defendants  engaged in a scheme of money laundering, tax avoidance, and fraud designed and implemented to camouflage illicit gains from the various tortious activities of Defendants Masrour Barzani, Waysi Barzani, Muksi Barzani, Mulla 'Babo" Mustafa Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani, Areen Masrour Barzani, and key facilitator Defendants Jonathon S. Moore, Joe R. Reeder, Valerie Cupp, Juli Mai Sanford, Laura Geho Harris, Rubar Sandi, and others. Illicit gains from these activities have provided the means to injure Plaintiffs in the past and to continue to injure and threaten Plaintiffs – perpetuating the Barzani led regime of worldwide terror and crime.  It was further a part of the scheme and artifice that these Defendants would and did intentionally perform acts and make statements to hide and conceal, and cause to be hidden and concealed, the purpose of, and the acts done in furtherance of, said scheme.

494.  Defendant  Moore  managed  financial  accounts  for,  of,  and  on  behalf  of  various  shell corporations  and  front  corporations  and  trusts  in  the  United  States  and  in  offshore  banking jurisdictions.  Defendants, by manipulative or deceptive device, with an emphasis on concealment,

intentionally concealed the scheme and course of conduct by entering into secret agreements, laundering foreign money through bank accounts in the names of limited liability corporations and trusts, and through the use of conduits, rather than in the name of the true foreign source and foreign ownership of funds. Agreements to conceal can factually be parts of conspiracies to commit other crimes.

646.    Certain individuals employed by and associated with the BCCE, including defendant Jonathon R. Moore, assisted by Defendant, Joe R. Reeder, defendants Julie Mae Sanford, Laura Geho Harris, Valarie Cupp, and Rubar Sandi, each of whom are citizens of the United States, and others, conspired and colluded with one another to use their positions within the BCCE to enrich themselves through schemes and course of conduct involving undisclosed and illegal payments. Though they also helped pursue the principal purpose of the BCCE, defendant Jonathon R. Moore and his co-conspirators further corrupted the BCCE by engaging in various criminal activities, including concealment and money laundering, in pursuit of personal gain. To further the corrupt ends of the Barzani Continuing Criminal Enterprise (BCCE), Defendant Moore and his co-conspirators facilitated the enterprise by providing each other with mutual assistance and coordination. From the beginning the conspirators insisted on secrecy, and careful deliberate steps, not ancillary but integral, were taken to sedulously keep hidden the identities of the Barzani defendants, and a continuation of the overt conspiratorial acts of secrecy after the accomplishment of the crime in furtherance of this conspiracy. The conspirators engaged in conduct designed to prevent detection of their illegal activities, to conceal the location of proceeds of those activities, and to promote the carrying on of those activities. That conduct included, among other things: the use of contracts to create an appearance of legitimacy for illicit payments; the use of various mechanisms, including trusted intermediaries, bankers, and financial advisors, to make and facilitate the making of illicit payments; the creation and use of shell and front companies and

bank accounts in tax havens and key outposts in the offshore financial system and other secretive banking jurisdictions; the active concealment including the execution of "secrecy agreements" with real estate brokers and agents, vendors, and real estate sales contracts, of foreign ownership; the structuring of financial transactions to avoid reporting requirements; the purchase of real property and other physical assets; and income tax evasion. Within the United States, such conduct took place within the District of Columbia and elsewhere.

647.    Beginning at least by 2007 and continuing to the present time, members of the BCCE caused millions of dollars associated with the fraudulent scheme or course of conduct to be wired from banking institutions and other financial entities outside and inside the United States into accounts controlled or overseen by defendant Jonathon Moore, Julie Mai Sanford, Laura Geho Harris, and Valeria Cupp, and Barzani family members and family members by marriage, in multiple electronic wire transfers. The payments were wired from accounts in U.S. and foreign banks held in the name of various entities to disguise the source, ownership, and nature of the funds. The payments were wired to entities defendants Jonathon S. Moore, Julie Mai Sanford, Laura Geho Harris, and Valerie Cupp, and Barzani family members and family members by marriage, and others, controlled, to further disguise the source and nature of the funds.

648. The pattern of unlawful activity through which the defendant Jonathon R. Moore, assisted by Defendant Joe R. Reeder, together with others, agreed to conduct and participate, directly and indirectly, in the conduct of financial affairs of the BCCE consisted of multiple acts unlawful under: (a) Title 18, United States Code, Section 1343 (wire fraud, including honest services wire fraud) ; (b) Title 18, United States Code, Sections 1956 and 1957 (money laundering and money laundering conspiracy) ; (c) Title 18, United States Code, Section 1952 (interstate and foreign travel in aid of racketeering) ; and (d) Title 31, United States Code, Sections 5314 and 5322 (willful failure to file report of foreign bank and financial accounts). At all times relevant, pursuant

to Title 31, Code of Federal Regulations, Sections 103.24, 103.27(c), 103 . 27(d) and 103.59(b), citizens and residents of the United States who had a financial interest in, or signature authority over, a … financial account in a foreign country with an aggregate value of more than $10,000 at any time during a particular year were required to file with the United States Department of the Treasury a Report of Foreign Bank and Financial Accounts on Form TD-F 90-22 (the "FBAR"). The FBAR for a given year was due by June 30 of the following year.  Defendant Jonathon R. Moore, then a resident of the District of Columbia, had signature and other authority over one or more financial accounts, having an aggregate value exceeding $10,000.  Within the District of Columbia and elsewhere, defendants Johnathon R. Moore, Julie Mai Sanford, Laura Geho Harris, and Valerie Cupp, Barzani family members and family members by marriage, and others, did knowingly and willfully fail to file with the United States Department of the Treasury a Report of Foreign Financial and Bank Accounts on Form TD-F 90-22.1, disclosing that they had signature and other authority over one or more financial accounts in foreign countries, which account(s) had an aggregate value of more than $10,000, while violating another law of the United States, to wit: Title 26, United States Code, Section 7201.

649.    Defendants Masrour Barzani, Mustafa Barzani, Waysi Barzani, Mansour Barzani, Sarwar Pedawi, Laween Pedawi, Johnathon R. Moore, with the assistance of Joe R. Reeder, Julie Mai Sanford, Laura Geho Harris, Valerie Cupp, Barzani family members and family members by marriage, and Rubar Sandi, and others, and their associates known and unknown, did mastermind, orchestrate, and facilitate, primarily from the law offices of Defendant Moore, a complex money-laundering and concealment scheme and course of conduct and did frequently collaborate with Defendants Barzani, including Barzani family members and family members by marriage, and did make representations and omissions about the Defendants' assets and the identity of the true

owners and source of funds of the Barzani Continuing Criminal Enterprise, in furtherance of criminal activity used to injure and harm plaintiffs.

650.  Defendants met semi-annually or quarterly for two days in Washington D.C., usually at the Moore law office or the Ritz Carlton Hotel in McLean, Virginia, with foreign sponsor money source Sarwar Pedawi and/or his coconspirator Laween Pedawi.   Defendants Sarwar Pedawi, Laween Pedawi, and Hamela Gardi are "foreign persons" as defined in the Countering America's Adversaries Through Sanction Act, 22 U.S.C. 9401, Sec. 193(3): "The term 'foreign person' means a person that is not a United States person. Defendants Sarwar Pedawi, Laween Pedawi, and Hamela Gardi directed and controlled by Defendant Masrour Barzani, are foreign persons acting to harm Plaintiffs and the United States.

651.  Defendants Sarwar Pedawi, Laween Pedawi, and Hamela Gardi did knowingly and intentionally transmit and cause to be transmitted monies by means of wire communications in interstate and foreign commerce writings, signs, signals, pictures, and sounds for the purpose of executing such scheme or course of conduct and artifice, and were actively complicit in the crime. Defendants Sarwar Pedawi, Laween Pedawi, and Hamela Gardi, President, Region Trade Bank for Investment and Finance (aka "RT Bank"), in Iraqi Kurdistan (and wife of BCCE coconspirator Defendant Ghafoor Khoshnaw) and acting as an agent of a foreign bank, not an agency or instrumentality of a foreign state, did over a multi-year period knowingly and unlawfully combine, conspire, confederate, and agree together and with each other to devise and intend to devise a scheme or course of conduct and artifice by means of material false and fraudulent pretenses and representations and omissions to knowingly use the bank and other banks, including U.S. financial institutions, to commit crimes in violation of international laws and to accomplish its BCCE illicit purposes and did originate electronic wire dollar denominated financial transmissions of dollar-denominated transactions in interstate commerce from Iraq, Dubai, and elsewhere to the United

States banks and financial institutions and knowing the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of the specified unlawful activity, each such transaction constituting a separate crime.

652. Defendants Sarwar Pedawi, Laween Pedawi, and Hamela Gardi are not employees of defendant Iraqi Kurdistan Regional Government or any government or foreign state or political subdivision thereof nor an agent or instrumentality thereof, neither is a citizen of a State of the United States, and are central co-conspirators, financial facilitators, international money movement orchestrators (of large volumes of illicit cash proceeds), strategists, and major moneymen and operatives of the Barzani Continuing Criminal Enterprise. Defendant Sarwar Pedawi is the chief executive of STER Group, which communiques of the U.S. State Department say is owned by members of the Barzani family. Defendants were often paid "gifts" of tens of thousands of dollars. Defendant Jonathon Moore often maintained bank cash accounts in the United States on behalf of defendants Barzani in the many millions of dollars. As part of the pattern of illegal activity employed, Defendants used facilities of interstate or foreign commerce with the intent to distribute the proceeds of unlawful activity and to conceal the source, ownership, and control of the funds. The funds were ultimately passed through U.S. financial institutions to then be used to acquire and invest in assets located in the United States and overseas, titled not in defendants' names but in the name of shell or front companies and trusts and other legal arrangements formed and organized by Defendant Jonathon R. Moore and his associates in complex ownership and control structures adding layers and chains of ownership between an asset and the beneficial owner(s) in different jurisdictions and countries, and different types of legal structures, for the purpose of enhanced anonymity and intentional concealment and obscuring beneficial ownership information, to conceal material facts, to protect their corrupt relationship

with the beneficial owners and others, including concealing assets of individuals who did support ISIS, a terrorist organization that has committed acts of violence against Americans, to avoid detection by law enforcement, taxing authorities, and national security officials including by using shell or front names and addresses when conducting international electronic money transfers, and holding in whole or in part the proceeds of crime.

653.    Representative entities used to conceal are listed below; but are not limited to merely this list, and the representative sample list is by all means not wholly inclusive:

A.    Hollow Oak, LLC
        A Delaware limited liability company
        Beneficial Owner: Muksi Barzani
        Manager: Julie Sanford

B.A.    Old Fireplace, LLC
        A Virginia limited liability company
        Sole Owner: Jocard Holdings Limited (BVI)
        Beneficial owner: Muksi Barzani

C.A.    983 Washington SB, LLC
        A Florida limited liability company
        Beneficial owner: Masrour Barzani
        Manager:  Masrour Barzani

D.A.    Old Stone LLC
        A Virginia limited liability company
        Beneficial owner: Muksi Barzani

E.A.    Great Bend Holdings, LLC
        A Virginia limited liability company
        Subsidiary of J. Sparrow Holdings Limited, a BVI company
        Sole  Owner:  Mustafa  Barzani,  3883  Connecticut  Avenue  NW,  Apt  613, Washington DC
        Sole Member: Haval Dosky

F.A.    Hillcrest Farm, LLC
        A Virginia limited liability company
        Beneficial owner: Mustafa Barzani

G.A.    Hillcrest Racing Stables, LLC
        A Virginia limited liability company

Beneficial owner: Mustafa Barzani

H.A.    One Park Crest Unit 1808, LLC
A limited liability company
Beneficial owner: Mustafa Barzani

I.A.    One Park Crest Unit 1816, LLC
Name changed to Highland Path LLC, a Virginia limited liability company

J.A.    One Park Crest Unit 1812, LLC
Owned by Teague Holding Limited (BVI)
A Virginia limited liability company
Sole beneficial owner: Mansour Barzani

K.A.    One Park Crest Unit 1816, LLC
A Virginia limited liability company

L.A.    One Park Crest Unit 1404, LLC
A Virginia limited liability company
Name changed to Old Stone Path, LLC

M.A.    One Park Crest Unit 1906, LLC
Owned by Chevalle Holdings Limited (BVI)
A Virginia limited liability company
Sole beneficial owner: Masrour Barzani

N.A.    One Park Crest Unit 1410, LLC
Named changed to Old Fireplace, LLC

O.A.    Park Crest Lofts Unit 627, LLC
A Virginia Limited Liability company

P.A.    RLFC, LLC
A Delaware limited liability company
Sole beneficial owner: Muksi Barzani

Q.A.    Grape Arbor, LLC
A District of Columbia limited liability company
Owned by J. Sparrow Holdings Limited (BVI)
Beneficial Owner: Mustafa Barzani, Trustee of The M&K Living Trust
Sole Member: Mustafa Barzani

R.A.    Bayberry Falls, LLC
A limited liability company

S.A.    Monarch E2, LLC
        A limited liability company
            Sole beneficial owner: Mustafa Barzani

T.A.    Woodlea Holdings, LLC
        A limited liability company
            Sole beneficial owner: Mustafa Barzani

U.A.    1224 Randolph LLC
        A limited liability company
            Beneficial owner: Muksi Barzani
            Acquired by GioGet LLC

V.A.    GioDet, LLC
        A Delaware limited liability company
            Sole owner: Muksi Barzani

W.A.    11900 Market Street, LLC
        A limited liability company
            Sole owner: Muksi Barzani

X.A.    SBPB, LLC
        Office: 1130 Connecticut Avenue NW. Washington DC
        Manager: Johnathon S. Moore

Y.A.    Angus Cross, LLC
        A limited liability company
            Single member LLC
            Sole Owner: Muksi Barzani

Z.A.    Cattle Cross, LLC
        A limited liability company
            Beneficial owner: Muksi Barzani

AA.A.  Highland Path, LLC
        A limited liability company
            Owned by Jocard Holdings Limited (BVI)
            Beneficial owner: Muksi Barzani
            Single member LLC

BB.A.  Lawson Lane, LLC
        A limited liability company
            Owned by Jocard Holdings Limited (BVI)
            Single member LLC

~~Sole Owner:  Muksi Barzani~~

CC.A.  ~~Kurdistan Arabian Stud, LLC~~
~~A limited liability company~~
~~Sole Owner: Mustafa Barzani~~
~~Office: 1 Wood Road, Wilmington, DE (Once residence of Jonathon Moore)~~

DD.A.  ~~Sylvania Jermantown LLC~~
~~A Virginia limited liability company~~
~~Single member LLC~~
~~Sole owner Muksi Barzani~~

EE.A.  ~~Sylvania Fair Lakes, LLC~~
~~A Virginia limited liability company~~
~~Single member LLC~~
~~Sole owner Muksi Barzani~~

FF.A.  ~~Sylvania NC LLC~~
~~A North Carolina limited liability company~~
~~Sole owner:  Muksi Barzani~~

GG.A.  ~~Golden Eagle Global, Inc. (GEG, Inc.)~~
~~A Delaware corporation~~
~~All shares sold to Mustafa Barzani for $1 to facilitate USG contracts~~
~~President:  Mustafa Barzani~~
~~Director, Vice President and Secretary:  Valerie Cup~~

HH.A.  ~~GEG Reklam (a division of GEG)~~
~~Division of GEG~~

II.A.  ~~GEG Construction~~
~~Same shareholders as parent Golden Eagle Global, Inc.~~

JJ.A.  ~~GEG Management LLC~~
~~A limited liability company~~
~~Owned by Golden Eagle Global, Inc.~~
~~All shares sold to Mustafa Barzani for $1 to facilitate USG contracts~~
~~President:  Mustafa Barzani~~
~~Vice President and Secretary:  Valerie Cupp~~

KK.A.  ~~GEGI Management, LLC~~
~~A limited liability company~~
~~5335 Wisconsin Ave, NW. Ste 440, Washington DC 20015~~
~~Covered costs for Masrour, Mansour, Muksi, Mustafa, and Waysi Barzani~~

LL.A.   GEG Kurdistan
          A shortened name for Golden Eagle Group, a Kurdish company

MM.A.          1150 K 1210 LLC
          A Washington DC limited liability company
          Owned by J. Sparrow Holdings Limited (BVI)
          Beneficial owner: Mustafa Barzani

NN.A.   1150 K 1410 LLC
          A Washington DC limited liability company

OO.A.   MLS111 Legacy Foundation, Inc.
          A corporation
          Beneficial owner: Katja Vrecar Barzani (Mustafa Barzani's wife)

PP.A.   Atlantic Noca, LLC
          A Delaware limited liability company
          Sole Owner:  Muksi Barzani

QQ.A.   360° Swiss
          A Kurdistan company
          Division of Golden Eagle Global
          Beneficial owner:  Mustafa Barzani

RR.A.   3883 Connecticut LLC
          A District of Columbia limited liability company
          Beneficial Owner:  Mustafa M.Barzani

SS.A.   Legacy Farm LLC
          A limited liability company
          Beneficial owner Muksi Barzani

TT.A.   Great Bend Holdings, LLC
          A limited liability company
          Sole beneficial owner: Mustafa Barzani

UU.A.   Pondview Revocable Trust
          Sole Owner: Muksi Barzani

VV.A.   M&K Living Trust
          Beneficial owners:  Mustafa Barzani, Katja Vrecar Barzani, Muksi Barzni
          Trustee: Mustafa Barzani

WW.A.        KLNB, LLC
              A Virginia limited liability company
              Beneficial owner: Masrour Barzani

XX.A. First Level Oak Shade LLC

(Plaintiffs have identified dozens — but only presently list herein 50 — shell or front corporations and trusts owned by named Barzani defendants, Barzani family members and Barzani family members by marriage, and organized, administered, and/or managed and facilitated by or in course of conduct with Defendants Moore, Reeder, Sanford, Cupp, Geho, Sandi, Sarwar Pedawi, Laween Pedawi, etc.  Records show Jonathon R. Moore and IFS to be a registered agent and/or officer of no less than 83 legal entities registered in New York, Delaware, Washington, DC, Indiana, Michigan, North Carolina, and Florida.  Moore is an officer of at least 49 entities — 36 in Delaware, six in the District of Columbia, three in Florida, and one each in the remaining states.  IFS is a registered agent/officer of no less than 27 Delaware and seven District of Columbia entities.  Records show Defendant Moore's subordinate, Defendant Julie Sanford, is either a registered agent or officer, including CEO, of no less than 22 active or inactive entities — seven in the District of Columbia, 11 in Virginia, two in North Carolina, and one each in Florida and Texas.  Her home address or her use of the Moore law firm address connects her to each entity.)

654    Complex ownership structures are not, in and of themselves, unlawful.  In this instance these ownership structures were knowingly and willfully organized and created in a "convoluted character associated with money laundering" "designed to disguise ownership and evade transaction reporting requirements," See *United States v. Adefehinti*, 510 F.3d 319, 324 (D.C.Cir. 2007) and utilized "for the sole purpose of holding legal title to these properties," "to conceal ownership", to "protect the family's privacy", to "keep Barzani brothers private", to "interpose a foreign corporation (and initially a trust) between the LLC's and the beneficial owners of each

property," to prevent "anyone from connecting the dots", and to launder proceeds of crime by the Barzani Continuing Criminal Enterprise. "Each piece of real property would be owned by a separate LLC." These anonymous shell companies used the U.S. financial system for their anonymous owners' benefits. For various limited liability companies and corporations, millions of dollars of funds were periodically replenished by defendants foreign sponsors Sarwar Pedawi and Laween Pedawi, most often for the purchase of U.S. assets and by means of international wire transfers associated with the fraudulent scheme or course of conduct, for which payment cleared through U.S. banks. It is not a defense that legitimate funds are also involved, and there is no de minimis exception. See *United States v. McGauley*, 279 U.S. F.3d 62, 71 (1st Cir. 2002).

655. These shell and front limited liability entities were and are owned by holding companies and trusts in the British Virgin Islands, a key outpost in the offshore financial system, formed by defendant Jonathon R. Moore and his associates under the laws of a foreign jurisdiction to disguise beneficial ownership of and launder illicit wealth, while specifically and purposefully maintaining a level of complete anonymity for the true owner, and splitting company incorporation and asset administration over different countries. For example, to conceal the true ownership of property and create anonymity while laundering illicit proceeds, Defendant Muksi Barzani owns a British Virgin Islands holding company which owns Sylvania Fair Lakes, LLC, with a Washington, D.C. address. It in turn owns Sylvania NC, LLC, which in turn owns real property in Mebane, North Carolina. Defendant Julie Mai Sanford is the manager of both examples.

656. Other British Virgin Islands holding companies and trusts owned and controlled by Defendants Masrour Barzani, Mansour Barzani, Muksi Barzani, Waysi Barzani, Mustafa Barzani, Sarwar Pedawi, Laween Pedawi, Rubar Sandi, and the BCCE, and administered and/or facilitated and/or financially funded by Defendants Jonathon R. Moore, Julie Mai Sanford, Laura Geho Harris, Valerie Cupp, Serwar Pedawi, Laween Pedawi, and Rubar Sandi, and others, include but are not limited to:

        A.   Teague Holdings Limited ("the holding company for Masrour")
           Incorporated British Virgin Islands February 1, 2008

British Virgin Islands corporation No. 1462498
Address:  Law Office of Johnathon R. Moore, PLLC
5335 Wisconsin Avenue, NW, Suite 440

Washington, DC 20015-2079
Sole Director:  Masrour Barzani
Reserve Director:  Mustafa Barzani, 3883 Connecticut Avenue NW, #623, Washington DC 2008
Secretary: Julie Sanford, 30 Saint Roberts Drive, Stafford, VA 22556
Sole shareholder:  Masrour Barzani
Beneficial shareholder:  Masrour Barzani, One Park Crest, Unit 1906, McLean, VA 22102


B.  Chevalle Holdings Limited ("Mansour's holding company")
British Virgin Islands corporation No.1462500
Sole Owner: Mansour Barzani, 8220 Crestwood Heights Drive, Apr 1812, McLean, VA 22102
Sole Director: Mansour Barzani
Reserve Director:  Mustafa Barzani, 3883 Connecticut Avenue NW, #613, Washington DC 20008
Address:  Law Office of Johnathon R. Moore, PLLC
5335 Wisconsin Avenue, NW, Suite 440
Washington, DC 20015-2079
Secretary: Julie Sanford, 30 Saint Roberts Drive, Safford, VA 22556

C.  Jocard Holdings Limited ("Muksi's holding company")
British Virgin Islands corporation No. 1462499
Address: 3076 Sir Francis Drake Highway, P. O. Box 3463, Road Town, Tortola, British Virgin Islands
Mailing address:  1072 Thomas Jefferson St., NW, Washington DC 20037
Sole Owner:  Muksi Barzani, 3883 Connecticut Avenue NW, #613, Washington DC 20008
Sole Director:  Muksi Barzani
Reserve Director: Mustafa Barzani
Secretary: Laura Geho

D.  Barbossa Holdings Limited ("Waysi's holding company")
British Virgin Islands corporation No. 1462492
Sole owner: Waysi Barzani
Sole director:  Waysi Barzani

E.  J. Sparrow Holdings Limited ("Mustafa's holding company)

British Virgin Islands corporation No. 1462490
Principal offices: 3383 Connecticut Ave., NW, #613, Washington DC 20008 and
5335 Wisconsin Avenue NW, Suite 950, Washington DC 20015
Sole owner: Mustafa Barzani
Sole Director: Mustafa Barzani
Reserve Director: Muksi Barzani and mother Jeyra Mohamad Khaled
Secretary: Laura Geho, 4000 Tunlaw Road NW, Washington DC 20007

F.   Liberty 1947 Holdings Limited
A successor holding company in British Virgin Islands

G.   TSG Global Holdings Inc.
Corporate Address: 5335 Wisconsin Avenue, NW, Suite 950, Washington DC
20015
Rubar Sandi, Founder, Chairman, The Sandi Group
Emine Sandi, President, The Sandi Group
AKA "The Sandi Group Global Holdings (TSG GH)"
Address: 2101 L Street NW, Ste 800, Washington DC
TSG Holdings LLC

H.   3B Worldwide Inc
A British Virgin Islands company
Shareholders: Sarwar Pedawi and Laween Pedawi'
Directors: Sarwar Pedawi and Laween Pedawi

I.   Varuna International Holdings Limited
A British Virgin Islands company
Beneficial owners: Sarwar Pedawi and Laween Pedawi
Directors: Sarwar Pedawi and Laween Pedawi

K.   Leopard International Holdings Limited
A British Virgin Islands company
Director: Sarwar Padawi
Law Office of Jonathon R. Moore, PLLC
5335 Wisconsin Avenue, NW, Suite 440, Washington DC
Jonathon R. Moore, Principal, Manager, and Sole Interest Holder


657. The various listed entities collectively constitute an "enterprise" as defined in Title 18, United

States Code, Section 1961(4), that is, a group of legal entities associated in fact (hereinafter the

"enterprise", as part of the Barzani Continuing Criminal Enterprise).  The enterprise constituted an ongoing organization whose members and coconspirators functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise. The enterprise was engaged in, and its activities affected, interstate and foreign commerce using legal entities by criminal actors to hold assets, purchase real estate, conduct wire transfers, burnish the appearance of legitimacy when dealing with counterparties (including financial institutions and contracting with the United States Government), and control legitimate businesses for ultimately illicit ends.

658.    Companies doing business and contracting with the United States Government, including in the instant case the Department of Defense, Defense Logistics Agency, and the Small Business Administration, must properly identify any foreign ownership, control, or influence ("FOCI").  In acts of blatant criminality on behalf of the BCCE and in furtherance of and as part of its criminal conspiracy, Defendants knowingly, deliberately, voluntarily, and willfully conspired and took proactive steps to conceal, for entity eligibility determination, the true beneficial ownership of foreign financial accounts and entities, including, for example, Golden Eagle Global, Inc. ("GEG"), purportedly owned by Defendant Valerie Cupp but not the true beneficial owner, though certified by Defendant Jonathon Moore who created false bills of sale and ownership transfer documents, and falsely certified with agencies of the U.S. Government as *Economically Disadvantaged Woman Owned Small Business*, and violated 18 U.S.C. § 1001(a)(3), which makes it a felony to knowingly and willfully make false statements to government agencies, and violated 18 U.S.C. § 371, the federal conspiracy statute.

659.    In furtherance of the conspiracy and to effect its illegal objects, in another fraudulent money laundering scheme or course of conduct of the BCCE, Defendant Moore and his defendant coconspirator associates unlawfully bring monies into the United States, knowingly and willfully to conceal the true nature of the scheme or course of conduct by fabricating multiple false or sham

"contracts", through a series of front companies and middlemen, which subsequently always underperform or perform little or no legitimate work or are breached. These corrupt or sham "contracts" and corrupt agreements usually take the place of the Defendant Iraqi Kurdistan Regional Government or departmental agencies within that government contracting for "goods" or other services. In one example, the Defendant KRG sought the advice for a cybersecurity protocol to prevent "zero-clock attacks on cellular phones". They contracted with Ben Jamil, dba CCS International. Jamil is a notorious Office of Foreign Assets violator who was indicted several times by the Department of Justice for customs violations and other schemes, and has numerous lawsuits against him for money laundering. Defendant KRG paid him approximately $300,000 for a sham contract for a demonstration in Erbil which never occurred. Upon information and belief, Jamil did not provide service under the contract. Rather, as described below, the contract was primarily or exclusively a mechanism to route money to Defendant Moore for the enrichment of the beneficial owner, the members of the Barzani Continuing Criminal Enterprise. Defendant KRG then sought Defendant Moore's advice on how to "sue" and Moore received another tranche of funds to engage an attorney to sue Jamil. The embezzled $300,000 remained in Jamil's possession and funds then are in possession from another wire to Moore's IOLTA accounts. No suit has been filed, and in reality the contract was a sham used to disguise and legitimate the corrupt agreement. The purported "contracts" were a cover for the true purpose of the agreement, which was furtherance of the criminal objectives of the BCCE. The activities of the enterprise provided the source of substantial means to damage and harm plaintiffs.

660. Each shell and front corporation had directors, and often a "sole director", who acted in concert with defendant Jonathon R. Moore, assisted by defendant Joe R. Reeder. Most, if not all the shell and front corporations maintained an office address in Washington, D.C. where the administrative officer and/or corporate secretary was located and where business was regularly

~~conducted.  This was the Washington, D.C. law office of Defendant~~ Jonathon R. Moore. ~~Knowing that the transactions were designed in whole or in part, and with the intent to defeat law and regulation, defendants and defendants' corporations knowingly and fraudulently transferred and concealed origins, sources, ownership, and property of defendants or the property of defendants' corporations.~~  ~~Defendant Moore, as long-time, widely engaged, and well-informed attorney, in Washington, D.C., and Defendant Reeder, as a long-time, widely engaged, well-informed, attorney and former senior U.S. Government officer having a high degree of awareness of Presidential Executive Orders, know that such Executive Orders of the President of the United States are declarations with the force of law; and knew or should have reasonably known the severity of these criminal actions, yet persisted.  In 2017, the President of the United States, invoking the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) (IEEPA), the National Emergencies Act (50 U.S.C. 1601 et seq.) (NEA), and the Global Magnitsky Human Rights Accountability Act (Public Law 114-328) (the "Act"), in a publicized Executive Order declared "serious human rights abuse and corruption around the world constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States, and I hereby declare a national emergency to deal with that threat." (Underlining added).~~

~~661~~    In testimony on May 21, 2019, before the U.S. Senate Banking, Housing and Urban Affairs Committee, Steven M. D'Antuono, Acting Deputy Assistant Director, Criminal Division of the Federal Bureau of Investigation, said:

> "For an illegal enterprise to succeed, criminals must be able to hide, move, and access these illicit proceeds—often resorting to money laundering and increasingly utilizing the anonymity of shell and front companies to obscure the true beneficial ownership of an entity. ~~The pervasive use of shell companies, front companies, nominees, or other means to conceal the true beneficial owners of assets is a significant loophole in this country's anti-money laundering (AML) regime. Under our existing regime, corporate structures are formed pursuant to state-level registration requirements, and while states require varying levels of information on the officers, directors, and managers, none require information~~

~~regarding the identity of individuals who ultimately own or control legal entities upon formation of these entities~~."

~~662~~495.        The National Money Laundering Risk Assessment (NMLRA) and the National Terrorist Financing Risk Assessment (NTFRA) listed "the most significant illicit finance threats facing the United ~~States"~~States" are money laundering linked to fraud, drug trafficking, and transnational organized crime, and public corruption – each a feature of the ~~Barzani Continuing Criminal Enterprise~~BCE and ~~the~~its facilitating defendants and co-conspirators. The *2018 NMLRA,* authored by the ~~U.S.~~ Department of Treasury, noted that, "bad actors consistently use shell companies to disguise criminal proceeds."  The severe criminality and extreme menace posed by Defendants' conduct is grievously and treacherously contrary to the self-characterization by Defendant Reeder in the instant case describing his client as a "strong and long standing ally" of the United States. The danger of Defendants' conduct has been amplified by the President ~~of the United States~~, who has declared the use of anonymous shell companies for illicit purposes "a core United States National Security interest." "Anonymous shell companies, opaque financial systems, and professional service providers enable the movement and laundering of illicit wealth, including in the United States and other rule-of-law-based democracies…. Corruption threatens United States national security, economic equity, global anti-poverty and development efforts, and democracy itself."  On April 6, 2024, ~~U.S.~~ Secretary of the Treasury Janet Yellen said, "It is secrecy that enables criminals to flourish."  Not only is Defendants' secret conspiracy of criminality financing ~~harm~~injury to Plaintiffs, it, like other criminal acts of Defendants enumerated herein, "threatens United States national security."

~~663~~496.        This is precisely the conspiratorial criminal scheme and method utilized by the BCE Defendants Masrour Barzani ~~Continuing Criminal Enterprise~~, Waysi Barzani, Muksi Barzani, Mulla 'Babo' Mustafa Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani, Areen Masrour Barzani, and key facilitator Defendants Jonathon S. Moore, Joe R. Reeder, Valerie Cupp, Juli Mai

515

Sanford, Laura Geho Harris, Rubar Sandi, and others, to move illicit gains from their various criminal activities into and within the United States.  ~~Many if not most of~~ ~~these~~the shell and front companies created by Defendants use the same Washington, D.C. address or a close variant thereof.  These anonymous shell and front companies used the U.S. financial system for their anonymous owners' benefits and to provide resources and means to damage and ~~harm plaintiffs~~injure plaintiffs.  Predicate offenses, as created by the Bank Secrecy Act of 1970 and expanded by the USA PATRIOT Act of 2001, are recurrently present.

~~664.    Millions of dollars~~497.        "The crime of conspiracy is therefore complete as soon as two or more conspirators enter into an agreement to commit an unlawful act (and depending on the jurisdiction as soon as one of the conspirators commits an overt act in furtherance of the conspiracy's objectives). It matters not at all whether the conspiracy ever achieves its intended purpose." "By contrast, conspiracy as a theory of liability is a mechanism for holding individuals responsible for crimes committed pursuant to a conspiratorial agreement." "Under the Pinkerton doctrine, an individual who joins a conspiracy can be held responsible for completed crimes he or she agreed to as part of the conspiracy and for any other crimes committed in furtherance of the conspiracy that were its reasonably foreseeable result."  See *Ali Hamza Ahmad al Bahlul v. United States*, 840 F.3d 757 (D.C. Cir. 2016), quoting *Pinkerton v. United States*, 328 U.S. 640, 646–47 (1946).

### B.    Defendants Conspire to Make Dirty Money Appear Clean

498.    From at least in or about 2007 through present time, in the District of Columbia and elsewhere, Defendant Masrour Barzani, Waysi Barzani, Muksi Barzani, Mulla 'Babo' Mustafa Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani, Areen Masrour Barzani, and key facilitator Defendants Jonathon S. Moore, Joe R. Reeder, Valerie Cupp, Juli Mai Sanford, Laura Geho Harris, Rubar Sandi, and others known and unknown, intentionally and knowingly

combined, conspired, confederated, and agreed together and w)ith each other to launder the proceeds of criminal conduct, including concealing transactions that violated American sanctions, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) .  The funds diverted were used for, among other things, the personal benefit of the Defendants and co-conspirators and their relatives and associates, including to purchase luxury real estate and commercial properties in various states of the United States and acquire other lavish items for family members including premium horses. Use of the interstate U.S. financial system was an essential feature of the fraudulent diversion of funds and the subsequent movement of ill-gotten proceeds.

499.    The Department of the Treasury defines money laundering as "the process of making illegally-gained proceeds (i.e. 'dirty money') appear legal (i.e. 'clean'). [https://www.fincen.gov/history-anti-money-laundering-laws#:~:text=Money%20laundering%20is%20the%20process,(i.e.%20%22clean%22).]   This is precisely the unlawful conspiracy and undertaking devised, orchestrated, executed, and participated in by Defendants Moore, Reeder, Sanford, Cupp, Harris, Sandi, and others for and in coordination with Defendants Masrour Barzani, Mulla "Babo" Mustafa Barzani, Waysi Barzani, Muksi Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani, Areen Masrour Barzani, and others, aided and facilitated by co-conspirator and others, in and through law offices, title companies, and financial institutions in and near Washington, D.C., Erbil, Dubai, and elsewhere, in a years-long cover up to keep the truth from financial regulators.

500.    As defined in the Countering America's Adversaries Through Sanctions Act (CAATSA) and contained in 31 CFR § 561.310, money laundering is defined:  "The term money laundering means engaging in deceptive practices to obscure the nature of transactions involving the movement of illicit cash or illicit cash equivalent proceeds into, out of, or through a country, or into, out of, or through a financial institution, such that the transactions are made to appear

legitimate."   31 CFR § 561.311 defines agent: "The term agent includes an entity established by a person for purposes of conducting transactions on behalf of the person in order to conceal the identity of the person."

501.    To achieve their common goals, Defendants Masrour Barzani, Waysi Barzani, Mulla "Babo" Mustafa Barzani, Muksi Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani, Areen Masrour Barzani, and key facilitator Defendants Jonathon S. Moore, Joe R. Reeder, Valerie Cupp, Juli Mai Sanford, Laura Geho Harris, Rubar Sandi, and others, identified in documents as administrative assistant to Moore, Harris, Cupp, and Sandi, middlemen to further disguise and legitimize the corrupt payments and complicit intermediaries in facilitating transactions, together with others, including accountants, to accomplish its purpose, conspired to and did conceal material facts and laundered criminally-derived money, often U.S. dollar denominated.  To aid and abet the conspiracy, Defendants provided "knowing substantial assistance" to the person or persons who committed the wrongful acts.  *Id.*, citing *Halbers t am v. Welch*, 705 F.2d 472 (D.C.Cir.1983).

502.    As evidentiary documents in possession of Plaintiffs confirm, Defendants Masrour Barzani, Waysi Barzani, Mulla "Babo" Mustafa Barzani, Muksi Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani, Areen Masrour Barzani, and key facilitator Defendants Jonathon S. Moore, Joe R. Reeder, Valerie Cupp, Juli Mai Sanford, Laura Geho Harris, Rubar Sandi, and others, knew that any transactions it was processing assisted in the tortious conduct.  These Defendants and co-conspirators regularly communicated about and in furtherance of the corrupt scheme, including via electronic email, some of which communications occurred while Barzani Defendants were in the United States.

503.    These Defendants devised and implemented a fraudulent scheme to conceal and disguise their clients' ownership and control of various entities and offshore structures by removing their

clients as beneficiaries of their own trusts and installing specious nominee beneficiaries. Defendants Moore, Reeder, Cupp, Sanford, Harris, Sandi, and others, and co-conspirators did not, as required by the Internal Revenue Service, report the income earned by their clients therefrom, fraudulently failed to report millions of dollars of worldwide income that Defendant Masrour Barzani earned while a United States taxpayer, which Moore and others concealed using their offshore structures and sham corporations, that Defendants Masrour Barzani, Waysi Barzani, Mulla "Babo" Mustafa Barzani, Muksi Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani, Areen Masrour Barzani, either beneficially owned or controlled.

504.    "The essence of conspiracy is an agreement, together with an overt act, to do an unlawful act, or a lawful act in an unlawful manner" *Cooper v. O'Connor,* 99 F.2d 135, 142 (D.C.Cir.), *cert. denied,* 305 U.S. 643, 59 S.Ct. 146, 83 L.Ed. 414 (1938). *Accord Edwards v. James Stewart & Co.,* 160 F.2d 935, 936-37 (D.C. Cir.1947); *International Underwriters, Inc. v. Boyle,* 365 A.2d 779, 784 (D.C.1976). Subsequent cases emphasize that agreement can only lead to liability if an act pursuant to it causes injury, as in the instant case, *See DeBobula v. Goss,* 193 F.2d 35, 36 (D.C.Cir.1951); *Blankenship v. Boyle,* 329 F.Supp. 1089, 1099 (D.D.C.1971), and is a means for establishing vicarious liability for the underlying tort. *Halberstam v. Welch*, 705 F. 2d 472 - Court of Appeals, Dist. of Columbia Circuit 1983.

505.    It was a part and object of the conspiracy that Defendants Masrour Barzani, Waysi Barzani, Mulla "Babo" Mustafa Barzani, Muksi Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani, Areen Masrour Barzani, and key facilitator Defendants Jonathon S. Moore, Joe R. Reeder, Valerie Cupp, Juli Mai Sanford, Laura Geho Harris, Rubar Sandi, and others, would and did receive, possess, conceal, store, and dispose of money, of the value of $5,000 and more, which had crossed a state and United States boundary after being stolen, unlawfully converted, and taken, knowing the same to have been stolen , unlawfully converted, and taken , in violation of 18 U.S.C.§ 2315.

506.    From at least in or about 2007 until present, in the District of the District of Columbia, and elsewhere, Defendants Masrour Barzani, Waysi Barzani, Mulla "Babo" Mustafa Barzani, Muksi Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani, Areen Masrour Barzani, and key facilitator Defendants Jonathon S. Moore, Joe R. Reeder, Valerie Cupp, Juli Mai Sanford, Laura Geho Harris, Rubar Sandi, and others, received, possessed, concealed, stored, and disposed of money, of the value of $5,000 and more, which had crossed a state and United States boundary after being stolen, unlawfully converted, and taken, knowing the same to have been stolen, unlawfully converted, and taken, to wit, BCE received proceeds of business fraud schemes which were transferred from bank accounts and money transfer locations outside of Washington, D.C. to bank accounts in Washington, D.C. and elsewhere. (18 U.S.C. § 2315 and 2.)

507.    "Under the U.S. money-laundering statute, financial transactions include the purchase, sale, loan, pledge, gift, transfer, delivery or other disposition of property between parties. See 18 U.S.C. § 1956(c)(3)." *In Matter of Extradition of Zhenly Ye Gon*, D.D.C. 2011.

## METHODS AND MEANS

508.    Defendants employed devices, schemes, and artifices, and engaged in acts, practices, and a course of interstate conduct that operated as a fraud or deceit.  BCE laundered tens of millions of U.S. denominated dollars from illicit funds from activities listed herein and other unlawful activities, including misappropriation and expropriation of sovereign funds, into the United States for the personal benefit of themselves and Barzani family members.  Funds were transferred by wire, check, draft, facsimile, or courier, using a series of shell and front companies, from outside the United States and within and through financial institutions located in Washington, D.C. and elsewhere to operate these numerous shell corporations, originating principally by, through and from foreign sponsor defendants. Sarwar Pedawi and Laween PedawiCo-conspirators, and others, frequently moved criminal proceeds from IraqiKurdistan, often through Dubai, and then washed

the proceeds through "holding companies" and ~~trusts~~offshore structures known as trusts, established on the advice of Defendant Moore and others known and unknown, and incorporated in the British Virgin Islands and elsewhere. Funds were deposited to accounts noted as trusts in British Virgin Islands, Jersey Channel Islands and Bahamas, which "holding companies" owned a network of shell and front companies in the United States to conduct U.S. dollar transactions in the United States and which through fraudulent, deceitful, and dishonest means concealed the name, true nature, and true ownership and beneficiaries from U.S. banks and United States bank regulators and tax authorities of millions of dollars of worldwide income.

~~665~~509.    Washed criminally~~—~~ derived proceeds included funds derived from criminal activities in violation of the Iranian Transactions and Sanctions Regulations ("ITSR") issued by The Secretary of the Treasury and its Office of Foreign Assets Control ("OFAC"), and the International Emergency Economic Powers Act ("IEEPA"), ~~Title 50, United States Code, Section~~50 U.S.C. § 1701-1706, as detailed herein above, authorizing the President of the United States to impose economic sanctions in response to an extraordinary threat to the national security, foreign policy, or economy of the United States.  Defendants have knowingly and willfully evaded the prohibitions of sanctions issued by the United States Government. Sources such as invoices, emails, letters, wire transfer records, company records, and others, using business names of shell and front corporations to conceal the beneficiaries of electronic wire transfers of funds, reveal voluminous transactions over a period of years relevant hereto and which were conducted through accounts at financial institutions in the United States or directed by United States financial institutions.

~~666~~510.    Every continuous, systematic, knowing, and voluntary act in furtherance of and to purposefully and corruptly launder money by concealing and disguising the nature, location, source, ownership, and control of millions of dollars of proceeds from various unlawful schemes

and courses of conduct of the ~~Barzani Continuing Criminal Enterprise~~BCE, a significant transnational criminal organization, aided, abetted, strategized, facilitated, orchestrated, conducted and caused to be conducted and attempted to conduct by Defendants ~~Jonathon R.~~Moore, assisted by ~~Defendant Joe R.~~Defendants Reeder, ~~Julie Mai~~Sanford, ~~Laura Geho~~Harris, ~~Valerie~~Rupp, ~~Rubar~~Sandi, ~~Sarwar Pedawi, Laween Pedawi, Hamela Gardi~~co-conspirators, and others, a criminal association operating in a culture of impunity, and wherein "at least one overt act took place in furtherance of the conspiracy," See *United States v. Hemphill*, 514 F.3d 1350, 1362 (D.C.Cir. 2008), has facilitated acts of foreign corruption, harmed the national security interests of the ~~United States,~~U.S., and enriched Defendants – thereby enhancing their ability to ~~harm~~injure Plaintiffs.  The injury is "fairly traceable to the defendant[s]' allegedly unlawful conduct."  *See Allen*, 468 U.S. at 751, 104 S.Ct. 667.~~  The Defendant Iraqi Kurdistan Regional Government and its defendant~~ Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, as principal officers ~~including~~of KRG. and its agents and representatives ~~and Barzani family members and family members by marriage~~including Defendant Treefa Aziz, are subject to suit because Defendants acted not as state actors "but in the manner of a private player within it."  See *Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607, 613 (1992).  Defendants used proceeds of predicate offenses to promote or facilitate other predicate offenses.

511.    Defendants Masrour Barzani, Mustafa Barzani, Waysi Barzani, Muksi Barzani, Mulla 'Babo' Mustafa Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani, Areen Masrour Barzani, and Barzani family members, Moore, Cupp, Sanford, and Harris, and co-conspirators, with the assistance of Defendant Reeder, and their associates known and unknown, including bankers identified by Plaintiffs, did mastermind, orchestrate, and facilitate, primarily from the law offices of Defendant Moore, a complex money-laundering and concealment scheme and course of conduct and did frequently collaborate with all Defendants Barzani, including Barzani family members,

and did make representations and omissions about all Barzani Defendants' assets and the identity of the true owners and source of funds of the BCE, in furtherance of criminal activity used to injure plaintiffs.

512.    In a continuum of complicity and enterprise corruption in an international and interstate conspiracy, Defendants Moore, Reeder, Sanford, Harris, Cupp, and Sandi, and others, did devise and engage in a multi-million dollar scheme or course of conduct and conspiracy with affirmative, planned, and deliberate acts of concealment and methods of obfuscation that they have repeatedly used, in the United States and abroad, to carry out financial crimes, masterminded by Defendant Moore who collaborated with Defendant Reeder as agents of a foreign principal, and their foreign sponsors, and did knowingly, unlawfully, deliberately, voluntarily, and corruptly agree to cooperate in a fraudulent scheme or course of conduct or shared a perfidious purpose and did demand, seek, receive, accept, and agree to receive and accept illicit foreign funds, and did knowingly and unlawfully combine, conspire, confederate, and agree together and with each other to devise and intend to devise a scheme or course of conduct and artifice to defraud and to deprive, by means of material false and fraudulent pretenses and representations, to conceal source and ownership, knowing that the transactions were designed in whole and in part to directly and indirectly achieve the criminal object of the BCE, and knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, including funds embezzled from state coffers of the KRG, which transactions in fact involved the proceeds of specified unlawful activity, and using their specialized expertise to hide the ill-gotten gains of the BCE, obscure their nefarious activities, and employ money laundering mechanisms and did launder proceeds generated by and did aid and abet bad acts committed by the malign actors of the BCE, many of whom are agents or officials of subdivisions of a foreign government, regardless of the predicate criminal activities, that they "knew were designed to conceal and disguise the nature,

the location, the source, the ownership, and the control of the proceeds of [the] unlawful activity," See *US v. Harmon*, 474 F. Supp. 3d 76, 83 (D.C. 2020), and played lucrative roles, and did financially profit from the criminal activities of BCE, as a center for discrete illicit financial dealings, within the District of Columbia and elsewhere, designed to conceal including fake representations concerning ownership structuring, of international money laundering through a series of complex transactions and shell or front companies with bank accounts, some opened by Defendant Moore and/or his subordinates in the U.S. without disclosing as required under the U.S. Patriot Act the foreign beneficial owners or percentage of ownership of the corporations owning said bank accounts, located in the United States and abroad, in this country in whole or in part, repeatedly performed in furtherance of object of the conspiracy and the conspirators' plan and scheme or course of conduct or artifice to launder millions of dollars of ill-gotten criminal proceeds derived from or obtained, directly or indirectly, through the commission of a crime unquestionably in connection with a commercial activity of defendants of the BCE, including Barzani family members , outside of the United States.  Said acts caused a direct effect in the United States. *See* 28 U.S.C. § 1605(a)(2) and numerous other anti-money laundering laws and regulations.

513.    To accomplish the scheme, Defendants Moore, Reeder, Sanford, Harris, Cupp, and Sandi, and others, did provide material misrepresentations, omissions, and false documentation by means of interstate telephone, letters, and emails to officials of PNB [Is this PNC Bank?] Bank, a federally-insured financial institution in another state, and others.

514.    Defendants knowingly and willfully did utilize the means and instrumentalities of interstate commerce, including U.S. mail, email, and other electronic means of communication, to transmit accounting irregularities, false statements, and misrepresentations, thereby committing fraud by means of multiple instances of electronic transmissions to launder illicit funds and camouflage true beneficial ownership.

515.    Defendants knowingly and willfully made use of federally-insured financial institutions, and did repeatedly cross state lines in so doing, while knowing that all or a portion of the money resulted from fraud and deceit.

516.    The civil conspiracy in the instant case to commit fraud, money laundering, and numerous other crimes, arose from a scheme, transnational in nature, between Defendants that was designed and implemented to defraud, from in or around 2007 and through present time, in the District of Columbia, and elsewhere, and revolves around evidence of rampant, systemic corruption committed by BCE, to launder tens if not hundreds of millions of illegally gained dollars.  The scheme is an economic based fraud, a rational and calculated crime, that required sophistication and deliberation, and unfolded over a period of years, and required extensive and meticulous planning, and was highly calculated.  The enormity and audacity of defendants' crime and those of their coconspirators necessitated professionals who used their skills as trained and experienced lawyers to operate a global money laundering scheme.

517.    The purpose of the money laundering conspiracy, an integral component of the BCE superintended by Defendants Moore and Reeder, was to unlawfully move quantitatively significant criminally-derived funds from Iraq and other international locations to the United States and, in furtherance of the scheme, deceptively obscure them in real property and other investments camouflaged in the names of sham corporations objectively and subjectively meant to disguise true ownership and fraudulently assert false ownership.

518.    Plaintiffs have identified dozens – but for brevity presently list only 50 at Appendix B but will particularize all at trial – shell or front corporations and trusts owned by named BCE defendants, Barzani family members, and organized, administered, and/or managed and facilitated by or in course of conduct with Defendants Moore, Reeder, Sanford, Cupp, Harris, Sandi, and co-conspirators, etc.  Records show Defendant Moore and Ingormar Financial Services ("IFS") to be

a registered agent and/or officer of no less than 83 legal entities registered in New York, Delaware, Washington, D.C., Indiana, Michigan, North Carolina, and Florida.  Moore is an officer of at least 49 entities – 36 in Delaware, six in the District of Columbia, three in Florida, and one each in the remaining states.  IFS is a registered agent/officer of no less than 27 Delaware and seven District of Columbia entities.  Records show Defendant Moore's subordinate, Defendant Sanford, is either a registered agent or officer, including CEO, of no less than 22 active or inactive entities – seven in the District of Columbia, 11 in Virginia, two in North Carolina, and one each in Florida and Texas.  Her home address or her use of the Moore law firm address connects her to each entity.

519.   Complex ownership structures are not, in and of themselves, unlawful.  In this instance these ownership structures were knowingly and willfully organized and created in a "convoluted character associated with money laundering" "designed to disguise ownership and evade transaction reporting requirements,"  See *United States v. Adefehinti*, 510 F.3d 319, 324 (D.C.Cir. 2007) and utilized "for the sole purpose of holding legal title to these properties," "to conceal ownership", to "protect the family's privacy", to "keep Barzani brothers private", to "interpose a foreign corporation (and initially a trust) between the LLC's and the beneficial owners of each property," to prevent "anyone from connecting the dots", and to launder proceeds of crime by the BCE.  "Each piece of real property would be owned by a separate LLC." These anonymous shell companies used the U.S. financial system for their anonymous owners' benefits.  For various limited liability companies and corporations, millions of dollars of diverted, misappropriated, expropriated, and pilfered funds were periodically replenished by defendants' intermediary foreign sponsors, usually through Dubai and British Virgin Islands accounts, most often for the purchase of U.S. assets and by means of international wire transfers associated with the fraudulent scheme or course of conduct, for which payment cleared through U.S. banks.  It is not a defense that

legitimate funds are also involved, and there is no de minimis exception. See *United States v. McGauley*, 279 U.S. F.3d 62, 71 (1st Cir. 2002).

520.    These shell and front limited liability entities were and are owned by holding companies and trusts in the British Virgin Islands, a key outpost in the offshore financial system, formed by Defendant Moore and his associates under the laws of a foreign jurisdiction to disguise beneficial ownership of and launder illicit wealth, while specifically and purposefully maintaining a level of complete anonymity for the true owner, and splitting company incorporation and asset administration over different countries, and listed at Appendix C.  For example, to conceal the true ownership of property and create anonymity while laundering illicit proceeds, Defendant Muksi Barzani owns a British Virgin Islands holding company which owns Sylvania Fair Lakes, LLC, with a Washington, D.C. address.  It in turn owns Sylvania NC, LLC, which in turn owns real property in Mebane, North Carolina.  Defendant Sanford is the manager of both examples.

521.    Corrupt foreign defendants herein, and their families, as an integral part of the BCE, intentionally used the United States as a place to keep and spend their unlawful gains, using Washington DC attorneys and their staffs to accomplish this criminal object. The BCE defendants, and others, knew it was a haven for BCE to engage in large-scale money laundering and sanctions evasion.

522.    Defendants acted with one or more of four intents: (i) an intent to conceal or disguise the nature, location, source, ownership, or control of the specified unlawful activity proceeds; (ii) to promote the underlying specified unlawful activity; (iii) to avoid a transaction reporting requirement, such as a SAR; or (iv) to commit the offense of tax evasion or filing a false tax return.

523.    It was a part and an object of this conspiracy to conduct or participate in, directly or

indirectly, the conduct of the affairs of the BCE; and to receive income derived from a pattern of corrupt activity and to use such income or the proceeds of such income in the establishment and operation of that enterprise.

524.    The purpose of the conspiracy was for Defendants Masrour Barzani, Waysi Barzani, Muksi Barzani, Mulla 'Babo" Mustafa Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani, Areen Masrour Barzani, Moore, Reeder, Cupp, Sanford, Harris, Sandi, and other conspirators of the Barzani Family, and others, to unlawfully enrich themselves by laundering the proceeds of a corrupt foreign scheme through a series of sham shell corporations, trusts, and overseas financial accounts that disguised and concealed the nature, location, source, ownership, and control of the illicit proceeds, including by transferring proceeds into and through bank accounts in the District of Columbia, and elsewhere, in an attempt to legitimize their illicit origin, by means of numerous false and fraudulent pretenses and representations, often to FDIC-insured banks and financial institutions, to acquire and maintain luxury assets, including commercial and high-end real estate, horses, and other property in the United States to make the assets appear legitimate, limit the risk of detection, evade international clearing mechanisms, and facilitate large-scale tax evasion, consistently hiding the connection to the BCE. This mechanism was used with the goal of bypassing the regulated financial sector and creating a parallel system of moving funds and keeping records of transactions and accountancy.

## C.    Defendants are Knowing and Complicit

525.    Defendants Masrour Barzani, Waysi Barzani, Muksi Barzani, Mulla 'Babo" Mustafa Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani, Areen Masrour Barzani, Moore, Reeder, Cupp, Sanford, Harris, Sandi, and co-conspirators of the Barzani Family, and others, were and are knowingly and willingly complicit.

526.    Defendants knew about and acted to support Defendants' illicit scheme, and had a general or specific awareness of their role in a criminal enterprise and profited financially therefrom.  None of defendants were unwitting or passive intermediaries, each possesses skills or expertise in placing, moving, and laundering funds, and each is a complicit actor who was and is knowingly involved, or is deliberately negligent, in the laundering process. Defendants Reeder and Moore, and others, are educated and knowledgeable in the law.

527.    Defendants Masrour Barzani, Waysi Barzani, Muksi Barzani, Mulla "Babo" Mustafa Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani, Areen Masrour Barzani, Moore, Reeder, Cupp, Sanford, Harris, Sandi, and others of the Barzani Family, and other persons, known and unknown, did knowingly and voluntarily combine, conspire, confederate, and agree to commit offenses defined in 18 U.S.C. § 1956, that is, to knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, which financial transaction involved the proceeds of unlawful activity, knowing the property involved in the financial transaction represented the proceeds of some form of unlawful activity, and knowing that such transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, in violation of 18 U.S.C. § 1956(a)(l)(B)(i) and (ii). The use of highly educated occupational professionals provided a veneer of legitimacy to the criminals of the BCE.

528.    As alleged herein, the individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the names of the Defendants and/or their sham corporations were materially false and misleading; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal banking and treasury laws. As set forth elsewhere herein in detail, these defendants issued or caused to be issued materially misleading statements and/or their

associations with the sham corporations which made them privy to confidential proprietary information concerning Defendants, participated in the fraudulent scheme alleged herein.

529.    The specified unlawful activity is: (a) a felony violation of the Foreign Corrupt Practices Act, in violation of 15 U.S.C. § 78dd-3; and (b) an offense against a foreign nation, specifically Iraq, involving the misappropriation, theft, and embezzlement of public funds, especially from state-owned and controlled oil entities, and other entities, by and for the benefit of a public official, specifically defendants Masrour Barani, Waysi Barzani, the Barzani Family, and others, as provided by 18 U.S.C. § 1956(c)(7)(B)(i) and (iv) and (C) and (D).

530.    Misrepresentations by defendants, a form of calculated deception, were legion. Knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, defendants would and did conduct and attempt to conduct many such financial transactions, which transactions affected interstate and foreign commerce and involved the use of financial institutions and the proceeds of specified unlawful activity, to wit: (i) computer fraud and abuse, in violation of 18 U.S.C. § 1030, and (ii) wire fraud, in violation of 18 U.S.C. § 1343, knowing the transactions were in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and did cause others to make false and misleading statements.

531.    Defendants, including counsel, provided written answers and information, by means of email and letters and forms, to financial institutions, agencies of government, and business entities containing false and misleading representations about source of funds, beneficial ownership, and criminal history.

532.    A portion of the corrupt proceeds also was used to pay the attorneys, administrative staff, accountants, and financial managers, including Defendants Moore, Reeder, Cupp, Sanford, Harris, Sandi, and others, who were engaged to create sophisticated financial mechanisms designed to

conceal and disguise the corrupt proceeds, and launder the funds for the benefit of Defendants Masrour Barzani, Waysi Barzani, Muksi Barzani, Mulla 'Babo" Mustafa Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani, and Areen Masrour Barzani, among others.

**D.    Defendants' Manner and Means to Defraud**

533.    None of the acts of money laundering or the conspiracy to commit money laundering were or are the acts of a sovereign, and are not analogous to the type of activity that courts have described as "sovereign" in nature.

534.    Through dozens of sham U.S. shell corporations, organized by and/or under the direction of Defendants Reeder, Moore, and their co-conspirators Cupp, Sanford, Harris, Sandi, Defendants Masrour Barzani, Waysi Barzani, Muksi Barzani, Mulla 'Babo" Mustafa Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani, Areen Masrour Barzani, and Barzani family members and others sought to exploit numerous U.S. banking and disclosure requirements, and engaged co-conspirators and Defendants Reeder, Moore, Cupp, Sanford, Harris, Sandi, among others, to launder criminal proceeds for their benefit.

535.    Each shell and front corporation has directors, and often a "sole director", who acts in concert with Defendant Moore, assisted by Defendant Reeder.  Most, if not all the shell and front corporations maintained an office address in Washington, D.C. where the administrative officer and/or corporate secretary was located and where business was regularly conducted.  This was the Washington, D.C. law office of Defendant Moore. Knowing that the transactions were designed in whole or in part, and with the intent to defeat law and regulation, defendants and defendants' corporations knowingly and fraudulently transferred and concealed origins, sources, ownership, and property of defendants or the property of defendants' corporations.

536.    Certain of the various sham shell corporations, organized, registered, administered, and managed by Defendants Moore, Cupp, Sanford, and Harris, and others, were used to purchase commercial and high-end luxury real estate holdings in multiple states in the United States.

537.    Use of sham shell companies and structures enabled the money laundering activity. Defendants are responsible for either producing or acquiring fraudulent documentation, bank statements and annual account statements, invoices for goods or services, consultancy arrangements, promissory notes and loans, and false reference letters needed to facilitate the laundering process. They provided assistance in purchasing commercial and high-end real estate and other assets in the District of Columbia and multiple states.  In distributing the criminal proceeds among each other, Defendants Masrour Barzani, Waysi Barzani, Muksi Barzani, Mulla 'Babo" Mustafa Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani, Areen Masrour Barzani, and Barzani family members and others, and their co-conspirators, used offshore sham shell companies and trusts, foreign bank accounts, and false contracts that concealed and disguised the nature, location, source, ownership and control of the proceeds.

538.    In furtherance of the laundering conspiracy, Defendants Masrour Barzani, Waysi Barzani, Muksi Barzani, Mulla 'Babo" Mustafa Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani, Areen Masrour Barzani, Barzani family members, and others, and their co-conspirators, to orchestrate the laundering of the proceeds of crime, conducted meetings in and spent their criminal proceeds in and through the District of Columbia.

539.    The funds used to acquire these properties are traceable to violations of specified unlawful activities and U.S. law, including according to documents of the U.S. Department of State a foreign offense involving the misappropriation, theft, or embezzlement of billions of dollars of public funds by or for the personal benefit of a public official, and the international transportation or receipt of stolen of fraudulently obtained property (18 U.S.C §1956(c)(7)(B)(iv) and 1956(c)(7)(A)

respectively. Defendants knew that the funds are the proceeds of criminal offenses including money laundering and wire fraud in violation of 18 U.S.C. § 1343, 18 U.S.C. § 1349, and 18 U.S.C. § 1956(h), knowing that the transactions were designed in whole and in part in a purposeful concealment architecture and course of conduct to purposefully conceal proceeds from various unlawful schemes and course of conduct of the BCE, thereby aiding and abetting and facilitating the BCE by allowing criminals to illegally access and transact in the U.S. economy, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form derived from or obtained, directly or indirectly, through the commission of unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(Xi); (a)(2)(B)(i); and 1956 (H) and 1956 (a)(3)(A). ("Financial transaction" means any "transaction," which in any way or degree affects interstate (or foreign) commerce and involves the movement of funds by wire or other means, involves one or more monetary instruments), involves the transfer of title to any real property, vehicle, vessel or aircraft, or involves the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree, 18 U.S.C. § 1956(c)).

540. To pull off this money laundering operation required incorporating trusts, multiple additional entities, and corporations in the British Virgin Islands and elsewhere, applying for entity bank accounts in multiple jurisdictions, engaging the services of multiple trust administrators, traveling to Iraq and Europe and elsewhere to meet on multiple occasions, traveling to British Virgin Islands to meet with trust administrators, facilitating dozens and dozens of global financial transactions into and out of multiple entity accounts, and committing countless hours to planning and executing this global money laundering operation.

541. British Virgin Islands holding companies and trusts are owned and controlled by Defendants Masrour Barzani, Mansour Barzani, Muksi Barzani, Waysi Barzani, Mustafa Barzani,

Rubar Sandi, coconspirators, and the BCE, and administered and/or facilitated and/or financially funded by Defendants Moore, Sanford, Harris, Cupp, Sandi, co-conspirators and others, including but are not limited to those listed in Appendix C. [It looks to me like many of these paragraphs are duplicates. I deleted some of them above.]

542.    Co-conspirators utilizing multiple mechanisms to move illicit funds serve as intermediaries between criminal BCE money sources in Iraq facilitate illicit money movements of significant volumes of funds, manage overseas bank accounts and pass-through trusts in British Virgin Islands and elsewhere and sham corporations in the United States, and with defendants and financial institutions, and maintain banking relationships with U.S. financial institutions, all in an effort to conceal and disguise the nature, source, ownership and control of the funds and elude U.S. law. Co-conspirators have banking relationships with financial institutions in the United States, United Kingdom, Dubai, Switzerland, and elsewhere in Europe.

543.    A U.S. regulator or law enforcement authority was precluded from identifying the beneficial owner because all shell and front companies were identified solely by registered agent, the law firm, or one of its subsidiaries, primarily the law office of Defendant Moore and Ingomar Fiduciary Services, Inc. (a Delaware corporation since 2000, with its offices registered with agencies of the State of Delaware at Defendant Moore's Washington. D.C. law office and since 2016 at his former residence in Wilmington Delaware) and Ingomar Services, Inc. (no longer active), named after the street where Defendant Moore lived at 4111 Ingomar Street, N.W., Washington, D.C., wholly owned and operated by Defendant Moore and of which he is President, and not a true owner or anyone actually associated with the shell or front company or trust entity.

544.    Ingomar Fiduciary Services, Inc. engages in a substantial, continuous, and systematic course of business, and was and is so dominated by Defendant Moore as to be his alter ego and a repository of at least some of the criminal proceeds transferred to the United States by Defendants,

and the assets of the corporation actually belong to Defendant Moore or to BCE Defendants. There exists a unity of interest, identical ownership and control, commingling and diversion of funds and assets, and use of the same office and business location. Separate personalities of Defendant Moore and Ingomar Financial Services, Inc. do not exist. Through Ingomar Fiduciary Services, Inc., Defendant Moore "concealed assets and transactions under the veil of a corporate entity that was 'nothing but a sham and a cloak.'" *Wellness*, 757 U.S. 665, 1953, citing *Sampsell*, 313 U.S. 218. Ingomar Fiduciary Services, Inc. was an "alter ego or business conduit *of the person in control.*" See *Labadie Coal Co. v. Black*, 672 F.2d 92, 97 (D.C. Cir. 1982). Defendant Moore's "control over" Ingomar Fiduciary Services, Inc. was "active and substantial," and "so dominated the [] corporation as to negate its separate personality." See *Material Supply Int'l, Inc. v. Sunmatch Indus. Co., 62 F.Supp.2d 13, 20 (D.D.C. 1999).* "[A]dherence to the fiction of the separate existence of the corporation would sanction a fraud or promote injustice." See *Diamond Chem. Co. v. Atofina Chems., Inc., 268 F.Supp.2d 1, 9 (D.D.C); see also In re Baan Co. Secs. Litig., 245 F.Supp.2d 117,129, (D.D.C.2003).*

545.    Defendants did engage in and materially assist monetary transactions in the United States in criminally derived properties, and in furtherance of the conspiracy and to effect its objects, knowingly and willfully conspired, confederated, and agreed with each other and others known and unknown, to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce by, through, and to a financial institution, which transactions involved the proceeds of unlawful activity.

546.    Defendants, as part of the scheme and artifice, did knowingly and willfully engage in the transportation, transmission and transfer of monetary instruments from and through a place outside of the United States to and within the United States with the intent to promote the carrying on of illegal activities, that is knowing that the monetary instruments and funds involved in the

transportation, transmission and transfer represented the proceeds from some form of unlawful activity and knowing that such transportation, transmission and transfer was designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of unlawful activity.

547.    Defendants and co-conspirators knew that the transaction or transactions were designed in whole or in part to conceal or disguise the nature, location, course, ownership, or control of the proceeds, in whole or in part of that unlawful activity in federal or foreign law, and in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and to avoid reporting requirements, and to evade, *inter alia*, U.S. regulations and tax laws by establishing sham or front corporations and opaque structures in order to conceal in records, documents and tangible objects their clients' true beneficial ownership from United States taxes.  Defendants also knowingly, willfully, deliberately, and fraudulently treated sizable expenses for purported "client reimbursable" to pay expenses of client investments and properties.  Money movement was knowingly, deliberately, and frequently falsely declared as "loans" papered with promissory notes, agreements, etc.  Defendants did knowingly and willfully conspire and collude to defraud the United States by impeding, impairing, influencing, obstructing and defeating the lawful governmental functions of the Internal Revenue Service ("IRS") in the ascertainment, computation, assessment and collection of revenue, thereby enriching the BCE by providing a major source of resources enabling the BCE to injure plaintiffs.

548.    Defendants Moore, Reeder, Cupp, Sanford, Harris, Sandi, and others, made use of the mails and means and instrumentalities of interstate commerce, including filing electronically through FDIC-insured bank servers, in violation of 18 U.S.C. § 371, corruptly in furtherance of the money laundering conspiracy, knowing that all and a portion of the money, originating from predicate crimes, would be used in violation of the law for purposes of obtaining property and other physical assets, and knowingly and willfully, directly and indirectly, caused to be falsified books, records,

and accounts required, in reasonable detail, to accurately reflect the transactions and sources of funds. They caused corrupt payments to be falsely recorded in furtherance of the conspiracy, and to achieve its illegal objectives. Defendants Moore, Reeder, and one or more of their co-conspirators committed, and caused to be committed, and did knowingly and willfully, directly and indirectly, falsely and caused to be falsified books, records, and accounts required, in reasonable detail, to accurately and fairly reflect the transactions and sources of funds. To complete the conspiracies and scheme to launder monies described herein, and by means of materially false and fraudulent pretenses, representations and promises, and by concealment of material facts, Defendants Moore, Reeder, Cupp, Sanford, Harris, Sandi, and others, and co-conspirators, utilized services at various federally insured financial institutions, all in violation of 18 U.S.C. § 1349, 1957, and 2.

549.    To make the transactions appear legitimate and conceal their fraudulent nature, the Conspirators established and caused others to establish in the United States and elsewhere, including British Virgin Islands, dozens of sham entities which are listed at Appendix B.

550.    In furtherance of the conspiracy and to effect its illegal objects, in another fraudulent money laundering scheme or course of conduct of the BCE, Defendant Moore and his defendant coconspirator associates unlawfully bring monies into the United States, knowingly and willfully to conceal the true nature of the scheme or course of conduct by fabricating multiple false or sham "contracts", through a series of front companies and middlemen, which subsequently always underperform or perform little or no legitimate work or are breached. These corrupt or sham "contracts" and corrupt agreements usually take the place of the KRG or departmental agencies within that government contracting for "goods" or other services. In one example, the KRG sought the advice for a cybersecurity protocol to prevent "zero-clock attacks on cellular phones". They contracted with Ben Jamil, dba CCS International. Jamil is a notorious Office of Foreign Assets

violator who was indicted several times by the Department of Justice for customs violations and other schemes and has numerous lawsuits against him for money laundering. The KRG paid him approximately $300,000 for a sham contract for a demonstration in Erbil which never occurred. Upon information and belief, Jamil did not provide service under the contract. Rather, as described below, the contract was primarily or exclusively a mechanism to route money to Defendant Moore for the enrichment of the beneficial owner, the members of the BCE. The KRG then sought Defendant Moore's advice on how to "sue" and Moore received another tranche of funds to engage an attorney to sue Jamil. The embezzled $300,000 remained in Jamil's possession and funds then are in possession from another wire to Moore's IOLTA accounts. No suit has been filed, and in reality the contract was a sham used to disguise and legitimate the corrupt agreement. The purported "contracts" were a cover for the true purpose of the agreement, which was furtherance of the criminal objectives of the BCE. The activities of the enterprise provided the source of substantial means to damage and injure plaintiffs. In short, this entire convoluted scheme was just one of many methods of moving "dirty" money and making it "clean" to provide the means to increase the wealth of Defendants and provide resources to operate the BCE that has injured Plaintiffs.

### E.    Defendant Attorneys Act Corruptly to Launder Money

551.    Instead of providing their services in a lawful manner, Defendant Attorneys Moore and Reeder acted intentionally rather than inadvertently, and their tortious acts constitute knowing, willful, unconscionable, and deceptive practices. Simultaneously, they failed to ensure their employees' and subordinates' acts were lawful.

552.    Defendant attorneys Moore and Reeder, and other attorneys, typically charged clients substantial fees to participate in the conspiracy. Defendants Moore and Reeder, acting together, are both subject to a range of ethical obligations and the Code of Professional Responsibility of

the District of Columbia Bar and, in the words of the Supreme Court, each has a "*solemn duty* to comply with the law and standards of professional conduct." See *Nix v. Whiteside*, 475 U.S. 157, 169, 106 S. Ct. 988, 89 L. Ed. 2d 123 (1986). The Supreme Court further declared,

> "Although counsel must take all reasonable lawful means to attain the objectives of the client, counsel is precluded from taking steps or in any way assisting the client in presenting false evidence or otherwise violating the law. This principle has consistently been recognized in most unequivocal terms by expositors of the norms of professional conduct since the first Canons of Professional Ethics were adopted by the American Bar Association in 1908. The 1908 Canon 32 provided:
>
> "No client, corporate or individual, however powerful, nor any cause, civil or political, however important, is entitled to receive nor should any lawyer render any service or advice involving disloyalty to the law whose ministers we are, or disrespect of the judicial office, which we are bound to uphold, or corruption of any person or persons exercising a public office or private trust, or deception or betrayal of the public. . . . He must . . . observe and advise his client to observe the statute law . . . ."These principles have been carried through to contemporary codifications[4] of an attorney's professional responsibility. Disciplinary Rule 7-102 of the Model Code of Professional Responsibility (1980), entitled "Representing a Client Within the Bounds of the Law," provides:
> In his representation of a client, a lawyer shall not:
>
>> 4.    Knowingly make a false statement of law or fact.
>>
>> 5.    Counsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent.
>>
>> 8.   Knowingly engage in other illegal conduct or conduct contrary to a Disciplinary Rule.   (See *Nix v. Whiteside*, 475 U.S. 157, 166, 106 S. Ct. 988, 89 L. Ed. 2d 123 (1986)."
>>
>> Disciplinary Rule 1-102: "A lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation."

553.    Defendants Moore and Reeder did not fulfill their legal obligations and betrayed the law as they, with colleagues, explicitly declared in written communications to Defendant members of the BCE and others that the purpose of the transactions and structuring scheme and course of conduct they intended to devise and did devise to circumvent federal laws, transmitted by means of wire communications in interstate and foreign commerce, writings, signs, signals, and sounds for the purpose of executing such scheme and course of conduct and artifice, was to conceal the

ownership and source of proceeds of unlawful activities and criminality, disguise the identities of those involved in unlawful activities, and evade and violate U.S. securities and tax laws by establishing sham and front limited liability corporations layered to conceal their clients' true beneficial ownership.  Defendant Moore, aided and abetted by Defendant Reeder, is an individual engaged by and associated with the BCE, primarily in Washington, D.C., where he oversaw complicit administrative staff Defendants Cupp, Sanford, and Harris, and others, each accomplices, for various shell and front corporations and other opaque corporate ownership structures, as a tool to disguise and move illicit funds, the structure of which he created, incorporated, oversaw, and was at various times a corporate officer thereof, and served as an access point to the U.S. financial system.  Defendants Moore, Cupp, Sanford, and Harris, and others, created and caused clients to sign paperwork that purported to and did make incomplete and misleading statements to substantiate false beneficial ownership, and did property purchase in a false name.

554.    Defendant Moore managed financial accounts for, of, and on behalf of various shell corporations and front corporations and trusts in the United States and in offshore banking jurisdictions.  Defendants, by manipulative or deceptive device, with an emphasis on concealment, conspired and intentionally concealed the scheme and course of conduct by entering into secret agreements, laundering foreign money through bank accounts in the names of limited liability corporations and trusts, and through the use of conduits, rather than in the name of the true foreign source and foreign ownership of funds.  Agreements to conceal were factually parts of conspiracies to commit other crimes.  Defendant Moore provided U.S. financial institutions, title companies, and other U.S. businesses with letters of endorsement and reference, upon which decisions were made, knowingly making one or more untrue and misleading material statements, and omitting to state one or more material facts in order to facilitate Defendants' scheme..

555.    Certain individuals employed by and associated with the BCE, including defendant Moore, assisted by Defendants Reeder, Cupp, Sanford, Harris, and Sandi, each of whom are citizens of the United States, and others, conspired and colluded with one another to use their positions within the BCE to enrich themselves through schemes and course of conduct involving undisclosed and illegal payments.  Though they also helped pursue the principal purpose of the BCE, Defendant Moore and his co-conspirators further acted as part of  the BCE by engaging in various criminal activities, including concealment and money laundering, in pursuit of personal gain.

556.    To further the corrupt ends of the BCE, Defendants Moore and Reeder and their co-conspirators facilitated the enterprise by providing each other with mutual assistance and coordination.  From the beginning the conspirators insisted on secrecy, and careful deliberate steps, not ancillary but integral, were taken to sedulously keep hidden the identities of the Barzani defendants, and a continuation of the overt conspiratorial acts of secrecy after the accomplishment of the crime in furtherance of this conspiracy.  The conspirators engaged in conduct designed to prevent detection of their illegal activities, to conceal the location of proceeds of those activities, and to promote the carrying on of those activities.  That conduct included, among other things: the use of contracts to create an appearance of legitimacy for illicit payments; the use of various mechanisms, including trusted intermediaries, bankers, and financial advisors, to make and facilitate the making of illicit payments; the creation and use of shell and front companies and bank accounts in tax havens and key outposts in the offshore financial system and other secretive banking jurisdictions; the active concealment including the execution of "secrecy agreements" with real estate brokers and agents, vendors, and real estate sales contracts, of foreign ownership; the structuring of financial transactions to avoid reporting requirements; the purchase of real property and other physical assets; and income tax evasion. Within the United States, such conduct took place within the District of Columbia and elsewhere.

557.    Beginning at least by 2007 and to the present time, members of the BCE caused tens of millions of dollars associated with the fraudulent scheme or course of conduct to be wired from banking institutions and other financial entities outside and inside the United States into accounts controlled or overseen by defendants Moore, Cupp, Sanford, Harris, and Barzani family members, in multiple electronic wire transfers.  The payments were wired from accounts in U.S. and foreign banks held in the name of various entities to disguise the source, ownership, and nature of the funds, to entities Defendants Moore, Cupp, Sanford, Harris, and Barzani family members, and others, controlled, to further disguise the source and nature of the funds.

558. The pattern of unlawful activity through which  Defendant Moore, assisted by Defendant Reeder, together with others, agreed to conduct and participate, directly and indirectly, in the conduct of financial affairs of the BCE consisted of multiple acts unlawful under: (a) 18 U.S.C. § 1343 (wire fraud, including honest-services wire fraud) ; (b) 18 U.S.C. § 1956 and 1957 (money laundering and money laundering conspiracy) ; (c) 18 U.S.C. § 1952 (interstate and foreign travel in-aid-of racketeering) ; and (d) 18 U.S.C. § 5314 and 5322 (willful failure to file report of foreign bank and financial accounts). At all times relevant, pursuant to 31 U.S.C. § 103.24, 103.27(c), 103.27(d) and 103.59(b), citizens and residents of the United States who had a financial interest in, or signature authority over, a … financial account in a foreign country with an aggregate value of more than $10,000 at any time during a particular year were required to file with the Department of the Treasury a Report of Foreign Bank and Financial Accounts on Form TD-F 90-22 (the "FBAR"). The FBAR for a given year was due by June 30 of the following year.  Defendant Moore, then a resident of the District of Columbia, had signature and other authority over one or more financial accounts, having an aggregate value exceeding $10,000.  Within the District of Columbia and elsewhere, defendants Masrour Barzani, Waysi Barzani, Muksi Barzani, Mulla 'Babo" Mustafa Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani, Areen Masrour Barzani,

and Barzani family members, Moore, Cupp, Sanford, and Harris, and others, did knowingly and willfully fail to file with the Department of the Treasury a FBAR, disclosing that they had signature and other authority over one or more financial accounts in foreign countries, which account(s) had an aggregate value of more than $10,000, while violating another law of the United States, to wit: 26 U.S.C. § 7201.

559.  Defendants Moore, Cupp, Sanford, Harris, and others, met semi-annually or quarterly for two days in Washington, D.C., usually at the Moore law office, or the Ritz Carlton Hotel in McLean, Virginia, with foreign sponsor and intermediary money source and/or coconspirators who are "foreign persons" as defined in the Countering America's Adversaries Through Sanction Act, 22 U.S.C. 9401, Sec. 193(3): "The term 'foreign per0son' means a person that is not a United States person.  Co-conspirators directed and controlled by Defendant Masrour Barzani, are foreign persons acting to injure Plaintiffs.

560.  As Directed by Defendant Masrour Barzani, and others, Co-conspirators known and unknown did knowingly and intentionally transmit and cause to be transmitted monies by means of wire communications in interstate and foreign commerce writings, signs, signals, pictures, and sounds for the purpose of executing such scheme or course of conduct and artifice, and were actively complicit in the crime.  Co-conspirators known and unknown did over a multi-year period knowingly and unlawfully combine, conspire, confederate, and agree together and with each other to devise and intend to devise a scheme or course of conduct and artifice by means of material false and fraudulent pretenses and representations and omissions to knowingly use the bank and other banks, including U.S. financial institutions, to commit crimes in violation of international laws and to accomplish its BCE illicit purposes and did originate electronic wire dollar-denominated financial transmissions of dollar-denominated transactions in interstate commerce from Iraq, Dubai, and elsewhere to the United States banks and financial institutions and knowing

the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of the specified unlawful activity, each such transaction constituting a separate crime.

561.    Co-conspirators are not employees of KRG or any government or foreign state or political subdivision thereof nor an agent or instrumentality thereof, neither is a citizen of a State of the United States, and are central co-conspirators, financial facilitators, international money movement orchestrators (of large volumes of illicit cash proceeds), strategists, and major moneymen and operatives of the BCE.  Defendants Cupp, Sanford, and Harris were often paid unreported "gifts" of tens of thousands of dollars.  Defendant Moore often maintained bank cash accounts in the United States on behalf of defendants Barzani in the many millions of dollars.  As part of the pattern of illegal activity employed, Defendants used facilities of interstate or foreign commerce with the intent to distribute the proceeds of unlawful activity and to conceal the source, ownership, and control of the funds. The funds were ultimately passed through U.S. financial institutions to then be used to acquire and invest in assets located in the United States and overseas, titled not in defendants' names but in the name of shell or front companies and trusts and other legal arrangements formed and organized by Defendant Moore and his associates in complex ownership and control structures adding layers and chains of ownership between an asset and the beneficial owner(s) in different jurisdictions and countries, and different types of legal structures, for the purpose of enhanced anonymity and intentional concealment and obscuring beneficial ownership information, to conceal material facts, to protect their corrupt relationship with the beneficial owners and others, including concealing assets of individuals who did support ISIS to avoid detection by law enforcement, taxing authorities, and national security officials including by using shell or front names and addresses when conducting international electronic money transfers, and holding in whole or in part the proceeds of crime.

562.    Representative entities used to conceal are partially listed in Appendix B; but are not limited to merely this list, and the representative sample list is  not wholly inclusive.

**F.    Defendant Attorneys Acted With Knowledge and Willful Blindness**

563.    The BCE scheme required the assistance of a money laundering operation that would match its scale and sophistication. BCE turned to Washington, D.C. lawyers, Defendants Moore and Reeder, who, with others including lawyers in Philadelphia, conceived and orchestrated a custom money laundering operation that could withstand scrutiny of anti-money laundering staff at financial institutions and a growing number of investigations.  In doing so, Defendants Reeder, Moore, and others, erased the connection between the true source and beneficial ownership of the funds "invested", further obscuring the link between predicate crimes and money proceeds of crime laundered.  Defendant Moore exercised a high degree of control over governing, bank, and transaction documents, and voluntarily assumed all attendant risk.

564.    In coordination with and in supervision of Moore's colleagues' employees - Defendants Cupp, Sanford, and Harris, and others including accountants - Defendants Reeder and Moore successfully created layers covering illicit proceeds by misusing and depositing and co-mingling funds into and through lawyer's IOLTA account, all in an effort to provide Barzani defendants with enhanced anonymity and transaction privacy for a substantial fee. Defendant Moore facilitated money laundering services by using a lawyer's trust account, or IOLTA, to transfer the proceeds of drug trafficking, counterfeiting, and other acts of the BCE.

565.    Defendants Moore, Cupp, Sanford, and Harris, and others including accountants, willfully combined, conspired, aided and assisted in, and procured, counseled, and advised, the preparation and presentation of tax documents, which the Defendants knew were false and fraudulent as to material matters, all in violation of 26 U.S.C. § 7206(2).

566.    Defendants Reeder and Moore were motivated by greed to commit such an egregious scheme.  The scheme was highly lucrative for BCE and for the Defendants' lawyers and their associates who abused entrusted power for private gain accompanied by secrecy, betrayal, deception, and callous disregard for a consequence suffered by the Plaintiffs and millions of citizens of Kurdistan who are victims of the underlying predicate crimes of this scheme, and knew or should have reasonably known the severity of these actions, yet persisted in their support of the BCE

567.    As seasoned lawyers, Defendants Reeder and Moore could easily discern from the CPA's analysis, account statements, audits, real estate agents, and other financial documents that the funds were flowing from a massive global crime scheme, confirmed by the blatant and documented efforts of Defendants Moore and Reeder, acting in concert with Defendant Masrour Barzani and other Defendants to conceal and hide the true nature of BCE financial transctions.

568.    In April 2020, the American Bar Association issued an important opinion, Formal Opinion 491, restating prior standards and reminding lawyers that they are responsible for conducting a sufficient inquiry into the facts and circumstances of a matter a client or prospective client asks them to undertake if there is a "high probability" that the client is seeking to use the lawyer's services to commit a crime. It states: [W]here facts known to the lawyer establish a high probability that a client seeks to use the lawyer's services for criminal or fraudulent activity, the lawyer has a duty to inquire further to avoid advising or assisting such activity .... Even if information learned in the course of a preliminary interview or during a representation is insufficient to establish "knowledge" under [Model] Rule 1.2 (d), other rules may require the lawyer to inquire further in order to help the client avoid crime or fraud, to avoid professional misconduct, and to advance the client's legitimate interest ...." ABA Formal Opinion 491 cites numerous cases, including Supreme Court precedent, incorporating the doctrine of willful

blindness into the legal definition of "knowledge." Failure to make a reasonable inquiry under these circumstances is "willful blindness".  Knowledge "denotes actual knowledge of the fact in question" which may be "inferred from circumstances."

569.    The Supreme Court held, "The doctrine of willful blindness is well established in criminal law. …[T]he doctrine of willful blindness hold that defendants cannot escape the reach of these statutes by deliberately shielding themselves from clear evidence of critical facts that are strongly suggested by the circumstances. . . . [The Model Penal Code defines] 'knowledge of the existence of a particular fact' to include a situation in which 'a person is aware of a high probability of [the fact's] existence, unless he actually believes that it does not exist.'" *See Global-Tech Appliances, Inc. v. SEB USA*, 563 U.S. 754, 767 (2011)

570.    A lawyer may accordingly face criminal charges or civil liability, in addition to bar discipline, for deliberately or consciously avoiding knowledge that a client is or may be using the lawyer's services to further a crime or fraud. *See United States v. Cavin*, 39 F.3d 1299, 1310 (5th Cir. 1994) (upholding deliberate ignorance jury instruction in prosecution of a lawyer); *United States v. Scott,* 37 F.3d 1564, 1578 (10th Cir. 1994) (affirming use of deliberate ignorance instruction against an attorney convicted of conspiracy to defraud the IRS); *Wyle v. R.J. Reynolds Indus., Inc.*, 709 F.2d 585, 590 (9th Cir. 1983) (upholding deliberate ignorance finding against law firm in antitrust suit because firm was aware of high probability that client made illegal payments and failed to investigate); *United States v. Benjamin*, 328 F.2d 854, 862 (2d Cir. 1964) (a lawyer may be held liable in a securities fraud suit if the lawyer has "deliberately closed his eyes to the facts he had a duty to see"); *Harrell v. Crystal*, 611 N.E. 2d 908, 914 (Ohio Ct. App. 1992) (affirming finding of liability in malpractice action for lawyer's failure to investigate sham tax shelters). *See In re Berman*, 769 P.2d 984, 989 (Cal. 1989) (en banc) (holding, in disciplinary proceeding for aiding a money laundering scheme, that attorney's "belief that the financial

statements contained false information reflects sufficient indicia of fraudulent intent to constitute moral turpitude".

571.    Willful blindness, sometimes called "deliberate ignorance" or "conscious avoidance", is present. "Willful blindness is distinct from mere recklessness or negligence: '(1) The defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact.'" *BEINS, AXELROD, PC, v. ANALYTICS, LLC, et al., Defendants.* Civil Action No. 19-3794 (JEB), D.C. Dist. Ct. 2020. *See Glob.-Tech Appliances, Inc., v. SEB S.A.*, 563 U.S. 754, 769 (2011).

572.    Defendants Reeder and Moore, and others, were not drawn unwittingly into criminal activity, particularly in the presence of multiple red flags and substantial worldwide media coverage of the BCE and its rampant corruption. Defendant Reeder was and is a registered lobbyist for the Barzani regime and offered defenses to the legislative and executive branches of government as to Barzani's alleged corruption.

573.    It is also well established in the United States that attorney-client privilege and the work product doctrine do not extend to criminal activity, "in furtherance of future illegal conduct – the so-called 'crime-fraud' exception", or to actions "in which an alleged illegal proposal is made in the context of a relationship which has an apparent legitimate end."  The crime-fraud exception places communications made in furtherance of a crime or fraud outside the attorney-client privilege  and "does not extend to communications made for the purpose of getting advice for the commission of a fraud or crime."  See *United States v. Zolin,* 491 U.S. 554, 563, 109 S.Ct. 2619, 2626 (1989).  Defendants Reeder and Moore "made or received the otherwise privileged communication with the intent to further an unlawful or fraudulent act," and actually "carried out the crime or fraud."  See *In re Sealed Case*, 223 F.3d 775, 779 (D.C. Cir. 2000).

668574.        With respect to Defendants Reeder and Moore, as Supreme Court Justice Bradly

aptly stated many years ago in *Ex parte Wall* (1882), 107 U. S. 265, 274, 2 Sup. Ct. 569, 27 L. Ed.

552:

> "Of all classes and professions, the lawyer is most sacredly bound to uphold the laws. He
>
> is their sworn servant; and for him, of all men in the world, to repudiate and override the
>
> laws, . . . argues recreancy to his position and office, and sets a pernicious example to the
>
> insubordinate and dangerous elements of the body politic. It manifests a want of fidelity to
>
> the system of lawful government which he has sworn to uphold and preserve."

669.    The Republic of Iraq, of which the defendant Iraqi Kurdistan Regional Government is part,
is since 2008 a participating nation, as is the United States, of the United Nations Convention
Against Corruption.

## XI.    DEFENDANTS USE DISHONESTY, FRAUD, AND DECEIT TO HARM
## PLAINTIFFS AND DEFRAUD UNITED STATES OF AMERICA

575.    Defendants have knowingly, deliberately, and willfully aided and abetted the defendant

Iraqi Kurdistan Regional Government and its principal officers and agents in committing

violations of the law of nations and violated and breached the provisions of this treaty and

international law in numerous ways, including but not limited to:

> Article 23:  The conversion or transfer of property, knowing that such property is the
>
> proceeds of crime, for the purpose of concealing or disguising the illicit origin of the
>
> property or of helping any person who is involved in the commission of the predicate
>
> offence to evade the legal consequences of his or her action; (ii) The concealment or
>
> disguise of the true nature, source, location, disposition, movement or ownership of or
>
> rights with respect to property, knowing that such property is the proceeds of crime;

Article 24:  The concealment or continued retention of property when the person involved knows that such property is the result of any of the offences established in accordance with this Convention.

670.    The Republic of Iraq is also a participating nation, as is the United States, of the International Convention for the Suppression of the Financing of Terrorism, which Defendants have knowingly, deliberately, and willfully violated.  "The Court is bound by the law of nations which is a part of the law of the land."  *THE NEREIDE, BENNETT, MASTER*, 13 U.S. 388, 3 L. Ed. 769 (1815).  Also *Ali v. Rumsfeld*, 649 F.3d 762 (D.C. Cir. 2011).  The Supreme Court has declared, "For two centuries we have affirmed that the domestic law of the United States recognizes the law of nations."  See *Sosa v. Alvafez-Jachain,* 542 US 692 SCOTUS.  Treaties are binding agreements between nations that govern the rights and obligations of participating countries.  The use of international conventions, i.e., treaties, was codified in the 1969 Vienna Convention on the Law of Treaties, and the treaty text is legally binding on the Defendants.  As a ratified treaty, the Vienna Convention has the status of federal law. "[T]reaties are recognized by our Constitution as the supreme law of the land."  See *Breard v. Greene,* 523 U.S. 371, 118 S. Ct. 1352, 140 L. Ed. 2d 529 (1998).

**Counterfeiting of Pharmaceuticals and Cigarettes, Production and Distribution of Illicit Drugs**

671.    The extensive and financially significant international counterfeiting component of the Barzani Continuing Criminal Enterprise (BCCE), which is a substantial component of financing the BCCE harm to Plaintiffs, is directed by Defendants Masoud Barzani and Masrour Barzani. Defendant Masrour Barzani is in partnership with co-conspirators Defendants Nizar Hanna Nasri,

Shimal Jawhar Salin, Sarwar Pedawi, and Ghafoor Khoshnaw who manage, oversee, profit, and money launder proceeds from counterfeiting operations of the Barzani Continuing Criminal Enterprise. Additionally, Defendant Sarwar Pedawi, a major co-conspirator with Defendants Masrour Barzani and Waysi Barzani, acting as a co-conspirator for Defendant Masrour Barzani, is a principal representative of Defendant Masrour Barzani in business transactions, directs Defendant Masrour Barzani's illicit oil trades, and directs illicit proceeds to purchase properties in the United States and elsewhere for Defendant Masrour Barzani and his shell companies and other camouflaged entities. Defendants Saad Alduski and Blend Aldoski manage and partner in manufacturing counterfeit cigarettes. These Defendants, in managing this financially significant criminal enterprise element, with the intent to deceive and defraud the rightful owners of the companies whose products are being counterfeited, report directly to the Prime Minister of Defendant Iraqi Kurdistan Regional Government, Defendant Masrour Barzani.

672. All of these willful and knowing counterfeiting of pharmaceuticals and cigarettes violations occurred and do occur at a time Defendant Masrour Barzani was and is Prime Minister of Defendant Iraqi Kurdistan Regional Government, the presiding and actual head of government and head of the executive power.

673. Defendants, directed by Masrour Barzani, knowingly engaged, attempted to engage, and aided, abetted, and caused others to engage and attempt to engage in transactions, dealings, the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing of illicit drugs and narcotics, and with one or more foreign persons designated by the U.S. Secretary of the Treasury as foreign terrorists or foreign terrorist organizations and willfully evaded and avoided, and do evade and avoid, the provisions of law prohibiting activity and dealings with such individuals.

674.    The illicit drug operation, including cocaine trafficking, punishable by death or life imprisonment under Iraq law, is headed by co-conspirator Defendant Nihad Barzani, brother of Defendant Masoud Barzani.  Defendant Nihad Barzani reports this criminal operation directly to Defendant Masrour Barzani.   Co-conspirator Defendant Ghafoor Khoshraw assists Defendant Nihad Barzani (a major director of oil smuggling and construction) and directs the highly profitable smuggling of cigarettes to Iran and the counterfeiting of U.S. brand cigarettes, along with electronic and technology product smuggling to Iran.  Revenue received by the Barzani Continuing Criminal Enterprise from this illicit drug operation is used directly to finance Barzani Continuing Criminal Enterprise's actions against Plaintiffs including attempted murder, murder, and torture, and other atrocity crimes.

675.    The core of the Barzani Continuing Criminal Enterprise counterfeiting, piracy, and smuggling operations is its partnering with U.S. designated anti-American terrorist organizations. The products the Barzani Continuing Criminal Enterprise counterfeits include primarily U.S. registered and trademarked brands, thereby knowingly and intentionally creating a negative economic impact on the United States economy and on U.S. commercial interests.  By simultaneously channeling substantial financial resources to the Barzani Continuing Criminal Enterprise and its criminal networks which disrupt and corrupt Kurdistan society and knowingly, and lacking all moral integrity as leaders of the Defendant Iraqi Kurdistan Regional Government, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their associate co-conspirators, imperil the physical health of the citizenry, which they govern, through inferior product quality, hazardous material, and substandard and uninspected manufacturing standards, and with wanton disregard for human life potentially killing innocent consumers.  In addition to the established link between counterfeiting and piracy and organized crime, Interpol has highlighted a disturbing relationship of counterfeiting and piracy with terrorist financing, with

intellectual property crime becoming the preferred method of financing for a number of terrorist groups, including those partnering and/or collaborating with the Barzani Continuing Criminal Enterprise.

676. The Barzani Continuing Criminal Enterprise counterfeiting operations, in pursuit of illicit profits, continually, knowingly, and intentionally violates numerous international treaties and conventions to which the controlling superior federal Government of the Republic of Iraq is a signatory nation, including the Paris Convention for the Protection of Industrial Property, to which the Government of the Republic of Iraq confirmed its accession on January 24, 1976.

677. The Barzani Continuing Criminal Enterprise, in pursuit of illicit profits, also continually, knowingly, and intentionally violates the established protocols of the World Intellectual Property Organization (WIPO).

678. The Barzani Continuing Criminal Enterprise, in pursuit of illicit profits, also continually, knowingly, and intentionally violates and infringes on registrations issued by the U.S. Patent and Trademark Office ("USPTO"), an agency of the United States Government.

679. While the overall magnitude of counterfeiting and piracy cannot be easily measured, counterfeiting and piracy are illicit activities in which the organized crime of the Barzani Continuing Criminal Enterprise networks thrive and with which revenue they finance their BCCE and make possible the damages inflicted upon Plaintiffs. Confidential Human Sources #1 and #8, who have direct clandestine access to senior ranking officials of Defendant Iraqi Kurdistan Regional Government, estimate that the financial revenue from various counterfeiting operations of the Barzani Continuing Criminal Enterprise exceeds U.S. twenty million dollars per month – thus totaling billions of dollars to date as the Barzani Continuing Criminal Enterprise continues unabated and unhampered.

680. The counterfeit items produced by the Barzani Continuing Criminal Enterprise are substandard or even dangerous, lack compliance with basic safety standards, are manufactured in manufacturing facilities not compliant with universally accepted industry Good Manufacturing Practice (GMP) standards, and possess no licenses from the trademark owner(s) to manufacture specific products. Evidence documents several Kurd cases of blindness resulting from illicit and unlawful activities of the Barzani Continuing Criminal Enterprise.

681.    With the knowing and willful authorization of Defendants Masrour Barzani and Waysi Barzani, counterfeit items and illicit items produced by the Barzani Continuing Criminal Enterprise are transported in trucks along the route used to transport illicit drugs.  The trucks were unlawfully diverted and provided by the Barzani's from Hummer vehicles issued to the Defendant Iraqi Kurdistan Regional Government by the United States Government under foreign aid and defense aid agreements for official use by the Defendant Iraqi Kurdistan Regional Government Peshmerga military and Parastin intelligence agents in furtherance of U.S. national security and foreign policy purposes.  Use of trucks and other equipment and materiel, provided by the United State Government through its foreign assistance programs and Defense agreements, for transportation of counterfeit pharmaceuticals and illicit drugs violates U.S. law and directly provides funds to enable Defendants to harm Plaintiffs.

682.    Counterfeit items produced by the Barzani Continuing Criminal Enterprise, with the knowing and willful authorization of Defendants Masrour Barzani and Waysi Barzani, knowingly pose substantial health and safety risks to consumers, including U.S. citizens residing in or visiting the areas of Defendant Iraqi Kurdistan Regional Government in Iraq.

683.    In its report *The Economic Impact of Counterfeiting and Piracy*, the Organisation for Economic Co-operation and Development, an intergovernmental organization of which the United States is a member nation, emphasized the potential mortal danger of counterfeit pharmaceuticals, willfully and knowingly ignored by the Barzani Continuing Criminal Enterprise:

> "In the case of pharmaceuticals, trademark infringing products may include correct *ingredients in incorrect quantities or may be composed according to a wrong formula. Products can furthermore contain non-active or even toxic ingredients. Ailments which could be remedied by genuine products may go untreated or worsen; in some cases, this may lead to death."*

684.    The unlawful Barzani Continuing Criminal Enterprise illegal activities, directed and controlled by Defendants Masrour Barzani and Waysi Barzani, undermine American enterprise innovation, which is key to American economic growth, and which negatively affects United

States relations with legitimate trading partners and the economy of the United States. Revenue derived from Barzani Continuing Criminal Enterprise illegal activities provides means for the Barzani Continuing Criminal Enterprise to harm Plaintiffs.

685.    This illegal counterfeiting and trafficking, directed and controlled by Defendants Masrour Barzani and Waysi Barzani, harm American commercial interests that comply with law, and thus those of American citizen shareowners, including American public employee and union pension plans, investors, employees, contractors, suppliers, lenders, banks, and rights holders because of the impact that they have on (i) sales and licensing, (ii) brand value and firm reputation, and (iii) the ability of firms to benefit from the breakthroughs they make in developing new products. Revenue derived by illegal counterfeiting and trafficking provides substantial revenue to the Barzani Continuing Criminal Enterprise enabling the Barzani Continuing Criminal Enterprise to harm Plaintiffs.

**Counterfeiting of United States Brand Alcohol**

686.    In the small Kurdistan village of Kalak, operating under the protective direction of co-conspirators Defendants Masrour Barzani, Shimal Jawhar Salih, and Sarwar Pedawi (as head of the STER's Jack Daniels™ operation), with the intent to deceive and defraud, Sarwar Pedawi manages the counterfeiting of industry-leading and internationally trademark protected whiskey brand Jack Daniels™. The ownership of STER is purposefully hidden and concealed, but a United States Department of State internal cable from the Baghdad U.S. Embassy reveals Defendant Masrour Barzani as majority owner of STER. STER is part of the Barzani Continuing Criminal Enterprise.

687.    The Barzani-owned STER Group, through its officers, employees, and agents, and Defendants Saad Aldoski and Blend Aldoski, knowingly and willfully manage and operate its

555

alcohol counterfeiting operations. Alcoholic beverage counterfeiting comprises a substantial part of the Barzani Continuing Criminal Enterprise counterfeiting revenue, and provides substantial means for the Barzani Continuing Criminal Enterprise to harm Plaintiffs.

688. Jack Daniels™ is a brand of Tennessee whiskey. It is legally produced in Lynchburg, Tennessee, by the Jack Daniels Distillery, which is owned by the Brown–Forman Corporation, a major American business enterprise operating worldwide with licensed products and representatives. STER and its criminal whiskey counterfeiting operation are not licensed by Jack Daniels, its parent company, or any related entity thereof.

689. The counterfeit whiskey alcohol product produced by the Barzani Continuing Criminal Enterprise — illegally and deceptively and fraudulently packaged, branded, marketed, and distributed as Jack Daniels™ — is sold to consumers and local marketers in Iraq, and illegally exported to Turkey and beyond, all in direct financial harm to Brown-Forman and its millions of individual shareowners, to the trade detriment of the United States of America and its balance of trade, to the pecuniary detriment of U.S. financial capital and financial transfers, and to the criminal and unjust enrichment of the Barzani Continuing Criminal Enterprise, thus enabling Defendants to damage and injure Plaintiffs.

**Smuggling of Counterfeit United States Brand Products and U.S. Currency**

690. Co-conspirator Defendant Sihad Barzani is the Barzani Continuing Criminal Enterprise go-between with government officials of the government of Iran and its anti-American terrorist operatives and the smuggling operation operated by the Barzani Continuing Criminal Enterprise. Defendant Sihad Barzani is Defendant Masoud Barzani's brother and under the direction of Defendant Masoud Barzani and Defendant Masrour Barzani, Defendant Sihad Barzani manages all Barzani Continuing Criminal Enterprise counterfeiting and money laundering operations. He

has offices in Haji Umran, Iraqi Kurdistan, a known smugglers' border post near the Iran-Iraq border.

691.    Defendant Sihad Barzani holds the titular rank of General in the Kurdish Peshmerga (the military force of Defendant Iraqi Kurdistan Regional Government), and acting under the command of Defendant Masrour Barzani, unlawfully diverts Peshmerga personnel and resources — very substantially funded by the United States Government — to the Barzani Continuing Criminal Enterprise to provide security and armed force for the Barzani Continuing Criminal Enterprise, and provide a part of the means to use violence against Plaintiffs and further the Barzani Continuing Criminal Enterprise.

692.    Under the direction of Defendants Masoud Barzani and Masrour Barzani, and with the intent to deceive and defraud, Defendant Sihad Barzani also supervises the Barzani Continuing Criminal Enterprise money laundering.  The Barzani Continuing Criminal Enterprise is engaged in the unlawful sale of oil to Iran.  Sales of oil and diesel to Iran, much of which is directed by co-conspirator Defendant Nihad Barzani for Defendant Masrour Barzani. Significant amounts of oil and diesel have been resold by Defendant Nihad Barzani to U.S. military installations in the area of Defendant Iraqi Kurdistan Regional Government as falsely labeled Iraq product, are contrary to and in circumvention of U.S. trade law and sanctions imposed by the Government of the United States.  By knowingly and purposely taking advantage of illegal exchange rate manipulation, Confidential Human Source #8, having clandestine access to those in the Barzani inner circle, reports that every unlawful US$1million sale of oil to Iran nets the Barzani Continuing Criminal Enterprise US$200,000 on the exchange rate, diverted through German and Dubai banks and elsewhere and back to the Iraqi Kurdistan region, providing means for the Barzani Continuing Criminal Enterprise to damage and harm Plaintiffs.

693.    Confidential Human Source #8 reports that every day the Barzani Continuing Criminal Enterprise unlawfully receives an estimated US$100mm U.S. currency through its oil sales.  Until March 2023, Confidential Human Source #1, who has direct clandestine access to senior ranking officials of Defendant Iraqi Kurdistan Regional Government, estimated that the Barzani Continuing Criminal Enterprise was selling 450,000 barrels per day—that number has since been reduced by the Iraq central government to an estimated 150,000 barrels per day.  Currency derived from illegal oil sales is transported inside oil tankers to the Islamic Revolutionary Guard Corps ("IRGC"), which is short of currency.  The United States Treasury Department has verified Iran then transfers these proceeds to Hezbollah, an organization designated by the United States as a Foreign Terrorist Organization.  Defendants knew and currently know that Hezbollah is a designated Foreign Terrorist Organization.  Revenue from its unlawful trade with Iran enables the Barzani Continuing Criminal Enterprise to harm and damage Plaintiffs.

694.    As part of its criminal conspiracy to disguise its true criminal activity, and with the intent to deceive and defraud, the Barzani Continuing Criminal Enterprise, acting through the Defendant Iraqi Kurdistan Regional Government which it controls in its entirety, has issued numerous well-documented intentionally and calculated misleading and deceptive statements, including communiques to and filings with the United States Government, often by its Washington representatives, agents, and advisors, including to  the White House and the Executive Office of the President of the United States, condemning the Islamic Revolutionary Guard Corps (IRGC).

695.    The United States Government placed the IRGC on its Foreign Terrorist Organizations list in 2019, at a time Defendant Masrour Barzani was and is the Prime Minister.  Despite the IRGC being designated a Foreign Terrorist Organization, the Barzani Continuing Criminal Enterprise has continued unrestrained its unlawful trade with the IRGC, providing the means to continue its criminal enterprise to harm and damage Plaintiffs.

, Mustafa Barzani, Jonathon Moore, Valerie Cupp, Juli Mai Sanford, Laura Geho Harris, and Rubar Sandi696.    The International Emergency Economic Powers Act authorized the President of the United States (the "President") to impose economic sanctions on a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy, or economy of the United States when the President declared a national emergency with respect to that threat.

697.    Beginning with Executive Order No. 12,170, issued on November 14, 1979, the President found that "the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States and declare[d] a national emergency to deal with that threat."

698.    On March 15 and May 6, 1995, the President issued Executive Orders Nos. 12,957, finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States," and declaring "a national emergency to deal with that threat," and 12,959, prohibiting, among other things, the exportation, re-exportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, and/or services from the United States or by a United States person; and on August 19, 1997, issued Executive Order No. 13,059 clarifying the previous orders (collectively, the "Executive Orders"). This included persons in a foreign country with knowledge or reason to know that such goods, technology, or services were intended specifically for supply, transshipment, or re-exportation, directly or indirectly, to the Islamic Republic of Iran or the Government of the Islamic Republic of Iran.    On August 19, 1997, the President issued Executive Order No. 13059, consolidating and clarifying Executive Order Nos. 12957 and 12959 (collectively, the "Executive Orders").    The Executive Orders authorized the United States Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Orders. Pursuant to this

authority, the Secretary of the Treasury promulgated the Iranian Transactions Regulations (renamed in 2012, the Iranian Transactions and Sanctions Regulations, the "ITSR") implementing the sanctions imposed by the Executive Orders.

699.    The most recent continuation of this national emergency was executed on March 12, 2020. 85 Fed. Reg. 14731 (Mar. 13, 2020), at a time Defendant Masrour Barzani was Prime Minister of Defendant Iraqi Kurdistan Regional Government, the presiding and actual head of government and head of the executive power.    Pursuant to this authority, the U.S. Secretary of the Treasury promulgated the Iranian Transaction Regulations, 31 C.F.R. Part 560, implementing the sanctions imposed by the Executive Orders. Effective October 22, 2012, the U.S. Department of the Treasury renamed and reissued the Iranian Transaction Regulations as the Iranian Transactions and Sanctions Regulations ("ITSRs").

700.    The ITSR also prohibits the supply of services where the benefit of such services is otherwise received in Iran, if such services are performed in the United States or provided outside the United States by a United States person.    See 31 C.F.R. § 560.410.

701.    The ITSR provides that the transfer of funds, directly or indirectly, from the United States or by a U.S. person to the Islamic Republic of Iran or the Government of the Islamic Republic of Iran is a prohibited export, re-export, sale, or supply of services to Iran or the Government of Iran. See 31 C.F.R. § 560.427(a).

702.    The ITSR further prohibits transactions that evade or avoid, have the purpose of evading or avoiding, cause a violation of, or attempt to violate the ITSR. 31 C.F.R. § 560.203.

703.    On October 25, 2007, the U.S. Department of the Treasury designated the IRGC Qods Force ("IRGC-QF") pursuant to Executive Order No. 13224 for providing lethal support to multiple terrorist organizations.

704.   According to the U.S. Department of the Treasury, the IRGC and its major holdings have a dominant presence in Iran's commercial and financial sectors, controlling multi-billion dollar businesses and maintaining extensive economic interests in the oil industry. Profits from these activities support the IRGC's full range of nefarious activities, including the proliferation of weapons of mass destruction ("WMD") and their means of delivery, support for terrorism, and a variety of human rights abuses, at home and abroad.

705.   On November 5, 2018, providing lethal support to multiple terrorist organizations the U.S. Department of the Treasury designated the National Iranian Oil Company ("NIOC") as a prohibited entity.  Public documents noted that NIOC is owned by the Government of the Islamic Republic of Iran through the Iranian Ministry of Petroleum. and is responsible for the exploration, production, refining, and export of oil and petroleum products in Iran.  It further noted the close relationship between the IRGC, which OFAC designated in 2007 because of its ties to Iran's ballistic missile program, and NIOC.

706.   On November 5, 2018, the U.S. Department of the Treasury designated National Iranian Tanker Company ("NITC") for providing lethal support to multiple terrorist organizations. Public documents noted that NITC was a Government of Iran entity which employed various front companies.

707.   On April 8, 2019, the President of the United States designated the IRGC as a Foreign Terrorist Organization. The designation noted that the IRGC actively finances and promotes terrorism.

708.   On January 23, 2020, the U.S. Department of the Treasury described NIOC as "an entity instrumental in Iran's petroleum and petrochemical industries, which helps to finance Iran's [IRGC-QF] and its terrorist proxies."

709.   Pursuant to 50 U.S.C. § 1705, it was a crime to willfully violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation or prohibition issued under IEEPA. The Defendants, and others known and unknown, knowingly and willfully combined, conspired,

confederated, and agreed together and with each other to violate, and to cause a violation of, licenses, orders, regulations, and prohibitions issued under the IEEPA.

710.    At all times relevant to this complaint, Defendant Masrour Barzani, a United States person, knowingly and willfully combined, conspired, confederated, and agreed, with persons including the IRGC, an entity of the Government of the Islamic Republic of Iran, without a U.S. government license, to deceive and defraud the United States and to commit offenses against the United States, more particularly by, among other things:

(a)    being complicit in or engaging in actions that materially assist, sponsor, or provide financial, materiel, or technological support for, or goods or services to, individuals or organizations so designated;offense and

(b)    defrauding the United States, including the U.S. Department of the Treasury, by knowingly targeted to injure Plaintiffs and willfully, directly and indirectly, interfering with and obstructing lawful government functions, that is, the enforcement of laws and regulations prohibiting the export and supply of goods from and to Iran, without authorization or a license, by deceit, craft, trickery, and dishonest means, in violation of Title 18, United States Code, Section 371; and

(c)    committing offenses against the United States, by knowingly and willfully, directly and indirectly, exporting, attempting to export, conspiring to export, or causing to be exported, oil to Iran, without obtaining the required license or other written authorization from the U.S. Department of the Treasury, in violation 18 U.S.C. § 371 (conspiracy to defraud the United States, including the U.S. Department of the Treasury), 50 U.S.C. §§ 1701-1706 (the International Emergency Economic Powers Act, or "JEEP A"), and 31 C.F.R. Part 560 (the Iranian Transactions and Sanctions Regulations, or "ITSRs").

.  In furtherance711.  The goals of the conspiracy by Defendant Masrour Barzani, his agents and representatives and their co-conspirators were:

(a)    conduct oil sales transactions with the IRGC, an entity of the Government of Iran, without a required license from OFAC;

(b)    conduct sales of spare parts and other materials and to entities in Iran, without a required license from OFAC;

(c)    to receive financial profits and other benefits without the required license from OFAC;

(d)    to conceal from U.S. persons and mislead the U.S. government, including OFAC, regarding the end user, use, and destination of oil and oil revenues shipped to or from Iran without the required license from OFAC; and

(e)    to evade and cause others to evade or violate the regulations, prohibitions, and licensing requirements of IEEPA and the ITSRs.

Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani and their agents and representatives, and Barzani family members including those by marriage, by violating U.S. anti-terrorism laws and sanctions, and conspiring with Iranian sponsors of terrorism, have significantly enriched themselves and obtained substantial resources enabling them to harm Plaintiffs.

712.    It was a calculated part of the conspiracy and scheme of Defendants Masoud Barzani Masrour Barzani, and Waysi Barzani, and their subordinate agents and representatives, including Barzani family members and family members by marriage, to knowingly and willfully conspire, deceive, defraud, and violate IEEPA to enrich the earnings of the Barzani Continuing Criminal Enterprise, all to the harm, detriment, and injury of Plaintiffs and the people of Iraqi Kurdistan.

713.    Prior to the U.S. State Department designating the IRGC as a foreign terrorist organization (FTO) in April 2019, the U.S. Department of the Treasury, a department within the Executive Branch of the United States government, designated the IRGC QF as an FTO and designated former IRGC-QF Commander Qassim Soleimani as a Specially Designated Global Terrorist, in October 2007; and the U.S. Department of the Treasury also sanctioned current IRGC-QF Commander Esmail Ghani as a Specially Designated Global Terrorist in March 2012. The Barzani Continuing Criminal Enterprise was doing business with, and receiving substantial money, from unlawful trade with the IRGC long before U.S. State Department FTO designation in April, 2019

— providing illicit resources for the Barzani Continuing Criminal Enterprise to damage and harm Plaintiffs.

**Production and Distribution of Counterfeit United States Pharmaceuticals**

714.   The Barzani Continuing Criminal Enterprise, with the intent to deceive and defraud, operates an unlawful network trading in counterfeiting of pharmaceuticals and medications owned by corporations licensed in the United States.

715.   In its *Counterfeit Pharmaceutical Inter-Agency Working Group Report* to the Vice President of the United States and to Congress, the Inter-Agency Working Group reported:

> *"Counterfeit medicines use a falsified mark in connection with a genuine medication with the intent to deceive consumers. Subsequently, counterfeit medicines have not undergone regulatory review and thus must be considered substandard. ...They pose a significant and growing threat to health at both the individual and the community levels, potentially causing treatment failure or death and contribution to increased anti-microbial resistance. ...they are a global health problem."*

716.   The Barzani Continuing Criminal Enterprise counterfeit medications, dangerous to public health, have not been tested by any government agency for safety, efficacy, content, or quality.

717.   The pharmaceutical counterfeiting by the Barzani Continuing Criminal Enterprise, including Defendant Jawhau Salin who manages counterfeiting of pharmaceuticals, knowingly violates U.S. trade laws, regulations, agreements, and intellectual property rights, and undermines and impairs trusted medicine supply chains, and knowingly and intentionally thereby defrauds and deprives U.S. license holders and product manufacturers of substantial revenue, earnings, and profits for shareowners — profit that has been diverted to the Barzani Continuing Criminal Enterprise to fund its operations that damage and harm Plaintiffs.

718.   Counterfeit pharmaceuticals, with active pharmaceutical and drug formulation ingredients, are substandard and unapproved medicines and present significant health and safety concerns.

719.   Iraq has been a member nation of the World Customs Organization ("WCO") since June 6, 1990.  Its mission includes "to develop international standards and to protect society and to secure a fair revenue collection."  The Barzani criminal counterfeiting operation, operating under the command and control of Defendants Masoud Barzani, Mansour Barzani, and Waysi Barzani, is in clear and knowing and purposeful contravention of each of these principles and standards.

720.   The Barzani Continuing Criminal Enterprise produces, markets, and distributes a large volume of counterfeit U.S. pharmaceuticals and medications that, according to Confidential Human Source #8, who has direct clandestine access to senior ranking Defendant Iraqi Kurdistan Regional Government officials, comprise a substantial part of the minimum U.S. $20,000,000 per month pharmaceutical counterfeiting revenue that funds the Barzani Continuing Criminal Enterprise operations that damage and harm Plaintiffs.

721.   The principal pharmaceuticals, counterfeited by the Barzani Continuing Criminal Enterprise are only legally manufactured by Pfizer Inc., an American multinational pharmaceutical and biotechnology corporation headquartered in New York City, and publicly owned by millions of shareowners — each of whom are financially damaged by the Barzani Continuing Criminal Enterprise.

722.   Legitimate Pfizer pharmaceuticals are manufactured for distribution and prescribed use in Turkey and cannot legally be exported from Turkey.  In addition to its own counterfeit Pfizer products, the Barzani Continuing Criminal Enterprise, directed by Defendant Masrour Barzani and operated by Defendants Shimal Jawhar Salin and Sarwar Pedawi, illegally and without license exports legitimate Pfizer pharmaceuticals from Turkey to Erbil, Kurdistan, Iraq where it markets and distributes them — with intent to deceive and defraud and with knowledge that Pfizer products

are prohibited for sale outside of Turkey.  These unlawful actions by the Barzani Continuing Criminal Enterprise deprives Pfizer of sales revenue.  The Barzani Continuing Criminal Enterprise actions deprive Pfizer shareowners of earnings and share value, and provide the Barzani Continuing Criminal Enterprise with the means to fund its operations that damage and harm Plaintiffs, including paying the costs of hit men to murder and sow fear, which is not imaginary nor wholly speculative, in anyone in partisan or political opposition to the Barzani Continuing Criminal Enterprise.

723.   Defendants Masrour Barzani, Waysi Barzani, and their agents and representatives, including Barzani family members, know and have full knowledge that no entity or person of the Barzani Continuing Criminal Enterprise is licensed by Pfizer, Inc. or any subsidiary or any related entity thereof.

724.   Another U.S. pharmaceutical counterfeited by the Barzani Continuing Criminal Enterprise, with the intent to deceive and defraud, is Eli Lilly medicines.   The procedure to profit from counterfeiting Lilly medicines is essentially the same as that for Pfizer. These unlawful activities also fund the Barzani Continuing Criminal Enterprise to provide the means to damage and harm Plaintiffs.

725.   Defendants Masrour Barzani, Waysi Barzani, and their agents and representatives, including Barzani family members and family members by marriage, know and have full knowledge that no entity or person of the Barzani Continuing Criminal Enterprise is licensed by Eli Lilly and Company or any subsidiary or any related entity thereof.

726.   The largest source of illegal drug revenue for the Barzani Continuing Criminal Enterprise, according to Confidential Human Source #8, who has direct clandestine access to senior ranking officials of the Defendant Iraqi Kurdistan Regional Government, is crystal meth and cocaine. The cocaine is unlawfully imported and distributed principally to Europe and Asia.   The Barzani

Continuing Criminal Enterprise partners with international drug cartels and the IRGC to obtain cocaine, and manufacture crystal meth. In the business association with the IRGC and international drug cartels, the IRGC is the lead member because of Iran's desperate need for cash. Defendant Masrour Barzani manages the illegal drug operation through the intelligence agency of the Defendant Iraqi Kurdistan Regional Government, which is controlled by the Barzani Continuing Criminal Enterprise. Raw material of Sudafed is imported from China and India in blister packaging. In Erbil, the capital city of the Defendant Iraqi Kurdistan Regional Government, the Sudafed is taken out of the blister packs and shipped in bulk to Iran for chemical processing. The product comes back to Erbil as meth and is then distributed to world markets, principally Europe and Asia. Under the direct control and command of Defendant Masrour Barzani, Defendant Sihad Barzani manages the crystal meth and cocaine operation for the Barzani Continuing Criminal Enterprise. Profits from the crystal meth and cocaine operation provide a substantial part of the revenue that enables the Barzani Continuing Criminal Enterprise to damage and harm Plaintiffs.

**Production and Distribution of Counterfeit U.S. Brand Cigarettes**

727. Counterfeiting of U.S. brand cigarettes is a substantial financial component of the Barzani/STER counterfeiting business, directed principally by Defendant Masrour Barzani, with intent to deceive and defraud, frequently in partnership with Defendant Nizar Hanna Nasri, and managed by Defendants Shimal Jawhar Salin, Sarwar Pedawi, Ghafoor Knosnaw, Saad Aldoski, Blend Aldoski, and others. The largest volume product is counterfeit Marlboro cigarettes, a U.S. cigarette brand owned and manufactured by Philip Morris USA (a branch of Altria) within the United States and by Philip Morris International (now separate from Altria) outside the United States.

567

728. The counterfeiting scheme operated by the Barzani Continuing Criminal Enterprise had and has a direct, substantial, and reasonably foreseeable effect on U.S. export trade and commerce, and to the harm of American national economic interests, to shareowners, corporate earnings, and harms the Plaintiffs by providing substantial funds to the BCCE to support its worldwide regime of murder, torture, and terror.

729. Cigarette counterfeiting as part of the Barzani Continuing Criminal Enterprise, according to Confidential Human Source #8, who has direct clandestine access to senior ranking Defendant Iraqi Kurdistan Regional Government officials. The counterfeiting is operated from a covert production facility in the marketplace city of Zakho, at the center of the eponymous Zakho District of the Duhok Governorate, located a few kilometers from the Iraq-Turkey border. The Barzani Continuing Criminal Enterprise controls the entire operation and counterfeit cigarettes are then sold throughout Iraq, providing substantial means to the Barzani Continuing Criminal Enterprise to harm Plaintiffs.

730. The raw material tobacco used by the Barzani Continuing Criminal Enterprise is sourced globally and meets no U.S. tobacco production or health standards and no standards of Philip Morris USA and/or Philip Morris International.

731. Defendants Masrour Barzani, Waysi Barzani, Ghafoor Khoshnaw, and their agents and representatives, including Barzani family members and family members by marriage, know and have full knowledge that no entity or person of the Barzani Continuing Criminal Enterprise is licensed by Philip Morris USA or Philip Morris International or Altria Group Inc. or any subsidiary or any related entity thereof.

732. Through the Barzani Continuing Criminal Enterprise and its illegal terrorist organization collaborators, the Barzani Continuing Criminal Enterprise is funding terrorists directly and indirectly. This collaboration with terrorists facilitates the harm to Plaintiffs and others. In

testimony to the U.S. Congress, the U.S. Department of Justice, in the section "Narcotics Trafficking, Gun Running and Terrorism are Supported by Cigarette Smuggling", declared:

> *"Current investigations have identified instances of terrorist groups forming alliances with tobacco traffickers to generate monies used to support their organizations and activities."*

the 733. Key findings of the U.S. Government Accounting Office, an agency of the United States Government, in its report *Terrorist Financing – U.S. Agencies Should Systematically Assess Terrorists' Use of Alternative Financing Mechanisms* include:

> *"Cigarette Smuggling Finances Terrorism."*
>
> *"Terrorists have earned assets through the highly profitable illicit trade in cigarettes. According to officials from the ATF, Hizballah, HAMAS, and al Qaeda have earned assets through trafficking in contraband cigarettes or counterfeit cigarette tax stamps."*
>
> *"Terrorist Groups Receive Substantial Funds from Smuggling Cigarettes." "[T]obacco smuggling also provides a lucrative source of funding for terrorists and other criminal organizations."*

The Barzani Continuing Criminal Enterprise is part of the terrorism being financed.

734. Though the Islamic Republic of Iran is not a member nation of the World Trade Organization, it uses counterfeiting and piracy as terms used to describe a range of illicit activities linked to intellectual property rights (IPR) infringement. The Barzani Continuing Criminal Enterprise counterfeiting constitutes infringement and willful infringement of IPRs described in the WTO Agreement on Trade-Related Aspects of Intellectual Property Rights (TRIPS); including trademarks, copyrights, patents, design rights, as well as a number of related rights – all of which are infringed by the Barzani Continuing Criminal Enterprise, are large in scope and magnitude, and fund in substantial part the Barzani Continuing Criminal Enterprise activities that have damaged and harmed Plaintiffs.

**Financial Payments, Bribes, and Inducements**

735.    The United States Supreme Court recognized that "No trustee has more sacred duties than a public official and any scheme to obtain an advantage by corrupting such an one must in the federal law be considered a scheme to defraud." "A scheme to get a public contract on more favorable terms than would likely be got otherwise by bribing a public official would not only be a plan to commit the crime of bribery, but would also be a scheme to defraud the public." *See Hammerschmidt v. United States*, 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed 968 (1924). Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, their agents and representatives, and Barzani family members and family members by marriage, have knowingly, willfully, wantonly, and repeatedly violated and besmirched their "sacred duties" as public officials and corruptly schemed to obtain advantage from U.S. officials and solicited violation of oath by public officers, thereby defrauding the American public to enrich themselves and harm Plaintiffs.

736.    To harm Plaintiffs, the Barzani Continuing Criminal Enterprise violates the Foreign Extortion Prevention Act (FEPA) which prohibits conferring any improper advantage in connection with obtaining or retaining business for or with, or directing business to, any person. "Foreign official" is defined broadly to mean (1) any official or employee of a foreign government or any department, agency, or instrumentality thereof; (2) any senior foreign political figure; (3) any official or employee of a public international organization; or (4) any person acting in an official or unofficial capacity for or on behalf of a government, department, agency, instrumentality, or a public international organization.   FEPA includes people acting in an "unofficial capacity" and "any senior foreign political figure" including an official's close associates and immediate family members.   Defendants U.S. Public Official #1 and US. Public

Official #2 and other employees and representatives of the United States  substantially benefited from knowing and willful violations of the FEPA by Defendants.

737.    Concurrently according to Confidential Human Sources #1 and #5, who have direct clandestine access to senior ranking Defendant Iraqi Kurdistan Regional Government officials, with respect to U.S. contracts and decisions and to improperly pressure and induce and influence U.S. officials, for corrupt purposes, to breach their official duties, and under color of official right, to deprive the American public of their intangible right to Public Officials' honest services, in furtherance of the conspiracy and to effect its illegal object thereof, the following illegalovert acts, among others, were committed and caused to be committed: Bribes and other inducements and favors of value, directly or indirectly, are and were paid to Defendants U.S. Public Official #1 and Public Official #2. They were two of many U.S. officials who were bribed and co-opted by the Barzani Continuing Criminal Enterprise, and who each and jointly possessed non-public information and substantial influence over U.S. Government and Coalition Provisional Authority decisions, including contracts, in the strategically important relationship between the United States and the Republic of Iraqin the District of Columbia and elsewhere.

738.    The U.S. officials bribed by the Barzani Continuing Criminal Enterprise were assigned to and possessed influence over the Coalition Provisional Authority, an instrumentality of the United States and having U.S. Government authority for procurement services, including but not limited to, acquisition planning, contract negotiations, cost and price analysis, and contract administration and possessing influence over, among other things, and including providing truthful analytical counsel and recommendations to the President of the United States, the U.S. national security hierarchy, and the U.S. Congress, regarding decisions to provide foreign military sales, foreign

~~military financing, and other United States and allied aid or support to or for the benefit of the Iraqi Kurdistan Regional Government.~~

576.    To create the appearance of transparency, good governance, and qualification, and as part of their deceptive scheme, Defendants Masrour Barzani, Mustafa Barzani, Jonathon Moore, Valerie Cupp, Juli Mai Sanford, Laura Geho Harris, and Rubar Sandi did corruptly alter and suppress documents, conceal records and information, and by use of means and the instrumentalities of interstate commerce and the mails, did provide false information to the United States Government for use in official proceedings, and took additional steps to conceal, and provide false and misleading statements (publicly and privately) and material omissions for the purposes of obstructing, influencing, and interfering with U.S. Government action or secure improper advantage.

577.    Defendants Masrour Barzani, Waysi Barzani, Muksi Barzani, Mulla 'Babo' Mustafa Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani, Areen Masrour Barzani, Jonathon S. Moore, Joe R. Reeder, Valerie Cupp, Juli Mai Sanford, Laura Geho Harris, and Rubar Sandi did knowingly combine, conspire, confederate, and agree with co-conspirators, known and unknown, to defraud the United States by using dishonesty, fraud, and deceit to impair, obstruct, and defeat lawful federal government functions, all in violation of 18 U.S.C. § 371.

578.    Defendants Masrour Barzani, Waysi Barzani, Muksi Barzani, Mulla 'Babo' Mustafa Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani, Areen Masrour Barzani, Jonathon S. Moore, Joe R. Reeder, Valerie Cupp, Juli Mai Sanford, Laura Geho Harris, and Rubar Sandi have been involved in a scheme and intent to defraud and have willfully participated in the scheme to defraud with actual knowledge of its fraudulent nature and with specific intent to defraud; could have reasonably foreseen that the Internet and other electronic facilities to carry out the fraudulent

scheme would be used; and actually used interstate wires to further Defendants' scheme to conceal their ongoing fraudulent activities.

### A.    Defendants Create Multitudinous Sham Corporations

579.    As part of the BCE to provide the means to injure Plaintiffs, multitudinous sham shell corporations, established both domestically and abroad, managed by Defendants Moore, Reeder, Cupp, Geho, Harris, and others, were used for the ultimate benefit of Defendants Masrour Barzani, Waysi Barzani, Muksi Barzani, Mulla 'Babo" Mustafa Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani, Areen Masrour Barzani, Jonathon S. Moore, Joe R. Reeder, Valerie Cupp, Juli Mai Sanford, Laura Geho Harris, and Rubar Sandi to launder and "clean" tens of millions of dollars, thereby compromising the lawful purposes of agencies of the United States Government, and enriching their unlawfully and purposefully concealed and secreted beneficial owners.  To this end hundreds of fraudulent documents were filed by Defendants Moore, Cupp, Geho, Harris, and others with various government and banking officials.

### B.    Defendants Defraud Programs Receiving U.S. Federal Funds

### (1)    Defendants' False Information and Claims to the United States Government

580.    Presently, of the Iraq Government's current monthly budget distribution of approximately $350 million to KRG, the federal Iraq Government is deducting amounts to repay depositors who Barzani's have not repaid.  Because of their many types of privileges and other unearned advantages of the seat of power and money in Kurdistan, and having mastered the tools of authority and with a recurrently repeated claim (albeit disputed) of elite tribal superiority and entitlement, and using the proceeds of their  criminal enterprise to consolidate control, privilege, and dominance, Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, as the leaders of BCE, and those in their innermost circle,  Defendants, acting as individuals with and for them, by facilitating criminal actions of Defendants and manipulating the apparatus of KRG for personal,

non-governmental, non-official purposes and by exercising political clout and raw power to evade or finesse jeopardy, by repeatedly and widely disseminating, including in official submissions to the Departments of Justice and State, the executive office of the President and Members of the United States Congress, false information and claims in the United States and worldwide to create the appearance of legitimacy and by falsely portraying to have no knowledge of or responsibility for innumerable heinous acts, have escaped serious and meaningful consequences and evaded legal accountability and tangible legal consequences for their decades-long crime spree which includes a conspiracy to harm Plaintiffs, and American national security, defense, and economic interests.

(2)    Defendants' 739.    U.S. federal regulations prohibit executive branch employees from accepting gifts.  Pursuant to Title 5, Section 2635.202 of the Code of Federal Regulations and to other titles, federal employees shall not directly or indirectly solicit or accept a gift that is either (1) from a prohibited source or (2) given because of the employee's position.  A "gift" includes any gratuity, favor, discount, entertainment, hospitality, loan, forbearance, or other item having monetary value.

740.    Under 5 U.S.C. § 7342, federal employees are prohibited from receiving gifts above a "minimal value" as prescribed by regulations, from a "foreign government", a term that includes "any agent or representative" thereof.  Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani are officials of a "foreign government" for purposes of 5 U.S.C. § 7342.

741.    Defendants U.S. Public Officials #1 and #2 conspired with Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani to fraudulently hide their close and continuing financial connections, as well as gifts, monies, and services provided to Defendants U.S. Public Officials #1 and #2 as part of and in furtherance of the scheme to financially benefit the co-conspirators of the Barzani Continuing Criminal Enterprise and their own personal enrichment and gratification, and to harm Plaintiffs.

742.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani did enter into a conspiracy and did engage in a corrupt relationship to commit bribery and honest services fraud, and corruptly give, offer, and promise something of value to Defendants U.S. Public Officials #1 and #2, with intent to influence an official act, and induce the employees to do acts in violation and breach of the lawful duty of such employees, in violation of Title 18, United States Code, Section 201(b)(l)(A) & (C) and 2.).    The purpose of the conspiracy was for Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani and their co-conspirators, agents, and representatives, to enrich themselves by paying bribes in the form of a complex series of cash payments, lucrative real property concessions, oil and gas concessions, and other non-cash inducements, favors, and favoritism, privilege and improper advantage, and other things of value, to Defendants U.S. Public Officials #1 and #2, who intended to be influenced and rewarded in connection with a business, transaction, and series of transactions, in exchange for Defendants U.S. Public Officials #l's and #2's agreement, assistance, and use of their official positions and official authority and influence to make false and misleading representations and grant favorable and discriminatory treatment of and special consideration to, including but not limited to, their business and energy interests and transactions with agencies and instrumentalities of the United States Government.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, assisted by their co-conspirator agents and representatives – and Barzani family members and family members by marriage, carried out the conspiracy through the following manner and means, among others, in pursuit of their private illicit financial interests:

(a)    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani coordinated in preparing and submitting inflated bids for U.S. Government contracts to create a false appearance of competitive bidding.

(b)    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani paid bribes for the contracts that Defendants U.S. Public Officials #1 and #2 awarded to their commercial interests.

(c)      Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani met with Defendants U.S. Public Official #1 and paid him a bribe in exchange for receiving a specific contract for which Barzani interests had submitted inflated bids.

(d)      Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani concealed the conspiracy by, among other things, demanding Defendants U.S. Public Officials #1 and #2 conceal and keep secret their payment of bribes and inducements, and Defendants U.S. Public Officials #1 and #2 did conceal the nature and purpose of the scheme and artifice to defraud.

**Corruption of U.S. Public Officials to Further Schemes of Barzani Continuing Criminal Enterprise**

743.   In furtherance of the conspiracy, and to effect its objects and purposes, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, assisted by their co-conspirator agents and representatives and Barzani family members and family members by marriage, committed the following overt acts, in furtherance of the Barzani Continuing Criminal Enterprise, among others, and Defendants U.S. Public Official #1 and U.S. Public Official #2 acting in willful and knowing concert with them, while each a public official of the United States military and government, did corruptly give, offer, scheme, and promise something of value to public officials, directly or indirectly, with intent to influence an official act, in violation of Title 18, United States Code, Section 201(b)(l)(A) & (C); these actions by Defendants aided and abetted the harm which was done to Plaintiffs.

744.   Defendants U.S. Public Official #1 and U.S. Public Official #2, were and are, as are all employees of the United States Government, prohibited from soliciting or accepting anything of value from a person . . . whose interests may be substantially affected by the performance or nonperformance of the individual's official duties." 5 U. S. C. § 7353(a)(2).  Further, at the times relevant, Defendants U.S. Public Official #1 and U.S. Public Official #2 each received periodic

intelligence and counterintelligence training and briefings that detailed their obligations to, among other things, complete a Foreign Contact Report after any contact with a person he or she "knows or suspects is a member of a foreign intelligence agency." Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani were "member(s) of a foreign intelligence agency," a fact known to Defendants U.S. Public Officials#1 and #2 who failed to submit such mandatory reports.

745. Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani and their agents and representatives both known and unknown, including Barzani family members and family members by marriage, did knowingly and willfully conspire and corruptly give, offer, and promise something of value to and did engage in a corrupt relationship with Defendants U.S. Public Officials #1 and #2 with the intent to influence official acts and to induce Defendants U.S. Public Officials #1 and #2 to do and to omit acts in violation of Defendants U.S. Public Official #1's and #2's lawful and official duties, and the conspirators would and did conceal Defendants U.S. Public Officials #1's and #2's involvement; that is, Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their agents and representatives, did corruptly commit acts in furtherance of an offer, payment, promise to pay, and authorize the payment of any money, offer, gift, promise to give, and authorize of the giving of anything of value, and offered and gave Defendants U.S. Public Officials #1 and #2, directly and indirectly, money, concessions, real property oil and gas rights, and interests in real property oil and gas rights, and residential housing, and other things of value, for influencing acts and decisions of Defendants U.S. Public Officials #1 and #2 in the performance of official acts and to induce Defendants U.S. Public Officials #1 and #2 to do and omit to do acts in violation of the lawful duty of such officials and to violate lawful and official duties to the United States Government in awarding contracts and favors to the Barzani Continuing Criminal Enterprise and their partners and co-conspirators—all of which acts provided means for Defendants to damage and harm Plaintiffs.

746. Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their agents and representatives, known and unknown, including Barzani family members and family members by marriage, and Defendants U.S. Public Officials #1 and #2, being senior public officials of the United States Government who compromised to act against the United States Government's best interests, directly and indirectly, knowingly and corruptly did combine, conspire, confederate, and agree together and with each other to engage in bribery, and did demand, seek, receive, accept, and agree to receive and accept anything of value personally and for any other person and entity, in return for being influenced in the performance of an official act(s), in violation of 18 U.S.C. § 201(b)(2), and did devise and intend to devise a scheme and artifice to defraud and deprive the United States Government and the citizens of the United States of their intangible right to the honest services of Defendants U.S. Public Officials #1 and #2 through bribery, and to cause wire communications to be transmitted in interstate and foreign commerce for the purpose of executing such scheme, in violation of 18 U.S.C. §§ 1343 and 1346 — all of which acts contributed to the success of the Barzani Continuing Criminal Enterprise to the damage and harm of Plaintiffs.

747. Defendants Masoud Barzani, Mansour Barzani, Waysi Barzani, and their co-conspirator agents and representatives, known and unknown, including Barzani family members and family members by marriage, willfully conspired and agreed with others and did engage in a corrupt relationship to corruptly provide millions of dollars in payments or real property, mineral, and energy concessions of very high value worth millions of dollars, to, and for the benefit of, Defendants U.S. Public Officials #1 and #2, and others, to secure an improper advantage and to influence those public officials in order to obtain and retain unlawful financial, policy, and contractual favoritism.

748. Under the command and control of Defendants Masoud Barzani, Mansour Barzani, and Waysi Barzani, and their agents and representatives, including Barzani family members and family

members by marriage, enormous amounts of American taxpayer dollars disappeared into this web of corrupt contractors and subcontractors, which permitted Defendants to harm Plaintiffs.

749. Under the command and control of Defendants Masoud Barzani, Mansour Barzani, and Waysi Barzani, and their co-conspirator agents and representatives, including Barzani family members and family members by marriage, and facilitated by Defendants U.S. Public Official #1 and U.S. Public Official #2, and others known and unknown, the Barzani Continuing Criminal Enterprise global scheme relied on a litany of criminal tactics, including but not limited to: (a) fraudulent reports that concealed corrupt relationships; (b) sham contracts used to corruptly route value to illicit recipients; (c) fake invoices used to further conceal corrupt payments; (d) the creation, maintenance, and use of off-the-books slush funds to make corrupt payments; (e) deliberate mischaracterization of corruption-related expenses including as being related to "travel," "consulting," "supply costs," "material consumption," "customer service," "cost of sales," "entitlements," "settlements," and "marketing and sales support"; (f) willful failure to implement internal controls necessary to prevent corrupt payments; and (g) the improper recording of corrupt payments on books and records, which were frequently submitted to agencies of the U.S. Government and the Coalition Provisional Authority.

750. The purpose of the conspiracy was: (a) to engage in a corrupt relationship with and use Defendants U.S. Public Officials #1's and #2 official position as senior United States military officers to benefit and enrich the Barzani Continuing Criminal Enterprise; (b) to defraud the United States Government and the citizens of the United States and senior Coalition Provisional Authority—Iraq officers and specialists; (c) to conceal the nature and purpose of the scheme and artifice to defraud; and (d) to induce and convince Defendants U.S. Public Officials #1 and #2 and others to misuse their public offices for personal gain, to the harm of U.S. taxpayers, with the desired and successful result of providing the means to harm and damage Plaintiffs.

751.    During the multi-year period when Defendants U.S. Public Officials #1 and #2 and others were aiding and abetting in furtherance of unlawful activity and receiving cash payments and no-cash grants and concessions of significant value from the Barzani Continuing Criminal Enterprise, Defendants U.S. Public Officials #1 and #2 supervised, negotiated, administered, and made decisions and recommendations on United States Government and Defendant Iraqi Kurdistan Regional Government contracts and benefits awarded to the Barzani Continuing Criminal Enterprise and its business partners.    Defendants U.S. Public Officials #1 and #2, and others, purportedly acting in their official capacities but actually acting *ultra vires*, routinely communicated and met with Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and co-conspirator representatives of Barzani Continuing Criminal Enterprise's business partners and associates, including Barzani family members and family members by marriage, and signed, recommended, administered, authorized, and supervised numerous contract awards and contract modifications and policy positions, which awarded millions of dollars to the Barzani Continuing Criminal Enterprise and its business partners.

752.    Defendants U.S. Public Officials #1 and #2, being public officials of the United States, directly and indirectly, knowingly, corruptly, and as part of the criminal conspiracy conduct, did demand, seek, receive, and accept, and agree to receive and accept anything of value personally or for another person and entity—specifically a stream of cash payments from the Barzani Continuing Criminal Enterprise and substantial oil drilling concessions and plats of real property land oil and gas rights and interest in real property oil and gas rights and residential housing "on the Hill" [the elite residential area where the Barzani Defendants live in Erbil, Kurdistan, Iraq]—in return for Defendants U.S. Public Officials #1 and #2 and others being influenced in the performance of official acts or for being induced to do an act and omit to do an act in violation of his/their official duties, specifically a series of official acts relating to procurements and contracts for the purpose

of benefiting the Barzani Continuing Criminal Enterprise and its business interests—all of which enabling actions to the Barzani Continuing Criminal Enterprise provided means for Defendants to damage and harm Plaintiffs.

753.    In reports to superior officers and officials of the United State Government, Defendants U.S. Public Officials #1 and #2, and others, each had a duty and were required by Policy Directives and policy generally, and as holders of U.S. national security clearances, to report accurate and complete information of financial assets, liabilities, and income, and did falsely, conceal, and cover up conceal by trick, scheme, and device material facts and consistently hid aspects and nature of their corrupt relationship with Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their co-conspirator agents and representatives, and their private interests. They knowingly (a) did not report any unexplained sources of income; (b) declared they had not engaged in any deceptive, illegal, or irresponsible financial practices; (c) had not been involved in any crime, and had not associated with anyone involved in illegal activities to his knowledge; (d) had not deliberately omitted, concealed, or falsified relevant and material facts from any personnel security questionnaire, personal history statement, or similar form used to conduct investigations, determine employment qualifications, award benefits or status, determine security clearance eligibility or trustworthiness or award fiduciary responsibilities; (e) had not deliberately provided false or misleading information concerning relevant and material matters to an investigator in connection with a personnel security or trustworthiness determination; (f) had not engaged in personal conduct or concealment of information that may increase vulnerability to coercion, exploitation or duress such as engaging in activities which, if known, may affect their personal, profession, or community standing or render them to be susceptible to blackmail; and (g) has not had association with any person, group or business venture that could be used, even unfairly, to criticize, impugn, or attack their character or qualifications for a government position. These

statements and representations were materially false because, as Defendants U.S. Public Officials #1 and #2 and others then and there knew, they were receiving cash payments and valuable oil and real property concessions from Defendants Masoud Barzani, Masrour Barzani, their representatives, and the Barzani Continuing Criminal Enterprise in exchange for preferential treatment concerning United States Government contracts awarded to Barzani's companies and business partners, contemporaneous with the time period of the Barzani Continuing Criminal Enterprise.

754.    Defendants U.S. Public Official #1, in his official duties, charged with the safekeeping, transfer, or disbursement of public money, free from deceit, craft, trickery, corruption and dishonest means, who without authority of law further engaged in criminal misconduct in apparent and actual conflict with his official and lawful duties, by impairing, impeding, and obstructing the lawful functions of the United States Army and the United States Department of Defense and U.S. foreign military assistance programs free from deceit, craft, trickery, corruption and dishonest means, in concert with Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, known officials of a foreign government, and co-conspirator agents and representatives of the Barzani Continuing Criminal Enterprise, including Barzani family members and family members by marriage, by knowingly, willingly, and unlawfully disguising the bribes in the form of facially legitimate transactions.  Defendant U.S. Public Official #1 committed the overt illegal acts of soliciting and accepting kickbacks by charging fees of as much as $10,000 to numerous American and international businesses to obtain appointments, meetings, and conferences with representatives of the Defendant Iraqi Kurdistan Regional Government and the Barzani regime, and to secure improper advantage and to influence acts and decisions of such government and agencies and instrumentalities.  Defendant U.S. Public Official #1 corruptly accepted and agreed to accept cash payments and things of value, and did perform and attempt to perform acts to carry

on and facilitate the promotion and carrying on of said unlawful activities, and concealed criminal conduct, corrupt payments, and evidence, and failed to disclose such income as required, and misrepresented and concealed facts from his superiors and subordinates, all in breach of the official's fiduciary duty, by means of materially false and fraudulent pretenses, representations, and promises, and by means of omission and concealment of material facts of facially legitimate transactions.  In violation of Title 18, United States Code, Section 371.

755.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their co-conspirator agents and representatives, including Barzani family members and family members by marriage, knew the United States Government operated and operates in Iraqi Kurdistan with a limited number of qualified contracting officers who had a vast network of contracts to supervise. Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their co-conspirator agents and representatives, including Barzani family members and family members by marriage, knew the United States government lacked the resources to investigate every payment made by Defendants or their subcontractors.  Defendants were thereby able to exploit those resource constraints to conceal their unlawful and illegitimate conduct from U.S. government personnel, when Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani should have been the ones to flag such issues for the agencies funding their projects with U.S. taxpayer money.

756.    Defendants, as recipients and beneficiaries of U.S. monetary and resource assistance, had and have a duty to ensure that funds acquired from the U.S. Government do not end up supporting terrorist activity, and the resources, expertise, and obligation to ensure that their practices did not materially support al Qaeda, al Qaeda in Iraq, or Islamic State.  Defendants did just the opposite as they enriched themselves through the Barzani Continuing Criminal Enterprise, allowing them to the harm of the Plaintiffs.

757.   Defendants actively and fraudulently concealed these violations to cloak their illegal activities.  Defendants fraudulently concealed their illegal activities, as alleged herein, by, inter alia, making false and misleading entries on their books and records, fashioning deliberately deficient internal controls and accounting systems, filing false and/or misleading documents with the U.S. government, and issuing false press releases, reports, and other statements concerning, inter alia, their compliance program, all of which actions made and makes possible the continuing operation of the Barzani Continuing Criminal Enterprise to harm Plaintiffs.

758.   Defendants' affirmative actions as alleged herein, including by their Washington, D.C. agents, representatives, and advisors, were wrongfully concealed and carried out in a manner that was intended to, and did, preclude detection; allowing the Barzani Continuing Criminal Enterprise to harm Plaintiffs in the past and to continue to harm Plaintiffs to the present time.

## THEFT CONCERNING PROGRAMS RECEIVING U.S. FEDERAL FUNDS

759.   **Theft** concerning **of U.S. Federal Funds**

581.   To enrich themselves and fund their tortious acts against Plaintiffs, theft from programs receiving U.S. federal funds is yet another BCE criminal scheme and conspiracy of extraordinary monetary magnitude, and in direct criminal opposition to the interests and national security of the United States.  To enrich themselves and fund their criminal acts against Plaintiffs, Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their co-conspirator agents and representatives known and unknown, including Barzani family members and family members by marriage, with the intent to deceive and defraud, entered into an agreement to defraud the United States and to obstruct the lawful functions of its agencies by deceitful and dishonest means, have willfully, knowingly, and voluntarily perpetuated a theft structure, plan, and scheme, and did knowingly and willfully, directly and indirectly, commit and cause to be committed offenses and

acts, against the United States Government and its agencies including but not limited to the U.S. Agency for International Development, the ~~U.S.~~ Department of State, and the ~~U.S.~~ Department of Defense and its military service branches, and knowingly obtained or attempted to obtain a benefit from the United States Government by means of false and fraudulent pretenses, representations, promises, or material omissions and with the intent to deprive the United States Government of such services with an aggregate value of more than $1 billion.

~~760~~582.     It was a purpose of the conspiracy for Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani to enrich themselves by embezzling, stealing, obtaining by fraud, and otherwise without authority knowingly converting to the use of any person other than the rightful owner and intentionally misapplying property and money that was owned by the United States Government or the ~~Defendant Iraqi Kurdistan Regional Government.~~KRG.    This property and money was under the care, custody, and control of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani in their official positions, and was without legal authority or statute stolen by them to enrich the ~~Barzani Continuing Criminal Enterprise~~BCE, which actions provided the means and enabled the ~~Barzani Continuing Criminal Enterprise~~BCE to ~~harm~~injure Plaintiffs.

### ~~761~~(3) Defendants' Theft of U.S. Foreign Military Assistance and Other U.S. Assistance

583.     As integral and indispensable to the ~~Barzani Continuing Criminal Enterprise~~BCE, the ~~Defendant Iraqi Kurdistan Regional Government~~KRG Peshmerga ~~(military), formally under the command of the Defendant Iraqi Kurdistan Regional Government's Ministry of Peshmerga Affairs and its subordinate employees and agents, but while in reality the Peshmerga force itself,~~ has become the armed unofficial standing army of ~~the Defendant Iraqi Kurdistan Regional Government~~KRG, commanded by Defendant Masrour Barzani.  Confidential Human Source #1, who has direct clandestine access to senior ~~ranking Defendant Iraqi Kurdistan Regional Government~~KRG officials, states that Defendants Masrour Barzani and Waysi Barzani treat the

Peshmerga as personal enforcers; and have engaged the services of Azhi Amin, a former member of an Al Qaeda affiliate, a designated foreign terrorist organizationFTO, a fact well known to Defendants Masrour Barzani and Waysi Barzani.  Aziz Amin now holds a Peshmerga command position directed by Defendants Masrour Barzani and Waysi Barzani to direct a substantial part of their criminally violent tortious acts against Plaintiffs.

762584.    During the period of operation of the Barzani Continuing Criminal Enterprise, the Defendant Iraqi Kurdistan Regional GovernmentBCE, KRG has received in excess of two billion dollars through the U.S. Government's Agency for International Development and its American Foreign Military Sales (FMS) and Foreign Military Assistance (FMA) programs, and other programs of the United States of America.    The Defendant Iraqi Kurdistan Regional GovernmentKRG has been supplied by the United States with thousands of M16 rifles, dozens of .50-caliber machine guns, more than 100 Humvees and armored vehicles, and dozens of 105 mm howitzers, along with other equipment and spare parts, ammunition, food, pay and medical equipment, among other resources and materiel.  All of these unlawfully diverted resources have been used by the Barzani Continuing Criminal EnterpriseBCE and Defendants to further their criminal and tortious intent and to harminjure the Plaintiffs.

**(4)    Defendants Defraud the U.S. Contracting Process to Harm Plaintiffs**

**(a)    Defendants Defraud Small Business Administration and Defense Logistics Agency**

585.    BCE received millions of dollars from the United States Government in exchange for providing the U.S. military with goods and services through a fraudulent corporation with a fraudulently and deliberately misrepresented ownership.

586.    Defendants Masrour Barzani, Mustafa Barzani, Moore, Cupp, and others, willfully and knowingly engaged in deception by creating and implementing an ownership structure to deceive:

(a) Global Eagle (and sometimes Golden Eagle Global, Inc., a Delaware corporation, EIN 20-5152832, (owned 100% by Defendant Muksi Barzani), Defendant Muksi Barzani managing Member; Golden Eagle Global, Inc; Defendant Mustafa Barzani, President and Director, 3883 Connecticut Avenue NW, #613, Washington. DC., Defendant Cupp President and Vice President; Defendant Mustafa Barzani, Vice President, Defendant Moore Assistant Secretary, a defense contracting firm located in Washington, D.C. and Erbil, Iraq;

(b) Golden Eagle Global, "a Kurdistan company"; Defendant Cupp, Vice President and Secretary;

(c) GEG Kurdistan;

(d) KEG Management, LLC;

(e) GEG Reklam, "a division of GEG");

(f) GEG Construction, Ameer Ahmed, CEO;

(g) Golden Eagle Global Corporation owns GEG (Delaware);

(h) GEGI Management, LLC: (owned 100% by Muksi Barzani); 5335 Wisconsin Avenue, NW, Suite 440, Washington, D.C.;

(i) Golden Eagle Global, 9707 E. Cactus Road, Scottsdale, AZ 85260;

(j) 763GEG LC VE DIS TICARET LTD STI (Switzerland);

(k) GEG Staffing, owned by Golden Eagle Group; Ameer Makkhoul Ahmed, Chief Executive Officer, GEG

587.    Defendants Masrour Barzani, Mustafa Barzani, Moore, and Cupp's fraudulent Golden Eagle motivation was wholly financial. Defendants Masrour Barzani, Mustafa Barzani, Moore and Cupp, and others, engaged in a conspiratorial campaign constituting criminal and tortious acts of BCE. Misleading military and government contracting officials, including the Small Business Administration and the Defense Logistics Agency, a component of the Department of Defense, about its true ownership.

588.    Companies doing business and contracting with the United States Government, including in the instant case at least the Department of Defense, Defense Logistics Agency, and the Small Business Administration, must properly identify any foreign ownership, control, or influence

("FOCI"). In acts of blatant criminality on behalf of the BCE and in furtherance of and as part of its tortious conspiracy, Defendants Masrour Barzani, Mustafa Barzani, Moore, Cupp, and others, knowingly, deliberately, voluntarily, and willfully conspired and took repeated proactive steps to conceal, for entity eligibility determination, the true beneficial ownership of foreign financial accounts and entities, including, for example, Golden Eagle Global, Inc. ("GEG"), represented by Defendants to be owned by Defendant Cupp but not the true beneficial owner, though certified by Defendants Moore and Cupp, and others, who to receive prime and subcontract awards created false bills of sale and ownership transfer documents, and falsely certified with agencies of the U.S. Government as *Economically Disadvantaged Woman Owned Small Business* ("WOSB"), and violated 18 U.S.C. § 1001(a)(3), which makes it a felony to knowingly and willfully make false statements to government agencies, and violated 18 U.S.C. § 371, the federal conspiracy statute.

589.    It was the object of the conspiracy to fraudulently obtain money from the Department of Defense ("DoD") through a fraud scheme. Defendants Masrour Barzani, Mustafa Barzani, Moore, and Cupp caused the creation of front-companies to fraudulently obtain DoD contracts, and caused the incorporation of Golden Eagle to serve as a fraudulent front-company.

590.    In furtherance of the conspiracy, and in violation of the False Claims Act, Defendants Masrour Barzani, Mustafa Barzani, Moore, and Cupp fraudulently misrepresented Cupp and Golden Eagle as businesses eligible and submitted documentation to the Small Business Administration for "Women-Owned Small Business" certification. Based on these false representations, Golden Eagle was granted WOSB certification.

591.    Congress specifically directed that any small business concern that is found to have "misrepresented the status of that concern as a small business concern owned and controlled by women" shall be subject to the penalties set forth in the False Claims Act. 15 U.S.C. § 637(m)(5)(C). Contrary to representations by Defendants Masrour Barzani, Mustafa Barzani,

Moore, and Cupp, and others, no woman ever owned a majority of Golden Eagle.  The claims by Defendants Masrour Barzani, Mustafa Barzani, Moore, and Cupp, and others, that Golden Eagle was a WOSB and that Defendant Cupp owned a majority of the company's stock were false because Golden Eagle was never 51% owned by Defendant Cupp and/or any woman.   Defendant Mustafa Barzani at all times exercised all control and ownership of the company, orchestrated by Defendants Moore and Cupp.

592.    Defendants Masrour Barzani, Mustafa Barzani, Moore, and Cupp, and others, were aware of the requirements for claiming WOSB status, aware Golden Eagle did not meet the statutory requirements, and its officers knowingly, willfully, and fraudulently utilized WOSB status as a contracting advantage.  During the relevant time period which Defendants Masrour Barzani, Mustafa Barzani, Moore, and Cupp, and others, and Golden Eagle misrepresented itself as a WOSB, it fraudulently earned millions of dollars from contracts unlawfully obtained.

593.    Defendant Cupp submitted documents identifying herself as the principal owner, was fraudulently listed as the entity's majority owner, and its primary point of contact ("POC"). As part of this registration, Golden Eagle was assigned a CAGE code so that the company could do business with the DoD electronically.

594.    Defendants Masrour Barzani, Mustafa Barzani, Moore, and Cupp, and others known and unknown, did knowingly and intentionally conspire and agree to devise a scheme and artifice to defraud the Department of Defense and the Small Business Administration, and to obtain money and property, by means of materially false and fraudulent pretenses, representations, and promises, and, for the purpose of executing such scheme and artifice to defraud, did transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, certain writings, signs, signals, and sounds, contrary to 18 U.S.C. § 1343.

595. Defendants knowingly and willfully submitted to federally-insured financial institutions and agencies of the U.S. Government false, misleading, or altered documents as well as material omissions that rendered certain statements misleading or false regarding the beneficial ownership of Golden Eagle.

596. Defendants Masrour Barzani, Mustafa Barzani, Moore, and Cupp agreed to suppress documents, conceal information and provide false information to the United States Government for the purpose of obstructing, influencing, and interfering with the award of government contracts. Part of the fraud and obstruction scheme was to withhold information from the United States Government contracting officers, make certain selective disclosures in connection with contracts, and to conceal the true beneficial ownership of Golden Eagle. Defendants Masrour Barzani, Mustafa Barzani, Moore, and Cupp's failure to disclose the real beneficial owner to the United States Government contracting officers was done intentionally and with full knowledge of all relevant facts.

597. Defendants Masrour Barzani, Mustafa Barzani, Moore, and Cupp did engage in one or more acts, practices, and courses of business which would and did operate as a fraud and deceit upon the United States Government, and by use of means and instrumentalities of interstate commerce and the mails.

598. Defendants Masrour Barzani, Mustafa Barzani, Moore, and Cupp, and others, knew that documents and forms were fraudulently filed. To wit, Defendant Cupp knew that forms and documents were filed at Defendant Moore's behest. Defendants Masrour Barzani, Mustafa Barzani, Moore, and Cupp, and others, knew that Defendant Mustafa Barzani should have been identified as the real party-in-interest.

599. Notwithstanding, Defendant Cupp, at the direction of Defendant Moore, attempted to and did use the fraudulently filed forms and documents for the fraudulent benefit of Golden Eagle and

its true beneficial owner.  To achieve their common goals, Defendants Masrour Barzani, Mustafa Barzani, Moore, and Cupp knew that Golden Eagle, as the applicant to the United States Government, was obligated to identify any real party-in-interest, and that Golden Eagle had intentionally and fraudulently failed to do so.  All forms and documents filed by Defendants Moore and Cupp on behalf of Golden Eagle were fraudulent.

600.    Defendants Masrour Barzani, Mustafa Barzani, Moore, and Cupp knowingly and willfully concealed from agencies of the United States Government the unlawfulness of Defendants Masrour Barzani, Mustafa Barzani, Moore, and Cupp's conduct, which was committed at the instruction of, and through the directions of, Defendant Moore.

601.    The Small Business Administration and agencies of the Department of Defense were deceived by the material omission and the fraudulent communications from Defendants Moore, Cupp, and others.

602.    In furtherance of this conspiracy and to effect its objects, within the District of Columbia and elsewhere, Defendants Masrour Barzani, Mustafa Barzani, Moore, and Cupp, together with others, did commit and cause the commission of, among others, violation of 18 U.S. Code § 371, 3238, and 3551 et seq.

### (b)    Defendants Defraud the Department of Defense

603.    The 2022 National Defense Authorization Act included $260 million for the ~~Defendant Iraqi Kurdish Regional Government~~ KRG  Peshmerga~~, a wholly subordinate agency of the Defendant Iraqi Kurdistan Regional Government~~ commanded and directed by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani and their co-conspirator agents and representatives. ~~The White House has signaled its intention to continue its financial support for the Kurdish militia (the Defendant Iraqi Kurdistan Regional Government Peshmerga).  H.R.5232, the Iraqi and Kurdish Peshmerga Forces Defense Act of 2023, is presently before Congress.~~

591

764604.    From these funds, the United States government has paid monthly stipends ranging from $100 to $400 per Peshmerga soldier.

765605.    Confidential Human Sources #1 and #5, who have direct clandestine access to senior ~~ranking~~ officials of ~~the Defendant Iraqi Kurdistan Rregional Government~~KRG, disclosed that Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, aided and abetted by their co-conspirator agents and representatives, ~~including Barzani family members and family members by marriage,~~ and others known and unknown to Plaintiffs, as central and integral to the funding of the ~~Barzani Continuing Criminal Enterprise~~BCE and its calculated ~~injury~~injuries to Plaintiffs, and to enriching themselves and others by fraudulently obtaining money from the United States and the agencies thereof, did knowingly conspire and devise and intended to devise a scheme and artifice to defraud and deprive the United States Government, to endanger United States national and economic security, to knowingly and willfully, directly and indirectly, endanger the lives and wellbeing of American military, diplomatic, and intelligence personnel in ~~Iraqi~~ Kurdistan, and to knowingly and willfully, directly and indirectly, commit the following offenses against the United States Government, which enables and furthers the objectives of the ~~Barzani Continuing Criminal Enterprise~~BCE: Theft concerning programs receiving federal funds, by corruptly and fraudulently obtaining money from the United States Government by knowingly falsifying invoices, records, documents, reports, representations, pretenses, and promises, and by knowingly making materially false, fictitious, fraudulent, and misleading statements, and knowingly failing to disclose material facts with a duty to disclose, including fictitious and false names, and knowingly transmitted and caused to be transmitted by means of wire communications writings, for services of Peshmerga personnel, designed in whole or in part to conceal and disguise the falsity of specified unlawful activity, and falsely state the number of Peshmerga soldiers and the amounts of their payment and willfully conceal true numbers and amounts, and retaining substantial portions of the fraudulently

secured proceeds, and that while conducting and attempting to conduct such financial transactions knowing that the funds involved in the financial transactions represented the proceeds of unlawful activity, and ~~continuing~~ to present time – which activity continues ~~to the present time~~ and makes possible the ~~continuing harm~~ injuries to ~~the~~ Plaintiffs.

~~766~~606.    Confidential Human Sources #1, #2, #3, #4, #5, and #8, who have direct clandestine access to senior ~~ranking~~ officials of ~~the Defendant Iraqi Kurdistan Regional Government,~~KRG assert, affirm, and declare the means and methods of enacting the criminal acts, and the scheme was carried out, in substance, generally, by something called "ghost" or "alien" employees.  These are employees on paper who either do not really exist or do not show up for work or do not perform the work for which the United States was billed – and for which the ~~Barzani Continuing Criminal Enterprise~~BCE criminally, knowingly, and fraudulently caused one or more inflated materially false invoices or otherwise communicated accounts, and falsified oral and written certifications, statements, and accounting records regarding the reliability of financial reporting, with the United States Government for payment, and failed to disclose, among other things, the existence of false documents and fabricated accounting records related to the payments, and knowingly and repeatedly accepted bloated improper payments from the United States Government, their affirmative legal obligation requiring true and correct accounting notwithstanding.  Those involved in the scheme have diverted and are diverting millions of dollars of U.S. financial assistance to the ~~Barzani Continuing Criminal Enterprise~~BCE criminal purposes, which enables the Defendants and the ~~Barzani Continuing Criminal Enterprise~~BCE to continue to ~~harm~~injure Plaintiffs.

~~767~~607.    Confidential Human Sources #1, #2, #3, #4, #5, and #8, who have direct clandestine access to senior ~~ranking~~KRG officials ~~of the Defendant Iraqi Kurdistan Regional Government~~, have identified Peshmerga commanders under the command and control of Defendants Masrour Barzani and Waysi Barzani who, with their agents and representatives, ~~including Barzani family~~

~~members and family members by marriage,~~ are thereby amassing enormous fraudulently obtained personal wealth. Peshmerga commanders, in return for this substantial illicit wealth, have served the ~~Barzani Continuing Criminal Enterprise~~BCE to ~~harm~~injure and continue to ~~harm~~injure Plaintiffs.

~~768~~608.    In an effort to legitimize fraudulent financial transactions of Defendants and the ~~Barzani Continuing Criminal Enterprise~~BCE, Defendants were and are layering funds through multiple levels of offshore entities and bank accounts throughout the world, often transferring the illicit proceeds through up to four levels of offshore bank accounts before reaching the final recipient. Members of the ~~Barzani Continuing Criminal Enterprise~~BCE conspiracy, led by Defendant ~~Jonathan~~ Moore, have sought to distance the origin of the funds from the final beneficiaries and disguise the nature, location, source, ownership, and control of the proceeds of said unlawful activity, knowing that the proceeds represented the proceeds of unlawful activity.

~~769~~609.    The fraudulently obtained funds were also disbursed by financial operators who acted on behalf of Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their co-conspirator agents and representatives, ~~including Barzani family members and family members by marriage,~~ known and unknown, including but not limited to the beneficial owners of the accounts, who delivered the payments in cash in ~~Iraqi~~ Kurdistan or in foreign countries, in packages or suitcases at locations predetermined by the beneficiary of the funds; or made the payments ~~to members~~ via wire transfer through one or more of the camouflaged offshore entities.

**(5)    Defendants Willfully Violate National Security Foreign Agent Registration**

610.    ~~770.    Additionally,~~ It was part of the conspiracy that, for the purpose of establishing relationships that could further the interests and objects of ~~the Defendant Iraqi Kurdistan Regional Government~~KRG and the ~~Barzani Continuing Criminal Enterprise~~BCE, including advocacy to the United States Government for funding of Peshmerga military forces ~~of Defendant Iraqi Kurdistan~~

594

Regional Government, Defendants Masrour Barzani and Jonathan Moore, and their co-conspirator agents and representatives, would and did recruit and induce representatives within the United States and elsewhere, who did willfully and knowingly, directly and indirectly, combine, conspire, confederate, and agree together and with each other to commit an offense against the United States to wit, willingly and knowingly act as an agent of a foreign principal, namely of Defendant Masrour Barzani and the Defendant Iraqi Kurdistan Regional GovernmentKRG, without registering with the United StatesU.S. Attorney General. These unregistered representatives of Defendant Masrour Barzani engaged in direct actions, and were compensated indirectly and primarily through oil and energy concessions and other concealed arrangements. At no time did co-conspirators notify the Justice Department's National Security Division's Foreign Agent Registration Act Unit ("FARA Unit") within the U.S. Department of Justice that they would and did act in the United States as an agent of a foreign government and official, and under the direction of Defendant Masrour Barzani, a United States person for the period of the conspiracy, would and did and do unlawfully perform acts and make statements to further Defendant Iraqi Kurdistan Regional Government KRG interests in the United States and influence the acts and decisions of such U.S. government, agencies, and instrumentalities including its foreign policy and expenditures, who did and do and cause to be misrepresented, hidden, and concealed, the purpose of the conspiracy and the criminal acts committed in furtherance thereof, all in violation of 18 U.S.C. § 371. These hidden tortious actions by named defendants and unnamed persons have enabled the Barzani Continuing Criminal EnterpriseBCE to have substantial means to harminjure Plaintiffs.

771. Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and Barzani family members and family members by marriage, and their agents and representatives, in furtherance of the conspiracy and to effect the illegal object thereof, committed and caused to be committed,

among others, the following overt acts, in furtherance of the Barzani Continuing Criminal Enterprise. Defendants have participated by deceitful and dishonest means in, facilitated, furthered, controlled, organized, and profited from the violent Barzani Continuing Criminal Enterprise, and enjoy the proceeds, fruits, and instrumentalities of its crimes including properties in the United States and elsewhere derived from or obtained, directly or indirectly, through the commission of the offenses, and whose members and associates conspired and engaged in acts, in furtherance of the Barzani Continuing Criminal Enterprise, and the manner and methods used by the Defendants and other members and associates of the enterprise to further the goals of the enterprise and to achieve its purposes included, but were not limited to, involving murder and attempted murder, extrajudicial execution, enforced disappearances, torture, intimidation, narcotics trafficking, counterfeiting, money laundering, fraud, obstruction of justice, tax fraud, immigration fraud, fraud against the United States Government, illicit sale and delivery of defense articles between sanctioned foreign countries without having received a license or approval from the United States Department of State, engaged in commercial trade with nations sanctions by the United States and prohibited by the Directorate of Defense Trade Controls ("DDTC"), conduct with designated terrorist organizations against the interests of the United States, and committed other crimes against the United States and its citizens and its national security interests, and the citizens of Iraqi Kurdistan, and thereby benefitting by receiving billions of illicit dollars. Defendants have hidden and attempted to hide under the false, deceptive, and legally unmerited cloak of anonymity and/or officialdom. None of their criminal actions are legitimate official, permissible, or lawful acts of a foreign sovereign or any subordinate governate, subdivision, or instrumentality thereof. And each and every criminal act committed by Defendants engaged in the Barzani Continuing Criminal Enterprise has provided the means to harm Plaintiffs.

772611.    Defendants from, through, and by their Washington, D.C. office and their Fairfax, Virginia, office and through and by their appointed, deputized, designated, and closely supervised Washington, D.C., representatives and employed staff, have repeatedly and recurrently violated requirements of the Foreign Agents Registration Act (FARA), 22 U.S.C. § 611, et seq., which establishes a registration, reporting (of accurate and complete information), and disclosure regime for agents of foreign principals (which includes foreign non-government individuals and entities) so that the U.S. government and the people of the United States are truthfully informed of the source of information and the identity of persons attempting to covertly and overtly influence U.S. public opinion, policy, and law.  Persons subject to the requirements of FARA have a legal duty and among other things are required to submit periodic registration statements containing truthful information about their activities and the income earned from them. See *22 U.S.C. § 612(a)*.

612.    By fraudulently making a false and misleading statement of a material fact and omitting to state a material fact necessary to make the statements made, and disregarding, concealing, and masking a mountain of incriminating evidence in periodic registration statements required to be filed and other required documents, records, and oral representations, which did not, in reasonable detail, accurately and fairly reflect truths, with the intent to deceive and defraud, and thereby improperly influencing the conduct of United States officers and officials, and to promote and conceal their ongoing transnational criminal schemes, Defendants, with especially co-conspirator Bayan Sami Abdul Rahman, Defendants Treefa Aziz and Hikmat Bamarni, as individuals demonstrated reckless, purposeful, knowing, and willful disregard for the truth in public declarations and filings with agencies of the United States Government.  Defendants and their Washington, D.C.-based agents, representatives, advisors, consultants, and attorneys falsified and caused to be falsely stated and certified and submitted or caused to be submitted by the Washington, D.C. office of KRG and by its KRG Washington representatives and employed staff,

and by the Fairfax, Virginia office of the KDP representative, designated, appointed, empowered, and directed by and reporting to Defendants Masoud Barzani and Masrour Barzani, and its retained Washington, D.C. consultants and advisors functioning under their direction, did, with specific criminal intent, cover up and knowingly failed to disclose and fraudulently conceal material facts and adverse information and failed to disavow their wrongful conduct and misrepresented the truth about the BCE in furtherance of the conspiracy and to effect the illegal object thereof, in submissions to the executive branch of the United States Government. Fraudulent submissions by Defendants took place in the District of Columbia and elsewhere and were published in English. They targeted a United States audience as part of a broad, premeditated, and calculated effort to covertly and overtly influence, distract, and shape public perceptions of Defendants Masoud Barzani and Masrour Barzani and their subordinates in the United States and around the world. Defendants engaged in acts, practices, and course of conduct which operated and would operate as a fraud and deceit upon an official person, and with the intent to impede, obstruct, mislead, deceive, defraud, or influence the foreign and military policy and lawful decision-making of the Government of the United States and citizens of the United States who relied on said filings to be truthful. Defendants took substantial actions domestically that aided and abetted violations of treaties, conventions, and law, including collaboration with officially designated terrorist organizations. At all times relevant hereto and in furtherance of the BCE, Defendants unlawful actions were major factors responsible for the acts complained of herein.

### (6)     Defendants' Crimes of International Theft

613.    In another illustrative example of an overt act in furtherance of the ~~Barzani Continuing Criminal Enterprise~~BCE, financial transaction records in the possession of Confidential Human Source #1 document removal of US$832 million from ~~Iraqi~~ Kurdistan to South Korea to Germany

by Barzani ~~subordinate Defendant~~co-conspirator Ashti Hawrami, the then ~~Defendant Iraqi Kurdistan Regional Government~~KRG Minister of Oil.

~~773.    To harm Plaintiffs and exceedingly enrich themselves, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their subordinate criminal co-conspirators, as part of the Barzani Continuing Criminal Enterprise, have willfully, recklessly, knowingly, purposefully, and with wanton disregard ignored and violated, at a minimum, international treaties, agreements, and conventions to which the Republic of Iraq is a signatory nation despite being obligated to follow each and every provision of said treaties, agreements, and conventions.~~

### ~~UNITED STATES TAX CRIMES IN FURTHERANCE OF~~

### ~~THE BARZANI CONTINUING CRIMINAL ENTERPRISE~~

### ~~774~~C.  Defendants' Abusive Criminal Tax Schemes

614.    In order to provide means to ~~harm~~injure Plaintiffs and exceedingly enrich themselves, and elude, evade, and circumvent requisite disclosure requirements and tax obligations of the U.S. Department of the Treasury and its Internal Revenue Service, Defendants Masoud Barzani, Masrour Barzani, Mustafa Barzani, and Waysi Barzani, and their subordinate criminal co-conspirators, ~~including Barani family members and family members by marriage,~~ and others known and unknown, as part of the ~~Barzani Continuing Criminal Enterprise~~BCE through abusive criminal tax schemes and fraudulent and deceptive practices, did voluntarily, intentionally, and knowingly conspire, combine, confederate, and agree together and with each other, and with individuals both known and unknown, and with wanton disregard for and as part of a pattern of illegal activity, ignored and violated, at a minimum, multiple federal tax laws and federal tax regulations having force of law of the United States, thereby interfering with the proper administration of the Internal Revenue Laws and ~~harming~~injuring Plaintiffs, in "a *conscious* course

of *deliberate* ignorance, *i.e.,* of purposeful blinding while knowing that a crime was likely in progress....".....". *United States v. Masse*, 816 F.2d 805, 812 (1st Cir.1987).

755615.      Defendants acted with the object of criminally enriching themselves and to provide means to harminjure Plaintiffs, by committing and causing to be committed various corrupt acts, including but not limited to: (a) providing false documents in connection with tax matters and (b) making false statements in connection with tax matters of the United States government, and (c) knowingly and willfully not paying taxes due the United States, all in violation of 26 U.S.C. 7212(a).

756616.      Defendants' money laundering financial transactions scheme, particularized herein, operated with the intent to engage in conduct in violation of 26 U.S.C. § 7201 (attempt to evade or defeat tax) or 7206 (tax fraud or false tax statements).  Defendant Masoud Barzani, Masrour Barzani, Mustafa Barzani, and Waysi Barzani acted intentionally rather than inadvertently, and knew that their conduct violated the tax laws.

617.   As part of the Barzani Continuing Criminal EnterpriseBCE to provide the means to damageinjure Plaintiffs, the defendant[s] knowingly and wilfullywillfully concealed material facts from the Internal Revenue Service in matters under its jurisdiction by making false or fraudulent representations to a federal agency or department, which were sufficiently repeated and related to form a ""pattern of illegal activity"."".  The illegal activities alleged herein were ""within the jurisdiction of [a] department or agency of the United States."." 18 U.S.C. § 1001.

777618.      To provide the means to harminjure plaintiffs and criminally enrich themselves, Defendants Masrour Barzani, Entifadh Kamal Qanbar, and Omar Barzani, and others did unlawfully, voluntarily, intentionally, and knowingly conspire, combine, confederate, and agree together and with each other, and with other individualsothers to defraud the United States by impeding, impairing, obstructing, and defeating the lawful government functions of the Internal

Revenue Service (IRS) in the ascertainment, computation, assessment, and collection of revenue, that is, U.S. ~~individual income~~ taxes.

~~778~~619.        The extreme amount of revenue raised by evasion and financial harm to the United States provides the means to ~~harm~~injure Plaintiffs as set forth herein.

####        **D.        Defendant Entifadh Kamal Qanbar Files False Documents**

~~779~~620.        As part of the ~~Barzani Continuing Criminal Enterprise~~BCE and according to the respective documents submitted by Defendant Entifadh Qanbar to the Internal Revenue Service, the Kurdish Protection Action Committee was purportedly organized for charitable purposes and "approved by Kurdish Prime Minister [Defendant] Masrour Barzani." Defendant ~~Entifadh~~ Qanbar submitted a Form 1023, Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code ("Tax Exempt Status Application"), on behalf of the Kurdish Protection Action Committee (KPAC).

~~780~~621.        Specifically, the IRS granted 501(c)(3) charity tax exempt status to KPAC on the Tax-Exempt Status Applications based on the false or intentionally and not mistakenly misleading documents prepared and submitted by Defendant ~~Entifadh~~ Qanbar.

~~781~~622.        As part of the ~~Barzani Continuing Criminal Enterprise~~BCE and to further its object, ~~Defendants~~Defendant Masrour Barzani and co-conspirator Aziz Ahmed, purportedly on behalf of the Council of Ministers of ~~Defendant Iraqi Kurdistan Regional Government~~KRG controlled by Defendant Masrour Barzani, in 2023 engaged Defendant ~~Entifdh~~ Qanbar for the sole purpose of filing false documents to obtain tax exempt status and to operate through a United States-incorporated Internal Revenue Service-issued non-profit 501(c)(3) tax exempt political, economic, and educational action committee named Kurdish Protection Action Committee incorporated in the State of Virginia.

~~782~~623.    Defendant ~~Entifdh~~ Qanbar is the architect of this fraudulent charitable giving tax scheme in furtherance of the ~~Barzani Continuing Criminal Enterprise.~~BCE.  He promotes, organizes, and executes ~~every~~all material ~~aspect~~aspects of the scheme that gives rise to the participants' bogus charitable status – from the creation of the bogus charity and ~~the~~its incorporation ~~thereof~~ to the completion and submission of the necessary tax documents.

~~783~~624.    Defendant ~~Entifdh~~ Qanbar formed ~~the entity~~and at all times controlled KPAC, secured tax identification numbers ~~for the entity~~, drafted or directed the drafting of all fraudulent documents necessary to create and operate the entity, and filed or directed the filing of all ~~necessary~~ paperwork with state and local authorities.

~~784~~625.    The self-declared purpose of said ~~Kurdish Protection Action Committee self-declared~~ KPAC in documents filed by Defendant ~~Entifdh~~ Qanbar with the U.S. Government is to "meet with American representatives and staff to educate them" on Kurdistan and "ask the Congress for support of the Kurdish American alliance… by focusing on certain acts and legislation…"  Defendant ~~Entifdh~~ Qanbar "will also prepare and disseminate informational materials and may engage in *lobbying*, *promotion*, perception management, and public relations." (Italics added)

~~785.~~ 626.  Defendant Qanbar engaged in multiple instances of perjury and false swearing. Contrary to this declaration submitted under oath by Defendant ~~Entifadh~~ Qanbar to the ~~U.S.~~ Department of Justice made pursuant to the Foreign Agents Registration Act, the Articles of Incorporation for the ~~Kurdish Protection Action Committee ("KPAC")~~,, filed with the State of Virginia in 2022 by Defendant ~~Entifdh~~ Qanbar, declare under oath "the corporation is organized exclusively for charitable, religious, education, and scientific purposes, including, for such purposes, the making of distributions to ~~organization~~organizations that qualify as exempt

organization under section 501(c)(3) of the Internal Revenue Code, or the corresponding section of any future federal tax code." "Lobbying" is not a lawful purpose.

786627.    Defendant Entifadh Qanbar, as the Incorporator of said corporation, in direct and purposeful contravention of the above sworn federal declaration, further declared to the State Corporation Commission of the Commonwealth of Virginia: "No substantial part of the activities of the corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation…"    Further, the By-Laws submitted by Defendant Entifadh Qanbar to the Commonwealth of Virginia declare, "The organization is organized exclusively for purposes pursuant to section 501(c)(4) of the Internal Revenue Code."

787628.    Defendant Entifdh Qanbar knew andor had reason to know that these statements were false or fraudulent. Specifically, Defendant Qanbar made many false statements regarding the validity of his scheme; the tax-exempt status of KPAC; and the propriety of the scheme participant's donations and resulting charitable contribution deductions.    Defendant Qanbar prepared and presented, or assisted others in preparing and presenting, documents and portions of documents that they know (knew or had reason to know) would be used in connection with material matters arising under the Internal Revenue laws.  Defendant Entifdh Qanbar knew and had reason to know the statutory purposes and permissible functions and activities of a 501(c)(3) and a 501(c)(4) organization are significantlymaterially different, and that the primary activities in which he and KPAC engage are explicitly prohibited within a 501(c)(3) tax exampleexempt organization. All these fraudulent actions were taken to hide income from the United States and provide means to damageinjure the Plaintiffs.

788629.    In furtherance of and aiding and abetting the concealment by trick, scheme or device of material facts from the IRS, this scheme "approved by Kurdish Prime Minister [Defendant] Masrour Barzani," Defendant Entifdh Qanbar did knowingly and willfully falsify,

conceal, and coverup by a trick, scheme, and device, a material fact, and the defendant made materially false, fictitious, and fraudulent statements and representations, and the defendant made and used a false writing and document knowing the same to contain a materially false, fictitious, and fraudulent statement and entry, in a matter within the jurisdiction of the ~~executive branch of the~~ Government of the United States.  Under the banner of KPAC, a 501(c)(3) tax exempt charitable organization, he has falsely, publicly, purposefully, knowingly, and maliciously accused former United States Ambassador Ryan Crocker and American Enterprise Institute scholars Danielle Pletka and Michael Rubin of being party to an Iranian information operations scheme after attending an ordinary conference in Baghdad, Iraq, during which the Prime Minister of Iraq spoke.

~~789~~630.    To aid the ~~Barzani Continuing Criminal Enterprise~~BCE in committing harm to Plaintiffs, in serious yet knowing violation of the legally permissible activities of a tax-exempt 501(c)(3) organization, Defendant ~~Entifdh~~ Qanbar coordinated with a foreign entity or foreign official, working together as a cohesive structure, over time, to manipulate the legislative process, obtain and retain political power on behalf of Defendants Masoud Barzani and Masrour Barzani, benefit financially, obfuscate the nature of their activities, and with longevity sufficient to pursue the ~~Barzani Continuing Criminal Enterprise's~~BCE's purpose, thus providing substantial means to enable Defendants to ~~damage~~injure Plaintiffs.  These fraudulent activities enabled Defendants to use the KPAC~~ as a vehicle~~, directly and indirectly, to provide means to ~~damage~~injure Plaintiffs.

~~790~~631.    Defendant ~~Entifadh~~ Qanbar prepared and submitted documents to the~~ U.S.~~ Department of the Treasury through its Internal Revenue Service, and to the State Corporation Commission of the Commonwealth of Virginia, which documents are materially~~, substantively,~~ and factually different from and in conflict with each other.  Defendant Qanbar's media appearance and X (formerly Twitter) feed, unreservedly available to a worldwide audience, appear only to

promote Defendant Masrour Barzani's propaganda, attack his political opponents, dismiss human rights concerns, and generally act to amplify partisan media in a manner that often crosses into libel and slander and remains functionally, wholly, and impermissibly different from the activities for which Defendant Qanbar registered with the Department of the Treasury. These activities were false and fraudulent and were taken with the object ~~and means~~ to ~~damage~~injure Plaintiffs.

~~791~~632.      The long-time~~, continuing,~~ and cumulative pattern of criminal conduct by Defendant Masoud Barzani, his agents and representatives ~~including family members and family members by marriage~~, and the ~~Barzani Continuing Criminal Enterprise~~BCE, aided and abetted by Defendant ~~Entifdh~~ Qanbar, has been and is one of purposeful, willing, knowing, and continual misrepresentation, fabrication, deceit, and falsification, which fraudulent activities substantially contributed to providing means to tortiously damage and ~~harm~~injure Plaintiffs.

~~792.     As a co-conspirator with and representative of the Barzani Continuing Criminal Enterprise, and to perpetuate the Barzani Continuing Criminal Enterprise to provide the means to harm Plaintiffs, Defendant Entifdh Qanbar made a willful concealment of material facts to officials of agencies of federal and state governments of the United States.~~

~~793~~633.      In order to maintain its tax exemption~~,~~ and use the charitable organization as a ~~means~~vehicle to provide means to ~~harm~~injure Plaintiffs, KPAC ~~was~~is required to ~~file~~ annually file IRS Form 990, truthfully disclosing the earnings and activities of the organization. To continue to use KPAC's tax-exempt status, ~~and~~ Defendant ~~Entifdh~~ Qanbar and others directed by ~~Defendant Entifdh~~ Qanbar filed IRS Forms 990 which intentionally and fraudulently omitted their transactions with persons and entities in Iraq and elsewhere and failed to disclose relevant requested information regarding the control~~,~~, history, and affiliations of the KPAC. Defendant ~~Entifdh~~ Qanbar made knowingly false public statements and ~~knowingly false~~ statements, and willful concealment of material facts, to officials of the United States Government, and used funds

to ~~harm~~injure Plaintiffs which acts were not in furtherance of the KPAC's purported charitable mission authorized by the Internal Revenue Service, and which fraudulent submissions enable KPAC to continue to operate and injure Plaintiffs.

~~794.   To be a sponsoring organization, the KPAC is required to report certain information on the annual "tax return" for tax exempt entities—Form 990, Return of Organization Exempt from Tax ("Form 990").   Defendant Entifdh Qanbar completed the bogus charity's Tax-Exempt Status Applications and Forms 990 and knew that the bogus charity did not truthfully report the required information, which fraudulent forms enable KPAC to continue to operate and damage Plaintiffs.~~

~~795.   At all times, Defendant Qanbar controlled the bogus charity, KPAC, which was formed to further the object of the Barzani Continuing Criminal Enterprise and to damage Plaintiffs.~~

~~**Defendant Omar S. Barzani:**~~

796    **E.      Defendants Masrour Barzani and Omar S. Barzani Fraudulently Obstructed Federal Tax Function**

634.    Defendant Omar Barzani is the self-declared principal officer of the Texas-based Barzani ~~Charitable~~Charity Foundation.  Defendant Masrour Barzani, a U.S. person, is listed on documents filed with the Internal Revenue Service as chairman of the Barzani Charity Foundation.

~~797.   Defendant Masrour Barzani, a U.S. person, is listed on documents filed by Defendant Omar S. Barzani with the Internal Revenue Service as chairman of the Barzani Charity Foundation.~~

~~798~~635.        As part of the criminal scheme of Defendants and the ~~Barzani Continuing Criminal Enterprise~~BCE to use the Barzani Charity Foundation to ~~harm~~injure Plaintiffs, Defendant Omar Barzani as the Fund's principal officer, ~~who~~ acting under direction of Defendant Masrour Barzani as Fund chairman, committed or caused to be committed perjury on submitted Internal Revenue Service forms, as described in more detail ~~below~~herein, conspired to fraudulently obstruct the federal tax function, and with premeditated deceit, fraudulently or unlawfully obtained, as a benefit

to the ~~Barzani Continuing Criminal Enterprise~~BCE to avoid U.S. taxes, a charitable non-profit tax designation and treatment in that he/they knowingly and with deliberate disregard of the clearly delineated requirements of law falsely declared or caused to be falsely declared to the Internal Revenue Service. false information.

~~799~~636.    Defendants Masrour Barzani and Omar Barzani conspired and knowingly and purposefully failed to disclose the defendants noncompliance with a statutory, regulatory, or contractual requirement, while omitting critical qualifying information, including making actionable misrepresentation and providing materially false information by knowingly and purposefully answering "NO" to at least the following qualifying questions: (a) Did the organization maintain an office, employees, or agents outside of the United States?; (b) Did the organization have aggregate revenues or expenses of more than $10,000 from grantmaking, fundraising, business, investment, and program service activities outside the United States, or aggregate foreign Investments valued at $100,000 or more?; (c) Did the organization report on Part IX, column (A), line 3, more than $5,000 of grants or other assistance to or for any foreign organization?; (d) Did the organization report on Part IX, column (A), line 3, more than $5,000 of aggregate grants or other assistance to or for foreign individuals?; (e) At any time during the calendar year, did the organization have an interest in, or a signature or other authority over, a financial account in a foreign country (such as a bank account, securities account, or other financial account)?; and knowingly and willfully failed to disclose officers, directors, and trustees. *See Universal Health Servs. Inc. v. U.S. ex rel. Escobar, 136 S. Ct. 1989, 2001 (2016).* Defendants Masrour Barzani and Omar Barzani knew ~~and had reason to know that~~ these statements were false or fraudulent, and if answered truthfully would result in IRS denial of the application for tax exempt status.

800637.       Defendant Omar Barzani administratively formed the entity, the Barzani Charity Foundation, secured tax identification numbers for the Barzani Charity Foundation, drafted or directed the drafting of all documents necessary to create and operate the Barzani Charity Foundation, and filed or directed the filing of all necessary paperwork with state and local authorities for the formation and continuance of the Barzani Charity Foundation.

801638.       Defendant Omar Barzani knew andor had reason to know the statutory requirements of a 501(c)(3) organization, yet made false statements as set forth herein regarding the validity of his scheme, to wit:  The lawful tax-exempt status of the Barzani Charity Foundation, thereby aiding and abetting Defendants and the Barzani Continuing Criminal Enterprises'BCEs' concealment by trick, scheme or device of material facts from the IRS.  Defendant Omar Barzani made false representations of a material fact knowing that the representations were false, and with the intent to mislead, obfuscate the nature of their activities, and with longevity sufficient to pursue the Barzani Continuing Criminal Enterprise'sBCE's purpose of evading taxes to provide substantial means to damageinjure Plaintiffs.   As co-conspirators with and representative of the Barzani Continuing Criminal EnterpriseBCE, and to perpetuate the Barzani Continuing Criminal EnterpriseBCE to provide the means to harminjure Plaintiffs, Defendants Masrour Barzani and Omar Barzani engaged in multiple instances of perjury and false swearing and made a willful concealment of material facts to officials of agencies of federal and state governments of the United Statesgovernment.

802639.       The Barzani Charity Foundation was incorporated in the State of Texas in 2015, operated in the intervening years, and has been forfeited by the Texas Comptroller of Public Accounts in 2024. .  At all times, Defendants Masrour Barzani and Omar Barzani controlled the bogus charity, which was formed to further the object of the Barzani Continuing Criminal EnterpriseBCE and to damage Plaintiffs.

**F.**    **Defendant Masrour Barzani Fraudulently Evaded Federal Tax Obligations**

803640.    Defendant Masrour Barzani, as a U.S. person resident alien (a green card holder),, is required by statute, as a term of such granted immigration status, to follow the same tax laws as U.S. citizens, is presumed to be a "resident" for purposes of tax classification, and must report worldwide income from all sources, including all income earned from foreign sources, that is, income from both within and outside the United States, must annually report financial assets outside the United States, and must disclose foreign bank accounts and other offshore international assets &and investments on his U.S. tax returns. Defendant Masrour Barzani, with willful and criminal intent, did not and does not submit the required annual truthful reporting to the United States Government. The failure to truthfully declare and pay U.S. taxes on Defendant's earnings provides a substantial part of the means enabling the BCE to injure Plaintiffs.

804641.    Defendant Masrour Barzani, as the head of the Barzani Continuing Criminal EnterpriseBCE, willfully and criminallytortiously, and to further the criminaltortious object of the enterprise and harminjure Plaintiffs, conspired with others unnamed to impede, impair, obstruct and defeat the lawful governmental functions of the Internal Revenue Service in the ascertainment, computation, assessment and collection of revenue, specifically, failing to comply with the Foreign Account Tax Compliance Act (FATCA), in an effort to defraud the United States, increase illicit wealth, and use wealth to injure Plaintiffs.

805642.    For numerous tax years, Defendant Masrour Barzani grossly, knowingly, and willingly evaded or defeated any tax imposed by or due and owing the United States, and signed, filed, and caused to be filed false and fraudulent or elected to not file U.S. tax documents, U.S. Individual Income Tax Returns, Form 1040, and other forms, knowing it/them to be false and fraudulent, and failed to properly and honestly comply with his legal and substantial tax obligations

as a United States person, knowing the returns and/or omissions to be false and fraudulent. By these criminal acts, Defendant Masrour Barzani failed to declare and pay proper taxes in very significant amounts, thereby enriching the criminal enterprise which directly provided the means for Defendants to commit brutal criminal and tortious acts to harminjure Plaintiffs.

643. As part of efforts of Defendants Masrour Barzani, Waysi Barzani, Muksi Barzani, Mulla 'Babo' Mustafa Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani, Jonathon S. Moore, Joe R. Reeder, Valerie Cupp, Juli Mai Sanford, Laura Geho Harris, and Rubar Sandi to defraud the I.R.S. and avoid U.S. taxes on worldwide income of Defendants Masrour Barzani, Waysi Barzani, Muksi Barzani, Mulla 'Babo' Mustafa Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani, and Areen Masrour Barzani, Defendants Moore, Reeder, Cupp, Sanford, Harris and assisted by other co-conspirators in the United States including accountants, implemented a fraudulent scheme to conceal and disguise Defendants Masrour Barzani, Waysi Barzani, Muksi Barzani, Mulla 'Babo' Mustafa Barzani's ownership and control of the offshore structure by removing them as beneficiaries of their own trusts and installing nominee beneficiaries. Defendants Moore, Reeder, Harris, Cupp, and others did not report Defendants' offshore structures, and the income earned by Defendants therefrom, as required by the Internal Revenue Service Code.

644. As part of their efforts to defraud U.S. tax authorities and evade U.S. taxes on worldwide income, Defendants Masrour Barzani, Mustafa Barzani, Moore, and Cupp, and others known and unknown, including co-conspirators accountants in the United States, devised and implemented a similar fraudulent scheme for Golden Eagle, LLC (and related Golden Eagle entities) that involved fraudulent transfer of overseas ownership by Defendant Mustafa Barzani, knowing that clients would maintain beneficial ownership of the overseas companies and trusts and the income earned therefrom.

645.    In furtherance of the BCE, Defendant Masrour Barzani, together with others did knowingly and willfully, directly and indirectly, and with criminal intent conspire to defraud the United States, and engaged in multiple instances of perjury and false swearing. Defendants designed and implemented a fraudulent, dishonest, and deceitful scheme to divert criminal proceeds and misappropriated KRG, Republic of Iraq Government, and United States foreign assistance funds, and conceal income and assets traceable to the conspiracy.  Defendant Masrour Barzani used undeclared bank accounts, the assets held therein, and the income earned thereon, and monies from unlawful conduct passed through intermediary accounts, to conceal the true source of the funds from the Internal Revenue Service.  Defendants used fraudulent, deceitful, and dishonest means to conceal the existence of bank accounts maintained by and for Defendants Masrour Barzani and Waysi Barzani, and others known and unknown, including Barzani family members, in order to help the Defendants purposefully evade U.S. taxes.  Defendant Masrour Barzani, having financial accounts in a foreign country with an aggregate value of more than $10,000, while violating another law of the United States and as part of a pattern of any illegal activity involving more than $100,000 in a 12-month period, has failed to be truthful in his filings of a Report of Foreign Bank and Financial Accounts with the U.S. Department of Treasury, thereby financially facilitating a criminal activity.  By defrauding the United States, the BCE gains additional resources to injure the Plaintiffs, as described herein.

646.    Defendants Masrour Barzani, Waysi Barzani, Muksi Barzani, Mulla 'Babo' Mustafa Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani, Moore,  Reeder, Cupp, Sanford, Harris and assisted by other co-conspirators in the United States including accountants, implemented a fraudulent scheme to conceal and disguise Defendants Masrour Barzani, Waysi Barzani, Muksi Barzani, Mulla 'Babo' Mustafa Barzani's ownership and control of the offshore structure by removing them as beneficiaries of their own trusts and installing nominee beneficiaries.

Defendants Moore, Reeder, Harris, Cupp, and others did not report Defendants Masrour Barzani, Waysi Barzani, Muksi Barzani, Mulla 'Babo" Mustafa Barzani's ownership of offshore structures, and through their unlawful conduct, willfully and knowingly impeded impaired, obstructed and defeated the lawful governmental functions of the Internal Revenue Service in the ascertainment, computation, assessment and collection of revenue, specifically, by knowingly and willfully failing to comply with the Foreign Account Tax Compliance Act (FATCA) and the Corporate Transparency Act (CTA), to fraudulently, in whole or in part, conceal, misrepresent, and disguise the nature, location, source, control and true beneficial ownership interests in offshore accounts, various assets including real property and money accounts, investments, and income, in the United States and outside the United States.

647.   For example, 983 Washington SB, LLC, owner of record of a commercial property in Miami, Florida; an office building in Delaware owned by the CT Corporation, an American branch of a Dutch company; multimillion dollar residential properties owned by LLCs in McLean, Virginia and Beverly Hills, California; were all funded, purchased and acquired with illicit proceeds of the unlawful activities of the BCE.  Defendants Masrour Barzani, Waysi Barzani, Muksi Barzani, Mulla 'Babo" Mustafa Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani, and others exercised full dominion and control over these and other hidden assets, and willfully and criminally failed to report foreign bank accounts, and willfully and criminally submitted false offshore disclosure submissions, all of which actions were taken to impede, impair, obstruct and defeat the lawful governmental functions of the Internal Revenue Service in the ascertainment, computation, assessment and collection of revenue.  Defendant Masrour Barzani, by failing to comply with FATCA and CTA and other statutes, used monies gained by hiding his assets to promote the carrying on of unlawful activity and to injure Plaintiffs.  Defendant Masrour Barzani further knowingly and willfully, directly and indirectly, violated numerous U.S. criminal statutes

including 18 U.S.C. § 2314 in the international transfer of monies stolen, converted, or taken by fraud, artifice, bribery and misrepresentation, and violated 18 U.S.C. § 1956, knowing that the property involved in Defendant's financial transactions represents proceeds of unlawful activity.

### G.    Defendants Masrour Barzani Defrauded U.S. Immigration

648.    Defendant Masrour Barzani procured his U.S. immigration status by willful and fraudulent misrepresentation, concealment of material facts, and false swearing and perjury.

649.    For purposes of concealing the conspiracy and its wrongful acts, Defendant Masrour Barzani did knowingly and willfully devise, and attempt to devise a scheme and artifice to defraud the "green card" application process. Defendant Masrour Barzani conspired with and was aided and abetted by Defendant Rubar Sandi to obtain fraudulently a "green card". The conspirators, Masrour Barzani and Rubar Sandi, failed to disclose material criminal conduct, submitted perjured testimony and false swearing.   According to section 212(a)(6)(C)(i) of the Immigration and Nationality Act, "Any alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit provided under this Act is inadmissible."

650.    Defendants Masrour Barzani and Rubar Sandi did willfully perform acts and make statements to hide and conceal, and cause to be hidden and concealed, the purpose of, and the acts done in furtherance of, said scheme, and knew their representations and sworn testimony about these matters and concealment of material facts were false and misleading.



651.    Defendant Masrour Barzani illegally procured his naturalization because he was statutorily precluded from establishing the good moral character necessary to naturalize on account of his false testimony for the purpose of obtaining an immigration benefit.  Defendant Masrour Barzani is not of good moral character, as particularized throughout the instant case.  Congress has also explicitly precluded individuals who give false testimony for the purpose of obtaining immigration benefits from being able to establish the good moral character necessary to naturalize. 8 U.S.C. § 1101(f)(6).  Individuals who commit unlawful acts adversely reflecting upon their moral character cannot meet the good moral character requirement, unless they prove that extenuating circumstances exist. See 8 C.F.R § 316.10(b)(3)(iii); 8 U.S.C. § 1101(f).  "[A] conviction during the statutory period is not necessary for a finding that an applicant lacks good moral character. It

is enough that the offense was 'committed' during that time." *United States v. Suarez*, 664 F.3d 655, 661 (7th Cir. 2011) (discussing both 8 U.S.C. § 1101(f)(3) and 8 C.F.R. § 316.10(b)(3)(iii)).

652.    Defendant Masrour Barzani conspiring with Defendant Sandi did defraud the United States by impeding, impairing, obstructing, and defeating the lawful government functions of an agency of the United States, in administering and executing United States immigration laws and regulations; and did commit offenses against the United States, namely: Defendants Masrour Barzani and Sandi willfully procured a benefit under U.S. immigration laws; made a false representation; the false representation was willfully made; the false representation was material to the grant/approvability of the immigration benefit; and the false representation was made to a U.S. government official.  A misrepresentation is material when it has a "natural tendency to influence, or [be] capable of influencing, the decision of the decision-making body to which it was addressed." *United States v. Boffil-Rivera*, 607 F.3d 736, 741 (11th Cir. 2010)

653.    Defendant Masrour Barzani did knowingly procure, contrary to law, the naturalization of any person, and documentary and other evidence of naturalization and of citizenship, in violation of 18 U.S.C. § 1425(a); did knowingly obtain a lawful permanent residence card, knowing it to have been procured by means of any false claim and statement and to have otherwise been procured by fraud, in violation of 18 U.S.C. § 1546(a); did knowingly subscribe as true any false statement with respect to a material fact in any application, affidavit, and other document required by the immigration laws and regulations prescribed thereunder, and knowingly present any application, affidavit, and other document which contains any such false statement and failed to contain any reasonable basis in law and fact and accompanying affidavits and other documentation, in violation of 18 U.S.C. § 1546(a).   Defendant committed acts during the statutory period that constitute the essential elements of the following criminal offenses: false swearing in an immigration matter, in

violation of 18 U.S.C. § 1546(a); making false statements, in violation of 18 U.S.C. § 1001; and perjury, in violation of 18 U.S.C. § 1621(1).

654.    Defendant Masrour Barzani procured his status by willful misrepresentation of a material fact. See section 240(c)(4)(C) of the Act; *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985) (stating that a finding that is plausible in light of the record viewed in its entirety is not clearly erroneous).  Failure for Defendant Masrour Barzani "to apprise himself of the contents of this important document [Immigration application] constituted deliberate avoidance – an act the law generally does not recognize as a defense to misrepresentation."  See *Hanna v. Gonzales*, 128 F. App'x 478, 480 (6th Cir. 2005) (stating that "the law . . . charges [an applicant] with knowledge of the application's contents").  See also *Bautista v. Star Cruises*, 396 F.3d 1289, 1301 (11th Cir. 2005).  Defendant Masrour Barzani affirmed under oath that he had never given false or misleading information to any U.S. Government official while applying for any immigration benefit or to prevent deportation, exclusion, or removal, and signed the immigration form under penalty of perjury pursuant to the laws of the United States, thereby falsely certifying that the information he provided was true and correct.

655.    At the time Defendant Masrour Barzani was admitted as a lawful permanent resident, Defendant was inadmissible pursuant to 8 U.S.C. § 1182(a)(6)(C)(i), because he sought to procure admission into the United States or other benefit provided for in the Immigration and Naturality Act by fraud or willfully misrepresenting a material fact.  Because Defendant Masrour Barzani was not lawfully admitted for permanent residence, he was and remains ineligible for naturalization under 8 U.S.C. §§ 1427(a)(1) and 1429.

656.     As part of the artifice Defendant Sandi caused the submission of false and fraudulent information to USCIS's predecessor, INS, on behalf of Defendant Masrour Barzani to fraudulently obtain immigration benefits for Defendant Masrour Barzani.  Anyone who assisted the applicant in preparing the application was also required to sign the application and declare that the information contained within the application was true, which Defendant Sandi knew was not true. Defendant Rubar Sandi knew these statements to be false, in violation of 18 U.S.C. § 1546(a) and 18 U.S.C. § 1621(1), all constituting crimes involving moral turpitude. *See Marin Rodriguez v. Holder*, 710 F.3d 734, 738-39 (7th Cir. 2013) (18 U.S.C. § 1546(a)); *Ghani v. Holder*, 557 F.3d 836, 840 (7th Cir. 2009) (18 U.S.C. § 1001); *U.S. ex rel. Carella v. Karnuth*, 2 F.Supp. 998, 998-99 (2nd Cir. 1933) (perjury).

657.     Defendants Masrour Barzani and Rubar Sandi cannot establish extenuating circumstances for their false testimony and false statements, and they therefore cannot avoid the regulatory bar on good moral character found at 8 C.F.R. § 316.10(b)(3)(iii).

658.     Based on the law and facts contained herein, good cause exists to institute proceedings pursuant to 18 U.S.C. § 1451(a) to revoke the U.S. immigration status of Defendants Masrour Barzani and Rubar Sandi.

## XII.    DEFENDANTS ORCHESTRATE GLOBAL COMMERCIAL CORRUPTION

### A.    Defendants' Widespread Transnational Commercial Corruption

659.    The multi-billion-dollar BCE is a continuous large-scale transnational criminal monopoly with no apparent limitations, which poses a threat of continued criminal activity.  It is a tightly controlled family conspiracy enterprise with a clearly identified hierarchy engaged for decades in significant criminal activity, acting in concert with others, not in furtherance of the interests of the

sovereign Republic of Iraq; but is a personal and private criminal conspiracy that exercises the type of criminal actions by which a private party criminally engages in unlawful trade and traffic or commerce.

660.    Secrecy and concealment are predominant, essential, and fundamental features of their successful criminal conspiracy while operating their BCE and tortiously harming Plaintiffs..

661.    Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their agents and representatives, were enabled to commit the offenses, over a substantial decades-long period of time, because of their positions in the BCE and their involvement in and control over the enterprise's affairs, and served as a central force in the conspiracy, as part of a long-term association that exists for criminal purposes, and with relationships among those associated with the BCE, with longevity sufficient to permit those associates to pursue the enterprise's purposes, with a common or shared purpose amongst its members, having continuity of structure and hierarchy, and a goal of maintaining and expanding political power, minimizing or eliminating perceived or real political opposition, maximizing revenues and receiving proceeds from the illicit activities, preventing the infiltration of legitimate enterprise competition, and protecting and securing the discreet criminal scheme for future continuity.

662.    An internal cable of the Department of State, originating through the U.S. Embassy in Iraq, further describes, characterizes, acknowledges, and assesses, in these unambiguous quoted excerpts, the pervasive systemic corruption of the KRG leaders (including Defendants Masoud Barzani, Masrour Barzani and Waysi Barzani) and their impact on democracy:

(a)    "Corruption is Kurdistan's biggest economic problem."

(b)    "In Kurdistan corruption spread from the top down."

(c)    "Corruption relies on family-clan and/or peshmerga ties. Kurdish corruption starts at the top with a few political 'godfathers' who quietly distribute contracts among themselves."

(d)    "The biggest complaint most ordinary Kurds have about both the Kurdistan Democratic Party (KDP) and the Patriotic Union of Kurdistan (PUK) is their extreme corruption.  Most Kurds believe corruption permeates every level of the parties and the two Kurdistan Regional Governments (KRGs) they control: KRG-Erbil (KRG-E) and KRG-Sulaymaniyah (KRG-S).  Most believe the two parties see the ubiquitous political controls they put on public life as necessary to protect their respective sources of illicit funds.  Thus, common wisdom in Kurdistan links corruption and the democracy deficit."

(e)    "Corruption in Kurdistan follows a patron-client model.  KRG-E corruption centers more on the Barzani clan."

(f)    "Government contracting is predictably rife with corruption."

(g)    "Corruption has warped the growth of the entire Kurdistan economy. For example, the leading private companies in Kurdistan are all vertically integrated cross-sectoral conglomerates, e.g., Diyar Group, Eagle Group, Falcon Group, KAR Group, Nasri Group, Sandi Group, Silver Star Group and Ster Group. These conglomerates tend to have construction, import-export, logistics, real estate and security subsidiaries.  All of these companies are alleged to be allied to one or more non-competing 'godfathers' in the local ruling party."

(h)    "The economies and governments of the Kurdish north are tightly wrapped in the tentacles of the KDP…"

(i)    "Corruption is the main economic problem in the north. Corruption chases away much legitimate investment (although the Kurds have been wise enough to wield corruption as a tax and not a confiscatory device), delegitimizes the whole idea of free markets and democracy, increases the (still small but growing) support for Islamic parties and increases the power of the corrupt, making it less likely they can be pried out of their positions. Furthermore, intra-Kurd corruption feeds the fears of Arab, Christian and Turcoman minorities in Kirkuk that they will be completely shut out of government jobs (still the vast majority of all jobs here), contracts and markets by KDP and PUK loyalists."

619

663.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, assisted by their agents and representatives, are "responsible for and complicit in ordering, controlling, or otherwise directing, acts of significant corruption, including the expropriation of private or public assets for personal gain, corruption related to government contracts or the extraction of natural resources, bribery, or the facilitation of or transfer of the proceeds of corruption to foreign jurisdictions," and have "materially assisted, sponsored, or provided financial, material or technological support for, or goods and services in support of" such acts, in knowing and willful violation of the Foreign Assistance Act of 1961 and subject to immediate Presidential sanctions.  By their knowing and willful violation of the Foreign Assistance Act, Defendants have been enabled to finance the BCE and obtain the means to injure Plaintiffs.

### B.    Defendants' Counterfeiting of Pharmaceuticals and Cigarettes, Production and Distribution of Illicit Drugs

664.    Revenue received by the BCE from its illicit drug operation is used directly to finance BCE's tortious actions against Plaintiffs including attempted murder, murder, and torture, and other atrocity crimes.

665.    The extensive and financially significant international counterfeiting component of the BCE, which partially finances the BCE injuries to Plaintiffs, is directed by Defendants Masoud Barzani and Masrour Barzani.  Defendant Masrour Barzani is in partnership with co-conspirators who manage, oversee, profit, and money launder proceeds from counterfeiting operations of the BCE. Additionally, a co-conspirator, a major co-conspirator with Defendants Masrour Barzani and Waysi Barzani, acting as a co-conspirator for Defendant Masrour Barzani, is a principal representative of Defendant Masrour Barzani in business transactions, directs Defendant Masrour Barzani's illicit oil trades, and directs illicit proceeds to purchase properties in the United States and elsewhere for Defendant Masrour Barzani and his shell companies and other camouflaged

entities.  Co-conspirators Saad Alduski and Blend Aldoski manage and partner in manufacturing counterfeit cigarettes.  These co-conspirators, in managing this financially significant criminal enterprise element, with the intent to deceive and defraud the rightful owners of the companies whose products are being counterfeited, report directly to Defendant Masrour Barzani.

666.    Defendants, directed by Masrour Barzani, knowingly engaged, attempted to engage, and aided, abetted, and caused others to engage and attempt to engage in transactions,  dealings, the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing of illicit drugs and narcotics, and with one or more foreign persons designated by the Secretary of the Treasury as foreign terrorists or foreign terrorist organizations and willfully evaded and avoided, and do evade and avoid, the provisions of law prohibiting activity and dealings with such individuals.

667.    The illicit drug operation, including cocaine trafficking, punishable by death or life imprisonment under Iraq law, is headed by co-conspirator Nihad Barzani, brother of Defendant Masoud Barzani.   Nihad Barzani reports this criminal operation directly to Defendant Masrour Barzani.   Co-conspirator Ghafoor Khoshraw assists Nihad Barzani (a major director of oil smuggling and construction) and directs the highly profitable smuggling of cigarettes to Iran and the counterfeiting of U.S. brand cigarettes, along with electronic and technology product smuggling to Iran.

668.    The core of the BCE counterfeiting, piracy, and smuggling operations is its partnering with U.S.-designated anti-American terrorist organizations.  The products the BCE counterfeits include primarily U.S. registered and trademarked brands, thereby knowingly and intentionally creating a negative economic impact on the United States economy and on U.S. commercial interests.  By simultaneously channeling substantial criminal earnings to the BCE, Interpol has highlighted a disturbing relationship of counterfeiting and piracy with terrorist financing, with intellectual

property crime becoming the preferred method of financing for a number of terrorist groups, including those partnering and/or collaborating with the BCE.

669.    The BCE counterfeiting operations, in pursuit of illicit profits, continually, knowingly, and intentionally violates numerous international treaties and conventions to which the Republic of Iraq is a signatory nation, including the Paris Convention for the Protection of Industrial Property.

670.    The BCE, in pursuit of illicit profits, also continually, knowingly, and intentionally violates the established protocols of the World Intellectual Property Organization (WIPO).

671.    The BCE, in pursuit of illicit profits, also continually, knowingly, and intentionally violates and infringes on registrations issued by the U.S. Patent and Trademark Office ("USPTO"), an agency of the United States Government.

672.    While the overall magnitude of counterfeiting and piracy cannot be easily measured, counterfeiting and piracy are illicit activities in which the organized crime of the BCE networks thrive and with which revenue they finance their BCE.  Confidential Human Sources #1 and #8, who have direct clandestine access to senior officials of the KRG, estimate that the financial revenue from various counterfeiting operations of the BCE exceeds U.S. twenty million dollars per month – thus totaling billions of dollars to date as the BCE continues unabated and unhampered – make possible the damages and injuries inflicted upon Plaintiffs.

673.    With the knowing and willful authorization of Defendants Masrour Barzani and Waysi Barzani, counterfeit and illicit items produced by the BCE are transported in trucks along the route used to transport illicit drugs.  The trucks were unlawfully diverted and provided by the Barzani's from Hummer vehicles issued to KRG by the United States Government under foreign aid and defense aid agreements for official use by the KRG Peshmerga military and Parastin intelligence agents in furtherance of U.S. national security and foreign policy purposes.  Use of these trucks

and other equipment and materiel for transportation of counterfeit pharmaceuticals and illicit drugs violates U.S. law and directly provides funds to enable Defendants to injure Plaintiffs.

674.    Counterfeit items produced by the BCE, with the knowing and willful authorization of Defendants Masrour Barzani and Waysi Barzani, knowingly pose substantial health and safety risks to consumers, including U.S. citizens residing in or visiting the areas of KRG in Iraq.

675.    This illegal counterfeiting and trafficking, directed and controlled by Defendants Masrour Barzani and Waysi Barzani, harm American commercial interests that comply with law, and thus those of American citizen shareowners, including American public employee and union pension plans, investors, employees, contractors, suppliers, lenders, banks, and rights holders because of the impact that they have on (i) sales and licensing, (ii) brand value and firm reputation, and (iii) the ability of firms to benefit from the breakthroughs they make in developing new products. Revenue derived by illegal counterfeiting and trafficking provides substantial revenue to the BCE enabling the BCE to injure Plaintiffs.

### C.    Defendants' Counterfeiting of United States Brand Alcohol

676.    In the small Kurdistan village of Kalak, operating under the protective direction of Defendant Masrour Barzani, co-conspirators Shimal Jawhar Salih and others, with the intent to deceive and defraud, operate the counterfeiting of industry-leading and internationally trademark-protected whiskey brand Jack Daniels™.  The ownership of STER is purposefully hidden and concealed, but a Department of State internal cable from the Baghdad U.S. Embassy reveals Defendant Masrour Barzani as majority owner of STER.  STER is part of the BCE.

677.    STER Group, through its officers, employees, and agents, and co-conspirators Saad Aldoski and Blend Aldoski, knowingly and willfully manage and operate its alcohol counterfeiting operations.    Alcoholic beverage counterfeiting comprises a substantial part of the BCE counterfeiting revenue and provides substantial means for the BCE to injure Plaintiffs.

678.  Jack Daniels™ is a brand of Tennessee whiskey.  It is legally produced in Lynchburg, Tennessee, by the Jack Daniels Distillery, which is owned by the Brown–Forman Corporation, a major American business enterprise operating worldwide with licensed products and representatives.  STER and its criminal whiskey counterfeiting operation are not licensed by Jack Daniels, its parent company, or any related entity thereof.

679.   The counterfeit whiskey alcohol product produced by the BCE – illegally and deceptively and fraudulently packaged, branded, marketed, and distributed as Jack Daniels™ – is sold to consumers and local marketers in Iraq, and illegally exported to Turkey and beyond, all in direct financial harm to Brown-Forman and its millions of individual shareowners, to the trade detriment of the United States of America and its balance of trade, to the pecuniary detriment of U.S. financial capital and financial transfers, and to the criminal and unjust enrichment of the BCE, thus enabling Defendants to damage and injure Plaintiffs.

### D.    Defendants' Smuggling of Counterfeit United States Brand Products and U.S. Currency

680.   Co-conspirator Sihad Barzani is the BCE go-between with government officials of the government of Iran and its anti-American terrorist operatives and the smuggling operation operated by the BCE.  Sihad Barzani is Defendant Masoud Barzani's brother, and under the direction of Defendant Masoud Barzani and Defendant Masrour Barzani,  Sihad Barzani manages all BCE counterfeiting and money laundering operations.  He has offices in Haji Umran, Kurdistan, a known smugglers' border post near the Iran-Iraq border.

681.   Sihad Barzani holds the titular rank of General in the Kurdish Peshmerga, and acting under the command of Defendant Masrour Barzani, unlawfully diverts Peshmerga personnel and resources – very substantially funded by the United States Government – to the BCE to provide security and armed force for the BCE, and provide a part of the means to use violence against Plaintiffs and further the BCE.

682.    Under the direction of Defendants Masoud Barzani and Masrour Barzani, and with the intent to deceive and defraud, co-conspirator Sihad Barzani also supervises the BCE money laundering.  The BCE is engaged in the unlawful sale of oil to Iran – most of the sales of oil and diesel to Iran are directed by co-conspirator Nihad Barzani for Defendant Masrour Barzani. Significant amounts of oil and diesel have been resold by Nihad Barzani to U.S. military installations in the area of KRG as falsely labeled Iraq product and are contrary to and in circumvention of U.S. trade law and sanctions imposed by the Government of the United States. By knowingly and purposely taking advantage of illegal exchange rate manipulation, Confidential Human Source #8, having clandestine access to those in the Barzani inner circle, reports that every unlawful US$1million sale of oil to Iran nets the BCE US$200,000 on the exchange rate, diverted through German and Dubai banks and elsewhere and back to the Kurdistan region, providing means for the BCE to damage and injure Plaintiffs.

683.    Confidential Human Source #8 reports that every day the BCE unlawfully receives an estimated US$100mm U.S. currency through its oil sales.  Until March 2023, Confidential Human Source #1, who has direct clandestine access to senior officials of KRG, estimated that the BCE was selling 450,000 barrels per day – that number has since been reduced by the Iraq central government to an estimated 150,000 barrels per day.  Currency derived from illegal oil sales is transported inside oil tankers to the IRGC, which is short of currency.  The Treasury Department has verified that Iran then transfers these proceeds to Hezbollah, an organization designated by the United States as a FTO, which Defendants know.  Revenue from its unlawful trade with Iran enables the BCE to injure and damage Plaintiffs.

### E.    Defendants' Smuggling of Counterfeit United States Brand Pharmaceuticals and Medications

684.    With the intent to deceive and defraud, BCE operates an unlawful network trading in counterfeiting of pharmaceuticals and medications owned by corporations in the United States.

685.    The BCE counterfeit medications and drug formulation ingredients are substandard and unapproved medicines, dangerous to public health, and have not been tested by any government agency for safety, efficacy, content, or quality.

6986.  The pharmaceutical counterfeiting by the BCE, including co-conspirator Jawhau Salin, who manages counterfeiting of pharmaceuticals, knowingly violates U.S. trade laws, regulations, agreements, and intellectual property rights, and undermines and impairs trusted medicine supply chains, and knowingly and intentionally thereby defrauds and deprives U.S. license holders and product manufacturers of substantial revenue, earnings, and profits for shareowners – profit that has been diverted to the BCE to fund its operations that damage and injure Plaintiffs.

687.    Iraq has been a member nation of the World Customs Organization ("WCO") since June 6, 1990.  Its mission includes "to develop international standards and to protect society and to secure a fair revenue collection."  The Barzani criminal counterfeiting operation, operating under the command and control of Defendants Masoud Barzani, Mansour Barzani, and Waysi Barzani, is in clear and knowing and purposeful contravention of each of these principles and standards.

688.  The BCE produces, markets, and distributes a large volume of counterfeit U.S. pharmaceuticals and medications that, according to Confidential Human Source #8, who has direct clandestine access to senior KRG officials, comprise a substantial part of the minimum US$20,000,000 per month pharmaceutical counterfeiting revenue that funds the BCE operations that damage and injure Plaintiffs.

689.    The principal pharmaceuticals, counterfeited by the BCE, are only legally manufactured by Pfizer Inc., an American multinational pharmaceutical and biotechnology corporation headquartered in New York City, and publicly owned by millions of shareowners – each of whom are financially damaged by the BCE.

690.    Legitimate Pfizer pharmaceuticals are manufactured for distribution and prescribed use in Turkey and cannot legally be exported from Turkey.  In addition to its own counterfeit Pfizer products, the BCE, directed by Defendant Masrour Barzani and operated by co-conspirator Shimal Jawhar Salin and others, illegally and without license exports legitimate Pfizer pharmaceuticals from Turkey to Erbil, Kurdistan, Iraq where it markets and distributes them – with intent to deceive and defraud and with knowledge that Pfizer products are prohibited for sale outside of Turkey. These tortious actions by the BCE deprive Pfizer of sales revenue, deprive Pfizer shareowners of earnings and share value, and provide the BCE with the means to fund its operations that damage and injure Plaintiffs, including paying the costs of hit men to murder and sow fear in anyone in partisan or political opposition to the BCE.

691.    Defendants Masrour Barzani, Waysi Barzani, and their agents and representatives,  know and have full knowledge that no entity or person of the BCE is licensed by Pfizer, Inc. or any subsidiary or any related entity thereof.

692.    Another U.S. pharmaceutical counterfeited by the BCE, with the intent to deceive and defraud, is Eli Lilly medicines.  The procedure to profit from counterfeiting Lilly medicines is essentially the same as that for Pfizer. These unlawful activities also fund the BCE to provide the means to damage and injure Plaintiffs.

693.    Defendants Masrour Barzani, Waysi Barzani, and their agents and representatives,  know and have full knowledge that no entity or person of the BCE is licensed by Eli Lilly and Company or any subsidiary or any related entity thereof.

### F.    Defendants Produce and Traffic In Crystal Meth And Cocaine

694.    The largest source of illegal drug revenue for the BCE, according to Confidential Human Source #8, who has direct clandestine access to senior officials of the KRG, is crystal methamphetamine and cocaine.  The cocaine is unlawfully imported and distributed principally to

Europe and Asia. The BCE partners with international drug cartels and the IRGC to obtain cocaine, and manufacture crystal meth. In the business association with the IRGC and international drug cartels, the IRGC is the lead member because of Iran's desperate need for cash. Defendant Masrour Barzani directs the illegal drug operation through the intelligence agency of the KRG, which he controls. Sudafed raw material is imported from China and India in blister packaging. In Erbil, the Sudafed is taken out of the blister packs and shipped in bulk to Iran for chemical processing. The product comes back to Erbil as meth and is then distributed to world markets, principally Europe and Asia. Under the direct control and command of Defendant Masrour Barzani, co-conspirator Sihad Barzani manages the crystal meth and cocaine operation for the BCE. Profits from the crystal meth and cocaine operation provide a substantial part of the revenue that enables the BCE to damage and injure Plaintiffs.

### G. Defendants' Production and Distribution of Counterfeit U.S. Brand Cigarettes

695. Counterfeiting of U.S. brand cigarettes is a substantial financial component of the Barzani/STER counterfeiting business, directed principally by Defendant Masrour Barzani, with intent to deceive and defraud, frequently in partnership with co-conspirators Nizar Hanna Nasri, and managed by co-conspirators known by Plaintiffs and to be presented at trial. The largest volume product is counterfeit Marlboro cigarettes, a U.S. cigarette brand owned and manufactured by Philip Morris USA (a branch of Altria) and by Philip Morris International (now separate from Altria) outside the United States.

696. The counterfeiting operated by the BCE had and has a direct, substantial, and reasonably foreseeable effect on U.S. export trade and commerce, and to the harm of American national economic interests, to shareowners, corporate earnings, and injures the Plaintiffs by providing substantial funds to the BCE to support its worldwide regime of murder, torture, and terror.

697.    Cigarette counterfeiting as part of the BCE, according to Confidential Human Source #8, who has direct clandestine access to senior KRG officials. The counterfeiting is operated from a covert production facility in the marketplace city of Zakho, located a few kilometers from the Iraq–Turkey border. BCE controls the entire operation, and substandard counterfeit cigarettes are then sold throughout Iraq, providing substantial means to the BCE to injure Plaintiffs.

698.    Defendants Masrour Barzani, Waysi Barzani, co-conspirator Ghafoor Khoshnaw, and their agents and representatives, know and have full knowledge that no entity or person of the BCE is licensed by Philip Morris USA or Philip Morris International or Altria Group Inc. or any subsidiary or any related entity thereof.

699.    Through the BCE and its illegal terrorist organization collaborators, the BCE is funding terrorists directly and indirectly, and is part of the terrorism being financed.  This collaboration with terrorists facilitates the harm to Plaintiffs and others.  In testimony to the U.S. Congress, the Department of Justice, in the section "Narcotics Trafficking, Gun Running and Terrorism are Supported by Cigarette Smuggling", declared:

> *"Current investigations have identified instances of terrorist groups forming alliances with tobacco traffickers to generate monies used to support their organizations and activities."*

700.

Though the Islamic Republic of Iran is not a member nation of the World Trade Organization, it uses counterfeiting and piracy as terms to describe a range of illicit activities linked to intellectual property rights (IPR) infringement.  BCE counterfeiting constitutes infringement and willful infringement of IPRs described in the WTO Agreement on Trade-Related Aspects of Intellectual Property Rights (TRIPS); including trademarks, copyrights, patents, design rights, as well as a number of related rights – all of which are infringed by the

BCE, are large in scope and magnitude, and fund in substantial part the tortious BCE activities that have damaged and injured Plaintiffs.

## XII.    HIDING FRUITS OF THE BARZANI CRIMINAL ENTERPRISE

### 806A.  Defendants Diverted And Concealed Proceeds of Unlawful Activity

701.    Defendants willfully and knowingly, directly and indirectly, combined, conspired, confederated, and agreed together, and with other individuals and groups known and unknown, including Barzani family members and family members by marriage, to engage in fraudulenttortious schemes and organized, established, and operated front corporations as a part and object of the conspiracy, a personal and private action and the type of actions by which a private party engages in trade and traffic or commerce, holding and increasing its monopolistic market share and continuing to generate enormous profits, and to which defendants diverted the proceeds of unlawful activity of the Barzani Continuing Criminal EnterpriseBCE, traceable to the commission of their offenses, including but not limited to a sum of money in United States currency, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of unlawful activity, to wit: received proceeds from various criminal and tortious schemes or artifice, which have been comingled with other illicit proceeds, and transferred and directed others, including those named herein, to transfer those proceeds among the shell companies, investments, holdings, and offshore bank accounts, in such locales as Dubai, British Virgin Islands, the United States, and elsewhere, controlled by participants in the schemes in order to conceal and disguise the source, location, ownership and control of the funds.  (Title 18, United States Code, Section 1956 (h).)

702.    807.    With multiple illicit schemes, Defendant Masrour Barzani and his co-conspirators created and did structurestructured a complex network of co-conspirator front corporations, subsidiaries, and affiliates in multiple countries, including but not limited to STER Group and its

multiple subsidiary entities, Daline Group, Sardar Holdings, and Falcon Group, through which the conspirators, executives, employees, and nominees, with the intent to deceive and defraud, and by means of false and fraudulent pretenses and representations, coordinated the ~~fraud~~tortious activity around the globe including knowingly and willfully, directly and indirectly, concealing the ongoing criminal schemes.

~~808~~703.     Defendants' collected and aggregated cash in the United States and elsewhere, and laundered the proceeds of the criminal enterprise in order to promote and conceal their transnational criminal schemes, and caused false statements to be made to, and to destroy and conceal documents and records to evade detection from, regulatory and law enforcement authorities in the United States, Iraq, and elsewhere, and transmitted said proceeds throughout the world.  Through a network of limited liability corporations and other concealing entities utilizing the skill of ~~Defendant~~ attorneys ~~Jonathan~~Defendants Moore and ~~Joe~~ Reeder, Defendants also purchased and aggregated commercial, rental, and residential real property in the United States and elsewhere that were and are in fact the proceeds of Barzani transnational criminal activity.

~~809.     Defendant Lina Barzani, possibly a fictitious person but represented to be the 29-year-old daughter of another Barzani family member, Defendant Sirwan Barzani, and an American citizen born in Virginia in 1994, is the alleged owner of record of U.S.-based Lina Holdings and its many properties, allegedly including 526 residential units and a Hard Rock Cafe, that are estimated by Confidential Human #15, who has direct clandestine access to senior ranking officials of the Defendant Iraqi Kurdistan Regional Government, to exceed US$1 billion.  Defendant Lina Barzani allegedly administers a disguised repository, in the United States, of substantial illicit criminal earnings of the Barzani Continuing Criminal Enterprise.  Documents allegedly reveal that Lina Holdings owns 26 different companies, 14 hotels, six factories, 286 cafes, 540 apartments, 48 restaurants, 8 diverse centers, two tourism projects, one hospital, and one bank.  Defendant Lina~~

~~Barzani presents herself online as a Vice President of J.P. Morgan. However, J.P. Morgan does not list her in its global employee directory. Earnings from assets managed and "owned" by Defendant Lina Barzani and entities she "controls" flow to the Barzani Continuing Criminal Enterprise and are substantially used to harm Plaintiffs.~~

~~810.    All Barzani family members named and unnamed herein, including Barzani family members and family members related to the tortfeasors by marriage, as individuals, have enjoyed the trappings of profuse illicit wealth and benefited from and are used in and/or intended to be used in facilitating and/or committing the subject offenses of the Barzani Continuing Criminal Enterprise, including willfully concealing the proceeds derived from it, often through a series of transactions and shell companies located in the United States and abroad, with full knowledge, support and participation in Barzani family criminal activities.~~ **B.    Defendants' Illicit Proceeds Used Finance Harm to Plaintiffs**

704.    Defendants inclusive, and unknowns, are responsible, criminally, and/or in some other actionable manner, for the events and happenings hereinafter referred to, and caused injuries and damages proximately thereby to Plaintiffs John Does 1-5,000 as hereinafter alleged.

705.    Defendants, and each of them, acting as individuals, were the agents, servants, partners, representatives, associates, and employees of and co-conspirators with each and every other Defendant and were acting within the course and scope of their agency, partnership, agreement, association, and employment, and, to the extent permitted by law, are jointly and severally liable.

706.    Each of the individual Plaintiffs have suffered *past* injuries-in-fact, "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."  See *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560).  There exists a "substantial risk" that threatened *future* injury will occur.  (See *Stringer v. Whitley,* 942 F.3d 715, 721 (5th Cir. 2019)).  Thoroughly documented past

harms constitute an injury-in-fact for purposes of pursuing injunctive relief as they cause ",

present adverse effects."

811.   It was a part and object of the conspiracy that all Barzani family members named and unnamed herein, including Barzani family members related by marriage, and others known and unknown, as individuals, knowing that the property or money involved represented the proceeds of some form of illegal activity, would and did conduct and attempt to conduct financial transactions, which in fact involved proceeds of unlawful activity including violations of IEEPA and multiple U.S. statutes, knowing that their involvement was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of unlawful activity.

812.   "It defies credulity that" family members and family members by marriage "did not know that something illegal was afoot." *See Halberstam v. Welch*, 705 F.2d 472, 486 (D.C. Cir. 1983). Family members knew and know full well the purpose of the forays and the means by which Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and Barzani family members and family members by marriage, and other co-conspirators, had risen from "rags to riches" in a relatively short period of time.  Family members were compliant, but neither dumb nor duped, so long as their personal comfort and fortune were assured.  Each was a willing partner in these criminal activities.  (*See Halberstam v. Welch,* No. 81-0903, mem. op. at 5 (D.D.C. Mar. 24, 1982) [herein cited as District Court Opinion]).

813.   "Secondary liability for aiding and abetting 'reaches persons who do not engage in the proscribed activities at all, but who give a degree of aid to those who do.'"  (See *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 208 (D.C. Cir. 2022).  *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 176, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994).

814.   The support of all named and unnamed Barzani family members and family members by marriage in the Barzani Continuing Criminal Enterprise, from which each has substantially, luxuriously, and illicitly financially benefited and does benefit from proceeds traceable to violations of the subject offenses, has made it possible for the Barzani Continuing Criminal Enterprise to have the means, management, dominance, and absolute control necessary to enable it to damage and otherwise injure Plaintiffs.

815.   The Court of Appeals for the District of Columbia Circuit held that "accountability does not depend inexorably upon personal performance of the acts comprising an offense.  He who assists the perpetrator of crime in its commission is as much answerable as if he had engaged in all of its essential aspects himself." (See *United States v. Staten*, 581 F.2d at 886 (D.C. Cir. 1978)). Through assistance, facilitation, enablement, abetment, collaboration, concealment, disguise, dissimulation, duplicity, deception, endorsement, misrepresentation, commercial advantage, and financial participation, inclusion, and benefit, and other means, the co-conspirator Barzani family and family members by marriage, and their agents, representatives, employees, and contractors, are equally accountable for the prodigious criminal and tortious acts of the transnational Barzani Continuing Criminal Enterprise conducted over many years and in many nations to enrich and empower Defendants and to enable Defendants to relentlessly harm Plaintiffs.


### KURDISH VICTIMS FUND, A NON-PROFIT 501(C)(3) FOUNDATION

816.   Documentary evidence confirms the Barzani Continuing Criminal Enterprise, often acting under the false and intentionally misleading cloak of officialdom, has been responsible for the deliberate extrajudicial murder of in excess of five thousand men, women, and children during the decades of its continuing criminal activity. See *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (*quoting O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)).

### C.    The Totality of Defendants' Tortious Acts are Domestically and Internationally Well-Recognized

707.    By means of this civil complaint, Plaintiffs seek that all Defendants be jointly and severally found liable to the extent permitted by law due to Defendants' unlawful activity.  Each individual Defendant is indirectly liable by means of collusion and conspiracy.  The complaint sufficiently alleges facts from which it may be inferred each Defendant joined the conspiracy with knowledge of the conspiracy's plan and with intent of helping it to accomplish its goals.  Plaintiffs have sufficiently alleged and will prove at trial (1) two or more persons agreed to commit a wrongful act, (2) each defendant joined the conspiracy knowing of at least one of the goals of the conspiracy and with the intent to help accomplish it, and (3) one or more of the violations was committed by someone who was a member of the conspiracy and acted in furtherance of the conspiracy. *Cabello v. Fernandez – Larios* , 402 F.3d 1148 (11th Cir.2005).

708.    A preponderance of the evidence at trial will satisfy the civil standard of proof that Defendants are "liable for the misconduct alleged."  (*Twombly*, 550 U.S. at 556)

709.    In sum, the Defendants are individually and collectively legally responsible for their roles in the BCE,  described throughout the Complaint, in causing all alleged torts and harms to Plaintiffs.  All Defendants are also liable because they conspired and/or acted together in a joint criminal enterprise.

**PRAYER FOR RELIEF**

710    All Plaintiffs' claims for relief arise under and violate domestic law and international law as defined in agreements, treaties, declarations, conventions, and resolutions, but are not limited to the following:

   (a)    Customary international law and treaties of the United States;

   (b)    Statues and common law of the United States;

   (c)    Statues and common law of the District of Columbia;

   (d)    Any other applicable laws, domestic, foreign or international.


**GENERAL ALLEGATIONS**

711.    The tortious acts and injuries to Plaintiffs and their deceased relatives described herein, as well as those similarly situated, were part of a deliberate pattern and practice of systematic human rights and civil rights violations and crimes, implemented and carried out by Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, Muksi Barzani, Mulla 'Babo' Mustafa Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani, Areen Masrour Barzani, and Barzani family members. Jonathon S. Moore, Joe R. Reeder, Valerie Cupp, Juli Mai Sanford, Laura Geho Harris, Rubar Sandi, Treefa Aziz, Afan Saleh Omar Sherwani, Omar S. Barzini, Entifadh Kamal Qanbar, Hamza Salim, Hikmet Bamerni, Hayman Quass, and Dasko Shirwani, acting at the direction, encouragement, and/or deliberate acquiescence of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani.

712.    All Defendants are also jointly and severally liable because they conspired and/or acted together in a joint criminal enterprise.

713.    It is a reasonable inference that individual defendants obtained a direct benefit from the commission of violations of international law by BEC, bolstering the allegation that defendants acted with purpose and knowledge.  See *10-80652-CIV-MARRA* (D.C. Action, Does 1-976).

## FIRST CLAIM FOR RELIEF

John Doe victims have surviving families and dependents that deserve compensation for the loss of their loved ones. Members of surviving families fear reprisals and imminent threats, which are not imaginary nor wholly speculative, and are afraid to come forward and seek redress because in their autocratic control of the Kurdistan judicial system Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, and their co-conspirator agents and representatives, including Barzani family members and family members by marriage, and others known and unknown, have purposefully limited all avenues and access for victims and their families, including the impossibility of safely conducting investigation and discovery in provincial Iraqi Kurdistan, to obtain justice and redress. These victims and their families have no realistic hope to obtain justice in the Republic of Iraq or Defendant Iraqi Kurdistan Regional Government or from any court of Defendant Iraqi Kurdistan Regional Government controlled and directed by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barani, and lacking protection from reprisals or other intimidation and retributive measures, they severely fear, which is not imaginary nor wholly speculative, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani and the Barzani Continuing Criminal Enterprise.

817.    Plaintiffs have established and incorporated a United States non-profit 501(c)(3) charitable Foundation, the "Kurdish Victims Fund", an entity with grave responsibility on behalf of victims and permitted to hold an interest in property under federal and state law, to compensate from any recovery in the instant case the John Doe victims and their families (who have a significant privacy interest in avoiding being identified as targets for murder or enforced disappearance or other non-trivial harm by the Barzani Continuing Criminal Enterprise); and have included the Kurdish Victims Fund as an additional plaintiff.

818.    The United States District Court for the District of Columbia held in *Beer* "that foreign sovereigns cannot use the constitutional constraints of the Fifth Amendment due process clause to shield themselves from large punitive damages awards." *Oveissi v. Islamic Republic of Iran,* 879 F.Supp.2d at 56 (D.D.C.2012), citing *Beer v. Islamic Republic of Iran,* 789 F.Supp.2d 14, 16-26 (D.D.C.2011) (Lamberth, C.J.).  Defendant Iraqi Kurdistan Regional Government is *not* a foreign sovereign, and even if it were it could not shield itself from punitive damages awards.

819.    Moreover, punitive damages—a type of civil remedy—are by definition intended to punish. The United States Supreme Court has declared punitive damages "are not compensation for injury. Instead, they are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence." *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 350 (1974)  Previous decisions of this Court have provided compensation for the extreme fear and distress a victim experiences knowing his death is imminent.  See *Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 81–82 (D.D.C. 2011) ("Courts have been influenced not only by the length of time that the victim endured physical suffering, but by the victim's mental anguish stemming from the knowledge that death was imminent."); *Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 157 (D.D.C. 2010); *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002). Prior decisions of this Court have considered "the duration of the pain and suffering, the nature and extent of the injuries, the fear and terror experienced by the victim, and the circumstances surrounding the death." *Id.*

820.    The United States District Court for the District of Columbia noted in *Oveissi* that Iran is a foreign state "with substantial wealth and has expended significant resources sponsoring terrorism."  Though Iraqi Kurdistan is *not* a foreign state but merely a political subdivision thereof, the same characterization and description is germane, relevant, material, and applicable to the Barzani Continuing Criminal Enterprise, "with its substantial wealth", and Defendant Iraqi

Kurdistan Regional Government, both of which Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani control absolutely.  See *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, at 56 (D.C. 2012).

## COUNT I
### (TORTURE VICTIMS PROTECTION ACT OF 1991, 28 U.S.C. §1350)

821.    Plaintiffs reallege and incorporate by reference the allegations and preceding paragraphs as if fully stated herein.

822.    When Congress enacted the Torture Victim Protection Act (TVPA) in 1991, it explicitly created a new cause of action against individuals who commit torture or deliberated extrajudicial killing in violation of international law "under actual or apparent authority, or color of law", of any foreign nation. *See* 28 U.S.C. § 1350 note § 2(a). (Torture Victim Protection); *Nestlé USA, Inc. v. Doe*, 141 S. Ct. 1931, 1937-38 (2021) (opinion of Thomas, J.)  "28 U.S.C. § 1350 provides that a district court shall have original jurisdiction over civil actions 'by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.'" *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774,777 (D.C. Cir. 1984).

823.    In its 2023 opinion *Doe v. Cisco Systems, Inc.*, No. 15-16909 (9th Cir. July 7, 2023), the 9th Circuit stated:

> *"Congress enacted the TVPA in 1992 to "establish[ ] a civil action for recovery of damages from an individual who engages in torture or extrajudicial killing." Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note). The statute provides that "[a]n individual who, under actual or apparent authority, or color of law, of any foreign nation . . . subjects an individual to torture shall, in a civil action, be liable for damages to that individual." 28 U.S.C. § 1350 note § 2(a)."*

824.    The statute provides liability for an individual who "*subjects* an individual to torture." 28 U.S.C. § 1350 note § 2(a). It does not specify that an individual must directly "torture" another. The statute defines "torture" as the "intentional[ ] inflict[ion]" of any act causing "severe pain or suffering." 28 U.S.C. § 1350 note § 3(b). Defendant's intentional infliction of severe pain and suffering on Plaintiffs was done for the purpose of discrimination, intimidation, or punishment. If Congress had intended to restrict TVPA liability to those who themselves intentionally commit acts causing severe pain or suffering, it could have used the term "tortures" or "inflicts torture" in section 2(a), the liability provision. Instead, the term used was "subjects an individual to torture." The dictionary definition of the verb "subject" includes "to cause or force to undergo or endure (something unpleasant, inconvenient, or trying).' *Subject,* Merriam-Webster, https://www.merriam-webster.com/dictionary/subject (last visited Feb. 24, 2023); *see also Subject,* American Heritage Dictionary, https://www.ahdictionary.com/word/search.html?q=subject (last visited Feb. 24, 2023) (defining the verb "subject" as "[t]o cause to experience, undergo, or be acted upon"). "Subjects . . . to torture" thus encompasses not only individuals who directly torture another but also those who in some respect *cause* another to undergo torture.

825.    Cruel, inhuman or degrading treatment constitutes acts that "inflict mental or physical suffering, anguish, humiliation, fear and debasement, which do not rise to the level of torture or do not have the same purposes as torture." *Chiminya Tachiona v. Mugabe,* 216 F. Supp. 2d 262, 281 (S.D.N.Y. 2002). The dividing line between the two violations "derives principally from a difference in the intensity of the suffering inflicted." *In re S. Afr. Apartheid Litig.,* 617 F. Supp. 2d 228, 254 (S.D.N.Y. 2009) (citing Restatement (Third) of Foreign Relations Law § 702 Reporter's Note 5 (1987)). The Defendants actions as set forth herein constituted extreme infliction of mental and physical suffering, anguish, humiliation, fear and debasement upon Plaintiffs and were torture.

826.    The TVPA extended the Alien Tort Claims Act (ATCA), 28 U.S.C. § 1350 (1991). *See* H. R. Rep. No. 102-367, at 3 (1991), reprinted in 1992 U.S.C.C.A.N. 84, 86. Additionally, other international agreements impose liability for torture, killing, and mistreatment. *See e.g.,* Universal Declaration of Human Rights, U.N. General Assembly Res. 217(III)(A) (1948); International Covenant on Civil and Political Rights, U.N. General Assembly Res. 2200(XXI)A, U.N. Doc. A/6316 (1966); European Convention for the Protection of Human Rights and Fundamental Freedoms, Art. 3, Council of Europe, European Treaty Series No. 5 (1968). *See Cabello v. Fernandez-Larios,* 402 F.3d 1148 (11th Cir. 2005).

827.    The TVPA encompasses claims against those who aid and abet torture and deliberated extrajudicial killing and other acts of atrocity crimes.

828.    Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani and the other named defendants, and others acting under their command, as individuals acting deceitfully under actual or apparent authority, or color of law, of the Republic of Iraq and the subordinate Defendant Iraqi Kurdistan Regional Government thereof have directly and indirectly subjected Plaintiffs to torture, enforced disappearances, extrajudicial killing, summary executions, and other tortious acts. These deliberated killings were not authorized through any kind of judicial judgment or court authorization falling within the TVPA's exception. 28 U.S.C. § 1350 note § 3(a).

829.    The District Court of the District of Columbia has held that "summary executions" and "a course of indiscriminate brutality, known to result in deaths", such as those committed by Defendants, can be "extrajudicial killings" under the TVPA. *See Flatow v. Islamic Republic of Iran,* 999 F. Supp. 1, 17 (D.D.C. 1998), *abrogated on other grounds as recognized in Christie v. Islamic Republic of Iran,* No. CV-19-1289 (BAH), 2020 WL 3606273, at *21 (D.D.C. July 2, 2020).

830. Defendants have created a regime of pervasive fear, which is not imaginary nor wholly speculative, and Plaintiffs and others have reasonable fear of retributive reprisals against themselves or members of their families, coupled with the impossibility of safely conducting investigation and discovery in geographical areas and government agencies controlled by Defendant Iraqi Kurdistan Regional Government that prevents the personal representatives of the five thousand murder victims and most victims of torture from stepping forward to seek redress in United States Courts pursuant to the provisions of the Torture Victim Protection Act of 1991. For that reason, Plaintiffs have established the Kurdish Victims Fund that will provide a means to provide aid to the families of murder and torture victims and who will continue to suffer from the emotional and psychological scars of these acts of torture for years to come. Plaintiffs are still grappling with the trauma: entire families murdered, tortured and mutilated, children and elderly people ripped from the arms of their loved ones and disappeared. All these atrocities are well documented. The injuries are directly traceable to actions of the defendants.

831. As a direct and proximate result of the Defendant's tortious conduct, the estate of Jihan Taha Abdulrahman suffered severe, substantial, and continuing damages. Plaintiff Shakhwan Abdulrahman, as representative of Jihan Taha Abdulrahman, deceased, demands judgment against all Defendants of the Barzani Continuing Criminal Enterprise for her kidnapping, imprisonment, torture, murder, and wrongful death, an act of international terrorism directly and proximately caused by defendant's actions, in retaliation for Jihan's speech and television interviews against the Barzani regime and to prevent her further public statements, in an amount sufficient to compensate her family for her loss, and for punitive damages in an amount sufficient to punish Defendants for her inhumane torture and murder. Based on the immense illicit wealth of the Barzani Continuing Criminal Enterprise, much of which wealth is hidden under false names and

shell and front corporations in the United States, punitive damages for the torture and murder of Jihan should be at least one billion dollars.

## COUNT II
## DEPRIVATION OF CONSTITUTIONAL RIGHTS,
## HATE CRIMES, AND ASSAULT AND BATTERY OF AMERICAN CITIZEN

832.    Plaintiff Shakhwan Abdulrahman demands judgment against Defendant Arfan Salih Omer Sherwani, Defendant Hamza Salim, Defendant Masrour Barzani, Defendant Hikmet Bamerni, Defendant Dasko Shirwani, Defendant Hayman Quassi, and all other Defendants who comprise the Barzani Continuing Criminal Enterprise for deprivation of constitutional rights secured by the First Amendment, indelibly scarred if ever compromised, and for personal cumulative injuries suffered, in Defendants' efforts to restrain free speech that was wholly political in nature, as a direct causative result of the assault and battery against him, with bodily injuries, without probable cause, on February 29, 2024, in Washington, D.C. in an amount sufficient to compensate him for the injuries he has suffered.  Plaintiff Shakhwan Abdulrahman also demands punitive damages against Defendants because of the willful and wanton assault and battery that deprived him of his guaranteed Constitutional right, enshrined in the Bill Of Rights, to peaceably assemble and express his views.  The Supreme Court said in *Elrod v. Burns*, 427 US 347 (1976), "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod* at 373. See also *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 592 U.S., 208 L. Ed. 2d 206 (2020).  The Supreme Court is loath to ever validate a prior restraint on free speech.  "Any prior restraint on expression comes to this Court with a 'heavy presumption' against its constitutional validity." *Carroll v. Princess Anne*, 393 U. S. 175, 393 U. S. 181 (1968); *Bantam Books, Inc. v. Sullivan*, 372 U. S. 58, 372 U. S. 70 (1963)." *Nebraska Press Assn. v. Stuart*, 427 U.S. 539 at 558 (1976).

833. Defendants did with malicious intent commit assault, battery, intentional infliction of emotional distress, hate crimes, hate crimes under D.C. Code § 22-3704, and civil rights violations pursuant to 42 U.S.C. § 1985, and did intentionally "cause a harmful or offensive contact with the plaintiff", and "intentionally caused the plaintiff to be placed in apprehension of such conduct." *See Acosta Orellana v. CropLife International* , 711 F.Supp.2d 81, 92 (D.D.C. 2010). An assault is "'an intentional and unlawful attempt or threat, either by words or acts, to do physical harm to the victim.'" *Hall v. District of Columbia* , 867 F.3d 138, 158 (D.C. Cir. 2017) (quoting *Evans-Reid v. District of Columbia* , 930 A.2d 930, 937 (D.C. 2007)). Plaintiff Shakhwan Abdurahman "suffered apprehension of harmful or offensive contact" and a "reasonable person in his position would have experienced such apprehension." *Collier v. District of Columbia* , 46 F.Supp.3d 6, 14 (D.D.C. 2014). Plaintiff's emotional distress resulted from "(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff [to suffer] severe emotional distress." *Ortberg v. Goldman Sachs Grp.* , 64 A.3d 158, 163 (D.C. 2013) (internal quotation marks omitted).

834. Few principles are more basic to the First Amendment than the fundamental precept that words are presumptively protected, regardless of their content. Defendant Shakhwan Abdulrahman has an unquestioned right, as does any American citizen entitled to First Amendment protection, to expression of views, without regard to its substantive content, ideological valence, or particular viewpoint, in safety, peace, and dignity, and without fear of molestation. Pure speech is a category of expression that receives "comprehensive protection under the First Amendment," See *Tinker v. Des Moines Indep. Cmty. Sch. Dist.,* 393 U.S. 503, 506 (1969); *303 Creative*, 143 S.Ct. 2312.

835. Defendant Arfan Salih Omer Sherwani, Defendant Masrour Barzani, Defendant Hamza Salim, Defendant Hikmet Bamerni, Defendant Dasko Shirwani, Defendant Hayman Quassi, and

644

all other Defendants who comprise the Barzani Continuing Criminal Enterprise unlawfully and purposefully used a degree and nature of force and intimidation and violence to stifle freedom of speech and legitimate political expression, cavalierly offensive to fundamental American rights and values, and the lawful recording thereof, in an unrestricted public place in the national capital city of the United States of America.   Plaintiff Shakhwan Abdulrahman's First Amendment interests were threatened and in fact were impaired by these unlawful acts to suppress speech.

836.   Moreover, awarding damages also serves United States national security interests by deterring foreign actors who sponsor terrorism and torture.

837.   In the instant case, remedies for Plaintiffs theoretically offered by Kurdistan courts are ineffective, unobtainable, unduly prolonged, inadequate, and obviously and patently futile, and Plaintiffs would suffer retaliation for bringing claims in Kurdistan. *See Jean v. Dorelien,* 431 F.3d 776, 783 (11th Cir. 2005)   There has been no criminal or civil accountability for crimes or human rights violations by Defendant Iraqi Kurdistan Regional Government or its leaders Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents and representatives.  The Defendant Iraqi Kurdistan Regional Government Peshmerga military justice system, operated under and directed by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents and representatives, did not discipline anyone involved in the crimes.  The Defendant Iraqi Kurdistan Regional Government judiciary, directed and controlled by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents and representatives, appears unable or unwilling to provide an adequate forum for the pursuit of claims rooted in these violations.  The Defendant Iraqi Kurdistan Regional Government judiciary does not function in a manner that allows Plaintiffs to reasonably pursue their claims.  *See, e.g., Ahmed v. Magan,* No. 2:10-CV-342, 2011 WL 13160129, at *5 (S.D. Ohio Nov. 7, 2011).   It is well and publicly documented by agencies of the United States and the United Nations that the Defendant Iraqi Kurdistan Regional

Government judiciary suffers from corruption and a lack of due process, political independence, and opacity.

838.    Under the TVPA, "[a] court shall decline to hear a claim under [the TVPA] if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred." 28 U.S.C. § 1350, note, sec.2(e).  Where local remedies are not "adequate" or "available" then a TVPA claimant need not first attempt to exhaust such remedies before suing. "The legal remedies offered by the [local] courts were [ ] ineffective, unobtainable, unduly prolonged, inadequate or obviously futile."  *Enahoro v. Abubakar,* 408 F.3d 877, 892 (7th Cir. 2005).  The District Court of the District of Columbia has likewise acknowledged that plaintiffs need not meet the exhaustion requirement under certain circumstances.  For example, plaintiffs need not exhaust their local remedies if the plaintiffs would suffer retaliation for bringing their claims locally.  See *e.g., Doe v. Exxon Mobil Corp.,* 393 F.Supp.2d 20, 25 (D.D.C. 2005).

839.    The perpetrators of atrocity crimes, torture, extrajudicial killing, and human rights abuses detailed herein remain ensconced in positions of power and authority in the Defendant Iraqi Kurdistan Regional Government, coupled with the fact that the Defendant Iraqi Kurdistan Regional Government has taken no action against any accused offenders, Plaintiffs' had and have reasonable, justified, substantial, and persistent fear of violent reprisal for bringing claims of such violations.  See *Jane W. v. Thomas*, Civil Action No. 18-0569 (E.D. Pa. Nov. 14, 2018).  *Jane W. v. Thomas*, 560 F. Supp. 3d 855 (E.D. Pa. 2021).

840.    Plaintiffs have established Defendant's liability under the Torture Victim Protection Act, 28 U.S.C. § 1350 note, for the acts of extrajudicial killing of Plaintiffs' decedents, attempted extrajudicial killings, and torture.  These are acts for which the TVPA creates an "unambiguous and modern basis" for liability.  See *Sosa v. Alvarez-Machain,* 542 U.S. 692, 728, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004) (citing H.R. Rep. No. 102-367, at 3 (1991)).

841. The District Court of the District of Columbia has interpreted the TVPA to allow liability for attempted extrajudicial killings, such as the attempts on Plaintiff Maki Revend, "even if no one died as a result of [the] attempt." *Gill v. Islamic Republic of Iran,* 249 F. Supp. 3d 88, 99 (D.D.C. 2017) (citing *Warfaa v. Ali,* 33 F. Supp. 3d 653, 666 (E.D. Va. 2014)) *aff'd,* 811 F.3d 653 (4th Cir. 2016).

842. The United States Supreme Court expressly held that plaintiffs in a federal cause of action under §1605A(c) may seek retroactive punitive damages for pre-enactment conduct and explicitly made a new cause of action available to remedy certain past acts of terrorism and related actions. See *Opati v. Republic of Sudan*, 140 S. Ct. 1601, 590 U.S., 206 L. Ed. 2d 904 (2020).

843. The private right of action in 28 U.S.C. § 1605A(c) also authorizes "punitive damages," which "serve to punish and deter the actions for which they are awarded." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d at 87. (D.C. 2010). Courts balance four factors to determine the appropriate amounts of punitive damages: "(1) the character of the defendants' act; (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." See *Cabrera v. Islamic Republic of Iran*, Civil Action No. 19-3835 (JDB) (D.C. Jan. 27, 2023), (quoting *Oveissi v. Islamic Republic of Iran,* 879 F.Supp.2d at 56 (D.D.C.2012) and *Acosta v. The Islamic Republic of Iran*, 574 F. Supp. 2d at 30 (D.C. 2008) citing *Acosta,* 574 F.Supp.2d at 30 (citing *Flatow v. Islamic Republic of Iran,* 999 F.Supp. 1, 32 (D.D.C.1998)).

844. Defendants' individual conduct of torture and other associated gross criminal violations is "part of a longstanding pattern and policy, making the need for deterrence clear." See *Abedini v. Government of Islamic Republic of Iran*, 422 F. Supp. 3d 118, at 141 (D.C. 2019).

845. In the instant case, all four factors weigh overwhelmingly in favor of awarding significant punitive damages. Wherefore, Plaintiffs demand judgment against Defendants, recognizing their

~~massive illicit wealth, for compensatory damages, including solatium, in an amount sufficient to~~ ~~compensate them for injuries perpetrated by Defendants and for solace; and for punitive damages~~ ~~sufficient to punish Defendants, acting as individuals, for the willful torture and extra-judicial~~ ~~killings and associated criminal acts and atrocity crimes, and sufficient to "yield the desired~~ ~~deterrent effect." See~~ *~~Valore v. Islamic Republic of Iran~~*~~, 700 F. Supp. 2d at 88 (D.C. 2010). The~~ ~~injuries are directly traceable to the challenged action of the defendants. "The state-sponsored~~ ~~terrorism exception to the FSIA expressly contemplates the award of solatium damages to the close~~ ~~relatives of terrorism victims." See 28 U.S.C. § 1605A(c). An award of solatium is intended to~~ ~~compensate for the "the mental anguish, bereavement and grief that those with a close personal~~ ~~relationship to a decedent experience as the result of the decedent's death, as well as the harm~~ ~~caused by the loss of the decedent." See~~ *~~Fritz v. Islamic Republic of Iran~~*~~, Civil Action No. 2015-~~ ~~0456 (D.D.C. 2018) , citing~~ *~~Belkin v. Islamic Republic of Iran~~*~~, 667 F. Supp. 2d 8, 22 (D.D.C.~~ ~~2009).~~

## COUNT III

*(ANTI-TERRORISM ACT – 18 USC 2333)*

*[All Defendants: Aiding-And-Abetting Liability, Attack Predicate]*

~~846~~714.    Plaintiffs ~~reallege~~repeat and ~~incorporate by reference~~re-allege each of the ~~allegations and preceding~~foregoing paragraphs ~~as if~~, *supra,* and are fully ~~stated herein.~~incorporated here by reference.

715.    The tortious terrorist acts committed by Defendants which killed or injured Plaintiffs and their family members, were violent acts and acts dangerous to human life that violated the criminal laws of the United States and many States, or would have violated those laws had they been committed within the jurisdiction of the United States or of the States. In particular, each attack

constituted one or more of murder, attempted murder, conspiracy to murder, kidnapping, and arson, in violation of state law; conspiracy to murder in a foreign country, killing and attempted killing of U.S. employees performing official duties, hostage taking, killing U.S. nationals abroad, use of weapons of mass destruction, commission of acts of terrorism transcending national boundaries, and bombing places of public use, in violation of 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, and 2332f, respectively.

716.847    Defendants aided and abetted and knowingly provided substantial assistance to alQaeda, al-Qaeda-in-Iraq, and Islamic State – and aided and abetted and knowingly provided substantial assistance to al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's attacks on Plaintiffs – by making payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State that financed those attacks, and, by obstructing United States counterterrorism policy by fraudulently concealing their protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State for years.

717.    The terrorist attacks that killed or injured Plaintiffs and their family members were committed, planned, and/or authorized by al-Qaeda, al-Qaeda-in-Iraq, and/or Islamic State which the United States has designated as FTOs under 8 U.S.C. § 1189 since 1999, 2004, and 2004, respectively.  The terrorist attacks committed by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, which killed or injured Plaintiffs and their family members, were violent acts and acts dangerous to human life that violated the criminal laws of the United States and many States, or would have violated those laws had they been committed within the jurisdiction of the United States or of the States. In particular, each attack constituted one or more of murder, attempted murder, conspiracy to murder, kidnapping, and arson, in violation of state law; and the destruction of U.S. property by fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing of U.S. employees performing official duties, hostage taking, killing U.S. nationals abroad, use of weapons of mass destruction, commission of acts of terrorism transcending national boundaries, and

bombing places of public use, in violation of 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, and 2332f, respectively

718.    The Anti-Terrorism Act (ATA) is an exercise in universal civil jurisdiction, as it extends domestic judicial jurisdiction over actions that occurred abroad to foreign plaintiffs; it has historically been a means for non-U.S. citizens to seek redress for serious human rights violations committed outside of the U.S.    It provides in full: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. The Alien Tort Statute ("ATS") confers district courts with "original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350.    A defendant may be liable for conduct that is "either a direct violation of the law of nations or the aiding and abetting of another's violation of the law of nations." *Balintulo v. Ford Motor Co.,* 796 F.3d 160, 166 (2d Cir. 2015); *accord Licci by Licci v. Lebanese Canadian Bank, SAL (Licci II),* 834 F.3d 201, 213 (2d Cir. 2016).    Before the ratification of the Constitution and the passage of the Judiciary Act of 1789 to implement its provisions, several international scandals had resulted from the "inability to provide judicial relief to foreign officials injured in the United States." *Kiobel,* 569 U.S. at 123; see also *Jesner,Jesner,* 138 S. Ct. at 1396-97 138 S. Ct. at 1396-97 (majority op.). Noting the problems caused by the lack of a forum in which aggrieved foreigners – in particular, ambassadors – could find an appropriate remedy, the Supreme Court in *Jesner* concluded that the First Congress of the United States enacted the ATS as part of the Judiciary Act of 1789 to "promote harmony in international relations by ensuring foreign plaintiffs a remedy for international-law violations in circumstances where the absence of such a remedy might provoke foreign nations to hold the United States accountable." - 138 S. Ct. at 1396-97, 1406138 S. Ct. at

1396-97, 1406 (majority op.); *see* also *Kiobel,Kiobel,* 569 U.S. at 123, and *Doe v. Cisco Systems, Inc.*, No. 15-16909 (9th Cir. July 7, 2023).

848719.     Al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's terrorist attacks occurred primarily outside the territorial jurisdiction of the United States.

720.     Plaintiffs are entitled to recover for their injuries under the federal Anti-Terrorism Act ("ATA")., through which Defendants are liable because they aided and abetted terrorist acts in Iraqi Kurdistan and elsewhere. 18 U.S.C. § 2333(d)(2). Plaintiffs accordingly seek justice under the ATA's aiding-and-abetting provision, which Congress enacted "to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." *Justice Against Sponsors of Terrorism Act* ("JASTA") § 2(b), Pub. L. No. 114-222, 130 Stat. 852, 853 (2016). See *Owens v. BNP PARIBAS, SA*, 897 F.3d 266, 277 (D.C. Cir. 2018).

849.     (721.  On January 4, 2022, the United States Court of Appeals for the D.C. Circuit decisively rejected every core legal argument advanced by the defendants in *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204 (D.C. Cir. 2022), broadly ruling that corrupt payments to terrorists in Iraq, which includes Defendant Iraqi Kurdistan Regional Governmentthe KRG, including protection payments, supported liability under the ATA. The D. C. Circuit Court further held the ATA "authorizes victims of terrorism to recover against anyone shown to have played a primary (direct) or secondary (aiding-and-abetting) role." (See *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 208 (D.C. Cir. 2022). Defendants, through their Washington, D.C. representatives and learned attorneys and other advisors, knew or should have known about the D.C. Circuit's *Atchley* ruling, which received significant media coverage, and further incentivized Defendants to

continue concealing their corrupt payments and transferal of materiel and transferal of sensitive and classified U.S. national defense information, gathered and owned by the United States government, including information from agencies that comprise the United States Intelligence Community and the ~~United States~~ Department of Defense, received by Defendants in their official capacities with the ~~Defendant Iraqi Kurdistan Regional Government~~KRG, to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.  The corrupt payments and transfers of materiel and intelligence information have materially provided means to operate and perpetuate the criminal enterprise that has ~~harmed~~injured Plaintiffs.

~~850~~722.    There are reasonable grounds and sufficient evidence to prove that Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, their agents and representatives ~~including Barzani family members and family members by marriage,~~ are jointly and severally liable for the aforementioned acts which harmed Plaintiffs, and continue to ~~harm~~injure Plaintiffs, none of which were permitted, sanctioned, or authorized by international law, international treaty or convention, Iraq law, or ~~Defendant Iraqi Kurdistan Regional Government~~KRG law, (i) for having committed or caused to be committed the acts, in furtherance of the ~~Barzani Continuing Criminal Enterprise~~BCE, directly, jointly with others and/or through others, and (ii) for his/their failure to exercise control properly over civilian, police, custodial, and military subordinates who committed the acts, or allowed for their commission, and who operated under his/their effective authority and control, pursuant to superior responsibility.

~~851~~723.    As a result of Defendants' torture and abuse, Plaintiffs, in their individual capacities, have suffered damages and will continue to suffer from the emotional and psychological scars and lack of sense of safety, protection, and security of these acts of terror for years to come. The injuries are directly traceable to the actions of the defendants.

852724.    The character of the acts and omissions of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, their agents, representatives, ~~servants, and Barzani family members and family members by marriage,~~and servants were deliberate, willful, knowing, intentional, wanton, malicious and oppressive, and should be punished by an award of punitive damages.

853725.    The private right of action in 28 U.S.C. § 1605A(c) also authorizes "punitive damages," which "serve to punish and deter the actions for which they are awarded." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d  at 87. (D.C. 2010).  Courts balance four factors to determine the appropriate amounts of punitive damages: "(1) the character of the defendants' act; (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants."  See *Cabrera v. Islamic Republic of Iran*, Civil Action No. 19-3835 (JDB) (D.C. Jan. 27, 2023), (quoting *Oveissi v. Islamic Republic of Iran,* 879 F.Supp.2d at 56 (D.D.C.2012) and *Acosta v. The Islamic Republic of Iran*, 574 F. Supp. 2d at 30 (D.C. 2008).

854726.    In the instant case, all four factors weigh strongly in favor of awarding significant punitive damages.  Wherefore, Plaintiffs Maki Revend, Shakhwan Abdulrahman, and Shakhwan Abdulrahman as representative of his tortured and murdered sister, Jihan Taha Abdulrahman,  and 5,000 John Does, merit judgment against Defendants in an amount sufficient to compensate them for injuries perpetrated and ~~continuing~~ injuries and threatened future injury, and it is absolutely clear the alleged wrongful behavior could reasonably be expected to recur, by Defendants and for significant losses and damages suffered from their plan, scheme, conspiracy, and course of conduct, and the fruits of their multitudinous crimes, in which each of the Defendants participated directly or indirectly, and willfully, directly and indirectly, intentionally, knowingly, and repeatedly in violation of the law of nations and willfully, intentionally, knowingly, and repeatedly, directly and indirectly, ignored laws and international treaties and conventions  governing malum

in se offenses, which dictate civilized and lawful behavior, of the sovereign Republic of Iraq, ~~the provincial Defendant Iraqi Kurdistan Regional Government~~KRG, and the United States ~~of America~~; and by reason of the acts, transactions, and omissions alleged herein; and solatium damages; and for treble damages as provided by law, sufficient to "yield the desired deterrent effect,"  See *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d at 88 (D.C. 2010)) along with costs of suit, including attorney's fees.

~~855~~727.      Solatium is "the mental anguish, bereavement[,] and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent['s] society and comfort."  See *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8 at 22 (D.C. 2009).  It also includes mental suffering as a result of injury to a loved one. E.g., *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d at 85 (D.C. 2010).  A solatium claim under § 1605A(c) is "indistinguishable" from a claim for intentional infliction of emotional distress,  *Estate of Hirshfeld v. Islamic Republic of Iran*, 330 F. Supp. 3d 1at 140 (D.C. 2018), and courts have applied elements of intentional infliction of emotional distress from the Second Restatement of Torts to FSIA solatium claims,  (*see,* e.g.,  *Selig v. Islamic Republic of Iran*, 2021 WL 5446870 at 12 (D.D.C. Nov. 22, 2021)).  Although, in a traditional tort context, a family member must generally be present at the time of an attack to recover for intentional infliction of emotional distress, Restatement (Second) of Torts § 46(2)(a) (Am. Law Inst. 1965), FSIA claimants need not meet this requirement because "a terrorist attack – by its nature – is directed not only at the victims but also at the victims' families,"  *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115 n.12 (D.D.C. 2005); accord, e.g., *Valore,* 700 F. Supp. 2d at 80 ("[T]errorism [is] unique among the types of tortious activities in both its extreme methods and aims . . . . One . . . need not be present at the time of a terrorist attack upon a third person to recover for severe emotional injuries suffered as a result." (citation omitted). *Cabrera v. Islamic Republic*

*of Iran*, Civil Action No. 19-3835, at 93 (JDB) (D.C. Jan. 27, 2023).  Plaintiffs' injuries are directly traceable to the challenged actions of the defendants.

856728.    Courts may "presume that those in direct lineal relationships with victims of terrorism suffer compensable mental anguish" … as sufficient for entitlement to solatium damages. *See Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 403 (D.D.C. 2015).

857.    Defendants729.    Defendant's conduct of terrorism and other associated gross criminal violations is "part of a longstanding pattern and policy, making the need for deterrence clear."  See *Abedini v. Government of Islamic Republic of Iran*, 422 F. Supp. 3d 118, at 141 (D.C. 2019).

858.    Wherefore,730.    Wherefore, as a result of Defendants' liability under 18 U.S.C. § 2333(d), Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.  Plaintiffs demand judgment against Defendants, recognizing their massive illicit wealth, for compensatory damages, including solatium, in an amount sufficient to compensate them for injuries perpetrated by Defendants and for solace; and for punitive damages sufficient to punish Defendants, acting as individuals, for the willful torture and extra judicial killings and associated criminal acts and atrocity crimes, and sufficient to yield the desired deterrent effect. See *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d at 88 (D.C. 2010).

## COUNT IV
### ( EXTRAJUDICIAL KILLING)

### 859SECOND CLAIM FOR RELIEF

#### *(Torture)*

731.    Plaintiffs reallegerepeat and incorporatere-allege each of the foregoing paragraphs, *supra, and are fully incorporated here* by reference the allegations set forth.

732.    The tortious acts described herein.

860.   The killings of Plaintiffs' Decedents by Defendants constitute deliberated extrajudicial killingstorture as defined by the Torture Victim

Protection Act, ("TVPA"), Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note). Additionally, these acts constitute "tort[s] ... committed in violation of the law of nations or a treaty of the United States" under the Alien Tort Statute, 28 U.S.C. § 1350, in that they were in violation of customary international law prohibiting torture as reflected, expressed, defined, and codified in multilateral treaties and other international instruments, international and domestic judicial decisions and other authorities.

733.   The absolute prohibition of torture and other ill-treatment is universally recognized. It is set out in all the major international and regional human rights instruments; is reflected in customary international law; and enjoys *jus cogens* status as a peremptory norm under international law (See *Vienna Convention on the Law of Treaties*, May 23, 1969, 1155 U.N.T.S 331 ("Vienna Convention") (Article 53)), from which no derogation is permitted. See, e.g., *Blake v. Republic of Argentina*, 965 F.2d 699, 714 (9th Cir. 1992).

734.   The torture of Plaintiffs did not arise from, and was not inherent in or incidental to, any lawful sanctions.

735.   Congress explicitly created a new cause of action against individuals who commit torture or deliberated extrajudicial killing in violation of international law "under actual or apparent authority, or color of law", of any foreign nation. *See Nestlé USA, Inc. v. Doe,* 141 S. Ct. 1931, 1937-38 (2021) (opinion of Thomas, J.)   "28 U.S.C. § 1350 provides that a district court shall have original jurisdiction over civil actions 'by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.'" *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774,777 (D.C. Cir. 1984).

736.    TVPA confers civil liability for damages upon "[a]n individual who, under actual or apparent authority, or color of law, of any foreign nation ... subjects an individual to extrajudicial killing...." 28 U.S.C. § 1350 (note) sec. 2(a).

737.    Plaintiffs do not have other "adequate and available" remedies in Kurdistan, including administrative remedies, that they have not yet exhausted, as particularized in the complaint. 28 U.S.C.§1350(2)(b). In Kurdistan, evidencing a long-standing history of retributive violence, local remedies are unobtainable, ineffective, inadequate or obviously futile. *See e.g. Doe v. Qi* , 349 F.Supp.2d 1258, 1319 (N.D.Cal.2004) (excusing exhaustion requirement under TVPA where complaint reveals that "those making allegations against the government could suffer serious reprisals"); *Estate of Rodriguez v Drummond Co* ., 256 F.Supp.2d 1250, 1267–68 (N.D.Ala.2003). (TVPA does not require exhaustion of local remedies where plaintiffs would be at risk of retaliation if they sought legal redress).  A Plaintiff's alleged failure to exhaust local remedies would not deprive the court of subject matter jurisdiction, *Cabello Barrueto v. Fernandez Larios* , 291 F.Supp.2d 1360 (S.D.Fla.2003), *aff'd* 402 F.3d 1148 (11th Cir.2005) ; *Estate of Rodriguez v Drummond Co* ., 256 F.Supp.2d 1250 (N.D.Ala.2003) (citing *Wiwa v Royal Dutch Petroleum Co* ., 2002 WL 319887 at *18 (S.D.N.Y.2002),

738.    The TVPA's ten-year statute of limitations does not bar claims arising out of killings which occurred more than ten years before filing of the Amended Complaints, when due to "extraordinary circumstances" which are both beyond the plaintiff's control and unavoidable with diligence. *Cabello Barrueto v. Fernandez Larios*, 402 F.3d at 1154 (11th Cir.2005).

739.    Defendants share conspiracy liability.  The TVPA authorizes a cause of action against "[a]n individual" for acts of extrajudicial killing and torture committed under authority of color of law of any foreign nation. 28 U.S.C. § 1350.  By its terms, the Act contemplates claims based on secondary, or indirect, theories of liability. *Doe v. Drummond Co* ., 782 F.3d 576, 603 (11th

Cir.2015), citing *Mohamad v. Palestinian Authority,* 566 U.S. at ——, 132 S.Ct. at 1709 ; *Carballo v. Fernandez – Larios, supra* ; *Aldana v. Del Monte Fresh Produce, N.A., Inc.* , 416 F.3d 1242, 1248 (11th Cir.2005).

740.    In its 2023 opinion *Doe v. Cisco Systems, Inc.*, No. 15-16909 (9th Cir. July 7, 2023), the 9th Circuit stated:

> *"Congress enacted the TVPA in 1992 to "establish[ ] a civil action for recovery of damages from an individual who engages in torture or extrajudicial killing." Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note). The statute provides that "[a]n individual who, under actual or apparent authority, or color of law, of any foreign nation . . . subjects an individual to torture shall, in a civil action, be liable for damages to that individual." 28 U.S.C. § 1350 note § 2(a)."*

741.    The statute provides liability for an individual who "*subjects* an individual to torture."  28 U.S.C. § 1350 note § 2(a).  It does not specify that an individual must directly "torture" another. The statute defines "torture" as the "intentional[ ] inflict[ion]" of any act causing "severe pain or suffering."  28 U.S.C. § 1350 note § 3(b).  Defendant's intentional infliction of severe pain and suffering on Plaintiffs was done for the purpose of discrimination, intimidation, or punishment. If Congress had intended to restrict TVPA liability to those who themselves intentionally commit acts causing severe pain or suffering, it could have used the term "tortures" or "inflicts torture" in section 2(a), the liability provision.  Instead, the term used was "subjects an individual to torture."  The dictionary definition of the verb "subject" includes "to cause or force to undergo or endure (something unpleasant, inconvenient, or trying).'  *Subject,* Merriam-Webster, https://www.merriam-webster.com/dictionary/subject (last visited Feb. 24, 2023); *see also Subject,* American Heritage Dictionary, https://www.ahdictionary.com/word/search.html?q=subject (last visited Feb. 24, 2023) (defining the verb "subject" as "[t]o cause to experience, undergo, or be acted upon").  "Subjects . . . to

torture" thus encompasses not only individuals who directly torture another but also those who in some respect *cause* another to undergo torture.

742.    Cruel, inhuman or degrading treatment constitutes acts that "inflict mental or physical suffering, anguish, humiliation, fear and debasement, which do not rise to the level of torture or do not have the same purposes as torture." *Chiminya Tachiona v. Mugabe,* 216 F. Supp. 2d 262, 281 (S.D.N.Y. 2002). The dividing line between the two violations "derives principally from a difference in the intensity of the suffering inflicted." *In re S. Afr. Apartheid Litig.,* 617 F. Supp. 2d 228, 254 (S.D.N.Y. 2009) (citing Restatement (Third) of Foreign Relations Law § 702 Reporter's Note 5 (1987)). The Defendants actions as set forth herein constituted extreme infliction of mental and physical suffering, anguish, humiliation, fear and debasement upon Plaintiffs and were torture.

743.    The TVPA extended the Alien Tort Claims Act (ATCA), 28 U.S.C. § 1350 (1991), *See* H. R. Rep. No. 102-367, at 3 (1991), reprinted in 1992 U.S.C.C.A.N. 84, 86. Additionally, other international agreements impose liability for torture, killing, and mistreatment. *See e.g.,* Universal Declaration of Human Rights, U.N. General Assembly Res. 217(III)(A) (1948); International Covenant on Civil and Political Rights, U.N. General Assembly Res. 2200(XXI)A, U.N. Doc. A/6316 (1966); European Convention for the Protection of Human Rights and Fundamental Freedoms, Art. 3, Council of Europe, European Treaty Series No. 5 (1968). *See Cabello v. Fernandez-Larios*, 402 F.3d 1148 (11th Cir. 2005).

744.    The TVPA encompasses claims against those who aid and abet torture and deliberated extrajudicial killing and other acts of atrocity crimes.

745.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani exercised command responsibility over, or directed, ordered, conspired with, or aided and abetted subordinates or persons or groups acting in coordination with or under their control, to torture Plaintiffs.

Furthermore, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani knew or should have known that their subordinates had committed, were committing, or were about to commit human rights abuses, and they failed to prevent the abuses or to punish those responsible.

746.    Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani and the other named defendants, and others acting under their command, as individuals acting deceitfully under actual or apparent authority, or color of law, of the Republic of Iraq and KRG have directly and indirectly subjected Plaintiffs to torture, enforced disappearances, extrajudicial killing, summary executions, and other tortious acts.  These deliberated killings were not authorized through any kind of judicial judgment or court authorization falling within the TVPA's exception. 28 U.S.C. § 1350 note § 3(a).

747.    This Court has held that "summary executions" and "a course of indiscriminate brutality, known to result in deaths", such as those committed by Defendants, can be "extrajudicial killings" under the TVPA.  *See Flatow v. Islamic Republic of Iran,* 999 F. Supp. 1, 17 (D.D.C. 1998), *abrogated on other grounds as recognized in Christie v. Islamic Republic of Iran,* No. CV 19-1289 (BAH), 2020 WL 3606273, at *21 (D.D.C. July 2, 2020).

748.    Defendants have created a regime of pervasive fear, and Plaintiffs and others have reasonable fear of retributive reprisals against themselves or members of their families, coupled with the impossibility of safely conducting investigation and discovery in geographical areas and government agencies controlled by the KRG that prevents the personal representatives of the five thousand murder victims and most victims of torture from stepping forward to seek redress in United States Courts pursuant to the provisions of the Torture Victim Protection Act of 1991.  For that reason, Plaintiffs have established the Kurdistan Victims Fund that will provide a means to provide aid to the families of murder and torture victims and who will continue to suffer from the emotional and psychological scars of these acts of torture for years to come.  Plaintiffs are still grappling with the trauma: entire families murdered, tortured and mutilated, children and elderly

660

people ripped from the arms of their loved ones and disappeared.  All these atrocities are well documented.  The injuries are directly traceable to actions of the defendants.

749.    Defendant Masoud Barzani, Masrour Barzani, and Waysi Barzani's acts or omissions described above and the tortious acts committed by their subordinates, caused the torture of Plaintiffs and caused them to suffer, and continue to suffer from, severe physical and mental pain and suffering. This includes threatened infliction of severe physical pain or suffering, the threat of imminent death, and the resulting psychological damage that persists to this day.

750.    As a result of this torture, Plaintiffs are entitled to damages in an amount to be determined at trial.

751.    As a direct and proximate result of the Defendant's tortious conduct, the estate of Jihan Taha Abdulrahman suffered severe and substantial damages.  Plaintiff Shakhwan Abdulrahman, as representative of Jihan Taha Abdulrahman, deceased, demands judgment against all Defendants of the BCE for her kidnapping, imprisonment, torture, murder, and wrongful death, an act of international terrorism directly and proximately caused by Defendant's actions, in retaliation for Jihan's speech and television interviews against the Barzani regime and to prevent her further public statements, in an amount sufficient to compensate her family for her loss, and for punitive damages in an amount sufficient to punish Defendants for her inhumane torture and murder. Based on the immense illicit wealth of the BCE, much of which wealth is hidden under false names and shell and front corporations in the United States, punitive damages for the torture and murder of Jihan should be at least one billion dollars.

752.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani's acts were deliberate, willful, intentional, wanton, malicious, and oppressive and should be punished by an award of punitive damages in an amount to be determined at trial.

**THIRD CLAIM FOR RELIEF**

*(Crimes Against Humanity)*

753. killings    Plaintiffs repeat and re-allege each of the foregoing paragraphs, *supra,* that are fully incorporated herein by reference.

754.    The abuses committed against Plaintiffs and Plaintiffs' decedents constitute crimes against humanity.  Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani knew or should have known that injuries complained of herein were a foreseeable result of their activity.  As such, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani are responsible for the murder of Plaintiffs' decedents, and these murders were knowingly committed as part of a widespread or systematic scheme.

755.    A crime against humanity involves the commission of one or more of the following prohibited criminal acts: murder, extermination, enslavement, deportation or forcible transfer, imprisonment, torture, rape and other forms of sexual violence, persecution, enforced disappearance, apartheid, or other inhumane acts.  Any one of the eleven acts is sufficient to establish a crime against humanity, yet each are acts of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani.

756.    By coercive acts, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani forcibly exiled, effectively deported, Ayoub Barzani, an example of forced exile committed against many John Doe Plaintiffs.  The crime of deportation or forcible transfer occurs when persons are moved from an area where they are lawfully present by expulsion or other coercive acts, and the transfer is impermissible under international law.  "Forcibly" refers not only to physical force but also to threat of force or coercion, such as that caused by fear of violence, duress, detention, psychological oppression or abuse of power, or by taking advantage of a coercive environment.

757.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, by virtue of their inhuman acts, also caused great suffering and/or serious injury to body or mental or physical health in the context of a widespread or systematic scheme.

758.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani's acts and omissions constitute "tort[s]...committed in violation of the law of nations or a treaty of the United States' under 28 U.S.C. § 1350 and also violate 28 U.S.C. § 1331 in that the acts and omissions against Plaintiffs violated customary multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

759.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani exercised command responsibility over, or directed, ordered, conspired with or aided and abetted subordinates in the KRG/KDP, or persons or groups acting in coordination with the KRG/KDP or under their control, to commit crimes against humanity.

760.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani knew or should have known that their subordinates had committed, were committing, or were about to commit crimes against humanity, and each failed to prevent the abuses or to punish those responsible.

761.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani's acts and omissions constituting crimes against humanity were deliberate, willful, intentional, wanton, malicious, and/or oppressive, and caused Plaintiffs to suffer damages, including severe physical and mental suffering, in amounts to be determined at trial, and should be punished by an award of punitive damages in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF

*(Cruel, Inhuman, Or Degrading Treatment Or Punishment)*

762.    Plaintiffs repeat and re-allege each of the foregoing paragraphs, *supra,* that are fully incorporated herein by reference.

763.    The abuses committed against Plaintiffs and Plaintiffs' decedents described herein each separately constitute cruel, inhuman, or degrading treatment or punishment.  These acts include, but are not limited to: the intentional torture resulting in severe physical and psychological abuse and agony, humiliation, fear and debasement, the injury and death of family members during such torture, resulting in profound fear, loss, and anguish.

764.    The acts described herein constitute "tort[s] ... committed in violation of the law of nations or a treaty of the United States" under the Alien Tort Statute, 28 U.S.C. § 1350, in that they were in violation of customary international law prohibiting ~~extrajudicial killings~~cruel, inhuman or degrading treatment or punishment as reflected, expressed, defined, and codified in 28 U.S.C. § 1331 and 1350 and multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

765.    Thus, the conduct constitutes a violation of the law of nations and customary international law prohibiting Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CTITP") as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions and other authorities. Extrajudicial killing is similarly reflected, expressed, defined and codified in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities, and is thus actionable.

766.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani's acts or omissions described above and the acts committed by their subordinates, caused the cruel, inhuman or degrading treatment or punishment of Plaintiffs and caused them to suffer severe or serious physical or mental pain and suffering.

767.    The acts of cruel, inhuman or degrading treatment or punishment described herein had the intent and effect of inflicting severe or serious physical or mental pain or suffering upon Plaintiffs.  As an intended result of these acts, Plaintiffs suffered severe or serious physical or mental pain or suffering in an amount to be proven at trial.

768.    The cruel, inhuman or degrading treatment or punishment of Plaintiffs did not arise from, and was not inherent in or incidental to, lawful sanctions.

769.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzan, and their subordinates, acted under color of official authority in subjecting Plaintiffs to torture and other cruel, inhuman or degrading treatment described above though no actual or apparent authority, law, or other legal authority of the Republic of Iraq, KRG, the United States, or any international treaty, convention, or agreement existed.

770.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani's actions were a proximate cause of the torture and other cruel, inhuman or degrading treatment suffered by Plaintiffs.  Plaintiffs were foreseeable victims of these acts.

771.861    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani's torture and other cruel, inhuman or degrading treatment of Plaintiffs caused Plaintiffs to suffer damages, including mental and emotional pain and suffering, in an amount to be determined at trial.

772.    Defendants Masoud Barzani, Masrour Barzani and Waysi Barzani's torture and other cruel, inhuman or degrading treatment of Plaintiffs was deliberate, willful, intentional, wanton, malicious, and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

773.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani's acts or omissions described above and the acts committed by their subordinates, caused the torture of Plaintiffs and caused Plaintiffs to suffer, and continue to suffer from, severe physical and mental pain and

suffering. This includes threatened infliction of severe physical pain or suffering, the threat of imminent death, and the resulting psychological damage that persists to this day.

774.    As a result, Plaintiffs are entitled to damages in an amount to be determined at trial.

775.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani's acts were deliberate, willful, intentional, wanton, malicious, and oppressive and should be punished by an award of punitive damages in an amount to be determined at trial.


**FIFTH CLAIM FOR RELIEF**

*(Extrajudicial Killing)*

776.    Plaintiffs repeat and re-allege each of the foregoing paragraphs, *supra,* that are fully incorporated herein by reference.

777.    With regard to the events alleged herein, Defendants did not act under the actual authority or law of the Republic of Iraq or KRG and any international treaty, convention, or agreement.

778.    The killings of Plaintiffs' decedents were deliberate and not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees that are recognized as indispensable by civilized peoples.  The killings were not lawfully carried out under the authority of any country or court, and were not acts of war.

779.    The killings of Plaintiffs' decedents constitute extrajudicial killings as defined by the Torture Victim Protection Act, 28 U.S.C. § 1350.  Additionally, killings constitute torts committed in violation of the law of nations, and thus of the United States, as reflected in federal common law which incorporates extrajudicial killing as a violation, pursuant to 28 U.S.C. § 1331 and 1350.  The conduct constitutes violations of the law of nations and customary international

law prohibiting extrajudicial killing, reflected, expressed, defined, and codified in multilateral treaties and other international instruments and domestic judicial decisions, and other authorities.

780.    Defendants knew or should have known that their acts would unlawfully kill innocent civilians, and that the deaths complained of herein were a deliberate and/or foreseeable result of such activity.

781.    Upon information and belief, no adequate remedies are available to the Plaintiffs under the laws or in the courts of KRG, which is the place in which conduct giving rise to the claim occurred, nor is any adequate remedy available in the Republic of Iraq.

782.    Defendants' acts and omissions caused Plaintiffs and Plaintiffs decedents' next of kin to suffer damages, including severe physical and mental pain and suffering, in amounts to be determined at trial.

783.    Defendants' acts and omissions were deliberate, willful, intentional, wanton, malicious, and/or oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

784.    The deliberated killings, committed by Defendants as individuals, were not authorized by a judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.

862785.    Defendants are also liable for crimes against humanity under the ATS.  These crimes are inhumane acts that include "murder, enslavement, deportation or forcible transfer, [or] torture" and are "committed as part of a widespread [or] systematic attack directed against a civilian population." *Talisman Energy,* 582 F.3d at 257; *ICC Elements of Crimes, Art. 7* ("These elements clarify the requisite participation in and knowledge of a widespread or systematic attack against a civilian population.").  Persecution and extermination, the crimes against humanity under which Plaintiffs seek liability, are actionable under the ATS.  *See, e.g. Khulumani v. Barclay Nat.*

*Bank Ltd., 504 F.3d 254, 286-287, n.1(2d Cir.2007) Hall, J . concurring)* (acknowledging extermination as a crime against humanity cognizable under the ATS); *Sexual Minorities Uganda v. Lively,* 960 F. Supp. 2d 304, 316-17 (D. Mass. 2013) ("persecution that rises to the level of a crime against humanity has repeatedly been held to be actionable under the ATS").  All crimes against humanity require Plaintiffs to demonstrate the crimes were (1) part of a widespread or systematic attack against civilians, and (2) the defendant "intended to further such an attack." *ICC Elements of Crimes, Art.* ~~7.~~786.    These elements exist here.   Plaintiffs also claim ~~Defendant's~~Defendants' liability for the crime against humanity of persecution under the ATS. This crime requires: (1) "denial of fundamental rights" and (2) "the intentional targeting of an identifiable group." *Lively,* 960 F. Supp. 2d at 317; *see also ICC Elements of Crimes, Art. 7(1)(h).*

~~863~~787.      Plaintiffs have demonstrated ~~Defendant's~~Defendants' liability for the crime against humanity of extermination under the ATS.  This crime requires that (1) one or more persons were killed; (2) as part of "a mass killing of members of a civilian population"; and (3) "[t]he perpetrator knew that the conduct was part of or intended the conduct to be part of a widespread or systematic attack directed against a civilian population." See *ICC Elements of Crimes, Art. 7(1)(b).*  Plaintiffs' decedents and hundreds of others were killed in the Yazidi Massacre, a mass killing that was pure terror targeting ~~Iraqi~~ Kurdistan's most innocent and part of a systematic assault on non-combatant civilians of Yazidi ethnicity, and where violence against women and children is characteristic, even doctrinal, leaving women to recoil in horror, disgust, and anguish.

~~864~~788.      The law of nations sets worldwide norms of conduct, prohibiting certain universally condemned heinous acts.  That body of law, however, takes no position on whether its norms may be enforced by civil actions for compensatory damages.  It leaves that decision to be separately decided by each nation.  The ATS confers on the U.S. courts jurisdiction to entertain civil suits for violations of the law of nations.  In the United States, if a plaintiff in a suit under the ATS shows

that he or she is the victim of a tort committed in violation of the norms of the law of nations, the court has jurisdiction to hear the case and to award compensatory damages against the tortfeasor. That is what the Supreme Court explained in *Sosa*." See *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111 (2d Cir. 2010). *Sosa v. Alvarez-Machain, 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2s 718 (2004).*

865789.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani are directly liable for the killings, as alleged herein. Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani also directly and indirectly exercised command responsibility over subordinates in the Defendant Iraqi Kurdistan Regional Government Peshmerga, the Defendant Iraqi Kurdistan Regional GovernmentKRG, the Defendant Iraqi Kurdistan Regional Government'sKRG's Asayish security forces, and KDP personnel who participated in the killings. Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani also engaged in a joint criminal enterprise with, conspired with, and/or aided and abetted their subordinates, as well as officers in the Peshmerga, the Defendant Iraqi Kurdistan Regional GovernmentKRG, Asayish security forces, ISIS and IRGC and their affiliates, and KDP who planned and/or carried out commands and plans to commit the killings. Furthermore, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani knew or should have known that their subordinates had committed, were committing, or were about to commit human rights abuses, and they failed to prevent the abuses or to punish those responsible.

866790.    Acts or omissions of Defendants Masoud Barzani, Mansour Barzani, and Waysi Barzani described above, and the acts committed by their subordinates and officers in the Defendant Iraqi Kurdistan Regional Government'sKRG's Peshmerga, the Defendant Iraqi Kurdistan Regional Government, Defendant Iraqi Kurdistan Regional Government'sKRG, Asayish security forces, and KDP, and Barzani family members and family members by marriage,

who planned and/or carried out or participated in said plans, caused the killings, and caused Plaintiffs to suffer severe mental pain and suffering.

867791.    Defendants Masoud Barzani's, Mansour Barzani's, and Waysi Barzani's acts or omissions described above, and the acts committed by their subordinates and officers in the Defendant Iraqi Kurdistan Regional Government'sKRG's Peshmerga, the Defendant Iraqi Kurdistan Regional Government, Defendant Iraqi Kurdistan Regional Government'sKRG, Asayish security forces, and KDP, and Barzani family members and family members by marriage, who planned and/or carried out said plans, were committed under apparent or feigned or falsified authority or color of law of the government of provincial Defendant Iraqi Kurdistan Regional Government.KRG.  These Defendants directed or ordered these illegal tortious acts in an existing superior-subordinate relationship, knowing that their orders would result in the substantial likelihood that human rights abuses will follow.  Defendants were in a position of authority that would compel one to commit human rights abuses at their order.  See *Jane W. v. Thomas*, 560 F. Supp. 3d 855 (E.D. Pa. 2021). at 212; see also *Abebe-Jiri v. Negewo,* No. 1:90-CV-2010-GET, 1993 WL 814304, at \*4 (N.D. Ga. Aug. 20, 1993), *aff'd sub nom. Abebe-Jira v. Negewo,* 72 F.3d 844 (11th Cir. 1996) ("Defendant is responsible under international law for his own acts, for acts which he directed, ordered, aided, abetted or participated in, and for acts committed by forces under his command which he authorized.").

868792.    As a result of these killings, Plaintiffs, in their individual capacities, have suffered damages and will continue to suffer from the emotional and psychological scars of these killings for years to come.  The injuries are directly traceable to the challenged actionactions of the Defendants.

869793.    Plaintiffs' claims are based on primary and secondary theories of liability and are recognized under the ATS and TVPA.  See, *e.g.,* TVPA, S. Rep. No. 102-249, at 8-9 (1991)

(explaining that "[a] higher official need not have personally performed or ordered the abuses in order to be held liable"); *Mohamad v. Palestinian Auth.,* 566 U.S. 449, 458, 132 S.Ct. 1702, 182 L.Ed.2d 720 (2012) ("the TVPA contemplates liability against officers who do not personally execute the torture or extrajudicial killing"); *Hilao v. Estate of Marcos,* 103 F.3d 767, 777 (9th Cir. 1996) (recognizing command responsibility under the TVPA and ATS, and citing the TVPA Senate Report in support).

794.    Defendants'870.        Defendants conduct of targeted extrajudicial killing and other associated gross criminal violations is "part of a longstanding pattern and policy, making the need for deterrence clear."  See *Abedini v. Government of Islamic Republic of Iran*, 422 F. Supp. 3d 118, at 141 (D.C. 2019).  Wherefore, Plaintiffs demand judgment against Defendants in an amount sufficient to compensate them for the damages suffered and damages Plaintiffs continue to suffer as a result of the extrajudicial killings as set forth above in amounts to be determined at trial.

871795.        The character of Defendants Masoud Barzani's, Masrour Barzani's, and Waysi Barzani's acts or omissions, and those of their associates and collaborators, including Barzani family members and family members by marriage, were deliberate, targeted, willful, intentional, wanton, malicious, oppressive, and knowingly unlawful,.  The harm to the Plaintiffs that the Defendants caused or intended to cause was extreme and monstrous;.  The need for deterrence from future criminal acts is paramount and essential, and the illicit massive wealth of the defendants is excessive affluence and stolen riches in the billions of illicit dollars, and should be punished by an award of punitive damages sufficient to punish Defendants for their extrajudicial killings and other atrocity crimes and crimes against humanity to "yield the desired deterrent effect" to deter future extrajudicial killings and associated criminal conduct and atrocity crimes.  (*See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d at 88 (D.C. 2010)).  Moreover, awarding damages also serves national security interests by deterring those foreign actors that sponsor extrajudicial killings.

## ~~COUNT V~~

### ~~LIBEL AND DEFAMATION OF CHARACTER OF PLAINTIFF MAKI REVEND~~

796.    Defendants Masoud Barzani, Masrour Barzani, ~~872.    Plaintiff repeats~~ and ~~realleges~~Waysi Barzani's acts and omissions caused Plaintiffs and Plaintiffs' decedents' next of kin to suffer damages, including severe physical and mental pain and suffering, in amounts to be determined at trial.

797.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani's acts and omissions were deliberate, willful, intentional, wanton, malicious, and/or oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

### SIXTH CLAIM FOR RELIEF

#### *(Violation of the Duty to Prevent Genocide)*

798.    Plaintiffs repeat and re-allege each of the foregoing paragraphs ~~as if set forth~~, *supra,* that are fully incorporated herein by reference.

~~873.    This defamation action arises from false and defamatory and libelous statements by Mr. Reeder in court filings and published online by the Court, available to readers in Washington, D.C., across the nation, and around the world, and likely to be subsequently reiterated in the press for years.  Mr. Reeder is a recognized former public official with access to government records, giving credibility to his categorically and demonstrably false statements presented as an unassailable truth and as a centerpiece of Mr. Reeder's attention-seeking motion to this Court.~~

~~874.    The substantial danger of injury to Plaintiff Maki Revend's reputation from Mr. Reeder's false statements, greater than that suffered by the public at large, is readily apparent.  Such statements, and which Mr. Reeder knew or should have known, would harm the reputation of~~

another as to lower him in the estimation of his journalism audience and the community or to deter third persons from associating with him.

875.    By publishing the false statements, Mr. Reeder caused harm and cognizable injury to Mr. Revend's reputation.

876.    At the time of the publication, Mr. Reeder knew or reasonably should have known these statements were false, and were part of no privileged category.  Mr. Reeder's statements meet the threshold requirements of defamation, that they were statements not of opinion, but that could be proved to be accurate or false.

877.    Mr. Reeder's false statements are defamatory and libelous *per se* because they impute to Mr. Revend the commission of crimes and criminal record which were untrue.  Mr. Reeder's false statements prejudice Mr. Revend in his profession as a journalist.  Mr. Revend is therefore entitled to presumed damages.

878.    As a direct and proximate result of these false statements by Mr. Reeder, Mr. Revend has suffered immediate and incalculable damages, including, *inter alia*, injury to his reputation as a trusted journalist, harm to his ability to carry on in his profession and career, embarrassment, humiliation, and emotional distress, in an amount to be determined at trial.

879.    Mr. Reeder's actions were malicious, willful, and wanton, and evidence a conscious disregard for Mr. Revend's rights.  The injury is directly traceable to the challenged action of the defendant. Accordingly, punitive damages are appropriate.

880.    Venue is proper in this Court because the causes of action asserted herein arose in this District and caused tortious injury by his act.

881.    WHEREFORE, Plaintiff respectfully requests that the Court enter an award in Plaintiff's favor and against Defendant Joe Reeder, as follows:

(1)   Awarding Mr. Revend compensatory damages of not less than $3,000,000, or in such additional amount to be proven at trial;

(2)   Awarding Mr. Revend punitive damages to the maximum extent permitted by law, but not less than $10,000,000;

(3)   Awarding Mr. Revend all of his expenses and costs, including attorney's fees; and

799.    Genocide is considered the "crime of crimes" and the prohibition against it is a *jus cogens* norm in international law, binding on all states at all times, and creates obligations *erga omnes* on all States, through their officials, to prevent and punish it.

800.    As a *jus cogens* norm, the prohibition permits no derogation and prevails over and invalidates international agreements in conflict therewith.

801.    Article I of the Genocide Convention imposes and codifies a legal duty under customary international law to prevent genocide.  Genocide Convention art. I. 283.

802.    Underscoring the gravity of this crime, Congress added 18 U.S.C. § 1091 to the federal criminal code to provide for punishment for those found guilty of committing, conspiring to commit, directly and publicly inciting to commit, attempting, and complicity in genocide, in accordance with Article I of the Convention.

803.    Defendants Masoud Barzani and Masrour Barzani had the capacity to prevent a genocide, and are held responsible for failing to do so as they failed to take all measures within their power to prevent it, or that might contribute to preventing it.

804.    This obligation to prevent and duty to act to prevent a genocide arised at the instant Defendants Masoud Barzani and Masrour Barzani learned of, or should normally have learned of, the existence of a serious risk that genocide would be committed.

805.   This duty exists particularly when a "State has available to it means likely to have a deterrent effect on those suspected of preparing genocide, or reasonably suspected of harbouring specific intent." *Bosn. & Herz. v. Serb. & Montenegro*, 2007 I.C.J. at 222, ¶ 431.

806.   Defendants Masoud Barzani and Masrour Barzani were aware, or should have been aware that genocide by ISIS against the Yazidi was about to be committed.

807.(4)   Granting such other and further relief as the Court deems appropriate.

## COUNT VI
## ASSAULT AND BATTERY
## AND INFLICTION OF EMOTIONAL DISTRESS

882.   Plaintiff repeats and realleges Defendants Masoud Barzani and Masrour Barzani failed to prevent the unfolding genocide, which has thus far resulted in the killing of over 12,000, including women and children, the injuring of over tens of thousands, the displacement of vast numbers of Yazidi, and an inhumane and deadly total siege.

808.   Defendants Masoud Barzani and Masrour Barzani did not take measures to deter ISIS's killing, inflicting conditions of life calculated to bring about destruction or causing serious bodily or mental harm to Yazidi civilians.

809.   Plaintiffs have been seriously and gravely harmed by Defendants Masoud Barzani and Masrour Barzani's failure to prevent the genocidal campaign, have family members who are among those killed during this genocidal campaign, and have family members in Kurdistan who are being subjected to serious bodily and mental harm in and are experiencing the grave impacts of this campaign of genocide.

## SEVENTH CLAIM FOR RELIEF

*(Complicity In Genocide)*

810.    Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth, *supra,* that are fully incorporated herein by reference.

811. Article III(e) of the Genocide Convention identifies "complicity in genocide" as a stand-alone crime. 18 U.S.C. § 1091 implements the Genocide Convention's obligation to punish genocide under U.S. criminal law and defines the offense of genocide. See 18 U.S.C. § 1091(a). 323. Complicity in genocide exists when there is a punishable act of genocide, to which the complicit party associates itself.

812.    Complicity includes the provision of means to aid, abet, enable or facilitate the commission of the crime.

813. Aiding and abetting consists of knowingly providing assistance to the principal which has a substantial effect on the perpetration of the violation.

814. Defendants Masoud Barzani and Masrour Barzani knowingly provided assistance with a substantial effect on the commission of  violations of international law, and specifically on the underlying acts of genocide of killing, causing serious bodily or mental harm, and inflicting conditions of life on the Yazidi population calculated to bring about its destruction.  Defendants knew their acts and omissions would assist these violations of international law, or with awareness of a substantial likelihood that their acts would assist such violations.

815.    Complicity requires that some positive action be taken to furnish aid or assistance to the perpetrators of the genocide.  An individual is complicit where they act with knowledge of the violation when they provide aid or support; they need not also share the specific intent to destroy a group in whole or in part.

816.  An individual, acting in their official capacity (with or without lawful authority), is complicit in genocide if they use the organs under their control with the knowledge that genocide

676

was about to be committed or was under way, and if the aid and assistance supplied, from the moment they became so aware onwards, to the perpetrators of the underlying acts or to those who were on the point of committing them, enabled or facilitated the commission of the acts.

817.    Defendants Masoud Barzani and Masrour Barzani are responsible for complicity because they instigated, aided or abetted, or procured the means for the commission of the genocide and complicit in ISIS's genocidal campaign against the Yazidi people of Kurdistan.

818.    Defendants Masoud Barzani and Masrour Barzani owed a duty of law to Plaintiffs and Plaintiffs' decedents to refrain from intentional and wantonly harmful or outrageous conduct. Defendants owed a duty to Plaintiffs' decedents because they were foreseeable victims of the planned ISIS attack on Yazidi individuals.  Defendants also owed a duty to Plaintiffs' decedents under customary international law which imposes duties upon governing powers and its officials with regard to protecting populations.

819.    As a direct and proximate cause of Defendants' breach of duty, John Doe Plaintiffs' Yazidi decedents were killed.  It was reasonably foreseeable that the ISIS attack would result in such deaths.

820.    Defendants' acts and omissions described herein  caused Plaintiffs and all of Plaintiffs' descendants' next of kin to suffer damages, including pecuniary damages, in an amount to be proven at trial.

821.    Defendants' acts and omissions were deliberate, willful, intentional, wanton, malicious, and/or oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

**EIGHTH CLAIM FOR RELIEF**

*(Wrongful Death – Jihan Taha Abdulrahman)*

822.    Plaintiffs  and re-allege each of the foregoing paragraphs, *supra,* that are fully incorporated herein by reference.

823.    Plaintiff Shakhwan Abdulrahman is the legal and personal representative of his deceased sister, Jihan Taha Abdulrahman, and brings this suit on behalf of all of their next of kin.

824.    TVPA confers civil liability for damages in a wrongful death action on "[a]n individual who, under actual or apparent authority, or color of law, of any foreign nation ... subjects an individual to extrajudicial killing...." 28 U.S.C. § 1350 (note) sec. 2(a).

825.    Defendant Masrour Barzani owed a duty to Jihan Taha Abdulrahman to refrain from intentional and wantonly harmful or outrageous conduct.  Defendant owed a duty to Jihan Taha Abdulrahman because she was a foreseeable victim of the kidnapping and incineration. Defendant also owed a duty to Jihan Taha Abdulrahman under customary international law.

826.    Defendants Masrour Barzani's authorization, command, and direction, which Defendant Masrour Barzani and others knew or should have known would cause the death Jihan Taha Abdulrahman, amounts to extreme and outrageous intentional conduct that transcends all possible bounds of decency and is utterly intolerable in a civilized society.

827.    As a direct and proximate cause of Defendant Masrour Barzani's breach of duty, Jihan Taha Abdulrahman was killed.  It was reasonably foreseeable that acts of Defendant's subordinates under his command would result in her death.

828.    The immolation and incineration of Jihan Taha Abdulrahman, and suffering of innocent next of kin, amounts to extreme and outrageous intentional conduct that transcends all possible bounds of decency and is utterly intolerable in a civilized society.

829.    Defendant Masrour Barzani intended to cause Plaintiffs to suffer humiliation, mental anguish, and extreme emotional distress or, alternatively, Defendant Masrour Barzani recklessly

disregarded the substantial probability of causing humiliation, mental anguish, and severe emotional distress to Plaintiffs with his conduct.

830.    As a direct and proximate cause of Defendant Masrour Barzani's outrageous conduct, Plaintiffs suffered severe emotional distress and mental suffering.  It was reasonably foreseeable that Defendant Masrour Barzani's acts would cause this suffering.

831.    Defendant Masrour Barzani's acts and omissions described herein caused Plaintiffs and all of Plaintiffs' decedents' next of kin, to suffer damages, including pecuniary damages, in an amount to be proven at trial.

832.    Defendants' acts and omissions were deliberate, willful, intentional, wanton, malicious, and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

**NINTH CLAIM FOR RELIEF**

*(Wrongful Death – Yazidi Genocide Victims)*

833.    Plaintiffs repeat and re-allege each of the foregoing paragraphs, *supra,* that are fully incorporated herein by reference.

834.    Plaintiff Kurdistan Victims Fund and John Doe Plaintiffs bring this suit on behalf of all Yazidi next of kin and surviving victims.

835.    TVPA confers civil liability for damages in a wrongful death action on "[a]n individual who, under actual or apparent authority, or color of law, of any foreign nation ... subjects an individual to extrajudicial killing...." 28 U.S.C. § 1350 (note) sec. 2(a).

836.    Defendants Masoud Barzani and Masrour Barzani owed a duty to every Yazidi person to refrain from intentional and wantonly harmful or outrageous conduct.  Defendants owed a duty to every Yazidi person because they were a foreseeable victim of the attack that killed members, caused serious bodily and mental harm, deliberately inflicted conditions of life that will and have

led to the group's physical destruction, imposed measures to prevent births within the group, forcibly transferred children of the group to another group, and imposed measures to prevent births within the group, committed unspeakable sexual attacks and rape on women and girls. Defendants also owed a duty under customary international law to refrain from such acts.

837.    Defendants Masoud Barzani and Masrour Barzani's authorization, command, and direction, which Defendants Masoud Barzani and Masrour Barzani and others knew or should have known would cause the death and unspeakable harm to all Yazidi, amounts to extreme and outrageous intentional conduct that transcends all possible bounds of decency and is utterly intolerable in a civilized society.

838.    As a direct and proximate cause of Defendant Masoud Barzani and Masrour Barzani's breach of duty, thousands of Plaintiffs' Yazidi decedents were killed.  It was reasonably foreseeable that the ISIS attack would result in such deaths.

839.    The genocidal death, injury, and suffering of innocent civilians, amounts to extreme and outrageous intentional conduct that transcends all possible bounds of decency and is utterly intolerable in a civilized society.

840.    Defendants Masoud Barzani and Masrour Barzani intended to cause Plaintiffs to suffer humiliation, mental anguish, and extreme emotional distress or, alternatively, Defendants Masoud Barzani and Masrour Barzani recklessly disregarded the substantial probability of causing humiliation, mental anguish, and severe emotional distress to Plaintiffs with their conduct.

841.    As a direct and proximate cause of Defendants Masoud Barzani and Masrour Barzani's outrageous conduct, Plaintiffs suffered severe emotional distress and mental suffering.  It was reasonably foreseeable that Defendants Masoud Barzani and Masrour Barzani's acts would cause this suffering.

842.    Defendants Masoud Barzani and Masrour Barzani's acts and omissions described herein caused Plaintiffs and Plaintiffs' decedents' next of kin, to suffer damages, including pecuniary damages, in an amount to be proven at trial.

843.    Defendants' acts and omissions were deliberate, willful, intentional, wanton, and malicious, and should be punished by an award of punitive damages to be determined at trial.

## TENTH CLAIM FOR RELIEF

### *(Negligent Infliction Of Emotional Distress)*

844.    Plaintiffs repeat and re-allege each of the foregoing paragraphs, *supra,* that are fully incorporated herein by reference.

845.    Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani owed a duty to Plaintiffs and Plaintiffs' decedents to refrain from intentional and wantonly harmful or outrageous conduct.   As a direct and proximate cause of Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani's breach of duty, Plaintiffs and Plaintiffs' decedents were harmed. It was reasonably foreseeable that the attacks would cause this harm.

846.883    Beyond mere negligence, Defendants' Masoud Barzani, Masrour Barzani, and Waysi Barzani's acts were deliberate, willful, intentional, wanton, malicious, and/or oppressive, and should be punished by an award of punitive damages in addition to compensatory damages, in respective amounts to be determined at trial.

847.    By authorizing, commanding, and directing an outrageous, wantonly violent acts against Plaintiffs, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani violated their duty and created an unreasonable and foreseeable risk of substantial bodily harm or death to the Plaintiffs.  The attack planned by ISIS, and facilitated by Defendants, placed the Plaintiffs in grave danger and/or made them reasonably fear for their physical safety.  During the ISIS attack

that Defendants authorized and facilitated, the surviving Plaintiffs all feared for their lives and experienced great trauma and shock.

848.    Plaintiffs have suffered and will continue to suffer extreme mental anguish and emotional distress that was directed caused by the trauma, shock, and fear that they experienced during and directly after the violent ISIS attack that was facilitated and orchestrated by the Defendants.

849.    Moreover, Defendant Masoud Barani, Masrour Barzani, and Waysi Barani's conduct caused many of the Plaintiffs to witness members of their immediate families suffer violent deaths or grave physical injury during the ISIS attack on the Yazidi.  Defendants' conduct was a substantial factor in bringing about the injuries and death of which Plaintiffs bore witness.

850.    Many Plaintiffs suffered and continue to suffer emotional torment caused by directly witnessing the violent death or serious physical injury of their immediate relatives during the attack authorized, enabled, and facilitated by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani.

851.    When they authorized, enabled, and facilitated the ISIS attack as set forth herein, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani carelessly and negligently ignored the obvious risk of causing Plaintiffs this trauma, fear, and severe emotional and mental suffering.  Defendants' disregard for the substantial risk of causing this trauma, suffering, and fear was so extreme in degree, as to go beyond all possible bounds of decency, and are utterly and intolerable in a civilized community.

852.    In this matter, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani negligently inflicted severe emotional distress upon Plaintiffs.  Defendants' acts and omissions caused Plaintiffs to suffer damages in amounts to be determined at trial.

853.    Beyond mere negligence, Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani's acts were deliberate, willful, intentional, wanton, malicious, and oppressive, and should

682

be punished by an award of punitive damages in addition to compensatory damages, in respective amounts to be determined at trial.

### ELEVENTH CLAIM FOR RELIEF

*(Deprivation Of Constitutional Rights Of American Citizen)(42 U.S.C. § 1983))*

854.    Plaintiffs repeat and re-allege each of the foregoing paragraphs, *supra,* that are fully incorporated herein by reference.

855.    The First Amendment protects the right of citizens to engage in public expressive activity, including demonstrating without being compelled to identify themselves  to government authorities. *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 165–67 (2002).

856.    Defendants Arfan Salih Omer Sherwani, Hamza Salim, Hikmet Bamerni, Hayman Quassi, and Dasko Shirwani attempted and did effect an unprovoked, intentional, unlawful offer of corporal injury by force, or force unlawfully directed, under such circumstances as to create a well-founded fear of imminent peril, coupled with the apparent present ability to effectuate the attempt if not prevented.

~~884~~857.    Defendants Arfan Salih Omer Sherwani, Hamza Salim, Hikmet Bamerni, Hayman Quassi, and Dasko Shirwani's voluntary and purposeful actions were not in self-defense, there was no evidence of intoxication, and no evidence of actual impairment of physical or mental capabilities so as to diminish the Defendant's ability to act with due care, and they acted with no lawful or police authority.

~~885~~858.    Defendants Arfan Salih Omer Sherwani, Hamza Salim, Hikmet Bamerni, Hayman Quass, and Dasko Shirwani, in a successful attempt to commit violence on the person of Plaintiff Shakhwan Abdulrahman,  ~~wilfully~~willfully touched Plaintiff ~~ ~~Shakhwan Abdulrahman, and did cause and occasion harmful, offensive, and violent physical contact with Plaintiff Shakhwan

Abdulrahman. As a direct result of ~~Defendants'~~Defendant's intentional actions of assault, battery and physical harm as alleged in this complaint, Plaintiff Shakhwan Abdulrahman experienced injuries and harm, all of which were reasonably foreseeable, and some of which injuries may be permanent, the full extent of which are still not known, and due in whole or part to the acts of Defendants Arfan Salih Omer Sherwani, Hamza Salim, Hikmet Bamerni, Hayman Quassi, and Dasko Shirwani including (a) physical pain and discomfort and suffering; (b) emotional harm; and (c) inconvenience and interference with usual and everyday activities.  The injuries are directly traceable to the challenged action of the Defendants.

859.    Plaintiff Shakhwan Abdulrahman demands judgment, finding them jointly and severally liable, against Defendants Masrour Barzani, Arfan Salih Omer Sherwani, Hamza Salim, Hikmet Bamerni, Hayman Quass, Dasko Shirwani, and all other Defendants, in their individual capacities, who comprise the BCE for deprivation of constitutional rights secured by the First Amendment, indelibly scarred if ever compromised, and for personal cumulative injuries suffered, in Defendants' efforts to restrain free speech that was wholly political in nature, as a direct causative result of the assault and battery against him, with bodily injuries, without probable cause, on February 29, 2024, in Washington, D.C. in an amount sufficient to compensate him for the injuries he has suffered.  Plaintiff Shakhwan Abdulrahman also demands punitive damages against Defendants Masrour Barzani, Arfan Salih Omer Sherwani, Hamza Salim, Hikmet Bamerni, Hayman Quass, and Dasko Shirwani because of the willful and wanton assault and battery that deprived him of his guaranteed Constitutional right, enshrined in the Bill of Rights, to peaceably assemble and express his views.

860.    Defendants Masrour Barzani, Arfan Salih Omer Sherwani, Hamza Salim, Hikmet Bamerni, Hayman Quass, Dasko Shirwani's conduct recklessly and callously disregarded and was indifferent to Plaintiff's rights because they violently acted with the intent to suppress Plaintiff's

freedom of speech.  Accordingly, punitive damages are appropriate and necessary to punish Defendant Masrour Barzani, Arfan Salih Omer Sherwani, Hamza Salim, Hikmet Bamerni, Hayman Quass, and Dasko Shirwani for abridging Plaintiff's constitutional rights and to deter similar violations in the future.

861.   Defendant Masrour Barzani is liable for the violation of plaintiff's due process rights because he had actual and constructive knowledge that his subordinates were violating the constitutional rights of Plaintiff, Shakhwan Abdulrahman, and had actual and constructive knowledge that it was highly likely that these constitutional violations would occur as a result of his actions. Despite this knowledge, Defendant Masrour Barzani acted with reckless and deliberate indifference to his subordinates' unconstitutional actions. Through his actions and failures to act, defendant Masrour Barzani expressly and tacitly authorized his subordinates' unlawful conduct

862.   Defendants Masrour Barzani, Arfan Salih Omer Sherwani, Hamza Salim, Hikmet Bamerni, Hayman Quass, and Dasko Shirwani are jointly and severally liable for the violation of Plaintiff Shakhwan Abdulrahman's,  due process rights because, pursuant to Defendant Masrour Barzani's orders, they directly participated in subjecting plaintiff to conduct that shocks the conscience, and directly participated in the deprivation of Plaintiff's liberty in the absence of legal process.

863.   Defendants Masrour Barzani, Arfan Salih Omer Sherwani, Hamza Salim, Hikmet Bamerni, Hayman Quass, and Dasko Shirwani acted under color of official authority in violating Plaintiff's due process rights.

864.   Defendants Masrour Barzani, Arfan Salih Omer Sherwani, Hamza Salim, Hikmet Bamerni, Hayman Quass, and Dasko Shirwani actions were a proximate cause of the violation of Plaintiff's substantive due process rights. Plaintiff was a foreseeable victim of these acts.

865.   Defendants Masrour Barzani, Arfan Salih Omer Sherwani, Hamza Salim, Hikmet Bamerni, Hayman Quass, and Dasko Shirwani's violation of Plaintiff's due process rights caused Plaintiff

to suffer damages, including mental and emotional pain and suffering, in an amount to be determined at trial.

866.    Defendants Masrour Barzani, Arfan Salih Omer Sherwani, Hamza Salim, Hikmet Bamerni, Hayman Quass, and Dasko Shirwani's violation of Plaintiff's due process rights was deliberate, willful, intentional, wanton, malicious, and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

867.    The denial of constitutional rights is an irreparable injury per se. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976).

868.    Defendants Masrour Barzani, Arfan Salih Omer Sherwani, Hamza Salim, Hikmet Bamerni, Hayman Quass, and Dasko Shirwani damaged Plaintiff Shakhwan Abdulrahman by depriving him of his constitutional right to engage in free speech in the traditional public forum of a public sidewalk, entitling Abdulrahman to monetary damages including reasonable attorneys' fees, expenses, and costs of litigation pursuant to 42 U.S.C. § 1988 and other applicable law.

869.    As a direct and proximate result of Defendant Masrour Barzani, Arfan Salih Omer Sherwani, Hamza Salim, Hikmet Bamerni, Hayman Quass, and Dasko Shirwani's actions, Plaintiff has suffered and continues to suffer irreparable injury, including being deprived of his constitutional right to freedom of speech. As a legal consequence of Defendants' violation of Plaintiff Shakhwan Abdulrahman's First Amendment rights, Plaintiff is entitled to damages from Defendants Masrour Barzani, Arfan Salih Omer Sherwani, Hamza Salim, Hikmet Bamerni, Hayman Quass, and Dasko Shirwani in their individual capacity.

870.    Defendant Masrour Barzani's acts or omissions described above and the acts committed by his subordinates, caused the torture of Plaintiff and caused him to suffer, and continue to suffer from, severe physical and mental pain and suffering. This includes threatened infliction of severe

physical pain or suffering, the threat of imminent death, and the resulting psychological damage that persists to this day.

871.    As a result of his torture, Plaintiff is entitled to damages in an amount to be determined at trial.

872.886    Defendant Masrour Barzani's acts were deliberate, willful, intentional, wanton, malicious, and oppressive and should be punished by an award of punitive damages in an amount to be determined at trial.

873.    Venue is proper in this Court because the causes of action asserted herein arose in this District and caused tortious injury by this act.

887874.    WHEREFORE, Plaintiff Shakhwan Abdulrahman respectfully requests that the Court enter an award in Plaintiff's favor and against Defendants, as follows:

> (1)    Awarding Mr. Abdulrahman compensatory damages of not less than $100,000, or in such additional amount to be proven at trial;
>
> (2)    Awarding Mr. Abdulrahman punitive damages to the maximum extent permitted by law, but not less than $1,000,000;
>
> (3)    Awarding Mr. Abdulrahman all of his expenses and costs, present and unknown in the future, of not less than $25,000; and
>
> (4)    Granting such other and further relief as the Court deems appropriate.

## TWELFTH CLAIM FOR RELIEF

### *(Hate Crimes Against American Citizen)*

875.    Plaintiffs repeat and re-allege each of the foregoing paragraphs, *supra,* that are fully incorporated here by reference.

876.    Defendants Masrour Barzani, Arfan Salih Omer Sherwani, Hamza Salim, Hikmet Bamerni, Hayman Quass, and Dasko Shirwani

PRAYER ~~OF RELIEF~~

~~888.    Plaintiffs' allegations~~ did with malicious intent commit assault, battery, intentional infliction of emotional distress, hate crimes, hate crimes under D.C. Code § 22-3704, and civil rights violations pursuant to 42 U.S.C. § 1985, and did intentionally "cause a harmful or offensive contact with the plaintiff", and "intentionally caused the plaintiff to be placed in apprehension of such conduct." *See Acosta Orellana v. CropLife International*, 711 F.Supp.2d 81, 92 (D.D.C. 2010). An assault is "'an intentional and unlawful attempt or threat, either by words or acts, to do physical harm to the victim.'" *Hall v. District of Columbia*, 867 F.3d 138, 158 (D.C. Cir. 2017) (quoting *Evans-Reid v. District of Columbia*, 930 A.2d 930, 937 (D.C. 2007)). Plaintiff Shakhwan Abdurahman "suffered apprehension of harmful or offensive contact" and a "reasonable person in his position would have experienced such apprehension." *Collier v. District of Columbia*, 46 F.Supp.3d 6, 14 (D.D.C. 2014).

877.    Plaintiff's emotional distress resulted from "(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff [to suffer] severe emotional distress." *Ortberg v. Goldman Sachs Grp.*, 64 A.3d 158, 163 (D.C. 2013) (internal quotation marks omitted).

878.    Few principles are more basic to the First Amendment than the fundamental precept that words are presumptively protected, regardless of their content. Plaintiff Shakhwan Abdulrahman has an unquestioned right, as does any American citizen entitled to First Amendment protection, to expression of views, without regard to its substantive content, ideological valence, or particular viewpoint, in safety, peace, and dignity, and without fear of molestation. Pure speech is a category

of expression that receives "comprehensive protection under the First Amendment," See *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969); *303 Creative*, 143 S.Ct. 2312.

879.    Defendants Masrour Barzani, Arfan Salih Omer Sherwani, Hamza Salim, Hikmet Bamerni, Hayman Quass, and Dasko Shirwani and all other Defendants who comprise the BCE unlawfully and purposefully used a degree and nature of force and intimidation and violence to stifle freedom of speech and legitimate political expression, cavalierly offensive to fundamental American rights and values, and the lawful recording thereof, in an unrestricted public place in the national capital city of the United States of America.    Plaintiff Shakhwan Abdulrahman's First Amendment interests were threatened and in fact were impaired by these unlawful acts to suppress speech.

880.    Moreover, awarding damages also serves United States national security interests by deterring foreign actors who sponsor terrorism and torture.

881.    In the instant case, remedies for Plaintiffs theoretically offered by Kurdistan courts are ineffective, unobtainable, unduly prolonged, inadequate, and obviously and patently futile, and Plaintiffs would suffer retaliation for bringing claims in Kurdistan.  See *Jean v. Dorelien*, 431 F.3d 776, 783 (11th Cir. 2005)   There has been no criminal or civil accountability for crimes or human rights violations by the KRG and its leaders Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents and representatives.  The KRG Peshmerga military justice system, operated under and directed by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents and representatives, did not discipline anyone involved in the crimes.  The KRG judiciary, directed and controlled by Defendants Masoud Barzani, Masrour Barzani, and Waysi Barzani, and their agents and representatives, appears unable or unwilling to provide an adequate forum for the pursuit of claims rooted in these violations.  The KRG judiciary does not function in a manner that allows Plaintiffs to reasonably pursue their claims.  See, *e.g., Ahmed v. Magan*, No. 2:10-CV-342, 2011 WL 13160129, at *5 (S.D. Ohio Nov. 7, 2011).   It is well and publicly

documented by agencies of the United States and the United Nations that the KRG judiciary suffers from corruption and a lack of due process, political independence, and opacity.

882.    Under the TVPA, "[a] court shall decline to hear a claim under [the TVPA] if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred." 28 U.S.C. § 1350, note, sec.2(c).  Where local remedies are not "adequate" or "available" then a TVPA claimant need not first attempt to exhaust such remedies before suing. "The legal remedies offered by the [local] courts were [ ] ineffective, unobtainable, unduly prolonged, inadequate or obviously futile." *Enahoro v. Abubakar,* 408 F.3d 877, 892 (7th Cir. 2005).  This court has likewise acknowledged that plaintiffs need not meet the exhaustion requirement under certain circumstances.  For example, plaintiffs need not exhaust their local remedies if the plaintiffs would suffer retaliation for bringing their claims locally.  See *e.g., Doe v. Exxon Mobil Corp.,* 393 F.Supp.2d 20, 25 (D.D.C. 2005).

883.    The perpetrators of atrocity crimes, torture, extrajudicial killing, and human rights abuses detailed herein remain ensconced in positions of power and authority in the KRG, coupled with the fact that the KRG has taken no action against any accused offenders, Plaintiffs' had and have reasonable, justified, substantial, and persistent fear of violent reprisal for bringing claims of such violations.  See *Jane W. v. Thomas*, Civil Action No. 18-0569 (E.D. Pa. Nov. 14, 2018).  *Jane W. v. Thomas*, 560 F. Supp. 3d 855 (E.D. Pa. 2021).

884.    Plaintiffs have established Defendants' liability under the Torture Victim Protection Act, 28 U.S.C. § 1350 note, for the acts of extrajudicial killing of Plaintiffs' decedents, attempted extrajudicial killings, and torture.  These are acts for which the TVPA creates an "unambiguous and modern basis" for liability.  See *Sosa v. Alvarez-Machain,* 542 U.S. 692, 728, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004) (citing H.R. Rep. No. 102-367, at 3 (1991)).

885.    This Court has interpreted the TVPA to allow liability for attempted extrajudicial killings, such as the attempts on Plaintiff Maki Revend, "even if no one died as a result of [the] attempt." *Gill v. Islamic Republic of Iran,* 249 F. Supp. 3d 88, 99 (D.D.C. 2017) (citing *Warfaa v. Ali,* 33 F. Supp. 3d 653, 666 (E.D. Va. 2014)) *aff'd,* 811 F.3d 653 (4th Cir. 2016).

886.    The Supreme Court expressly held that plaintiffs in a federal cause of action under §1605A(c) may seek retroactive punitive damages for pre-enactment conduct and explicitly made a new cause of action available to remedy certain past acts of terrorism and related actions.  See *Opati v. Republic of Sudan*, 140 S. Ct. 1601, 590 U.S., 206 L. Ed. 2d 904 (2020).

887.    The private right of action in 28 U.S.C. § 1605A(c) also authorizes "punitive damages," which "serve to punish and deter the actions for which they are awarded." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d  at 87. (D.C. 2010).  Courts balance four factors to determine the appropriate amounts of punitive damages: "(1) the character of the defendants' act; (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants."  See *Cabrera v. Islamic Republic of Iran*, Civil Action No. 19-3835 (JDB) (D.C. Jan. 27, 2023), (quoting *Oveissi v. Islamic Republic of Iran,* 879 F.Supp.2d at 56 (D.D.C.2012) and *Acosta v. The Islamic Republic of Iran*, 574 F. Supp. 2d at 30 (D.C. 2008) citing *Acosta,* 574 F.Supp.2d at 30 (citing *Flatow v. Islamic Republic of Iran,* 999 F.Supp. 1, 32 (D.D.C.1998)).

888.    Defendants' individual conduct of torture and other associated gross criminal violations is "part of a longstanding pattern and policy, making the need for deterrence clear."  See *Abedini v. Government of Islamic Republic of Iran*, 422 F. Supp. 3d 118, at 141 (D.C. 2019).

889.    In the instant case, all four factors weigh overwhelmingly in favor of awarding significant punitive damages.  Wherefore, Plaintiffs demand judgment against Defendants, recognizing their massive illicit wealth, for compensatory damages, including solatium, in an amount sufficient to

compensate them for injuries perpetrated by Defendants and for solace; and for punitive damages sufficient to punish Defendants, acting as individuals, for the willful torture and extra judicial killings and associated criminal acts and atrocity crimes, and sufficient to "yield the desired deterrent effect."  See *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d at 88 (D.C. 2010). The injuries are directly traceable to the challenged action of the defendants.  "The state-sponsored terrorism exception to the FSIA expressly contemplates the award of solatium damages to the close relatives of terrorism victims." See 28 U.S.C. § 1605A(c). An award of solatium is intended to compensate for the "the mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent."  See *Fritz v. Islamic Republic of Iran*, Civil Action No. 2015-0456 (D.D.C. 2018) , citing *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009).

## THIRTEENTH CLAIM FOR RELIEF

### *(Money Laundering)*

890.    Plaintiffs repeat and re-allege each of the foregoing paragraphs, *supra,* that are fully incorporated herein by reference.

891.    From a date unknown, but no later than on or about 2007, and continuing to a date unknown, but at least 2023, in the District of Columbia and elsewhere, the Defendants Masrour Barzani, Waysi Barzani, Muksi Barzani, Mulla 'Babo" Mustafa Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani, Areen Masrour Barzani, and key facilitators Defendants Jonathon S. Moore, Joe R. Reeder, Valerie Cupp, Juli Mai Sanford, Laura Geho Harris, Rubar Sandi, and others, and their co-conspirators named and unnamed, did knowingly and willingly combine, conspire, confederate, and agree with each other and with others known and unknown to commit money laundering of narcotics and other criminal proceeds in violation of 18 U.S.C. § 1957, to purchase

real estate and other assets in the United States, that is, to knowingly engage in and attempt to engage in monetary transactions by, in, and through financial institutions, into accounts of sham entities, affecting foreign and interstate commerce, in criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activity, committed collectively, and did aid and abet the same, such property having been derived from a specified unlawful activity, knowing that:

> (a)    the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of unlawful activity; and

> (b)    the property involved in the financial transactions represented the proceeds of some form of unlawful activity.

All in violation of 81 U.S.C. § 1956(a)(1)(B)(i).

892.    To accomplish the money laundering, Defendants knowingly and willfully made false, deceitful, and purposefully untrue statements and material declarations of ownership, with ulterior motives to shield, conceal, disguise, and camouflage the true beneficial owners from disclosure, all as set forth herein.

## FOURTEENTH CLAIM FOR RELIEF

### (Conspiracy to Launder Money)

893.    Plaintiffs repeat and re-allege each of the foregoing paragraphs, *supra,* and are fully incorporated here by reference.

894.    From at least in or about 2007 and continuing through at least present day, in the District of Columbia and elsewhere, Defendants Masrour Barzani, Waysi Barzani, Muksi Barzani, Mulla 'Babo' Mustafa Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani, Areen Masrour Barzani, Jonathon S. Moore, Joe R. Reeder, Valerie Cupp, Juli Mai Sanford, Laura Geho Harris,

Rubar Sandi, and others, did unlawfully, willfully and knowingly combine, conspire, confederate and agree together and with each other, and with others known and unknown, to commit certain offenses under 18 U.S.C. § 1956 and 1957.

895.    Defendants Masrour Barzani, Waysi Barzani, Muksi Barzani, Mulla 'Babo" Mustafa Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani, Areen Masrour Barzani, Jonathon S. Moore, Joe R. Reeder, Valerie Cupp, Juli Mai Sanford, Laura Geho Harris, Rubar Sandi, and others, did conduct and attempt to conduct financial transactions affecting interstate and international commerce, which transactions involved the proceeds of specified unlawful activity, (that is, ), (1) with the intent to promote the carrying on of such specified unlawful activity and (2) with the intent to engage in conduct constituting a violation of [26 U.S.C. § 7201], [26 U.S.C. § 7206] and (3) knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity, and (4) knowing that the transactions were designed in whole and in part to avoid a transaction reporting requirement under federal law, and that while conducting and attempting to conduct such financial transactions knew that the property involved in the financial transactions, represented the proceeds of some form of unlawful activity, in violation of 18 U.S.C. § 1956(a).

896.    Defendants Masrour Barzani, Waysi Barzani, Muksi Barzani, Mulla 'Babo" Mustafa Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani, Areen Masrour Barzani, Jonathon S. Moore, Joe R. Reeder, Valerie Cupp, Juli Mai Sanford, Laura Geho Harris, Rubar Sandi, and others, knowingly transported, transmitted and transferred and attempted to transport, transmit and transfer a monetary instrument and funds from a place inside and outside the United States to

and through a place outside the United States with the intent to promote the carrying on of specified unlawful activity, in violation of 18 U.S.C. §1956(a)(2)(A); and

897.    Defendants Masrour Barzani, Waysi Barzani, Muksi Barzani, Mulla 'Babo" Mustafa Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani, Areen Masrour Barzani, Jonathon S. Moore, Joe R. Reeder, Valerie Cupp, Juli Mai Sanford, Laura Geho Harris, Rubar Sandi, and others, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, to transport, transmit and transfer and attempt to transport, transmit and transfer a monetary instrument and funds from a place in the United States to and through a place inside the United States knowing that such transportation was designed in whole or in part to conceal and disguise the nature, location, source, the ownership and the control of the proceeds of specified unlawful activity, and to avoid a transaction reporting requirement under federal law, in violation of 18 U.S.C. §1956(a)(2)(B).

898.    Defendants Masrour Barzani, Waysi Barzani, Muksi Barzani, Mulla 'Babo" Mustafa Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani, Areen Masrour Barzani, Jonathon S. Moore, Joe R. Reeder, Valerie Cupp, Juli Mai Sanford, Laura Geho Harris, Rubar Sandi, and others, knowingly engaged, attempted to engage and did cause and aid and abet others in engaging in monetary transactions in criminally derived property that was of a value greater than $10,000, in violation of 18 U.S.C. § 1957.

899.    Sham real estate corporations, as fictitious owners of real property, were knowingly and willfully created and made operative, intentionally misrepresenting their ownership of property to deceive others, by and/or owned by Defendants Masrour Barzani, Waysi Barzani, Muksi Barzani, Mulla 'Babo" Mustafa Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani, Areen Masrour Barzani, Jonathon S. Moore, Joe R. Reeder, Valerie Cupp, Juli Mai Sanford, Laura Geho Harris,

Rubar Sandi, and others. These properties constitute, and are derived from, proceeds traceable to one or more violations of: (i) a foreign offense involving the misappropriation of public funds by or for the benefit of a public official (18 U.S.C. § 1956(c)(7)(B)(iv)); (ii) fraud by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); (iii) wire fraud (18 U.S.C. § 1343); and/or (iv) international transportation or receipt of stolen or fraudulently obtained property (18 U.S.C. § 2314), and receipt of stolen money (18 U.S.C. § 2315), each of which is a specified unlawful activity under 18 U.S.C. §§ 1956(c)(7)(A), 1956(c)(7)(B)(iv) and 1956(c)(7)(D), and a conspiracy to commit such offenses.

900.    In furtherance of this conspiracy and to effect the objects thereof, including to injure and did injure Plaintiffs, the conspiracy is actionable since liability for civil conspiracy depends on performance of some underlying tortious act, ever present in the instant case, and is a means for establishing and does establish vicarious liability for the underlying tort. *Halberstam v. Welch*, 705 F. 2d 472 - Court of Appeals, Dist. of Columbia Circuit 1983.

901.    The manner and means by which the defendants and others carried out the conspiracy and the claimed overt and tortious acts, were, but not limited to, the financial transactions described hereinabove, which were committed in the District of Columbia, and elsewhere, all in violation of 18 U.S.C. § 1956(h).

**FIFTEENTH CLAIM FOR RELIEF**

*(Defamation Per Se)*

902.    Plaintiffs repeat and re-allege each of the foregoing paragraphs, *supra,* that are fully incorporated herein by reference.

903.    This defamation action arises from false, defamatory, inflammatory, and libelous statements by Defendant Reeder, made negligently, and portrayed Plaintiff Revend in a misleading

manner knowing that the portrayal was false or with reckless disregard for its truth or falsity, as set forth in greater detail herein, in court filings and published online by the Court, available to readers in Washington, D.C., across the nation, and around the world, and likely to be subsequently reiterated in the press for years.  The unprivileged statements were and remain false, and were made by Defendant with actual malice or with reckless disregard for the truth given that Defendant Reeder knows that these statements are patently and demonstrably false.  Defendant Reeder knew or should have known they were false and defamatory.  portrayed Plaintiffs in this manner knowing that the portrayal was false or with reckless disregard for its truth or falsity.

904.    As the proximate result of publication of the maliciously false and defamatory statements to third parties, wrongfully stating criminal conduct, Plaintiff Revend has been damaged.

905.    Defendant Reeder, as an attorney, made these strategic and defamatory statements, which were communicated and published to third parties, within the scope and course of his employment or contractual relationship with the other defendants, without verifying their authenticity or accuracy, with intent to harm Plaintiff Revend given that, *inter alia*, Defendant Reeder's defamatory statements appear to have been prepared in advance, were written, and manufactured an impression of impropriety where none exists.   Plaintiff has suffered general and special damages, including damage to Plaintiffs' reputation and standing in the community, shame, mortification, hurt feelings, embarrassment, humiliation, damage to peace of mind, emotional distress, and injury in journalist standing.  Although the full nature, extent, and amount of these damages are currently unknown, Plaintiff will continue to suffer general and special damages as a direct result of Defendant Reeder's conduct which exposes Plaintiff to hatred, contempt, ridicule, obloquy, and has a tendency to injure Plaintiff in his journalism. Defendant Reeder manufactured an impression of impropriety where none exists,

906.    Defendant Reeder is a recognized former public official with access to government records, giving credibility to his categorically and demonstrably false statements presented as an unassailable truth and as a centerpiece of Defendant Reeder's attention-seeking motion to this Court.

907.    Defendants' statements were published, without regard to their truth or falsity.  By publishing the false statements, Defendant Reeder caused harm and cognizable injury to Plaintiff Revend's reputation.  Innumerable people actually read the false and defamatory statements.

908.    The statements tend to so harm the reputation of Plaintiff Revend as to lower his professional reputation in the worldwide Kurdish community or deter third persons from associating or dealing with him and, as such, constitute defamation *per se*.  "Imputing criminal behavior to an individual is generally considered defamatory *per se,* and actionable without proof of special damages."  See *Paul v. Davis*, 424 In U.S. 693, 697, 96 S. Ct. 1155, 47 L. Ed. 2d 405 (1976).

909.    Under District of Columbia law, Plaintiff Maki Revend makes a false light claim, showing (1) publicity by means of the court publishing the complaint and Defendants' defamatory motion on its website, which is widely covered by Kurdistan media; (2) about a false statement, representation or imputation; (3) understood to be of and concerning the plaintiff; and (4) which places the plaintiff in a false light that would be offensive to a reasonable person.  See *Doe v. Bernabei & Wachtel, PLLC*, 116 A.3d 1262, 1267 (D.C. 2015) (alteration in original) (internal quotation marks and citation omitted).

910.    The statements were made by Defendant Reeder in bad faith, with actual malice, oppression and fraud in that he was aware at the time of the falsity of the publication and thus, made said statements in bad faith, one of ill-will directed toward Plaintiff Reeder without any regard for the truth, and were part of no privileged category.  Defendant Reeder's statements meet

the threshold requirements of defamation, in that they were statements not of opinion, but statements that could be proved to be accurate or false.

911.    Defendant Reeder's false statements are defamatory and libelous *per se* because they impute to Mr. Revend the commission of crimes and criminal record which were untrue. Defendant Reeder's false statements prejudice Mr. Revend in his profession as a journalist and political activist.  Mr. Revend is therefore entitled to presumed damages.

912.    Moreover, the statements tend to so harm the reputation of Plaintiff Revend as to lower his professional reputation in the community or deter third parties from associating or dealing with him and, as such, constitute defamation *per se*.

913.    As a direct and proximate result of these maliciously false and defamatory statements by Defendant Reeder, Mr. Revend has suffered immediate and incalculable damages, including, *inter alia*, injury to his reputation as a trusted journalist, harm to his ability to carry on in his profession, embarrassment, humiliation, and emotional distress, and deter third persons from associating or dealing with him, in an amount to be determined at trial.

914.    Defendant Reeder's actions were malicious, willful, and wanton, and without any regard for the truth evidence a conscious ill-will and disregard for Mr. Revend's rights.  The injury is directly traceable to the challenged intentional action of the defendant made with actual malice toward Plaintiff Revend.  Accordingly, punitive damages are appropriate.

915.    Venue is proper in this Court because the causes of action asserted herein arose in this District and caused tortious injury by his act.

WHEREFORE, Plaintiff Revend demands judgement against Defendant Reeder for damages, punitive damages, court costs, and such other relief as the Court deems just and proper. The substantial danger of injury to Plaintiff Maki Revend's reputation from Defendant Reeder's false statements, greater than that suffered by the public at large, is readily apparent.  Such

statements, and which Defendant Reeder knew or should have known were false and defamatory, would harm the reputation of another as to lower him in the estimation of his journalism audience and the community or to deter third persons from associating with him. Plaintiff respectfully requests that the Court enter an award in Plaintiff's favor and against Defendant Joe Reeder, as follows:

(1)  Awarding Mr. Revend compensatory damages of not less than $3,000,000, or in such additional amount to be proven at trial;

(2)  Awarding Mr. Revend punitive damages to the maximum extent permitted by law, but not less than $10,000,000;

(3)  Awarding Mr. Revend all of his expenses and costs, including attorney's fees; and

(4)  Granting such other and further relief as the Court deems appropriate.

WHEREFORE, Plaintiff Maki Revend demands judgement against Defendant Joe Reeder and all Defendants for damages, punitive damages, court costs, and such other relief as the Court deems just and proper.

## PRAYER OF RELIEF

916.    Plaintiffs' causes of action arise and under and violate domestic law and international law as defined in agreements, declarations, conventions, resolutions, and treaties, including but not limited to the following:

        a)        Customary international law and treaties of the United States;

        b)        Statutes and common law of the United States;

        c)        Statutes and common law of the District of Columbia;

        d)        Any other applicable laws, domestic or international.

917.    The claims herein under the law of nations are based on norms that are definable, obligatory, and universally recognized.

918.    The acts and injuries to Plaintiffs and their deceased relatives described herein, as well as those similarly situated, were part of a pattern and practice of systematic human rights violations, designed, ordered, implemented, and directed with the participation of Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, Muksi Barzani, Mulla 'Babo" Mustafa Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani, Areen Masrour Barzani, and Barzani family members, Jonathon S. Moore, Joe R. Reeder, Valerie Cupp, Juli Mai Sanford, Laura Geho Harris, Rubar Sandi, Treefa Aziz, Afan Saleh Omar Sherwani, Omar S. Barzani, Entifadh Kamal Qanbar, Hamza Salim, Hikmet Bamerni, Hayman Quass, Dasko Shirwani, and carried out by personnel acting at the direction and/or with the encouragement or acquiescence of Defendants Masoud Barani, Masrour Barzani, and Waysi Barzani.

919.    The allegations, preponderance of the evidence, state a claim of violation of clearly established law.  See *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

~~889~~920.    Plaintiffs request that the Court:

(a)    Enter judgment against Defendants finding them jointly and severally liable in the amount of Nine Billion Dollars ($9,000,000,000.00), finding them jointly and severally liable under the Torture Victims Protection Act of 1991, 28 U.S.C. § 1350;

(b)    Award Plaintiffs compensatory, consequential, and punitive damages to the maximum extent permitted by law, and treble any compensatory damages awarded under the Torture Victims Protection Act of 1991 pursuant to 28 U.S.C. § 1350;

(c)    Award Plaintiffs their litigation expenses including attorney's fees and costs and expenses incurred in this action, pursuant to 28 U.S.C. § 1350);

(d)    Enter judgment against Defendants in the amount of Nine Billion Dollars ($9,000,000,000.00) finding them jointly and severally liable under the Anti-Terrorism Act, 18 U.S.C. § 2333;

(e)    Award Plaintiffs compensatory, consequential, and punitive damages to the maximum extent permitted by law, and treble any compensatory damages awarded under the Anti-Terrorism Act, pursuant to 18 U.S.C. § 2333;

(j)    Award Plaintiffs prejudgment interest; and

(k)    Award Plaintiffs any such further relief the Court deems just and proper.

(i)    Ender a declaratory judgement holding the Defendants' conduct was in violation of the law of nations.

## JURY DEMAND

~~890~~921.    In accordance with Federal Rules of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

Dated: ~~May 13, 2024~~January 9, 2025

702

*Counsel for Plaintiffs Kurdistan Victims Fund, et. al.*

**TATE BYWATER PLC**

By:

 /s/ James R. Tate_____
Tate Bywater
James R. Tate, *pro hac vice*
2740 Chain Bridge Road
Vienna, VA 22181
Tel: 703-938-5100
Email: jtate@tatebywater.com

 /s/ Paul Mickelsen_____
Tate Bywater
Paul Mickelsen (D.C. Bar Number 500750)
Benjamin Ader (D.C. Bar Number 1616990)
2740 Chain Bridge Road
Vienna, VA 22181
Tel: 703-938-5100
Email: pmickelsen@tatebywater.com

/s/ James R. Tate

Tate Bywater
James R. Tate, *pro hac vice*
2740 Chain Bridge Road
Vienna, VA 22181
Tel: 703-938-5100
Email: jtate@tatebywater.com

**<u>Certificate of Service</u>**

I HEREBY CERTIFY that on the 13th9th day of May 2024January 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will serve a copy to counsel of record for Defendants who have filed an appearance.

/s/ *James* Benjamin Ader

Benjamin Ader

APPENDIX A

To effect its tortious objects to injure Plaintiffs

DEFENDANTS' MINIMUM STATUTORY VIOLATIONS – PARTIAL LISTING

To effect its tortious objects to injure Plaintiffs, and by reason of the conduct alleged herein, to be more fully particularized at trial, the criminal and civil violations of U.S. federal law, Presidential Executive Orders having force of law, and regulations, and treaties, agreements, conventions, and international laws, knowingly or recklessly, directly or indirectly, committed or caused to be committed by Defendants Masoud Barzani, Masrour Barzani, Waysi Barzani, Muksi Barzani, Mulla 'Babo" Mustafa Barzani, Jeyra Mohamad Khaled, Katja Vrecar Barzani, Areen Masrour Barzani, Jonathon S. Moore, Joe R. ~~Tate~~ Reeder, Valerie Cupp, Juli Mai Sanford, Laura Geho Harris, Rubar Sandi, Treefa Aziz, Afan Saleh Omar Sherwani, Omar S. Barzini, Entifadh Kamal Qanbar, Hamza Salim, Hikmet Bamerni, Hayman Quass, Dasko Shirwani, Barzani family members, and their co-conspirators, agents, and representatives are inordinately extensive in number, scope, depth, breadth, magnitude, gravity, continuity, longevity, and criminal severity.

The tortious violations schemed, condoned, taken, and being taken, directly and indirectly, by the Defendants have provided the means for Defendants to deliberately kill and injure Plaintiffs named and unnamed, in multitudinous overt acts and violations of, at a minimum, the following distinct U.S. federal statutory provisions:

1.  18 U.S.C. § 2339C(a)(1)(B) – Financing Terrorism
2.  21 U.S.C. § 848 – Criminal Enterprise
3.  31 U.S.C. § 3729 – False Claim Act
4.  18 U.S.C. § 2332d – Financial Transactions
5.  18 U.S.C. § 2339A – Providing Material Support to Terrorists
6.  18 U.S.C. § 1203; 18 U.S.C. 2332(b)(2); 18 U.S.C. § 1114; 18 U.S.C. § 1116 – Hostage taking resulting in death
7.  18 U.S.C. § 1958 – Murder for hire
8.  18 U.S.C.§§ 1116(a), 1116(c), and 1111(b) – Murder of an Internationally Protected Person
9.  18 U.S.C. § 1956 – Laundering Money
10. 18 U.S.C. § 1956 and 1957.Conspiracy to Launder Money
11. 18 U.S.C. § 641 – Stealing from the United States
12. 22 U.S. C. § 2778 – Arms Export Control Act
13. 28 U.S.C. § 1350 note § 2(a)(1)-(2) – The Torture Act
14. 18 U.S.C. § 2340A – Torture
15. 28 U.S.C. §1350 – Extrajudicial Killing
16. 18 U.S.C. §1091 – Genocide
17. 28 U.S.C. §1350 – Crimes Against Humanity
18. 42 U.S.C. § 1983 – Deprivation of Rights
19. 8 U.S.C. § 666 – Theft from Programs Receiving Federal Funds and Bribery
20. 18 U.S.C. § 201(c)(1)(A)  – Illegal Gratuity
21. 18 U.S.C. § 1959 – Violent Crimes in Aid of Racketeering
22. 18 U.S.C. § 1621 – Perjury
23. 18 U.S.C. § 371 – Immigration, Conspiracy to Defraud the United States.
24. 18 U.S.C. § 1958 (a) – Travel In or Use of Foreign Commerce
25. 18 U.S.C. § 371 and 3551 et seq. – Conspiracy to Defraud the United States, the Foreign Account Tax Compliance Act
26. 26 U.S.C. § 720 – Attempt to evade or defeat tax
27. 18 U.S.C. § 371 – Conspiracy to Defraud the United States
28. 15 U.S.C. § 78dd-1 -- Foreign Extortion Prevention Act
28. 15 U.S.C. § 78dd-3 -- Foreign Corrupt Practices Act
29. 18 U.S.C. § 201 (b)(1)(A) and (C) and (b)(2)(A) and (C) – Conspiracy to Commit Bribery
30. 18 U.S.C. § 1519 – Falsification of Records with Intent to Influence Immigration Decision

31.    8 U.S.C. § 1101(f)(6) Person of Bad Moral Character

32.    31 U.S.C. § 3729 – False Claims, with Intent to Influence a Tax Decision

33.    50 U.S.C. § 1701, et seq: International Emergency Economic Powers Act

34.    22 U.S.C. § 2778 – Export of Arms to Iran and ISIS

35.    18 U.S.C. § 2339B – Knowingly and Intentionally Combine, Conspire, Confederate, and Agree to Knowingly and Unlawfully Provide Support and Resources to a Foreign Terrorist Organization

36.    18 U.S.C. § 2333(a) – Payment to Foreign Terrorist Organization

36.    21 U.S.C. § 1901-1906 – Foreign Narcotics Traffickers

37.    18 U.S.C. § 1952 – Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises

38.    18 U.S.C. § 1952 – Violation of the Travel Act

39.    18 U.S.C. § 2320 – Trafficking in Counterfeit Goods

40.    26 U.S.C. § 7201 – Attempt to Evade or Defeat Tax

41.    21 U.S.C. § 848 –  Criminal Enterprise

42.    18 U.S.C. § 2314 – Transportation of Stolen Monies

43.    Federal Food, Drug, and Cosmetic Act and the Drug Supply Chain Security Act (DSCSA) of 2013

44.    18 U.S.C. § 1956 – Laundering of monetary instruments

45.    42 U.S.C. § 1985 – Conspiracy to interfere with civil rights

46.    18 U.S.C. §  2339b – Providing Material Support to Foreign Terrorist Organization

47.    18 U.S.C. § 1091 – Genocide

48.    Currency and Foreign Transactions Reporting Act

49.    18 U.S.C. & 2339(B) Anti-Terrorism Act

50.    18 U.S.C. § 371 – Conspiracy to defraud the United States

51.    18 U.S.C. § 1091(e) -Genocide Accountability Act of 2007

52.    Elie Wiesel Genocide and Atrocities Prevention Act of 2018

53.    31 U.S.C. § 3729(a)(1) (2006), and, as amended, 31 U.S.C. § 3729(a)(1)(A)) -- False Claims Act: Presentation of False Claims

54.    31 U.S.C. § 3729(2)(2006) and, as amended, 31 U.S.C. § 3729(a)(1)(B) - False Claims Act: Making or Using a False Record or Statement

55.    Unjust Enrichment

56.    18 U.S.C. § 793(e) and  3238 -- Willful Transmission of National Defense Information

57.    Conspiracy to Launder Monetary Instruments

58.    18 U.S.C. § 371, 3238, and 3551 et seq. – Conspiracy

59.    22 U.S.C. § 108 – Global Magnitsky Human Rights Accountability Act

60.    U.S.A. Patriot Act

61.    18 U.S.C. § 2333(d)(2) --Justice Against Sponsors of Terrorism Act

62.    12 U.S.C. § 1829b, 12 U.S.C. 1951-1960, 31 U.S.C. 5311-5314, 5316-5336 – Bank Secrecy Act

63.    18 U.S.C. § 1956(a)(1)(B)(i) – Laundering proceeds of criminal conduct
64.    43 U.S.C. § 1985(3) – Civil Rights Violations
65.    18 U.S.C. § 241 – Civil Rights Violations
66.    18 U.S.C. § 2304A – Torture by Public Official
67.    18 U.S.C. § 242 et seq. – Deprivation of Rights Under Color of Law
68.    26 U.S.C. § 7212(a) – Willfully Not Paying Taxes
69.    26 U.S.C. § 7201 --   Evade or Defeat Taxes
70.    26 U.S.C. § 7206 – Tax Fraud
71.    Foreign Account Tax Compliance Act
72.    Corporate Transparency Act
73.    18 U.S.C. § 2314 – International Trafficking in Stolen Monies
74.    18 U.S.C. § 1101(f)(6) – False Testimony
75.    8 U.S.C. § 1101(f) and 1101 (f)(3) – Good Moral Character
76.    18 U.S.C. § 1425(a) – False Procurement of Citizenship
77.    18 U.S.C. § 1546(a) – False Procurement of Permanent Residence
78.    18 U.S.C. § 1621(1) – False Procurement of Permanent Residence
79.    8 U.S.C. §1182(a)(6)(C)(i) – Sought Permanent Residence by Fraud
80.    8 U.S.C. § 1427(a)(1) and 1429 – Unlawful Permanent Residence
81.    18 U.S.C. § 1956(h) – Conceal Ownership/Source of Funds
82.    18 U.S.C. § 5314 and 5322 – Failure to Report Foreign Bank and Financial Accounts
83.    26 U.S.C. § 7201 – Evade or Defeat Taxes
84.    22 U.S.C. § 9401, Sec. 193(3) – Countering America's Adversaries Through Sanction Act
85.    18 U.S.C. § 1001(a)(3) – False Statements
86.    18 U.S.C. § 1343, 1349, 1956 – Money Laundering Wire Fraud
87.    18 U.S.C. § 2315 and 2 – Unlawfully converted and transferred
88.    18 U.S.C. § 1956(c)(7)(B)(iv) –International Transfer of Fraudulently Obtained Property
89.    18 U.S.C. § 1956(c)(3) – disposition of property
90.    18 U.S.C. § 1956(c)(7)(A)-Receipt of Fraudulent Obtained Property
91.    18 U.S.C. § 1349, 1957, and 2 – Utilizing Federally Insured Inst.
92.    18 U.S.C. § 1028(a)(7) and 1028 (a)(1) – Identify Theft and Assumption
93.    18 U.S.C. § 1030 – Computer Fraud
94.    18 U.S.C. § 1343 – Wire Fraud
95.    22 U.S.C. § 611 – Failure to File Required Registration Statement
96.    50 U.S.C. § 1701-1706 – International Emergency Economic Powers Act
97.    Iranian Transaction Regulations
** And others.

APPENDIX B

To effect its tortious objects to injure Plaintiffs

DEFENDANTS' SHAM CORPORATIONS – PARTIAL LISTING

The Sham Corporations Were Involved In And/Or Traceable
To The Proceeds Of The Foregoing Alleged Criminal Conduct


As set forth below, numerous assets represent property, all in the United States, derived from proceeds traceable to the foregoing alleged criminal conduct, as well as property involved in money laundering in violation of 18 U.S.C. §§ 1956 and 1957 and numerous other statutes.


A.    Hollow Oak, LLC
       A Delaware limited liability company
       Beneficial Owner: Muksi Barzani
       Manager: Julie Sanford

B.    Old Fireplace, LLC
       A Virginia limited liability company
       Sole Owner: Jocard Holdings Limited (BVI)
       Beneficial owner: Muksi Barzani

C.    983 Washington SB, LLC
       A Florida limited liability company

Beneficial owner: Masrour Barzani
Manager:  Masrour Barzani


D.    Old Stone LLC
        A Virginia limited liability company
        Beneficial owner: Muksi Barzani

E.    Great Bend Holdings, LLC
        A Virginia limited liability company
        Subsidiary of J. Sparrow Holdings Limited, a BVI company
        Sole Owner: Mustafa Barzani, 3883 Connecticut Avenue NW, Apt 613, Washington DC
        Sole Member: Haval Dosky

F.    Hillcrest Farm, LLC
        A Virginia limited liability company
        Beneficial owner: Mustafa Barzani

G.    Hillcrest Racing Stables, LLC
        A Virginia limited liability company
        Beneficial owner:  Mustafa Barzani

H.    One Park Crest Unit 1808, LLC
        A limited liability company
        Beneficial owner: Mustafa Barzani

I.    One Park Crest Unit 1816, LLC
        Name changed to Highland Path LLC, a Virginia limited liability company

J.    One Park Crest Unit 1812, LLC
        Owned by Teague Holding Limited (BVI)
        A Virginia limited liability company
        Sole beneficial owner: Mansour Barzani

K.    One Park Crest Unit 1816, LLC
        A Virginia limited liability company

L.    One Park Crest Unit 1404, LLC
        A Virginia limited liability company
        Name changed to Old Stone Path, LLC

M.    One Park Crest Unit 1906, LLC

Owned by Chevalle Holdings Limited (BVI)
A Virginia limited liability company
Sole beneficial owner: Masrour Barzani

N.    One Park Crest Unit 1410, LLC
Named changed to Old Fireplace, LLC

O.    Park Crest Lofts Unit 627, LLC
A Virginia Limited Liability company

P.    RLFC, LLC
A Delaware limited liability company
Sole beneficial owner: Muksi Barzani

Q.    Grape Arbor, LLC
A District of Columbia limited liability company
Owned by J. Sparrow Holdings Limited (BVI)
Beneficial Owner: Mustafa Barzani, Trustee of The M&K Living Trust
Sole Member: Mustafa Barzani

R.    Bayberry Falls, LLC
A limited liability company

S.    Monarch E2, LLC
A limited liability company
Sole beneficial owner: Mustafa Barzani

T.    Woodlea Holdings, LLC
A limited liability company
Sole beneficial owner: Mustafa Barzani

U.    1224 Randolph LLC
A limited liability company
Beneficial owner: Muksi Barzani
Acquired by GioGet LLC

V.    GioDet, LLC
A Delaware limited liability company
Sole owner: Muksi Barzani

W.    11900 Market Street, LLC
A limited liability company
Sole owner: Muksi Barzani

X.      SBPB, LLC
        Office: 1130 Connecticut Avenue NW. Washington DC
        Manager:  Johnathon S. Moore


Y.      Angus Cross, LLC
        A limited liability company
        Single member LLC
        Sole Owner: Muksi Barzani


Z.      Cattle Cross, LLC
        A limited liability company
        Beneficial owner: Muksi Barzani


AA.     Highland Path, LLC
        A limited liability company
        Owned by Jocard Holdings Limited (BVI)
        Beneficial owner: Muksi Barzani
        Single member LLC


BB.     Lawson Lane, LLC
        A limited liability company
        Owned by Jocard Holdings Limited (BVI)
        Single member LLC
        Sole Owner:  Muksi Barzani


CC.     Kurdistan Arabian Stud, LLC
        A limited liability company
        Sole Owner: Mustafa Barzani
        Office: 1 Wood Road, Wilmington, DE (Once residence of Jonathon Moore)


DD.     Sylvania Jermantown LLC
        A Virginia limited liability company
        Single member LLC
        Sole owner Muksi Barzani


EE.     Sylvania Fair Lakes, LLC
        A Virginia limited liability company
        Single member LLC
        Sole owner Muksi Barzani


FF.     Sylvania NC LLC
        A North Carolina limited liability company

Sole owner:  Muksi Barzani

GG.    Golden Eagle Global, Inc. (GEG, Inc.)
       A Delaware corporation
       All shares sold to Mustafa Barzani for $1 to facilitate USG contracts
       President:  Mustafa Barzani
       Director, Vice President and Secretary:  Valerie Cup

HH.    GEG Reklam (a division of GEG)
       Division of GEG

II.    GEG Construction
       Same shareholders as parent Golden Eagle Global, Inc.

JJ.    GEG Management LLC
       A limited liability company
       Owned by Golden Eagle Global, Inc.
       All shares sold to Mustafa Barzani for $1 to facilitate USG contracts
       President:  Mustafa Barzani
       Vice President and Secretary:  Valerie Cupp

KK.    GEGI Management, LLC
       A limited liability company
       5335 Wisconsin Ave, NW. Ste 440, Washington DC 20015
       Covered costs for Masrour, Mansour, Muksi, Mustafa, and Waysi Barzani

LL.    GEG Kurdistan
       A shortened name for Golden Eagle Group, a Kurdish company

MM.    1150 K 1210 LLC
       A Washington DC limited liability company
       Owned by J. Sparrow Holdings Limited (BVI)
       Beneficial owner: Mustafa Barzani

NN.    1150 K 1410 LLC
       A Washington DC limited liability company

OO.    MLS111 Legacy Foundation, Inc.
       A corporation
       Beneficial owner: Katja Vrecar Barzani (Mustafa Barzani's wife)

PP.    Atlantic Noca, LLC
       A Delaware limited liability company

Sole Owner:  Muksi Barzani

QQ.    360° Swiss
A Kurdistan company
Division of Golden Eagle Global
Beneficial owner:  Mustafa Barzani

RR.    3883 Connecticut LLC
A District of Columbia limited liability company
Beneficial Owner:  Mustafa M.Barzani

SS.    Legacy Farm LLC
A limited liability company
Beneficial owner Muksi Barzani

TT.    Great Bend Holdings, LLC
A limited liability company
Sole beneficial owner: Mustafa Barzani

UU.    Pondview Revocable Trust
Sole Owner: Muksi Barzani

VV.    M&K Living Trust
Beneficial owners:  Mustafa Barzani, Katja Vrecar Barzani, Muksi Barzni
Trustee: Mustafa Barzani

WW.   KLNB, LLC
A Virginia limited liability company
Beneficial owner: Masrour Barzani

XX.    First Level Oak Shade LLC

APPENDIX C

To effect its tortious objects to injure Plaintiffs

DEFENDANTS' FOREIGN HOLDING COMPANIES – PARTIAL LISTING

A.  Teague Holdings Limited ("the holding company for Masrour")
    Incorporated British Virgin Islands February 1, 2008
    British Virgin Islands corporation No. 1462498
    Address;  Law Office of Johnathon R. Moore, PLLC
    5335 Wisconsin Avenue, NW, Suite 440

    Washington, DC 20015-2079
    Sole Director:  Masrour Barzani
    Reserve Director:  Mustafa Barzani, 3883 Connecticut Avenue NW, #623,
    Washington DC 2008
    Secretary: Julie Sanford, 30 Saint Roberts Drive, Stafford, VA 22556
    Sole shareholder:  Masrour Barzani
    Beneficial shareholder:  Masrour Barzani, One Park Crest, Unit 1906, McLean, VA
    22102


B.  Chevalle Holdings Limited ("Mansour's holding company")
    British Virgin Islands corporation No.1462500
    Sole Owner: Mansour Barzani, 8220 Crestwood Heights Drive, Apr 1812, McLean,
    VA 22102
    Sole Director: Mansour Barzani
    Reserve Director: Mustafa Barzani, 3883 Connecticut Avenue NW, #613,
    Washington DC 20008
    Address;  Law Office of Johnathon R. Moore, PLLC
    5335 Wisconsin Avenue, NW, Suite 440
    Washington, DC 20015-2079
    Secretary: Julie Sanford, 30 Saint Roberts Drive, Safford, VA 22556

C.  Jocard Holdings Limited ("Muksi's holding company")
    British Virgin Islands corporation No. 1462499
    Address: 3076 Sir Francis Drake Highway, P. O. Box 3463, Road Town, Tortola,
    British Virgin Islands
    Mailing address:  1072 Thomas Jefferson St., NW, Washington DC 20037
    Sole Owner:  Muksi Barzani, 3883 Connecticut Avenue NW, #613, Washington
    DC 20008
    Sole Director:  Muksi Barzani

Reserve Director: Mustafa Barzani
Secretary: Laura Geho

D.  Barbossa Holdings Limited ("Waysi's holding company")
British Virgin Islands corporation No. 1462492
Sole owner: Waysi Barzani
Sole director:  Waysi Barzani

E.  J. Sparrow Holdings Limited ("Mustafa's holding company)
British Virgin Islands corporation  No. 1462490
Principal offices:  3383 Connecticut Ave., NW, #613, Washington DC 20008 and
5335 Wisconsin Avenue NW, Suite 950,  Washington DC 20015
Sole owner:  Mustafa Barzani
Sole Director:  Mustafa Barzani
Reserve Director:  Muksi Barzani and mother Jeyra Mohamad Khaled
Secretary:  Laura Geho, 4000 Tunlaw Road NW, Washington DC 20007

F.    Liberty 1947 Holdings Limited
A successor holding company in British Virgin Islands

G.    TSG Global Holdings Inc.
Corporate Address:  5335 Wisconsin Avenue, NW, Suite 950, Washington DC
20015
Rubar Sandi, Founder, Chairman, The Sandi Group
Emine Sandi, President, The Sandi Group
AKA "The Sandi Group Global Holdings (TSG GH)"
Address:  2101 L Street NW, Ste 800, Washington DC
TSG Holdings LLC

H.  Leopard International Holdings Limited
A British Virgin Islands company
Director: Sarwar Padawi
Law Office of Jonathon R. Moore, PLLC
5335 Wisconsin Avenue, NW, Suite 440, Washington DC
Jonathon R. Moore, Principal, Manager, and Sole Interest Holder

James R. Tate

APPENDIX D

To effect its tortious objects to injure Plaintiffs

INTERNATIONAL TREATIES AND CONVENTIONS VIOLATED – PARTIAL LISTING

To which the Republic of Iraq is subject:

- International Convention for the Protection of All Persons from Enforced Disappearance

- International Covenant on Civil and Political Rights

- American Convention

- Convention against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment

- Convention on the Non-Applicability of Statutory Limitations to War Crimes and Crimes against Humanity

- United Nations Basic Principles and Guidelines on the Right to a Remedy and Reparation for Victims of Violations of International Human Rights and Humanitarian Law

- Basic Principles and Guidelines on the Right to a Remedy and Reparation for the Victims of Gross Violations of International Human Rights Law and Serious Violations of International Humanitarian Law

- Convention on the Prevention and Punishment of the Crime of Genocide

- American Declaration of the Rights And Duties of Man

- Vienna Convention on the Law of Treaties

- United Nations Convention Against Corruption

- International Convention Against the Taking of Hostages

- International Convention for the Suppression of the Financing of Terrorism

- United Nations Convention Against Transnational Organized Crime

- Vienna Convention on Diplomatic Relations

- Universal Declaration of Human Rights

- United Nations Charter

- Paris Convention for the Protection of Industrial Property

- Protocols of the World Customs Organization

- International Convention on the Elimination of All Forms of Racial Discrimination

- Convention on the Elimination of All Forms of Discrimination against Women