# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MAKI REVEND, *et al.*,

                *Plaintiffs,*

v.

MASROUR BARZANI, *et al.*,

                *Defendants.*

Civil Action No. 1:24-cv-00278-RDM
Judge Randolph Moss

## DECLARATION OF STEPHEN M. STUDDERT

Nothing contained within my declaration relies on conjecture or speculation. Every statement made herein is anchored in verifiable fact.

I submit this Declaration in order to assist the Court by explaining the circumstances under which I received information and preliminary assistance from numerous individuals, why I maintained the confidentiality of many of those individuals, and why Plaintiffs' counsel did not receive identifying information concerning many upstream contributors. The statements set forth herein are based upon my personal knowledge except where expressly stated otherwise.

I am a private American citizen, I am not an attorney, I am not an agent or proxy or stalking horse for any government domestic or foreign, and I am a founder and Chair of the Kurdistan Victims Fund, a small volunteer-centric American-chartered 501(c) (3) organization. I have been acting as conduit and litigation support consultant to the Tate Bywater law firm in providing volunteers to assist the firm in prosecuting the instant case. I have given my word to every volunteer, whether lawyers or others who have provided relevant facts and proof, that I

1 SMS

would keep their identities confidential because of fear of retribution to them and/or their families from Defendants or their agents should identities become known.  I have kept my word to keep confidential the identities of all who have assisted in the instant litigation.

After reading the transcript of this Court's June 22, 2026, hearing, I learned that the Court is doubtful that any fear of retribution by Defendants or their agents is credible.  The Barzani regime's track record of retaliating against dissent is extensively detailed in U.S. government intelligence and human rights reports, and by federal agents with whom I have personally spoken.  My own extensive interviews with journalists targeted by the Barzani regime further confirm the terrifying, systematic reality of this oppression, harassment, and persecution.

I provide the following background information to assure the Court that the fears of John Doe's named in the initial Complaint in this case and all persons who have provided evidence or volunteered to assist are in fact real and credible.

Before leaving full-time federal government service as a White House official, over a course of many years I have represented several Presidents of the United States at the highest level to officers of many nations of the world, including nations of the Middle East.  I received additional appointments to federal positions from Presidents of both political parties.  During my public service, including service in law-enforcement executive responsibilities and with classified materials, I received training and experience concerning the protection of sensitive information, including the importance of safeguarding sources, methods, and individuals who may face risk if exposed.  That background informed my decision to treat source confidentiality as a serious litigation-safety concern in this matter.

Through that professional background I became acquainted with Iraqi Kurdistan, and especially to the torturous plight of its ethno-religious Yazidi minority.  I have personally

2

interviewed women and girls who are the victims of rape and child trafficking. I have personally interviewed Kurdish business persons whose business were literally stolen by the Barzani regime. I have personally visited the leadership of Iraqi Kurdistan during numerous trips to Iraq over a multi-year period, and have gained high respect, love, and sadness for the Kurdish people.

From that extensive interaction with Kurdish people, over time I have learned that the Kurdish people are in essence deeply oppressed and victims of a government that remains in power by the use of extreme violence, including murder and torture. Not originally accepting these allegations and impressions at face value, I have informally visited with numerous State Department, Justice Department, and intelligence community officials, solely to learn confirmation of these citizen allegations. I have personally had Ministers of the Kurdistan Regional Government blatantly solicit bribes and contract kickbacks from me. One minister offered me a substantial KRG contract in exchange for getting his child a scholarship and admission to a specific New York university. Another KRG minister offered a substantial contract with specific instructions to whom (a family member) we were to pay a portion of the earnings. I had a KRG Governor tell me essentially the same thing. I had a KRG police general offer me a substantial contract in exchange for a cut of the earnings. Each of these senior officials were Barzani-directed appointees. I have interviewed Kurdish citizens who were arrested, jailed, and tortured by the Barzani-controlled Peshmerga, without trial, and in some cases I personally saw their physical body wounds. On multiple occasions I have personally witnessed hundreds, if not thousands, of Kurdish oil tank trucks lined up at the Iran border awaiting sundown to deliver stolen and embargoed Kurdish oil to Iran under cover of darkness lest, I was told, they be seen by U.S. intelligence satellites. I have met at secret Kurdistan mountain locations with senior officers of the KRG Peshmerga military forces and had them tell

3 SMS

me how the Barzani regime billed the U.S. Government for reimbursement for what they called non-existent "ghost soldiers".

