# EXHIBIT A

# STEPHEN M. STUDDERT

July 28, 2026

James R. Tate, Esq.
Counsel for Plaintiffs
Tate Bywater
2740 Chain Bridge Road
Vienna, Virginia 22181

Re:    Response to Judge Moss Minute Order Post July 22, 2026 Hearing

Dear Mr. Tate:

You asked me to set out, in writing, why our information sources and legal assistance volunteers have asked me to ensure that their participation in the Barzani case remain anonymous. Since the time that I decided to do all that I can to assist the Kurdish victims, I have given my word to keep the identities of those assisting with the case completely unnamed. Up to this point, I have kept my word and have not revealed their identities to anyone, including you and your firm.

I respect this Court and Judge Moss, and I do not take lightly any request from the Court. I have reviewed my testimony at the July 22, 2026, hearing. The Court asked me if I could reveal the names, under seal, of attorneys practicing in the United States assisting with this case. I answered that I guess that I could. Since the July 22nd hearing I have thought carefully about revealing their names, even under seal, and realized that I just cannot break my word to these lawyers or any of the other volunteers that are assisting us. I have always done my best to be honest and keep my word. I believe the trust that the volunteers had and have in my word is the reason they have been willing to donate their time, provide evidence and input and collaboration, and help us to assist the Kurdistan victims who really can't help themselves.

Immediately after the hearing on July 22nd I sought input from a number of our volunteers and also the Plaintiffs on the question of identity disclosure under seal. Without exception, each of the volunteers I contacted strongly opposed disclosure, and reminded me of my promise to keep their identities confidential. The volunteers I contacted included U.S. lawyers and paralegal researchers who have been assisting us and are familiar with the trauma and fear that the Kurdistan people suffer on a daily basis.

The courageous individuals who have helped us, lawyers and others, live with a well-founded, justifiable, and constant fear that they or their family members will be kidnapped or tortured or killed, that they will lose their employment, or that their businesses will be seized or crushed by the Barzani regime. The record demonstrates that this fear is neither imaginary, exaggerated, nor theoretical; it reflects concrete, documented risks of physical violence, professional ruin, and economic confiscation.

I have communicated with each of the Plaintiffs on this subject. As they have made clear all along, they live in a well-founded and constant fear of the Barzanis. Maki is the victim of four documented assassination attempts. Shakhwan's sister was incinerated by the Barzani regime.

Mr. James R. Tate
Page Two

Their fear is very real, painful, personal, and omnipresent. They want to protect our volunteers and do not want any names revealed to any government.

For the Kurdish volunteers, their own experience is primarily with the Kurdistan court system, which the U.S. State Department has identified as corrupt and subject to political control. Beyond Kurdistan, Barzani associates, using one attorney and partially orchestrated at least by Defendants Jonathan Moore and Valerie Cupp, have sued Maki seventeen times in German courts in a campaign of harassment designed to weaken him. The U.S. lawyers are familiar with successful hacks of records at the highest level of the United States Government. The only sure security is strict anonymity and zero disclosure. To that end, I have never revealed to you or anyone in your firm the identity of our volunteers who have worked hard, gathered evidence, and assisted us with the legal papers in this case.

The Barzanis kill and torture. The U.S. Government record of this is extensive. Even one of our witnesses, Sidqi Bradosti, an American citizen, was jailed and held for a prolonged period without trial and was tortured, and his wife was threatened, while held by the Barzani regime. That is present-day history, not distant history.

Beyond individual acts of violence, the U.S. Government and United nations agencies and others have extensively documents the Barzani regime's severe human-rights and civil-rights abuses, including arbitrary detention, torture, extrajudicial punishment, and systematic repression of perceived opponents and their families. This broader pattern of abuse makes the risk to our sources and volunteers both more credible and more grave.

The information these volunteers and sources have provided exposes extraordinary crimes, including the theft of hundreds of millions, if not billions, of dollars from the United States Government. When I was sworn in as an Assistant to the President of the United States, I took a constitutional oath to protect and defend the Constitution of the United States. That is precisely what I am attempting to do here as an unpaid private citizen: protect individuals who have come forward at great personal risk with information concerning massive theft from and fraud of the United States Government.

My own experience, training, and knowledge of advanced persistent threats ("APT") leads me not to trust the security of court information systems for material of this life-and-death sensitivity. When in government service I received frequent and often classified security briefings on the magnitude of ever-worsening APT risk. State Department, intelligence community, and FBI agent friends have kept me updated. The largest data-exfiltration hack in history was of the U.S. Office of Personnel Management (OPM), where the personnel files of over 22 million individuals, including highly sensitive background-investigation and security-clearance records (SF-86 forms) of current and former federal employees, job applicants, contractors, and listed family members, were stolen by Chinese state-sponsored actors. My own file was among those compromised. Two of my own former Members of Congress, Frank Wolf

Mr. James R. Tate
Page Three

and Chris Stewart, have shared they were warned by federal agents as to the extreme vulnerability of government computer files. Former Rep. Stewart and I have discussed this Barzani peril and criminality as recently as the day after the July 22 hearing. (Rep. Stewart served as senior member of the House Permanent Select Committee on Intelligence, chaired the House Intelligence Committee's Department of Defense Intelligence subcommittee, and served on the Counterterrorism, Counterintelligence, and Counterproliferation subcommittee and the State and Foreign Operations Subcommittee of the House Appropriations Committee. He knows what he is talking about!)

The federal Judiciary itself has publicly acknowledged that its case-management systems face "escalated cyberattacks of a sophisticated and persistent nature" and that CM/ECF and PACER are "outdated, unsustainable due to cyber risks, and require replacement."

The combination of all these facts heightens, rather than diminishes, the already well-founded fear among our sources and volunteers that any identifying information – however sealed or restricted – could ultimately be compromised and used to enable lethal retaliation, professional destruction, or economic expropriation by the Barzani regime or its partners.

I gave these individuals my word that their identities would be protected. I regard that commitment as a matter of personal honor and professional obligation, and I cannot in good conscience violate the trust they placed in me when they agreed to assist us without compensation and at great personal risk. Revealing their identities, even under seal, would expose them to a real and well-founded risk of lethal retaliation. I simply cannot breach my word of honor.

I have the highest respect for Judge Moss and for this Court. My inability to disclose these identities is not a matter of disrespect, but of a solemn commitment I made to people whose safety remains at genuine risk. Their safety is my unwavering responsibility. In short, the anonymity protocols were not optional. They were, and remain, necessary to keep sources and their families alive, employed, and free from harassment or extrajudicial injury, or worse.

Respectfully,

Stephen M. Studdert