I have also learned that the exceptionally corrupt leadership of Iraqi Kurdistan, while publicly professing to be friends of the United States, have in fact often been acting against the United States in cooperation with the rogue nation state of Iran and other designated terrorist organizations in violation of the laws of the United States; and have been defrauding the United States as spelled out in the Complaint filed in this case. I have viewed countless actual documents, some public and some not. Before I left government service, I resolved that if the opportunity ever came, I would do all that I could to assist the Kurdish people, who I grew to love. Though after government service I returned to the business community, I resolved to devote a substantial portion of the rest of my life to helping the underprivileged, including organizing and leading the largest non-government all-volunteer medical rescue mission to Haiti after its horrific earthquake.

My sole motivation was and is a principle I learned, and embraced, as an undergraduate student and amplified by the Presidents who I served. My most influential undergraduate professor, Stewart Grow, instilled in me an unshakeable desire to help those who cannot help themselves. From him I learned these principles: That God helps those who cannot help themselves, the Biblical injunction to speak up on behalf of those who are voiceless or unable to defend themselves in times of trouble (Proverbs 31:8), and Pearl Bucks' famous quote "The test of a civilization is in the way that it cares for its helpless members." This influence led to graduate studies in international security affairs, not law school, and to my government service, as an appointed and elected official at the local, state, and federal levels, and to years of

4 $w\delta$

non-profit involvement and leadership – and to helping the Kurdish people who, because of oppression and fear, are indeed effectively helpless to give voice to their plight.

While it may appear reasonable on the surface to assume our motivation is "political", given the political nature of the defendants and the scope of their activities, that assumption is grounded solely in unfounded speculation, not in fact. I cannot emphasize this point strongly enough! To say that my or our motivation in the Kurdistan issue is in any way "political" is absolutely an untruth: I have zero political motivation, only a sincere heartfelt desire to help those who truly cannot help themselves. Attorneys who continue to ascribe a political motivation have absolutely no basis for such unfounded and unsubstantiated statements. My humanitarian work is entirely independent of politics. No agency, official, or representative of any government, political party, or political organization or group – domestic or foreign – has ever has encouraged, funded, directed, sanctioned, or influenced my efforts to assist these victimized Kurdish people. No agency, official, or representative of any government, political party, or political organization – domestic or foreign – has made me or the Kurdistan Victims Fund any promises of compensation or other benefit or reward.

It is equally incorrect, and unfounded, to say I, or any of those helping, are financially paid. My total compensation (earned, accrued, paid, or promised) to date in this case is zero. The same is true for all volunteer helpers, attorneys and non-attorneys, that have assisted in this case. The freedom the Barzani regime enjoys was bought with the lives of American service members who died to end Saddam Hussein's murderous reign. For this regime to now systematically cheat the United States is a betrayal of those sacrifices and an act I find utterly and morally abhorrent.

5

True tyrants do not protect their people; they prey upon them. The Barzani's rule with the same monstrous disregard for human life that defined Saddam Hussein's murderous regime, turning the power of the state against its own citizens. The Barzani's legacy is one of unchecked cruelty, marked by the well-documented brutal silencing of journalists, the persecution of minorities, and the systematic bleeding of the region's resources for personal gain. They proved that the most dangerous enemy a people can face is a leader who views his own population as a threat to be neutralized.

Several years before the instant case was filed, I began to be approached by individuals that knew of my experience in Iraqi Kurdistan and my affinity for the Kurds and their plight. These individuals sought help for their families either living in Iraqi Kurdistan or for family members who had been forced by leaders of the Kurdistan Regional Government to leave Iraqi Kurdistan. Some of these Kurdish refugees have settled in the United States. One of those who approached me was the son of a Kurdish immigrant of many years who resided in a state located in the western United States. This man's father had been gunned down at his place of business in a Western U.S. State by assassins the son believed had been hired by the Barzani family that controlled Iraqi Kurdistan. Finding it difficult to believe that the Barzani's would dare to gun down one of their Kurdish expatriates in the United States, I sought out the FBI agent that had investigated the case and the state prosecutor. That FBI agent assured me that he was certain that the Barzani's had ordered the hit, but did not have sufficient proof to bring a criminal case. At that point I decided to make a real effort to obtain proof and assist victims of what I was convinced was a cruel and violent Iraqi Kurdish government that was enslaving its people. Based on my personal observations, interviews, review of documents, and conversations with government officials and law enforcement agents, I came to acknowledge the Barzani regime did

6

indeed involve an international criminal enterprise that extended its tenacles, and victims, far beyond Iraqi Kurdistan and into the United States.

The first step I took to obtain proof of Barzani actions was to travel, at my expense, to Europe and meet with Iraqi Kurdish expatriates and Kurdish journalists who said they had been forced out of Iraqi Kurdistan by the Barzani's. This also included present officials of the Barzani regime speaking openly to me in abject fear of disclosure, and exiled Barzani family members who spoke openly and candidly with me, frequently very emotionally and with many tears, but did so declaring their incessant fear of Barzani retribution for speaking with me, and sought my promise not to disclose their names.

This evidence, both documentary and anecdotal, courageously brought to me unsolicited by previously unknown individuals, conclusively demonstrates the immense harm inflicted upon, and within, the United States through systematic money laundering, fraud, tax evasion, and the calculated deception of U.S. policy officials. Some who traveled, at their expense, to meet with me are verified officials of the Barzani government, who feared for their lives if their names were disclosed. Sometimes I would neither ask nor record their names, to protect them. One KRG official told me he was speaking to me because the Barzani regime attempted to murder his wife.

After examining several hundred media reports and U.S. government investigative reports of Barzani corruption and human rights violations, I came to know I had greatly underestimated the magnitude, significance, and gravity of their misconduct. It was particularly troubling to me that its leader is Masrour Barzani, a U.S. green card holder who, in my view, and in his green card declaration to obey U.S. laws, owes true loyalty to this great nation. Americans' lives have been spent giving the Barzani family what is now modern Iraqi Kurdistan.

7 𝓈𝓂𝓁𝓈

One of the Kurdish expatriates that I met was Maki Revend, a Plaintiff in the instant case. I met with Mr. Revend in Germany, and with German police protection officers who accompany Mr. Revend everywhere, and learned that Mr. Revend had been the victim of several police-documented assassination attempts attributed to the Barzani's, and was under 24/7 protection by the German police. I also met with other Barzani victims living in several different countries in Europe who lived in fear of being killed by Barzani hired assassins, each of whom provided deeply detailed accounts and an overwhelming amount of narrative evidence to support their claims. Each of them encouraged and hoped for litigation in the United States and offered their assistance, so long as they remained anonymous lest their families become victims of Barzani retribution. My investigation also included back-channel consultations and non-attributable meetings with officials of the federal sovereign Republic of Iran, who shared detailed intelligence and documentation verifying the full scope of Barzani corruption and their brutal suppression of dissent. This was all done as a private American citizen who cares about the current plight of the Kurdish people.

After returning back to the United States, other Kurdish expatriates and American investigative journalists began to trust me and provide evidence of criminal behavior of the Barzani regime. After accumulating substantial factual material and documentary evidence, I decided to meet with my respected old friend, James Tate, advise him of what I had learned, and ask him to review whether legal relief might be available. and see if he and his law firm could help me to assist the victims of the Iraqi Kurdistan regime. With friends, we formed the volunteer organization Kurdistan Victims Fund to assist those in need and to make United States policy leaders, including Congress, aware of the enormity of misconduct and misinformation by

8

the Barzani regime operating as the Kurdistan Regional Government, over which the Barzani family exercises total authority and control.

Many victims of the Barzani Criminal Enterprise, from the Middle East, Europe, Asia, and the United States, apparently at personal risk, have contacted me unsolicited and provided relevant evidence. That happens on an almost weekly basis – even today. How they found my name I do not know, except through word of mouth among Kurd expatriates and Kurd family members in Kurdistan. Even former federal officials with information about the Barzani corruption have, of their own volition, contacted me to provide evidence and source recommendations.

I did not recruit anonymous individuals to assist in this litigation. To the contrary, over a period of years, individuals from the United States and abroad voluntarily and unsolicited sought me out because of my longstanding involvement with the Kurdish people and my more recent work through the Kurdistan Victims Fund. Many contacted me only after learning, through word of mouth or public reporting, of my humanitarian work and this litigation. Their assistance was entirely voluntary. Many stated that they would provide factual information, research leads, documents, or professional observations only if their identities remained confidential because they feared retaliation, intimidation, professional consequences, harm to family members, or physical danger if their identities became known. I neither solicited anonymous participation nor encouraged anonymity as a litigation strategy. Rather, anonymity was a condition imposed by many of those who came forward before they were willing to provide assistance.

Before receiving information from many of these individuals, I gave them my word that I would not disclose their identities without their consent because they represented that disclosure could subject them or their families to retaliation or other serious harm. I regarded that

9

commitment as fundamental to their willingness to come forward and, in good conscience, could not violate it.

Because those confidentiality concerns appeared genuine and were repeatedly expressed by individuals with firsthand knowledge of the alleged misconduct at issue, I honored the commitments I made to protect their identities. When transmitting factual materials, research leads, evidence, offender names, or preliminary draft material to Plaintiffs' counsel, I intentionally omitted identifying information concerning those individuals whenever disclosure was unnecessary to counsel's evaluation of the substance of the materials. My purpose was solely to protect individuals whom I believed faced genuine litigation-safety concerns. It was never my purpose to interfere with counsel's independent professional responsibilities, to conceal information from the Court, or to circumvent any obligation imposed by the Federal Rules of Civil Procedure. At no time did I believe that maintaining the confidentiality of individuals who voluntarily came forward would diminish Mr. Tate's professional accountability to the Court.

Mr. Tate traveled to my location and spent a week going over evidence that I obtained to support allegations in the Complaint. A number of those who offered assistance were lawyers, both domestic and foreign, who learned of the Complaint that we filed. Without exception, every lawyer that offered help insisted that their involvement remain confidential. I agreed to respect their request for confidentiality and have never violated it. A number of attorneys who offered assistance were lawyers that I personally believe to be highly competent, experienced attorneys. All attorneys have assisted us without compensation of any kind. Their sole motivation has been to help Kurdish victims of the Barzani's. I only sent attorney work product to Mr. Tate from attorneys that I believed to be bar members in good standing who had the highest reputations for competence and honesty. Being from outside the legal profession, I could

10

only accept the inputs of attorneys as procedurally appropriate or substantively valid. Being outside the legal profession, I reasonably believed the volunteer attorneys who assisted were competent members of the bar and my reliance on their legal input was absolute, reasonable, and conducted in complete good faith, and with gratitude. If there are any unintended gaps, procedural imperfections, or errors within motion text, they are entirely well-intentioned human errors born of the urgency of protecting lives and the high-stakes nature of gathering international evidence. They are not an attempt to obscure the truth or mislead, nor used to defeat the pursuit of baseline justice.

I did not ask Mr. Tate to refrain from learning the identities of any source. Rather, because I had already undertaken commitments of confidentiality to numerous individuals before transmitting their information, I simply did not disclose identifying information that I had promised to protect. Because I intentionally did not transmit identifying information concerning many upstream contributors, Mr. Tate never learned the identities of those individuals and therefore could not disclose information that had never been communicated to him. Accordingly, when the Court later requested the identities of all persons involved in preparing the motions, I understood that Mr. Tate could truthfully identify only those individuals whose identities had actually been communicated to him.

Let me be unequivocally clear: there is no political agenda, no political funding, no hidden motive, and no overarching political purpose behind our actions. Defense counsel has repeatedly suggested that motivation is political. It unequivocally is not. Nor is there any personal animus against any defendant.

We are compellingly motivated and inspired by a commitment to help those in need, independent of partisan conflicts or government influence, nor do we allow partisan interests to

11

influence our mission.  Our work begins and ends solely with addressing human need, completely insulated from the political forces of any nation.  Any attempt to frame our work through a political lens is entirely groundless.  We refuse to let our humanitarian mission be co-opted, defined, or distracted by political forces.  We remain fiercely independent, focused solely on and committed to the oppressed Kurdish people we serve.

My decades of service to this nation give me a clear perspective on what truly serves American interests, and what betrays them.  For Barzani attorneys to label the Barzani regime a vital U.S. ally is grossly misleading.  It is the ordinary Kurdish people as a whole, not their corrupt government, who are a vital U.S. ally.  The regime's false protestations notwithstanding, their behavior amounts to an outright fleecing of the U.S. funding apparatus.  Their actions represent an unacceptable subversion of U.S. goals, and their disregard for our shared strategic alignment is utterly indefensible.  This is not a political statement; it is an objective assessment of a profound betrayal.  Furthermore, nothing contained within this declaration relies on conjecture or speculation.  Except where I expressly identify information as having been reported to me by others, the statements contained herein are based upon my personal knowledge.  Every statement made herein is anchored in verifiable fact.  The defense's continuous effort to recast this case as a political dispute is a cynical distraction from the regime's atrocities.  By prioritizing political smoke screens over factual evidence, counsel does a grave disservice to the integrity of this Court, the plight of the Kurdish victims, and the interests of the United States.

I have honored these commitments throughout this litigation because I genuinely believe, based on my personal observations, interviews, review of documentary evidence, and conversations with individuals who came forward only after receiving my assurance that their identities would remain confidential, that disclosing their identities could expose them or

12

members of their families to retaliation, physical danger, intimidation, exile, professional retaliation or loss of employment, or other serious adverse consequences. I therefore regarded those commitments as solemn obligations and have acted consistently with them throughout this litigation. After years of firsthand experience, I genuinely believed people's safety and livelihoods could be endangered if I broke my word.

I have authorized Tate Bywater to provide my contact information to the Court under seal as authorized by the Court.

Executed this ___27___ day of June, 2026.

_Stephen M. Studdert_
Stephen M. Studdert

Sworn and subscribed to before me this ___27___ day of June, 2026.

_Esmeralda Hurt_
Notary Public

My commission expires: __November 4 2029__

Seal:

ESMERALDA HURT
NOTARY PUBLIC · STATE OF NEVADA
Appointment Recorded in Clark County
No: 21-9342-01
Expires November 14, 2029

13